JOHN M. MCCOY III (Cal. Bar No. 166244)
E-mail: mccoyj@sec.gov
DAVID J. VAN HAVERMAAT (Cal. Bar No. 175761)
E-mail: vanhavermaatd@sec.gov
KELLY BOWERS (Cal. Bar No. 164007)
E-mail: bowersk@sec.gov
ALKA N. PATEL (Cal. Bar No. 175505)
E-mail: patelal@sec.gov
CATHERINE W. BRILLIANT (Cal. Bar No. 229992)
E-mail: brilliantc@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Rosalind Tyson, Acting Regional Director
Andrew Petillon, Associate Regional Director
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL T. UBERUAGA, EDWARD P. RYAN, PATRICIA FRAZIER, TERESA A. WEBSTER, and MARY E. VATTIMO,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27 of

-1-

the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78(u)(d)(1), 78u(d)(3)(A), 78u(e) & 78aa. Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

2. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district, and four of the Defendants reside and/or are located in this district.

## SUMMARY

3. This case involves false and misleading statements by five former officials of the City of San Diego (the "City") during 2002 and 2003 in connection with the City's municipal securities offerings that raised over $260 million, continuing bond disclosures, and 2003 rating agency presentations. These officials were: Defendants Michael T. Uberuaga ("Uberuaga"), the former City Manager; Edward P. Ryan ("Ryan"), the former City Auditor and Comptroller; Patricia Frazier ("Frazier"), the former Deputy City Manager for Finance; Teresa A. Webster ("Webster"), the former Assistant City Auditor and Comptroller; and Mary E. Vattimo ("Vattimo"), the former City Treasurer.

4. During 2002 and 2003, the five Defendants knew, among other things, that the City faced severe difficulty funding its future pension and retiree health care obligations unless new revenues were obtained, pension and health care benefits were reduced, or City services were cut. They also knew that the City's looming financial crisis resulted from (1) the City's intentional under-funding of its pension plan since fiscal year 1997; (2) the City's granting of additional retroactive pension benefits since fiscal year 1980; and (3) the City's use of the pension fund's assets to pay for the additional pension and retiree health care benefits since fiscal

year 1980.

5. Nevertheless, Uberuaga, Ryan, Frazier, Webster, and Vattimo acted recklessly in failing to disclose these and other material facts to investors and to rating agencies.

## DEFENDANTS

6. Michael T. Uberuaga is a resident of Meridian, Idaho. Uberuaga was the City's Manager from November 1997 until April 2004.

7. Edward P. Ryan is a resident of El Cajon, California. Ryan was the City's Auditor and Comptroller from 1982 until February 2004. He is a licensed Certified Public Accountant in California.

8. Patricia Frazier is a resident of San Diego, California. Frazier was the City's Deputy City Manager for Finance from 1997 until 2005.

9. Teresa A. Webster is a resident of San Diego, California. Webster was the City's Assistant Auditor and Comptroller from December 1994 to February 2004 and the acting Auditor and Comptroller from February 2004 to March 2005. Webster was also a trustee of the City's pension plan from 1995 until March 2005. She is also a Certified Public Accountant in California.

10. Mary E. Vattimo is a resident of San Diego, California. Vattimo was the City's Treasurer from June 2001 until January 2005. Vattimo was also a trustee of the City's pension plan from 2001 until March 2005.

## RELATED PARTIES

11. The City of San Diego, California, is a California municipal corporation with all municipal powers authorized by the California Constitution and laws, including the power to issue debt. The City is the seventh most populous city in the country, with approximately 1.3 million residents.

12. San Diego City Employees' Retirement System ("CERS") is a multiple-employer, defined benefit plan established by the City to provide retirement benefits to its members, *i.e.*, City employees and their beneficiaries.

## THE CITY'S PENSION AND RETIREE HEALTH CARE CRISIS

**A.  The City's Pension Plan**

13.  The City provides a defined benefit pension plan and retiree health care benefits to its employees through CERS. The actuary retained by CERS determines each year the value of the plan's assets and liabilities and the required pension contributions. The City and the employees each pay a portion of the required contributions.

14.  In the disclosure to investors of the City's pension obligations and funding of those obligations, at least three concepts were material:

    (a)  CERS's funded ratio, *i.e.*, the ratio of its assets to liabilities;

    (b)  The City's unfunded liability to CERS, *i.e.*, the dollar shortfall between CERS's assets and liabilities; and

    (c)  The City's net pension obligation, also called the NPO, *i.e.*, the cumulative difference between what the City actually contributed to CERS and the amount that the City would have contributed had it conformed to a funding method recognized by the Government Accounting Standards Board ("GASB"). GASB is the organization that establishes standards of state and local governmental accounting and financial reporting.

15.  In 2001 and 2002, as shown on the chart below, as calculated by the CERS actuary, CERS's funded ratio fell substantially, and the City's unfunded liability and net pension obligation increased dramatically. In addition, in February 2003, as also shown on the chart below, the actuary projected that CERS's funded ratio would continue to fall and the City's unfunded liability and net pension obligation would continue to increase substantially:

/ / /
/ / /
/ / /
/ / /

| Fiscal Year ending | Funded Ratio | Unfunded Liability | Net Pension Obligation |
|---|---|---|---|
| 6/30/00 | 97.3% | $69 million | $23.05 million |
| 6/30/01 | 89.9% | $284 million | $30.98 million |
| 6/30/02 | 77.3% | $720 million | $39.23 million |
| 6/30/09 projected | 65.6% | $2 billion | $446 million |

16. The City conducted its own analysis in mid-2003, which yielded similar projections.

17. This fall in CERS's funded ratio and the increase in the City's unfunded liability and net pension obligation was the result of many factors, including:

    (a) CERS twice agreed to permit the city to underfund its annual contributions to CERS, as further alleged below;

    (b) The City used so-called surplus earnings to pay additional pension and other non-pension benefits on behalf of CERS's members, as further alleged below (surplus earnings are earnings above CERS's actuarially projected 8% return rate, which pension plans typically retain to support the plan's financial soundness and to make up for years in which earnings fall short of the assumed return rate); and

    (c) CERS suffered substantial investment losses in fiscal years 2001 and 2002 - $193.2 million in fiscal year 2001 and $364.8 million in fiscal year 2002.

///
///
///
///

### 1. **CERS Agrees To Two Proposals By The City Permitting The City To Underfund Its Annual CERS Contributions**

#### a. **CERS Agrees To The City's Proposal In 1997 To Underfund Its Pension Obligations - "Manager's Proposal 1"**

18. In fiscal year 1996, the City agreed to increase significantly and retroactively all employees' pension benefits. Because the City could not afford to fund the cost of the benefit increases, it made them contingent on CERS's agreement to the City's underfunding of its annual contribution to CERS.

19. In fiscal year 1997, the City and CERS entered into an agreement, referred to as Manager's Proposal 1, that allowed the City to intentionally underfund its annual liability to CERS in fiscal years 1997 through 2006. This funding method was not approved by GASB. Manager's Proposal 1 also required that if CERS's funded ratio fell below 82.3%, the City would have to increase its CERS contribution.

20. As part of Manager's Proposal 1, CERS, at the City's request, recorded $39.2 million from the surplus earnings as a net pension obligation "reserve" or "NPO Reserve." The amount represented the difference between what the City would have contributed under a GASB-accepted funding rate and what the City actually contributed under Managers Proposal 1. The NPO Reserve, despite its name, was not a true reserve because its creation and funding had no effect on CERS's funded ratio or the City's unfunded liability to CERS.

#### b. **CERS Agrees To The City's Proposal In 2002 To Extend The Time It Would Underfund Its Pension Obligations - "Manager's Proposal 2"**

21. In the second half of fiscal year 2002, the City agreed again to increase pension benefits for fiscal year 2003. From as early as October 2001,

however, the City was aware that CERS's funded ratio would likely fall below the 82.3% floor established by Manager's Proposal 1, which would require the City to increase its annual fiscal year 2004 contribution to CERS by at least $25 million. CERS's annual actuarial report as of June 30, 2001, which was issued on February 12, 2002, also confirmed this downward trend in the funded ratio.

22. Concerned about likely having to pay the additional amount, the City conditioned the pension benefit increases on the City's obtaining from CERS relief from the floor of Manager's Proposal 1. Those additional pension benefits included increasing the general members' retirement multiplier from 2.25% to 2.5%. Significantly, this increase raised the Defendants' pensions by thousands of dollars each year. In November 2002, the City and CERS (including Webster in her role as a CERS Board member) agreed to Manager's Proposal 2, which provided that once CERS's funded ratio fell below the 82.3% required by Manager's Proposal 1, the City would have five years to increase its CERS contributions to reach a GASB-accepted funding rate. Manager's Proposal 2 thus effectively allowed the City an additional five years to underfund its annual CERS contribution.

**2. The City Uses Surplus Earnings For Non-Pension Purposes**

23. For the purpose of the annual actuarial calculations, the CERS actuary assumed a projected 8% rate of return. Any actual earnings above 8% were considered to be surplus earnings to offset years in which the earnings fell below the assumed return rate.

24. Since the early 1980s, the City used CERS's surplus earnings to fund an ever-increasing amount of additional pension and non-pension benefits for CERS members including, but not limited to, making an extra monthly pension payment each year known as the "thirteenth check," paying retiree health care benefits, and funding certain portions of the employee pension contributions. In total, the City used surplus earnings of $150 million as of the end of fiscal year

2001 and an additional $25 million as of the end of fiscal year 2002 primarily to fund non-pension benefits for CERS members. From fiscal years 1997 through 2003, this use by the City of surplus earnings accounted for 17% of the increase in the City's unfunded liability to CERS.

**B.   Retiree Health Care Benefits**

25.   As of February 2003, the present value of the City's liability for future health care was in excess of $1.1 billion. The City was paying retiree health care benefits out of CERS's surplus earnings.

### THE DEFENDANTS' INVOLVEMENT IN THE FALSE AND MISLEADING DISCLOSURES

**A.   The City's 2002 and 2003 Municipal Securities Offerings and Continuing Disclosures**

26.   In 2002 and 2003, the City conducted five municipal securities offerings totaling $261,850,000. These offerings were entitled:

- $25,070,000 Public Facilities Financing Authority of the City of San Diego Lease Revenue Bonds, Series 2002B (Fire and Safety Project) (June 2002);
- $93,200,000 City of San Diego, 2002-03 Tax Anticipation Notes Series A (July 2002);
- $15,255,000 City of San Diego/Metropolitan Transit Development Board Authority 2003 Lease Revenue Refunding Bonds (San Diego Old Town Light Rail Transit Extension Refunding (April 2003);
- $17,425,000 City of San Diego 2003 Certificates of Participation (1993 Balboa Park/Mission Bay Park Refunding) (May 2003); and
- $110,900,000 City of San Diego 2003-04 Tax Anticipation Notes Series A (July 2003).

27.   For each of the offerings, the City issued offering documents that purported to disclose the material information regarding the offering and the City

1  in appendix A, prepared and updated by City officials in the Financing Services
2  Department. The 2002 offering documents included the City's fiscal year 2001
3  audited financial statements as appendix B, prepared by the Auditor's office and
4  the City's outside auditor. The 2003 offering documents included the City's fiscal
5  year 2002 audited financial statements as appendix B, prepared by the Auditor's
6  office and the City's outside auditor. Information regarding the City's pension and
7  retiree health care obligations was provided in both appendices A and B in each of
8  the offerings.
9       28.   During 2002 to 2003, pursuant to its contractual obligation, the City
10 also filed annual disclosures (otherwise called continuing disclosures) relating to
11 its $2.29 billion in outstanding bonds for the purpose of updating investors on the
12 state of the City's finances. City officials in the Financing Services Department
13 coordinated, reviewed, and filed the 2003 continuing disclosures. Most of these
14 continuing disclosures included the same appendices A and B that were contained
15 in the City's bond offering documents.

**B.   Rating Agency Presentations**

17      29.   The City made presentations to the rating agencies on a yearly basis,
18 both in connection with specific bond offerings and to update the rating agencies
19 on the City's general credit. In 2003, upon the rating agencies' request, the City
20 included information about its pension liabilities in these presentations.

**C.   The City's False And Misleading Disclosures**

22      30.   The City's bond offering documents, continuing disclosures and
23 rating agency presentations included certain information about the City's then
24 current unfunded liability and funded ratio. However, these disclosures omitted
25 other material information.
26      31.   Specifically, the disclosures in appendix A of the City's bond offering
27 documents and continuing disclosures were false and misleading because:
28

1  (a) There was no disclosure of the City's looming financial crisis
2  or that it resulted from (i) the City's intentional under-funding of its pension plan
3  since fiscal year 1997; (ii) the City's granting of additional retroactive pension
4  benefits since fiscal year 1980; and (iii) the City's use of the pension fund's assets
5  to pay for the additional pension, non-pension, and retiree health care benefits
6  since fiscal year 1980;
7  (b) There was no disclosure that certain sums relating to a lawsuit
8  settlement were excluded from the calculation of the unfunded liability, which, if
9  included, would have substantially increased such unfunded liability;
10  (c) There was no disclosure in 2003 that the City's unfunded
11  liability to CERS was expected to dramatically increase, from $720 million at the
12  beginning of fiscal year 2003 to an estimated $2 billion at the beginning of fiscal
13  year 2009 and its estimated annual pension contribution would grow from $51
14  million in 2002 to $248 million in 2009;
15  (d) There was no disclosure that Manager's Proposal 1 and
16  Manager's Proposal 2 were significant contributors to the projected increases in the
17  City's unfunded liability and annual pension contribution to CERS, nor was there
18  any disclosure that Webster voted to approve Manager's Proposal 2 in her capacity
19  as a CERS Board member knowing that its enactment would continue the City's
20  underfunding of CERS while increasing her pension; and
21  (e) There was no disclosure that (i) the estimated present value of
22  the City's liability for retiree health care was $1.1 billion; (ii) the retiree health care
23  expense was being paid with surplus earnings from CERS; (iii) this surplus
24  earnings reserve was running out of money; and (iv) the City would have to begin
25  paying this substantial expense out of its own budget.
26  32. Disclosures in appendix B of the City's bond offering documents and
27  continuing disclosures were false and misleading because:
28

1  (a) It stated that the City's NPO was funded in a reserve, when, in fact, it was not;

2  (b) The City's 2002 financial statements reported that the City's NPO was $39.2 million as of the end of fiscal year 2001, but failed to disclose that at the time of the 2003 offerings, the City had already calculated that its NPO for fiscal year 2003 would be $51.9 million;

(c) The 2002 financial statement footnotes falsely stated that the City's method for funding CERS included "a provision to assure the funding level of [CERS] would not drop below a level [CERS's actuary] deem[ed] reasonable to protect the financial integrity of [CERS]." In fact, this statement was false and misleading in that CERS's funded ratio at the end of fiscal year 2002 was 77.3%, which was less than the 82.3% that the CERS actuary deemed reasonable. Further, the footnote failed to disclose that (i) Manager's Proposal 1 had established a trigger level of 82.3% for the funded ratio; (ii) by the latter half of fiscal year 2002, the City was aware that CERS funded ratio would likely fall below this trigger level; and (iii) if Manager's Proposal 2 were not approved, the City would have had to make a large additional payment to CERS;

(d) The 2002 financial statement footnotes also falsely stated that CERS's actuary believed that the City's funding method was an excellent method for the City and was superior to certain GASB-accepted funding methods. In fact, this statement was false and misleading in that the actuary ceased to have this view once CERS's funded ratio fell below 82.3%;

(e) There was no disclosure in the 2002 financial statement footnotes that Manager's Proposal 2 was a significant contributor to the projected increases in the City's unfunded liability and annual pension contribution to CERS, nor was there any disclosure that Webster voted to approve Manager's Proposal 2 in her capacity as a CERS Board member knowing that its enactment would continue the City's underfunding of CERS while increasing her pension;

-11-

    (f) The 2001 financial statement footnotes also falsely stated that the CERS's actuary "is in the process of requesting the GASB to adopt the [City's] funding method as an approved expending method which would eliminate any reported NPO." In fact, although the CERS actuary had initiated communication with GASB, GASB had never responded; and

    (g) The footnote disclosures for the City's financial statements regarding the City's retiree health care obligations, which stated that the City provided such benefits to certain retirees at a cost of $7.2 million in fiscal year 2001 and $8.9 million in fiscal year 2002 and that "expenses for [such retiree health care benefits] are recognized as they are paid." This statement was misleading because there was no disclosure that the retiree health care expense was being paid with surplus earnings from CERS; that this surplus earnings reserve was running out of money; and that the City would have to begin paying this substantial expense out of its own budget.

  33. In the 2003 rating agency presentations, the City failed to disclose, among other things, the material facts identified in paragraph 31.

### D. Uberuaga, Ryan, Frazier, Webster, and Vattimo Were Reckless In Making the False and Misleading Disclosures

  34. Uberuaga, Ryan, Frazier, Webster, and Vattimo had substantial knowledge of the City's pension and retiree health care obligations. Uberuaga, Ryan, Frazier, Webster, and Vattimo were all aware that Manager's Proposal 2 would allow the City to continue to underfund CERS while at the same time increase their pensions. Additionally, they were all aware of (a) the findings of a blue ribbon committee in April 2002 that raised concerns about the City's pension and retiree health care liabilities; and (b) CERS's response to the blue ribbon committee report in February 2003, which highlighted the true reasons for the pension underfunding and further included other relevant information pertaining to the projected NPO. The CERS response also stated that the City was not making

any contributions to CERS to pay for its retiree health care liability, that CERS had been paying for this liability with money in a reserve funded with CERS's surplus earnings from prior years, that the reserve would be depleted by FY 2006, and that in FY 2006, the City would have to pay an estimated $15 million for retiree health care.

35. Additionally, Vattimo and Webster were CERS trustees from 2001 to 2005 and 1995 to 2005, respectively. In that role, both Vattimo and Webster received CERS's actuarial reports and hence were very familiar with the pension underfunding issue, reasons for approving Managers Proposals 1 and 2, and the reasons for the underfunding. Vattimo and Webster were advised in March 2003 by CERS's counsel to nullify Managers Proposal 2 due to its questionable legality.

36. Despite this knowledge, Uberuaga advised the City Council on the issuance of the municipal securities. The City Council delegated the preparation of the final official statement to Uberuaga as the City Manager. Uberuaga recklessly certified in writing that appendix A in the May 2003 Balboa Park/Mission Bay Park Refunding bond offering documents did not contain any false or misleading statements. Uberuaga knew or was reckless in not knowing that this certification was false.

37. Ryan signed the City's FY 2001 and FY 2002 Comprehensive Annual Financial Reports, representing that "[a]ll disclosures necessary to enable the reader to gain an understanding of the City's, and its related agencies', financial activities have been included." Ryan was also one of the signatories to the management representation letters to the outside auditor in FYs 2001 and 2002, in which he confirmed that he was responsible for the City's financial statements and that the financial statements fairly presented the City's financial position. Ryan was reckless in failing to ensure that these representations were true.

38. Frazier oversaw the preparation of the City's appendix A, which contained some of the misleading disclosures, and participated in the City's rating

agency presentations. Accordingly, she knew or was reckless in not knowing that the disclosures in the bond offerings, continuing disclosures and rating agency presentations were misleading. Nevertheless, she recklessly certified that appendix A included in the 2002 Fire and Safety bond offering and the 2003 Balboa Park offering did not contain any false or misleading statements. She was also reckless in signing five continuing disclosures in FY 2003 in which appendix A was included, and in reviewing and making presentations to the rating agencies.

39.    Webster recklessly participated in making false and misleading statements in the City's disclosures and in the rating agency presentations. Webster reviewed the relevant disclosures in appendix B, including the pension footnotes in the City's financial statements. She knew or was reckless in not knowing that the statements contained in appendix B were false and misleading. Nevertheless, she failed to correct the misstatements. Additionally, Webster made oral presentations on the pension plan before the rating agencies in 2003 and fielded numerous questions on that topic.

40.    Vattimo recklessly participated in making false and misleading disclosures to investors and rating agencies. Vattimo was a member of the transactional financing team that prepared the City's offering documents. The team, consisting of City officials and outside retained consultants, met several times to review, discuss, and ultimately finalize the offering documents at "page-turner meetings." Vattimo also reviewed and edited appendix A as it was updated periodically within the Financing Services Department. Vattimo signed closing letters for two bond offerings in FYs 2002 and 2003 (specifically, the 2002 and 2003 Tax Anticipation Notes) representing that appendix A did not contain any false or misleading statements, when, in fact, it did. She also signed continuing disclosures for six prior bond offerings in FY 2003, which contained appendices A and B. Finally, Vattimo edited the 2003 presentation to the rating agencies relating to the City's pension obligations and participated in other parts of the presentation.

E. **The City's Voluntary Disclosure Results In The Lowering Of The Ratings On The City's Bonds**

41. The City eventually filed a Voluntary Report of Information on January 27, 2004, which disclosed information regarding CERS's current and estimated future funded status, the City's current and estimated future liabilities to CERS; the reasons for the substantial decrease in CERS's funded ratio and increase in the City's liability to CERS; and the City's previous use of CERS funds to pay for retiree health care and the City's estimated future liabilities for retiree health care.

42. Shortly after the disclosures in the Voluntary Report, the rating agencies lowered their ratings on the City's bonds.

**FIRST CLAIM FOR RELIEF**
**Violations Of Section 17(a) Of The Securities Act**
**Against Defendants Uberuaga, Ryan, Frazier, Webster and Vattimo**

43. The Commission realleges and incorporates by reference paragraphs 1 through 42 above.

44. Defendants Uberuaga, Ryan, Frazier, Webster, and Vattimo, and each of them, by engaging in the conduct described above, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:

    a. with scienter, employed devices, schemes, or artifices to defraud;

    b. obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c. engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the

purchaser.

45. By engaging in the conduct described above, Defendants Uberuaga, Ryan, Frazier, Webster, and Vattimo violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SECOND CLAIM FOR RELIEF
### Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 Thereunder Against Defendants Uberuaga, Ryan, Frazier, Webster and Vattimo

46. The Commission realleges and incorporates by reference paragraphs 1 through 42 above.

47. Defendants Uberuaga, Ryan, Frazier, Webster, and Vattimo, and each of them, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

    a.    employed devices, schemes, or artifices to defraud;

    b.    made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    c.    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

48. By engaging in the conduct described above, Defendants Uberuaga, Ryan, Frazier, Webster, and Vattimo violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

///

///

## V.

Grant such other and further relief as this Court may determine to be just and necessary.

DATED: April 7, 2008

_____
DAVID J. VAN HAVERMAAT
Attorney for Plaintiff
Securities and Exchange Commission

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
SECURITIES AND EXCHANGE COMMISSION

**DEFENDANTS**
MICHAEL T. UBERUAGA, EDWARD P. RYAN, PATRICIA FRAZIER, TERESA A. WEBSTER, and MARY E. VATTIMO

(b) County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant ADA COUNTY, IDAHO
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

08 APR -7 PM 12:09
CLERK, U.S. DISTRICT
SOUTHERN DISTRICT OF CALIFORNIA
BY: ____ DEPUTY

08 CV 0625 DMS LSP

(c) Attorney's (Firm Name, Address, and Telephone Number)
David J. Van Havermaat    Tel: (323)965-3998
Securities and Exchange Commission
5670 Wilshire Blvd., 11th Fl., Los Angeles, CA 90036

Attorneys (If Known)
(See Attachment to Civil Cover Sheet)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)
- [X] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS – PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

**TORTS – PERSONAL INJURY**
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence
- **Habeas Corpus:**
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- [X] 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)
- [X] 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. §77q(a), 15 U.S.C. §78j(b), and 17 C.F.R. §240.10b-5.
Brief description of cause:
Securities Fraud

## VII. REQUESTED IN COMPLAINT:
- ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
- DEMAND $ _____
- CHECK YES only if demanded in complaint:
- JURY DEMAND: ☐ Yes [X] No

## VIII. RELATED CASE(S) IF ANY
(See instructions)
JUDGE Hon. Roger T. Benitez    DOCKET NUMBER 06-CR-0043-BEN

DATE 04/07/2008
SIGNATURE OF ATTORNEY OF RECORD
David J. Van Havermaat /s/

**FOR OFFICE USE ONLY**
RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**ORIGINAL**

**ATTACHMENT TO CIVIL COVER SHEET**
*Securities and Exchange Commission vs. Michael T. Uberuaga, et al.*

**Mary E. Vattimo**

David Hahn, Esq.
Hahn & Adema
501 West Broadway, Suite 1600
San Diego, CA 92101
Tel: (619) 235-2100
Fax: (619) 235-2101
dhahn@hahnadema.com

**Teresa A. Webster**

Frank T. Vecchione, Esq.
105 W. F Street, Suite 215
San Diego, CA 92101
Tel: (619) 231-3653

**Michael T. Uberuaga**

Robert J. Lauchlan, Esq.
McKenna Long & Aldridge LLP
750 B Street, Suite 3300, Symphony Towers
San Diego, CA 92101
Tel: (619) 595-5419
Fax: (619) 595-5450
rlauchlan@mckennalong.com

**Patricia Frazier**

Thomas W. McNamara, Esq.
La Bella & McNamara, LLP
401 West A Street, Suite 1150
San Diego, CA 92101
Tel: (619) 696-9200
Fax: (619) 696-9269
tmcnamara@labellamcnamara.com

**Edward P. Ryan**

Frank J. Ragen, Esq.
105 West F. Street, Suite 215
San Diego, CA 92101
Tel: (619) 231-4330