David A. Hahn, SBN 125784
HAHN & ADEMA
501 West Broadway, Suite 1600
San Diego, California 92101-8474
Telephone (619) 235-2100
Facsimile  (619) 235-2101

Specially Appearing for Defendant
MARY E. VATTIMO

### UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 08-CV-0625 DMS LSP |
| Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT MARY VATTIMO'S MOTION TO DISMISS** |
| v. | |
| MICHAEL T. UBERUAGA, EDWARD P. RYAN, PATRICIA FRAZIER, TERESA A. WEBSTER, AND MARY E. VATTIMO, | Date: November 7, 2008<br>Time: 1:30 p.m.<br>Dept.: Courtroom 10 |
| Defendant. | Judge: Hon. Dana M. Sabraw |

## I.   INTRODUCTION

The SEC alleges two claims against Ms. Vattimo and the other defendants -- one under section 17(a) of the Securities Act of 1933 and another under section 10(b) of the Securities Exchange Act of 1934 and Rule 10-b-5 thereunder. The SEC has not, however, pled facts that if proven would show that Ms. Vattimo violated either statutory section or Rule. Under both claims, the SEC must prove, among other things, materiality. Even when considered at this motion to dismiss stage, the alleged omissions regarding the City pension fund are immaterial as a matter of law, most clearly as to the two Tax Anticipation Notes ("TANs") offerings. Those offerings represent $204.1 million of the $261.85 million principal amount (78%) of the five subject offerings and were the only two subject offerings for which Ms. Vattimo signed a closing certificate. As further described herein, the TANs were one year notes secured by dedicated property tax revenues

1 and were repaid from a separate property tax revenue fund. Given the secured, short-term structure
2 of these offerings, alleged omissions relative to the long-term health of the City pension fund, or any
3 other long-term matters, are wholly irrelevant to a reasonable TANs investor. As such, the alleged
4 omissions in the Complaint are immaterial as a matter of law. In addition, substantial portions of the
5 conduct the SEC has alleged fall outside the five-year statute of repose for penalties in 28 U.S.C. §
6 2462. For these (and other) reasons, the Complaint should be dismissed. Because amendment
7 would be futile (given the SEC's lengthy pre-filing investigation), the dismissal should be granted
8 with prejudice.

## II. MOTIONS TO DISMISS GENERALLY

10 A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the
11 legal sufficiency of a claim.[1] In evaluating a Rule 12(b)(6) motion, "the Court must accept well-
12 pleaded allegations as true, but it is not required to accept 'legal conclusions cast in the form of
13 factual allegations if those conclusions cannot reasonably be drawn from the facts alleged.'" *SEC v.*
14 *Yuen*, 221 F.R.D. 631, 634 (C.D. Cal 2004) (dismissing SEC complaint; quoting *Clegg v. Cult*
15 *Awareness Network*, 18 F.3d. 752, 754-55 (9th Cir. 1994)). The Court may consider materials that
16 are subject to judicial notice when ruling on a motion to dismiss.[2] A complaint is properly dismissed
17 where either: (1) it lacks a cognizable legal theory for recovery; or (2) where the plaintiff alleges
18 insufficient facts to support a cognizable legal theory.[3]

## III. THE COMPLAINT MUST BE DISMISSED BECAUSE THE ALLEGED DISCLOSURE OMISSIONS ARE IMMATERIAL AS A MATTER OF LAW

21 Under both the § 17(a) and §10(b)/Rule 10 b-5 claims, the Commission must allege facts,
22 that if proven true, would show that Ms. Vattimo made a misstatement or omission of material fact.[4]

---

[1] *Navarro v. Block*, 250 F3d. 729, 732 (9th Cir. 2001).

[2] *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).

[3] *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984).

[4] 15 U.S.C. § 77q(a); 17 C.F.R. § 240.10b-5(b). We do not address here the so-called "scheme" or "artifice" liability provisions of Rule 10b-5. *See, Simpson v. AOL Time Warner Inc.* 452 F.3d 1040, 1048 (9th Cir, 2006). There is no allegation whatsoever that Ms. Vattimo's conduct had a deceptive purpose and effect as required for liability under these provisions. In this regard, Defendant Vattimo adopts and incorporates the analysis set forth in Section V.B. of Defendant Uberuaga's Memorandum of Points and Authorities in Support of Motion to Dismiss. That analysis applies foursquare to Ms. Vattimo and demonstrates why no scheme liability can be properly pled in this case.

1   The allegations against Ms. Vattimo appear to be based solely on alleged omissions in Appendix A
2   to the City's bond disclosures and the same alleged omissions in the 2003 rating agency presentation
3   (Complaint ¶¶ 31, 34 and 40).[5]

4        The standard for materiality of omissions was set forth by the United States Supreme Court
5   in *TSC Industries, Inc. v. Northway, Inc.* 426 U.S. 438 (1976):  "There must be a substantial
6   likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor
7   as having significantly altered the 'total mix' of information made available."  While materiality is a
8   mixed question of fact and law, it may be resolved by the Court as a matter of law if the
9   immateriality of the statement or allegedly omitted fact is so obvious that reasonable minds would
10  not differ.  *Id.* at 455; *see also, Fecht v. The Price Company*, 70 F.3d 1078, 1081 (9th Cir. 1995).  As
11  one Court of Appeals has stated, "a complaint that alleges only immaterial misrepresentations
12  presents an 'insuperable bar to relief,' and dismissal of such a complaint is proper."  *Parnes v.*
13  *Gateway 2000 Inc.* 122 F.3d 539, 546 (8th Cir. 1997) (quoting *Fusco v. Xerox Corp.* 676 F.2d 332,
14  334 (8th Cir. 1982).  From these principles, courts have often decided immateriality as a matter of
15  law.  *See, e.g., In re Silicon Graphics, Inc. Securities Litigation*, 970 F. Supp. 746, 765-66 (N.D. Cal.
16  1997) (five percent revenue shortfall was immaterial as a matter of law); *Ieradi v. Mylan*
17  *Laboratories, Inc.*, 230 F.3d 549, 599 (3rd Cir. 2000) (failure to disclose existence and substance of
18  exclusive supply contracts was immaterial); *Connett v. Justus Enterprises of Kansas, Inc.*, 68 F.3d
19  382, 384-88 (10th Cir. 1995) (omission of appraised value of assets immaterial in bond offering);
20  *Recupito v. Prudential Securities, Inc.*, 112 F.Supp.2d 449, 458 (D. Md. 2000) (omission of fact that
21  lenders had complete discretion to determine value of collateral was immaterial as a matter of law);
22  *United States v. Bingham*, 992 F.2d 975 (9th Cir. 1993) (defendant's misrepresentation of officer and
23  director status was immaterial as a matter of law).

24      **A.**    **The Bond Offering Documents Accurately Disclosed Key Actuarial Information**

25       To analyze whether omissions such as those alleged in the Complaint are material,
26  one must first review, among other things, the disclosures actually made.  In this case, although not

---

[5]  The SEC has not alleged, and cannot allege, that Ms. Vattimo had any role in the preparation, review and approval of Appendix B -- the City's Comprehensive Annual Financial Report.

3

apparent from the face of the Complaint, the offering documents referenced therein accurately disclose the most salient actuarial information regarding the City's pension plan. Interestingly, in its Cease-and-Desist Order with the City the SEC acknowledged that the City made "substantial" disclosures about its pension funding policies and status.[6] Specifically, the Commission stated that:

> At least three concepts were *particularly important* in the disclosure to the public of the City's pension obligations and funding of those obligations: (1) CERS' funded ratio; (2) the City's unfunded liability to CERS; and (3) the City's net pension obligation, also called the NPO.[7]

The SEC makes a similar statement in the Complaint, stating that "at least three concepts were material" and then citing the same concepts described in the Cease-and-Desist Order.[8]

Significantly, the City accurately disclosed the City's unfunded liability and funded ratio in Appendix A to the offering documents for all five subject offerings, based upon the most recent actuarial report available at that time. Specifically, for the two offerings in calendar year 2002, the Official Statement disclosed that the UAAL (Unfunded Actuarial Accrued Liability -- shortfall of assets to liabilities) was $283.89 million as of June 30, 2001, compared to $68.96 million as of June 30, 2000. This represented an increase of $214.93 million or 312%. The information allowed calculation of the funding ratio of 89.9% as of June 30, 2001, compared to 97.3% as of June 30, 2000.[9]

Similarly, the Appendix A to the Official Statements for the three calendar year 2003 offerings accurately disclosed this key actuarial information. The offering documents stated that the UAAL was $720.7 million as of June 30, 2002, compared to $283.89 million as of June 30, 2001. This represented an increase of $436.8 million, or 154%. The documents also disclosed that the funding ratio as of June 30, 2002 was 77.3%, compared to 89.9% as of June 30, 2001.[10]

---

[6] *In the Matter of City of San Diego, California*, Order Instituting Cease-and-Desist Proceedings, Making Findings, and Imposing a Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933 and Section 21 of the Securities Exchange Act of 1934, File No. 3-12478, November 14, 2006 ("Cease-and-Desist Order"), Ex. 4 to Defendant Michael T. Uberuaga's Request for Judicial Notice in Support of Motion to Dismiss ("Uberuaga NOL") at p. 16.

[7] Ex. 4 to Uberuaga NOL, Consent Decree at pp. 5-6 (emphasis added).

[8] Complaint at ¶ 14.

[9] *See* Ex. 1 to Ms. Vattimo's Notice of Lodgment in Support of Motion to Dismiss ("NOL"), Official Statement for Fire and Safety Project Bonds at p. 4, and Ex. 2 to NOL, Official Statement for 2002-03 Tax Anticipation Notes at p. 21.

[10] *See* Ex. 3 to NOL, Official Statement for Old Town Light Rail Bonds, at pp. 34 and 36; Ex. 4 to NOL, Official

4

In addition to these "particularly important" or "material" items, the offering documents made additional disclosures. The City's CAFR (Comprehensive Annual Financial Report) was attached as Exhibit B to the Official Statements and disclosed the existence of an NPO and its rapid growth from 1998-2001.[11] The offering documents also referred investors to the SDCERS' stand-alone Financial Report, which contained further detailed information on pension matters.[12] The 2003 offering documents also disclosed the *Gleason* litigation in which the plaintiff alleged that the City would owe approximately $2.8 billion to SDCERS by 2009 and would have an annual pension expense of $250 million.[13]

Thus, the offering documents accurately disclosed "particularly important" and "material" information about the City's pension fund. This disclosure was in fact "substantial" and clearly showed the negative trends in the UAAL and NPOs which existed at that time.

### B. The Alleged Omissions Regarding The City's Pension Fund and Retiree Health Care Obligations Are Patently Irrelevant To An Investor In Tax Anticipation Notes

The Complaint alleges that Ms. Vattimo signed closing letters for only two of the subject offerings -- 2002-03 TANs and 2003-04 TANs. What the Complaint does not indicate, however, is that the structure of the TANs renders any alleged omissions about the long-term health of the City's pension fund and retiree health care obligations to be meaningless to investors. Investor focus is solely on property tax revenues, which serve as security for repayment for the short-term borrowings.

The City issued TANs every year since the mid-1960's (except for Fiscal Year 1978-79) as its short-term borrowing program to finance its working capital needs.[14] The TANs are one year notes and are secured by dedicated property tax revenues to be received by the City. The City is

---

Statement for the Park Refunding Offering at pp. 50 and 52; and Ex. 5 to NOL, Official Statement for 2003-04 Tax Anticipation Notes at pp. 64-65.

[11] The 1998-99 NPO increase was 52.4%, the 1999-2000 increase was 34.3%, and the 2000-01 increase was 26.7% (2001 being the last year of available data). *See, e.g.,* Ex. 1 to NOL Official Statement for Fire and Safety Bonds at p. 10; and Ex. 3 to NOL, Official Statement for Old Town Light Rail Bonds at p. 42.

[12] *See, e.g.,* Ex. 2 to NOL, Official Statement for 2002-03 Tax Anticipation Notes at p. 26.

[13] *See* note 10, *supra*.

[14] *See* Ex. 5 to NOL, Official Statement for 2003-04 Tax Anticipation Notes at pp. 60 and 62b.

required to deposit property tax revenues into a special repayment fund which is pledged as security. Amounts deposited into this pledged fund may not be used for any purpose other than repayment of the TANs.[15] With respect to the 2002-03 TANs, property tax revenues for Fiscal Year 2002-03 were estimated to be $188.6 million and the amount needed to repay the TANs and interest thereon was approximately $97.3 million.[16] With respect to the 2003-04 TANs, property tax revenues for Fiscal Year 2003-04 were estimated to be $199 million and the amount needed to repay the TANs and interest thereon was approximately $112 million.[17] Thus, the TANs offerings were "over secured" by factors of approximately 1.94 and 1.78, respectively.[18] As one would expect, both TANs offerings have been repaid in full.

Given this structure, TANs investor focus was always on upcoming property tax receipts. The alleged omitted information was meaningless to investors and is immaterial as a matter of law. As such, the SEC's requested relief should be barred to the extent it is based in any way on the TANs offerings.

### C.   Actuarial Projections Are Immaterial As A Matter Of Law

Defendant Vattimo adopts and incorporates by reference the analysis of Defendant Uberuaga and Defendant Webster that actuarial projections are inherently speculative and unreliable, and are immaterial as a matter of law.[19] As such, the Complaint must be dismissed.

### D.   Retiree Health Care Liabilities Were Non-Disclosable And Immaterial As A Matter of Law.

Defendant Vattimo hereby adopts and incorporates by reference the analysis of Defendant Uberuaga and Defendant Webster that the City had no duty to disclose future retiree health care liability and as such any alleged omissions were immaterial as a matter of law.[20] As such, the

---

[15] *See* Ex. 5 to NOL, Official Statement for 2003-04 Tax Anticipation Notes at pp. 60, 62b and 62c.

[16] *See* Ex. 2 to NOL, Official Statement 2002-03 Tax Anticipation Notes, p. 18.

[17] *See* Ex. 5 to NOL, Official Statement 2003-04 Tax Anticipation Notes, p. 62c.

[18] This rock solid security was reflected in the return to investors on the offerings. 2002-03 TANs were priced to yield an interest rate of 1.7% at maturity, and the 2003-04 TANs were priced to yield an interest rate of 0.8% at maturity.

[19] *See* generally, Memorandum of Points and Authorities of Defendant Michael Uberuaga in Support of Motion to Dismiss; and Memorandum of Points and Authorities of Defendant Teresa Webster in Support of Motion to Dismiss.

[20] *See* generally, Memorandum of Points and Authorities of Defendant Michael Uberuaga in Support of Motion to

Complaint must be dismissed.

## IV. SUBSTANTIAL PORTIONS OF THE SEC'S REQUESTED RELIEF ARE PRECLUDED BY THE STATUTE OF REPOSE OF 28 U.S.C. § 2462

The SEC's request for relief based upon two of the five bond offerings, as well as other acts alleged in the Complaint, must be dismissed pursuant to the applicable statute of repose set forth in 28 U.S.C. § 2462, which states that "an action, suit or proceeding for the enforcement of any civil fine, penalty or forfeiture, pecuniary or otherwise shall not be entertained unless commenced within five years from the date when the claim first accrued . . ." In the Complaint, the SEC seeks punitive relief against Ms. Vattimo for alleged conduct going back at least six years. Under § 2462, however, any penalty against Ms. Vattimo is limited to conduct that occurred on or after April 8, 2003 (the first day of the five year period ending on the date of the filing of this action -- April 7, 2008).[21]

To determine whether § 2462 applies to a particular form of requested relief, courts look at the consequences of such relief to assess whether it amounts to a form of punishment. *See SEC v. Jones,* 476 F.Supp.2d 374, 383 (S.D.N.Y. 2007) ("whether the Commission's action for a permanent injunction is subject to the five-year limitations period in § 2462 depends on whether the injunction is a penalty or a remedial measure"). The distinction between equitable and punitive remedies is crucial in determining whether § 2462 will bar relief. Equitable relief remedies a past wrong, by "correcting or undoing the effects" of a defendant's conduct. *Johnson v. SEC*, 87 F.3d 484, 491 (D.C. Cir. 1996). In contrast, a penalty is a "form of punishment . . . which goes beyond remedying the damage caused to the harmed parties by the defendant's actions." *Id.* at 488. Thus, if nominally "equitable" relief is in reality punitive or if the SEC cannot provide sufficient justification that the requested relief serves a remedial purpose, the 5-year statute of limitations under § 2462 will apply to preclude the relief. *Id.* at 488-89 (SEC order censuring and suspending broker due to conduct occurring more that five years before commencement of proceedings was a penalty under § 2462).

---

Dismiss; and Memorandum of Points and Authorities of Defendant Teresa Webster in Support of Motion to Dismiss.

[21] The Complaint alleges false and misleading disclosures with respect to five municipal securities offerings. (Complaint at ¶ 26) Two of those offerings were completed in June and July 2002, well outside of the five year repose period -- $25,070,000 Public Facilities Financing Authority of the City of San Diego Lease Revenue Bonds, Series 2002B (Fire and Safety Project) (June 2002) and $93,200,000 City of San Diego, 2002-03 Tax Anticipation Notes Series A (July 2002).

*See also SEC v. DiBella*, 409 F.Supp.2d 122, 127-28 and n. 3 (D. Conn. 2006) (noting that § 2462 applies to SEC claims for permanent injunctions, civil penalties and officer and director bars, but not to a claim for disgorgement).[22]

The *Johnson* analysis clearly indicates that the SEC's requested relief here -- permanent injunction and civil penalties -- is punitive.  The Complaint has not alleged any facts that suggest Ms. Vattimo poses a future risk to the public.  The last alleged violation by Ms. Vattimo occurred in 2003, more than four years before the filing of this action.  (Complaint, ¶ 40.)  Since leaving the City, Ms. Vattimo has been unemployed and now cares for her two young children.  Given the substantial (and unwarranted) publicity about this matter, she has very limited prospects for employment, certainly not any involving the securities laws.  Thus, there is no risk of future harm and no basis for injunctive relief.  Moreover, entry of an injunction for alleged conduct occurring over six years ago will surely further stigmatize Ms. Vattimo in the community and serve as a formidable barrier to future employment.  These consequences have the "sting of punishment" -- rather than serve any remedial purpose, they will serve only to punish Ms. Vattimo.

Other factors also indicate that this action against Ms. Vattimo is purely punitive.  The SEC has already entered into the Cease-and-Desist Order with the City, thereby obtaining a public remedy for the alleged violations.  The current action inappropriately (and punitively) focuses on Ms. Vattimo and the other four defendants.  In fact, dozens of other City employees and outside experts were involved in the City's disclosure process during the time periods in the Complaint.  These include the City Council members who approved the offerings and others, including experts who explicitly approved the disclosure documents.  Yet, these persons were not charged.  Moreover, Ms. Vattimo's conduct is alleged only to be "reckless" (Complaint at ¶ 40) and there is no allegation that she profited in any way from the matters at issue.[23]  Under these circumstances, this action, and the relief the SEC seeks, can be regarded only as punitive.  Accordingly, the SEC's requests for relief should be barred under 28 U.S.C. § 2462 to the extent they are based on conduct occurring

---

[22] *SEC v. Rind*, 991 F.2d 1486 (9th Cir. 1993) is not to the contrary.  *Rind* involved the then-applicable statute of limitations for private actions; it did not address § 2462.

[23] For these reasons, *SEC v. Berry* 2008 WL 2002537 (N.D. Cal.) is distinguishable.  At a minimum, the *Berry* analysis would bar the requested civil penalties for conduct outside the statute of repose.

8

1 before April 8, 2003.

## V. LEGISLATIVE IMMUNITY REQUIRES DISMISSAL OF THE COMPLAINT

Ms. Vattimo hereby adopts and incorporates the legislative immunity analysis set forth in the Uberuaga Motion to Dismiss.[24] That analysis applies with equal force to Ms. Vattimo and requires dismissal of the Complaint.

The Complaint alleges that Ms. Vattimo signed closing letters for two of the five offerings in question -- 2002-03 TANs and 2003-04 TANs.[25] The City Council approved both of these offerings, including the Preliminary Official Statement, and authorized the City Manager or his designee to sell the notes.[26] Moreover, the authorizing resolutions authorize the City Treasurer or her designee to prepare the Official Statement and authorize the City Manager, City Treasurer, City Auditor, and designees (among others) generally to take all other actions necessary to effect the issuance of the notes.[27] Thus, all actions taken by Ms. Vattimo regarding the TANs were authorized by the City Council and delegated to Ms. Vattimo. Those were legislative acts for which legislative immunity applies, and the SEC has no claim against Ms. Vattimo based thereon.

The Complaint also alleges that Ms. Vattimo signed continuing disclosures for six prior bond offerings.[28] The same legislative immunity analysis applies with respect to these signatures.[29] Each of these underlying prior bond offerings (occurring between 1996 and 2002) and the accompanying disclosure documents were approved by the City Council, which authorized and directed the City Manager or his designees to take all actions to effectuate the bond offerings, including execution of a continuing disclosure agreement pursuant to which the continuing disclosures were transmitted.[30]

---

[24] *See* generally Memorandum of Points and Authorities of Michael Uberuaga in Support of Motion to Dismiss.

[25] Complaint at ¶40.

[26] *See* generally, City Council Resolution R-296500, Ex. 7 to NOL; and City Council Resolution R-297969, Ex. 10 to NOL.

[27] *Id.*

[28] Complaint at ¶40; Exs. 17-19 to NOL.

[29] The Complaint does not allege that Ms. Vattimo made any certification or representation regarding the continuing disclosures. The simple reason is that it cannot do so; the documents signed by Ms. Vattimo are transmittals only and contain no such certification or representation. The continuing disclosures are submitted pursuant to continuing disclosure agreements between the City and the trustees for each bond offering.

[30] *See* City Council Ordinances O-18270 and O-18271; Ex. 15 to NOL; City Council Resolution R-295760 and R-

## VI. CONCLUSION

For the foregoing reasons, Ms. Vattimo's motion to dismiss should be granted, and the SEC's Complaint against her should be dismissed with prejudice.

Dated: September 8, 2008

**HAHN & ADEMA**

By:    s/David A. Hahn
David A. Hahn
Specially Appearing for Defendant
MARY E. VATTIMO

---

295762, Ex. 16 to NOL; City Council Ordinance O-18285, Ex. 11 to NOL; City Council Ordinance O-18289, Ex. 12 to NOL; City Council Resolution R-288106, Ex. 13 to NOL; and City Council Ordinance O-19054, Ex. 14 to NOL.