# EXHIBIT 2

NEW ISSUE — BOOK-ENTRY-ONLY

RATINGS: *Moody's: MIG-1*
*Standard & Poor's: SP-1+*
*Fitch: F1+*

*In the opinion of Stradling Yocca Carlson & Rauth, a Professional Corporation, Bond Counsel, under statutes and court decisions and assuming continuing compliance by the City with certain conditions imposed by applicable federal tax law as described herein, interest on the Notes is not included in gross income for federal income tax purposes and is not treated as a specific item of tax preference for purposes of the federal alternative minimum tax on individuals and corporations. Such interest, however, is included in the adjusted current earnings of certain corporations for purposes of computing the alternative minimum tax imposed on such corporations. Interest on the Notes is exempt from present State of California personal income. See "Tax Matters" herein.*

# $93,200,000
# CITY OF SAN DIEGO, CALIFORNIA
## 2002-03 Tax Anticipation Notes
### Series A
3.00% Interest Rate @ 101.382% Price to Yield 1.70%

**Dated:** July 1, 2002

**Due:** August 1, 2003

The City of San Diego, California 2002-03 Tax Anticipation Notes, Series A (the "Notes") are being issued to finance working capital needs of the City of San Diego (the "City") during the Fiscal Year beginning July 1, 2002 and ending June 30, 2003 ("Fiscal Year 2002-03"). The Notes are being issued in fully registered form only and will be registered in the name of Cede & Co., as nominee of the Depository Trust Company, New York, New York ("DTC"). DTC will act as securities depository of the Notes. Ownership interests in the Notes may be purchased in book-entry form only in denominations of $5,000 or any integral multiple thereof. Purchasers of such beneficial interests will not receive physical delivery of the Notes. Principal of and interest on the Notes will be payable by the Paying Agent to DTC. DTC will in turn remit such principal and interest to the DTC Participants (as hereinafter defined), who will in turn remit such principal and interest to the Beneficial Owners (as hereinafter defined) of the Notes. See "APPENDIX D—BOOK-ENTRY ONLY SYSTEM" hereto.

The Notes, in accordance with California law, are general obligations of the City, but are payable from property tax moneys received by the City and if such property tax moneys are insufficient to enable the City to make such payments, then from such other legally available taxes, income, revenue, cash receipts and other moneys attributable to the City's Fiscal Year 2002-03 that are lawfully available for payment of the Notes and the interest thereon. The City pledges as security for the payment of the principal of and interest on the Notes (1) from the first property tax moneys received by the City on or after November 30, 2002, an amount equal to one-half of the total principal and interest due with respect to the Notes on or before the maturity thereof; and (2) from the remaining property tax moneys received by the City on or after April 10, 2003, an amount equal to the difference between (a) the total principal and interest due with respect to the Notes on or before the maturity thereof and (b) the amount previously deposited in the Repayment Fund. In the event that by April 30, 2003 such property tax moneys are insufficient to enable the City to make such transfers, the City is obligated to thereafter transfer other legally available taxes, income, revenue, cash receipts and other moneys attributable to the Fiscal Year 2002-03 to the Repayment Fund so that the amounts in such fund are at least equal to the amounts required to pay the principal of and interest on the Notes as they become due. The Repayment Fund and all amounts held therein are pledged and irrevocably set aside to the payment of the Notes. See "The Notes" herein.

Principal of the Notes is payable in lawful money of the United States of America at maturity. Interest on the Notes will be payable in like lawful money on July 1, 2003 and at maturity. Interest on the Notes will be computed on the basis of a 360-day year of twelve 30-day months and will accrue from the date of issuance of the Notes. The Notes are not subject to redemption prior to maturity.

THIS COVER PAGE CONTAINS CERTAIN INFORMATION FOR QUICK REFERENCE ONLY. INVESTORS MUST READ THE ENTIRE OFFICIAL STATEMENT TO OBTAIN INFORMATION ESSENTIAL TO THE MAKING OF AN INFORMED INVESTMENT DECISION.

The Notes are offered when, as and if issued and received by the original purchasers, subject to approval as to their legality by Stradling Yocca Carlson & Rauth, a Professional Corporation, Newport Beach, California, Bond Counsel, and certain other conditions. Certain matters will be passed upon for the City by the City Attorney. Public Resources Advisory Group, Los Angeles, California, is serving as Financial Advisor to the City in connection with the issuance of the Notes. It is anticipated that the Notes, in book-entry form, will be available for delivery through the facilities of DTC on or about July 1, 2002.

**Zions First National Bank**

**First Albany Corp.**

Dated: June 4, 2002

Exhibit 2
14 of 175

No dealer, broker, salesperson or other person has been authorized by the City or the Underwriter to give any information or to make any representations in connection with the offer or sale of the Notes other than those contained herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the City or the Underwriter. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy nor shall there be any sale of the Notes by a person in any jurisdiction in which it is unlawful for such person to make such an offer, solicitation or sale.

This Official Statement is not to be construed as a contract with the purchasers or owners of the Notes. Statements contained in this Official Statement which involve estimates, forecasts or matters of opinion, whether or not expressly so described herein, are intended solely as such and are not to be construed as representations of fact.

The information set forth herein has been provided by the City and other sources that are believed by the City to be reliable. This Official Statement is submitted in connection with the execution and delivery of the Notes referred to herein and may not be reproduced or used, in whole or in part, for any other purpose. The information and expression of opinion herein are subject to change without notice and neither delivery of the Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the City or any other parties described herein since the date hereof. All summaries of the Resolution or other documents are made subject to the provisions of such documents and do not purport to be complete statements of any or all of such provisions. Reference is hereby made to such documents on file with the City for further information in connection therewith.

The Financial Advisor has not audited, authenticated or otherwise verified the information set forth in the Official Statement, or any other related information available to the City, with respect to the accuracy and completeness of disclosure of such information, and no guaranty, warranty or other representation is made by the Financial Advisor respecting accuracy and completeness of the Official Statement or any other matter related to the Official Statement.

IN CONNECTION WITH THE OFFERING OF THE NOTES, THE UNDERWRITER MAY OVER ALLOT OR EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICE OF SUCH NOTES AT A LEVEL ABOVE THAT WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME. THE UNDERWRITER MAY OFFER AND SELL THE NOTES TO CERTAIN DEALERS AND DEALER BANKS AND BANKS ACTING AS AGENTS AT PRICES LOWER OR HIGHER THAN THE PUBLIC OFFERING PRICE STATED ON THE COVER PAGE HEREOF AND SAID PUBLIC OFFERING PRICES MAY BE CHANGED FROM TIME TO TIME BY THE UNDERWRITER.

The Underwriters have provided the following sentence for inclusion in this Official Statement. The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, its responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

Exhibit 2
15 of 175

## OFFICIAL STATEMENT
### $93,200,000
### CITY OF SAN DIEGO, CALIFORNIA
### 2002-03 Tax Anticipation Notes
### Series A

## INTRODUCTION

*This introduction contains only a brief summary of certain of the terms of the Notes being offered, and a brief description of the Official Statement. All statements contained in this introduction are qualified in their entirety by reference to the entire Official Statement. References to, and summaries of, provisions of the Constitution and laws of the State of California and any documents referred to herein do not purport to be complete and such references are qualified in their entirety by reference to the complete provisions. This Official Statement speaks only as of its date, and the information contained herein is subject to change.*

**General**

The purpose of this Official Statement (the "Official Statement"), which includes the cover page and attached Appendices, is to provide certain information concerning the sale and delivery of $93,200,000 aggregate principal amount of City of San Diego, California 2002-03 Tax Anticipation Notes, Series A (the "Notes") issued by the City of San Diego (the "City"). The Notes, in accordance with California law, are general obligations of the City, and are secured by and payable from property tax moneys received by the City and if such property tax moneys are insufficient to enable the City to make such payments, then from such other legally available taxes, income, revenue, cash receipts and other moneys attributable to the City's fiscal year beginning on July 1, 2002 and ending on June 30, 2003 ("Fiscal Year 2002-03") and legally available for payment thereof, all as more particularly described under the caption "The Notes—Security for the Notes" below.

The Notes are issued under the authority of Section 92 of the City Charter of the City, Article 7.6, Chapter 4, Part 1, Division 2, Title 5 (commencing with Section 53850) of the California Government Code and a resolution adopted by the City Council of the City on May 14, 2002 (the "Resolution"). The Notes are being issued to finance the seasonal cash flow deficits in the City's General Fund (the "General Fund") during Fiscal Year 2002-03.

**City of San Diego Short-Term Borrowing Program**

The City has issued tax anticipation notes every year since the mid-1960's (except for Fiscal Year 1978-79) to meet its cash flow requirements. In Fiscal Year 2001-02, the City sold a single series of tax anticipation notes in the aggregate principal amount of $73,000,000, the repayment of which has been fully funded. The City has never defaulted on the payment of principal of and interest on any of its short-term or long-term debt obligations.

The City may issue in Fiscal Year 2002-03 an additional series of City of San Diego, California 2002-03 Tax Anticipation Notes (the "Additional Notes") in an aggregate principal amount such that the combined principal amount of the Notes and the Additional Notes does not exceed $150,000,000. See "THE NOTES—Additional Notes."

Exhibit 2
16 of 175

## THE NOTES

### General

The Notes will mature on August 1, 2003 and will be dated and will bear interest at the annual rate set forth on the cover of this Official Statement. Interest on the Notes will be computed on a 30-day month, 360-day year basis. Principal of the Notes will be payable on the maturity date of the Notes. Interest on the Notes will be payable on July 1, 2003 and on the maturity date of the Notes. So long as Cede & Co. is the registered owner of the Notes, the principal of and interest on the Notes are payable by wire transfer by JPMorgan Chase Bank, or its successor, as Paying Agent (the "Paying Agent"), to Cede & Co., as nominee of The Depository Trust Company ("DTC") in New York, New York which is expected, in turn, to remit such amounts to its participants for subsequent disbursement to beneficial owners of the Notes. See "APPENDIX C—BOOK-ENTRY ONLY SYSTEM."

**The Notes are not subject to redemption prior to maturity.**

### Additional Notes

The Resolution authorizes the City to issue one series of Additional Notes during Fiscal Year 2002-03 in an aggregate principal amount such that the combined principal amount of the Notes and the Additional Notes does not exceed $150,000,000. All Additional Notes must mature within thirteen (13) months of their date of issuance. The Additional Notes, if any, will be equally and ratably secured with the Notes. See "—Security for the Notes" below.

### Security for the Notes

The Notes, in accordance with California law, are general obligations of the City, but are payable from property tax moneys received by the City and if such property tax moneys are insufficient to enable the City to make such payments, then from such other legally available taxes, income, revenue, cash receipts and other moneys attributable to the City's Fiscal Year 2002-03 that are lawfully available for payment of the Notes and the interest thereon.

The Resolution provides that as security for the payment of the principal of and interest on the Notes, the City agrees and covenants to deposit in trust into a special fund to be held by the City, designated as the "2002-03 Tax Anticipation Notes Repayment Fund" (the "Repayment Fund"), sufficient moneys to enable the City to pay in full such principal and interest, as follows: (1) from the first property tax moneys received by the City on or after November 30, 2002, an amount equal to one-half of the total principal and interest due with respect to the Notes on or before the maturity thereof; and (2) from the remaining property tax moneys received by the City on or after April 10, 2003, an amount equal to the difference between (a) the total principal and interest due with respect to the Notes on or before the maturity thereof and (b) the amount previously deposited in the Repayment Fund. The City pledges all such property tax moneys for the payment of the principal of and interest on the Notes subject to the terms of and application in accordance with the Resolution. If by April 30, 2003 such property tax moneys are insufficient to enable the City to make such transfers, the City shall thereafter transfer other legally available taxes, income, revenue, cash receipts and other moneys attributable to the City's 2002-03 fiscal year to the Repayment Fund so that the amounts in the Repayment Fund are at least equal to the amounts required to pay the principal of and interest on the Notes as they become due. The Repayment Fund and all amounts

2

Exhibit 2
17 of 175

held therein are pledged and irrevocably set aside to the payment of the Notes. Amounts deposited in the Repayment Fund may not be used for any purpose other than payment of the Notes and may be invested in legal investments which are permitted by the California Government Code and which mature not later than the latest maturity date of the Notes; provided that the earnings on any such investment shall be transferred by the City to the City's General Fund.

The City may, under its City Charter and provisions of the California Government Code, issue the Notes or any series of Additional Notes only if the total amount of bonds, notes and warrants, including the Notes, issued in anticipation of the collection of taxes in any fiscal year does not in the aggregate exceed 25% of the City's total appropriations for such fiscal year and the principal of and interest on such bonds, notes and warrants does not exceed 85% of the estimated uncollected taxes and other moneys available for the payment of such bonds, notes and warrants. Property tax revenues for Fiscal Year 2002-03 are estimated to be $188.6 million and total General Fund revenues of the City for Fiscal Year 2002-03 are estimated to be approximately $732.8 million. The estimated amount needed to repay the Notes and the interest thereon is approximately $97.3 million.

The City's proposed general fund budget for Fiscal Year 2002-03 and adopted general fund budget for the Fiscal Year ending 2002 and actual results for Fiscal Years 1997 through 2001 are set forth in "APPENDIX A—THE CITY OF SAN DIEGO FINANCIAL AND DEMOGRAPHIC INFORMATION—Municipal Government and Financial Information" herein

**Note Repayment Fund**

The Repayment Fund and all amounts held therein are pledged and irrevocably set aside to the payment of the Notes. Amounts deposited in the Repayment Fund may not be used for any purpose other than payment of the Notes and may be invested in legal investments which are permitted by the Government Code of the State of California (the "State") and which mature not later than the maturity date of the Notes; provided that the earnings on any such investment will be transferred by the City to the General Fund.

**Investment of Note Proceeds and Amounts in the Repayment Fund**

The City intends to invest the Repayment Fund, as well as the proceeds of the Notes, in its pooled operating investment fund. For a description of the City's pooled operating investment fund, see "APPENDIX A—THE CITY OF SAN DIEGO FINANCIAL AND DEMOGRAPHIC INFORMATION—Investment of Funds" hereto.

**Enforceability of Remedies**

The rights of the owners of the Notes are subject to the limitations on legal remedies against cities in the State, including a limitation on enforcement of judgments against funds needed to serve the public welfare and interest. Additionally, enforceability of the rights and remedies of the owners of the Notes, and the obligations incurred by the City, may become subject to the following: the Federal Bankruptcy Code and applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or affecting the enforcement of creditors' rights generally; equitable principles which may limit the specific enforcement under State law of certain remedies; the exercise by the United States of America of the powers delegated to it by the Constitution; and the reasonable and necessary exercise, in certain exceptional situations, of the police powers inherent in the

3

Exhibit 2
18 of 175

sovereignty of the State and its governmental bodies in the interest of serving a significant and legitimate public purpose. Bankruptcy proceedings, or the exercise of powers by the federal or State government, if initiated, could subject the owners of the Notes to judicial discretion and interpretation of their rights in bankruptcy or otherwise, and consequently may entail risks of delay, limitation or modification of their rights.

Pursuant to Section 53856 of the California Government Code, the principal of and interest on the Notes are a lien and charge against the Repayment Fund and other moneys pledged therefor pursuant to the Resolution. Under Chapter 9 of the Bankruptcy Code (Title 11, United States Code), which governs the bankruptcy proceedings for public agencies such as the City, there are no involuntary petitions in bankruptcy. If the City were to file a petition under Chapter 9 of the Bankruptcy Code, the owners of the Notes could be prohibited from taking certain steps to enforce their rights under the Resolution. In March 1995 a ruling of the United States Bankruptcy Court for the Central District of California, concerning Orange County notes issued in 1994 under the same statutory authority as the Notes, held that the pledge granted by Orange County pursuant to a resolution adopted by that County in connection with the issuance of tax and revenue anticipation notes ("TRANs") was not effective with respect to general revenues accruing to the County after the filing of a petition in bankruptcy. The resolution obligated Orange County to set aside a specified amount of revenues in certain months in order to secure the payment of its TRANs. On July 12, 1995, the United States District Court for the Central District of California reversed the order of the Bankruptcy Court and ordered that the obligation created under the resolution adopted by Orange County is a statutory lien which survived the filing of Orange County's bankruptcy petition.

On January 24, 1996, the United States Bankruptcy Court for the Central District of California held in the case of *County of Orange v. Merrill Lynch* that a State statute providing for a priority of distribution of property held in trust conflicted with, and was preempted by, federal bankruptcy law. In that case, the court addressed the priority of the disposition of moneys held in a County investment pool upon bankruptcy of the county, but was not required to directly address the state statute that provides for the lien in favor of holders of tax and revenue anticipation notes. The City will be in possession of the taxes and other revenues that will be set aside and pledged to repay the Notes and, prior to payment of these funds to the Paying Agent, these funds will be invested in the name of the Repayment Fund for a period of time in the City Investment Pool. In the event of a petition for the adjustment of City debts under Chapter 9 of the Bankruptcy Code, a court might hold that the Owners of the Notes do not have a valid and/or prior lien on the Pledged Amounts where such amounts are deposited in the City Pooled Operating Investment Fund and may not provide the Noteowners with a priority interest in such amounts. In that circumstance, unless the Owners could "trace" the funds from the Repayment Fund that have been deposited in the City Pooled Operating Investment Fund, the Owners would be unsecured (rather than secured) creditors of the City. There can be no assurance that the Owners could successfully so "trace" the pledged taxes and other amounts credited to the Repayment Fund.

**Available Sources of Payment**

Proposition 218, a statewide voter initiative passed on November 5, 1996, and pending litigation may make it more difficult for the City to generate additional sources of revenue for the General Fund and may reduce the City's financial flexibility. For further information, see "APPENDIX A—THE CITY OF SAN DIEGO FINANCIAL AND DEMOGRAPHIC INFORMATION—Limitations on Taxes and Appropriations."

4

Exhibit 2
19 of 175

## APPENDIX A

## THE CITY OF SAN DIEGO

*The information and expressions of opinion set forth herein have been obtained from sources believed to be reliable, but such information is not guaranteed as to accuracy or completeness. Statements contained herein which involve estimates, forecasts, or matters of opinion, whether or not expressly so described herein, are intended solely as such and are not to be construed as representations of facts. The information and expressions of opinion herein are subject to change without notice, and neither delivery of this Official Statement nor any sale thereafter of the securities offered hereby shall under any circumstances create any implication that there has been no change in the affairs of the City or in any other information contained herein since the date of the Official Statement.*

## INTRODUCTION

With a total population of approximately 1.3 million in 2002, and a land area of 330 square miles, the City of San Diego (the "City") is the seventh largest city in the nation and the second largest city in California. The City is the county seat for the County of San Diego (the "County") and is the County's business and financial center.

Based on estimates published by the California Department of Finance in May 2002, the City's population grew by 9.7% between 1993 and 2002, for an average increase of approximately 12,300 annually. A major factor in the City's growth is its quality of life. In addition to having a favorable climate, the City offers a wide range of cultural and recreational services to both residents and visitors. With mild temperatures year round, the City's numerous beaches, parks, tennis courts, and golf courses are in constant use.

Another factor in the City's growth is its diversified economy. Recent historical growth has been concentrated in four major areas: high tech manufacturing and research (including electronics, telecommunications, scientific instruments, drugs, and biomedical equipment); professional services; tourism; and international trade. Historically, the City has also benefited from a stable economic foundation composed of basic manufacturing (ship building, industrial machinery, television & video equipment, and printing & publishing), public and private higher education, health services, military, and local government.

## PENSION PLAN

All benefited City employees participate with the full-time employees of the San Diego Unified Port District (the "District") in the City Employees' Retirement System ("CERS"). CERS is a public employee retirement system that acts as a common investment and administrative agent for the City and the District. Through various benefit plans, CERS provides retirement benefits to all general, safety (police and fire), and legislative members.

The CERS plans are structured as defined benefit plans in which benefits are based on salary, length of service, and age. City employees are required to contribute a percentage of their annual salary to CERS. State legislation requires the City to contribute to CERS at rates determined by actuarial valuations.

The City's last actuarial valuation dated June 30, 2000 stated the funding ratio (Valuation of Assets available for Benefits to Total Actuarial Accrued Liability), of the CERS fund to be 97.3%. The CERS fund has an Unfunded Actuarial Accrued Liability (UAAL) of $68.959 million as of June 30, 2000. The UAAL is the difference between total actuarial accrued liabilities of $2.528 billion and assets allocated to funding of $2.459 billion. The UAAL is amortized over a 30-year period, which started July 1, 1991, with each year's amortization payment reflected as a portion of the percentage of payroll representing the employer's contribution rate. As of June 30, 2000, there were 21 years remaining in the amortization period.

The CERS Retirement Board has received the Actuary's report on the results of the actuarial valuation for the year ended June 30, 2001. In that report, the new UAAL as of June 30, 2001, is $283.89 million. That reflects actuarial accrued liabilities of $2.809 billion and assets allocated to funding of $2.526 billion. The assumptions and calculations made in the June 30, 2001, actuarial valuation are subject to review, approval, or revisions by the Retirement Board. Therefore, the UAAL as of June 30, 2001, may change.

## INSURANCE, CLAIMS, AND LITIGATION

### Workers' Compensation And Long-Term Disability

The City is self-insured for Workers' Compensation and Long-term Disability. The City's self-insured liability for Workers' Compensation and Long-term Disability is accounted for in the Self Insurance Fund. The Self Insurance Fund for Workers' Compensation and Long-Term Disability is supported by contributions from each of the City's operating funds. These contributions are determined by multiplying an annually established rate by the gross salaries payable from each of the City's operating funds. As of June 30, 2001, there is a fund equity deficit in the Self Insurance Fund of approximately $29,281,000. It is anticipated that individual claim settlements will be funded through participating operating fund contributions subsequent to the filing of a claim and prior to its settlement.

### Employee Group Health Insurance

Employee Group Health coverage is provided to employees and retirees by third party group health insurance carriers through an annual "cafeteria plan" selection process.

APPENDIX B

CITY OF SAN DIEGO
GENERAL PURPOSE FINANCIAL STATEMENTS

Exhibit 2
22 of 175



# CALDERON, JAHAM & OSBORN

### AN ACCOUNTANCY CORPORATION

CERTIFIED PUBLIC ACCOUNTANTS & CONSULTANTS

www.cjo.com

INDEPENDENT AUDITORS' REPORT

The Honorable Mayor, Members of the
City Council and City Manager of the
City of San Diego, California

We have audited the accompanying general-purpose financial statements and the combining and individual fund and account group financial statements of the City of San Diego, California, as of and for the year ended June 30, 2001, as listed in the foregoing table of contents. These general-purpose financial statements are the responsibility of the City of San Diego, California management. Our responsibility is to express an opinion on these general-purpose financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in *Government Auditing Standards,* issued by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the general-purpose financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the general-purpose financial statements referred to above present fairly, in all material respects, the financial position of the City of San Diego, California, as of June 30, 2001, and the results of its operations and cash flows of its proprietary fund types and nonexpendable trust funds for the year then ended in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, the combining and individual fund and account group financial statements referred to above present fairly, in all material respects, the financial position of each of the individual funds and account groups of the City of San Diego, California, as of June 30, 2001, and the results of operations of such funds and cash flows of its individual proprietary fund types and nonexpendable trust funds for the year then ended in conformity with accounting principles generally accepted in the United States of America.

In accordance with *Government Auditing Standards,* we have also issued a separate report dated November 21, 2001, on our consideration of the City of San Diego's internal control over financial reporting and our tests of its compliance with certain provisions of laws, regulations, contracts and grants.

Comerica Bank Tower
600 "B" Street, Suite 1900
San Diego, CA 92101
Phone: (619) 234-5137
Fax: (619) 234-5162
E-mail: cjo@cjo.com

1

Exhibit 2
23 of 175

P.O. Box 1039
1236 State Street
El Centro, CA 92243
Phone: (760) 352-6022
Fax: (760) 352-2492
E-mail: cjocpas@thegrid.net

Our audit was performed for the purpose of forming an opinion on the general-purpose financial statements of the City of San Diego, California, taken as a whole and on the combining and individual fund and account group financial statements. The information listed as supporting schedules and statistical data in the table of contents is presented for purposes of additional analysis and is not a required part of the general-purpose financial statements of the City of San Diego, California. Such information, except for that portion marked "unaudited" on which we express no opinion, has been subjected to the auditing procedures applied in the audit of the general-purpose, combining and individual fund and account group financial statements and, in our opinion, is fairly stated in all material respects in relation to the financial statements of each of the respective individual funds and account groups, taken as a whole.

November 21, 2001          Calderon, Jaham + Osborn

2

Exhibit 2
24 of 175

8.    LEASE COMMITMENTS (Continued)

Year Ending June 30,

| | |
|---|---:|
| 2002 | $ 21,874 |
| 2003 | 21,464 |
| 2004 | 20,668 |
| 2005 | 20,029 |
| 2006 | 19,717 |
| Thereafter | 591,217 |
| Total | $694,969 |

This amount does not include contingent rentals which may be received under certain leases of property on the basis of percentage returns. Contingent rentals amounted to $37,276,359 in the year ended June 30, 2001.

9.    DEFERRED COMPENSATION PLAN

City of San Diego

The City offers its employees a deferred compensation plan created in accordance with Internal Revenue Code Section 457. The plan, available to all full-time City employees, permits them to defer a portion of their salary until future years. The deferred compensation is not available to employees until termination, retirement, death, disability or an unforeseeable emergency. All assets and income of the deferred compensation plan are held in trust for the exclusive benefit of plan participants and their beneficiaries.

Fair value of the plan assets was $116,760,663 at June 30, 2001.

10.    PENSION PLANS

The City has a defined benefit plan and various defined contribution pension plans covering substantially all of its employees.

DEFINED BENEFIT PLAN

a.    Plan Description

All of the City and the San Diego Unified Port District (the "District") full-time employees participate in the San Diego City Employees' Retirement System ("SDCERS").

SDCERS is a public employee retirement system established in 1927 by the City and administered by a Board of Administration (the "Board") to provide retirement, disability, death and survivor benefits for its members.

In 1963, through an agreement between the City and the District, employees of the District became members of SDCERS.

The Plan is a defined benefit plan which covers all eligible employees of the City and the District. The Plan is a multiple-employer public employee retirement system that acts as a common investment and administrative agent for the City and the District. As a defined benefit plan, retirement benefits are determined primarily by a member's age at retirement, the length of membership service and the member's final compensation earnable based on the highest one-year period.

Exhibit 2
25 of 175

## 10.    PENSION PLANS (Continued)

The Plan provisions applicable to general members are generally applicable to the District's general members and those applicable to lifeguard members are generally applicable to the District's safety members.

All full-time City and District employees are eligible to participate in the Plan. Salaried classified employees become members of the system upon employment. Salaried unclassified employees hired on or after August 11, 1995 become members upon employment.

SDCERS is considered part of the City of San Diego's financial reporting entity and is included in the City's financial reports as a pension trust fund.

SDCERS issues a stand-alone financial report which is available at its office located at 401 B Street, Suite 400, San Diego, California 92101.

b.    Funding Policy

SDCERS' funding policy provides for periodic employer contributions at actuarially determined rates that, expressed as percentages of annual covered payroll, are designed to accumulate sufficient assets to pay benefits when due. The normal cost and actuarial accrued liability are determined using the projected unit credit actuarial funding method. Unfunded actuarial accrued liabilities are being amortized as a level percent of payroll over a period of 30 years (20 years remaining).

Employees are required to contribute a percentage of their annual salary to the Plan. Contributions vary according to age at entry into the plan and salary. The City and the District contribute a portion of the employees' share and the remaining amount necessary to fund the system based on an actuarial valuation at the end of the preceding year under the projected unit credit method of actuarial valuation. Prior to June 30, 1993, contributions were based on the entry age normal cost method of valuation.

During the period July 1, 2000 to June 30, 2001 contributions totaling $81,914,000 ($45,553,000 employer and $36,361,000 employee) were made. Of the employer contributions, $36,443,000 was applied to normal cost and $9,110,000 was applied to unfunded accrued liability. All of the employer offset contributions were applied to normal cost.

In 1996 the City Council approved proposed changes to the San Diego City Employees' Retirement System (SDCERS) which included changes to retiree health insurance, plan benefits, employer contribution rates and system reserves. The proposal included a provision to assure the funding level of the system would not drop below a level the Board's actuary deems reasonable in order to protect the financial integrity of the SDCERS. A citizen required vote on the changes related to retiree health insurance passed overwhelmingly in 1996. In 1997, the active members of the SDCERS voted and approved the changes. Portions of the proposal requiring SDCERS Board approval (employer rates and reserves) were approved after review and approval by its independent fiduciary counsel and consultation with the actuary. The San Diego Municipal Code was then amended to reflect the changes.

The changes provide the employer contribution rates be "ramped up" to the actuarially recommended rate in .50 percent increments over a ten year period at such time it was projected that the Projected Unit Credit (PUC) and Entry Age Normal (EAN) rates would be equal and the SDCERS would convert to EAN. The actuary calculated the present value of the difference between the employer contribution rate and actuarial rates over the ten year period and this amount was funded in a reserve. This "Corridor" funding method is unique to the SDCERS and therefore is not one of the six funding methods formally sanctioned by the GASB for expending purposes. As a result for June 30, 2001, the actuary rates are reported to be $30,983,000 more than paid by the City which, technically per GASB 27 effective for periods beginning

## 10.   PENSION PLANS (Continued)

after June 15, 1997, is to be reported as a Net Pension Obligation (NPO) even though the shortfall is funded in a reserve. The actuary believes the Corridor funding method is an excellent method for the City and that it will be superior to the PUC funding method. The actuary is in the process of requesting the GASB to adopt the Corridor funding method as an approved expending method which would then eliminate any reported NPO.

c.   Annual Required Contribution

The annual required contribution for the current year was determined as part of the June 30 actuarial valuation using the projected unit credit actuarial funding method. The actuarial assumptions included (a) an 8.0% investment rate of return and (b) projected salary increases of 4.75% per year. Both (a) and (b) included an inflation rate of 4.5%. The actuarial value of assets was determined using techniques that smooth the effects of short-term volatility in the market value of investments over a five-year period. The unfunded actuarial accrued liability is being amortized as a level percentage of projected payroll on an open basis. The remaining amortization period at June 30, 2001 was 20 years.

d.   Three-Year Trend Analysis

The following table shows the City's Annual Pension Cost (APC) and the percentage of the APC contributed for the most current year available and preceding years (in thousands):

| Fiscal Year Ending | APC | Percentage of APC Contributed | Net Pension Obligation |
|---|---|---|---|
| 6/30/98 | $40,863 | 75.81% | $15,124. |
| 6/30/99 | 44,008 | 78.32 | 23,046 |
| 6/30/00 | 50,044 | 78.66 | 30,983 |

e.   Net Pension Obligation Three Year-Trend Analysis

The following table shows the calculation of the City's NPO for the most current year available and preceding years (in thousands):

| Fiscal Year Ending | Actuarial Required Contribution (ARC) | Interest on NPO | ARC Adjustment | Amortization Factor | APC | Contributions Made | Change in NPO | NPO |
|---|---|---|---|---|---|---|---|---|
| 6/30/98 | $40,660 | $ 478 | $ 275 | 21.69 | $40,863 | $30,979 | $9,149 | $15,124 |
| 6/30/99 | 43,504 | 1,210 | 706 | 21.41 | 44,008 | 34,467 | 7,922 | 23,046 |
| 6/30/00 | 49,276 | 1,844 | 1,076 | 21.41 | 50,044 | 39,364 | 7,937 | 30,983 |

## DEFINED CONTRIBUTION PLANS

a.   Pursuant to the City's withdrawal from the Federal Social Security System effective January 8, 1982, and to the Federal Government's mandate of a Social Security Medicare tax for all employees not covered by Social Security hired on or after April 1, 1986. the City established the Supplemental Pension Savings Plan ("SPSP"), a defined contribution plan administered by American Express Trust Company, Minneapolis, MN, which provides pension benefits for eligible full-time employees. In a defined contribution plan, benefits depend solely on amounts contributed to the plan plus investment earnings. Employees are eligible to participate from the date of employment. State legislation requires that both the employee and the City contribute an amount equal to 3% of the employee's total salary each month. Participants in the plan hired before April 1, 1986 and on or after April 1, 1986 may voluntarily contribute up to an additional 4.5% and 3.05%, respectively, of total salary.

10.    PENSION PLANS (Continued)

The City also contributes an amount equal to the employee voluntary contributions    The City's contributions for each employee (and interest allocated to the employee's account) are fully vested after five years of continuous service.  City contributions for, and interest forfeited by, employees who leave employment before five years of service are used to reduce the City's contribution requirement.

The City and the covered employees contributed approximately $41,556,000 for the year ending June 30, 2001.  As of June 30, 2001, fair value of Plan assets totaled approximately $390,319,000.  SPSP is considered part of the City of San Diego's financial reporting entity and is included in the City's financial reports as a Pension Trust Fund.

In addition, the City established a 401(k) Plan effective July 1, 1985   The plan is a defined contribution plan administered by American Express Trust Company, Minneapolis, MN, to provide  pension benefits for all eligible full-time employees.  Employees are eligible to participate twelve months after the date of employment. Employees make contributions to their 401(k) accounts through payroll deductions, and may also elect to have the City contribute to their 401(k) accounts through the City's Employees' Flexible Benefits Program.

The employees' 401(k) contributions were calculated pursuant to various combination arrangements.  The covered employees and the City contributed approximately $19,316,000 during the Fiscal Year.

As of June 30, 2001, fair value of Plan assets totaled approximately $104,909,000.  The 401(k) Plan is considered part of the City of San Diego's financial reporting entity and is included in the City's financial reports as an Agency Fund.

b.    Centre City Development Corporation ("CCDC") has a Money Purchase Pension Plan covering all full-time permanent employees.  The plan is a defined contribution plan under which benefits depend solely on amounts contributed to the plan plus investment earnings.  Employees are eligible to participate on the first day of the month following 90 days after their date of employment.  During each plan year, CCDC contributes quarterly an amount equal to 8% of the total quarterly compensation for all employees. CCDC's contributions for each employee are fully vested after six years of continuous service.

CCDC's total payroll in Fiscal Year 2001 was approximately $2,445,056.  CCDC contributions were calculated using the base salary amount of approximately $2,326,716.  CCDC made the required 8% contribution, amounting to approximately $186,137 (net of forfeitures) for Fiscal Year 2001.

In addition, CCDC has a Tax Deferred Annuity Plan covering current and previous full-time permanent employees.  The plan is a defined contribution plan.  Employees are eligible to participate the first day of the month following 90 days after their date of employment.  During each plan year, CCDC contributes semi-monthly an amount equal to 10% of the total semi-monthly compensation for all employees.

CCDC's contributions for each employee are fully vested at time of contribution.

CCDC's total payroll in Fiscal Year 2001 was approximately $2,445,056.  CCDC contributions were calculated using the base salary amount of approximately $2,326,716.  CCDC made the required 10% contribution amounting to approximately $232,671 for Fiscal Year 2001.  The Tax Deferred Annuity Plan includes amounts deposited by employees prior to CCDC becoming a contributor to the Plan.

The fiduciary responsibilities of CCDC consist of making contributions and remitting deposits collected.

Exhibit 2
28 of 175

20-33

## 10.    PENSION PLANS (Continued)

c.    The San Diego Convention Center Corporation Money Purchase Pension Plan (the "Plan") became effective January 1, 1986. The Plan is a qualified defined contribution plan and, as such, benefits depend on amounts contributed to the plan plus investment earnings and allocated forfeitures, less allowable plan expenses. The Plan covers employees not otherwise covered through a collective bargaining unit agreement. Employees are eligible at the earlier of the date on which they complete six months of continuous full-time service, or the twelve-month period beginning on their hire date (or any subsequent plan year) during which they complete 1,000 hours of service. A plan year is defined as a calendar year. Plan balances for each eligible employee are vested gradually over five years of continuing service with an eligible employee becoming fully vested after five years. Forfeitures and Plan expenses are allocated in accordance with Plan provisions.

Required contributions were calculated using the covered compensation amount of approximately $8,806,412. SDCCC has funded the required contribution as of June 30, 2001.

For the Fiscal Year ended June 30, 2001, pension expense for the Plan amounted to $863,187. SDCCC records pension expense during the Fiscal Year based upon estimated covered compensation.

SDCCC offers its employees a Deferred Compensation Plan (the "Deferred Plan") created in accordance with Internal Revenue Code Section 457. The Deferred Plan, available to all employees, permits them to defer a portion of their salary until future years. The deferred compensation is not available to employees until termination, retirement, death, disability, or an unforeseeable emergency.

SDCCC funds the deferred compensation through investments in various mutual funds administered by an insurance company. Until paid or made available to the employee or other beneficiary, such investments and all related earnings thereon are solely the property and right of SDCCC (without being restricted to the provisions of benefits under the Deferred Plan), subject only to the claims of SDCCC's general creditors. Participants under the Deferred Plan have only the right to receive benefits in an amount equal to the balance of their account. SDCCC is of the opinion that it has no liability for the losses under the Deferred Plan but does have the duty of due care that would be required of an ordinary prudent investor. SDCCC believes that it is unlikely that it will use the Deferred Plan's assets to satisfy claims of creditors in the future.

d.    San Diego Data Processing Corporation ("SDDPC") has accrued and set aside funds in a money market account to provide employees who transferred from the City to SDDPC with retirement benefits approximately equal to those under the City's retirement plan. As of June 30, 2001 and 2000, the balance in the account was $121,798 and $115,453, respectively.

The balance at June 30, 2001 consisted of the total estimated liability plus interest earned on the account since its establishment in Fiscal Year 1991.

In addition, SDDPC has in effect a Money Purchase Pension Plan ("the Plan") covering substantially all employees. The plan is a defined contribution plan, wherein benefits depend solely on amounts contributed to the plan plus investment earnings. Employees are eligible to participate from the date of employment. During each plan year, SDDPC contributes monthly an amount equal to 20% of the total monthly compensation for all employees. SDDPC contributions for each employee are fully vested after four years of continuous service.

SDDPC's total payroll in Fiscal Year 2001 and 2000, was approximately $22,871,911 and $20,686,496, respectively. As all employees are substantially covered, SDDPC contributions were calculated using this base salary amount. SDDPC made the required 20% contribution amounting to approximately $4,247,425 and $4,150,505 for Fiscal Years 2001 and 2000 respectively.

## 10.   PENSION PLANS (Continued)

e.   San Diego Housing Commission ("SDHC") provides pension benefits for all of its full-time employees through a defined contribution plan.  Employees are eligible to participate on the first day of their employment.  The SDHC contributes an amount equal to 14% of the employee's base salary semi-monthly.  The SDHC's contributions for each employee (and interest allocated to the employee's account) are fully vested after four years of continuous service.  The SDHC contributions for, and interest forfeited by, employees who leave employment before four years of service are used to reduce the SDHC's contribution requirement.

SDHC made the required 14% contribution, amounting to approximately $1,493,970 for Fiscal Year 2001 based on covered payroll of approximately $10,374,262.

SDHC offers its employees a deferred compensation plan created in accordance with Internal Revenue Code Section 457.  The plan, available to all full-time SDHC employees, permits them to defer a portion of their salary until future years.  The deferred compensation is not available to employees until termination, retirement, death, disability or an unforeseeable emergency.

Fair value of the Plan assets was $18,856,838 at June 30, 2001.

f.   Southeastern Economic Development Corporation ("SEDC") has a Simplified Employee Pension Plan covering all full-time, permanent employees.  The plan is a defined contribution plan.  Employees are eligible to participate on the first day of the month following 90 days after their date of employment.  During each plan year, SEDC contributes monthly an amount equal to 12% of the employee's base salary.  Beginning July 1, 1998, SEDC contributed an additional monthly amount equal to 15% of the base salary for management employees.  Such contributions are fully vested upon contributions.

SEDC's total payroll in Fiscal Year 2001 was approximately $762,500.  SEDC contributions were calculated using the base salary amount of approximately $692,000.  SEDC made the required 12% contribution, amounting to approximately $93,600 for Fiscal Year 2001.

## 11.   POST RETIREMENT HEALTH INSURANCE

In addition to providing pension benefits, the City of San Diego Municipal Code provides certain health care insurance benefits for retired general and safety members of SDCERS who retired on or after October 6, 1980. At June 30, 2001, approximately 2,435 eligible retirees received benefits.

Certain health care insurance benefits were established during Fiscal Year 1995 for eligible retirees who retired prior to October 6, 1980 or who were otherwise not eligible to receive City-paid health care insurance as of June 30, 1994.  At June 30, 2001, approximately 648 eligible retirees received benefits.

Currently, expenses for post-employment healthcare benefits are recognized as they are paid.  For the Fiscal Year ended June 30, 2001, expenditures of approximately $7,207,018 were recognized for such health care benefits.

Substantially all of the City's general and safety members of SDCERS may become eligible for those benefits if they reach normal retirement age and meet service requirements as defined while working for the City.

Exhibit 2
30 of 175

20-35