# EXHIBIT 4

Fitch: AAA/AA+
Moody's: Aaa/Aa3
Standard & Poor's: AAA/AA-
(See "RATINGS" herein)

*In the opinion of Stradling Yocca Carlson & Rauth, a Professional Corporation, Newport Beach, California ("Special Counsel"), under existing statutes, regulations, rulings and judicial decisions, and assuming the accuracy of certain representations and compliance with certain covenants and requirements described herein, the interest (and original issue discount) due with respect to the Certificates is excluded from gross income for federal income tax purposes and is not an item of tax preference for purposes of calculating the federal alternative minimum tax imposed on individuals and corporations. In the further opinion of Special Counsel, the interest (and original issue discount) due with respect to the Certificates is exempt from State of California personal income tax. See "TAX EXEMPTION" herein.*

$17,425,000
**CITY OF SAN DIEGO**
**2003 Certificates of Participation**
**(1993 Balboa Park/Mission Bay Park Refunding)**
Evidencing Undivided Proportionate Interests in Lease Payments to be Made by the
**CITY OF SAN DIEGO**
Pursuant to a Lease with the
**SAN DIEGO FACILITIES AND EQUIPMENT LEASING CORPORATION**

Dated: Date of Delivery                                                                                             Due: November, as shown on the inside cover

The City of San Diego (the "City") 2003 Certificates of Participation (1993 Balboa Park/Mission Bay Park Refunding) (the "Certificates") are being executed and delivered to (i) refund the City's outstanding Certificates of Participation (Balboa Park and Mission Bay Park Capital Improvements Program), Series 1993, (ii) acquire a debt service reserve fund surety bond and a financial guaranty insurance policy for the Certificates, and (iii) pay the costs of issuance incurred in connection with the execution and delivery of the Certificates. See "THE REFUNDING PLAN" herein. The Certificates represent undivided proportionate interests of the Owners in the lease payments (the "Lease Payments") to be made by the City to the San Diego Facilities and Equipment Leasing Corporation (the "Corporation"), under the Facilities Lease Agreement, dated as of June 1, 2003, by and between the City and the Corporation (the "Lease Agreement") pursuant to which the City will lease the North Torrey Pines Golf Course and the Balboa Park House of Charm (collectively, the "Site") from the Corporation. See "DESCRIPTION OF THE SITE" herein.

Interest represented by the Certificates is payable semiannually on May 1 and November 1 of each year, commencing on November 1, 2003. The Certificates will be executed and delivered in the principal amount of $5,000 and any integral multiple thereof. See "THE CERTIFICATES – General" herein. The Certificates will be executed and delivered in book-entry form only and, when delivered, will be registered in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"), which will act as securities depository for the Certificates. Individual purchases of the Certificates will be made in book-entry form only. Purchasers of the Certificates will not receive certificates representing their ownership interests in the Certificates purchased. Principal, premium, if any, and interest payments due with respect to the Certificates are payable directly to DTC by Wells Fargo Bank, National Association, as Trustee. Upon receipt of payments of principal, premium, if any, and interest, DTC will in turn distribute such payments to the beneficial owners of the Certificates. See APPENDIX G — "DTC BOOK-ENTRY SYSTEM" herein.

**The Certificates are subject to extraordinary and optional prepayment prior to maturity, as described herein. See "THE CERTIFICATES – Prepayment" herein.**

THE CERTIFICATES DO NOT CONSTITUTE AN OBLIGATION OF THE CORPORATION OR THE CITY FOR WHICH THE CORPORATION OR THE CITY IS OBLIGATED TO LEVY OR PLEDGE ANY FORM OF TAXATION OR FOR WHICH THE CORPORATION OR THE CITY HAS LEVIED OR PLEDGED ANY FORM OF TAXATION. THE OBLIGATION OF THE CITY TO MAKE LEASE PAYMENTS UNDER THE LEASE AGREEMENT DOES NOT CONSTITUTE AN OBLIGATION OF THE CITY FOR WHICH THE CITY IS OBLIGATED TO LEVY OR PLEDGE ANY FORM OF TAXATION OR FOR WHICH THE CITY HAS LEVIED OR PLEDGED ANY FORM OF TAXATION. NEITHER THE CERTIFICATES NOR THE OBLIGATION OF THE CITY TO MAKE LEASE PAYMENTS CONSTITUTES AN INDEBTEDNESS OF THE CORPORATION, THE CITY, THE STATE OF CALIFORNIA OR ANY POLITICAL SUBDIVISION THEREOF WITHIN THE MEANING OF ANY CONSTITUTIONAL OR STATUTORY DEBT LIMITATION OR RESTRICTION.

Payment of the principal of and interest represented by the Certificates when due will be insured by a financial guaranty insurance policy to be issued by Ambac Assurance Corporation, a Wisconsin-domiciled stock insurance corporation, simultaneously with the delivery of the Certificates. See "CERTIFICATE INSURANCE" herein.

*Ambac*

The purchase of the Certificates involves certain risks which should be considered by investors. See "RISK FACTORS" for a discussion of certain risk factors that should be considered in addition to the other matters set forth herein.

**This cover page contains information for quick reference only. It is not a summary of this issue. Potential purchasers must read the entire Official Statement to obtain information essential to making an informed investment decision.**

MATURITY SCHEDULE
(See Inside Cover Page)

*The Certificates will be offered when, as and if executed and delivered, and received by the Underwriter, subject to the approval as to their legality by Stradling Yocca Carlson & Rauth, a Professional Corporation, Newport Beach, California, Special Counsel, and certain other conditions. Certain legal matters will be passed upon for the City by the City Attorney and for the Corporation by Foley & Lardner, San Diego, California. It is anticipated that the Certificates will be available in book-entry form for delivery to DTC in New York, New York, on or about June 17, 2003.*

**CITIGROUP**

Dated: May 29, 2003

Exhibit 4
47 of 175

$17,425,000
CITY OF SAN DIEGO
2003 Certificates of Participation
(1993 Balboa Park/Mission Bay Park Refunding)
Evidencing Undivided Proportionate Interests in Lease Payments to be Made by the
CITY OF SAN DIEGO
Pursuant to a Lease with the
SAN DIEGO FACILITIES AND EQUIPMENT LEASING CORPORATION

Maturity Schedule
$17,425,000 Serial Certificates

| Maturity (November 1) | Principal Amount | Interest Rate | Price/Yield |
|---|---|---|---|
| 2003 | $ 485,000 | 1.00% | 100% |
| 2004 | 1,230,000 | 1.50 | 1.00 |
| 2005 | 1,710,000 | 1.60 | 1.15 |
| 2006 | 1,730,000 | 1.60 | 1.35 |
| 2007 | 1,780,000 | 4.00 | 1.85 |
| 2008 | 1,835,000 | 2.00 | 100 |
| 2009 | 460,000 | 2.30 | 100 |
| 2010 | 470,000 | 2.70 | 2.75 |
| 2011 | 485,000 | 3.00 | 100 |
| 2012 | 495,000 | 3.00 | 3.10 |
| 2013 | 510,000 | 3.20 | 3.25 |
| 2014 | 530,000 | 3.30 | 3.40 |
| 2015 | 545,000 | 3.40 | 3.50 |
| 2016 | 565,000 | 3.60 | 3.65 |
| 2017 | 585,000 | 3.60 | 3.70 |
| 2018 | 605,000 | 3.70 | 3.80 |
| 2019 | 630,000 | 3.875 | 3.95 |
| 2020 | 655,000 | 3.875 | 4.00 |
| 2021 | 680,000 | 4.00 | 4.15 |
| 2022 | 705,000 | 4.00 | 4.20 |
| 2023 | 735,000 | 4.00 | 4.25 |

Exhibit 4
48 of 175

# APPENDIX A
# THE CITY OF SAN DIEGO

*The information and expressions of opinion set forth herein have been obtained from sources believed to be reliable, but such information is not guaranteed as to accuracy or completeness. Statements contained herein which involve estimates, forecasts, or matters of opinion, whether or not expressly so described herein, are intended solely as such and are not to be construed as representations of facts. The information and expressions of opinion herein are subject to change without notice, and neither delivery of this Official Statement nor any sale thereafter of the securities offered hereby shall under any circumstances create any implication that there has been no change in the affairs of the City or in any other information contained herein since the date of the Official Statement.*

## INTRODUCTION

With a total population of approximately 1.3 million in 2002, and a land area of 330 square miles, the City of San Diego (the "City") is the seventh largest city in the nation and the second largest city in California. The City is the county seat for the County of San Diego (the "County") and is the County's business and financial center.

Based on estimates published by the California Department of Finance in May 2002, the City's population grew by 9.7% between 1993 and 2002, with an average increase of approximately 12,300 annually. A major factor in the City's growth is its quality of life. In addition to having a favorable climate, the City offers a wide range of cultural and recreational services to both residents and visitors. With mild temperatures year round, the City's numerous beaches, parks, tennis courts, and golf courses are in constant use.

Another factor in the City's growth is its diversified economy. Recent growth has been concentrated in four major areas: high tech manufacturing and research (including electronics, telecommunications, scientific instruments, drugs, and biomedical equipment); professional services; tourism; and international trade. Historically, the City has also benefited from a stable economic foundation composed of basic manufacturing (ship building, industrial machinery, television & video equipment, and printing & publishing), public and private higher education, health services, military, and local government.

## PENSION PLAN

All benefited City employees participate with the full-time employees of the San Diego Unified Port District (the "District") in the City Employees' Retirement System ("CERS"). CERS is a public employee retirement system that acts as a common investment and administrative agent for the City and the District. Through various benefit plans, CERS provides retirement benefits to all general, safety (police and fire), and legislative members.

The CERS plans are structured as defined benefit plans in which benefits are based on salary, length of service, and age. City employees are required to contribute a percentage of their annual salary to CERS. State legislation requires the City to contribute to CERS at rates determined by actuarial valuations.

The City's last actuarial valuation dated June 30, 2002 stated the funding ratio (Valuation of Assets available for Benefits to Total Actuarial Accrued Liability), of the CERS fund to be 77.3%. The CERS fund has an Unfunded Actuarial Accrued Liability (UAAL) of $720.7 million as of June 30, 2002, which represents a $436.8 million increase in the UAAL since the previous actuarial calculation dated June 30, 2001. The UAAL is the difference between total actuarial accrued liabilities of $3.169 billion and assets allocated to funding of $2.448 billion. The increase in the UAAL as of June 30, 2002, results primarily from the lower than anticipated investment returns. The UAAL is amortized over a 30-year period, which started July 1, 1991, with each year's amortization payment reflected as a portion of the percentage of payroll representing the employer's contribution rate. As of June 30, 2002, there were 19 years remaining in the amortization period. See "**LITIGATION POTENTIALLY AFFECTING THE GENERAL FUNDS OF THE CITY- Other Litigations and Claims**" for a discussion of a pending litigation relating to the funding of the UAAL.

## INSURANCE, CLAIMS, AND LITIGATION

### Workers' Compensation And Long-Term Disability

The City is self-insured for Workers' Compensation and Long-term Disability. The City's self-insured liability for Workers' Compensation and Long-term Disability is accounted for in the Self Insurance Fund. The Self Insurance Fund for Workers' Compensation and Long-Term Disability is supported by contributions from each of the City's operating funds. These contributions are determined by multiplying an annually established rate by the gross salaries payable from each of the City's operating funds. As of June 30, 2002, there is a fund equity deficit in the Self Insurance Fund of approximately $29.3 million. It is anticipated that individual claim settlements will be funded through participating operating fund contributions subsequent to the filing of a claim and prior to its settlement.

### Employee Group Health Insurance

Employee Group Health coverage is provided to employees and retirees by third party group health insurance carriers through an annual "cafeteria plan" selection process.

### Public Liability Insurance

The City carries public liability insurance in the amount of $54 million in excess of the City's $1 million self-insured retention. This means that the City may pay up to the first $1 million in any one insured public liability loss and that insured losses above $1 million and up to $54 million are paid by

At that same election, another proposition was submitted to the voters for consideration. This proposition, Proposition F, asked the voters whether the City Charter should be amended to require that, in order to be adopted or effective, any City Charter amendment, ballot proposal, initiative, statute, law, or regulation requiring a greater than simple majority vote of the electorate, and which is proposed to be adopted on or after the date of this election, must be adopted by the same proportionate vote of the electorate. In effect, the City has argued in the litigation described below that, the adoption of this proposition would require that Proposition E would have to be approved by a two-thirds vote of the qualified electors voting in the March 5, 2002 election.

Proposition E was approved by 54.4% and Proposition F was approved by 50.3% of the voters in the March 5, 2002 election. Having received a majority vote, Proposition F was adopted. The City has taken a position that Proposition E, however, by the terms of Proposition F, was not adopted.

There have been two cases filed challenging the results of the March 5, 2002 election pertaining to Propositions E and F; *Teyssier v. City of San Diego, et al.* and *Howard Jarvis Taxpayers Association v. City of San Diego et al.* Both actions seek declaratory relief contending that Proposition F is unconstitutional. In addition, *Teyssier* seeks a writ of mandate directing the City to certify and record the adoption of Proposition E. Both matters allege (i) that Proposition F is preempted by the California Constitution; (ii) that it cannot affect an election held prior to its effective date; and (iii) that Proposition F, having received fewer votes than Proposition E, an alleged conflicting measure on the same ballot, should have been defeated. The trial court consolidated the two cases.

On April 22, 2003, the City received a minute order of the trial court for the consolidated cases. The Court's ruling declines to invalidate Proposition E. The Court leaves open the question whether Proposition E could require a supermajority for an amendment to the City Charter, which would impose or raise a general tax. The Court's minute order has not been reduced to a judgment. The City has not yet decided to appeal or otherwise contest the ruling. Regardless of the outcome of the litigation, these lawsuits are unlikely to have any impact to the City's budget or revenue for Fiscal Year 2003, because they relate only to new or increased taxes. It is currently anticipated that the City's proposed budget for Fiscal Year 2004 would not include projected revenues from any such tax enhancing measures.

**Other Litigation and Claims**

In February 2002, the Public Facilities Financing Authority of the City of San Diego issued lease revenue bonds in the aggregate principal amount of $169,685,000 (the "Ballpark Bonds") for the construction of a state of the art baseball park. The ballpark project has been the subject of a variety of litigations, however, there has not been any new litigation filed regarding the project since the approval of the original Offering Document in 2002. The case *Skane v. City of San Diego*, Court of Appeal case no. D038879 has been finally resolved, the California Supreme Court denying a petition for review on October 2, 2002. On January 30, 2003, the Fourth District Court of Appeal filed an opinion affirming a trial court judgment in favor of the City in the case *Simmons v. City of San Diego*, Court of Appeal case no. D039838. The plaintiffs failed to file a petition for review to the California Supreme Court by the filing deadline of March 11, 2003. The City and Bond Counsel are considering the import of the appellate court's decision on the City's ability to refund the 2002 Bonds (see "**BONDED AND OTHER INDEBTEDNESS- Proposed Additional General Fund Lease Commitments**). The case *City v. All Persons Interested*, Superior Court case no. GIC763487 was the subject of appeals that were consolidated under Court of Appeal case no D038587 and were further consolidated with Skane. The Court of Appeal affirmed the judgment in favor of the City and the Redevelopment Agency. The California Supreme Court

denied the petitions for review on October 2, 2002.

On March 29, 2002, Brown Field Aviation Park LLC (BFAP) filed a claim seeking damages in excess of $120 million, asserting that the City breached a Memorandum of Understanding that provided BFAP with the exclusive right to negotiate a proposed Development Agreement and Master Lease that would transform Brown Field into a cargo airport with ancillary commercial and industrial uses. BFAP contended that the City breached the MOU by requiring review by the Federal Aviation Administration prior to a City Council hearing. In addition, BFAP claimed the city breached the MOU by failing to present the project for City Council consideration in September 2000, and by failing to continue negotiations after the FAA released a preliminary airspace analysis on September 29, 2000.

On March 4, 2003 the City Council approved a settlement of this case by agreeing to pay BFAP $1.25 million. This sum represents a refund of the money BFAP paid to the City for the right to negotiate the project and for the labor costs incurred by the City staff in reviewing the proposed project. The City's excess liability carrier also agreed to pay $249,000 in settlement of the claim.

On January 16, 2003, a class action complaint (*Gleason v. City of San Diego, et al.*) for declaratory relief was filed in the Superior Court against the City, the City's Employees' Retirement System (SDCERS), and certain named members of the SDCERS board of administration. The plaintiffs, former City employees who receive City retirement benefits, allege that as a result of recent actions taken by the defendants, the SDCERS trust fund has an unfunded accrued liability of $720 million, and that by 2009, the City will owe approximately $2.8 billion to SDCERS, with an annual City budget expense of more than $250 million. In addition to the declaration of their rights, plaintiffs ask for restitution to the SDCERS trust fund, an injunction prohibiting the City from unlawfully underfunding the trust fund in the future, money damages, attorneys' fees, and other relief.

As noted under the heading "**PENSION PLAN**" above, the City's unfunded accrued actuarial liability as of June 30, 2002 is approximately $720 million. The City is defending the case and believes it has complied with applicable law in the funding of the SDCERS trust fund. The case is still in the early stages, and the City has not completed an assessment of the claim. The City cannot predict the outcome of the litigation at this time, but if the plaintiffs are successful, there potentially may be additional expense to the General Fund in the funding of the SDCERS trust fund and otherwise, over and above the City's expected expense in the funding of its pension obligations.

## INVESTMENT OF FUNDS

The Treasurer of the City of San Diego, in accordance with the Charter of the City of San Diego and authority granted by the City Council, is responsible for investing the unexpended cash in the Treasurer's pooled operating investment fund (the "City Pool"). Responsibility for the daily investment of funds in the City Pool is delegated to the City's Chief Investment Officer. The City is the only participant in the City Pool; there are no other City Pool participants either voluntary or involuntary. The investment objectives of the City Pool are preservation of capital, liquidity and return.

### Oversight and Reporting Requirements

The City Treasurer provides an investment report on a monthly basis to the City Manager, the City Auditor and Comptroller and the City Council and annually presents a statement of investment policy (the "Investment Guidelines") to the City Manager, the City Council and the City Manager's

10. **LEASE COMMITMENTS (Continued)**

    This amount does not include contingent rentals which may be received under certain leases of property on the basis of percentage returns. Contingent rentals amounted to $34,230,181 in the year ended June 30, 2002.

11. **DEFERRED COMPENSATION PLAN**

    <u>City of San Diego</u>

    The City offers its employees a deferred compensation plan created in accordance with Internal Revenue Code Section 457. The plan, available to all full-time City employees, permits them to defer a portion of their salary until future years. The deferred compensation is not available to employees until termination, retirement, death, disability or an unforeseeable emergency. All assets and income of the deferred compensation plan are held in trust for the exclusive benefit of plan participants and their beneficiaries.

    Fair value of the plan assets was $101,962,660 at June 30, 2002.

12. **PENSION PLANS**

    The City has a defined benefit plan and various defined contribution pension plans covering substantially all of its employees.

    DEFINED BENEFIT PLAN

    a. <u>Plan Description</u>

        All of the City and the San Diego Unified Port District (the "District") full-time employees participate in the San Diego City Employees' Retirement System ("SDCERS").

        SDCERS is a public employee retirement system established in 1927 by the City and administered by a Board of Administration (the "Board") to provide retirement, disability, death and survivor benefits for its members.

        In 1963, through an agreement between the City and the District, employees of the District became members of SDCERS.

        The Plan is a defined benefit plan which covers all eligible employees of the City and the District. The Plan is a multiple-employer public employee retirement system that acts as a common investment and administrative agent for the City and the District. As a defined benefit plan, retirement benefits are determined primarily by a member's age at retirement, the length of membership service and the member's final compensation earnable based on the highest one-year period.

        The Plan provisions applicable to general members are generally applicable to the District's general members and those applicable to lifeguard members are generally applicable to the District's safety members.

        All full-time City and District employees are eligible to participate in the Plan. Salaried classified employees become members of the system upon employment. Salaried unclassified employees hired on or after August 11, 1995 become members upon employment.

12. **PENSION PLANS (Continued)**

   SDCERS is considered part of the City of San Diego's financial reporting entity and is included in the City's financial reports as a pension trust fund.

   SDCERS issues a stand-alone financial report which is available at its office located at 401 B Street, Suite 400, San Diego, California 92101.

   b. <u>Summary of Significant Accounting Policies</u>

   SDCERS financial statements are prepared using the accrual basis of accounting. Member contributions are recognized in the period they are due. Benefits and refunds are recognized when due and payable in accordance with terms of the Plan.

   c. <u>Funding Policy</u>

   SDCERS' funding policy provides for periodic employer contributions at actuarially determined rates that, expressed as percentages of annual covered payroll, are designed to accumulate sufficient assets to pay benefits when due. The normal cost and actuarial accrued liability are determined using the projected unit credit actuarial funding method. Unfunded actuarial accrued liabilities are being amortized as a level percent of payroll over a period of 30 years (19 years remaining).

   Members are required to contribute a percentage of their annual salary to the Plan. Contributions vary according to age at entry into the plan and salary. The City and the District contribute a portion of the employees' share and the remaining amount necessary to fund the system based on an actuarial valuation at the end of the preceding year under the projected unit credit method of actuarial valuation. Prior to June 30, 1993, contributions were based on the entry age normal cost method of valuation.

   During the period July 1, 2001 to June 30, 2002 contributions totaling $105,699,000 ($51,058,000 employer and $54,641,000 employee) were made. Of the employer contributions, $40,846,000 was applied to normal cost and $10,212,000 was applied to unfunded accrued liability. All of the employer offset contributions were applied to normal cost.

   In 1996 the City Council approved proposed changes to the San Diego City Employees' Retirement System (SDCERS) which included changes to retiree health insurance, plan benefits, employer contribution rates and system reserves. The proposal included a provision to assure the funding level of the system would not drop below a level the Board's actuary deems reasonable in order to protect the financial integrity of the SDCERS. A citizen required vote on the changes related to retiree health insurance passed overwhelmingly in 1996. In 1997, the active members of the SDCERS voted and approved the changes. Portions of the proposal requiring SDCERS Board approval (employer rates and reserves) were approved after review and approval by its independent fiduciary counsel and consultation with the actuary. The San Diego Municipal Code was then amended to reflect the changes.

   The changes provide the employer contribution rates be "ramped up" to the actuarially recommended rate in .50 percent increments over a ten year period at such time it was projected that the Projected Unit Credit (PUC) and Entry Age Normal (EAN) rates would be equal and the SDCERS would convert to EAN. The actuary calculated the present value of the difference between the employer contribution rate and actuarial rates over the ten year period

## 12. PENSION PLANS (Continued)

and this amount was funded in a reserve. This "Corridor" funding method is unique to the SDCERS and therefore is not one of the six funding methods formally sanctioned by the Governmental Accounting Standards Board for expending purposes. As a result for June 30, 2002, the actuary rates are reported to be $39,230,000 more than paid by the City which, technically per GASB 27 effective for periods beginning after June 15, 1997, is to be reported as a Net Pension Obligation (NPO) even though the shortfall is funded in a reserve. The actuary believes the Corridor funding method is an excellent method for the City and that it will be superior to the PUC funding method.

### d. Annual Required Contribution

The annual required contribution for the current year was determined as part of the June 30, 1996 actuarial valuation using the projected unit credit actuarial funding method. The actuarial assumptions included (a) an 8.0% investment rate of return and (b) projected salary increases of 4.75% per year. Both (a) and (b) included an inflation rate of 4.5%. The actuarial value of assets was determined using techniques that smooth the effects of short-term volatility in the market value of investments over a five-year period. The unfunded actuarial accrued liability is being amortized as a level percentage of projected payroll on an open basis. The remaining amortization period at June 30, 2002 was 19 years.

### e. Three-Year Trend Analysis

The following table shows the City's Annual Pension Cost (APC) and the percentage of the APC contributed for the most current year available and preceding years (in thousands):

| Fiscal Year Ending | Annual Pension Cost (APC) | Percentage Contributed | Net Pension Obligation |
|---|---|---|---|
| 6/30/99 | $ 44,008 | 78.3% | $ 23,046 |
| 6/30/00 | 50,044 | 78.66 | 30,983 |
| 6/30/01 | 52,585 | 84.32 | 39,230 |

### f. Net Pension Obligation Three Year-Trend Analysis

The following table shows the calculation of the City's NPO presented in governmental business-type and fiduciary funds for the most current year available and preceding years (in thousands):

| Fiscal Year Ending | Actuarial Required Contribution (ARC) | Interest on NPO | ARC Adjustment | Amortization Factor | APC | Contributions Made | Change in NPO | NPO |
|---|---|---|---|---|---|---|---|---|
| 6/30/99 | $ 43,504 | $ 1,210 | $ 706 | 21.41% | $44,008 | $34,467 | $ 7,922 | $ 23,046 |
| 6/30/00 | 49,276 | 1,844 | 1,076 | 21.41 | 50,044 | 39,364 | 7,937 | 30,983 |
| 6/30/01 | 54,346 | 2,269 | 4,030 | 21.41 | 52,585 | 44,338 | 8,247 | 39,230 |

12. **PENSION PLANS (Continued)**

   DEFINED CONTRIBUTION PLANS

   a. Pursuant to the City's withdrawal from the Federal Social Security System effective January 8, 1982, and to the Federal Government's mandate of a Social Security Medicare tax for all employees not covered by Social Security hired on or after April 1, 1986, the City established the Supplemental Pension Savings Plan ("SPSP"), a defined contribution plan administered by American Express Trust Company, Minneapolis, MN, which provides pension benefits for eligible full-time employees. In a defined contribution plan, benefits depend solely on amounts contributed to the plan plus investment earnings. Employees are eligible to participate from the date of employment. State legislation requires that both the employee and the City contribute an amount equal to 3% of the employee's total salary each month. Participants in the plan hired before April 1, 1986 and on or after April 1, 1986 may voluntarily contribute up to an additional 4.5% and 3.05%, respectively, of total salary.

   The City also contributes an amount equal to the employee voluntary contributions. The City's contributions for each employee (and interest allocated to the employee's account) are fully vested after five years of continuous service. City contributions for, and interest forfeited by, employees who leave employment before five years of service are used to reduce the City's contribution requirement.

   The City and the covered employees contributed approximately $45,584,371. As of June 30, 2002, fair value of Plan assets totaled approximately $375,108,000. SPSP is considered part of the City of San Diego's financial reporting entity and is included in the City's financial reports as a Pension Trust Fund.

   In addition, the City established a 401(k) Plan effective July 1, 1985. The plan is a defined contribution plan administered by American Express Trust Company, Minneapolis, MN, to provide pension benefits for all eligible full-time employees. Employees are eligible to participate twelve months after the date of employment. Employees make contributions to their 401(k) accounts through payroll deductions, and may also elect to have the City contribute to their 401(k) accounts through the City's Employees' Flexible Benefits Program.

   The employees' 401(k) contributions were calculated pursuant to various combination arrangements. The covered employees and the City contributed approximately $21,650,000 during the fiscal year.

   As of June 30, 2002, fair value of Plan assets totaled approximately $104,059,000. The 401(k) Plan is considered part of the City of San Diego's financial reporting entity and is included in the City's financial reports as an Agency Fund.

   b. Centre City Development Corporation ("CCDC") has a Money Purchase Pension Plan covering all full-time permanent employees. The plan is a defined contribution plan under which benefits depend solely on amounts contributed to the plan plus investment earnings. Employees are eligible to participate on the first day of the month following 90 days after their date of employment. During each plan year, CCDC contributes quarterly an amount equal to 8% of the total quarterly compensation for all employees. CCDC's contributions for each employee are fully vested after six years of continuous service. CCDC's total payroll in Fiscal Year 2002 was approximately $2,614,401. CCDC contributions were calculated using the base salary amount of approximately $2,533,958. CCDC made the required 8% contribution, amounting to approximately $202,716 (net of forfeitures) for Fiscal Year 2002.

## 12. PENSION PLANS (Continued)

In addition, CCDC has a Tax Deferred Annuity Plan covering current and previous full-time permanent employees. The plan is a defined contribution plan. Employees are eligible to participate the first day of the month following 90 days after their date of employment. During each plan year, CCDC contributes semi-monthly an amount equal to 10% of the total semi-monthly compensation for all employees.

CCDC's contributions for each employee are fully vested at time of contribution.

CCDC's total payroll in Fiscal Year 2002 was approximately $2,614,401. CCDC contributions were calculated using the base salary amount of approximately $2,533,958. CCDC made the required 10% contribution amounting to approximately $253,396 for Fiscal Year 2002. The Tax Deferred Annuity Plan includes amounts deposited by employees prior to CCDC becoming a contributor to the Plan.

The fiduciary responsibilities of CCDC consist of making contributions and remitting deposits collected.

c. The San Diego Convention Center Corporation Money Purchase Pension Plan (the "Plan") became effective January 1, 1986. The Plan is a qualified defined contribution plan and, as such, benefits depend on amounts contributed to the plan plus investment earnings and allocated forfeitures, less allowable plan expenses. The Plan covers employees not otherwise covered through a collective bargaining unit agreement. Employees are eligible at the earlier of the date on which they complete six months of continuous full-time service, or the twelve-month period beginning on their hire date (or any subsequent plan year) during which they complete 1,000 hours of service. A plan year is defined as a calendar year. Plan balances for each eligible employee are vested gradually over five years of continuing service with an eligible employee becoming fully vested after five years. Forfeitures and Plan expenses are allocated in accordance with Plan provisions.

Required contributions were calculated using the covered compensation amount of approximately $9,206,590. SDCCC has funded the required contribution as of June 30, 2002.

For the fiscal year ended June 30, 2002, pension expense for the Plan amounted to $1,032,196. SDCCC records pension expense during the fiscal year based upon estimated covered compensation.

SDCCC offers its employees a Deferred Compensation Plan (the "Deferred Plan") created in accordance with Internal Revenue Code Section 457. The Deferred Plan, available to all employees, permits them to defer a portion of their salary until future years. The deferred compensation is not available to employees until termination, retirement, death, disability, or an unforeseeable emergency.

SDCCC funds the deferred compensation through investments in various mutual funds administered by an insurance company. Until paid or made available to the employee or other beneficiary, such investments and all related earnings thereon are solely the property and right of SDCCC (without being restricted to the provisions of benefits under the Deferred Plan), subject only to the claims of SDCCC's general creditors. Participants under the Deferred Plan have only the right to receive benefits in an amount equal to the balance of their account. SDCCC is of the opinion that it has no liability for the losses under the Deferred Plan but does have the duty of due care that would be required of an ordinary prudent investor.

## 12. PENSION PLANS (Continued)

SDCCC believes that it is unlikely that it will use the Deferred Plan's assets to satisfy claims of creditors in the future.

d. San Diego Data Processing Corporation ("SDDPC") has accrued and set aside funds in a money market account to provide employees who transferred from the City to SDDPC with retirement benefits approximately equal to those under the City's retirement plan. As of June 30, 2002 and 2001, the balance in the account was $124,315 and $121,798, respectively. The balance at June 30, 2002 consisted of the total estimated liability plus interest earned on the account since its establishment in Fiscal Year 1991.

In addition, SDDPC has in effect a Money Purchase Pension Plan ("the Plan") covering substantially all employees. The plan is a defined contribution plan, wherein benefits depend solely on amounts contributed to the plan plus investment earnings. Employees are eligible to participate from the date of employment. During each plan year, SDDPC contributes monthly an amount equal to 20% of the total monthly compensation for all employees. SDDPC contributions for each employee are fully vested after four years of continuous service.

SDDPC's total payroll in Fiscal Year 2002 and 2001, was approximately $25,830,029 and $22,871,911, respectively. As all employees are substantially covered, SDDPC contributions were calculated using this base salary amount. SDDPC made the required 20% contribution amounting to approximately $4,817,292 and $4,247,425 for Fiscal Years 2002 and 2001 respectively.

e. San Diego Housing Commission ("SDHC") provides pension benefits for all of its full-time employees through a defined contribution plan. Employees are eligible to participate on the first day of their employment. The SDHC contributes an amount equal to 14% of the employee's base salary semi-monthly. The SDHC's contributions for each employee (and interest allocated to the employee's account) are fully vested after five years of continuous service. The SDHC contributions for, and interest forfeited by, employees who leave employment before four years of service are used to reduce the SDHC's contribution requirement.

SDHC made the required 14% contribution, amounting to approximately $1,524,625 for Fiscal Year 2002 based on covered payroll of approximately $10,872,780.

SDHC offers its employees a deferred compensation plan created in accordance with Internal Revenue Code Section 457. The plan, available to all full-time SDHC employees, permits them to defer a portion of their salary until future years. The deferred compensation is not available to employees until termination, retirement, death, disability or an unforeseeable emergency.

Fair value of the Plan assets was $4,322,216 at June 30, 2002.

f. Southeastern Economic Development Corporation ("SEDC") has a Simplified Employee Pension Plan covering all full-time, permanent employees. The plan is a defined contribution plan. Employees are eligible to participate on the first day of the month following 90 days after their date of employment. During each plan year, SEDC contributes monthly an amount equal to 12% of the employee's base salary. Beginning July 1, 1998, SEDC contributed an additional monthly amount equal to 3% of the base salary for management employees. Such contributions are fully vested upon contributions.

12. **PENSION PLANS (Continued)**

SEDC's total payroll in Fiscal Year 2002 was approximately $804,918. SEDC contributions were calculated using the base salary amount of approximately $683,100. SEDC made the required 12% contribution, amounting to approximately $91,710 for Fiscal Year 2002.

13. **POST RETIREMENT HEALTH INSURANCE**

In addition to providing pension benefits, the City of San Diego Municipal Code provides certain health care insurance benefits for retired general and safety members of SDCERS who retired on or after October 6, 1980. At June 30, 2002, approximately 3,327 eligible retirees received benefits.

Certain health care insurance benefits were established during Fiscal Year 1995 for eligible retirees who retired prior to October 6, 1980 or who were otherwise not eligible to receive City-paid health care insurance as of June 30, 1994. At June 30, 2002, approximately 536 eligible retirees received benefits.

Currently, expenses for post-employment healthcare benefits are recognized as they are paid. For the fiscal year ended June 30, 2002, expenditures of approximately $8,882,138 were recognized for such health care benefits.

Substantially all of the City's general and safety members of SDCERS may become eligible for those benefits if they reach normal retirement age and meet service requirements as defined while working for the City.

14. **INTERFUND RECEIVABLES, PAYABLES, AND TRANSFERS**

Interfund working capital advances balances at June 30, 2002 are as follows (in thousands):

| WCA To | WCA From Nonmajor Governmental | WCA From Internal Service Funds | WCA From Fiduciary Funds | Total |
|---|---|---|---|---|
| General Fund | $ 300 | $ 10,728 | $ 1,489 | $ 12,517 |
| Nonmajor Governmental | 2,190 | 11,898 | 72 | 14,160 |
| Sewer Utility Fund | - | 18,916 | 155 | 19,071 |
| Water Utility Fund | - | 15,533 | 131 | 15,664 |
| Nonmajor Enterprise | 126 | 10,171 | 38 | 10,335 |
| Internal Service Funds | - | 310 | 94 | 404 |
| Total | $ 2,616 | $ 67,556 | $ 1,979 | $ 72,151 |

The balance of $67,246 due from the internal service funds generally resulted from initial investments made to establish working capital when each internal service fund was first created; none of the balance is scheduled to be collected in the subsequent year.