1   ROBERT S. BREWER, JR. (SBN 65294)
    E-mail:  rbrewer@mckennalong.com
2   ROBERT J. LAUCHLAN, JR. (SBN 118545)
    E-mail:  rlauchlan@mckennalong.com
3   GARY K. BRUCKER, JR. (SBN 238644)
    E-mail:  gbrucker@mckennalong.com
4   MCKENNA LONG & ALDRIDGE LLP
    750 B Street, Suite 3300
5   San Diego, CA  92101
    Telephone:     (619) 595-5400
6   Facsimile:     (619) 595-5450

7   Attorneys for Defendant
    MICHAEL T. UBERUAGA

8

9              **UNITED STATES DISTRICT COURT**

10           **SOUTHERN DISTRICT OF CALIFORNIA**

11

12  SECURITIES AND EXCHANGE              CASE NO.  08-CV-0625-DMS (LSP)
    COMMISSION,
13                                       **DEFENDANT MICHAEL T.**
                  Plaintiff,             **UBERUAGA'S MEMORANDUM OF**
14                                       **POINTS AND AUTHORITIES IN**
         vs.                             **SUPPORT OF HIS MOTION TO**
15                                       **DISMISS THE COMPLAINT**
    MICHAEL T. UBERUAGA, EDWARD P.
16  RYAN, PATRICIA FRAZIER, TERESA A.    Date:      November 7, 2008
    WEBSTER, and MARY E. VATTIMO,        Time:      1:30 p.m.
17                                       Judge:     Hon. Dana M. Sabraw
                  Defendants.            Ctrm:      10
18

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

McKenna Long &
Aldridge LLP
Attorneys At Law
San Diego
                                         CASE NO. 08-CV-0625-DMS (LSP)

# TABLE OF CONTENTS

                                                                                        **Page**

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL BACKGROUND ............................................................................... 2

      A.    The City Council Is Generally Tasked To Raise And Spend Public Money,
            Yet Is Not A Party To The Complaint Or The Cease-And-Desist Order .............. 2

      B.    The Complaint Links Mr. Uberuaga To Only One City Security, And
            Only One Act ................................................................................................... 4

      C.    Mr. Uberuaga's Legislative Immunity Is Evidenced By The Terms Of
            The Resolution, Confirming That His Certification Was A Legislative Act ........ 5

III.  MOTIONS TO DISMISS IN GENERAL ............................................................ 6

IV.   LEGISLATIVE IMMUNITY REQUIRES DISMISSAL OF THE COMPLAINT
      IN ITS ENTIRETY .............................................................................................. 7

      A.    Legislative Immunity In General ..................................................................... 7

      B.    Legislative Immunity Applies To The Issuance Of Municipal Bonds ................ 8

            1.    The Issuance Of Municipal Bonds Constitutes The Formulation Of
                  Policy, Rather Than Ad Hoc Decision Making .......................................... 9

            2.    The Issuance Of Municipal Bonds Affects The Public At Large ............. 10

            3.    The Issuance Of Municipal Bonds Is Formally Legislative In
                  Character ............................................................................................. 10

            4.    The Issuance Of Municipal Bonds Bears All The Hallmarks Of
                  Traditional Legislation ........................................................................ 11

      C.    Legislative Immunity Applies To Mr. Uberuaga And The Entire
            Complaint Must Be Dismissed ...................................................................... 12

V.    THE COMPLAINT MUST BE DISMISSED AS IT CONTAINS ONLY CLAIMS
      WHICH FAIL TO STATE KEY ELEMENTS, OR WHICH STATE ELEMENTS
      THAT CANNOT POSSIBLY BE ESTABLISHED ........................................... 13

      A.    The Second Prong Of Both Claims Must Be Dismissed Due To Lack
            Of Materiality ............................................................................................... 14

            1.    None Of The Alleged Omissions Referenced In Paragraph 31 Of
                  The Complaint Are Material Because The Park Refunding Bond Is
                  Insured ................................................................................................ 15

            2.    The Alleged Omissions Referenced In Paragraphs 31(a), (c), (d),
                  And (e) Of The Complaint Are Immaterial Because Expected
                  Future Liabilities Are Speculative, Uncertain And, Therefore, Not
                  Discloseable ........................................................................................ 17

            3.    The Alleged Omission Referenced In Paragraph 31(b) Of The
                  Complaint Is Immaterial Because No Reasonable Investor Would
                  Consider "Certain Sums," In The Abstract, Important Information ......... 19

            4.    The Alleged Omissions Contained In Paragraph 31(e) Of The
                  Complaint Are Immaterial Because, In 2003, Financial Accounting
                  Standards Did Not Require The Reporting Of Future Retiree Health
                  Care Liabilities ................................................................................... 19

**TABLE OF CONTENTS**
(continued)

Page

    B.    The First And Third Prongs Of Both Claims Fail And Must Be Dismissed Due To Lack Of Conduct By Mr. Uberuaga Having A Deceptive Purpose And Effect ................................................................................................ 21

VI.    EACH OF THE ALLEGED OMISSIONS CONTAINED IN APPENDIX A OF THE PARK REFUNDING BOND WERE IN THE PUBLIC DOMAIN ........................ 22

VII.    THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE ............................ 24

VIII.    CONCLUSION ................................................................................................ 24

McKenna Long &
Aldridge LLP
Attorneys At Law
San Diego

CASE NO. 08-CV-0625-DMS (LSP)

# TABLE OF AUTHORITIES

**Page**

## CASES

*Aitchison v. Raffiani*
    708 F.2d 96 (3rd Cir. 1983) ................................................................. 10, 11

*Alexander v. Holden*
    66 F.3d 62 (4th Cir. 1995) ....................................................................... 9

*Bannum, Inc. v. City of Beaumont*
    236 F. Supp. 2d 633 (E.D. Tex. 2002) ..................................................... 8

*Basic Inc. v. Levinson*
    485 U.S. 224 (1998) ......................................................................... 14, 15

*Bogan v. Scott-Harris*
    523 U.S. 44 (1998) ............................................................................. 7, 10

*Bolt v. Merrimack Pharms., Inc.*
    503 F.3d 913 (9th Cir. 2007) ................................................................ 20

*Chateaubriand v. Gaspard*
    97 F.3d 1218 (9th Cir. 1996) ............................................................. 8, 12

*Clegg v. Cult Awareness Network*
    18 F.3d 752 (9th Cir. 1994) ..................................................................... 7

*Cooper v. Pickett*
    137 F.3d 616 (9th Cir. 1997) .............................................................. 7, 19

*Freeman v. Decio*
    584 F.2d 186 (7th Cir. 1978) ................................................................ 18

*Goldman v. Belden*
    754 F.2d 1059 (2nd Cir. 1985) ............................................................. 14

*Gorman Towers, Inc. v. Bogoslavsky*
    626 F.2d 607 (8th Cir. 1980) .................................................................. 8

*Gravel v. United States*
    408 U.S. 606 (1972) ............................................................................. 11

*In re Apple Computer Sec. Litig.*
    886 F.2d 1109 (9th Cir. 1989) .............................................................. 22

*In Re Horton*
    88 Ops. Cal. Atty. Gen. 165 (2005) .................................................. 17, 18

*In re JP Morgan Chase Securities Litigation*
    363 F. Supp. 2d 595 (S.D.N.Y. 2005) .................................................. 16

*In re Lyondell Petrochemical Co. Sec. Litig.*
    984 F.2d 1050 (9th Cir. 1993) .......................................................... 18, 20

*In re Retirement Cases*
    110 Cal. App. 4th 426 (2003) ............................................................... 17

*James v. Gerber Prods., Co.*
    587 F.2d 324 (6th Cir. 1978) ................................................................ 18

*Kaahumanu v. County of Maui*
    315 F.3d 1215 (9th Cir. 2003) ......................................................... 8, 9, 10

McKenna Long &
Aldridge LLP
Attorneys At Law
San Diego

CASE NO. 08-CV-0625-DMS (LSP)

**TABLE OF AUTHORITIES**
(continued)

Page

*Levine v. NL Industries, Inc.*
    926 F.2d 199 (2nd Cir. 1991)................................................................. 16

*Malone v. Microdyne Corp.*
    26 F.3d 471 (4th Cir. 1994).................................................................. 20

*MGIC Indem. Corp. v. Weisman*
    803 F.2d 500 (9th Cir. 1986)................................................................. 7

*Navarro v. Block*
    250 F.3d 729 (9th Cir. 2001)................................................................. 6

*Orange v. County of Suffolk*
    830 F. Supp. 701 (E.D.N.Y. 1993)........................................................ 8

*Panter v. Marshall Field & Co.*
    646 F.2d 271 (7th Cir. 1981)................................................................ 18

*Rateree v. Rockett*
    852 F.2d 946 (7th Cir. 1988)........................................................ 8, 9, 13

*Robertson v. Dean Witter Reynolds, Inc.*
    749 F.2d 530 (9th Cir. 1984)................................................................. 7

*S.E.C. v. Berry*
    2008 WL 2002537 (N.D. Cal.).............................................................. 22

*S.E.C. v. Baxter*
    2007 WL 2013958 (N.D. Cal. 2007)....................................................... 7

*S.E.C. v. Yuen*
    221 F.R.D. 631 (C.D. Cal. 2004)........................................................... 7

*Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc.*
    806 F.2d 1393 (9th Cir. 1986)............................................................. 24

*Simpson v. AOL Time Warner Inc.*
    452 F.3d 1040 (9th Cir. 2006)....................................................... 21, 22

*Sup. Ct. of Virginia v. Consumers Union*
    446 U.S. 719 (1980)...................................................................... 7, 10

*Tenney v. Brandhove*
    341 U.S. 367 (1951)...................................................................... 7, 10

*Terry v. Bobb*
    827 F. Supp. 366 (E.D. Va. 1993).......................................................... 8

*TSC Industries, Inc. v. Northway, Inc.*
    426 U.S. 438 (1976)..................................................................... 14, 15

*United States v. Brewster*
    408 U.S. 501 (1972)............................................................................ 8

*Vaughn v. Teledyne, Inc.*
    628 F.2d 1214 (9th Cir. 1980)............................................................. 18

*Vess v. Ciba-Geigy Corp. USA*
    317 F.3d 1097 (9th Cir. 2003)......................................................... 7, 19

**TABLE OF AUTHORITIES**
(continued)

Page

*Williams v. County of Greene*
   734 F. Supp. 235 (W.D. Va. 1990) ................................................................ 11

**STATUTES AND RULES**

15 U.S.C.
   Section 77q(a) ........................................................................................ 1
   Section 77q(a)(1)-(3) ..................................................................... 14, 21
   Section 78j(b) ........................................................................................ 1

Fed. R. Civ. P.
   Rule 8(a)(2) .......................................................................................... 7
   Rule 9(b)............................................................................................... 7
   Rule 12(b)(6) ........................................................................................ 6
   Rule 12(e) ........................................................................................... 19

17 C.F.R.
   Section 240.10b-5 ................................................................................ 1
   Section 240.10b-5(a)-(c) .............................................................. 14, 21

## I.    **INTRODUCTION**

After more than *four years* of investigation, the Securities and Exchange Commission ("SEC") filed its initial complaint on April 7, 2008 (the "Complaint"), naming as defendants Michael T. Uberuaga and four other former employees of the City of San Diego (the "City"). The Complaint alleges two civil claims—the first, under Section 17(a) of the Securities Act of 1933 ("Section 17(a)"),[1] and the second, under Section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)")[2] and Rule 10b-5 thereunder ("Rule 10b-5")[3]—in connection with five City securities offerings in 2002 and 2003.

The Complaint alleges that Mr. Uberuaga performed only *one* improper act in connection with *one* security. Yet, that alleged act was merely a step in the process of the City raising and thereafter spending public money through the issuance of a City security, and was well within the sphere of legitimate legislative activity. Thus, the alleged act is protected by absolute legislative immunity, and the Complaint must be dismissed with prejudice.

In addition to the complete defense of legislative immunity, the Complaint has other fatal defects. First, the second prong of both claims—the Section 17(a) first claim, as well as the Section 10(b) and Rule 10b-5 second claim—require materiality, which the SEC cannot possibly establish; and, thus, the second prong of both claims must be dismissed. Second, the SEC has not alleged, and lacks any basis to assert, that Mr. Uberuaga's act had a deceptive purpose and effect. Because the first and third prongs of both purported claims require this element, they too must be dismissed. Therefore, due to a lack of materiality and a deceptive purpose and effect, which no amendment may possibly cure, all three prongs of both claims, and thus the entire Complaint, must be dismissed with prejudice.

---

[1] 15 U.S.C. § 77q(a).
[2] 15 U.S.C. § 78j(b).
[3] 17 C.F.R. § 240.10b-5.

McKenna Long &
Aldridge LLP
Attorneys At Law
San Diego

## II.    FACTUAL BACKGROUND

### A.    The City Council Is Generally Tasked To Raise And Spend Public Money, Yet Is Not A Party To The Complaint Or The Cease-And-Desist Order

Between 2002 and 2003, the City Council passed resolutions authorizing the issuance of five municipal securities offerings.[4] The Complaint vaguely alleges that the disclosure statements accompanying these securities offerings were false and misleading.[5] Although the City Council was the general legislative body of the City, empowered, *inter alia*, to raise and spend public money through municipal securities offerings,[6] no current or former City Council member is named as a defendant in the Complaint. The Complaint, limited to five former City employees (none of which are City Council members), may represent the first and only time that the SEC has ever filed in federal district court, a contested action against a municipal employee, seeking a civil (i.e., monetary) penalty under Section 17(a), Section 10(b), and Rule 10b-5.

True, the SEC has, on occasion, brought administrative enforcement actions and reached agreed-upon dispositions with local governments and sometimes their employees.[7] For example, the SEC and the City alone entered into an "Order Instituting Cease-and-Desist Proceedings, Making Findings, and Imposing a Cease-and-Desist Order Pursuant to Section 8a of the Securities Act of 1933 and Section 21c of the Securities Exchange Act of 1934" dated November 14, 2006 (the "Cease-and-Desist Order").[8] The Cease-and-Desist Order, which references the *same* five municipal securities cited in the Complaint, names *only* the City as a respondent.[9] Just as in the Complaint, the Cease-and-Desist Order does not name a City Council member as a party. Yet, attorneys for the City—as evidenced by a record of a September 21, 2004 closed session of the City Council—were purportedly simultaneously negotiating with the

---

[4] Complaint ¶ 26.

[5] *Id.* ¶ 18.

[6] *See* San Diego City Charter, Art. III § 11.1 (1986), Ex. 1 to Mr. Uberuaga's Request for Judicial Notice in Support of His Motion to Dismiss the Complaint ("RJN").

[7] *See, e.g.,* January 24, 1996 Order in *In the Matter of County of Orange, et al.*; July 31, 2003 Order in *In the Matter of The Massachusetts Turnpike Authority*; March 21, 2003 Opinion of the Commission in *In the Matter of The City of Miami, Florida*, Exs. 2, 3, & 15 to RJN.

[8] *See generally* Cease-and-Desist Order, Ex. 4 to RJN.

[9] *Id.* at 3 & 14.

1  SEC on behalf of both the City **and** the City Council:  "Motion to authorize team to negotiate

2  with SEC for best deal possible, with caveat that City Council be included in deal with City and

3  not be left to be dealt with separately."[10]

4          These facts raise numerous questions.  Why are no current or former members of the City

5  Council named parties in the Complaint or the Cease-and-Desist Order, considering they

6  generally are responsible for raising and spending money through municipal securities offerings?

7  Is there any reported court decision as precedent for an action such as this, a contested action filed

8  in federal district court against a municipal employee seeking a civil (i.e., monetary) penalty

9  under Section 17(a), Section 10(b), and Rule 10b-5?  Is there law, and perhaps some related

10 communication between the SEC and City Council members or their counsel, which applies not

11 only to City Council members, but also to Mr. Uberuaga, and requires that this action be

12 dismissed at the very outset?  These questions are not new, and surfaced as recently as a May 13,

13 2008 City Council meeting:

14      Peters:        . . . Mr. Aguirre doesn't have the benefit of the interaction that
                       we've had with the regulatory agencies . . . and there is no reason
15                     why Mr. Aguirre should know that . . .

16      Madaffer:      . . . I have information Mr. Aguirre that you don't have with
                       respect to the SEC, and I feel very confident that I can sit here and
17                     have this discussion today without being part of any further actions
                       by the SEC.
18
        Aguirre:       Would it be, I'm not, I'm not disagreeing with you, but would it
19                     be, would it be something that you could put on the record so at
                       least you'd have the record . . .
20
        Madaffer:      I just did.
21
        Aguirre:       No, but I mean is the information, has the SEC told you that they
22                     will not be charging you, and Mr. Peters, have they told you that
                       you're not going to be charged?  Mr. Maienschien have they made
23                     that representation to you?

24      Madaffer:      Mr. Aguirre, I am not at liberty to go on beyond anything or what I've
                       already said.  So let me just leave it at that.[11]
25

26  _____

27  [10] *See* September 21, 2004 Closed Session Vote of City Council, Ex. 5 to RJN.

    [11] Official Audio Record of May 13, 2008 City Council Meeting, Ex. 6 to RJN; *see also*
28  Declaration of Nancy Scott in Support of Michael T. Uberuaga's Motion to Dismiss the
    Complaint at 11:12-16, 15:21-16:5.

1    Perhaps no current or former member of the City Council is a party to the Complaint or the

2    Cease-and-Desist Order due, at least in part, to legislative immunity.  As discussed below,

3    Mr. Uberuaga is certainly entitled to legislative immunity in this action, requiring that the

4    Complaint be dismissed in its entirety with prejudice.

5    **B.    The Complaint Links Mr. Uberuaga To Only *One* City Security, And Only *One* Act**

6

7    On March 3, 2003, the City Council enacted Resolution Number R-297692 (the

8    "Resolution"), which authorized numerous actions in connection with a City security issued

9    sometime between March and July 2003, and which refinanced a 1993 bond relating to the

10    acquisition, construction, and installation of public improvements in Balboa and Mission Bay

11    Parks (the "Park Refunding Bond").[12]  This is the ***only*** City security to which the Complaint links

12    Mr. Uberuaga.[13]

13    The Complaint alleges that Mr. Uberuaga certified in writing that Appendix A to the Park

14    Refunding Bond did not contain any false or misleading statements,[14] and that Mr. "Uberuaga

15    knew or was reckless in not knowing that this certification was false" or misleading because it

16    failed to disclose information the Complaint references in five vague and ambiguous paragraphs

17    (Paragraph 31(a) - (e)).[15]  This is the ***only*** allegedly wrongful act which the Complaint purports

18    was performed by Mr. Uberuaga.[16]

19    The Complaint does ***not*** allege that Mr. Uberuaga had any degree, experience, or training

20    as an accountant, attorney, or securities professional; that the City provided Mr. Uberuaga with

21    any training on securities disclosures; that Mr. Uberuaga drafted any portion of any security

22    document or disclosure; or that Mr. Uberuaga failed to follow, or acted contrary to, the advice of

23    any accounting, legal, or securities professional.[17]  Moreover, neither the review nor approval of

24    securities disclosures fell within Mr. Uberuaga's many defined job duties and responsibilities as

25    ---

26    [12] *See generally* City Council Resolution Number R-297692, Ex. 7 to RJN.

       [13] Complaint ¶ 36.

       [14] *Id.*

27    [15] *Id.* ¶¶ 31, 36.

       [16] *See generally Id.*

28    [17] *Id.*

1  outlined by the City Charter.[18]  Thus, considering Mr. Uberuaga's lack of training and general

2  lack of job duties relating to securities, there is no reason to believe that Mr. Uberuaga knew or

3  should have known what constituted a false or misleading statement in a City security.

4     In addition to the foregoing, it is significant to note that:  (1) no investor is alleged to have

5  lost a penny or otherwise been harmed in connection with the Park Refunding Bond; (2) the Park

6  Refunding Bond, initially totaling $17,425,000 with only $10,490,000 outstanding as of June 30,

7  2008,[19] is secured by insurance,[20] and will certainly be repaid in full; and (3) Mr. Uberuaga is not

8  alleged to have received *any* personal benefit in connection with the Park Refunding Bond.

9    **C.**   <u>**Mr. Uberuaga's Legislative Immunity Is Evidenced By The Terms Of**</u>

10       <u>**The Resolution, Confirming That His Certification Was A Legislative Act**</u>

11     As alluded to in the Complaint,[21] the City Council expressly acknowledged that City

12  Manager Michael T. Uberuaga had at least the following legislative authority in connection with

13  the Park Refunding Bond:

14     3.   The City Manager, the Deputy City Manager, and their authorized
       designees . . . are authorized and directed . . . *to do any and all things to*

15         *execute and deliver any and all documents which they may deem*
       *necessary and advisable in order to consummate the sale and delivery*

16         *of the Certificates of Participation and otherwise effectuate the purposes*
       *of this Resolution*, and such actions previously taken by such officers are

17         hereby ratified and confirmed.

18     . . .

19     9.   . . . the City Manager, the Deputy City Manager and their authorized
       designees are hereby authorized (i) *to solicit and accept bids for*

20         *municipal bond insurance* for the 2003 Certificates . . . and (iii) *if it is*
       *determined that the policy and the surety will result in interest rate*

21         *or loan payment savings for the City, to pay the insurance premium*
       *of such policy and/or surety from the proceeds of the issuance and sale*

22         *of the Certificates* . . . .

23     10.   *The Preliminary Official Statement*, a copy of which is on file as
       Document No. RR-297692-4, *is approved for distribution* in the offering

24         and sale of Certificates of Participation evidencing proportionate interests
       of the holders thereof in Lease Payments to be made by the City under the

25         Facilities Lease and any distribution of the Preliminary Official Statement

---

[18] *See* San Diego City Charter, Art. V, § 28 (1977), Ex. 1 to RJN.

[19] San Diego Fiscal Year 2009 Proposed Budget at 87, Ex. 8 to RJN.

[20] Park Refunding Bond at § 9, pp. 1-2 & 12-15, Ex. 9 to RJN.

[21] Complaint ¶ 36.

by the Financial Advisors prior to the date hereof is ratified and approved. The City Manager is hereby authorized to execute a certificate evidencing his determination, on behalf of the City, that he deems final within the meaning of Rule 15c2-12 of the Securities Exchange Act of 1934, the Preliminary Official Statement describing the Certificates.

11.    The City Manager, the Deputy City Manager, and their authorized designees, are authorized *to approve corrections and additions to the Preliminary Official Statement* by supplement or amendment thereto, or otherwise as appropriate, provided that any such corrections or additions shall be necessary to cause the information contained therein to conform with facts material to the Certificates, or to the proceedings of the City, or such corrections or additions are in form rather than in substance.

12.    The City Manager, the Deputy City Manager, and their authorized designees, are authorized and directed *to cause the Preliminary Official Statement to be brought into the form of a Final Official Statement and to execute said Final Official Statement*, dated as of the date of the sale of the Certificates.  The City Manager, the Deputy City Manager, and their authorized designees, are further authorized and directed to execute a statement that the facts contained in the Final Official Statement, and any supplement or amendment thereto (which shall be deemed an original part thereof for the purpose of such statement) were, at the time of sale of the Certificates, true and correct in all material respects and that the Final Official Statement did not, on the date of sale of the Certificates, and does not, as of the date of delivery of the Certificates, contain any untrue statement of a material fact with respect to the City required to be stated where necessary to make a statement not misleading in light of the circumstances under which it was made.  The City Manager, the Deputy City Manager, and their authorized designees, shall take such further actions prior to the signing of the statement as are deemed necessary or appropriate to verify the accuracy of the statement.

13.    The City Manager shall *deposit the projected Savings in a reserve fund . . . to be used for capital projects in Mission Bay and Balboa Park . . . .*[22]

But for this express authorization and delegation, the City Council would have been required to perform these legislative tasks.[23]

## III.    MOTIONS TO DISMISS IN GENERAL

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of a claim.[24]  In ruling on a Rule 12(b)(6) motion to dismiss, "the Court must accept well-pleaded allegations as true, but it is not required to accept 'legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts

---

[22] City Council Resolution Number R-297692 at 5-6 & 8-10 (emphasis added), Ex. 7 to RJN.
[23] *See* San Diego City Charter, Art. III § 11.1 (1986), Ex. 1 to RJN.
[24] *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

alleged.'"[25]  The Court may consider materials that are subject to judicial notice when ruling on a

motion to dismiss.[26]  A complaint is properly dismissed where either:  (1) it lacks a cognizable

legal theory for recovery; or (2) where the plaintiff alleges insufficient facts to support a

cognizable legal theory.[27]

Even under the so-called "notice pleading" standard of Rule 8(a)(2), the SEC is required

to plead facts with particularity that, if proven, would establish its claims under Section 17(a),

Section 10b, and Rule 10b-5.[28]  In other words, plaintiffs must allege "'the who, what, when,

where, and how' of the misconduct charged."[29]  This requirement applies not only to fraud

claims, but also to non-fraud claims grounded in allegations of fraudulent conduct,[30] such as the

Complaint's allegation that a single act by Mr. Uberuaga was reckless.[31]

## IV.    LEGISLATIVE IMMUNITY REQUIRES DISMISSAL OF THE COMPLAINT IN ITS ENTIRETY

### A.    Legislative Immunity In General

Local government officials are absolutely immune from suit for actions taken "in the

sphere of legitimate legislative activity."[32]  This immunity guarantees government officials the

freedom to discharge their legislative duties without fear of prosecution,[33] and further ensures that

"the exercise of legislative discretion [will] not be inhibited by judicial interference or distorted

by the fear of personal liability."[34]

Because legislative immunity aims to protect the integrity of the legislative process, it

applies to *any* act undertaken by a government official that serves "the due functioning of the

---

[25] *S.E.C. v. Yuen*, 221 F.R.D. 631, 634 (C.D. Cal. 2004) (quoting *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994)).

[26] *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).

[27] *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984).

[28] Fed. R. Civ. P. 9(b).

[29] *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)).

[30] *Vess*, 317 F.3d at 1103-04; *S.E.C. v. Baxter*, 2007 WL 2013958, *3 (N.D. Cal. 2007).

[31] Complaint ¶ 36.

[32] *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951); *see also Bogan v. Scott-Harris*, 523 U.S. 44, 45 (1998); *Sup. Ct. of Virginia v. Consumers Union*, 446 U.S. 719, 731-32 (1980).

[33] *Tenney*, 341 U.S. at 376-77.

[34] *Bogan*, 523 U.S. at 52.

1    [legislative] process," irrespective of his or her specific title or position.[35]  In other words,

2    whether legislative immunity applies to an individual turns on the **nature** of the act in question,

3    rather than the specific duties or title of the individual asserting immunity.[36]  Applying this

4    functional approach to legislative immunity, courts routinely have applied legislative immunity

5    not only to local legislators, but also to local officials—including city managers, directors, and

6    other executives—performing legislative functions.[37]

7        Unlike qualified official immunity, which is broader in scope than legislative immunity,

8    and which also applies to Mr. Uberuaga's alleged act, legislative immunity does not require any

9    showing of good faith and is appropriately raised on a motion to dismiss.[38]

10       **B.**    **Legislative Immunity Applies To The Issuance Of Municipal Bonds**

11       On March 3, 2003, the City Council voted to enact the Resolution, which authorized the

12   issuance of the Park Refunding Bond.[39]  The Complaint challenges the adequacy or completeness

13   of the disclosures accompanying this bond offering.  Although it appears to be a question of first

14   impression, because the decision to raise and spend public money is a legislative task,[40] and

15   one that is the general responsibility of the City Council,[41] the issuance of municipal bonds—

16   including the formulation of policy relating to the completion of tasks referenced in the

17   Resolution, which constituted mandatory acts precedent to the raising and spending of public

18   money via the Park Refunding Bond—should be protected by absolute legislative immunity.

19       To determine whether the issuance of municipal bonds constitutes a legislative act for

20   purposes of legislative immunity, four factors must be considered:  (1) whether the act involves

21   formulation of policy or ad hoc decision making; (2) whether the act applies to few individuals or

22   broadly to several; (3) whether the act is formally legislative in character; and (4) whether the act

---

23
24   [35] *United States v. Brewster*, 408 U.S. 501, 515-16 (1972).
     [36] *Chateaubriand v. Gaspard*, 97 F.3d 1218, 1220 (9th Cir. 1996).
25   [37] *Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d 607, 614 (8th Cir. 1980); *Bannum, Inc. v. City of Beaumont*, 236 F. Supp. 2d 633, 634-35, 637 (E.D. Tex. 2002); *Terry v. Bobb*, 827 F. Supp.
26   366, 368 (E.D. Va. 1993); *Orange v. County of Suffolk*, 830 F. Supp. 701, 706 (E.D.N.Y. 1993).
     [38] *See Kaahumanu v. County of Maui*, 315 F.3d 1215, 1219 (9th Cir. 2003).
27   [39] *See generally* City Council Resolution Number R-297692, Ex. 7 to RJN.
     [40] *Rateree v. Rockett*, 852 F.2d 946, 950 (7th Cir. 1988).
28   [41] *See, e.g.*, San Diego City Charter, Art. III § 11.1 (1986), Ex. 1 to RJN.

MCKENNA LONG &
ALDRIDGE LLP
ATTORNEYS AT LAW
SAN DIEGO                                    - 8 -                        CASE NO. 08-CV-0625-DMS (LSP)

1    bears "all the hallmarks of traditional legislation."[42]  The allegations contained within the

2    Complaint, as well as judicially noticeable facts, establishes that each of these criteria have been

3    met in this case.

4                    1.      The Issuance Of Municipal Bonds Constitutes The Formulation Of Policy,
                             Rather Than Ad Hoc Decision Making
5

6             A decision is ad hoc if it applies only to a particular case or in particular circumstances

7    and does not effectuate policy or create a binding rule of conduct.[43]  The distinction between

8    policy making (i.e., legislative) and ad hoc decision making (i.e., administrative) lies between the

9    general and the specific:

10            If the underlying facts relate to particular individuals or situations and the
              decision impacts specific individuals or singles out specifiable individuals, the
11            decision is administrative.  On the other hand, the action is legislative if the facts
              involve generalization concerning a policy or state of affairs and the
12            establishment of a general policy affecting the larger population.[44]

13            In this case, the Resolution authorized the issuance of the Park Refunding Bond, which

14    involved the refinancing of a 1993 public bond for the stated purpose of saving money and

15    reinvesting the same into Balboa and Mission Bay Parks.[45]  The decisions to enact the Resolution

16    and issue the Park Refunding Bond—both of which concerned the budgetary priorities of the

17    City—was a prospective measure and inherently policy-driven.[46]  After all, "budgetmaking is a

18    quintessential legislative function,"[47] and city budgeting involves raising and spending money via

19    municipal securities.  Also, the Park Refunding Bond affected and benefited millions of taxpayers

20    and visitors to City parks.

21            Equally prospective and policy-driven were decisions made and actions performed by

22    authority from, and at the direction of, the City Council in connection with the Resolution and

23    issuance of the Park Refunding Bond, since they were necessary conditions precedent to the

24    City's ability to raise and spend public money via that particular security; and, therefore "in the

25    _____

      [42] *Kaahumanu*, 315 F.3d at 1220.
26    [43] *Id.*
      [44] *Alexander v. Holden*, 66 F.3d 62, 66 (4th Cir. 1995) (citations and quotation marks omitted).
27    [45] *See generally* City Council Resolution Number R-297692, Ex. 7 to RJN.
      [46] *Id.* at 1-5.
28    [47] *Rateree*, 852 F.2d at 950.

1    sphere of legitimate legislative activity,"[48] and/or "in direct assistance of legislative activity."[49]

2    No bond would have been issued, and no public money would have been raised and thereafter

3    spent, but for persons referenced in the Resolution, acting as agents of the City Council, and

4    formulating policy for the performance of acts authorized by the City Council.  Further, as the

5    City Council was generally the legislative body of the City, simple logic dictates that City

6    employees authorized and directed by the City Council to make decisions and perform actions in

7    connection with a City security, and the attendant raising and spending of public money, are

8    engaged in legislative action.

9        Therefore, the issuance of the Park Refunding Bond, including the decisions made and

10    actions performed at the direction of the City Council, was not ad hoc, but rather constituted a

11    policy-driven exercise.

12        2.    The Issuance Of Municipal Bonds Affects The Public At Large

13        Legislative immunity is disfavored for acts that apply to a few individuals rather than to

14    the public at large.[50]  The quintessential example of a legislative act that applies to a few

15    individuals, and thus lacks the protection of legislative immunity, is the decision to reject an

16    individual's application for a building permit.[51]  In contrast, the City Council's vote to authorize

17    the Resolution, the decisions and actions required to effectuate the Resolution, the actual issuance

18    of the Park Refunding Bond, and the expenditure of funds raised by the bond, all broadly affected

19    the community at large, as would any decision or action designed to raise and save the City

20    money, and to benefit parks enjoyed by millions of people each year.

21        3.    The Issuance Of Municipal Bonds Is Formally Legislative In Character

22        The vote to enact the Resolution is clearly entitled to legislative immunity, as voting is

23    "quintessentially legislative."[52]  Equally legislative is the "deliberative and communicative"

24

25    _____

[48] *Tenney*, 341 U.S. at 376; *see also Bogan*, 523 U.S. at 45; *Sup. Ct. of Virginia*, 446 U.S. at

26    731-32.
[49] *Aitchison v. Raffiani,* 708 F.2d 96, 99-100 (3rd Cir. 1983).

27    [50] *Kaahumanu*, 315 F.3d at 1222.
[51] *Id.*

28    [52] *Bogan*, 523 U.S. at 55.

1    process involved in a decision to pass legislation,[53] including Mr. Uberuaga's **recommendation** to

2    the City Council that they adopt the Resolution.[54]  Similarly legislative are the tasks performed

3    "in direct assistance of legislative activity,"[55] including the act now challenged by the SEC; that

4    is, Mr. Uberuaga's written certification that Appendix A in the Park Refunding Bond offering

5    documents did not contain any false or misleading statements.  This is especially true since the

6    City Council is ultimately responsible for this otherwise delegated task[56] and, in enacting the

7    Resolution, **voted to approve for distribution** the disclosures contained in Appendix A as it

8    existed in the City's Preliminary Official Statement.[57]

9               4.    The Issuance Of Municipal Bonds Bears All The Hallmarks Of
                      Traditional Legislation
10

11           The hallmarks of the traditional legislative process is not particularly complicated.  In the

12    case of a tax increase, for example, a bill would be introduced, debated, and passed (or not).

13    Not surprisingly, local legislators are immune from suit for the enactment of tax ordinances.[58]

14    The process for issuing a municipal bond, merely an alternative form of city financing, is no

15    different.  Here, the Resolution was introduced because it stood to save the City approximately

16    $2.3 million.[59]  Mr. Uberuaga, as City Manager, weighed in on the issue and **recommended** that

17    the City Council adopt the Resolution.[60]  The City Council then unanimously voted to adopt the

18    Resolution,[61] and delegated to Mr. Uberuaga and others the performance of all tasks needed to

19    "effectuate the purposes of this Resolution,"[62] which was otherwise the ultimate responsibility of

20    the City Council.[63]  And because no bond could have been issued, and no money raised and

21

22    [53] *Gravel v. United States*, 408 U.S. 606, 625 (1972).
      [54] Minutes for Regular Council Meeting of March 3, 2003 at 11-12, Ex. 10 to RJN.
23    [55] *Aitchison*, 708 F.2d at 99-100.
      [56] *See, e.g.*, San Diego City Charter, Art. III § 11.1 (1986), Ex. 1 to RJN.
24    [57] City Council Resolution Number R-297692 at 8-9; Park Refunding Bond at § 8, pp. A-1 -
      A-46, Exs. 7 & 9 to RJN.
25    [58] *See Williams v. County of Greene*, 734 F. Supp. 235, 236 (W.D. Va. 1990).
26    [59] City Council Resolution Number R-297692 at 5, Ex. 7 to RJN.
      [60] Minutes for Regular Council Meeting of March 3, 2003 at 11-12, Ex. 10 to RJN.
27    [61] City Council Resolution Number R-297692 at 11, Ex. 7 to RJN.
      [62] *Id.* at 5-6.
28    [63] *See, e.g.*, San Diego City Charter, Art. III § 11.1 (1986), Ex. 1 to RJN.

1  thereafter spent, without the performance of each of these tasks, they are all necessarily hallmarks

2  of the traditional legislative process of raising and spending public money.

3                                  *       *       *

4          In sum, legislative immunity should apply to the issuance of the Park Refunding Bond,

5  including but not limited to, all decisions and actions in accordance with the Resolution, which

6  constitute mandatory conditions precedent to the raising and spending of public money via that

7  particular City security.  Indeed, legislative immunity may also explain the omission of City

8  Council members from the Complaint and the Cease-and-Desist Order, and the lack of precedent

9  for this action, but in any event, requires dismissal of Mr. Uberuaga from this case.

10     **C.**     **Legislative Immunity Applies To Mr. Uberuaga And The Entire**
                  **Complaint Must Be Dismissed**

11

12         The SEC's allegation that Mr. "Uberuaga recklessly certified in writing that [A]ppendix A

13  in the [Park Refunding Bond] offering documents did not contain any false or misleading

14  statements" is the *only* wrongful act allegedly performed by Mr. Uberuaga.[64]  But for this one

15  legislative act, which the SEC itself admits was authorized by the City Council, and *delegated* to

16  Mr. Uberuaga,[65] the SEC has *no claim* against Mr. Uberuaga.

17         Considering the City Council delegated this and other legislative acts to Mr. Uberuaga in

18  connection with the *passing* of the Resolution, and the *issuance* of the Park Refunding Bond,[66]

19  Mr. Uberuaga is entitled to absolute legislative immunity.  It makes no difference that

20  Mr. Uberuaga, not a City Council member, certified Appendix A, or performed any other act

21  referenced in the Resolution:  "[i]f the legislative assistant's conduct would be immune if

22  performed by the legislator himself, the legislative assistant shares the immunity."[67]  Moreover,

23  the City Council itself voted to approve for distribution Appendix A to the City's Preliminary

24  Official Statement even before Mr. Uberuaga allegedly certified the substantially similar

25

26  _____

     [64] *See generally* Complaint.

27  [65] *Id.* ¶ 36.

     [66] *See generally* City Council Resolution Number R-297692, Ex. 7 to RJN.

28  [67] *Chateaubriand,* 97 F.3d at 1220, n. 2.

1   Appendix A to the City's Final Official Statement.[68]  Indeed, the disclosures regarding the City's

2   pension obligations are *identical* in both versions of Appendix A.[69]

3          It is important to note that even without the Resolution or any other City Council action,

4   absolute legislative immunity extends to Mr. Uberuaga.  Even if the City Council did not pass the

5   Resolution expressly authorizing and delegating legislative tasks which were conditions

6   precedent to raising and spending public money via the security, Mr. Uberuaga's act in

7   connection with the issuance of the Park Refunding Bond still constituted legislative activity,

8   since it was an integral part of the traditional legislative function of budget making,[70] which the

9   City Charter specifically granted to Mr. Uberuaga:

> It shall be the duty of the Manager to . . . prepare and submit to the Council the
> annual budget estimate and such reports as may be required by the body . . . The
> Manager, as Chief Budget Officer of the City, shall be responsible for planning
> the activities of the City government and for adjusting such activities to the
> finances available . . . He shall be charged with the bringing together of estimates
> covering the financial needs of the City, with the checking of these estimates
> against the information relative to past expenditures and income, with the
> preparation of budget document and supporting schedules and with the
> presentation of the budget to the Council.[71]

15  Accordingly, the Complaint must be dismissed in its entirety.

16  **V.      THE COMPLAINT MUST BE DISMISSED AS IT CONTAINS ONLY CLAIMS
            WHICH FAIL TO STATE KEY ELEMENTS, OR WHICH STATE ELEMENTS
17          THAT CANNOT POSSIBLY BE ESTABLISHED**

18         The Complaint contains just two claims: the first under Section 17(a),[72] and the second

19  under Section 10(b) and Rule 10b-5 thereunder.[73]  As to both claims, the Complaint must allege,

20  *inter alia*, facts that, if proven true, would show that Mr. Uberuaga either:  (a) employed devices,

21  schemes, or artifices to defraud ("first prong"); (b) made a misstatement or omission of material

22  fact ("second prong"); or (c) engaged in transactions, acts, practices, or courses of business which

---

24  [68] *See* City Council Resolution Number R-297692 at 8-9; Park Refunding Bond at §§ 8 & 9,
25  Exs. 7 & 9 to RJN.
    [69] *Compare* Park Refunding Bond at § 8, pp. A-32 & A-38 *with* Park Refunding Bond at § 9,
26  pp. A-32 & A-38, Ex. 9 to RJN.
    [70] *Rateree*, 852 F.2d at 950.
27  [71] *See* San Diego City Charter, Art. V, § 28 (1977), Ex. 1 to RJN.
    [72] Complaint ¶ 44.
28  [73] *Id.* ¶ 47.

1  operated or would operate as a fraud or deceit upon other persons ("third prong").[74]  The

2  Complaint itself, and judicially noticeable facts, establish that the two claims are fatally deficient

3  and cannot be remedied, as they fail to allege key elements which cannot be alleged in good faith,

4  or allege elements that cannot possibly be established.

5  **A.    The Second Prong Of Both Claims Must Be Dismissed Due To Lack**
       **Of Materiality**
6

7       The standard for materiality in the context of securities violations, as established by the

8  United States Supreme Court in *TSC Industries, Inc. v. Northway, Inc.* and its progeny, is that an

9  omitted fact is material if there is a "substantial likelihood that the disclosure of the omitted fact

10 would have been viewed by the reasonable investor as having significantly altered the 'total mix'

11 of information made available."[75]  Although materiality is a mixed question of law and fact, a

12 complaint may be dismissed under Rule 12(b)(6) if the alleged omissions are "so obviously

13 unimportant to a reasonable investor that reasonable minds could not differ on the question of

14 their importance."[76]

15      The SEC alleges that Mr. Uberuaga recklessly certified in writing Appendix A in the Park

16 Refunding Bond though it was false and misleading because:

17      (a)    There was no disclosure of the City's looming financial crisis or that it
              resulted from (i) the City's intentional under-funding of its pension plan
18             since fiscal year 1997; (ii) the City's granting of additional retroactive
              pension benefits since fiscal year 1980; and (iii) the City's use of the
19             pension fund's assets to pay for the additional pension, non-pension, and
              retiree health care benefits since fiscal year 1980;
20

21      (b)    There was no disclosure that certain sums relating to a lawsuit settlement
              were excluded from the calculation of the unfunded liability, which, if
22             included, would have substantially increased such unfunded liability;

23      (c)    There was no disclosure in 2003 that the City's unfunded liability to
              CERS was expected to dramatically increase, from $720 million at the
24             beginning of fiscal year 2003 to an estimated $2 billion at the beginning of
              fiscal year 2009 and its estimated annual pension contribution would grow
25             from $51 million in 2002 to $248 million in 2009;

26

27 [74] 15 U.S.C. § 77q(a)(1)-(3); 17 C.F.R. § 240.10b-5(a)-(c).
[75] 426 U.S. 438, 449 (1976); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1998).
28 [76] *Goldman v. Belden*, 754 F.2d 1059, 1067 (2nd Cir. 1985).

(d)    There was no disclosure that Manager's Proposal 1 and Manager's Proposal 2 were significant contributors to the projected increases in the City's unfunded liability and annual pension contribution to CERS, nor was there any disclosure that Webster voted to approve Manager's Proposal 2 in her capacity as a CERS Board member knowing that its enactment would continue the City's underfunding of CERS while increasing her pension; and

(e)    There was no disclosure that (i) the estimated present value of the City's liability for retiree health care was $1.1 billion; (ii) the retiree health care expense was being paid with surplus earnings from CERS; (iii) this surplus earnings reserve was running out of money; and (iv) the City would have to begin paying this substantial expense out of its own budget.[77]

The allegations contained within the Complaint, as well as judicially noticeable facts, establish that these purported categories of omissions—together or individually—are immaterial as a matter of law.

        1.    <u>None Of The Alleged Omissions Referenced In Paragraph 31 Of The Complaint Are Material Because The Park Refunding Bond Is Insured</u>

None of the five supposed categories of omissions from Appendix A, as alleged in Paragraph 31 of the Complaint, are material.  An omitted fact is only material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[78]

In this case, the "total mix" of information made available to investors included a critical fact which the SEC ignores and which conclusively renders the alleged omissions immaterial; that is, the Park Refunding Bond was and is *secured by an insurance policy*:

The Insurer, Ambac Assurance Corporation, has made a commitment to issue the Financial Guaranty Insurance Policy relating to the Certificates effective as of the date of issuance of the Certificates.  Under the terms of the Financial Guaranty Insurance Policy, the Insurer will pay . . . that portion of the principal of and interest with respect to the Certificates which shall become Due for Payment but shall be unpaid by reason of Nonpayment of the Issuer . . . .[79]

Thus, even in the unlikely event that the City is somehow unable to meet its obligations under the Park Refunding Bond for *any* reason, investors are still *guaranteed* payment.

---

[77] Complaint ¶¶ 31(a)-(e), 36.
[78] *TSC Indus., Inc.*, 426 U.S. at 449; *see also Basic Inc.*, 485 U.S. at 232.
[79] Park Refunding Bond at § 9, p. 12, Ex. 9 RJN.

The issue of whether an insurance policy can render otherwise omitted material facts immaterial was addressed in *In re JP Morgan Chase Securities Litigation*, wherein plaintiffs alleged that defendant failed to disclose to investors the true extent of its Enron-related exposure in a press release, including the existence of $2.6 *billion* in outstanding secured transactions.[80] In granting defendant's motion to dismiss, the court—relying on *Levine v. NL Industries, Inc.*, discussed *infra*—found the alleged omissions within the press release to be immaterial because the transactions were *insured*.[81]

In *Levine v. NL Industries, Inc.*, the Second Circuit Court of Appeal held that defendant NL's "alleged failure to disclose environmental law violations was immaterial because [the Department of Energy] had agreed to *indemnify* NL . . . in the event of liability or loss arising out of any such violations."[82] In so holding, the *Levine* Court stated that because "there was no plausible way that NL's shareholders could suffer financially from the consequences of the alleged environmental violations . . . a reasonable investor would not consider NL's asserted violations of environmental law important information significantly altering the *total mix* of information made available to the investor."[83]

Accordingly, because the Park Refunding Bond was and is secured by an insurance policy, the five supposed categories of omissions from Appendix A as alleged in Paragraph 31 of the Complaint, particularly those that relate to the City's ability to pay its debt obligations, are immaterial as a matter of law in light of the "total mix" of available information. Interestingly, the SEC does not allege that any investor has ever been harmed due to any alleged omission; that the value of the Park Refunding Bond fluctuated in any way as a result of the City's January 27, 2004 "Voluntary Report of Information," which purported to first disclose the five alleged omissions in Appendix A;[84] or that the alleged omissions have proven to be accurate or true.

---

[80] 363 F. Supp. 2d 595, 634 (S.D.N.Y. 2005).
[81] *Id.*
[82] 926 F.2d 199, 203 (2nd Cir. 1991) (emphasis added).
[83] *Id.* (emphasis added).
[84] Complaint ¶ 41.

2.    The Alleged Omissions Referenced In Paragraphs 31(a), (c), (d), And (e)
Of The Complaint Are Immaterial Because Expected Future Liabilities
Are Speculative, Uncertain And, Therefore, Not Discloseable

The first, third, fourth, and fifth of the SEC's five alleged categories of omissions, with minor variations, are all directly related to the City's purported failure to disclose the so-called "looming financial crisis," the projected increases in its unfunded pension liability as calculated by City (and other) actuaries, and retiree health care liability.[85] As a preliminary matter, the Complaint is flat out wrong in asserting that there was *no* disclosure regarding these issues, as Appendix A to the Park Refunding Bond disclosed the following:

> The City's last actuarial valuation dated June 30, 2002 stated the funding ratio . . .
> of the CERS fund to be 77.3%. The CERS fund has an Unfunded Actuarial
> Accrued Liability (UAAL) of $720.7 million as of June 30, 2002, which
> represents a $436.8 million increase in the UAAL since the previous actuarial
> calculation dated June 30, 2001 . . . On January 16, 2003, a class action
> complaint (*Gleason v. City of San Diego, et al.*) for declaratory relief was filed . . .
> The plaintiffs . . . allege that as a result of recent actions taken by the defendants,
> the SDCERS trust fund has an unfunded accrued liability of $720 million, and
> that by 2009, the City will owe approximately $2.8 billion to SDCERS, with an
> annual City budget expense of more than $250 million . . . The City cannot
> predict the outcome of the litigation at this time, but if the plaintiffs are
> successful, there potentially may be additional expense to the General Fund in the
> funding of SDCERS trust fund and otherwise, over and above the City's expected
> expense in the funding of its pension obligations.[86]

In any event, none of these categories of alleged omissions can possibly satisfy the materiality requirement, as non-factual, speculative, and uncertain information need not be disclosed and is therefore immaterial.

Actuarial valuation is a complex, mathematical "science" that relies on a number of variable and ever-changing assumptions. "In practice, the actuarial valuation of a [pension] fund is an ongoing endeavor, requiring complex assumptions about a number of variables, as well as regular corrections based on actual experience."[87] Due to this complexity, and "fluctuations in market performance, unexpected rates of employee turnover, and unforeseen increases in salary or in purchases of service credits," actuarial valuations are "imperfect" and actual experience will

---

[85] *Id.* ¶¶ 13-16, 31(a), (c), (d) and (e).

[86] Park Refunding Bond at § 9, pp. A-32 & A-38, Ex. 9 to RJN.

[87] *In Re Horton*, 88 Ops. Cal. Atty. Gen. 165, *3 (2005); *see also In re Retirement Cases*, 110 Cal. App. 4th 426, 457-460 (2003).

1   often not follow actuarial assumptions.[88]  Such is the case here, where the ostensibly material

2   projections[89] have turned out to be grossly inaccurate over time; for example:  (1) the City's

3   estimated annual pension contribution for fiscal year 2009 is now $86 million *less* than predicted

4   in 2003[90]—a 35 percent difference; and (2) the City's estimated unfunded pension liability for

5   fiscal year 2009 is now $817 million *less* than predicted in 2003—a 41 percent difference.[91]

6          For these reasons, case law mandates that projections, estimates, and other information

7   must be ***reasonably certain*** before they may be released to the public.[92]  Indeed, in *Vaughn v.*

8   *Teledyne, Inc.,* the Ninth Circuit Court of Appeals, after noting that the SEC does not require

9   companies to disclose financial projections, suggested that internal projections lacking in

10  reasonable certainty ***should not*** be disclosed to the public.[93]  "It is just good general business

11  practice to make such projections for internal corporate use.  There is no evidence, however, that

12  the estimates were made with such reasonable certainty even to ***allow*** them to be disclosed to the

13  public."[94]  Moreover, it makes good public policy not to require the disclosure of such

14  information:  "[a] corporation may be called upon to make confidential projections for a variety

15  of sound purposes where public disclosure would be harmful . . . A far reaching disclosure

16  requirement might not be in the best interests of the market, the corporation's legitimate business

17  plans and, ultimately, investors . . . ."[95]

18         Consequently, because actuarial projections regarding pension liabilities and estimates of

19  retiree health care liability are highly speculative and uncertain in nature, as demonstrated by the

20  gross inaccuracies of the figures referenced in the Complaint, they were non-discloseable and

21  immaterial as a matter of law.

---

22  [88] *In Re Horton*, 88 Ops. Cal. Atty. Gen. 165, *3 (2005).

23  [89] Complaint ¶ 31(c).

24  [90] *Compare* Complaint ¶ 31 *with* March 21, 2008 San Diego Comprehensive Annual Financial Report at 18, Ex. 11 to RJN.

25  [91] *Compare* Complaint ¶ 31 *with* March 21, 2008 San Diego Comprehensive Annual Financial Report at 141, Ex. 11 to RJN.

26  [92] *See Panter v. Marshall Field & Co.*, 646 F.2d 271, 292 (7th Cir. 1981); *see also James v. Gerber Prods., Co.*, 587 F.2d 324, 327 (6th Cir. 1978).

27  [93] 628 F.2d 1214, 1221 (9th Cir. 1980).

28  [94] *Id.,* (emphasis added); *see also Freeman v. Decio*, 584 F.2d 186, 199-200 (7th Cir. 1978).
    [95] *In re Lyondell Petrochemical Co. Sec. Litig.*, 984 F.2d 1050, 1052-53 (9th Cir. 1993).

1        3.    The Alleged Omission Referenced In Paragraph 31(b) Of The Complaint
2              Is Immaterial Because No Reasonable Investor Would Consider "Certain
              Sums," In The Abstract, Important Information

3        The second of the SEC's five alleged categories of omissions claims that: "certain sums

4    relating to a lawsuit settlement were excluded from the calculation of the unfunded liability,

5    which, if included, would have substantially increased such unfunded liability." Mr. Uberuaga

6    respectfully submits that, without further context, which the SEC fails to provide, this alleged

7    omission is meaningless, and no reasonable investor would or could possibly view such a

8    meaningless statement important enough to consider when making an investment decision.

9    Indeed, there are many reasons to settle a lawsuit, including the desire to avoid even costlier

10   litigation expenses. Moreover, lawsuit settlements are often confidential and a publication of the

11   same could subject a party to even more liability. Thus, such a meaningless statement in the

12   abstract might, itself, potentially constitute a misrepresentation or omission of material fact.

13       Furthermore, what is a "certain sum?" This vague and amorphous phrase fails to meet the

14   particularity requirement that applies to fraud allegations; i.e., the "'the who, what, when, where,

15   and how' of the misconduct charged."[96] At a minimum, the SEC should be required to provide a

16   more definite statement in support of this otherwise vague and ambiguous alleged omission.[97]

17       4.    The Alleged Omissions Contained In Paragraph 31(e) Of The Complaint
18             Are Immaterial Because, In 2003, Financial Accounting Standards Did Not
             Require The Reporting Of Future Retiree Health Care Liabilities

19       The fifth of the SEC's five alleged categories of omissions claims that: "[t]here was no

20   disclosure that (i) the estimated present value of the City's liability for retiree health care was

21   $1.1 billion; (ii) the retiree health care expense was being paid with surplus earnings from CERS;

22   (iii) this surplus earnings reserve was running out of money; and (iv) the City would have to

23   begin paying this substantial expense out of its own budget."[98] In addition to other deficiencies

24   alleged, materiality cannot possibly be established as to this category, considering the City had no

25

26

27   [96] *Vess*, 317 F.3d at 1106 (quoting *Cooper*, 137 F.3d at 627).
     [97] Fed. R. Civ. P. 12(e).
28   [98] Complaint ¶ 31(e).

1    duty in March 2003 to disclose its *potential* future retiree health care liability, and securities

2    actions alleging failure to disclose are dismissed when there was no duty to disclose.[99]

3        It has been said that:  "[t]he Financial Accounting Standards of GAAP and the antifraud

4    rules promulgated under § 10(b) of the 1934 Act serve similar purposes, and courts have often

5    treated violations of the former as indicative that the latter were also violated."[100]  Because the

6    Governmental Accounting Standards Board ("GASB") is the official source of generally accepted

7    accounting principles ("GAAP") for state and local governments,[101] and is relied upon in the

8    Complaint as a benchmark,[102] compliance with the financial accounting standards of GASB, like

9    GAAP, should also indicate compliance with securities laws.

10        GASB 45, first enacted in June 2004, requires local governments to conduct regular

11    actuarial studies to determine the actuarial accrued liability for retiree health care benefits,[103] and

12    to disclose potential future retiree health care liabilities.[104]  But, GASB 45 was not enacted until

13    one year *after* the issuance of the Park Refunding Bond.[105]  Moreover, local governments with

14    annual revenues of $100 million or more, such as the City, were not required to comply with

15    GASB 45 until *after* December 15, 2006.[106]  Thus, the City was under no obligation to disclose

16    future retiree health care liabilities until more than three years after the issuance of the Park

17    Refunding Bond, and any such related omissions are immaterial as a matter of law and fail to

18    support any claim.

19                           *   *   *

20        In sum, the Complaint fails to adequately allege that any supposed misstatement or

21    omission in connection with the Park Refunding Bond was material.  And this lack of materiality

22    defect cannot possibly be remedied since, for example, the Park Refunding Bond was (and is)

23

---

[99] *In re Lyondell Petrochemical Co. Sec. Litig.*, 984 F.2d at 1052.

[100] *Malone v. Microdyne Corp.*, 26 F.3d 471, 478 (4th Cir. 1994).

[101] http://www.gasb.org/facts/facts_about_gasb.pdf (in existence on July 14, 2008); *see also Bolt v. Merrimack Pharms., Inc.*, 503 F.3d 913, 918 n. 6 (9th Cir. 2007).

[102] Complaint ¶¶ 14, 22.

[103] GASB Statement of Standards No. 45 at 11407, Ex. 12 to RJN.

[104] *Id.*

[105] *Id.* at 11406.

[106] *Id.* at 11409.

1  secured by an insurance policy.  Thus, the second prong of both alleged claims must be

2  dismissed.

3      **B.    The First And Third Prongs Of Both Claims Fail And Must Be Dismissed**
       **Due To Lack Of Conduct By Mr. Uberuaga Having A Deceptive Purpose**
4      **And Effect**

5          The first and third prongs of Section 17(a), and Section 10(b) and Rule 10b-5 thereunder,

6  proscribe "schemes" and "artifices" to defraud, as well as any act or practice that would defraud

7  another person.[107]  A defendant may be held liable under these prongs if he has "engaged in

8  conduct that had the principal purpose and effect of creating a false appearance of fact in

9  furtherance of the scheme."[108]  However, "[it] is not enough that a *transaction* in which a

10  defendant was involved had a deceptive purpose and effect; the defendant's *own conduct*

11  contributing to the transaction or overall scheme must have had a deceptive purpose and

12  effect."[109]  Put differently, "[c]onduct that is consistent with the defendants' normal course of

13  business would not typically be considered to have the purpose and effect of creating a

14  misrepresentation."[110]

15          Apart from the alleged omissions made in connection with the issuance of the Park

16  Refunding Bond—which as indicated above were immaterial—the Complaint fails to allege that

17  Mr. Uberuaga's conduct had a deceptive purpose and effect,[111]  which allegation cannot be made

18  in good faith given the totality of the circumstances.  First, there is nothing illegal or unusual

19  about government underfunding, including the underfunding of pension liabilities and retiree

20  health care obligations.  Second, since the City's actuarial projections of potential, future, pension

21  and retiree health care liabilities were highly speculative and uncertain in nature, their non-

22  disclosure was consistent with a normal course of business.  Third, since the City was not

23  required to calculate and disclose its potential future retiree health care liability pursuant to

24  GASB guidelines, the City's non-disclosure of the same was also consistent with a normal course

25

26  [107] 15 U.S.C. § 77q(a)(1)-(3); 17 C.F.R. § 240.10b-5(a)-(c).
    [108] *Simpson v. AOL Time Warner Inc.,* 452 F.3d 1040, 1048 (9th Cir. 2006).
27  [109] *Id.* (emphasis in original).
    [110] *Id.* at 1050.
28  [111] *See generally* Complaint.

1  of business.  Fourth, the money raised by the Park Refunding Bond was designated for the

2  altruistic purpose of saving money and improving Balboa and Mission Bay Parks.  Fifth, not a

3  penny raised by the Park Refunding Bond went to Mr. Uberuaga, but rather all to the City.  And

4  sixth, no investor is alleged to have lost a penny or otherwise been harmed in any way, as the

5  Park Refunding Bond is insured and payment is guaranteed.

6      Moreover, Mr. Uberuaga's alleged act bears no resemblance to the classic schemes to

7  defraud.  There is no allegation that Mr. Uberuaga "was a primary architect of the scheme to

8  finance . . . sham entities," or that he "'masterminded' [a] company's misleading accounting

9  practices."[112]  There is also no allegation that Mr. Uberuaga "falsified stock option grants . . . in

10  order to avoid properly accounting for compensation charges."[113]  There simply is no allegation

11  that Mr. Uberuaga personally profited or acted criminally or unethically.  Rather, Mr. Uberuaga is

12  merely one of several current and former public servants who allegedly made a supposedly

13  reckless *mistake* in the normal course of business.

14      Accordingly, because the SEC did not and cannot allege that Mr. Uberuaga made any

15  *material* misstatement or omission in connection with the Park Refunding Bond, as required by

16  the second prong of both claims, and because the SEC did not and cannot allege that

17  Mr. Uberuaga's own conduct had a deceptive purpose and effect, and contributed to a device,

18  scheme, or artifice to defraud, or a transaction, act, practice, or course of business which operated

19  or would operate as a fraud or deceit upon other persons, as required by the first and third prongs

20  of both claims, the Complaint must be dismissed in its entirety.

21  **VI.    EACH OF THE ALLEGED OMISSIONS CONTAINED IN APPENDIX A OF**
22  **THE PARK REFUNDING BOND WERE IN THE PUBLIC DOMAIN**

23      A "defendant's failure to disclose material information may be excused where that

24  information has been made credibly available to the market by other sources."[114]  If this is the

25  case, the issue then becomes whether, in light of the publicly available information, a rational jury

26

---

27  [112] *Simpson,* 452 F.3d at 1049.

28  [113] *S.E.C. v. Berry,* 2008 WL 2002537, *11 (N.D. Cal.).
[114] *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1115 (9th Cir. 1989).

could nonetheless find a "substantial likelihood" that full disclosures by the defendants would have "significantly altered the 'total mix' of information made available."[115] The alleged omissions from Appendix A of the Park Refunding Bond were in the public domain, and full disclosure by the City would *not* have significantly altered the total mix of information made available to investors.

At least the following information was in the public domain prior to the issuance of the Park Refunding Bond: (1) in April 2002, a Blue Ribbon Committee issued findings which "raised concerns about the City's pension;"[116] (2) in January 2003, a class action complaint was filed against the City and others, alleging that "SDCERS trust fund ha[d] an unfunded accrued liability of $720 million, and that by 2009, the City [would] owe approximately $2.8 billion to SDCERS, with an annual City budget expense of more than $250 million;"[117] (3) the February 2003 response to the Blue Ribbon Committee stated that:

> the City was not making any contributions to CERS to pay for its retiree health care liability, that CERS had been paying for this liability with money in a reserve funded with CERS's surplus earnings from prior years, that the reserve would be depleted by FY 2006, and that in FY 2006, the City would have to pay an estimated $15 million for retiree health care;[118]

and (4) numerous other *publicly available* documents, including correspondence with bond ratings agencies and news articles not subject to judicial notice, revealed substantial details regarding the City's pension liabilities, for example:

> From February 9 through 13, 2003, the local newspaper wrote three front page, above-the-fold articles about the City's under-funded pension system and the CERS response. The newspaper articles explained that (1) by the end of FY 2009 the City's unfunded liability to CERS was projected to increase to almost $2 billion; and (2) the City's unfunded liability for retiree health care was estimated to be $1.1 billion.[119]

Moreover, the Park Refunding bond itself made numerous disclosures as discussed and quoted in Section V.A.2, *supra*. Indeed, even the SEC was forced to acknowledge that "the City made

---

[115] *Id.*
[116] Complaint ¶ 34.
[117] Park Refunding Bond at § 9, p. A-38, Ex. 9 to RJN.
[118] Complaint ¶ 34.
[119] Cease-and-Desist Order at 13, n.16, Ex. 4 to RJN.

1    ***substantial disclosures*** regarding (1) the City's policies for funding CERS; and (2) the status of

2    CERS's funding and the City's liability to CERS."[120]

3          Unfortunately, since motions to dismiss are confined to the allegations in the complaint

4    and judicially noticeable facts, this issue—as well as Mr. Uberuaga's official immunity—cannot

5    be fully litigated at this time, and is appropriately reserved for summary judgment if necessary.

6    **VII.   THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE**

7          The SEC has been investigating the City's securities offerings since early 2004.[121]  The

8    SEC and the City entered into the Cease-and-Desist Order dated November 14, 2006.[122]  On

9    April 7, 2008, nearly a year and a half later, the SEC filed the present action.  Yet, after a

10   substantial length of time, the SEC is unable to prepare a complaint without every prong of every

11   claim having fatal defects that cannot possibly be remedied since certain facts—e.g., legislative

12   immunity, insurance coverage, lack of materiality, lack of deceptive purpose and effect,

13   information in the public domain and subject to judicial notice, etc.—will never change.  And

14   because these facts will never change, no amendment "could . . . possibly cure the deficiency,"

15   and the Court should therefore dismiss the Complaint with prejudice.[123]

16   **VIII.   CONCLUSION**

17         "The [stated] mission of the [SEC] is to protect investors, maintain fair, orderly, and

18   efficient markets, and facilitate capital formation."[124]  In this case, no investor was harmed.

19   Further, the SEC has already settled with the City, and obtained assurance that the City will

20   obtain capital in a fair, orderly, and efficient manner.  Consequently, it would appear that the

21   SEC's mission in San Diego has been accomplished.

22         Putting aside the SEC's motives for filing this action, and its selective prosecution of

23   Mr. Uberuaga and other defendants in this case, legislative immunity, the insurance that backs the

24   Park Refunding Bond, and the failure of the SEC to plead any satisfactory claim, requires the

---

[120] *Id.* at 16 (emphasis added).

[121] February 14, 2004 SEC Document Request to Mr. Uberuaga; February 23, 2005 SEC Subpoena to Mr. Uberuaga, Exs. 13 & 14 to RJN.

[122] *See generally* Cease-and-Desist Order, Ex. 4 to RJN.

[123] *Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc.,* 806 F.2d 1393, 1401 (9th Cir. 1986).

[124] http://www.sec.gov/about/whatwedo.shtml (in existence on July 14, 2008).

1   granting of Mr. Uberuaga's Motion to Dismiss the Complaint.  Leave to amend should not be

2   granted, considering that even after more than four years of investigation, the SEC has failed to

3   state a claim, and certain facts—e.g., legislative immunity, insurance coverage, lack of

4   materiality, lack of deceptive purpose and effect, information in the public domain and subject to

5   judicial notice, etc.—will never change.

6        For these reasons, and those more fully explained above, the Court should dismiss the

7   SEC's Complaint, with prejudice, and put an end to its unprecedented overreaching in this federal

8   court action against former City employee, Mr. Uberuaga.

9

10  Dated:  September 8, 2008                 Respectfully submitted,

11                                           MCKENNA LONG & ALDRIDGE LLP

12

13                                                        s/Robert S. Brewer
                                             ROBERT S. BREWER, JR.
14                                           ROBERT J. LAUCHLAN, JR.
                                             GARY K. BRUCKER, JR.
15                                           Attorneys for Defendant MICHAEL T. UBERUAGA
16                                           E-mail:  rbrewer@mckennalong.com

17  SD:22164492.16

18

19

20

21

22

23

24

25

26

27

28