1   ROBERT S. BREWER, JR. (SBN 65294)
    E-mail: rbrewer@mckennalong.com
2   ROBERT J. LAUCHLAN, JR. (SBN 118545)
    E-mail: rlauchlan@mckennalong.com
3   GARY K. BRUCKER, JR. (SBN 238644)
    E-mail: gbrucker@mckennalong.com
4   MCKENNA LONG & ALDRIDGE LLP
    750 B Street, Suite 3300
5   San Diego, CA 92101
    Telephone:    (619) 595-5400
6   Facsimile:    (619) 595-5450

7   Attorneys for Defendant
    MICHAEL T. UBERUAGA

8

9                 UNITED STATES DISTRICT COURT

10              SOUTHERN DISTRICT OF CALIFORNIA

11

12  SECURITIES AND EXCHANGE          CASE NO. 08-CV-0625-DMS (LSP)
    COMMISSION,
13                                   DEFENDANT MICHAEL T.
                    Plaintiff,       UBERUAGA'S REQUEST FOR
14                                   JUDICIAL NOTICE IN SUPPORT OF
         vs.                         HIS MOTION TO DISMISS
15
    MICHAEL T. UBERUAGA, EDWARD P.   Date:    November 7, 2008
16  RYAN, PATRICIA FRAZIER, TERESA A. Time:    1:30 p.m.
    WEBSTER, and MARY E. VATTIMO,    Judge:   Hon. Dana M. Sabraw
17                                   Ctrm:    10
                    Defendants.
18

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

McKenna Long &
Aldridge LLP
Attorneys At Law
San Diego

1    Pursuant to Federal Rule of Evidence 201(b) and (d), defendant Michael T. Uberuaga

2  hereby requests that the Court take judicial notice of the following documents, and the facts

3  contained therein, submitted in support of his Motion to Dismiss:

4    1.    Attached hereto as **Exhibit 1** is a true and correct copy of relevant portions of the

5  City of San Diego ("City") Charter.

6    2.    Attached hereto as **Exhibit 2** is a true and correct copy of the "Order Instituting a

7  Public Administrative Cease-and-Desist Proceeding Pursuant to Section 8A of the Securities Act

8  of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings and Imposing

9  Cease-and-Desist Order," dated January 24, 1996, in *In the Matter of County of Orange,*

10  *California, et al.*

11    3.    Attached hereto as **Exhibit 3** is a true and correct copy of the "Order Instituting

12  Cease-and-Desist Proceeding, Making Findings, and Imposing Cease-and-Desist Order Pursuant

13  to Section 8A of the Securities Act of 1933," dated July 31, 2003, in *In the Matter of the*

14  *Massachusetts Turnpike Authority, et al.*

15    4.    Attached hereto as **Exhibit 4** is a true and correct copy of the "Order Instituting

16  Cease-and-Desist Proceeding, Making Findings, and Imposing Cease-and-Desist Order Pursuant

17  to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of

18  1934," dated November 14, 2006, in *In the Matter of the City of San Diego, California.*

19    5.    Attached hereto as **Exhibit 5** is a true and correct copy of a record of a September

20  21, 2004 closed session and vote of the City Council, entitled:  "Anticipated Litigation –

21  Significant Exposure:  In the matter of the City of San Diego Bond Offerings."

22    6.    Attached hereto as **Exhibit 6** is a true and correct copy of the official audio record

23  of a May 13, 2008 City Council meeting, available for purchase from the City Clerk's Office.

24  For the convenience of the Court, a transcription of the relevant portions of this recording is

25  provided in Paragraph 3 of the concurrently-filed "Declaration of Nancy Scott in Support of

26  Michael T. Uberuaga's Motion to Dismiss the Complaint."

27    7.    Attached hereto as **Exhibit 7** is a true and correct copy of City Council Resolution

28  Number R-297692, adopted March 3, 2003, dated March 10, 2003 (the "Resolution").

8.     Attached hereto as **Exhibit 8** is a true and correct copy of relevant portions of the "City of San Diego Fiscal Year 2009 Proposed Budget."

9.     Attached hereto as **Exhibit 9** is a true and correct copy of relevant portions of materials relating to a City security issued sometime between March and July 2003, which refinanced a 1993 bond relating to the acquisition, construction, and installation of public improvements in Balboa and Mission Bay Parks (the "Park Refunding Bond").  The Resolution relates to the Park Refunding Bond.

10.     Attached hereto as **Exhibit 10** is a true and correct copy of relevant portions of "The City of San Diego, California Minutes for Regular Council Meeting of March 3, 2003."

11.     Attached hereto as **Exhibit 11** is a true and correct copy of relevant portions of the March 21, 2008 "City of San Diego State of California Comprehensive Annual Financial Report Fiscal Year Ended June 30, 2006."

12.     Attached hereto as **Exhibit 12** is a true and correct copy of relevant portions of the Government Accounting Standards Board Statement No. 45.

13.     Attached hereto as **Exhibit 13** is a true and correct copy of a transmittal letter and document request from the Securities and Exchange Commission ("SEC") to Mr. Uberuaga. Pages of documents have various dates, both February 12 and 14, 2004.

14.     Attached hereto as **Exhibit 14** is a true and correct copy of a February 23, 2005 transmittal letter, subpoena, and attachment from the SEC to Mr. Uberuaga.

15.     Attached hereto as **Exhibit 15** is a true and correct copy of the "Opinion of the Commission," dated March 21, 2003, in *In the Matter of The City of Miami, Florida.*

The Court may take judicial notice of material that is properly submitted as part of a complaint, including documents which are either physically attached to the complaint, or those upon which "the plaintiff's complaint necessarily relies" and whose "authenticity . . . is not contested."[1]  Paragraphs 26, 31, and 36 of the SEC's initial complaint filed on April 7, 2008 (the "Complaint") reference **Exhibit 9** hereto, and paragraphs 14 and 22 of the Complaint reference **Exhibit 12** hereto.  The Complaint also necessarily relies on both exhibits, as the disclosures

---

[1] *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001) (internal quotations omitted).

1  accompanying **Exhibit 9** are allegedly misleading and purportedly fail to meet the accounting

2  standards set forth in **Exhibit 12**.[2]  Thus, judicial notice of both **Exhibit 9** and **Exhibit 12** hereto

3  is appropriate.

4      The Court may also take judicial notice of matters of public record, defined as a fact "not

5  subject to reasonable dispute in that it is capable of accurate and ready determination by resort to

6  sources whose accuracy cannot reasonably be questioned."[3]  **Exhibits 1-11** hereto constitute

7  matters of public record not subject to reasonable dispute, and judicial notice of these exhibits is

8  proper.

9      Further, **Exhibits 1 and 5-11** hereto, constitute records of the City, and as government data

10  and/or publications,[4] they are not subject to reasonable dispute and are judicially noticeable.

11      Also, **Exhibits 2-4 and 13-15** hereto, constitute records of the SEC, and because "a court

12  may take judicial notice of records and reports of administrative bodies,"[5] they are not subject to

13  reasonable dispute and are judicially noticeable.

14      In addition to taking judicial notice of **Exhibits 1-15** hereto, the Court may also take judicial

15  notice of "facts that are contained in materials of which the court may take judicial notice."[6]

16      Accordingly, defendant Mr. Uberuaga respectfully requests that the Court grant his Request

17  for Judicial Notice and consider the foregoing documents, and facts contained therein, in ruling

18  on his Motion to Dismiss.

19  Dated:  September 8, 2008        Respectfully submitted,

20                  MCKENNA LONG & ALDRIDGE LLP

21                         s/Robert S. Brewer

22                  ROBERT S. BREWER, JR.
                    ROBERT J. LAUCHLAN, JR.

23                  GARY K. BRUCKER, JR.

                Attorneys for Defendant MICHAEL T. UBERUAGA

24                  E-mail:  rbrewer@mckennalong.com

SD:22166618.1

25

26  [2] Complaint ¶¶ 14, 22, 26, 31, 36.

   [3] *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1025 n.2 (9th Cir. 2006).

27     [4] *Id.*

   [5] *Mack v. South Bay Beer Dist.*, 798 F.2d 1279, 1282 (9th Cir. 1986) (internal quotations omitted).

28     [6] *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999) (internal
quotations omitted).

# EXHIBIT 1

# ARTICLE III

## LEGISLATIVE POWER

**Section 11:    Legislative Power**

All legislative powers of the City shall be vested, subject to the terms of this Charter and of the Constitution of the State of California, in the Council, except such legislative powers as are reserved to the people by the Charter and the Constitution of the State.

**Section 11.1:  Legislative Power — Nondelegable**

The same prohibition against delegation of the legislative power which is imposed on the State Legislature by Article XI, Section 11a of the Constitution of the State of California shall apply to the City Council of The City of San Diego, so that its members shall not delegate legislative power or responsibility which they were elected to exercise in the adoption of any ordinance or resolution which raises or spends public monies, including but not limited to the City's annual budget ordinance or any part thereof, and the annual ordinance setting compensation for City employees, or any ordinance or resolution setting public policy.

The City Council shall annually adopt an ordinance establishing salaries for all City employees.  The City Council shall adopt this ordinance not later than May 30 of each year after considering all relevant evidence including but not limited to the needs of the citizens of the City of San Diego for municipal services, the ability of the citizens to pay for those services, local economic conditions and other relevant factors as the Council deems appropriate.  The City Council shall give priority in the funding of municipal services to the need of the citizens for police protection in considering adoption of this salary ordinance and the annual budget ordinance.

The prohibition imposed by this section against unlawful delegation of the legislative responsibility to set compensation for city employees shall extend to any scheme or formula which seeks to fix the compensation of City of San Diego employees at the level of compensation paid to employees of any other public agency whose governing board is not elected by and not accountable to the people of the City of San Diego.  This prohibition shall also extend to any scheme or formula which seeks to fix, establish, or adjust the compensation of City of San Diego employees at the level of the largest cities in California or the State of California.
*(Addition voted 06-03-1980; effective 07-16-1980.)*
*(Amendment voted 11-04-1980; effective 12-31-1980.)*
*(Amendment voted 06-03-1986; effective 09-08-1986.)*

Page 1 of 10

Exhibit 1
Page 1 of 5

# ARTICLE V

*(All executive authority, power, and responsibilities conferred upon the City Manager in this Article are transferred to the Mayor during the operative period of Charter Article XV.  See Charter § 260(b).)*

## EXECUTIVE AND ADMINISTRATIVE SERVICE

**Section 26:    Administrative Code**

The existing Departments, Divisions and Boards and existing Offices of the City Government are hereby continued unless changed by the provisions of this Charter or by ordinance of the Council.  The Council shall by ordinance, by majority vote, adopt an administrative code providing for the detailed powers and duties of the administrative offices and departments of the City Government, based upon the provisions of this Charter.  Thereafter, except as established by the provisions of this Charter, the Council may change, abolish, combine, and rearrange the departments, divisions and boards of the City Government provided for in said administrative code, but such ordinance creating, combining, abolishing or decreasing the powers of any department, division or board shall require a vote of two-thirds of the members elected to the Council.  The Council may by ordinance, if authorized so to do by the general law of the State, provide that any function of the City may be performed by the County or that any function of the County may be performed by the City, provided the respective legislative bodies authorize and approve such transfer and assumption of function.  There may also be established a combined City and County district for the performance of any function.
*(Amendment voted 09-17-1963; effective 02-11-1964.)*
*(Amendment voted 11-08-1977; effective 01-20-1978.)*

**Section 26.1:  Public Services Required**

It shall be the obligation and responsibility of The City of San Diego to provide public works services, water services, building inspection services, public health services, park and recreation services, library services, and such other services and programs as may be desired, under such terms and conditions as may be authorized by the Council by ordinance.
*(Addition voted 09-17-1963; effective 02-11-1964.)*

Exhibit 1
Page 2 of 5

## Section 27:    The City Manager

The Council shall elect a Manager under this Charter, who shall be the chief administrative officer of the City.  The Manager shall be chosen by the Council solely on the basis of his proven administrative qualifications.  The Manager need not, when elected, be a resident of the City or State, but must be a citizen of the United States.  He shall, upon his election, immediately become a resident of the City.  No member of the Council shall, during the time for which he was elected, or for one (1) year thereafter, be eligible to hold the position of Manager.  The Manager shall be elected for an indefinite term, but may be removed at the pleasure of the Council; provided, however, that the Manager shall not be removed unless a majority of the members of the Council shall vote in favor of such removal.  Before the Manager may be removed he shall, if he shall so demand, be given a written statement of the reasons alleged for his removal and the right to be heard publicly thereon at a meeting of the Council prior to the final vote on the question of his removal, but pending and during such hearing the Council may suspend him from office.  At least two weeks shall be given the Manager between notice and hearing for the preparation of his answer to the reasons for removal.  The action of the Council in suspending or removing the Manager shall be final and conclusive on everyone, it being the intention of this Charter to vest all authority and fix all responsibility for such suspension or removal in the Council.  He shall receive a salary to be fixed in the annual appropriation ordinance.  The salary set in the appropriation ordinance shall not be reduced while the Manager holds office, but may be subject to increase by the Council at its discretion.  The Manager shall designate one of his subordinates as Assistant Manager, who shall serve as Manager in case of the absence or disability of the Manager.

In the event of a vacancy in the office of City Manager, the Council shall fill the same within sixty (60) days after the vacancy occurs; provided, however, that it shall require the affirmative vote of a majority of the members of the Council to elect a person to the office of Manager.
*(Amendment voted 12-19-1933; effective 01-18-1935.)*
*(Amendment voted 09-17-1963; effective 02-11-1964.)*
*(Section 27 is superceded in its entirety by Charter sections 260 and 265 during the operative period of Charter Article XV.  See Charter § 260(a).)*

## Section 28:    Duties of the Manager

It shall be the duty of the Manager to supervise the administration of the affairs of the City except as otherwise specifically provided in this Charter; to make such recommendation to the Council concerning the affairs of the City as may seem to him desirable; to keep the Council advised of the financial condition and future needs of the City; to prepare and submit to the Council the annual budget estimate and such reports as may be required by that body, including an annual report of all the Departments of the

Exhibit 1
Page 3 of 5

City; to see that the ordinances of the City and the laws of the State are enforced; and to perform such other duties as may be prescribed by this Charter or required of him by ordinance or resolution of the Council. Except as otherwise provided in this Charter, all other administrative powers conferred by the laws of the State upon any municipal official shall be exercised by the Manager or persons designated by him. He shall assume the position of Director of any Department under his control for which a Director has not been appointed. The Directors, or heads of the administrative Departments under the Manager shall be immediately responsible to him for the efficient administration of their respective Departments. The Manager may set aside any action taken by a Director or Department subordinate responsible to him, and may supersede him in authority in the functions of his office or employment. Where no provision has been made by ordinance authorizing a subordinate official to act as departmental head in case of a vacancy, the Manager may designate an interim acting head or perform personally the functions of the office. The Manager, as Chief Budget Officer of the City, shall be responsible for planning the activities of the City government and for adjusting such activities to the finances available. To this end he shall prepare annually a complete financial plan for the ensuing year and shall be responsible for the administration of such a plan when adopted by the Council. He shall be charged with the bringing together of estimates covering the financial needs of the City, with the checking of these estimates against the information relative to past expenditures and income, with the preparation of the budget document and supporting schedules and with the presentation of the budget to the Council. He shall have the power to employ experts, or consultants to perform work or give advice connected with the Departments of the City when such work or advice is necessary in connection therewith. If the cost of hiring said expert or consultant exceeds a sum to be established by ordinance of the City Council, no such expert or consultant shall be hired without approval of the Council. The Council shall provide sufficient funds in the annual appropriation ordinance or by supplemental appropriation ordinances for such purposes and shall charge such additional services against the appropriation of the respective Departments.

The Manager shall execute all contracts for the Departments under his control. He shall approve all requisitions and vouchers for said Departments in person or through such assistants as he may designate for the purpose.

The Manager may prescribe such general rules and regulations as he may deem necessary or expedient for the general conduct of the administrative Departments. The Director of each Department shall in like manner prescribe such rules and regulations as may be deemed necessary and expedient for the proper conduct of each Department, not inconsistent with the general rules and regulations prescribed by the Manager.

In order to expedite the work of any department or to adequately administer an increase in the duties which may devolve on any Department or to cope with periodic or seasonal changes, the Manager, subject to Civil Service regulations, is empowered to transfer

Exhibit 1
Page 4 of 5

employees temporarily from one Department to perform similar duties in another Department.  Likewise each Department head shall have power to transfer employees from one Division to another within his Department.

The Manager may direct any Department or Division to perform work for any other Department or Division.  Such powers to transfer employees or to direct the performance of work shall not apply to the Police or Fire Departments.

During January of each year the Manager shall present to the Council an annual report of the City's affairs for the previous fiscal year.

In case of general conflagration, rioting, flood, or other emergency menacing life and property, the Manager shall marshal all the forces of the different Departments of the City for the maintenance of the general security, and shall have the power to deputize or otherwise employ such other persons as he may consider necessary for the purpose of protecting the City and its residents.  The Council may, however, in any such emergencies authorize the Mayor to take command of the police, maintain order and enforce the law.

And in such authorized emergencies the Manager shall be subordinate to and shall carry out such duties as may be assigned to him by the Mayor.
*(Amendment voted 11-02-1976; effective 01-12-1977.)*

**Section 29:    Responsibility of Manager - Powers of Appointment and Removal**

The Manager shall be responsible to the Council for the proper administration of all affairs of the City placed in his charge, and to that end, subject to the Civil Service provisions of this Charter and except as otherwise provided herein, he shall have the power to appoint and remove all officers and employees in the administrative service of the City under his control; but the Manager may authorize the head of a Department or officer responsible to him to appoint and remove subordinates in such Department or office.  Appointments made by, or under the authority of, the Manager, shall be on the basis of administrative ability and of the training and experience of such appointees in the work which they are to perform.  All such appointments shall be without definite term unless for temporary service not to exceed sixty days.  No person directly related to the City Manager by blood or marriage shall be eligible for employment unless such relative was in the employ of the City at the time of the appointment of the City Manager.
*(Amendment voted 09-17-1963; effective 02-11-1964.)*

Exhibit 1
Page 5 of 5

# EXHIBIT 2

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES ACT OF 1933
Release No. 7260 / January 24, 1996

SECURITIES EXCHANGE ACT OF 1934
Release No. 36760 / January 24, 1996

ADMINISTRATIVE PROCEEDING
File No. 3-8937

| | |
|---|---|
| In the Matter of | ORDER INSTITUTING A PUBLIC ADMINISTRATIVE CEASE-AND-DESIST PROCEEDING PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS AND IMPOSING CEASE-AND-DESIST ORDER |
| COUNTY OF ORANGE, CALIFORNIA; ORANGE COUNTY FLOOD CONTROL DISTRICT; and COUNTY OF ORANGE, CALIFORNIA BOARD OF SUPERVISORS, | |
| Respondents. | |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate that a public administrative cease-and-desist proceeding be and hereby is instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") against the County of Orange, California ("Orange County" or the "County"), the Orange County Flood Control District (the "Flood Control District") and the County of Orange, California Board of Supervisors (the "Board").

II.

In anticipation of the institution of this proceeding, Orange County, the Flood Control District and the Board have submitted an Offer of Settlement, which the Commission has determined to accept. Solely for the purpose of this proceeding and any other proceedings brought by or on behalf of the Commission or to which the Commission is a party, and without admitting or denying the findings contained herein, except that Orange County, the Flood Control District and the Board each☐

Exhibit 2
Page 1 of 36

admits the jurisdiction of the Commission over them and over the subject matter of this proceeding, Orange County, the Flood

Control District and the Board, by their Offer of Settlement,
consent to the entry of this Order Instituting A Public
Administrative Cease-And-Desist Proceeding Pursuant to Section 8A
of the Securities Act of 1933 and Section 21C of the Securities
Exchange Act of 1934, Making Findings and Imposing Cease-and-
Desist Order ("Order") and to the entry of the findings and the
cease and desist order set forth below.

Accordingly, IT IS HEREBY ORDERED that a proceeding pursuant
to Section 8A of the Securities Act and Section 21C of the
Exchange Act be, and hereby is, instituted.

III.

On the basis of this Order and the Offer of Settlement
submitted by Orange County, the Flood Control District and the
Board, the Commission finds that:-[1]-

A.     SUMMARY

This Order concerns false and misleading statements in the
offer and sale of over $2.1 billion in municipal securities
issued in 1993 and 1994 by Orange County, the Flood Control
District and a school district located in Orange County (the
"School District").-[2]-  In connection with these

---------FOOTNOTES----------

-[1]-     The findings herein are made pursuant to the Offer
          of Settlement of Orange County, the Flood Control
          District and the Board and are not binding on any
          other person or entity named as a respondent in
          this or any other proceeding.

-[2]-     As more fully discussed below, the offerings may
          be categorized into four types:  the reinvestment
          offerings; the tax and revenue anticipation note
          ("TRAN") offerings; the Teeter note offerings; and
          the Pension Bond offering.  The reinvestment
          offerings were:  the $400,000,000 COUNTY OF
          ORANGE, CALIFORNIA 1993-94 TAXABLE NOTES issued by
          Orange County on July 1, 1993; the $600,000,000
          COUNTY OF ORANGE, CALIFORNIA 1994-95 TAXABLE NOTES
          issued by Orange County on July 8, 1994; the
          [SCHOOL DISTRICT] $50,000,000 TAXABLE NOTES issued
          by the School District on August 26, 1993; the
          [SCHOOL DISTRICT] $50,000,000 TAXABLE NOTES issued
          by the School District on August 1, 1994; and the
          $100,000,000 TAXABLE NOTES issued by the Flood
          Control District on August 2, 1994.  The TRAN
                                        (continued...)

======================================START OF PAGE 2======□

offerings, the County, the Flood Control District and the Board
variously made material misstatements in the disclosure documents
for the offerings (the "Official Statements") or authorized the
use of Official Statements that were either false or misleading
by omitting to state material facts regarding:  1) the Orange
County Investment Pools (the "County Pools"), including the

Exhibit 2
Page 2 of 36

County Pools' investment strategy and investment results,
manipulation of the County Pools' yield, and investment in the
County Pools of the funds pledged to repay the securities, which
matters affected the issuer's ability to repay the municipal
securities and the County Pools' ability to perform under
agreements to repurchase or provide for repayment of the
municipal securities (the "Purchase Agreements"); 2) Orange
County's financial condition, including its economic reliance on
the investment results of the County Pools as a source of funds
to repay its obligations on the securities; 3) the tax-exempt
status of the offering; 4) an undisclosed cap on the interest
rate payable to investors on certain variable rate municipal
securities sold in the offerings; and 5) the unauthorized use of
an audit report.  In addition, in connection with the offer and
sale of certain of the municipal securities, misrepresentations
were made to certain national securities rating agencies (the
"Rating Agencies") concerning the County Pools.  These material
misstatements were made in violation of Section 17(a) of the
Securities Act and Section 10(b) of the Exchange Act and Rule
10b-5 thereunder.

B.   THE RESPONDENTS

---------FOOTNOTES----------
      -[2]-(...continued)
                offerings were:  the $299,660,000 COUNTY OF
                ORANGE, CALIFORNIA 1994-95 POOLED TAX AND REVENUE
                ANTICIPATION NOTES, issued by Orange County on
                July 1, 1994; the $169,000,000 COUNTY OF ORANGE,
                CALIFORNIA 1994-95 TAX AND REVENUE ANTICIPATION
                NOTES, SERIES A issued by Orange County on July 5,
                1994; and the $31,000,000 COUNTY OF ORANGE,
                CALIFORNIA 1994-95 TAX AND REVENUE ANTICIPATION
                NOTES, SERIES B issued by Orange County on August
                11, 1994.  The Teeter offerings were:  the
                $111,000,000 COUNTY OF ORANGE, CALIFORNIA 1994-95
                (TEETER PLAN) TAXABLE NOTES issued by Orange
                County on July 20, 1994; and the $64,000,000
                COUNTY OF ORANGE, CALIFORNIA 1994-95 (TEETER PLAN)
                TAX-EXEMPT NOTES issued by Orange County on August
                18, 1994.  The Pension Bonds were issued by Orange
                County on September 28, 1994 in two series:  the
                $209,840,000 COUNTY OF ORANGE, CALIFORNIA TAXABLE
                PENSION OBLIGATION BONDS SERIES 1994A; and the
                $110,200,000 COUNTY OF ORANGE, CALIFORNIA TAXABLE
                PENSION OBLIGATION BONDS SERIES 1994B.


=======================================START OF PAGE 3======□



      County of Orange, California ("Orange County" or the
"County") is a legal subdivision and political subdivision of the
State of California and a body corporate and politic having the
powers specified in Title 3 of the California Government Code and
such others necessarily implied from the express
powers.-[3]-  On December 6, 1994, the County filed for
protection under Chapter 9 of the United States Bankruptcy Code
after incurring investment losses in the County Pools.  Orange
County conducted eight of the eleven offerings of municipal
securities that are the subject of this Order.

Exhibit 2
Page 3 of 36

Orange County Flood Control District (the "Flood Control District") is a body corporate and politic having the powers enumerated in its enabling legislation.-[4]-  The Orange County Board of Supervisors is designated and empowered to act as ex officio board of supervisors of the Flood Control District.-[5]-  The Flood Control District's principal functions are to provide for the control and preservation of flood and storm waters within Orange County.  The Flood Control District conducted one of the municipal securities offerings that are the subject of this Order.

Orange County Board of Supervisors (the "Board") is the body through which the County exercises its powers.-[6]-  The Board consists of five full-time members, each serving a term of four years.-[7]-  The Board has legislative, financial and police powers.  The Board exercises its financial powers through its supervision of and control over the financial affairs of the County.  The financial powers of the Board include:  examination and audit, or causing the audit, of the financial accounts and records of all officers having responsibility for County moneys;

---------FOOTNOTES----------

-[3]-    See Cal. Const. Art. XI, □ 1 (West Supp. 1995);
         Cal. Gov't Code □ 23003 (West 1988).

-[4]-    See Cal. Water Code App. □ 36-1 et seq. (West
1968
         & West Supp. 1995).

-[5]-    Cal. Water Code App. □ 36-3 (West Supp. 1995).

-[6]-    See Cal. Gov't Code □ 23005; see also Board of
         Supervisors of Modoc County v. Archer, 18 Cal.
         App. 3d 717, 721, 96 Cal. Rptr. 379, 382 (1971).

-[7]-    Simultaneous with the entry of this Order, the
         Commission, pursuant to Section 21(a) of the
         Exchange Act, issued a Report of Investigation in
         the Matter of County of Orange, California as It
         Relates to the Conduct of the Members of the Board
         of Supervisors, in connection with the matters
         discussed herein.


=======================================START OF PAGE 4======□




supervision of the official conduct of all County officers, including the Treasurer; investment of County surplus funds; approval of proposed County budgets and adoption of final County budgets; and contracting for County indebtedness, including issuing municipal securities.-[8]-

C.    RELATED INSTRUMENTALITIES AND PERSONS

The Orange County Investment Pools (the "County Pools") were instrumentalities of the County and were not established as legal entities distinct from the County.  The County Pools operated as an investment fund managed by Orange County through which the Treasurer invested the County funds and public funds

Exhibit 2
Page 4 of 36

deposited in the County's control by various local governments or districts (the "Pool Participants" or the "Participants"). As of December 1994, the County Pools held approximately $7.6 billion in Participant deposits, including County funds. The County Pools consisted of the Commingled Pool (the principal investment pool with $6.126 billion in Participant deposits), the Bond Pool (the pool primarily for proceeds from tax-exempt offerings with $1.261 billion in Participant deposits) and Specific Investments (investments separately managed for certain Participants, including Orange County, with $210 million in Participant deposits).

As of December 1994, there were approximately 183 Pool Participants. Orange County invested essentially all of its liquid assets in the County Pools, almost $2.3 billion. In addition, approximately 80 other Participants were required by California law to deposit their funds with the Treasurer (the "Mandatory Participants"). As of December 1994, these Mandatory Participants had deposited about $1.6 billion into the County Pools. The remaining approximately 102 Participants voluntarily deposited their funds with the Treasurer for investment in the County Pools (the "Voluntary Participants"). As of December 1994, these Voluntary Participants had deposited approximately $3.7 billion into the County Pools. In total, the County, the

--------FOOTNOTES----------

-[8]-     See Cal. Gov't Code ☐ 25250 (West 1988)
          (examination and audit of County financial
          records); Cal. Gov't Code ☐ 25303 (West 1988)
          (supervision of County officials, particularly
          functions relating to public funds); Cal. Gov't
          Code ☐ 53601 (West Supp. 1995) (investment of
          surplus funds); Cal. Gov't Code ☐☐ 29064 & 29088
          (West Supp. 1995) (approval of proposed budget and
          adoption of final budget); Cal. Gov't Code ☐

25256

          (West 1988) (limitation on amount of debt Board
          may approve); Cal. Gov't Code ☐ 53853 (West Supp.
          1995) (authorization of short-term note
          offerings).

=======================================START OF PAGE 5======☐

Mandatory Participants and the Voluntary Participants had invested or deposited $7.6 billion into the County Pools.

The Orange County Treasurer-Tax Collector (the "Treasurer") is an elected official who manages the treasury and tax collection functions of Orange County under the authority of the Board. The Treasurer is aided in his treasury responsibilities by an assistant treasurer (the "Assistant Treasurer"), a non-elected County official. The Treasurer and Assistant Treasurer also serve as the Treasurer and Assistant Treasurer of the Flood Control District.-[9]-  The Treasurer and the Assistant Treasurer managed the County Pools' funds and securities, directed the County Pools' investments and communicated with Pool Participants and prospective investors in the County Pools.-[10]-

Exhibit 2
Page 5 of 36

D.    FACTS

1.    Orange County's Financial Condition

Orange County's financial condition was closely tied to the financial condition of the County Pools.  The County was heavily dependent on the County Pools as a source of income to balance its current operating budget.-[11]-  The County's use of interest income as a revenue source to balance its discretionary budget had been increasing since at least fiscal year 1991-92,

--------FOOTNOTES----------

-[9]-      See Cal. Water Code App. ▢ 36-3 (West Supp. 1995).

-[10]-     Simultaneous with the entry of this Order, the Commission filed a complaint, Securities and Exchange Commission v. Robert L. Citron and Matthew R. Raabe, Civil Action No. (C.D. Cal.), in connection with the matters discussed herein.

-[11]-     For fiscal year 1994-95, Orange County's total budget was approximately $3.7 billion.  Of that amount, the County was required to spend about 88%, or $3.266 billion, for specific purposes. The remaining 12%, or $462.5 million, comprised Orange County's discretionary budget, over which the Board had authority to determine how funds would be allocated.  Orange County's discretionary budget for fiscal year 1994-95 was $462.5 million.

The largest portion of that amount, $162 million, or 35%, was budgeted to come from investment income on Orange County's investment in the County Pools.

==========================================START OF PAGE 6======▢

and increased dramatically for fiscal year 1994-95.-[12]- This increased use of interest income was due to a decline in revenue from other sources, particularly property taxes.-[13]-  The Board approved the County's budget and was aware of the County's increasing use of interest income from the County Pools to balance the discretionary budget.

The County had two sources of funds to invest in the County Pools and earn investment interest.  First, from January 1993 to December 1994, Orange County had invested essentially all of its liquid assets in the County Pools, almost $2.3 billion, including funds pledged to repay municipal securities.  Second, in 1993 and 1994, Orange County issued $1 billion in municipal securities, through two offerings, for the sole purpose of reinvesting the proceeds in the County Pools, $400 million of which was repaid in 1994.

Due to the County Pools' risky investment strategy, the

Exhibit 2
Page 6 of 36

County Pools ultimately lost approximately $1.7 billion of the Participants' deposits of $7.6 billion, a loss of about 22.3%, when the County Pools' securities portfolio was liquidated. Orange County itself lost approximately $600 million of its $2.3 billion investment in the County Pools.  The County also suffered a loss of $157 million in estimated and budgeted interest earnings from the County Pools, contributing to a projected budget deficit for fiscal year 1994-95 of approximately $172 million.  As a result of these losses, on December 6, 1994, Orange County filed a bankruptcy petition under Chapter 9 of the United States Bankruptcy Code.  As a result of Orange County's economic dependence on the County Pools and their subsequent collapse, the County has not repaid or repurchased approximately $910 million in municipal securities at the time they were to mature by their original terms or were tendered for repurchase.-[14]-

---------FOOTNOTES----------

-[12]-    For fiscal year 1991-92, interest earnings were $36.8 million, or 7.4% of the discretionary budget; for fiscal year 1992-93, $64.5 million, or 12.4% of the discretionary budget; and for fiscal year 1993-94, they were budgeted at $58.3 million, or 15.1% of the discretionary budget.

-[13]-    Property tax revenues comprised 52.8% of the total discretionary budget for fiscal year 1991-92, 49.1% for fiscal year 1992-93, 33.4% for fiscal year 1993-94, and were projected to be only 25.4% for fiscal year 1994-95.

-[14]-    These municipal securities have been rated in default by one of the Rating Agencies.  In Orange
(continued...)

=========================================START OF PAGE 7=====□

2.    The Orange County Investment Pools

    The eleven municipal securities offerings that raised over $2.1 billion and that are the subject of this Order were significantly dependent on the investment performance of the County Pools in one or more of the following ways such that fair and accurate disclosure about the operation of the County Pools was material to investors in the municipal securities:  1) the proceeds from certain offerings, totalling $1.2 billion, were reinvested in the County Pools to obtain interest earnings; 2) the funds pledged to repay certain of the securities were invested in the County Pools; 3) the County Pools agreed to repurchase or repay certain of the securities; and/or 4) the County's economic reliance on the County Pools materially affected its ability to repay its securities.  The false and misleading statements in the offer and sale of the municipal securities also related principally to the County Pools.  Accordingly, in order to set forth these false and misleading statements, it is necessary to first discuss the County Pools and the reasons for their collapse.

    a.    The County Pools' Investment Strategy

Exhibit 2
Page 7 of 36

The County Pools' investment policy as stated by the Treasurer's office to Pool Participants was, in order of importance: 1) preservation of investment capital; 2) liquidity; and 3) investment yield. The Treasurer, however, caused the County Pools to engage in a very risky investment strategy. The strategy involved using a high degree of leverage by obtaining funds through reverse repurchase agreements on a short-term basis (less than 180 days), and investing in securities with a longer maturity (generally two to five years), many of which were volatile derivative securities.-[15]-

---------FOOTNOTES----------

-[14]-(...continued)
          County's bankruptcy proceeding, the County, the
          noteholders and the creditors' committee agreed to
          extend, or rollover, the maturity of approximately
          $800 million of these municipal securities to June
          30, 1996.

-[15]-    The term leverage is used where the value of the
          position is greater than the equity in the
          position. In other words, a person would be
          deemed to hold a leveraged position if he or she
          can maintain a larger position than the equity in
          the position. The term repurchase agreement
          refers to an agreement by the seller (i.e., the
          dealer) to repurchase securities (usually
          government securities), and an agreement by the
                                        (continued...)


==========================================START OF PAGE 8======□




    The County Pools' investment return was to result principally from the interest received on the securities in the County Pools. Leverage enabled the County Pools to purchase more securities for the purpose of generating increased interest income. This strategy was profitable as long as the County Pools were able to maintain a positive spread between the long-term interest rate received on the securities and the short-term interest rate paid on the funds obtained through reverse repurchase agreements.

    b.    The County Pools' Holdings

    During 1993 and 1994, the Treasurer on behalf of Orange County, using reverse repurchase agreements, leveraged the Participants' deposits to amounts ranging from 158% to over 292%.

The Treasurer then invested the Participants' deposits and the funds obtained through reverse repurchase agreements in debt securities issued by the United States Treasury or government sponsored enterprises; however, many of these securities were risky derivative securities, comprising from 27.6% to 42.2% of the combined County Pools' portfolio and from 31% to 53% of the Commingled Pool's portfolio.

    The County Pools were heavily invested in derivative

Exhibit 2
Page 8 of 36

instruments known as inverse floaters that pay interest rates
inversely related to the prevailing market interest rate.
Inverse floaters are negatively affected by a rise in interest
rates. From January 1993 through November 1994, from 24.89% to
39.84% of the County Pools' total portfolio consisted of inverse
floaters. In contrast, the County Pools invested only sparingly
in securities that paid interest rates directly related to the
prevailing interest rate (variable rate securities) or securities
that paid interest rates that rose at certain stated intervals to
certain stated rates (step-up securities). From January 1993

---------FOOTNOTES----------
    -[15]-(...continued)
              purchaser (i.e., the investor) to resell the same
              securities, for a certain price at a certain time
              in the future. In a reverse repurchase agreement,
              the dealer agrees to buy the securities and the
              investor agrees to repurchase them at a later
              date. Reverse repurchase agreements were a method
              by which the County obtained funds from broker-
              dealers and effectively pledged the County Pools'
              securities as collateral. Derivative instruments
              encompass a wide array of financial contracts,
              including swaps, futures, options and forwards,
              that derive their value from the performance of
              other assets, such as equities, debt, foreign
              currency and commodities.

==========================================START OF PAGE 9======□

through November 1994, only 1.84% to 5.59% of the County Pools'
portfolio consisted of such securities. Accordingly, the County
Pools invested in inverse floaters to speculate on the direction
of short and long-term interest rates.

          c.    The County Pools' Sensitivity To Interest Rate
                Changes

     The composition of the County Pools' portfolio made it
highly sensitive to interest rate changes. As interest rates
rose, the market value of the County Pools' securities (debt
instruments) fell, and the interest received on the County Pools'
inverse floaters also dropped. In October 1992 and January 1993,
the Treasurer was advised that the County Pools' modified
duration was seven years.-[16]-  In other words, for each
1% increase (or decrease) in the prevailing interest rate, the
County Pools' equity (i.e., the value of the County Pools'
securities less the amount obtained through reverse repurchase
agreements) would decrease (or increase) by approximately 7%.
The Treasurer was also advised that the modified duration
indicated substantially more price volatility than would be
expected from a portfolio with the County Pools' short average
maturity. The Treasurer was further advised that the County
Pools' lengthy modified duration was the result of the County
Pools' investment in inverse floaters and the use of reverse
repurchase agreements to leverage the portfolio.

     In February 1994, the Treasurer was advised that: over $5
billion of the County Pools' derivative securities (which

Exhibit 2
Page 9 of 36

comprised roughly 75% of the County Pools' total derivative
holdings and about 25% of the entire portfolio) had an average
duration of approximately five years; and for each basis point
(.01%) rise in comparable duration Treasury securities, the mark-
to-market value of these securities would fall by $2.7 million.

       d.   The Effect Of The Rise In Interest Rates In 1994
           On The County Pools

    The County Pools' investment strategy was profitable so long
as interest rates, including rates on reverse repurchase

---------FOOTNOTES----------
    -[16]-    A measure of the County Pools' sensitivity to
          interest rate changes, and therefore risk, is the
          portfolio's "modified duration."  Modified
          duration measures the sensitivity of the
          portfolio's market value to changes in prevailing
          interest rates (duration does not refer to
          maturity of the portfolio).  The longer the
          modified duration of a portfolio, the more
          sensitive its market value is to interest rate
          change.

=========================================START OF PAGE 10=====□

agreements, remained low and the market value of the County
Pools' securities remained stable.  The Treasurer's Annual 1992-
93 Financial Statement for the County Pools stated that the
investment strategy was "predicated on interest rates to continue
to remain low for a minimum of the next three years."

    During 1993, interest rates remained low and relatively
stable.  Due to the low interest rates and the County Pools'
investment strategy, the County Pools earned a relatively high
yield of about 8% during 1993.  Beginning in February 1994,
interest rates began to rise.  This rise in interest rates caused
the County Pools' yield to decrease, the reverse repurchase costs
to increase, the County Pools' interest income on inverse
floaters to decrease and the market value of the County Pools'
debt securities to decline.-[17]-  The rising interest
rates and the declining market value of the County Pools'
securities also caused the County to be subject to collateral
calls and reductions in amounts obtained under reverse repurchase
agreements of over $1.36 billion.  In sum, because of the
leverage employed in managing the County Pools and the losses
which would be incurred by selling the securities subject to
reverse repurchase agreements, the County Pools were facing a
growing liquidity crisis.

       e.   Manipulation Of The County Pools' Yield

    The Treasurer and the Assistant Treasurer manipulated the
County Pools' yield by:  1) diverting interest income from
Commingled Pool Participants to an account for the benefit of
Orange County; and 2) causing the Commingled Pool to acquire and
transfer securities at off-market prices to the detriment of
Commingled Pool Participants.

Exhibit 2
Page 10 of 36

Between April 1993 and June 1994, the Treasurer and the Assistant Treasurer misappropriated a total of $92.9 million from the Commingled Pool Participants, diverting these funds to an Orange County account designated the "Economic Uncertainty Fund."

Between April 1993 and June 1994, they reported monthly, and distributed quarterly, to the Commingled Pool Participants the Commingled Pool's yield less the amount misappropriated.   Then

---------FOOTNOTES----------
   -[17]-      By at least February 1992, the Treasurer generated
               month-end reports that marked-to-market a
               substantial portion of the County Pools' portfolio
               (from 26% to over 43%).  These reports reflected
               that the securities marked-to-market declined in
               value, ranging from over $26 million in January
               1994 (or .45% loss in value), to over $443 million
               in June 1994 (or 5.24% loss in value), to over
               $565 million (or 6.27% loss in value) in September
               1994.

=========================================START OF PAGE 11=====☐

from July 1994 through November 1994, as the Commingled Pool's yield decreased, they overstated the Commingled Pool's yield to the Commingled Pool Participants by a total of $17.6 million.

From approximately April 1993 through November 1994, the Treasurer and the Assistant Treasurer caused the Commingled Pool to transfer securities at prices below market to, and to acquire securities at above market prices from, six Specific Investment Participants (including Orange County).  These transactions resulted in a market value loss to the Commingled Pool that otherwise would have been borne by the Specific Investment Participants.

3.   The Municipal Securities Offerings

The Board, the Treasurer and the Assistant Treasurer were the County officials primarily responsible for the issuance of the County's municipal securities.  The Treasurer and the Assistant Treasurer were responsible for proposing to the Board and preparing the documents for the County's and the Flood Control District's short-term (less than thirteen months) debt offerings that are the subject of this Order.  For such short-term debt offerings, they proposed the issuance of the securities, participated in the drafting and review of, and signed, the Official Statements and related documents and participated in the selection of the underwriters, bond counsel and financial advisers.  They also participated in determining the County's cash flow deficit and the size of its cash flow borrowings.  For the long-term debt offering that is the subject of this Order, the Treasurer and the Assistant Treasurer participated in the drafting and review of the portion of the Official Statement relating to the County Pools and in the preparation of various related documents.

The Assistant Treasurer, acting in his capacity as a County employee, was also principally responsible for the two offerings

Exhibit 2
Page 11 of 36

by the School District.  He proposed that the School District issue the municipal securities and assisted in the drafting and review of the Official Statements and the selection of the underwriters, bond counsel and financial advisers.  The Assistant Treasurer also met with the Rating Agencies to discuss the offerings that are the subject of this Order.

The Board had final authority to authorize and approve each of the municipal securities offerings by Orange County and the Flood Control District.  The Board approved each of the County and the Flood Control District offerings discussed below, which raised over $2 billion.  The Board's resolutions authorizing the issuance of the County's municipal securities specifically recited the approval of drafts of the Official Statements and authorized their completion and correction by a County official.


=========================================START OF PAGE 12======☐


a.    The Reinvestment Offerings

In 1993 and 1994, Orange County, the Flood Control District and the School District conducted a total of five municipal securities offerings raising $1.2 billion for the purpose of earning interest income by investing the offering proceeds in the County Pools at an expected higher rate of return (the "Reinvestment Offerings").  In these transactions, the municipal securities issuers expected to generate profits by investing at a rate of return that was higher than the rate of interest paid to the noteholders.  Unlike most municipal securities offerings, these Reinvestment Offerings did not provide investors with interest income exempt from federal income taxation because the reinvestment practices used in these offerings did not conform to federal income tax law for tax-exempt securities.

Exhibit 2
Page 12 of 36

`=============================================START OF PAGE 13======□`

### (1)  The 1993 Reinvestment Offerings

Orange County's first Reinvestment Offering was for $400 million in taxable notes (the "$400 Million Reinvestment Notes").

The notes had an interest rate of 3.95% per annum, matured, and were repaid, on July 1, 1994.  On August 26, 1993, the School District issued $50 million in taxable notes (the "1993 $50 Million Reinvestment Notes").  The notes had an interest rate of 3.72% per annum, matured, and were repaid, on August 26, 1994.

The Official Statements for these 1993 Reinvestment Offerings represented that:  the issuer would deposit the offering proceeds into an account pledged to repay the notes; the issuer intended to invest the funds in the repayment account; if the issuer suffered an investment loss, the pledged funds could be insufficient to repay the notes; and the issuer would satisfy any deficiency in the pledged funds from any other moneys lawfully available for repayment.

As discussed below, the Official Statements for the $400 Million Reinvestment Notes and the 1993 $50 Million Reinvestment Notes contained material misstatements and omissions regarding: 1) the County Pools, including the County Pools' investment strategy and investment in the County Pools of the funds pledged to repay the securities, which matters affected the issuer's ability to repay the municipal securities; and 2) the unauthorized use of an audit report (with respect to the $400 Million Reinvestment Notes only).

### (2)  The 1994 Reinvestment Offerings

In 1994, there were three Reinvestment Offerings.  First, Orange County issued on July 8, 1994, $600 million in taxable notes (the "$600 Million Reinvestment Notes").  These notes had a variable interest rate equal to the one-month London Interbank Offered Rate ("LIBOR"); however, under the terms of the notes, the interest rate was not to exceed 12% per annum.  The notes were originally due on July 10, 1995; the maturity of these notes has been extended to June 30, 1996.  The School District issued $50 million in taxable notes (the "1994 $50 Million Reinvestment Notes") on August 1, 1994.  The 1994 $50 Million Reinvestment Notes had a variable interest rate equal to the one-month LIBOR plus .03%; however, under the terms of the notes, the interest

Exhibit 2
Page 13 of 36

rate was not to exceed 12% per annum.  The 1994 $50 Million Reinvestment Notes matured, and were repaid, on August 24, 1995. The Flood Control District, on August 2, 1994, issued $100 million in taxable notes (the "$100 Million Reinvestment Notes").

The notes had a variable interest rate equal to the one-month LIBOR plus .03%; however, under the terms of the notes, the interest rate was not to exceed 12% per annum.  The notes matured, and were repaid, on August 1, 1995.


=========================================START OF PAGE 14=====☐


     The proceeds from these Reinvestment Offerings were deposited into an account pledged to repay the notes.  Each of the Official Statements for these Reinvestment Offerings disclosed that the issuer intended to invest the pledged funds in the County Pools and that, if an investment loss occurred, the issuer would satisfy the deficiency from any other moneys lawfully available for repayment.  The lawfully available funds for the $600 Million Reinvestment Notes consisted essentially of funds in the discretionary budget.

     The Official Statements for the $600 Million Reinvestment Notes and the $100 Million Reinvestment Notes contained material misstatements and omissions regarding:  1) the County Pools, including the County Pools' investment strategy and investment results, and manipulation of the County Pools' yield, which matters affected the issuer's ability to repay the municipal securities; 2) Orange County's financial condition, including its economic reliance on investment results of the County Pools as a source of funds to repay its obligations on the securities (with respect to the $600 Million Reinvestment Notes only); 3) an undisclosed cap on the interest rate payable to noteholders; and 4) the unauthorized use of an audit report.  The Official Statement for the 1994 $50 Million Reinvestment Notes contained material misstatements and omissions regarding the County Pools, including the County Pools' investment strategy and investment results, and manipulation of the County Pools' yield, which matters affected the issuer's ability to repay the municipal securities.

          b.   The Tax And Revenue Anticipation Note Offerings

     In 1994, Orange County conducted three separate tax and revenue anticipation note ("TRAN") offerings raising a total of almost $500 million.  TRANs are designed to help local governments cover periodic cash flow deficits that arise because they receive revenues infrequently during the year while their working capital expenses are ongoing.  Such notes are later repaid with the expected tax and other revenue received.  As the deficits occur only periodically, TRANs proceeds are typically not spent immediately and are invested to earn investment income until needed to fund cash flow deficits.  Because of the exclusion from federal income taxation of interest received, tax-exempt TRANs carry a lower interest rate than taxable securities of the same maturity and credit quality, thereby increasing the potential return on reinvestment.

Exhibit 2
Page 14 of 36

(1)   The 1994 $299.66 Million Pooled TRANs

On July 1, 1994, Orange County issued $299.66 million pooled tax and revenue anticipation notes (the "$299.66 Million Pooled TRANs").  These TRANs were tax-exempt and had an interest rate of 4.5% per annum.  The notes matured, and were repaid, on July 28,

==========================================START OF PAGE 15======☐

1995.  As represented in the Official Statement, Orange County used the offering proceeds to purchase $299.66 million in notes issued by 27 Orange County school districts.  The school districts then used these funds for their cash flow deficits. The Official Statement represented that, to repay the notes, the County would deposit certain funds pledged by the school districts in a repayment account, which the County pledged to repay the notes.  The Official Statement also represented that the pledged money would be invested and reinvested but did not disclose where or how the pledged money would be invested.

The County Pools provided for repayment of the $299.66 Million Pooled TRANs through a Purchase Agreement, entitled Standby Purchase Agreement.  Pursuant to this agreement, the Treasurer, as fund manager of the County Pools, agreed to purchase the school district notes to the extent they were not repaid by the school districts, thus assuring sufficient funds to repay the TRANs.  The Assistant Treasurer signed the Purchase Agreement on behalf of the County Pools.

The Official Statement for the $299.66 Million Pooled TRANs contained material misstatements and omissions regarding the County Pools, including the County Pools' investment strategy and investment results, manipulation of the County Pools' yield, and investment in the County Pools of the funds pledged to repay the securities, which matters affected the issuer's ability to repay the municipal securities and the County Pools' ability to perform under the Purchase Agreement.

(2)   The 1994 $169 Million And $31 Million TRANs

Orange County issued two series of TRANs for its own cash flow purposes.  The first, issued on July 5, 1994, was the $169 Million 1994-95 Tax and Revenue Anticipation Notes, Series A (the "$169 Million TRANs").  These notes were represented to be tax-exempt and had an interest rate of 4.5% per annum.  The second series of TRANs, the $31 Million 1994-95 Tax and Revenue Anticipation Notes, Series B (the "$31 Million TRANs"), was issued on August 11, 1994.  These notes were also represented to be tax-exempt and had a variable interest rate equal to 70% of the one-month LIBOR; however, the interest rate on the notes was not to exceed 12% per annum.  The $169 Million TRANs matured on July 19, 1995, and the $31 Million TRANs matured on August 10, 1995; the maturity of these notes has been extended to June 30, 1996.-[18]-

Exhibit 2
Page 15 of 36

--------FOOTNOTES----------
    -[18]-   The County has also failed to set aside specified

pledged amounts to repay these TRANs at maturity,
as required under the terms of these TRANs.

=========================================START OF PAGE 16======☐

In the Official Statements for these offerings, the County
represented that the money to be used to repay the notes would be
deposited in the County Pools.  The Official Statements further
advised prospective investors that, if Orange County suffered an
investment loss and the repayment funds were insufficient to
repay the notes, the County would satisfy the deficiency from any
other moneys lawfully available for repayment.  The lawfully
available funds for these offerings consisted essentially of
funds in the discretionary budget.

The Official Statement for the $169 Million TRANs and the
$31 Million TRANs contained material misstatements and omissions
regarding:  1) the County Pools, including the County Pools'
investment strategy and investment results, and manipulation of
the County Pools' yield, which matters affected the issuer's
ability to repay the municipal securities ; 2) Orange County's
financial condition, including its economic reliance on the
investment results of the County Pools as a source of funds to
repay its obligations on the securities; 3) the tax-exempt status
of the offering; and 4) the unauthorized use of an audit report.

c.    The Teeter Note Offerings

In 1994, Orange County conducted two Teeter Note offerings.
The purpose of the Teeter offerings was to fund the Teeter Plan
which is an alternate method of property tax distribution.
Pursuant to this plan, the County pays local entities (such as
school districts) their share of property taxes from the offering
proceeds upon levy rather than actual collection and then retains
all property taxes, and the penalties and interest thereon, upon
collection.

In the first Teeter offering, the County issued $111 million
of taxable notes (the "$111 Million Teeter Notes") on July 20,
1994.  These notes had a variable interest rate that was reset
monthly at the one-month LIBOR; however, under the terms of the
notes, the interest rate was not to exceed 12% per annum.  In the
second Teeter offering, the County issued $64 million of tax-
exempt notes (the "$64 Million Teeter Notes") on August 18, 1994.

The $64 Million Teeter Notes had a variable interest rate that
was reset monthly at 70% of the one-month LIBOR; however, the
interest rate was not to exceed 12% per annum.  The $111 Million
and the $64 Million Teeter Notes (the "Teeter Notes") matured,
and were repaid, on June 30, 1995.

The Official Statements for the Teeter notes represented
that the County planned to invest certain delinquent tax receipts
pledged to repay the Teeter Notes in the County Pools.  The
County Pools also agreed to repurchase the Teeter Notes through
Purchase Agreements, entitled Standby Note Purchase Agreements,
which agreements obligated the Treasurer, as fund manager of the
County Pools, to purchase the Teeter notes to the extent that

Exhibit 2
Page 16 of 36

===========================================START OF PAGE 17=====☐

there were insufficient funds to repay them.  The Official
Statements further advised potential investors that if the
repayment funds were insufficient, any deficiency would be
satisfied from moneys received under the Purchase Agreements and
other moneys lawfully available for repayment.  The lawfully
available funds for these offerings consisted essentially of
funds in the discretionary budget.

   The Official Statement for the $111 Million Teeter Notes and
the $64 Million Teeter Notes contained material misstatements and
omissions regarding:  1) the County Pools, including the County
Pools' investment strategy and investment results, and
manipulation of the County Pools' yield, which matters affected
the issuer's ability to repay the municipal securities and the
County Pools' ability to perform under Purchase Agreements; 2)
Orange County's financial condition, including its economic
reliance on the investment results of the County Pools as a
source of funds to repay its obligations on the securities; 3) an
undisclosed cap on interest rate payable to noteholders (with
respect to the $111 Million Teeter Notes only); and 4) the
unauthorized use of an audit report.

      d.   The Pension Bond Offering

   In September 1994, Orange County issued taxable Pension
Obligation Bonds (the "Pension Bonds") for the purpose of
financing the County's unfunded, but accrued, pension liability.
The Pension Bonds were issued in two series.  The fixed-rate
Series A bonds in the amount of $209.84 million were dated as of
September 1, 1994, and issued on September 28, 1994, and matured
or mature in varying amounts in the years 1995 through 2004.  The
variable-rate Series B bonds in the amount of $110.2 million were
dated and issued on September 28, 1994, and mature in 2008 (the
"Series B Pension Bonds").

   Under the terms of the Series B Pension Bonds, the investors
had the right to tender their bonds to a remarketing agent for
repurchase.  If the remarketing agent could not remarket the
tendered Series B Pension Bonds within seven days, the County
Pools, pursuant to a Purchase Agreement, entitled Standby
Withdrawal Agreement, agreed to purchase the tendered securities
in an amount up to the County's unrestricted funds in the County
Pools, which included funds in the County's discretionary budget.

According to the Official Statement, that amount was
approximately $491.4 million as of June 30, 1994.  After Orange
County announced the County Pools' losses in early December 1994,
the holders of the Series B Pension Bonds tendered the bonds to
the County Pools for repurchase.  Orange County and the County
Pools declared bankruptcy and refused to purchase any of the
Series B Pension Bonds.

Exhibit 2
Page 17 of 36

===========================================START OF PAGE 18=====☐

The Official Statement for the Pension Bonds contained
material misstatements and omissions regarding:  1) the County
Pools, including the County Pools' investment strategy and
investment results, and manipulation of the County Pools' yield,
which matters affected the issuer's ability to repay the
municipal securities and the County Pools' ability to perform
under the Purchase Agreement; and 2) Orange County's financial
condition, including its economic reliance on the investment
results of the County Pools as a source of funds to repay its
obligations on the securities.

    4.    Misrepresentations And Omissions In The Offer And Sale
          Of Municipal Securities

The offerings discussed above variously contained material
misstatements and omissions regarding:  1) the County Pools,
including the County Pools' investment strategy and investment
results, manipulation of the County Pools' yield, and investment
of funds pledged to repay certain securities into the County
Pools, which matters affected the issuer's ability to repay the
municipal securities and the County Pools' ability to perform
under the Purchase Agreements; 2) the financial condition of
Orange County, including its economic reliance on the investment
results of the County Pools as a source of funds to repay its
obligations on the securities; 3) the tax-exempt status of the
offering; 4) an undisclosed cap on the interest rate payable to
investors on certain variable rate municipal securities sold in
the offerings; and 5) the unauthorized use of an audit report.

        a.    The Risks Relating To The County Pools

Each of the Official Statements for the eleven offerings
misrepresented or was misleading in failing to disclose material
information concerning the County Pools.  The significance of the
County Pools to these transactions was obvious.  Where the funds
pledged to repay the notes were invested in the County Pools, the
issuer looked to that investment to satisfy its repayment
obligations.  Any risks that those pledged funds would decrease
affected the issuer's ability to repay the notes.  Similarly, in
the offerings where the County Pools, pursuant to Purchase
Agreements, provided for repurchase or repayment of the
securities, disclosure regarding the County Pools was important
so that investors could evaluate the County Pools' financial
strength and ability to perform under the agreement.  In
addition, in certain County offerings in which other County funds
were a source of repayment, disclosure regarding the County Pools
was important to investors because availability of such other
funds depended upon the County Pools' performance.  The Official
Statements variously contained false or misleading disclosure
regarding the County Pools in four areas:  1) the investment
strategy; 2) the investment results; 3) the manipulation of the

==========================================START OF PAGE 19======□

Exhibit 2
Page 18 of 36

County Pools' yield; and 4) investment of funds pledged to repay certain securities into the County Pools.

       (1)  The County Pools' Investment Strategy And The Risks Of That Strategy

The Official Statements for all eleven municipal securities offerings misrepresented and/or failed to disclose material information concerning the County Pools' investment strategy and the risks of that strategy, as more fully stated below. The County Pools' investment strategy, particularly the amount of leverage, and the risks of that strategy were material to these securities offerings. The County Pools' investment strategy and the risks of that strategy were directly related to the safety of an investment in the municipal securities, the safety of the funds pledged to repay the municipal securities and the County Pools' ability to fulfill its obligations to repurchase or repay municipal securities. The County Pools' investment strategy and the risks of that strategy also directly affected Orange County's ability to repay its securities from other available funds because of the County's economic dependence on the County Pools. Investors were not informed of these matters and were deprived of the ability to make an informed investment decision based upon all material facts.

       (a)  The $400 Million Reinvestment Notes, The 1993 $50 Million Reinvestment Notes And The $299.66 Million Pooled TRANs

The Official Statements for two offerings--the $400 Million Reinvestment Notes and the 1993 $50 Million Reinvestment Notes--completely omitted any discussion of the County Pools. The Official Statement for another offering--the $299.66 Million Pooled TRANs--only referenced the County Pools in setting forth the terms of the Purchase Agreement. This discussion failed to provide any disclosure on the County Pools' investment strategy and the risks of that strategy.

Specifically, the Official Statements for these three offerings failed adequately to disclose that the investment strategy: 1) was risky; 2) was predicated upon the assumption that prevailing interest rates would remain at relatively low levels; 3) involved a high degree of leverage through the use of reverse repurchase agreements; 4) involved a substantial investment in derivative securities, including inverse floaters; and 5) was very sensitive to changes in the prevailing interest rate because of the leverage.

The Official Statements for these three offerings also failed to adequately disclose the disproportionate risks that the investment strategy posed to repayment of the municipal securities.

======================================START OF PAGE 20======□

       (b)  The 1994 Reinvestment Notes, The $169 Million TRANs, The $31 Million TRANs And The Teeter Notes

Exhibit 2
Page 19 of 36

The Official Statements for seven of the offerings--the 1994 Reinvestment Notes, the $169 Million and $31 Million TRANs and the Teeter Notes--contained some disclosure regarding the County Pools, which disclosure was virtually identical to each other, with only the deviations noted below.

With respect to the County Pools' holdings, the Official Statements disclosed that the County Pools invested in "various fixed and floating rate securities."-[19]-  It was not disclosed that the County Pools were heavily invested in derivative securities, which comprised from 27.6% to 42.2% of the combined County Pools' portfolio and from 31% to 53% of the Commingled Pool's portfolio.  In particular, inverse floaters comprised from 24.89% to 39.84% of the County Pools' holdings. The Official Statements further did not disclose the risks these holdings posed to repayment of the municipal securities.

With respect to the County Pools' investment strategy, the Official Statements disclosed that the County Pools' investment policy allowed for the purchase of a variety of securities, "with limitations as to exposure, maturity, and credit rating for each security type.  The mix of securities held will vary depending upon liquidity requirements, interest rate expectations and other factors."-[20]-  This statement failed to disclose that the County Pools' investment strategy was risky, and was premised on the assumption that interest rates would remain relatively low. The Official Statement further did not disclose the risks this

---------FOOTNOTES----------

-[19]-    The Official Statements for the $64 Million Teeter Notes and the 1994 $50 Million Reinvestment Notes further disclosed that "[a]s of June 30, 1994, approximately 20% of the [Pools] was invested in derivative products of which substantially all were floating rate and inverse floating rate government securities."  As stated above, the Pools' derivative holdings were significantly greater than 20% and most of them were inverse floaters.

-[20]-    The Official Statements for the $64 Million Teeter Notes and the 1994 $50 Million Reinvestment Notes stated that the County Pools' investment policy permitted a "variety of domestic securities and derivative products" with the same limitations as set forth above that would vary in the same way, i.e., "depending upon liquidity requirements, interest rate expectations and other factors."

=======================================START OF PAGE 21======□

investment strategy posed to repayment of the municipal securities.

Additionally, with respect to the use of the County Pools' securities as collateral for the reverse repurchase agreements, the Official Statements for these offerings represented that: "[f]rom time to time," the Treasurer pledged "a significant portion" of the County Pools' securities "with respect to reverse

Exhibit 2
Page 20 of 36

repurchase agreements."-[21]-  No mention was made of the
extremely high degree of leverage involved in the portfolio, at
times as much as 292%, or the risk this posed to repayment of the
municipal securities.

    With respect to the County Pools' sensitivity to interest
rate changes, the Official Statements represented that: "[t]he
price and income volatility of the [Pools' floating rate
securities was] greater than standard fixed income securities and
may serve to increase the volatility of the [Pools'] return and
market value in various interest rate environments."-[22]-
This statement is misleading in that it does not disclose that
the County Pools' investment strategy was predicated on interest
rates remaining low, nor the extent to which the County Pools
were sensitive to interest rate changes; specifically, that
rising interest rates would have an extremely negative impact on
the County Pools, and in turn, upon the ability to repay the
municipal securities from the sources dependent on the County
Pools.

    The Official Statements also represented that the "market
value and liquidity of the [County Pools] will depend upon, among
other factors, the maturity of the various investments," and that
the average maturity of the County Pools' securities, depending
on the offering, was from 843 to 884 days.  The Official
Statements did acknowledge that the "average maturities do not

---------FOOTNOTES----------
    -[21]-    With respect to leverage, the Official Statement
              for the $169 Million TRANs instead stated:
              "[f]rom time to time, the [County Pools have] and
              may also enter into various reverse repurchase
              agreements which are essentially leverage
              investments."

    -[22]-    The Official Statement for the $100 Million
              Reinvestment Notes differed only in that it
              included a reference to reverse repurchase
              agreements, stating:  "[t]he price and income
              volatility of floating rate securities and reverse
              repurchase agreements is greater than standard
              fixed income securities and may increase the
              volatility of the Pools' return and market value
              in various interest rate environments. . . ."

=========================================START OF PAGE 22======▢

account for the impact of leverage and other factors related to
various derivative securities in the portfolio."-[23]-
However, this statement also is misleading in that it failed to
disclose, as the Treasurer had been advised, that:  the modified
duration indicated substantially more price volatility than would
be expected from a portfolio with the County Pools' short average
maturity; and the duration, or sensitivity of the portfolio to
interest rate changes, was such that a large portion of the
County Pools' securities holdings had an average duration of
approximately five years.  Moreover, it did not disclose the
associated risks this posed to the repayment of the municipal
securities.

Exhibit 2
Page 21 of 36

Moreover, the Official Statements for these offerings failed to disclose the risks of rising interest rates on the County Pools' investment strategy.  Namely, the Official Statements failed to disclose that if interest rates rose, as they did in 1994, it would have a substantial negative impact on the County Pools and, because of its dependence on the County Pools, the County itself.  First, the reverse repurchase costs would increase and the income that the County Pools earned from the inverse floaters in the portfolio would decrease, creating lower earnings for the County Pools.  Second, the County Pools' securities would decline in market value.  Third, as the value of the County Pools' securities fell, the County would suffer collateral calls from broker-dealers and reductions in loan amounts on the reverse repurchase agreements.  All three events would reduce the income that Orange County would receive from the County Pools, with the possible loss of principal of invested funds as well.

(c)   The Pension Bonds

The Official Statement for the Pension Bond transaction contained even less disclosure regarding the County Pools' investment strategy and the risks of that strategy.  The Official Statement represented that:  "[t]he [County Pools'] investment policy focuses on retaining the safety of investment principal

---------FOOTNOTES----------

-[23]-    The Official Statements for the $64 Million Teeter Notes and the 1994 $50 Million Reinvestment Notes also stated that "[i]f these derivative products were taken into account, the effect would be to lengthen the average maturity of the [County Pools]."  As set forth above, the County Pools' derivative holdings were significantly greater than 20% and most of them were inverse floaters.  This simple statement that the derivative products would lengthen maturity was inadequate to describe their actual or likely effect on the portfolio's interest rate sensitivity.

==========================================START OF PAGE 23======☐

while earning satisfactory yields."  It went on to state that: "it is the [County Pools'] practice to select quality investments from reputable, stable and trustworthy dealers, and not to take any risks which . . . would be unreasonable."  Additionally, the Official Statement disclosed that:

The [County Pools'] funds are invested primarily in United States Government Securities, including, but not limited to, United States Treasury Notes, Treasury Bills, Treasury Bonds, and obligations of United States Government Agencies [and that w]hen circumstances warrant, the [County Pools'] investments may also include bankers acceptances, negotiable certificates of deposit of national or state-chartered banks and state or federal thrifts, commercial paper, repurchase agreements, reverse repurchase agreements, medium term corporate notes and collateralized time deposits.

Exhibit 2
Page 22 of 36

The Official Statement further represented that "[t]o maintain the liquidity of its investments, the [County Pools] invest in securities that are actively traded in the securities markets."

These statements were false or misleading. The County Pools' investment strategy was not "focus[ed] on retaining the safety of investment principal" but was highly risky and premised upon the assumption that prevailing interest rates would remain at relatively low levels. The Official Statement omitted to disclose that the County Pools were highly leveraged through reverse repurchase agreements and that the County Pools were heavily invested in derivative securities, including inverse floaters. The Official Statement further omitted to disclose that the use of this strategy made the County Pools' extremely sensitive to changes in the interest rate.

(2) The County Pools' Investment Results

Moreover, as a result of the County Pools' investment strategy, the County Pools suffered investment losses in 1994, which investment results were also not disclosed to investors in the 1994 municipal securities offerings. As a result, investors were not provided information material to the assessment of the ability to repay the municipal securities from sources affected by the County Pools.

The Official Statements for the nine offerings conducted in 1994 failed to disclose material information concerning the County Pools' investment results. During 1994, the County Pools' investment income declined because reverse repurchase costs had increased while the income that the County Pools earned from inverse floaters had decreased. Additionally, the County Pools had suffered substantial market losses in the overall value of the portfolio. Declining market value of securities in the

======================================START OF PAGE 24======☐

County Pools subject to reverse repurchase agreements resulted in collateral calls and reduction in loan amounts against such securities on rollover of the agreements, as well as reduction of the liquidity of the County Pools.-[24]- None of these facts were disclosed in any of the Official Statements.

The Official Statements for these 1994 offerings included Orange County's financial statements for the fiscal year ended June 30, 1993, which were based on information that was at least twelve months old at the time of the offerings. The financial statements contained a footnote concerning the County Pools that presented information that the market value of the investments was above the purchase price, indicating that the County Pools had a market profit. By the end of June 1994, just prior to the 1994 offerings, the Treasurer's records indicated that the portion of the County Pools' securities that were marked-to-market had suffered market losses of over $443 million, or a 5.24% loss in value. In light of these market losses, the inclusion of the 1993 financial statements alone in the 1994 offerings without any update regarding investment results was

Exhibit 2
Page 23 of 36

materially misleading because the Official Statements failed to disclose information regarding the recent market losses, which related to the ability to repay the municipal securities.

Information concerning the decline in the County Pools' investment results was material to these securities offerings. The County Pools' declining investment results were directly related to the safety of an investment in the securities, the safety of the funds pledged to repay the securities and the ability of the County Pools to fulfill its obligations to repurchase or repay the securities. The County Pools' investment results also directly affected Orange County's ability to repay its securities from other available funds because of the County's economic dependence on the Pools.

(3)    Manipulation Of The County Pools' Yield

The Official Statements for eight offerings--the 1994 Reinvestment Notes, the $169 Million and the $31 Million TRANs, the Teeter Notes and the Pension Bonds--misrepresented that the County Pools' yield would be distributed pro rata to the Participants. The Treasurer and the Assistant Treasurer had in fact diverted interest income from certain Commingled Pool Participants to an account for the benefit of Orange County. As a result, the Commingled Pools' yield was misrepresented in the Official Statements for these offerings. In late 1994, the

---------FOOTNOTES----------
    -[24]-    From January through June 1994, the County was
              subject to approximately $873 million in
              collateral calls or reductions in loan amounts
              under reverse repurchase agreements.


=========================================START OF PAGE 25======☐




Treasurer and the Assistant Treasurer used a portion of the misappropriated funds to supplement the Commingled Pool's yield. The "supplemented" yield was then falsely reported in the Official Statement for the Pension Bonds.

The Treasurer and the Assistant Treasurer also shifted $131 million in market losses from some Specific Investment Participants, including the County, to the Commingled Pool, causing the Commingled Pool Participants to suffer losses that should have been borne by others. This information was not disclosed and also rendered false the representations regarding the pro rata distribution.

The Commingled Pool's accurate reporting of investment results and assumption of market losses were directly related to the safety of an investment in the securities, the safety of the funds pledged to repay the securities and the ability of the County Pools to fulfill their obligations to repurchase or repay the securities. Accordingly, the information concerning the Commingled Pool's true yield, the calculation and payment of the Commingled Pool's yield, the misappropriation of interest income from the Participants and the Commingled Pool's acquisition and transfer of securities at off-market prices was material.

Exhibit 2
Page 24 of 36

(4)    Investment In The County Pools

The Official Statements for three offerings--the $400 Million Reinvestment Notes, the 1993 $50 Million Reinvestment Notes and the $299.66 Million Pooled TRANs--stated that the funds pledged to repay the notes would be invested as permitted by the resolutions authorizing the issuance and sale of the notes and by California law.  None of the Official Statements for these three offerings disclosed that the issuer intended to invest such funds in the County Pools.  The Official Statement for the $299.66 Million Pooled TRANs only mentions that, under the Purchase Agreement, the County Pools would purchase the school district notes to the extent that any of the school districts failed to repay.

Information concerning the issuers' use and investment of such funds was directly related to their ability to later repay the securities, an issue of critical importance to investors. Moreover, as discussed herein, disclosure regarding investment in the County Pools was material in light of the County Pools' risky investment strategy and poor investment results in 1994.

b.    The Financial Condition Of Orange County

The Official Statements for six offerings--the $600 Million Reinvestment Notes, the $169 Million and $31 Million TRANs, the Teeter Notes and the Pension Bonds--failed to disclose Orange County's true financial condition, in particular, that the County

==========================================START OF PAGE 26======□

was using interest income from the County Pools as the largest single source of revenue for its discretionary budget.  Further, Orange County's use of this interest income as a revenue source was increasing while other traditional revenue sources, such as property taxes, were decreasing.  The funds invested to generate investment income came from two sources, the County's own funds and proceeds from the Reinvestment Offerings.  Orange County had invested essentially all of its liquid assets in the County Pools, including funds to repay its municipal securities.  In addition, the investment of virtually all of the County's liquid assets in the County Pools exposed Orange County to the volatility of the County Pools, including the potential loss of not only interest income, but of principal as well.  The failure to disclose this information rendered disclosure regarding the County's financial condition and its ability to repay its securities materially misleading.

The Official Statements disclosed the decline in certain traditional revenue and that, as a result of the decline, the County's fiscal year 1992-93 and 1993-94 budgets were becoming increasingly dependent on state funding for revenue to support County services.  The Official Statements for the six 1994 offerings failed to disclose, however, that for the County's proposed 1994-95 discretionary budget, the County was using interest income as the largest single revenue source.  The inclusion of the information concerning prior budgets was materially misleading in light of the proposed 1994-95 discretionary budget's use of interest income as the largest

Exhibit 2
Page 25 of 36

single revenue source.

Such information regarding Orange County's financial
condition was important as it related to Orange County's ability
to repay its obligations, including municipal securities debt.
Moreover, with the exception of the Pension Bonds, these County
offerings were short-term general obligations, which, under
California law, the County could repay only with funds received
or accrued during fiscal year 1994-95.  Therefore, given the
County's use of interest income from the County Pools, if the
County Pools' investments performed poorly, as eventually
occurred, the County would have a budget deficit and could not
repay the securities and meet its other expenses.  The County's
financial condition was also material to the Purchase Agreement
for the Series B Pension Bonds, under which the County Pools, to
the extent of the County's unrestricted funds in the County
Pools, agreed to repurchase any tendered securities.  If the
County Pools' investments performed poorly, as eventually
occurred, the County would not have sufficient unrestricted funds
to purchase the Series B Pension Bonds when tendered under the
terms of the Purchase Agreement.

          c.    The Tax-Exempt Status Of The Offerings


=========================================START OF PAGE 27======☐



The purpose of the tax-exempt $169 Million TRAN and the $31
Million TRAN offerings was purportedly to fund Orange County's
projected cash flow deficit for fiscal year 1994-95.  As such,
these TRAN offerings were offered and sold as tax-exempt
borrowings.  Compliance with the Internal Revenue Code and
Treasury Regulations is a prerequisite to exemption from federal
income taxation of the interest received on the municipal
securities by the investors.  The Official Statements failed to
disclose, however, that the County's activities in calculating
the size of the offerings placed the tax-exempt status in
jeopardy.-[25]-

The Internal Revenue Service has regulations that limit the
size of a municipality's tax-exempt short-term working capital
borrowings to, in effect, the amount that the municipality will
actually use to fund cash flow deficits.-[26]-  Therefore,

---------FOOTNOTES----------
     -[25]-    Orange County's bond counsel issued an opinion
               that these TRANs were tax-exempt.  However, the
               County was aware of material facts concerning the
               relationship between the size of the offering and
               the County's cash flow deficit.  As discussed
               below, the Official Statements were materially
               misleading in failing to disclose these facts and
               the significant associated risks that the tax-
               exempt status could be denied.  Investors were,
               therefore, unable to make an informed investment
               decision regarding the tax-exempt status of the
               offerings.

     -[26]-    More specifically, Treasury Regulations include a

Exhibit 2
Page 26 of 36

proceeds-spent-last expenditure rule which
implicitly provides the sizing rule for TRAN
offerings.  See Treasury Regulation □ 1.148-
6(d)(3)(i).  Sizing analysis of a tax-exempt
borrowing is critical because oversizing a
borrowing will preclude the conclusion that
proceeds will be spent within the allowable
temporary period, a necessary element of a tax-
exempt borrowing.  Under the rules regarding
allocation of proceeds of an issue for determining
when the proceeds are spent, proceeds of a TRAN
borrowing are allocated to working capital
expenditures as of any date only to the extent
that those working capital expenditures exceed
"available amounts."  See id.  Available amounts
include amounts that may be used without
legislative or judicial action and without a
legislative, judicial or contractual requirement
that amounts be reimbursed.  See Treasury
Regulation □ 1.148-6(d)(3)(iii).


========================================START OF PAGE 28======□



the determination of available amounts is critical to the sizing
of a TRANs borrowing and ultimately to the tax-exempt status of
the borrowing.

    Internal Revenue Code □ 103(a) provides the statutory
authority for tax-exempt bonds.  This section provides, in
summary, that gross income does not include interest on any state
or local bond (i.e., the bonds are tax-exempt), with certain
exceptions, including the exception that the exclusion from gross
income does not apply to any "arbitrage bond."-[27]-
Municipal securities are arbitrage bonds under Internal Revenue
Code □ 148 if an abusive arbitrage device is used in connection
with the securities issue.  Therefore, municipal securities are
not tax-exempt if the issuer engages in an "abusive arbitrage
device."-[28]-  If the IRS determines that a portion of a
purported tax-exempt offering is an abusive arbitrage device,
then the IRS can declare the entire offering taxable.  Moreover,
should the IRS later declare the notes to be taxable, its remedy
is to seek the unpaid taxes from the noteholders.-[29]-



---------FOOTNOTES----------
    -[27]-    See Internal Revenue Code □ 103(b)(2).

    -[28]-    Treasury Regulation □ 1.148-10(a)(1) defines an
              abusive arbitrage device as any "action [that] has
              the effect of:  (i) enabling the issuer to exploit
              the difference between tax-exempt and taxable
              interest rates to obtain a material financial
              advantage; and (ii) overburdening the tax-exempt
              bond market," which occurs if the action "results
              in issuing more bonds."  Treasury Regulation □
              1.148-10(a) further states that the regulation
              concerning abusive arbitrage devices "is to be
              applied and interpreted broadly to carry out the

Exhibit 2
Page 27 of 36

purposes of section 148."

-[29]-     Should the IRS determine that the tax-exempt
          securities are "arbitrage bonds" under Internal
          Revenue Code ☐ 148(a), the IRS would seek rebate
          of the excess interest earned from the issuer.
          See Internal Revenue Code ☐ 148(f). The IRS,
          however, does not have a right to tax or assess
          the issuer but can request that the amount be
          rebated. If the issuer fails to rebate the
          arbitrage, the remedy is to seek the amount from
          the noteholders as the interest earned on the
          notes is not excludable from the noteholders'
          income. See Harbor Bancorp v. Commissioner of
          Internal Revenue, 1995 U.S. Tax Ct. LEXIS at *54-
          55 (Oct. 16, 1995).


==========================================START OF PAGE 29======☐




     Information concerning the tax-exempt status of these TRANs
offerings was very important to investors. Failure to disclose
information regarding the tax analysis that provided the basis
for the tax-exemption opinion deprived investors of information
material to an assessment of the tax-exempt status of the
TRANs.-[30]- Tax-exempt securities typically pay a lower
interest rate than other debt securities, which interest rate
differential investors accept because of the tax-exempt status.
Thus, if the securities are not tax-exempt, the interest rate is
not competitive and the securities are not as attractive to
investors. Further, the investors may be liable for the unpaid
taxes on the interest received.

                    (1)  The $169 Million TRANs

     On June 21, 1994, the County restricted $27.5 million so
that these funds could not be used to pay future working capital
expenditures. The County restricted the funds to increase the
amount of its projected cash flow deficit. The County intended
to use the $27.5 million for working capital expenditures in
fiscal year 1994-95 and budgeted for that purpose in the final
budget adopted by the Board on September 27, 1994 (and effective
July 1, 1994).

     The effect of this artificial increase in the cash flow
deficit was to enable the County to increase the size of its TRAN
offering from $142 million to $169 million. A County Auditor-
Controller employee testified that County officials questioned
the propriety of the restrictions to increase the cash flow
deficit and the size of the TRAN offering but dropped their
objections after bond counsel opined that the $169 Million TRANs
would be tax-exempt.

     None of the facts relating to the County's artificial
increase of the size of its cash flow deficit were disclosed in
the Official Statement for this offering. The Official Statement
also failed to disclose the risks that the IRS might declare the
entire $169 Million TRANs taxable and that the investors may be
liable for the unpaid taxes.

Exhibit 2
Page 28 of 36

    (2)  The $31 Million TRANs

On August 2, 1994, Orange County restricted another $64 million.  The purpose of this restriction was to make the $64

 --------FOOTNOTES----------
  -[30]-    See SEC v. Stifel, Nicolaus and Co., Lit. Rel. No. 14587 (Aug. 3, 1995); In the Matter of Derryl W. Peden, Securities Act Rel. No. 7069, Exchange Act Rel. No. 35045, Admin. Proc. File No. 3-8400 (Dec. 2, 1994); SEC v. Matthews & Wright Group, Inc., Lit. Rel. No. 12072 (April 27, 1989).

====================================START OF PAGE 30======☐


million unavailable to the County to pay future working capital expenditures and to thereby further increase the amount of its fiscal year 1994-95 cash flow deficit by $64 million. Accordingly, the County was able to issue the $31 million TRAN on August 11, 1994, to finance this cash flow deficit.  As with the other TRANs borrowing, the Official Statement failed to disclose the facts surrounding the sizing of the offering and the risks this created to the tax-exempt status.

    d.  The Interest Rate Cap

The Official Statements for three offerings--the $600 Million Reinvestment Notes, the $111 Million Teeter Notes and the $100 Million Reinvestment Notes--each stated that they paid a variable interest rate equal to the one-month LIBOR. Undisclosed, however, was the fact that the notes for each of these offerings contained a 12% per annum cap on the maximum variable interest rate that the County would pay.  While the existence of this cap was indicated on the face of the actual notes, no disclosure was made to noteholders in the Official Statements.  The existence of an interest rate cap is material to investors.-[31]-

    e.  Unauthorized Use Of Audit Report

The Official Statements for seven offerings--the $400 Million, the $600 Million and the $100 Million Reinvestment Notes, the $169 Million and the $31 Million TRANs and the two Teeter Notes--falsely represented that the County's auditor had consented to the inclusion of its audit report of the County's financial statements in the Official Statements.  This report and Orange County's audited financial statements were included as exhibits to the Official Statements for these offerings.

Under Generally Accepted Auditing Standards ("GAAS"), if the auditor had consented to the inclusion of its audit reports in the Official Statements, the auditor would have been required to "extend [its] procedures with respect to subsequent events from the date of [its] audit report[s] up to the effective date [of the sale of the securities]."-[32]-  Pursuant to the GAAS

 --------FOOTNOTES----------
  -[31]-    LIBOR never reached 12% per annum during the original term of the notes; therefore, the

Exhibit 2
Page 29 of 36

interest cap never limited the interest rate paid
to investors.  However, certain investors have
investment policies against buying securities
containing an interest rate cap.

-[32]-     AICPA 1989 Audit and Accounting Guide, Audits of
State and Local Governmental Units, Ch. 19,
(continued...)

============================================START OF PAGE 31======□

subsequent events procedures, if the auditor had consented, the
auditor should have, among other things, read the County's most
recent interim financial statements, read minutes of Board
meetings, made inquiries of County officials concerning the
County's operations and finances, made inquiries of the County's
legal counsel and made such other inquiries as it considered
necessary and appropriate.-[33]-

     The engagement contract between Orange County and the
auditors provided that the auditors would perform a subsequent
events review upon the request of the County Auditor-Controller
as necessary to allow the use of the auditors' report in the
Official Statements and that the auditors would perform two such
reviews at no charge.

     In fact, Orange County did not obtain the consent of the
auditors to include their report in the Official Statements, and
the auditors did not conduct any post-audit review.  That the
auditor had not consented to the inclusion of its audit report
accompanying the County's financial statement in these Official
Statements was important.  Reasonable investors rely on audited
financial statements in making investment decisions.  Further,
the representation that the auditor has consented to the
inclusion of its audit report implies that the auditor has
conducted some additional review prior to consenting to this use.

The investors' ability to rely on an audit opinion is affected by
the fact that the auditor has not consented to the inclusion of
its audit report in the Official Statement and has not conducted
any post-audit review.

     5.   Misrepresentations To Rating Agencies

     In presentations to the Rating Agencies relating to eight
offerings--the $600 Million, the $100 Million and the 1994 $50
Million Reinvestment Notes, the $169 Million and the $31 Million
TRANs, the two Teeter Notes and the Pension Bonds--the Assistant
Treasurer misrepresented the County Pools' holdings.  These
misrepresentations ultimately ran to the purchasers of these
securities.  The Assistant Treasurer represented that only 20% of
the County Pools' portfolio consisted of derivative securities.
In fact, derivative securities comprised from 27.6% to 42.2% of
the combined County Pools' portfolio and from 31% to 53% of the
Commingled Pool's portfolio.  In particular, inverse floaters

Exhibit 2
Page 30 of 36

--------FOOTNOTES----------
-[32]-(...continued)

19.6; see also AICPA Codification of Statements on
Auditing Standards ("AU")

☐ 711.

-[33]-     See AU ☐ 560.12.


=========================================START OF PAGE 32======☐



comprised from 24.89% to 39.84% of the County Pools'
holdings.-[34]-

    The Assistant Treasurer also misrepresented to the Rating
Agencies that money in the Economic Uncertainty Fund was
available to pay the principal and interest on five offerings--
the $600 Million Reinvestment Notes, the $169 Million and the $31
Million TRANs and the two Teeter Notes--and omitted to disclose
that such funds had been misappropriated from the Commingled Pool
Participants.

E.     LEGAL DISCUSSION:  ORANGE COUNTY, THE FLOOD CONTROL DISTRICT
       AND THE BOARD VIOLATED THE ANTIFRAUD PROVISIONS OF SECTION
       17(a) OF THE SECURITIES ACT AND SECTION 10(b) OF THE
       EXCHANGE ACT AND RULE 10b-5 THEREUNDER IN THE OFFER AND SALE
       OF THE MUNICIPAL SECURITIES

    Section 17(a) of the Securities Act and Section 10(b) of the
Exchange Act and Rule 10b-5 thereunder make it unlawful for any
person, in the offer or sale (Section 17(a)) or in connection
with the purchase or sale of any security (Section 10(b) and Rule
10b-5), to employ any device, scheme, or artifice to defraud, to
make any untrue statement of a material fact, to omit to state a
material fact, or to engage in any act, practice or course of
business which operates or would operate as a fraud or deceit
upon any person through the means or instruments of interstate
commerce or the mails.

    The notes and bonds issued by Orange County, the Flood
Control District and the School District are clearly securities
under Section 2(1) of the Securities Act and Section 3(a)(10) of
the Exchange Act.  In addition, the County Pools' obligations
under the agreements to repurchase the Teeter Notes and the
Series B Pension Bonds were puts and, therefore, separate
securities under Section 2(1) of the Securities Act and Section
3(a)(10) of the Exchange Act.

    Information is material if there is a substantial likelihood
that a reasonable investor would consider it important to an
investment decision.  See Basic Inc. v. Levinson, 485 U.S. 224,
231-32 (1988); TSC Industries, Inc. v. Northway, Inc., 426 U.S.
438, 449 (1976).  Furthermore, when the information pertains to a
possible future event, "materiality `will depend upon a balancing
of both the indicated probability that the event will occur and
the anticipated magnitude of the event in light of the totality
of the company activity.'"  Basic Inc., 485 U.S. at 238 (quoting

---------FOOTNOTES----------
    -[34]-     Obviously, the materiality of the percentage of
               securities in a portfolio that are derivatives
               will depend upon the type and use of the

Exhibit 2
Page 31 of 36

derivatives in that portfolio.

===========================================START OF PAGE 33======□

SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir. 1968)
(en banc), cert. denied, 394 U.S. 976 (1969)).

Scienter is required to establish violations of Section
17(a)(1) of the Securities Act and Section 10(b) of the Exchange
Act and Rule 10b-5 thereunder.  See Aaron v. SEC, 446 U.S. 680,
701-02 (1980).  Scienter is "a mental state embracing intent to
deceive, manipulate or defraud."  Ernst & Ernst v. Hochfelder,
425 U.S. 185, 193 n.12 (1976).  In the Ninth Circuit,
recklessness satisfies the scienter requirement.  Hollinger v.
Titan Capital Corp., 914 F.2d 1564 (9th Cir. 1990) (en banc),
cert. denied, 499 U.S. 976 (1991).  Recklessness is "an extreme
departure from the standards of ordinary care, and which presents
a danger of misleading [investors] that is either known to the
defendant or is so obvious that the actor must have been aware of
it."  Id., 914 F.2d at 1569.

1.    The Misrepresentations And Omissions Of Material Facts

As described more fully above, in the offer and sale of the
Reinvestment Note offerings, the TRAN offerings, the Teeter Note
offerings and the Pension Bond offering, Orange County
misrepresented and/or omitted to disclose material information
regarding:  1) the Orange County Investment Pools (the "County
Pools"), including the County Pools' investment strategy and
investment results, manipulation of the County Pools' yield, and
investment in the County Pools of the funds pledged to repay the
securities, which matters affected the issuer's ability to repay
the municipal securities and the County Pools' ability to perform
under Purchase Agreements; 2) Orange County's financial
condition, including its economic reliance on the investment
results of the County Pools as a source of funds to repay its
obligations on the securities; 3) the tax-exempt status of the
offering; 4) an undisclosed cap on the interest rate payable to
investors on certain variable rate municipal securities sold in
the offerings; and 5) the unauthorized use of an audit report.
In addition, misrepresentations were made to the Rating Agencies
concerning the County Pools.-[35]-

In the offer and sale of the $100 Million Reinvestment
Notes, the Flood Control District misrepresented and/or omitted
to disclose material information regarding:  1) the Orange County
Investment Pools (the "County Pools"), including the County

---------FOOTNOTES----------
    -[35]-    The Assistant Treasurer's misrepresentations to
              the Rating Agencies are separate violations of the
              antifraud provisions of Section 17(a) of the
              Securities Act and Section 10(b) of the Exchange
              Act and Rule 10b-5 thereunder.  See SEC v. Coffey,
              493 F.2d 1304 (6th Cir. 1974), cert. denied, 420
              U.S. 908 (1975).

Exhibit 2
Page 32 of 36

===========================================START OF PAGE 34======□

Pools' investment strategy and investment results, manipulation of the County Pools' yield, and investment in the County Pools of the funds pledged to repay the securities, which matters affected the issuer's ability to repay the municipal securities; 2) an undisclosed cap on the interest rate payable to investors on certain variable rate municipal securities sold in the offerings; and 3) the unauthorized use of an audit report.

The Board, in the offer and sale of the $169 Million TRANs, the $31 Million TRANs, the $600 Million Reinvestment Notes, the $111 Million Teeter Notes, the $64 Million Teeter Notes and the Pension Bonds, approved Official Statements that misrepresented and/or omitted to disclose material information regarding the financial condition of Orange County, including its economic reliance on the investment results of the County Pools as a source of funds to repay its obligations on the securities.

    2.   Orange County, The Flood Control District And The Board
        Acted With Scienter

Orange County, the Flood Control District and the Board acted with scienter in making the above misrepresentations and omissions of material fact in the securities offerings. For purposes of the County's and the Flood Control District's liability under the federal securities laws, the scienter of Orange County and Flood Control District officials may be imputed to Orange County and the Flood Control District. See SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1089 n.3 (2d Cir. 1972).

The Treasurer and the Assistant Treasurer acted with a high degree of scienter. They were involved in the day-to-day management of the County Pools and directed the County Pools' investments. Of all the participants involved, they had the most detailed knowledge of the County Pools' investment strategy and declining investment results during 1994. Further, they directed the misappropriation of interest income from the Commingled Pool Participants, the manipulation of the Commingled Pool's yield and the Commingled Pool's off-market securities transactions with Specific Investment Participants.

The Treasurer and the Assistant Treasurer also participated in Orange County's budget process by providing estimates of projected interest revenue. Additionally, they were involved in determining Orange County's cash flow deficit, increasing the size of that deficit by restricting Orange County funds, thereby artificially increasing the size of the $169 Million TRANs and the $31 Million TRANs. They actively participated in the offer and sale of the municipal securities, including participating in the preparation of the Official Statements and selecting the professional participants.

=======================================START OF PAGE 35======☐

Exhibit 2
Page 33 of 36

The Board acted with scienter in authorizing the disclosure disseminated in connection with the issuance of six offerings-- the $600 Million Reinvestment Notes, the $169 Million and the $31 Million TRANs, the two Teeter Notes and the Pension Bonds. The Board knew that the County intended to use interest income from the County Pools to fund a growing percentage of the County's discretionary budget. Nevertheless, the Board authorized the issuance of approximately $1.3 billion in debt in 1994, much of which was solely for reinvestment to generate interest income, without taking appropriate steps under the circumstances to assure that information about the County's finances was fairly and accurately disclosed to investors.

F.    CONCLUSION

Accordingly, based on the foregoing, the Commission finds that Orange County, the Flood Control District and the Board violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

IV.

Orange County has submitted an Offer of Settlement in which, without admitting or denying the findings herein, it consents to the Commission's entry of this Order, which makes findings, as set forth above, and orders Orange County to cease and desist from committing or causing any violation and any future violation of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. As set forth in Orange County's Offer of Settlement, Orange County undertakes to cooperate with Commission staff in preparing for and presenting any civil litigation or administrative proceedings concerning the transactions that are the subject of this Order.

V.

The Flood Control District has submitted an Offer of Settlement in which, without admitting or denying the findings herein, it consents to the Commission's entry of this Order, which makes findings, as set forth above, and orders the Flood Control District to cease and desist from committing or causing any violation and any future violation of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. As set forth in the Flood Control District's Offer of Settlement, the Flood Control District undertakes to cooperate with Commission staff in preparing for and presenting any civil litigation or administrative proceedings concerning the transactions that are the subject of this Order.

VI.

==========================================START OF PAGE 36======□

The Board has submitted an Offer of Settlement in which, without admitting or denying the findings herein, it consents to the Commission's entry of this Order, which makes findings, as

Exhibit 2
Page 34 of 36

set forth above, and orders the Board to cease and desist from
committing or causing any violation and any future violation of
Section 17(a) of the Securities Act and Section 10(b) of the
Exchange Act and Rule 10b-5 thereunder.  As set forth in the
Board's Offer of Settlement, the Board undertakes to cooperate
with Commission staff in preparing for and presenting any civil
litigation or administrative proceedings concerning the
transactions that are the subject of this Order.

                              VII.

     In determining to accept this Offer, the Commission
considered remedial acts adopted and implemented by Orange
County, the Flood Control District and the Board, such as the
adoption and implementation of policies and procedures regarding
the authorization, approval and issuance of proposed municipal
securities offerings and regarding internal audit and accounting
procedures and cooperation afforded the Commission staff.

                             VIII.

     In view of the foregoing, the Commission deems it
appropriate to accept the Offer of Settlement submitted by Orange
County, the Flood Control District and the Board and impose the
cease-and-desist orders specified in the Offer of Settlement.

     Accordingly, IT IS HEREBY ORDERED that, pursuant to Section
8A of the Securities Act and Section 21C of the Exchange Act:

     1.   Orange County shall cease and desist from committing or
causing any violation and any future violation of Section 17(a)
of the Securities Act and Section 10(b) of the Exchange Act and
Rule 10b-5 thereunder;

     2.   Orange County shall comply with its undertakings
described in Section IV above;

     3.   The Flood Control District shall cease and desist from
committing or causing any violation and any future violation of
Section 17(a) of the Securities Act and Section 10(b) of the
Exchange Act and Rule 10b-5 thereunder;

     4.   The Flood Control District shall comply with its
undertakings described in Section V above;

     5.   The Board shall cease and desist from committing or
causing any violation and any future violation of Section 17(a)
of the Securities Act and Section 10(b) of the Exchange Act and
Rule 10b-5 thereunder; and


==========================================START OF PAGE 37=====☐




     6.   The Board shall comply with its undertakings described
in Section VI above.

     By the Commission.

Exhibit 2
Page 35 of 36

```
            Jonathan G. Katz
            Secretary
```

```
=====================================START OF PAGE 38=====□□
```

Exhibit 2
Page 36 of 36

http://www.sec.gov/litigation/admin/337260.txt                                    4/11/2008

# EXHIBIT 3

Case 3:08-cv-00625-DMS-LSP    Document 11-4    Filed 09/08/2008    Page 49 of 98

he Massachusetts Turnpike Authorithy: Admin. Proc. Rel. No. 33-8260 / July 31, 2003          Page 1 of 8

Home | Previous Page



U.S. Securities and Exchange Commission

## UNITED STATES OF AMERICA
## before the
## SECURITIES AND EXCHANGE COMMISSION

**SECURITIES ACT OF 1933**
**Release No. 8260 / July 31, 2003**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-11198**

| | |
|---|---|
| In the Matter of | : |
| | : |
| THE MASSACHUSETTS | : ORDER INSTITUTING CEASE-AND-DESIST |
| TURNPIKE AUTHORITY and | : PROCEEDINGS, MAKING FINDINGS, AND |
| JAMES J. KERASIOTES, | : IMPOSING CEASE-AND-DESIST ORDER |
| | : PURSUANT TO SECTION 8A OF THE |
| | : SECURITIES ACT OF 1933 |
| Respondents. | : |
| | : |

### I.

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") against the Massachusetts Turnpike Authority ("Turnpike Authority") and James J. Kerasiotes ("Kerasiotes") (collectively "Respondents").

### II.

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement (the "Offers"), which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, Respondents consent to the entry of this Order Instituting Cease-and-Desist Proceedings, Making Findings, and Imposing Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933 ("Order"), as set forth below.

### III.

On the basis of this Order and Respondents' respective Offers, the Commission finds that:

**A. Summary**

Exhibit 3
Page 1 of 8

The Massachusetts Turnpike Authority: Admin. Proc. Rel. No. 33-8260 / July 31, 2003

This matter involves misrepresentations resulting from the delay in disclosing cost increases at the Massachusetts Central Artery/Ted Williams Tunnel Project (the "Project"), popularly known as the "Big Dig," by the Turnpike Authority and Kerasiotes in connection with three municipal bond offerings during 1999. The offerings were by the Turnpike Authority in March 1999, the Commonwealth of Massachusetts ("Commonwealth") in September 1999, and the Massachusetts Bay Transportation Authority ("MBTA") in December 1999. At the time of each of these offerings, the Project staff had projected cost increases exceeding $1 billion, which should have been disclosed to the public, including potential bondholders, underwriters, and credit rating agencies in connection with the bond offerings. However, because the cost increases had not been fully quantified or confirmed, the Respondents deemed them to be speculative and did not disclose them. Instead, beginning in the spring of 1999, the Project staff embarked upon an effort to quantify and confirm the specific amount of any cost increases, including a "bottom-up" review of every Project contract. As a result, the offering materials accompanying each of the bond offerings indicated that the Project was on budget and that it would cost only $5.5 billion to complete. The cost increases were ultimately disclosed to the public in February 2000. Although Respondents' approach to dealing with projected cost increases was part of an effort to control Project costs, their failure to disclose such cost increases did not take into account their obligations under the federal securities laws. By their negligent conduct, the Turnpike Authority committed and Kerasiotes committed and caused violations of Sections 17(a)(2) and (3) of the Securities Act.

## B. Respondents

*1. The Turnpike Authority*, at all times relevant to this matter, was an agency of the Commonwealth. From 1997 through the present, the Turnpike Authority was responsible for overseeing the Project, described more fully below. The Project was staffed by approximately 625 employees of a joint venture between two major international construction companies, Bechtel Corporation and Parsons Brinckerhoff Quade & Douglas ("Bechtel/Parsons"), approximately 125 employees of the Turnpike Authority, and legal counsel (collectively referred to herein as the "Project staff").

*2. Kerasiotes*, age 49, of Medfield, Massachusetts, was the chairman of the Turnpike Authority from 1996 through April 11, 2000. Kerasiotes oversaw the Project for a decade in various positions -- first as Massachusetts Transportation Secretary (from 1990 through 1992), then as Secretary of the Executive Office of Transportation and Construction (from 1992 through 1996), and finally as Chairman of the Turnpike Authority (from 1997 through April 11, 2000). Kerasiotes delegated day-to-day management duties to the Project director, who reported to him regularly.

## C. Other Relevant Entities

*1. The Executive Office for Administration and Finance* ("Administration and Finance") is an agency of the Commonwealth responsible for, among other things, preparing municipal bond offering materials for the Commonwealth and certain of its agencies that describe the financial condition of the Commonwealth.

*2. The MBTA* is an agency of the Commonwealth that operates mass transit facilities in 78 cities and towns in greater Boston. At all times relevant to

Exhibit 3
Page 2 of 8

Case 3:08-cv-00625-DMS-LSP    Document 11-4    Filed 09/08/2008    Page 51 of 98

The Massachusetts Turnpike Authorithy: Admin. Proc. Rel. No. 33-8260 / July 31, 2003                     Page 3 of 8

this matter, the MBTA was authorized to issue municipal bonds, and the Commonwealth was the guarantor of such bonds.

*3. Bechtel/Parsons* was hired as the Project's outside private contractor and management consultant. Hired for their expertise at financial oversight of multi-billion dollar construction projects, Bechtel/Parsons was contractually obligated to create, track, and estimate the Project's budget, which Bechtel/Parsons did at all times relevant hereto. Bechtel/Parsons' contract required it to prepare quarterly cash flow projections reflecting the financial status of the Project, which the Turnpike Authority reviewed and provided to Administration and Finance for inclusion in bond offering materials.

### D. Facts

*1. Background*

The Project is a large, complex highway construction project that involves the depression under ground of a three-mile portion of Interstate 93 in downtown Boston (known as the Central Artery) and the construction of a new tunnel under Boston Harbor to link the Massachusetts Turnpike to Logan International Airport (the Ted Williams Tunnel) and two bridges over the Charles River. Construction of the Project began in 1991 and is currently expected to be completed in December 2004.

Historically, Project costs were borne by the Commonwealth, the Turnpike Authority, and the federal government. Through 1999, a majority of Project costs were borne by the federal government. However, as of March 1999, the federal contribution was reaching its limit, and by late 1999, it was apparent that the federal government would not provide additional funds for the Project. Accordingly, any Project cost increases were the responsibility of the Commonwealth and the Turnpike Authority.

Given the scope of the Project, costs were a concern from its inception. In an attempt to contain costs and achieve the Project's budget, the Project staff continually reviewed cost trends and pressures. Bechtel/Parsons regularly prepared cost estimates, which were reviewed and then used by the Turnpike Authority to manage the Project. Throughout this period, Kerasiotes told the Project staff that budget management was a "zero sum game," meaning that, for every cost increase, the Project staff must find a corresponding cost reduction or source of revenue. Kerasiotes was reluctant to approve increases in the Project budget estimates in part because hebelieved that public disclosure of an increase before it was absolutely certain that such an increase was unavoidable would make such an increase a self-fulfilling prophecy, thereby leading to Project cost increases that might otherwise have been prevented. Although this approach was an effort by Respondents to attempt to hold Project costs down, Respondents were negligent in failing to disclose cost increases in 1999, given how far the Project had progressed.

In 1997, Kerasiotes presided over a budget revision that established the total cost of the Project at $10.8 billion. From 1997 until February 2000, at Kerasiotes' direction, the Turnpike Authority, its employees, and Bechtel/Parsons consistently stated to the public that the Project cost would total $10.8 billion and that the Project was "on time and on budget." However, by March 1999, Respondents and the Project staff had become aware of significant projected cost increases that they negligently failed to disclose.

Exhibit 3
Page 3 of 8

tp://www.sec.gov/litigation/admin/33-8260.htm

Case 3:08-cv-00625-DMS-LSP    Document 11-4    Filed 09/08/2008    Page 52 of 98

he Massachusetts Turnpike Authority: Admin. Proc. Rel. No. 33-8260 / July 31, 2003    Page 4 of 8

### 2. Project Costs Increased

The $10.8 billion budget was built on a number of budget assumptions adopted in connection with the Project staff's last detailed budget review in 1995. The budget assumptions, which were based in part upon experience through 1995 and then recently-implemented cost controls, included: (1) the Project would be able to award contracts for 13% less than the Project's market estimates (a "market discount"); (2) the cost of previously-awarded contracts would not increase (due to unexpected construction problems) by more than 10.7% overall and 7% going forward; and (3) the Project would terminate and stop paying Bechtel/Parsons as the Project's management consultant in 2002 -- two years before the Project's then-projected completion date -- after construction of the underground artery was scheduled to be completed and the less complicated demolition of the existing highway was scheduled to begin.

From April 1998 through December 1999, the Project staff regularly prepared internal projections of best and worst-case budget scenarios, known as "up-down" charts. By July 1998, these charts consistently showed projected cost increases in excess of $1 billion, most of which would be incurred in 2000 and 2001. Most of the cost increases were directly related to the failure of various assumptions underlying the $10.8 billion budget, both on a historical and going-forward basis. These charts also showed potential offsets consisting of sources of revenue and scope or cost reductions to pay for the cost increases, such that the charts reflected no net increase in the budget. However, by the summer of 1999, the Project had progressed to the point where meaningful scope or cost reductions were no longer feasible.

In February 1999, and on additional occasions thereafter, the Project staff reviewed the various assumptions underlying the $10.8 billion budget. Those reviews revealed significant cost increases arising from the failure of those assumptions. As of February 1999, contracts were being awarded for 6.5% less than the Project's market estimates (not 13%), the cost of previously-awarded contracts had increased by 11.6% (not 7%), and it had become apparent that the Turnpike Authority would not terminate Bechtel/Parsons as the Project's management consultant in 2002. As a result, by March 1999, Respondents should have recognized that significant projected cost increases would occur. Instead of disclosing this information, beginning in the spring of 1999, the Project staff embarked upon a process to quantify the specific amount and timing of the cost increases. Between September and December 1999, the Project staff conducted a comprehensive bottom-up review of all Project contracts and costs. Kerasiotes believed that the Project staff could not determine the actual amount of a budget increase until it completed such a review and then submitted that review to an outside consultant for verification, a process that had been followed prior to the Project cost increases announced in 1995. Moreover, Kerasiotes did not want to disclose the problem until the Project staff determined its scope and came up with a solution. However, given Respondents' awareness of significant projected cost increases, Respondents acted negligently in failing to disclose such increases in the three bond offerings in 1999.

By mid-November 1999, the bottom-up review indicated that the Project's actual and projected costs were likely to exceed the Project's budget by approximately $1.4 billion and that additional funding would be needed beginning in 2001. After a series of meetings between the Turnpike Authority staff, Bechtel/Parsons, and legal counsel, the results of this review were presented to Kerasiotes on December 15, 1999.

Exhibit 3
Page 4 of 8

### 3. The March 1999 Turnpike Authority Offering

On March 24, 1999, the Turnpike Authority sold approximately $809 million in 30-year revenue bonds that were insured by a AAA-rated insurance company. In its Official Statement accompanying the bond offering, which was signed by Kerasiotes, the Turnpike Authority stated that future Project costs would total approximately $5.5 billion. This amount was derived from a quarterly cash flow projection prepared by the Project staff (and reviewed by Turnpike Authority finance personnel) by subtracting the costs incurred to date on the Project from the $10.8 billion budget. The $5.5 billion figure did not include any cost increases.

### 4. The September 1999 Commonwealth Offering

On September 22, 1999, the Commonwealth sold $500 million in 20-year general obligation bonds using an Official Statement containing information concerning Project costs provided by the Turnpike Authority. The Official Statement accompanying the bond offering, prepared by Administration and Finance, contained the Project's cash flow information provided by the Turnpike Authority, which represented that the Project's cash needs and sources for each fiscal year from 1999 through completion of the Project would total $5.5 billion. This amount was derived from a quarterly cash flow projection prepared by the Project staff (and reviewed by Turnpike Authority finance personnel) by subtracting the costs incurred to date on the Project from the $10.8 billion budget amount. Pursuant to Kerasiotes' approach to addressing cost increases, the $5.5 billion figure did not include any cost increases.

### 5. The December 1999 MBTA Offering

On December 9, 1999, before the Project staff presented the results of its bottom-up review to Kerasiotes, the MBTA sold $200 million in 30-year general obligation bonds using an Information Statement containing information concerning Project costs provided by the Turnpike Authority. The bonds were general obligations of the MBTA payable from the MBTA's general revenue fund. However, if the MBTA was not able to pay the bonds, they would be paid by the Commonwealth and were secured by the Commonwealth's full faith and credit. Accordingly, the MBTA's Official Statement contained an Information Statement from the Commonwealth. Based upon information the Turnpike Authority provided to Administration and Finance, the Information Statement stated that it would cost $5.5 billion to complete the Project. This amount was derived from a quarterly cash flow projection prepared by the Project staff (and reviewed by Turnpike Authority finance personnel) by subtracting the costs incurred to date from the $10.8 billion budget amount. Pursuant to Kerasiotes' approach to addressing cost increases, the $5.5 billion figure did not include any cost increases.[1]

### 6. Disclosure of Cost Increases and Subsequent Events

On February 1, 2000, Kerasiotes and the Turnpike Authority disclosed to the media that the Project would cost approximately $1.4 billion more than the $10.8 billion budget. These cost increases equaled approximately 3% of the total revenues of the Commonwealth estimated for fiscal year 2000 and 2001 and 9% of the total Commonwealth debt load as of January 1, 1999. Moreover, these cost increases exceeded the amount of the Commonwealth's Stabilization (or "rainy day") Fund, which the Commonwealth had pledged to use to provide tax relief, save for future

Exhibit 3
Page 5 of 8

Case 3:08-cv-00625-DMS-LSP   Document 11-4   Filed 09/08/2008   Page 54 of 98

he Massachusetts Turnpike Authority: Admin. Proc. Rel. No. 33-8260 / July 31, 2003          Page 6 of 8

contingencies, and fund one-time expenditures.

Following the disclosure of the cost increases, the Turnpike Authority took several steps to improve its disclosure practices. These steps included, but are not limited to, generating a publicly-available monthly report that includes detailed information regarding the Project's cost projections, conducting an annual, detailed review similar to the reviews conducted in 1994 and 1999, utilizing estimates of an outside consultant to test budget assumptions and cost figures generated by Project staff, and retaining outside counsel to provide disclosure advice on an ongoing basis.

## E. Violations

As a result of the negligent conduct described above, the Turnpike Authority committed and Kerasiotes committed and caused violations of Sections 17(a)(2) and (3) of the Securities Act.[2] In order to establish a cause of action under Sections 17(a)(2) and (3) of the Securities Act, it must be established that: (1) the misrepresentations were material; and (2) the misrepresentations were in the offer or sale of securities. *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *Superintendent of Ins. v. Bankers Life and Casualty Co.*, 404 U.S. 6 (1971); *Aaron v. SEC*, 446 U.S. 680, 686 n.5 (1980). A finding of scienter is not required to establish violations of Sections 17(a)(2) and (3) of the Securities Act; negligence is sufficient. *Aaron*, 446 U.S. at 696-97; *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 453-454 (3d Cir. 1997).

The cost increases identified by the Project staff were material to each of the three bond offerings in this matter. Information is material if there is a substantial likelihood that a reasonable investor would consider it important in making his or her investment decision. *See Basic*, 485 U.S. at 231-32, 240; *TSC Industries v. Northway, Inc.*, 426 U.S. 438, 439 (1976); *SEC v. Steadman*, 967 F.2d 636, 643 (D.C. Dir. 1992); *Selective Disclosure and Insider Trading*, Rel. No. 33-7881 (Aug. 15, 2000), 2000 SEC LEXIS 1672 at *32 (adopting case law definition of materiality for purposes of Regulation FD). *See also City of Miami*, Initial Dec. Rel. No. 185 (June 22, 2001), 2001 SEC LEXIS 1250, *51 (whether official statement is misleading depends on "whether an investor who had been reasonably diligent in reviewing the Official Statement would have been misled") (citation omitted). This requirement is fulfilled if there is a substantial likelihood that the information would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. *Id.* If the information relates to possible future events, materiality "will depend upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Basic*, 485 U.S. at 238; *SEC v. MacDonald*, 699 F.2d 47, 50 (1st Cir. 1983) ("materiality of facts regarding a contingent future event is simply a function of the anticipated magnitude of the event if it occurs, discounted by the probability of its occurring"). *See also Milton v. Van Dorn Co.*, 961 F.2d 965, 969-70 (1st Cir. 1992) (same).

Reasonable investors would have considered Project cost increases in excess of $1 billion to be an important factor in the investment decision-making process and would have viewed such information as significantly altering the total mix of information available. In addition to being a substantial amount in absolute terms, the cost increases equaled approximately 3% of the total revenues of the Commonwealth estimated for fiscal year 2000 and 2001 (when the majority of the cost increases would be incurred) and 9% of the total Commonwealth debt load as of January 1, 1999, and exceeded the amount of the Commonwealth's rainy

Exhibit 3
Page 6 of 8

Case 3:08-cv-00625-DMS-LSP    Document 11-4    Filed 09/08/2008    Page 55 of 98

The Massachusetts Turnpike Authority: Admin. Proc. Rel. No. 33-8260 / July 31, 2003
Page 7 of 8

day fund. Reasonable investors were entitled to know about cost increases of this magnitude that would have to be met by the Commonwealth and/or the Turnpike Authority so the investors themselves could evaluate the financial condition of the Turnpike Authority and/or Commonwealth and analyze fully the bond offerings. *See Basic*, 485 U.S. at 234 ("[d]isclosure, and not paternalistic withholding of accurate information, is the policy chosen and expressed by Congress"). *See also Statement of the Commission Regarding Disclosure Obligations of Municipal Securities Issuers and Others*, Exchange Act Release No. 34-33741 (March 9, 1994), 1994 SEC LEXIS 700, *16 (citing same standard for municipal security offerings).

Because the Project cost information provided by the Turnpike Authority was included in the materials accompanying each offering at issue here, the misrepresentations about such costs were made in the offer or sale of securities under Section 17(a) of the Securities Act. *See Miami*, 2001 SEC LEXIS 1250 at *50 (finding violations of Sections 17(a) where issuer's offering materials "distributed to inform and influence the investing public"). Section 17(a) is to be interpreted broadly, and an individual who provides false or misleading information included in offering materials may be liable under this section even if that individual does not have direct contact with investors or editorial control of offering materials. *See SEC v. Holschuh*, 694 F.2d 130, 142-45 (7th Cir. 1982). Here, the Turnpike Authority and Kerasiotes are liable because they negligently created, directly or indirectly, the particular misrepresentations at issue.

## F. The Turnpike Authority's Remedial Efforts

In determining to accept the Respondents' Offers, the Commission considered the remedial acts promptly undertaken by the Turnpike Authority.

### IV.

In view of the foregoing, the Commission deems it appropriate to issue the cease-and-desist order specified in Respondents' respective Offers.

## ACCORDINGLY, IT IS HEREBY ORDERED:

Pursuant to Section 8A of the Securities Act, that Respondents Turnpike Authority and Kerasiotes cease and desist from committing or causing any violations and any future violations of Sections 17(a)(2) and (3) of the Securities Act.

By the Commission.

Jonathan G. Katz
Secretary

---

1  Kerasiotes was not unjustly enriched and did not profit financially by his conduct in connection with any of the bond offerings at issue in this matter, and no investor suffered a financial loss.

2  The actions and state of mind of high-ranking Turnpike Authority and Project staff officials, can be imputed to the Turnpike Authority even though no

Exhibit 3
Page 7 of 8

tp://www.sec.gov/litigation/admin/33-8260.htm

member of the Turnpike Authority's current board knew of the information set forth above during 1999. *See City of Miami*, Initial Dec. Rel. No. <u>185</u> (June 22, 2001), 2001 SEC LEXIS 1250, *53 ("City is responsible for the acts of its City Manager and Finance Department officials, and the knowledge of these individuals is imputed to the City"), *aff'd*, Securities Act Rel. No. 8213 (March 21, 2003), 2003 SEC LEXIS 676; *Erik W. Chan*, Initial Dec. Rel. No. 172 (Sept. 14, 2000), 2000 SEC LEXIS 2274 at 28-29 (same) (citing cases). Good faith conduct may constitute a violation when negligent. *See SEC v. Brincat*, 2001 U.S. Dist. LEXIS 20213, *3 (N.D. Ill. Dec. 5, 2001) ("Even if [respondent] acted in good faith, he may still be liable ... if he acted ... negligently"). *See also SEC v. Pros Int'l, Inc.*, 994 F.2d 767, 769 (10th Cir. 1993) ([respondent] acted negligently even though "there has been no showing that [he] intended to defraud investors").

*http://www.sec.gov/litigation/admin/33-8260.htm*

Home | Previous Page                                    Modified: 07/31/2003

Exhibit 3
Page 8 of 8

tp://www.sec.gov/litigation/admin/33-8260.htm

# EXHIBIT 4

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES ACT OF 1933
Release No. 8751 / November 14, 2006

SECURITIES EXCHANGE ACT OF 1934
Release No. 54745 / November 14, 2006

ADMINISTRATIVE PROCEEDING
File No. 3-12478

| | |
|---|---|
| In the Matter of<br><br>City of San Diego, California,<br><br>Respondent. | ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934 |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 21C of the Securities Exchange Act of 1934 ("Exchange Act"), against the City of San Diego, California (the "City" or "Respondent").

II.

In anticipation of the institution of these proceedings, the City has submitted an Offer of Settlement ("Offer"), which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, the City consents to the entry of this Order Instituting Cease-and-Desist Proceedings, Making Findings, and Imposing a Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934 ("Order"), as set forth below.

Exhibit 4
Page 1 of 22

## III.

On the basis of this Order and the City's Offer, the Commission finds that:[1]

### A.    SUMMARY

This matter involves the City of San Diego's violations of the antifraud provisions of the federal securities laws in connection with the offer and sale of over $260 million in municipal bonds in 2002 and 2003. At the time of these offerings, City officials knew that the City faced severe difficulty funding its future pension and health care obligations unless new revenues were obtained, pension and health care benefits were reduced, or City services were cut. The City's looming financial crisis resulted from (1) the City's intentional under-funding of its pension plan since fiscal year 1997; (2) the City's granting of additional retroactive pension benefits since fiscal year 1980; (3) the City's use of the pension fund's assets to pay for the additional pension and retiree health care benefits since fiscal year 1980; and (4) the pension plan's less than anticipated earnings on its investments in fiscal years 2001 through 2003.

Despite the magnitude of the problems the City faced in funding its future pension and retiree health care obligations, the City conducted five separate municipal bond offerings, raising more than $260 million, without disclosing these problems to the investing public. In each of these offerings, the City prepared disclosure documents that are used with municipal securities offerings—that is, preliminary official statements and official statements—and made presentations to rating agencies.[2] In addition, in 2003 it prepared and filed information pursuant to continuing disclosure agreements under Exchange Act Rule 15c2-12 with respect to $2.29 billion in outstanding City bonds and notes.[3] Although the City provided some disclosure about its pension and retiree health care obligations, it did not reveal the gravity of the City's financial problems, including that:

- The City's unfunded liability to its pension plan was expected to dramatically increase, growing from $284 million at the beginning of fiscal year 2002 and $720

---

[1] The findings herein are made pursuant to the City's offer of settlement and are not binding on any other person or entity in this or any other proceeding.

[2] An official statement is a document prepared by an issuer of municipal bonds that discloses material information regarding the issuer and the particular offering. A preliminary official statement is a preliminary version of the official statement that is used to describe the proposed new issue of municipal securities prior to the determination of the interest rate(s) and offering price(s). The preliminary official statement may be used to gauge interest in an issue and is often relied upon by potential purchasers in making their investment decisions.

[3] Continuing disclosures are disclosures of material information relating to prior years' municipal bond offerings that are periodically provided to the marketplace by the bonds' issuer pursuant to contractual agreements and Exchange Act Rule 15c2-12.

Exhibit 4
Page 2 of 22

million at the beginning of fiscal year 2003 to an estimated $2 billion at the
beginning of fiscal year 2009;

- The City's total under-funding of the pension plan was also expected to increase
dramatically, growing tenfold from $39.2 million in fiscal year 2002 to an
estimated $320 to $446 million in fiscal year 2009;

- The City's projected annual pension contribution would continue to grow, from $51
million in 2002 to $248 million in 2009; and

- The estimated present value of the City's liability for retiree health benefits was
$1.1 billion.

The City's enormous pension and retiree health liabilities and failure to disclose those
liabilities placed the City in serious financial straits. When the City eventually disclosed its
pension and retiree health care issues in fiscal year 2004, the credit rating agencies lowered the
City's credit rating. The City also has not obtained audited financial statements for fiscal years
2003, 2004, and 2005.

Consequently, the City violated Section 17(a) of the Securities Act, Section 10(b) of the
Exchange Act and Rule 10b-5 thereunder, which prohibit the making of any untrue statement of
material fact or omitting to state a material fact in the offer or sale of securities.[4]

## B.    THE RESPONDENT

**City of San Diego, California** is a California municipal corporation with all municipal
powers, functions, rights, privileges, and immunities authorized by the California Constitution and
laws, including the power to issue debt. The City is the seventh most populous city in the country,
with approximately 1.3 million residents.

## C.    RELATED PARTY

**San Diego City Employees' Retirement System ("CERS")** is a defined benefit plan[5]
established by the City to provide retirement, disability, death, and retiree benefits to its members,

---

[4] The Commission acknowledges that in the City's offering documents for sewer revenue bonds
issued in 1995, 1997, and 1999 and sewer revenue bonds that were offered but not issued in 2003,
in its continuing disclosures, and in its communications with rating agencies, the City failed to
disclose that the City's wastewater fee rate structure did not comply with certain federal and state
clean water laws, that the City was not in compliance with the terms of certain government grants
and loans, and that the City could have been required to repay those grants and loans due to such
non-compliance. The offerings in the 1990s, however, predate the offerings that are the subject of
this Order, and the City did not consummate the 2003 offering because issues arose regarding the
adequacy of its pension disclosure. In addition, in 2004, the City came into compliance with the
federal and state clean water laws and the grant and loan covenants by adopting a new fee rate
structure. The City thereby avoided having immediately to repay the government grants and loans.

[5] A defined benefit plan is a traditional pension plan under which pre-determined retirement
benefits are based on a formula established by factors such as age, years of service, and

3

Exhibit 4
Page 3 of 22

i.e., City employees and their beneficiaries. CERS is administered by the CERS Board, which during the relevant period included eight City employees, including the City Treasurer and the Assistant City Auditor and Comptroller, one retiree, and three non-employee City citizens appointed by the City Council as CERS Board members.

D.    FACTS

    1.    Background

        a.    Structure of the City's Government

Until January 2006, the City's form of government was a city manager system.[6] Legislative powers of the City were vested in the City Council ("Council"), which made policies and appointed a professional city manager to carry out those policies. The Council was composed of nine full-time Council members who served for staggered four-year terms. Eight of the Council members represented the City's eight districts. The Mayor, who was elected at large, presided at the meetings of the Council and served as the official head of the City for ceremonial purposes. The Mayor and each Council member had one vote; the Mayor had no veto power.

Prior to 2006, the City Manager ("Manager") was the City's chief administrative officer and had substantial control over local government decisions. The Manager, appointed by the Mayor and Council, advised the Council of the City's present and projected financial condition, appointed and removed all city department heads (except the City Auditor and Comptroller ("City Auditor"), City Attorney, and City Clerk), prepared the City's budget, and carried out the Council's budget plan. During the relevant time period, the City's general fund budget was less than $900 million. The City Manager had several Deputy City Managers, one of whom was in charge of the Financing Services Department, which had responsibility for overseeing the City's issuance of municipal securities.

Prior to 2006, the City Auditor was also appointed by the Council, and was required to file at least monthly with the City Manager and Council a summary statement of revenues and expenses for the preceding accounting period.[7] The Auditor was the City's chief financial officer and was responsible for the preparation and issuance of the City's Comprehensive Annual Financial Reports, also referred to as CAFRs. The City's Comprehensive Annual Financial Reports included audited financial statements prepared pursuant to standards established by the

---

compensation, and in which the employer bears risk if the employer and employee contributions and the investment return on those contributions are not sufficient to fund the pension benefits.

[6] In January 2006, the City transitioned from a City Manager / Council form of government to a strong Mayor form of government. Under the new system, the Mayor became the City's chief executive officer and the City Manager's position was eliminated. The Council continues to act as the legislative body. City of San Diego City Charter, Article XV.

[7] City of San Diego City Charter, Article V, Section 39.

Exhibit 4
Page 4 of 22

Government Accounting Standards Board ("GASB")[8] and various statistical, financial, and other information about the City. Portions of the Comprehensive Annual Financial Reports for the years ended June 30, 2001, and June 30, 2002 were attached as appendix B to the preliminary official statements and the official statements. The Comprehensive Annual Financial Reports for 2001 and 2002 were also filed as continuing disclosures.

The elected City Attorney served as the chief legal officer for the City. The City Attorney's office advised the Council, City Manager, and all City departments on legal matters, including disclosure in the City's securities offerings. The City Attorney was responsible for preparing all ordinances, resolutions, contracts, and other legal documents.

### b.    The City's Pension Plan

The City provided a defined benefit pension plan and retiree health care benefits to its employees through CERS. CERS functioned as a trust for the benefit of its members (i.e., approximately 18,500 current and former City employees and officials). The City was the creator of the trust and determined its terms, including the members' required contributions and the levels of benefits. CERS was administered by a Board of Administration, which controlled the investment of CERS's funds and which owed fiduciary duties to CERS members. CERS's assets consisted of past contributions by the City and CERS members and investment earnings on those funds. CERS's liabilities consisted of operating expenses and the future pension benefits that were owed to members.

Each year, CERS hired an actuary to determine the value of the plan's assets and liabilities based on certain actuarial assumptions and the amount that needed to be contributed to the plan so that the plan accumulated sufficient assets to pay pension (but not health care) benefits when due.[9] Pursuant to the City Charter, the City was to contribute half of that amount, which was expressed in terms of a percentage of payroll expenses, with the other half to be contributed by the employees, which amount was determined as a percentage of compensation based on the employee's age upon entry into CERS.

At least three concepts were particularly important in the disclosure to the public of the City's pension obligations and funding of those obligations: (1) CERS's funded ratio; (2) the

---

[8] GASB is the organization that establishes standards of state and local governmental accounting and financial reporting.

[9] An actuarial valuation is a determination by an actuary, as of a specified date, of the normal cost, actuarial accrued liability, actuarial value of the assets, and other relevant values for a pension plan based on certain actuarial assumptions. The actuarial value of assets refers to the value of cash, investments, and other property belonging to a pension plan as used by the actuary for the purpose of preparing the actuarial valuation for the pension plan. The actuarial accrued liabilities are what is owed in connection with past services, as determined by one of the actuarial cost methods. Actuarial assumptions are estimates of future events with respect to certain factors affecting pension costs, including rates of mortality, disability, employee turnover, retirement, rates of investment income, and salary increases. Actuarial assumptions are generally based on past experience, often modified for projected changes in conditions.

Exhibit 4
Page 5 of 22

City's unfunded liability to CERS; and (3) the City's net pension obligation, also called the NPO. CERS's funded ratio was the ratio of its assets to liabilities. The City's unfunded liability to CERS was the dollar shortfall between CERS's assets and liabilities. The City's net pension obligation was the cumulative difference between what the City actually contributed to CERS and the amount that the City would have contributed had it conformed to a funding method recognized by GASB.

   2.   **The City's Pension and Retiree Health Care Benefits and Funding of CERS**

   The City failed to disclose material information regarding substantial and growing liabilities for its pension plan and retiree health care and its ability to pay those obligations in the future in the disclosure documents for its 2002 and 2003 offerings, in its continuing disclosures filed in 2003, and in its presentations to the rating agencies. As more fully described below, the City's substantial and growing pension and retiree health care liabilities resulted from several factors, including: (1) the City's intentional under-funding of its annual pension contribution; (2) the City's granting of new retroactive pension benefits; (3) the City's use of certain CERS earnings to pay for various additional pension and retiree health care benefits and to pay a portion of employees' pension contributions; and (4) CERS's earning less than anticipated returns on its investments.

   a.   **The City's Historical Practice of Using "Surplus Earnings" to Fund Pension and Retiree Health Care Benefits**

   In fiscal year 1980, the City began instructing CERS to use "surplus earnings"—i.e., earnings above the actuarially projected 8% return rate[10]—to fund an ever-increasing amount of additional benefits for CERS members. Pension plans typically retain surplus earnings to support the plan's financial soundness and to make up for years in which earnings fall short of the assumed return rate. Rather than retaining its surplus earnings, the City began using surplus earnings in fiscal year 1980 to fund an annual extra or "13[th] check" to retirees. The City continued using surplus earnings to pay for retiree health care benefits in fiscal year 1982 and to pay an ever-increasing amount of the employees' CERS contributions in fiscal year 1998.[11]

   In total, the City used surplus earnings to pay pension benefits and employees' contributions totaling $150 million as of the end of fiscal year 2001 and an additional $25 million as of the end of fiscal year 2002. According to a 2005 CERS audit, the City's use of surplus

---

[10] Without regard to its actual historical rate of return on investments, the CERS Board assumed an annual rate of investment return of 8%, which the actuary incorporated into his calculations. CERS defined surplus earnings as the amount of realized investment earnings in excess of the actuarially projected 8% return rate.

[11] In fiscal years 2003 and 2004, the City used CERS's surplus earnings from prior years to pay up to 27% of the employees' contributions.

6

Exhibit 4
Page 6 of 22

earnings accounted for 17% of the increase in the City's unfunded liability to CERS from fiscal year 1997 through fiscal year 2003.

        **b.**      **Manager's Proposal 1: The City Proposes Additional Benefits in Exchange for Contribution Relief**

In fiscal year 1996, the City agreed to increase significantly and retroactively all employees' pension benefits. The City, however, could not afford to fund the cost of the benefit increases. The City therefore made the pension benefit increases contingent on CERS's agreement to the City's under-funding of its annual contribution to CERS.

In fiscal year 1997, the City and CERS entered into an agreement, which was referred to as Manager's Proposal 1, that set the City's annual contribution at gradually increasing rates through fiscal year 2008. This funding method, which the City termed "Corridor" funding, was not recognized by GASB and set annual funding rates that were not actuarially determined and were projected to be below GASB-recognized funding rates through fiscal year 2006. In other words, under Corridor funding, the City would be intentionally under-funding its annual liability to CERS in fiscal years 1997 through 2006.[12] After fiscal year 2006, it was estimated that the funding rate of Manager's Proposal 1 would equal a GASB-accepted rate. Manager's Proposal 1 also contained a provision intended to protect CERS's financial soundness. Specifically, if CERS's funded ratio fell below 82.3%, the City would have to increase its CERS contribution rate.

In fiscal years 1996 and 1997, the City estimated that under Manager's Proposal 1, by the end of fiscal year 2008, the City's net pension obligation would be $110.35 million. Because the City's Corridor funding method was not GASB-recognized, GASB required that the City disclose its net pension obligation in its annual financial statements.

        **c.**      **The *Corbett* Litigation Requires the City to Fund Additional Retroactive Benefits**

In March 2000, the City again retroactively increased pension benefits. Specifically, the City and CERS settled a class action lawsuit brought by CERS members, with *Corbett* as the named class plaintiff.[13] Under the *Corbett* settlement, the City retroactively gave increased pension benefits to both current and retired City employees, increasing CERS's liabilities. Under

---

[12] Manager's Proposal 1 was viewed skeptically by some members of the CERS Board who were not City employees. The majority of the CERS Board, however, consisted of City officials who received benefit increases that were contingent on the Board's approval of Manager's Proposal 1. Moreover, CERS's actuary informed the CERS Board that Manager's Proposal 1 was a sound proposal and CERS's fiduciary counsel opined that the Board would be acting within the ambit of its fiduciary discretion in approving Manager's Proposal 1.

[13] The *Corbett* plaintiffs raised various claims based on a 1997 California Supreme Court decision which held that an employee's salary for purposes of calculating basic pension benefits included the value of overtime and accrued leave.

Exhibit 4
Page 7 of 22

Manager's Proposal 1, however, the City's contributions to CERS did not increase. As a result, the City's unfunded liability to CERS increased by $185 million.

In negotiating the *Corbett* settlement, however, the City purposefully structured certain of the increased *Corbett* benefits to avoid having those benefits adversely affect CERS's reported funded ratio and the City's reported unfunded liability to CERS. Specifically, the City structured the *Corbett* settlement so that the increased benefits for retired CERS members were to be paid in a given year only if there were sufficient surplus earnings from that year to pay the benefit. If there were insufficient surplus earnings in a given year to pay the increased benefit, then the cost of the increased benefit would become CERS's liability and would eventually be paid from future years' surplus earnings. The City and CERS treated the increased benefits to retired CERS members as contingent liabilities that were not taken into account in determining CERS's funded ratio or the City's unfunded liability to CERS. As of June 30, 2001, according to CERS's actuary, if the contingent portion of the *Corbett* settlement had been included in CERS's valuation, the City's unfunded liability to CERS would have increased by $70 to $76 million and CERS's funded ratio would have decreased by 2% to 2 ½ % from what was actually reported by the City. Thus, the City's pension situation was even more dire than the numbers, as they were reported by the City, indicated.

### d.     CERS's Actuary Report for Fiscal Year 2001 Shows a Dramatic Increase in the City's Pension Liabilities

In fiscal year 2001, CERS's investment return began to fall short of its anticipated 8% annual return. The City was informed of CERS's declining performance in February 2002, when it received CERS's annual actuarial valuation for fiscal year 2001. This report stated that as of the end of fiscal year 2001, CERS's funded ratio was 89.9% and the City's unfunded liability to CERS was $284 million, as compared to a funded ratio of 97.3% and an unfunded liability of $69 million only one year earlier. Moreover, the report noted that if the *Corbett* contingent benefit to CERS retired members were included, the City's unfunded liability to CERS would have increased to at least $354 million and CERS's funded ratio would have fallen to at least 87.9%.

CERS's actuary attributed these changes to a number of factors, including CERS's actuarial investment losses[14] of $95.6 million (and warned that there would be further actuarial investment losses in fiscal year 2002 unless the markets improved during the remaining five months of the fiscal year). In his report, CERS's actuary also warned that "all parties" should be "acutely aware that the current practice of paying less than the [actuarial] computed rate of contribution … will help foster an environment of additional declines in the funded ratio in absence of healthy investment returns."

In May 2002, the City learned that CERS would likely not have any surplus earnings from fiscal year 2002 to pay for the contingent benefits—specifically, retiree health care benefits, the 13th check, and the *Corbett* increase to retirees.

---

[14] Actuarial investment losses are the difference between the assumed investment rate, which in the City's case was 8% annually, and the actual investment results.

Exhibit 4
Page 8 of 22

e.    **The Blue Ribbon Committee Report Puts the City on Notice about its Growing Pension and Retiree Health Care Liabilities**

In April 2002, the City received a warning that the City's pension and retiree health care liabilities would continue to grow and that the City was not adequately planning to meet those liabilities. This came in the form of a report from the City's Blue Ribbon Committee to the City Council.[15] The report stated that the Blue Ribbon Committee had three principal concerns regarding CERS. First, the City was granting retroactive retirement benefit increases but pushing the cost of those benefit increases into the future, long after the individuals involved in the decisions were gone. Second, the City's budgetary process did not adequately comprehend the steadily growing annual expense of the pension contribution, "particularly given the uncontrollable and non-discretionary nature of this liability." The Committee stated that the City's pension contribution would substantially increase and warned that any future benefit increases, particularly retroactive increases, would "significantly exacerbate this problem." Third, the City's budgetary process did not recognize that retiree health care costs were a non-discretionary expense that would grow at an increasing rate and that the City was not paying out of its current year's budget the full cost for their future retiree health benefits. This report thus squarely put the City on notice that it had substantial future pension and healthcare liabilities it would probably be unable to pay under the current system.

f.    **Manager's Proposal 2: The City Again Proposes Additional Pension Benefits in Exchange for Relief from an Impending Lump Sum Payment**

In fiscal year 2003, the City again increased its pension liability by granting additional retroactive benefits, used additional CERS assets to pay for additional pension and retiree health care benefits and an increased portion of the employees' contribution, and obtained additional time to under-fund its annual CERS contribution.

In the second half of fiscal year 2002, the City agreed to increase pension benefits for fiscal year 2003. From as early as October 2001, however, the City was concerned that CERS's funded ratio would fall below the 82.3% floor established by Manager's Proposal 1, which would require the City, at the very least, to increase its contributions to CERS by at least $25 million to be at a higher GASB-accepted rate.

Concerned about having to pay the additional $25 million, the City sought to condition the pension benefit increases on the City's obtaining from CERS relief from the floor of Manager's Proposal 1. In November 2002, the City and CERS agreed to Manager's Proposal 2 and the City

---

[15]  In April 2001, the Mayor had appointed a nine-member committee of San Diego citizens, known as the Mayor's Blue Ribbon Committee on City Finances, to independently evaluate the City's fiscal health and make any appropriate recommendations. In February 2002, the Blue Ribbon Committee presented its report to the Council's Rules Committee, identifying nine areas of concern, two of which related to the City's pension fund. The same report was made to the full Council in April 2002.

9

Exhibit 4
Page 9 of 22

adopted the increased pension benefits as of July 2002. Under Manager's Proposal 2, once CERS's funded ratio fell below 82.3%, the City would have five years to increase its contributions to CERS to reach a GASB-recognized funding rate.

As a result of CERS's actuarial losses in fiscal year 2002, CERS did not have surplus earnings to pay the 13th check, the cost of retiree health care, and the *Corbett* benefit increase to retired CERS members. In conjunction with Manager's Proposal 2, however, the City directed CERS to use certain of its reserve accounts to pay the 13th check and the retiree health care benefits, and to pay an increased portion of certain City employees' CERS contributions. The reserve funds could have been used to increase CERS's funded ratio and decrease the City's unfunded liability to CERS; instead, the City directed that CERS use the reserve funds to pay additional benefits.

> **g.    CERS's Actuary Report for Fiscal Year 2002 and Projections for the Future Show that the City Faces Substantial Problems Funding its Pension and Retiree Health Care Liabilities**

In early 2003, the City received two reports from CERS's actuary. These reports provided the City with negative information regarding the present and projected status of CERS's funded ratio and the City's unfunded liability to CERS. First, in January 2003, the City received CERS's actuary report for fiscal year 2002. This report stated that during fiscal year 2002, CERS suffered an actuarial loss of $364.8 million and that as of the end of fiscal year 2002, CERS's funded ratio was 77.3% and the City's unfunded liability to CERS was $720 million, as compared to a funded ratio of 89.9% and unfunded liability of $284 million only one year earlier. The actuary's report further stated that if the *Corbett* contingent benefit to CERS retired members had been included, the City's unfunded liability to CERS would have been at least $790 million, and CERS's funded ratio would have been approximately 75.3%. In the concluding comment, the actuary stated that CERS was "in adequate condition," which was the first time that the actuary had not described CERS as "actuarially sound."

Second, in February 2003, CERS's actuary provided to the City projections of the City's contributions under Manager's Proposal 2, the City's net pension obligation, the City's unfunded liability to CERS, and CERS's unfunded ratio. Specifically, the City's contribution rate was projected to more than quadruple—from 9.83% of payroll in fiscal year 2002 ($51 million) to 35.27% of payroll in fiscal year 2009 ($248 million). The following chart illustrates the growth in the City's projected annual contribution to CERS:

Exhibit 4
Page 10 of 22



The City's net pension obligation was projected to grow by tenfold—from $39.23 million in fiscal year 2002 to as much $446 million in fiscal year 2009. The following chart illustrates the growth in the City's projected net pension obligation:



The City's unfunded liability was projected to increase more than seven fold—from $284 million at the beginning of fiscal year 2002 to $2 billion at the beginning of fiscal year 2009. CERS's funded ratio was projected to continue to fall—from 77.3% at the beginning of fiscal year 2003 to 65.6% at the beginning of fiscal year 2009. The following chart illustrates this dramatic increase in the City's projected unfunded liability to CERS:

11

Exhibit 4
Page 11 of 22



The City had knowledge of these projections prior to all of its 2003 municipal securities offerings.

> h.  The *Gleason* Litigation: CERS
>     Members Challenge Manager's Proposal 1 and
>     Manager's Proposal 2

Further evidence that the City's under-funding of CERS was potentially threatening the City's future fiscal health came in January 2003, when CERS members filed a class action, with *Gleason* as the named class plaintiff, against the City and CERS alleging breaches in connection with the City's under-funding of CERS under Manager's Proposal 1 and Manager's Proposal 2. Among other things, the *Gleason* complaint alleged that by 2009, the City would owe approximately $2.8 billion to CERS, with an annual City budget expense of more than $250 million. In March 2003, the CERS attorney in the *Gleason* litigation advised CERS that (1) certain CERS Board members had breached their fiduciary duty by adopting Manager's Proposal 2; and (2) CERS should exercise its right to nullify Manager's Proposal 2. The CERS Board, which included the City Treasurer and the Assistant City Auditor and Comptroller, rejected this advice. If Manager's Proposal 2 had been nullified, the City would have been required to make an immediate potential payment to CERS of up to $159 million.

12

Exhibit 4
Page 12 of 22

i.   **CERS's Response to the Blue Ribbon Committee Report
Advises the City's Officials of the Growing Pension
and Retiree Health Care Crisis.**

In February 2003, additional detailed information about the City's pension funding crisis
was presented to City officials when CERS responded to the Blue Ribbon Committee's report.[16] In
its response, CERS advised the City that as of June 30, 2002, CERS's funded ratio had fallen to
77.3% and the City's unfunded liability to CERS had increased to $720 million.  The response
also stated that the falling funded ratio and the increasing unfunded liability resulted from three factors:
a dramatic decline in CERS's investment performance in fiscal years 2001 and 2002; the City's
granting of increased benefits; and the City's contributions to CERS at less than a GASB-
recognized rate.

With respect to the City's under-funding, the response stated that the annual amount of the
City's under-funding of CERS continued to increase in fiscal years 2002 and 2003, which was
contrary to the initial projections from Manager's Proposal 1 that the annual amount of under-
funding would decline beginning in fiscal year 2001.  The response further stated that the City's
net pension obligation would reach $102 million by the end of fiscal year 2003 and $423 million
by the end of fiscal year 2009.

The response also discussed the City's future liability for retiree health care.  CERS's
actuary had estimated that the present value of the City's liability for future retiree health care was
in excess of $1.1 billion.  The response further stated that the City was not making any
contributions to CERS to pay for this liability, that CERS had been paying for this liability with
money in a reserve funded with CERS's surplus earnings from prior years, that the reserve would
be depleted in fiscal year 2006, and that in fiscal year 2006, the City would have to pay an
estimated $15 million for retiree health care.  The response warned that absent a change in the
benefit and a dramatic decrease in future health care costs, the City could be facing significant
future funding obligations.  The response recommended that the City consider funding this future
health care liability as part of its annual contribution to CERS.

j.   **The City's Study of Its Pension Obligations Concludes
that the City's Pension Liabilities Could Negatively
Impact the City's Credit Rating**

In April 2003, the City received additional information regarding the projected growth of
its future pension liabilities and the possible negative effect those liabilities would have on the
City's credit rating and ability to issue municipal securities.  In February 2003, the City hired a
financial adviser to analyze CERS's funding and to develop potential solutions.  On April 16,

---

[16] From February 9 through 13, 2003, the local newspaper wrote three front page, above-the-fold
articles about the City's under-funded pension system and the CERS response.  The newspaper
articles explained that (1) by the end of FY 2009 the City's unfunded liability to CERS was
projected to increase to almost $2 billion; and (2) the City's unfunded liability for retiree health
care was estimated to be $1.1 billion.

13

Exhibit 4
Page 13 of 22

2003, the financial adviser provided to the City a preliminary pension analysis. In its analysis, the financial adviser stated that because of the City's under-funding, the City's unfunded liability would continue to grow and CERS's funded ratio would continue to fall through fiscal year 2021 regardless of actuarial gains or losses. The financial adviser estimated that under Manager's Proposal 2, the City's unfunded liability to CERS would grow to $1.9 billion at the end of fiscal year 2009 and to $2.9 billion at the end of fiscal year 2021, and CERS's funded ratio would fall to 66.5% at the end of fiscal year 2009 and would be 67% at the end of fiscal year 2021.

The preliminary pension analysis also stated that the City's large unfunded liability to CERS would cause the City's contribution to CERS to increase dramatically. The analysis estimated that the City's contribution rate to CERS would more than double—from 18.87% of payroll (or $107.5 million) in fiscal year 2004 to 40.9% of payroll ($286.9 million) in fiscal year 2009.

The preliminary pension analysis also discussed the effect that the City's unfunded liability would have on the City's credit rating. The financial adviser stated that the City's current unfunded liability would not only trigger an adverse credit event but that the rating agencies would expect the City to develop a plan to reduce its unfunded liability by increasing its annual contributions and/or funding the unfunded liability by issuing bonds. The financial adviser further stated that if the City did not develop and implement such a plan, the City's unfunded liability could cause the City "significant credit and legal challenges." The City's disclosures in 2003 failed to inform investors of the financial adviser's analysis.

3.    The Offerings, Continuing Disclosures, and Rating Agency Presentations

a.    The Bond Offerings and the City's Preparation of the Offerings' Disclosure Documents

During 2002 and 2003, the City conducted the following five municipal securities offerings totaling $261,850,000 in par value:

- $25,070,000 Public Facilities Financing Authority of the City of San Diego Lease Revenue Bonds, Series 2002B (Fire and Safety Project ) (June 2002)
- $93,200,000 City of San Diego, 2002-03 Tax Anticipation Notes Series A (July 2002)
- $15,255,000 City of San Diego/Metropolitan Transit Development Board Authority 2003 Lease Revenue Refunding Bonds (San Diego Old Town Light Rail Transit Extension Refunding (April 2003)
- $17,425,000 City of San Diego 2003 Certificates of Participation (1993 Balboa Park/Mission Bay Park Refunding) (May 2003)
- $110,900,000 City of San Diego 2003-04 Tax Anticipation Notes Series A (July 2003)

A transactional financing team prepared the offering documents, that is, the preliminary official statement and the official statement, for each of the five municipal bond offerings. The

Exhibit 4
Page 14 of 22

financing team consisted of outside consultants and officials from the City Manager's office (financing services division), Auditor and Comptroller's office, and the City Attorney's office. The outside consultants included, among others, bond counsel, disclosure counsel, and underwriters. The preliminary official statement and the official statement for each of the five offerings consisted of a description of the offering, a general description of the City, including financial, economic, statistical, and other information in appendix A, and audited annual financial statements from the City's Comprehensive Annual Financial Reports in appendix B. Information regarding its pension and retiree health care obligations was provided in both appendices A and B.

The outside consultants took the lead in drafting the description of the bond offerings. City officials in the financing services division were responsible for drafting appendix A. The financing services division updated Appendix A on an ongoing basis and at the time of a bond offering, forwarded the latest version of Appendix A to the entire financing team. The team met several times to review, comment on, and ultimately finalize the preliminary official statements and official statements at "page-turner meetings." Appendix B was prepared by the Auditor's office and the City's outside auditor. The Council approved all of the 2002 and 2003 offerings at open session meetings.

### b.    The Continuing Disclosures

During the relevant period, the City also filed annual continuing disclosures relating to its $2.29 billion in outstanding bonds for the purpose of updating investors on the state of the City's finances.[17] City officials in the financing services division coordinated, reviewed, and filed the 2002 and 2003 continuing disclosures. Almost all of these continuing disclosures included appendix A and portions of the City's Comprehensive Annual Financial Reports. The financing services division was responsible for ensuring that the most updated and accurate version of appendix A was attached to the continuing disclosures before they were filed.

### c.    The 2003 Rating Agency Presentations

The City made presentations to the rating agencies on a yearly basis, both in connection with specific bond offerings and to update the rating agencies on the City's general credit. The presentations were made orally with PowerPoints in meetings with representatives from Fitch Ratings, Moody's Investors Service, and Standard and Poor's. In 2003, the rating agencies specifically asked the City to address the pension plan as part of its annual presentations. These presentations were important because they directly affected the City's bond ratings. The 2003

---

[17] An underwriter of municipal securities covered by Exchange Act Rule 15c2-12 may not purchase or sell municipal securities in connection with an offering unless the issuer has undertaken in a written agreement or contract for the benefit of the bondholders to provide its audited annual financial statements and certain other annual financial and operating information, to nationally recognized municipal securities information repositories and state information depositories designated by the Commission and to provide notices of certain material events and notices of any failures to file on the nationally recognized municipal securities information repositories or the Municipal Securities Rulemaking Board and state information depositories.

15

Exhibit 4
Page 15 of 22

PowerPoint presentations were prepared and presented by officials from the City Manager's office, including the financing services division, and the City Auditor and Comptroller's office. The financing services division drafted the pension portion of the 2003 PowerPoint presentation. Officials from the City Auditor's office made the oral presentation on the pension plan and fielded numerous questions on that topic from the rating agencies.

     4.      The False and Misleading Disclosures

In the preliminary official statement and the official statements for the 2002 and 2003 offerings, the 2003 presentations to the rating agencies, and the 2003 continuing disclosures, the City made substantial disclosures regarding (1) the City's policies for funding CERS; and (2) the status of CERS's funding and the City's liability to CERS. Additionally, in the preliminary official statements, the official statements, and continuing disclosures, the City made certain representations regarding its retiree health care obligations. The disclosures (collectively "Disclosures"), however, were misleading because the City failed to include material information regarding the City's current funding of its pension and retiree health care obligations, the City's future pension and retiree health care obligations, and the City's ability to pay those future obligations.

First, with respect to the pension issues, the City failed in the Disclosures to reveal several material facts, including that (1) the City was intentionally under-funding its pension obligations so that it could increase pension benefits but push off the costs associated with those increases into the future; (2) because of the City's under-funding of its pension plan, its net pension obligation was expected to continue to grow at an increasing rate, reaching from $320 million to $446 million by the end of fiscal year 2009; (3) the City's unfunded liability was expected to continue to grow at a substantial rate, reaching approximately $2 billion by fiscal year 2009; (4) this growth in the City's unfunded liability resulted from the City's intentional under-funding of its pension plan, the City's granting of new retroactive pension benefits, the City's use of pension plan earnings to pay additional benefits, and the pension plan's less than anticipated investment return; (5) the City's annual pension contribution was expected to more than quadruple by fiscal year 2009; and (6) the City would have difficulty funding its future annual pension contributions unless it obtained new revenues, reduced pension benefits, or reduced City services. Moreover, the City falsely disclosed in Appendix B to its preliminary official statements and its official statements that its net pension obligation was funded in a reserve.

Additionally, with respect to retiree health care benefits, the City failed to disclose in its preliminary official statements, official statements, and continuing disclosures that[18] (1) the estimated present value of its liability for retiree health care was $1.1 billion; (2) the City had been covering the annual cost for retiree health care with pension plan earnings from prior years that were expected to be depleted in fiscal year 2006; (3) after fiscal year 2006, the City would have to pay for the retiree health care benefits from its own budget at an estimated annual cost of $15 million; and (4) the City had not planned for paying such additional costs.

---

[18] The issue of retiree health care was not addressed in the rating agency presentations.

Exhibit 4
Page 16 of 22

### 5.    The City's Knowledge of the Misleading Disclosures

The City, through certain of its officials, knew that its Disclosures were misleading. The Mayor and Council were responsible for approving the issuance of the bonds and notes, including issuance of the preliminary official statements and official statements. The Mayor and Council delegated final approval of the official statements to the City Manager. The City Manager's office was responsible for the preparation of the preliminary official statements and the official statements, including appendix A. The City Auditor's office was responsible for the preparation of appendix B to the preliminary official statements and official statements. Through their designees on the CERS Board, among other things, both the City Manager's and the City Auditor's offices had knowledge about the City's use of CERS's surplus earnings, Manager's Proposals 1 and 2, CERS's actuary reports for fiscal years 2001 and 2002, and CERS's response to the Blue Ribbon Committee Report. Also, several representatives of the City Manager's office, City Attorney's office, and Auditor and Comptroller's office attended relevant closed session meetings of the Council where Manager's Proposals 1 and 2 and the *Corbett* and *Gleason* litigations were discussed. Moreover, the Blue Ribbon Committee Report and CERS's response to the Blue Ribbon Committee Report were both presented to a committee of the Council at which officials from the City Manager's and Auditor and Comptroller's office were present. Finally, the offices of the City Manager and the City Auditor were responsible for the City's study of its pension obligations that occurred in early 2003. Through their participation and involvement in the above-referenced matters, certain city officials knew or were reckless in not knowing that the Disclosures were false and misleading.

Specifically, by early 2002, the City, through its officials, knew, among other things, that (1) CERS's funded ratio would likely fall below the 82.3% floor set by Manager's Proposal 1; (2) the City was proposing Manager's Proposal 2 to avoid the effects of CERS's falling below the floor; (3) Manager's Proposal 2 allowed the City more time to under-fund CERS; and (4) the Blue Ribbon Committee had raised concerns about the City's under-funding of CERS and the future retiree health care liability. By early 2003, the City, through its officials, knew, among other things, that (1) the City's projected total contributions to CERS would grow from $77 million in fiscal year 2004 to $248 million in fiscal year 2009; (2) CERS had fallen below the 82.3% floor of Manager's Proposal 1; (3) the City and CERS had adopted Manager's Proposal 2 to allow the City more time to under-fund CERS; and (4) CERS was using reserved surplus earnings to pay certain benefits and to pay an increased portion of the employees' CERS contribution.

### 6.    Materiality and the City's Voluntary Disclosure

The misleading Disclosures were material in view of the City's overall financial health. The Disclosures were also material given the magnitude of the City's projected annual CERS payments in the future and the potential consequences of those liabilities to the City, including inability to make the payments without reduction in other services.

The nature and level of under-funding brought into question the City's ability to fund the pension and health care benefits in the future as well as its ability to repay the bonds and notes. Under such a scenario, the City could be forced to choose between paying pension contributions, paying what the City owes on its bonds and notes, reducing services, and/or raising fees and taxes.

Exhibit 4
Page 17 of 22

The materiality of the misleading Disclosures was demonstrated by the impact on the City's bond ratings when it finally disclosed key facts about the pension plan on January 27, 2004 in a voluntary report of information, after a non-employee CERS Board member raised concerns about the City's disclosure. The voluntary report provided information regarding (1) CERS's current and estimated future funded status; (2) the City's current and estimated future liabilities to CERS; (3) the reasons for the substantial decrease in CERS's funded ratio and increase in the City's liability to CERS; (4) the City's previous use of CERS funds to pay for retiree health care and the City's estimated future liabilities for retiree health care; and (5) the City's anticipated difficulty funding its increasing CERS contribution without new City revenues, a reduction in pension benefits, a reduction in City services, or other actions. Shortly after the disclosures in the voluntary report, the rating agencies lowered their ratings on the City's bonds and notes.

E.    **Legal Discussion**

    1.    **The Securities Act and Exchange Act Antifraud Provisions**

State and local governments are exempt from the registration and reporting provisions of the Securities Act and the Exchange Act. Similarly, the Commission's authority to establish rules for accounting and financial reporting under Section 19 of the Securities Act and Section 13(b) of the Exchange Act does not extend to municipal securities issuers. The City and other municipal securities issuers, however, are subject to the antifraud provisions of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. In addition, the Commission has promulgated a broker-dealer rule, Exchange Act Rule 15c2-12, which in general limits market access for certain municipal securities issues to those offerings in which the issuer agrees to file annual financial disclosures of specified financial and operating information as well as notices of certain events, if material, and notices of any failures to file with repositories designated by the Commission. The antifraud rules apply to such disclosure and to any other statements made to the market.

Section 17(a) of the Securities Act prohibits misrepresentations or omissions of material facts in the offer or sale of securities. Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit misrepresentations or omissions of material fact in connection with the purchase or sale of any security. These provisions prohibit the making of any untrue statement of material fact or omitting to state a material fact in the offer, purchase, or sale of securities. A fact is material if there is a substantial likelihood that its disclosure would be considered significant by a reasonable investor. Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1987); TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976).

Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 require a showing that defendants acted with scienter. Aaron v. SEC, 446 U.S. 680, 701-02 (1980). Scienter is "a mental state embracing intent to deceive, manipulate or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976). In the Ninth Circuit, recklessness satisfies the scienter requirement. Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc). Recklessness is "an extreme departure from the standards of ordinary care, and which presents a danger of misleading [investors] that is either known to the defendant or is so obvious

Exhibit 4
Page 18 of 22

that the actor must have been aware of it." Id., 914 F.2d at 1569. Scienter, however, need not be shown to establish a violation of Section 17(a)(2) or (3). Aaron v. SEC, 446 U.S. 680, 697 (1980). Violations of these sections may be established by showing negligence. SEC v. Hughes Capital Corp., 124 F.3d 449, 453-54 (3d Cir. 1997); SEC v. Steadman, 967 F.2d 636, 643 n. 5 (D.C. Cir. 1992).

> ### 2.   The City's Violations of the Antifraud Provisions of the Securities Act and the Exchange Act

The City's public disclosures in the preliminary official statements and official statements for its 2002 and 2003 offerings, its 2003 continuing disclosures, and presentations to the rating agencies failed to disclose material information regarding the City's current funding of its pension and retiree health care obligations, the City's future pension and retiree health care obligations, and the City's ability to pay those future obligations. The omission of this information caused the information that was disclosed to be misleading.

This information was material to investors. The magnitude of the City's unfunded liabilities was enormous. For example, the City knew that by 2009 the unfunded liability would reach $1.9 billion and its actuarially required contribution would be approximately $240 million compared to $51 million in FY 2002. The City's under-funding of CERS and unfunded liabilities to CERS and for retiree health care were projected to continue to grow at an increasing rate. The increase in the City's under-funding and unfunded liabilities resulted, in part, from the City's decisions to increase pension and retiree health care benefits but push the costs of those increases into the future, to use CERS's prior earnings to cover additional benefits, and to pay a portion of the employees' contribution to CERS. All of this information raised a question whether the City could pay for these pension and retiree health care obligations and repay the bonds and notes issued by and on behalf of the City.

The City, through its officials, acted with scienter.[19] City officials who participated in drafting the misleading disclosure were well aware of the City's pension and retiree health care issues and the magnitude of the City's future liabilities. Moreover, even though the City officials knew that the City's pension issues were of concern to the rating agencies, they failed to disclose material information regarding the City's pension and retiree health care issues. In light of the City's officials' detailed knowledge of the magnitude of the City's pension and retiree health care liabilities and of the rating agencies' interest in those liabilities, the City officials acted recklessly in failing to disclose material information regarding those liabilities.

## F.   REMEDIAL EFFORTS AND UNDERTAKINGS

1.     Since 2005, Respondent has implemented several remedial measures with a view to detect and prevent securities violations. Specifically, the City has terminated certain officials in the City Manager's and Auditor and Comptroller's offices or has allowed them to resign. The City has filled these positions with new employees generally having significant relevant experience with

---

[19] The City's scienter is based on the mental state of its officials. SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1089 n.3 (2d Cir. 1972).

Exhibit 4
Page 19 of 22

other municipal governments or the private sector. The City has hired a full time municipal securities attorney who is responsible for coordinating the City's public disclosure and who has conducted continuing education for the City's deputy attorneys on the City's disclosure requirements.

2.     The Mayor resigned and has been replaced by a former City police chief. In January 2006, pursuant to a public referendum, the City changed from a strong city manager form of government to a strong mayor form of government.

3.     The City has hired new outside professionals including new auditors for its fiscal year audits. The City also hired individuals not affiliated with the City to act as the City's Audit Committee and charged the Committee with investigating the City's prior disclosure deficiencies and making recommendations to prevent future disclosure failures. The City has also hired new disclosure counsel for all of its future offerings, who will have better and more continuous knowledge on the City's financial affairs. This disclosure counsel has conducted seminars for City employees on their responsibilities under the federal securities laws.

4.     The City has also enacted ordinances designed to change the City's disclosure environment. First, the City created a Disclosure Practices Working Group, comprised of senior City officials from across city government. The Working Group is charged with reviewing the form and content of all the City's documents and materials prepared, issued, or distributed in connection with the City's disclosure obligations relating to securities issued by the City or its related entities; and conducting a full review of the City's disclosure practices and to recommend future controls and procedures. Second, the Mayor and City Attorney must now personally certify to the City Council the accuracy of the City's official statements. Third, the City Auditor must annually evaluate the City's internal financial controls and report the results to the City Council.

5.     Respondent shall comply with the following undertakings to:

a.     Retain, not later than 60 days after the date of this Order, at its expense, an independent consultant not unacceptable to the Commission's staff (the "Independent Consultant"). The City shall require the Independent Consultant to (a) conduct annual reviews for a three-year period of the City's policies, procedures, and internal controls regarding its disclosures for offerings, including disclosures made in its financial statements, pursuant to continuing disclosure agreements, and to rating agencies, the hiring of internal personnel and external experts for disclosure functions, and the implementation of active and ongoing training programs to educate appropriate City employees, including officials from the City Auditor and Comptroller's office, the City Attorney's office, the Mayor, and the City Council members regarding compliance with disclosure obligations; (b) make recommendations concerning these policies, procedures, and internal controls with a view to assuring compliance with the City's disclosure obligations under the federal securities laws; and (c) assess, in years two and three, whether the City is complying with its policies, procedures, and internal controls, whether the City has adopted any of the Independent Consultant's recommendations from prior year(s) concerning such policies, procedures, and internal controls for disclosures

Exhibit 4
Page 20 of 22

for offerings, and whether the new policies, procedures, and internal controls were effective in achieving their stated purposes;

b.  No later than 10 days following the date of the Independent Consultant's engagement, provide to the Commission staff a copy of an engagement letter detailing the Independent Consultant's responsibilities pursuant to paragraph 5(a) above;

c.  Arrange for the Independent Consultant to issue its first report within 120 days after the date of the engagement and the following two reports within 60 days following each subsequent one-year period from the date of engagement. Within 10 days after the issuance of the reports, the City shall require the Independent Consultant to submit to Kelly Bowers of the Commission's Pacific Regional Office a copy of the Independent Consultant's reports. The Independent Consultant's reports shall describe the review performed and the conclusions reached and shall include any recommendations deemed necessary to make the policies, procedures, and internal controls adequate and address the deficiencies set forth in Section III.D of the Order. The City may suggest an alternative method designed to achieve the same objective or purpose as that of the recommendation of the Independent Consultant provided that the City's Mayor and City Attorney certify in writing to the Commission staff that they have a reasonable belief that the alternative method is expected to have the same objective or purpose as that of the Independent Consultant's recommendation;

d.  Take all necessary and appropriate steps to adopt, implement, and employ the Independent Consultant's recommendations or the City's alternative method designed to achieve the same objective or purpose as that of the Independent Consultant's recommendation; and

e.  Require the Independent Consultant to enter into an agreement that provides that for the period of engagement and for a period of two years from completion of the engagement, the Independent Consultant shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with the City, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity; provided however, that the Independent Consultant may enter into an agreement with the City to serve as an independent monitor to oversee the City's remedial efforts with respect to enhanced accountability, greater transparency, increased fiscal responsibility, and independent oversight. Except as permitted above, the agreement will also provide that the Independent Consultant will require that any firm with which he/she is affiliated or of which he/she is a member, and any person engaged to assist the Independent Consultant in performance of his/her duties under this Order shall not, without prior written consent of the Pacific Regional Office, enter into any employment, consultant, attorney-client, auditing or other professional relationship with the City, or any of its present or former affiliates, directors, officers, employees, or agents acting in

Exhibit 4
Page 21 of 22

their capacity as such for the period of the engagement and for a period of two years after the engagement.

      6.    In determining whether to accept the City's Offer, the Commission considered these undertakings and remediation measures.

**IV.**

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in the City's Offer.

Accordingly, it is hereby ORDERED that:

      A.    The City cease and desist from committing or causing any violations and any future violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; and

      B.    The City comply with the undertakings enumerated in paragraph 5 of Section III.F. above.

By the Commission.

                              Nancy M. Morris
                              Secretary

22

Exhibit 4
Page 22 of 22

# EXHIBIT 5

TITLE: Anticipated Litigation – Significant Exposure: In the Matter of City of San Diego Bond Offerings
ACA Girard

DATE OF CLOSED SESSION:  September 21, 2004

[ ]  REAL PROPERTY NEGOTIATIONS G.C. § 54956.8
    [ ] Ongoing/Status Report
    [ ] Final Approval of Agreement (D)
        Substance of Agreement:
    [ ] Final Approval dependent upon other party

[x]  LITIGATION G.C. § 54956.9
    [ ] (a) Pending  [x] (b) (1) Significant Exposure [ ] (b) (2) Authorizing Session  [ ](c) Initiating
    [ ] Defend Litigation (D)                [x] Status Report
    [ ] Seek Appellate Review (D)       [ ] Refrain from Seeking Appellate Review (D)
    [ ] Amicus Participation              [ ] Other (see below)
    [ ] Settlement Offer To Be Conveyed     [ ] Acceptance of Signed Settlement Offer (D)
    [ ] Initiate Litigation or Intervene (D)   [ ] Contingent Acceptance of Signed Offer
    [ ] Non-Disclosure of Litigation Recommended  [ ] See Report
        (check if yes):
        [ ] Interfere with service of process
        [ ] Impair ability to settle

[ ]  CLAIMS DISPOSITION G.C. § 54956.95
    [ ] Offer Made      [ ] Offer Accepted    [ ] See Report

[ ]  DECISION ON EMPLOYMENT STATUS G.C. § 54957
    [ ] Appoint (D)  [ ] Employ (D)  [ ] Accept Resignation (D)  [ ] Discipline (D)
    [ ] Dismissal or Nonrenewal (disclose after exhaustion of administrative remedies) [ ] Performance Evaluation
    Title: _____
    Change in Compensation: _____

[ ]  LABOR NEGOTIATIONS G.C. § 54957.6     ATTENDEES:
    [ ] Ongoing/Status Report         [x]City Mgr   [ ]Asst City Mgr   [x]City Atty
    [ ] Final Approval of Agreement (D)    [ ]Exec Asst City Atty        [x]Asst City Atty (Girard)
    Other Party to Negotiation:        [ ]City Auditor
    Item Approved:            [x]Other:  Paul Maco, Rick Sauer, Mike Attanacio, John McNally,
                         Frank Devaney

[ ]  PUBLIC SECURITY THREAT G.C. § 54957

[x]  VOTE    [ ]  NO VOTE NECESSARY

| Name | Yes | No | Absent |
|---|---|---|---|
| District 1 | x | | |
| District 2 | x | | |
| District 3 | | | x |
| District 4 | | | Vacant |
| District 5 | x | | |
| District 6 | | | x |
| District 7 | x | | |
| District 8 | x | | |
| Mayor | x | | |
| Voting Tally | 6 | 0 | 2 |

COMMENTS: Motion to authorize team to negotiate with SEC for best deal possible, with caveat that City Council be included in deal with City and not be left to be dealt with separately.

APPROVED: _____

NOTE: (D) DISCLOSE FOLLOWING CLOSED SESSION

Exhibit 5
Page 1 of 1

# EXHIBIT 6



**COPY OF CD WILL BE DELIVERED TO THE COURT, COUNSEL FOR ALL PARTIES WILL RECEIVE A COPY UNDER SEPARATE COVER.**

Exhibit 6
Page 1 of 1

# EXHIBIT 7

*G l c*
*due*

(R-2003-1024) Rev. 1
03/10/03

RESOLUTION NUMBER R-_____ **297692**

ADOPTED ON ___ MAR 03 2003 ___

A RESOLUTION AUTHORIZING THE SALE OF NOT TO
EXCEED $22,000,000 CERTIFICATES OF PARTICIPATION
BY THE CITY OF SAN DIEGO, CALIFORNIA; APPROVING
A TRUST AGREEMENT, FACILITIES LEASE, SITE LEASE,
ASSIGNMENT AGREEMENT, ESCROW AGREEMENT,
FORM OF THE OFFICIAL BID FORM, THE NOTICE
INVITING BIDS, AND THE PRELIMINARY OFFICIAL
STATEMENT; AND AUTHORIZING AND DIRECTING
CERTAIN ACTIONS WITH RESPECT THERETO.

WHEREAS, the San Diego Facilities and Equipment Leasing Corporation [Corporation]

is a nonprofit public benefit corporation organized and existing under the laws of the State of

California with the authority to assist the City of San Diego [City] in the financing of public

facilities and improvements; and

WHEREAS, the City has proposed that the Corporation assist the City in the refinancing

of the acquisition, construction and installation of a portion of certain public improvements

proposed in Balboa Park and Mission Bay Park [Balboa Park and Mission Bay Park Capital

Improvements Program], which portion financed by the hereinafter described 1993 Certificates

constitutes the "1993 Project;" and

WHEREAS, the City and the Corporation have heretofore entered into a Facilities Lease,

dated as of November 1, 1993 [1993 Lease Agreement] pursuant to which the Corporation

agreed to lease to the City certain land and improvements located thereon consisting generally of

the North Torrey Pines Golf Course and the Balboa Park House of Charm, more particularly

described in the Site Lease and Facilities Lease described herein [Facilities]; and

-PAGE 1 OF 10-

Exhibit 7
Page 1 of 11

WHEREAS, the Corporation and the City have previously entered into certain agreements with respect to the execution and delivery of the $27,985,000 City of San Diego, California, Certificates of Participation (Balboa Park and Mission Bay Park Capital Improvement Program) Series 1993 [1993 Certificates], which 1993 Certificates evidenced undivided proportionate interests in lease payments made pursuant to the terms the 1993 Lease Agreement; and

WHEREAS, the City desires to prepay the 1993 Lease Agreement and to hereby defease and refinance the 1993 Certificates to achieve discounted present value reductions in scheduled lease payments; and

WHEREAS, the City wishes to enter into certain leases and other agreements and authorize the sale of 2003 Certificates of Participation (1993 Balboa Park/Mission Bay Park Refunding) [2003 Certificates] under the Trust Agreement described below in order to refinance the 1993 Project; and

WHEREAS, it has been proposed that the City lease the same land and improvements [Facilities] to the Corporation, which were the subject of the 1993 Lease Agreement, pursuant to a Site Lease, dated as of May 1, 2003 (or such other date as the City Manager may select for convenience of reference), by and between the City and the Corporation [Site Lease], the form of which has been presented to this City Council, which will grant the Corporation the right to use the Facilities for a term not to exceed 32 years, for which the Corporation will make a lump sum advance rental payment which will be used by the City for the prepayment of the 1993 Lease and the refinancing of the 1993 Project; and

WHEREAS, it has been proposed that the City lease back the Facilities from the Corporation pursuant to an amended and restated Facilities Lease, dated as of May 1, 2003 (or such other date as the City Manager may select for convenience of reference), by and between the

-PAGE 2 OF 10-

Exhibit 7
Page 2 of 11

City and the Corporation [Facilities Lease], the form of which has been presented to this City

Council, pursuant to which the City will agree to lease the Facilities, for a term not to exceed 32

years, from the Corporation and to make certain lease payments [Lease Payments] in connection

therewith; and

WHEREAS, as a financing mechanism, Certificates of Participation [2003 Certificates]

will be executed and delivered evidencing the proportionate interests of the owners thereof in the

Lease Payments to be made by the City to the Corporation under the Facilities Lease; and

WHEREAS, it has been proposed that the Corporation grant, assign and transfer all of its

right to receive the Lease Payments under the Facilities Lease from the City to Wells Fargo Bank,

N.A., as Trustee [Trustee] pursuant to an Assignment Agreement, dated as of May 1, 2003 (or

such other date as the City Manager may select for convenience of reference), by and between the

Corporation and the Trustee [Assignment Agreement], the form of which has been presented to

this City Council, for the purpose of paying the interest components and principal components on

the Certificates; and

WHEREAS, the Corporation and the City have determined that it would be in the best

interest of the Corporation, the City and citizens of the community to authorize, pursuant to the

Trust Agreement, dated as of May 1, 2003 (or such other date as the City Manager may select for

convenience of reference), by and among the Corporation, the Trustee and the City [Trust

Agreement], the form of which has been presented to this City Council, the preparation,

execution, sale and delivery of Certificates of Participation in an amount not to exceed

$22,000,000 [Certificates] which represent direct and proportionate interests in the principal

components and interest components of the Lease Payments; and

Exhibit 7
Page 3 of 11

WHEREAS, in connection therewith, the City Council of the City has introduced Ordinance No. 0-_____ (N.S.), entitled "AN ORDINANCE PURSUANT TO SECTION 99 OF THE CITY CHARTER AUTHORIZING A FACILITIES LEASE AND SITE LEASE WITH SAN DIEGO FACILITIES AND EQUIPMENT LEASING CORPORATION AND A TRUST AGREEMENT, AND APPROVING THE FORM OF AN ASSIGNMENT AGREEMENT RELATING TO THE DELIVERY OF CERTIFICATES OF PARTICIPATION IN AN AMOUNT NOT TO EXCEED $22,000,000 FOR A TERM NOT EXCEEDING 32 YEARS (1993 BALBOA PARK/MISSION BAY PARK REFUNDING), AND SUCH OTHER NECESSARY ACTIONS IN CONNECTION THEREWITH" [Ordinance]; and

WHEREAS, pursuant to the City's authorization there has been prepared and presented to this City Council a Preliminary Official Statement containing information material to the offering and sale of the Certificates; and

WHEREAS, the Preliminary Official Statement has been filed with this City, and the members of the City Council, with the aid of its staff and the Financial Advisors to the City, have reviewed said Preliminary Official Statement; and

WHEREAS, the City Council wishes to approve certain aspects of the Bonds to be issued by the Authority for the Project, including the form of Official Statement to be utilized in connection with the offering of the Bonds [Official Statement], the form of Escrow Agreement, the form of the Official Bid Form and the Notice Inviting Bids to be distributed to potential Purchasers of the Bonds and the form of Continuing Disclosure Agreement providing for certain continuing disclosure by the City of pertinent financial information related to the refunding bonds; and

-PAGE 4 OF 10-

Exhibit 7
Page 4 of 11

WHEREAS, the City deems it necessary and proper that proposals be invited for the purchase of the Certificates and that the Certificates be sold in the manner described below; and

WHEREAS, as a result of the sale and delivery of the 2003 Certificates, and the substitution of a surety policy for monies on deposit in the Reserve Fund for the 1993 Certificates, the City anticipates it will save approximately $2.3 million in projected budgetary savings [Savings] in fiscal years 2003-2004 and 2004-2005; NOW, THEREFORE,

BE IT RESOLVED, by the Council of the City of San Diego, as follows:

1. That this Council hereby authorizes the preparation, execution, sale and delivery of Certificates of Participation in an aggregate principal amount not to exceed $22,000,000 in accordance with the terms and provisions of the Trust Agreement, subject to the execution and delivery of the Trust Agreement, the Facilities Lease, the Site Lease, and the Assignment Agreement in substantially the form approved by Ordinance No. 0-_____ (N.S.), copies of which are on file as Document Nos. 00-_____-1, 00-_____-2, 00-_____-3, and 00-_____-4, respectively. The proceeds of the Certificates of Participation shall be deposited with the Trustee and applied as provided in the Trust Agreement.

2. Wells Fargo Bank, N.A. is hereby appointed as Trustee on behalf of the owners of the Certificates of Participation with the duties and powers of such trustee as set forth in the Trust Agreement.

3. The City Manager, the Deputy City Manager, and their authorized designees, the City Clerk and such other officers of the City are authorized and directed, jointly and severally, to do any and all things to execute and deliver any and all documents which they may deem necessary and advisable in order to consummate the sale and delivery of the Certificates of Participation and

Exhibit 7
Page 5 of 11

otherwise effectuate the purposes of this Resolution, and such actions previously taken by such officers are hereby ratified and confirmed.

4. The City Clerk is hereby authorized and directed to cause the Notice Inviting the Bids approved in Section 6, below, to be published once, to the extent required by law, at least fifteen days prior to the earliest date for receiving proposals provided for therein, in The San Diego Daily Transcript, the official newspaper of the City, with such changes, insertions and omissions as the City Clerk may approve, such approval to be conclusively evidenced by such publication of the Notice Inviting Bids. The City Clerk shall also cause to be published in The Bond Buyer once, at least ten days prior to the earliest date for receiving proposals provided for therein, a short form Notice of Sale of the Certificates, in a form acceptable to the City Manager based on the recommendation of the Financial Advisors.

5. Sealed proposals for the purchase of the Certificates shall be received by the Treasurer of the City at the time and place provided for in the Notice Inviting Bids as hereinafter approved or such other as the City Manager may select based on the advice of the City's Financial Advisors. The President of the Corporation, or his authorized designee, is hereby authorized and directed for and on behalf of the Corporation to award sale of the Certificates within 26 hours of the receipt of bids to the responsible bidder offering the lowest true interest cost to the City, all as determined by the Treasurer, in consultation with the City's Financial Advisors, with the right being reserved to reject any and all bids; provided that the aggregate principal amount of the Certificates shall not exceed Twenty-Two Million Dollars ($22,000,000), the stated interest rate for any maturity of Certificates may not exceed the maximum rate allowed by law, and scheduled debt services with respect to the Certificates shall be less, on a discounted, present value basis, than scheduled debt service with respect to the 1993 Certificates. The City Treasurer is hereby

Exhibit 7
Page 6 of 11

authorized and directed to deliver the Certificates to the successful bidder upon payment therefor

at the purchase price specified in the attached bid, including accrued interest to the date of

delivery, and to undertake any and all acts necessary or desirable to accomplish the purpose of

this resolution.

6. The form, terms and provisions of the Notice Inviting Bids, in substantially the form

submitted to this meeting, a copy of which is on file as Document No. RR-297692, are

hereby approved and adopted as part of this Resolution. The City Manager, the Deputy City

Manager, and their authorized designees, are hereby authorized and directed to cause such Notice

Inviting Bids to be printed with such changes, insertions and omissions as the City Manager, the

Deputy City Manager, and their authorized designees, may approve, such approval to be

conclusively evidenced by the final printing of the Notice Inviting Bids and Official Bid Form.

7. The form of the Escrow Agreement [Escrow Agreement] among the City, the

Corporation and BNY Western Trust Company, [Escrow Bank] in substantially the form

submitted to this meeting, a copy of which is on file as Document No. RR-_____-2, is hereby

297692

approved. The City Manager, the Deputy City Manager, and their authorized designees, are

hereby authorized and directed, for and in the name and on behalf of the City, to execute and

deliver to the Corporation and the Escrow Bank the Escrow Agreement in substantially said form,

with such changes therein as the City Manager, the Deputy City Manager, and their authorized

designees, may require or approve, such approval to be conclusively evidenced by the execution

and delivery thereof by the City Manager, the Deputy City Manager, or their authorized

designees.

8. The form of the Continuing Disclosure Agreement between the City, on behalf of the

Corporation, and the Trustee [Continuing Disclosure Agreement], in substantially the form

Exhibit 7
Page 7 of 11

297692

submitted to this meeting, a copy of which is on file as Document No. RR-_____-3, is hereby

approved. The City Manager, the Deputy City Manager, and their authorized designees, are

hereby authorized and directed, for and in the name and on behalf of the City, to execute and

deliver to the Trustee the Continuing Disclosure Agreement in substantially said form, with such

changes therein as the City Manager, the Deputy City Manager, or their authorized designees,

executing such document may require or approve, such approval to be conclusively evidenced by

the execution and delivery thereof.

9. The City Manager, Deputy City Manager, City Clerk, and their authorized designees,

and other officials of the City are hereby authorized and directed to execute such other

agreements, documents and certificates as may be necessary to effect the purpose of this

resolution and the financing herein authorized. Without limiting the foregoing, the City Manager,

the Deputy City Manager and their authorized designees are hereby authorized (i) to solicit and

accept bids for municipal bond insurance for the 2003 Certificates and/or a surety for reserve

related to all or part of any reserve requirements related to the 2003 Certificates; (ii) to finalize

the form of such policy and/or surety; and (iii) if it is determined that the policy and the surety will

result in interest rate or loan payment savings for the City, to pay the insurance premium of such

policy and/or surety from the proceeds of the issuance and sale of the Certificates and to enter

into a reimbursement agreement relative to such surety with the provider thereof.

10. The Preliminary Official Statement, a copy of which is on file as Document

297692

No. RR–_____–4, is approved for distribution in the offering and sale of Certificates of

Participation evidencing proportionate interests of the holders thereof in Lease Payments to be

made by the City under the Facilities Lease and any distribution of the Preliminary Official

Statement by the Financial Advisors prior to the date hereof is ratified and approved. The City

Exhibit 7
Page 8 of 11

Manager is hereby authorized to execute a certificate evidencing his determination, on behalf of the City, that he deems final within the meaning of Rule 15c2-12 of the Securities Exchange Act of 1934, the Preliminary Official Statement describing the Certificates.

11. The City Manager, the Deputy City Manager, and their authorized designees, are authorized to approve corrections and additions to the Preliminary Official Statement by supplement or amendment thereto, or otherwise as appropriate, provided that any such corrections or additions shall be necessary to cause the information contained therein to conform with facts material to the Certificates, or to the proceedings of the City, or such corrections or additions are in form rather than in substance.

12. The City Manager, the Deputy City Manager, and their authorized designees, are authorized and directed to cause the Preliminary Official Statement to be brought into the form of a Final Official Statement and to execute said Final Official Statement, dated as of the date of the sale of the Certificates. The City Manager, the Deputy City Manager, and their authorized designees, are further authorized and directed to execute a statement that the facts contained in the Final Official Statement, and any supplement or amendment thereto (which shall be deemed an original part thereof for the purpose of such statement) were, at the time of sale of the Certificates, true and correct in all material respects and that the Final Official Statement did not, on the date of sale of the Certificates, and does not, as of the date of delivery of the Certificates, contain any untrue statement of a material fact with respect to the City required to be stated where necessary to make a statement not misleading in light of the circumstances under which it was made. The City Manager, the Deputy City Manager, and their authorized designees, shall take such further actions prior to the signing of the statement as are deemed necessary or appropriate to verify the accuracy of the statement.

-PAGE 9 OF 10-

Exhibit 7
Page 9 of 11

13.  The City Manager shall deposit the projected Savings in a reserve fund [Reserve Fund] to be used for capital projects in Mission Bay and Balboa Park; provided, however, during the annual review of the City's budget, the Council will determine how the Savings will be allocated in the annual appropriations ordinance and may allocate such funds for other purposes than capital projects in Mission Bay and Balboa Park.

14.  This Resolution shall become effective on the effective date of Ordinance No. 0-_19161_

APPROVED:  CASEY GWINN, City Attorney

By _____
       Kelly J. Salt
       Deputy City Attorney

KJS:pev
2/18/03
2/27/03 Cor.Copy
3/10/03 Rev.1
Or.Dept:Fin.Svcs.
Aud.Cert:N/A
R-2003-1024

-PAGE 10 OF 10-

Exhibit 7
Page 10 of 11

Passed and adopted by the Council of The City of San Diego on _____ MAR 0 3 2003 _____
by the following vote:

| Council Members | Yeas | Nays | Not Present | Ineligible |
|---|---|---|---|---|
| Scott Peters | ☑ | ☐ | ☐ | ☐ |
| Michael Zucchet | ☑ | ☐ | ☐ | ☐ |
| Toni Atkins | ☑ | ☐ | ☐ | ☐ |
| Charles L. Lewis | ☑ | ☐ | ☐ | ☐ |
| Brian Maienschein | ☑ | ☐ | ☐ | ☐ |
| Donna Frye | ☑ | ☐ | ☐ | ☐ |
| Jim Madaffer | ☑ | ☐ | ☐ | ☐ |
| Ralph Inzunza | ☑ | ☐ | ☐ | ☐ |
| Mayor Dick Murphy | ☑ | ☐ | ☐ | ☐ |

AUTHENTICATED BY:

DICK MURPHY
_____
Mayor of The City of San Diego, California.

(Seal)

CHARLES G. ABDELNOUR
_____
City Clerk of The City of San Diego, California.

By _____, Deputy.

---

Office of the City Clerk, San Diego, California

Resolution
Number   R-297692        Adopted   MAR 0 3 2003

Exhibit 7
Page 11 of 11

# EXHIBIT 8



# CITY OF SAN DIEGO

## Fiscal Year 20 09

# PROPOSED BUDGET

## VOLUME I    Budget Overview and Schedules

### TABLE OF CONTENTS

| | |
|---|---|
| Mayor's Budget Message | v |
| Executive Summary | 1 |
| Fiscal Recovery | 21 |
| Fiscal Policies | 29 |
| Service Impacts | 35 |
| Business Process Reengineering and Managed Competition | 51 |
| City Management Program | 55 |
| General Fund Revenues | 61 |
| Debt Obligations | 85 |
| Financial Summary and Schedules | 91 |
| Capital Improvements Program | 117 |
| City Agencies | 123 |
| Glossary | 135 |

**Jerry Sanders**
Mayor

**Scott Peters**
Council President
District 1

**Toni Atkins**
Councilmember
District 3

**Brian Maienschein**
Councilmember
District 5

**Jim Madaffer**
Council President Pro Tem
District 7

**Kevin Faulconer**
Councilmember
District 2

**Anthony Young**
Councilmember
District 4

**Donna Frye**
Councilmember
District 6

**Benjamin Hueso**
Councilmember
District 8

**Jay M. Goldstone**
Chief Operating Officer

**Michael J. Aguirre**
City Attorney

Prepared by Financial Management
This information is available in alternative formats upon request
Printed on Recycled Paper

Exhibit 8
Page 1 of 2

# Debt Obligations

## TABLE 1 – SUMMARY OF DEBT OBLIGATIONS

| | | Projected Principal Outstanding 6/30/2008 | Projected FY 2009 Debt/Lease Payment | Final Maturity | Primary Funding Source |
|---|---|---|---|---|---|
| **GENERAL OBLIGATION BONDS** | | | | | |
| 1991 | San Diego General Obligation Bonds (Public Safety Communications Project) | $8,170,000 | $2,332,273 | FY 2012 | Property Tax |
| 1994 | San Diego Open Space Facilities District No. 1 Refunding Series | $410,000 | $434,600 | FY 2009 | Franchise Fees |
| | **Subtotal General Obligation Bonds** | **$8,580,000** | **$2,766,873** | | |
| **GENERAL FUND BACKED LEASE-REVENUE OBLIGATIONS** | | | | | |
| **Certificates of Participation** | | | | | |
| 1996A | Certificates of Participation Balboa Park/ Mission Bay Park Improvements Program | $9,760,000 | $3,529,135 | FY 2011 | Transient Occupancy Tax |
| 1996B | Refunding Certificates of Participation Balboa Park/Mission Bay Park Improvements Program | $8,445,000 | $877,130 | FY 2022 | Transient Occupancy Tax |
| 2003 | 1993 Balboa Park/Mission Bay Park Improvements Program Refunding Certificates of Participation | $10,490,000 | $2,156,739 | FY 2024 [1] | Transient Occupancy Tax |
| **Lease Revenue Bonds** | | | | | |
| 1994 | City/MTDB Authority Refunding - Bayside Trolley Extension | $5,390,000 | $2,925,813 | FY 2010 | Transient Occupancy Tax |
| 1996 | Qualcomm (Jack Murphy) Stadium | $57,775,000 | $5,769,853 | FY 2027 | Stadium Revenues & Transient Occupancy Tax |
| 1998 | Convention Center Expansion Authority | $173,355,000 | $13,698,438 | FY 2028 | Transient Occupancy Tax & Port Authority Contribution |
| 2002B | Fire and Life Safety Facilities Project | $22,805,000 | $1,611,208 | FY 2032 | Safety Sales Tax |
| 2003 | 1993 City/MTDB Authority Refunding - Old Town Trolley Extension | $12,775,000 | $1,151,224 | FY 2023 | Transient Occupancy Tax |
| 2007A | Ballpark Refunding Bonds | $152,765,000 | $11,314,500 | FY 2032 | Transient Occupancy Tax & Centre City Development Corporation [6] |
| | Subtotal General Fund Backed Lease-Revenue Obligations | **$453,560,000** | **$43,034,039** | | |
| | **TOTAL GENERAL FUND OBLIGATIONS** | **$462,140,000** | **$45,800,912** | | |
| **WASTEWATER AND WATER SYSTEM OBLIGATIONS [2]** | | | | | |
| **Wastewater System Obligations** | | | | | |
| 1993 | Sewer Revenue Bonds | $167,955,000 | $16,319,000 | FY 2023 | Net Wastewater System Revenues |
| 1995 | Sewer Revenue Bonds | $265,540,000 | $23,585,016 | FY 2025 | Net Wastewater System Revenues |
| 1997 | Sewer Revenue Bonds | $196,800,000 | $16,636,723 | FY 2027 | Net Wastewater System Revenues |
| 1999 | Sewer Revenue Bonds | $263,400,000 | $20,514,898 | FY 2029 | Net Wastewater System Revenues |
| 2007 | Sewer Revenue Notes (Short Term Private Placement) [3] | $223,830,000 | $11,191,500 | FY 2009 | Net Wastewater System Revenues |
| **Water System Obligations** | | | | | |
| 1998 | Water Certificates of Undivided Interest | $254,075,000 | $21,353,503 | FY 2028 | Net Water System Revenues |
| 2002 | Subordinated Water Revenue Bonds | $277,675,000 | $18,036,568 | FY 2032 | Net Water System Revenues |
| 2007 | Subordinated Water Revenue Notes (Private Placement) [4] | $57,000,000 | $2,307,772 | FY 2009 | Net Water System Revenues |
| 2008 | Subordinated Water Revenue Notes (Private Placement) [5] | $150,000,000 | $4,551,000 | FY 2010 | Net Water System Revenues |
| | **TOTAL WATER AND WASTEWATER SYSTEM OBLIGATIONS** | **$1,856,275,000** | **$134,495,980** | | |

[1] The 2003 Balboa Park/Mission Bay Park Refunding Series consists of 2 underlying leases - (a) The North Course Torrey Pines lease (terminates in FY 2009); and (b) The House of Charm lease (terminates in FY 2024).
[2] In addition to the debt obligations, the Water and Wastewater Systems have outstanding State Revolving Fund (SRF) loan obligations. As of 6/30/08, principal outstanding in Water SRF loans is projected at $19.8 million, and principal outstanding in Wastewater SRF loans is projected at $87.9 million.
[3] Interest only payments; principal due 5/15/2009.
[4] Interest only payments; principal due 1/30/09.
[5] Interest only payments; principal due 8/29/09.
[6] $5 million contributed by the Centre City Development Corporation for Fiscal Year 2009.

City of San Diego
Fiscal Year 2009 Proposed Budget

Exhibit 8
Page 2 of 2