# EXHIBIT 9

$17,425,000
**CITY OF SAN DIEGO**
**2003 CERTIFICATES OF PARTICIPATION**
**(1993 BALBOA PARK/MISSION BAY PARK REFUNDING)**

**CLOSING INDEX**

**BASIC DOCUMENTS**

1. Site and Facilities Lease

2. Facilities Lease

3. Trust Agreement

4. Assignment Agreement

5. Escrow Agreement

6. Subordination Agreement (3)

7. Notice Inviting Bids

8. Preliminary Official Statement

9. Official Statement

10. Continuing Disclosure Agreement

**CITY CLOSING DOCUMENTS**

11. CDIAC Notice of Proposed Debt Issuance, Acknowledgment from CDIAC and Notice of Final Sale

12. City Incumbency/Signature Certificate

13. Certificate Re Compliance with Section 147(f), together with Proof of Publication

14. Closing Certificate of the City

15. Rule 15c2-12 Certificate

16. Certificate of City Accepting Bid, together with winning bid form

17. Instructions to Trustee

18. Written Costs of Issuance Requisition

19. Tax Certificate with TEFRA Notice and Approval, Certificates of the Underwriter, Insurer and Non-Profits; IRS Form 8038-G

20. Certificate Re Insurance, together with Evidences of Insurance

1

Exhibit 9
Page 1 of 165

21.     Certificate Re Subordination Agreements

22.     Certificate Regarding Permitted Encumbrances

23.     DTC Letter of Representations

24.     Specimen COP

25.     Irrevocable Instructions and Request to Prior Trustee

**CORPORATION CLOSING DOCUMENTS**

26.     Corporation Incumbency/Signature Certificate

27.     Certificate of the Secretary/Treasurer, together with (a) Articles of Incorporation, as restated and amended, and Bylaws; Certificate of Status Domestic Corporation (Good Standing Certificate); California Franchise Tax Board Exempt Letter of Good Standing

28.     Closing Certificate of the Corporation

**RESOLUTIONS**

29.     Resolution No. R-297875 entitled "Resolution of the Council of the City of San Diego Approving the Execution and Delivery of Certificates of Participation For the Balboa Park/.Mission Bay Park Refunding," adopted on April 21, 2003; Excerpt of Minutes of the April 21, 2003 meeting.

30.     Resolution No. R-297692 entitled "A Resolution Authorizing the Sale of Not to Exceed $22,000,000 Certificates of Participation by the City of San Diego, California; Approving a Trust Agreement, Facilities Lease, Site Lease, Assignment Agreement, Escrow Agreement, Form of the Official Bid Form, the Notice Inviting Bids, and the Preliminary Official Statement; and Authorizing and Directing Certain Actions With Respect Thereto," adopted on March 3, 2003; Minutes of the March 3, 2003 meeting.

31.     Ordinance No. O-19161 (New Series) entitled "An Ordinance of the Council of the City of San Diego Pursuant to Section 99 of the City Charter Authorizing a Facilities Lease and Site Lease With San Diego Facilities and Equipment Leasing Corporation and a Trust Agreement and Approving the Form of an Assignment Agreement Relating to the Delivery of Certificates of Participation in an Amount Not to Exceed $22,000,000 for a Term Not Exceeding 32 Years (1993 Balboa Park/Mission Bay Park Refunding) and Such Other Necessary Actions in Connection Therewith," adopted on March 17, 2003; Minutes of the March 17, 2003 meeting.

32.     Resolution No. FELC-2003-4 of the San Diego Facilities and Equipment Leasing Corporation entitled "A Resolution of the Board of Directors of the San Diego Facilities and Equipment Leasing Corporation Authorizing the Sale of Not to Exceed $22,000,000 Aggregate Principal Amount of Certificates of Participation; Approving a Trust Agreement, Facilities Lease, Site Lease, Assignment Agreement and Form of the Official Notice Inviting Bids and Official Bid Form; and Authorizing and Directing Certain Actions With Respect Thereto," adopted on March 20, 2003; Minutes of the March 20, 2003 meeting.

**TRUSTEE CLOSING DOCUMENTS**

33. Assistant Secretary's Certificate Re Signatures

34. Closing Certificate of Trustee

35. Trustee's Receipt for Proceeds of Certificates of Participation

**ESCROW BANK CLOSING DOCUMENTS**

36. Secretary's Certificate, together with Extract of By-laws and Official Signing Powers Authorities Certificate

37. Closing Certificate of the Escrow Bank

38. Escrow Bank's Receipt

**INSURER DOCUMENTS**

39. Specimen Financial Guaranty Insurance Policy

40. Specimen Surety Bond

41. Guaranty Agreement

42. Rating Letters (6)

**OPINIONS OF COUNSEL**

43. Approving Opinion of Special Counsel

44. Reliance Letter to Trustee and Insurer

45. Supplemental Opinion

46. Defeasance Opinion

47. Opinion of Special Counsel Re Guaranty Agreement

48. Opinion of the City Attorney

49. Opinion of Corporation's Counsel

50. Opinion of Trustee's Counsel

51. Opinion of Insurer's Counsel

**DOCUMENTS RELATING TO 501(c)(3) CORPORATIONS**

52. Certificates of Non-Profit Corporations

53. Opinions of Counsel to Non-Profit Corporations

**MISCELLANEOUS DOCUMENTS**

54. Underwriter's Receipt for Certificates of Participation

55. Verification Report

56. Affidavit of Publication in the *San Diego Daily Transcript* of the Notice of Public Hearing and Summary of Ordinance No. O-19161 (New Series)

57. Affidavit of Publication in the *San Diego Daily Transcript* and *The Bond Buyer* of the Notice of Intention to Sell Certificates of Participation

58. Letter of Instructions to Title Company

59. Termination of 1993 Site and Facilities Lease

60. Termination of 1993 Facilities Lease

61. Termination of 1993 Assignment Agreement

62. CLTA Leasehold Title Insurance Policy

63. Distribution List

**8**

Exhibit 9
Page 5 of 165

**PRELIMINARY OFFICIAL STATEMENT DATED MAY 22, 2003**

NEW ISSUE - BOOK-ENTRY-ONLY

INSURED RATINGS/UNDERLYING RATINGS:
Fitch: AAA/AA+
Moody's: Aaa/Aa3
Standard & Poor's: AAA/AA-
(See "RATINGS" herein)

*In the opinion of Stradling Yocca Carlson & Rauth, a Professional Corporation, Newport Beach, California ("Special Counsel"), under existing statutes, regulations, rulings and judicial decisions, and assuming the accuracy of certain representations and compliance with certain covenants and requirements described herein, the interest (and original issue discount) due with respect to the Certificates is excluded from gross income for federal income tax purposes and is not an item of tax preference for purposes of calculating the federal alternative minimum tax imposed on individuals and corporations. In the further opinion of Special Counsel, the interest (and original issue discount) due with respect to the Certificates is exempt from State of California personal income tax. See "TAX EXEMPTION" herein.*

$17,325,000[*]
**CITY OF SAN DIEGO**
**2003 Certificates of Participation**
**(1993 Balboa Park/Mission Bay Park Refunding)**
Evidencing Undivided Proportionate Interests in Lease Payments to be Made by the
**CITY OF SAN DIEGO**
Pursuant to a Lease with the
**SAN DIEGO FACILITIES AND EQUIPMENT LEASING CORPORATION**

Dated: Date of Delivery                                                    Due: November 1, as shown on the inside cover

The City of San Diego (the "City") 2003 Certificates of Participation (1993 Balboa Park/Mission Bay Park Refunding) (the "Certificates") are being executed and delivered to (i) refund the City's outstanding Certificates of Participation (Balboa Park and Mission Bay Park Capital Improvements Program), Series 1993, (ii) acquire a debt service reserve fund surety bond and a financial guaranty insurance policy for the Certificates, and (iii) pay the costs of issuance incurred in connection with the execution and delivery of the Certificates. See "THE REFUNDING PLAN" herein. The Certificates represent undivided proportionate interests of the Owners in the lease payments (the "Lease Payments") to be made by the City to the San Diego Facilities and Equipment Leasing Corporation (the "Corporation"), under the Facilities Lease Agreement, dated as of June 1, 2003, by and between the City and the Corporation (the "Lease Agreement") pursuant to which the City will lease the North Torrey Pines Golf Course and the Balboa Park House of Charm (collectively, the "Site") from the Corporation. See "DESCRIPTION OF THE SITE" herein.

Interest represented by the Certificates is payable semiannually on May 1 and November 1 of each year, commencing on November 1, 2003. The Certificates will be executed and delivered in the principal amount of $5,000 and any integral multiple thereof. See "THE CERTIFICATES – General" herein. The Certificates will be executed and delivered in book-entry form only and, when delivered, will be registered in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"), which will act as securities depository for the Certificates. Individual purchases of the Certificates will be made in book-entry form only. Purchasers of the Certificates will not receive certificates representing their ownership interests in the Certificates purchased. Principal, premium, if any, and interest payments due with respect to the Certificates are payable directly to DTC by Wells Fargo Bank, National Association, as Trustee. Upon receipt of payments of principal, premium, if any, and interest, DTC will in turn distribute such payments to the beneficial owners of the Certificates. See Appendix G — "DTC BOOK-ENTRY SYSTEM" herein.

**The Certificates are subject to extraordinary, optional and mandatory prepayment prior to maturity, as described herein. See "THE CERTIFICATES – Prepayment" herein.**

THE CERTIFICATES DO NOT CONSTITUTE AN OBLIGATION OF THE CORPORATION OR THE CITY FOR WHICH THE CORPORATION OR THE CITY IS OBLIGATED TO LEVY OR PLEDGE ANY FORM OF TAXATION OR FOR WHICH THE CORPORATION OR THE CITY HAS LEVIED OR PLEDGED ANY FORM OF TAXATION. THE OBLIGATION OF THE CITY TO MAKE LEASE PAYMENTS UNDER THE LEASE AGREEMENT DOES NOT CONSTITUTE AN OBLIGATION OF THE CITY FOR WHICH THE CITY IS OBLIGATED TO LEVY OR PLEDGE ANY FORM OF TAXATION OR FOR WHICH THE CITY HAS LEVIED OR PLEDGED ANY FORM OF TAXATION. NEITHER THE CERTIFICATES NOR THE OBLIGATION OF THE CITY TO MAKE LEASE PAYMENTS CONSTITUTES AN INDEBTEDNESS OF THE CORPORATION, THE CITY, THE STATE OF CALIFORNIA OR ANY POLITICAL SUBDIVISION THEREOF WITHIN THE MEANING OF ANY CONSTITUTIONAL OR STATUTORY DEBT LIMITATION OR RESTRICTION.

Payment of the principal of and interest represented by the Certificates when due will be insured by a financial guaranty insurance policy to be issued by Ambac Assurance Corporation, a Wisconsin-domiciled stock insurance corporation, simultaneously with the delivery of the Certificates. See "CERTIFICATE INSURANCE" herein.

**Ambac**

The purchase of the Certificates involves certain risks which should be considered by investors. See "RISK FACTORS" for a discussion of certain risk factors that should be considered in addition to the other matters set forth herein.

**This cover page contains information for quick reference only. It is not a summary of this issue. Potential purchasers must read the entire Official Statement to obtain information essential to making an informed investment decision.**

MATURITY SCHEDULE
(See Inside Cover Page)

*The Certificates will be offered when, as and if executed and delivered, and received by the Underwriter, subject to the approval as to their legality by Stradling Yocca Carlson & Rauth, a Professional Corporation, Newport Beach, California, Special Counsel, and certain other conditions. Certain legal matters will be passed upon for the City by the City Attorney and for the Corporation by Foley & Lardner, San Diego, California. It is anticipated that the Certificates will be available in book-entry form for delivery to DTC in New York, New York, on or about June 17, 2003.*

Dated: May ___, 2003

[*] *Preliminary, subject to change.*

This Preliminary Official Statement and the information contained herein are subject to completion or amendment. These securities may not be sold, nor may offers to buy them be accepted, prior to the time the Official Statement is delivered in final form. Under no circumstances shall this Preliminary Official Statement constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of, these securities in any jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration, qualification or filing under the securities laws of any such jurisdiction.

Exhibit 9
Page 6 of 165

$17,325,000[*]
**CITY OF SAN DIEGO**
2003 Certificates of Participation
(1993 Balboa Park/Mission Bay Park Refunding)
Evidencing Undivided Proportionate Interests in Lease Payments to be Made by the
**CITY OF SAN DIEGO**
Pursuant to a Lease with the
**SAN DIEGO FACILITIES AND EQUIPMENT LEASING CORPORATION**

Maturity Schedule[*]
$17,325,000[*] Serial Certificates

| Maturity (November 1) | Principal Amount | Interest Rate | Price |
|---|---|---|---|
| 2003 | $ 455,000 | | |
| 2004 | 1,115,000 | | |
| 2005 | 1,715,000 | | |
| 2006 | 1,740,000 | | |
| 2007 | 1,775,000 | | |
| 2008 | 1,815,000 | | |
| 2009 | 445,000 | | |
| 2010 | 460,000 | | |
| 2011 | 475,000 | | |
| 2012 | 490,000 | | |
| 2013 | 505,000 | | |
| 2014 | 525,000 | | |
| 2015 | 550,000 | | |
| 2016 | 575,000 | | |
| 2017 | 590,000 | | |
| 2018 | 615,000 | | |
| 2019 | 640,000 | | |
| 2020 | 665,000 | | |
| 2021 | 695,000 | | |
| 2022 | 725,000 | | |
| 2023 | 755,000 | | |

---

[*] *Preliminary, subject to change.*

Exhibit 9
Page 7 of 165

$17,325,000[*]
**CITY OF SAN DIEGO**
**2003 Certificates of Participation**
**(1993 Balboa Park/Mission Bay Park Refunding)**
**Evidencing Undivided Proportionate Interests in Lease Payments to be Made by the**
**CITY OF SAN DIEGO**
**Pursuant to a Lease with the**
**SAN DIEGO FACILITIES AND EQUIPMENT LEASING CORPORATION**

**Maturity Schedule[*]**
$17,325,000[*] Serial Certificates

| Maturity (November 1) | Principal Amount | Interest Rate | Price |
|---|---|---|---|
| 2003 | $ 455,000 | | |
| 2004 | 1,115,000 | | |
| 2005 | 1,715,000 | | |
| 2006 | 1,740,000 | | |
| 2007 | 1,775,000 | | |
| 2008 | 1,815,000 | | |
| 2009 | 445,000 | | |
| 2010 | 460,000 | | |
| 2011 | 475,000 | | |
| 2012 | 490,000 | | |
| 2013 | 505,000 | | |
| 2014 | 525,000 | | |
| 2015 | 550,000 | | |
| 2016 | 575,000 | | |
| 2017 | 590,000 | | |
| 2018 | 615,000 | | |
| 2019 | 640,000 | | |
| 2020 | 665,000 | | |
| 2021 | 695,000 | | |
| 2022 | 725,000 | | |
| 2023 | 755,000 | | |

---

[*] *Preliminary, subject to change.*

Exhibit 9
Page 8 of 165

This Preliminary Official Statement and the information contained herein are subject to completion or amendment. These securities may not be sold, nor may offers to buy them be accepted prior to the time the Official Statement is delivered in final form. Under no circumstances shall this Preliminary Official Statement constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of, these securities in any jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration, qualification or filing under the securities laws of any such jurisdiction.

## PRELIMINARY OFFICIAL STATEMENT DATED MAY 22, 2003

NEW ISSUE - BOOK-ENTRY-ONLY

INSURED RATINGS/UNDERLYING RATINGS:
Fitch: AAA/AA+
Moody's: Aaa/Aa3
Standard & Poor's: AAA/AA-
(See "RATINGS" herein)

*In the opinion of Stradling Yocca Carlson & Rauth, a Professional Corporation, Newport Beach, California ("Special Counsel"), under existing statutes, regulations, rulings and judicial decisions, and assuming the accuracy of certain representations and compliance with certain covenants and requirements described herein, the interest (and original issue discount) due with respect to the Certificates is excluded from gross income for federal income tax purposes and is not an item of tax preference for purposes of calculating the federal alternative minimum tax imposed on individuals and corporations. In the further opinion of Special Counsel, the interest (and original issue discount) due with respect to the Certificates is exempt from State of California personal income tax. See "TAX EXEMPTION" herein.*

**$17,325,000***
**CITY OF SAN DIEGO**
**2003 Certificates of Participation**
**(1993 Balboa Park/Mission Bay Park Refunding)**
**Evidencing Undivided Proportionate Interests in Lease Payments to be Made by the**
**CITY OF SAN DIEGO**
**Pursuant to a Lease with the**
**SAN DIEGO FACILITIES AND EQUIPMENT LEASING CORPORATION**

Dated: Date of Delivery

Due: November 1, as shown on the inside cover

The City of San Diego (the "City") 2003 Certificates of Participation (1993 Balboa Park/Mission Bay Park Refunding) (the "Certificates") are being executed and delivered to (i) refund the City's outstanding Certificates of Participation (Balboa Park and Mission Bay Park Capital Improvements Program), Series 1993, (ii) acquire a debt service reserve fund surety bond and a financial guaranty insurance policy for the Certificates, and (iii) pay the costs of issuance incurred in connection with the execution and delivery of the Certificates. See "THE REFUNDING PLAN" herein. The Certificates represent undivided proportionate interests of the Owners in the lease payments (the "Lease Payments") to be made by the City to the San Diego Facilities and Equipment Leasing Corporation (the "Corporation"), under the Facilities Lease Agreement, dated as of June 1, 2003, by and between the City and the Corporation (the "Lease Agreement") pursuant to which the City will lease the North Torrey Pines Golf Course and the Balboa Park House of Charm (collectively, the "Site") from the Corporation. See "DESCRIPTION OF THE SITE" herein.

Interest represented by the Certificates is payable semiannually on May 1 and November 1 of each year, commencing on November 1, 2003. The Certificates will be executed and delivered in the principal amount of $5,000 and any integral multiple thereof. See "THE CERTIFICATES – General" herein. The Certificates will be executed and delivered in book-entry form only and, when delivered, will be registered in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"), which will act as securities depository for the Certificates. Individual purchases of the Certificates will be made in book-entry form only. Purchasers of the Certificates will not receive certificates representing their ownership interests in the Certificates purchased. Principal, premium, if any, and interest payments due with respect to the Certificates are payable directly to DTC by Wells Fargo Bank, National Association, as Trustee. Upon receipt of payments of principal, premium, if any, and interest, DTC will in turn distribute such payments to the beneficial owners of the Certificates. See Appendix G—"DTC BOOK-ENTRY SYSTEM" herein.

**The Certificates are subject to extraordinary, optional and mandatory prepayment prior to maturity, as described herein. See "THE CERTIFICATES – Prepayment" herein.**

THE CERTIFICATES DO NOT CONSTITUTE AN OBLIGATION OF THE CORPORATION OR THE CITY FOR WHICH THE CORPORATION OR THE CITY IS OBLIGATED TO LEVY OR PLEDGE ANY FORM OF TAXATION OR FOR WHICH THE CORPORATION OR THE CITY HAS LEVIED OR PLEDGED ANY FORM OF TAXATION. THE OBLIGATION OF THE CITY TO MAKE LEASE PAYMENTS UNDER THE LEASE AGREEMENT DOES NOT CONSTITUTE AN OBLIGATION OF THE CITY FOR WHICH THE CITY IS OBLIGATED TO LEVY OR PLEDGE ANY FORM OF TAXATION OR FOR WHICH THE CITY HAS LEVIED OR PLEDGED ANY FORM OF TAXATION. NEITHER THE CERTIFICATES NOR THE OBLIGATION OF THE CITY TO MAKE LEASE PAYMENTS CONSTITUTES AN INDEBTEDNESS OF THE CORPORATION, THE CITY, THE STATE OF CALIFORNIA OR ANY POLITICAL SUBDIVISION THEREOF WITHIN THE MEANING OF ANY CONSTITUTIONAL OR STATUTORY DEBT LIMITATION OR RESTRICTION.

Payment of the principal of and interest represented by the Certificates when due will be insured by a financial guaranty insurance policy to be issued by Ambac Assurance Corporation, a Wisconsin-domiciled stock insurance corporation, simultaneously with the delivery of the Certificates. See "CERTIFICATE INSURANCE" herein.

### *Ambac*

The purchase of the Certificates involves certain risks which should be considered by investors. See "RISK FACTORS" for a discussion of certain risk factors that should be considered in addition to the other matters set forth herein.

**This cover page contains information for quick reference only. It is not a summary of this issue. Potential purchasers must read the entire Official Statement to obtain information essential to making an informed investment decision.**

MATURITY SCHEDULE
(See Inside Cover Page)

*The Certificates will be offered when, as and if executed and delivered, and received by the Underwriter, subject to the approval as to their legality by Stradling Yocca Carlson & Rauth, a Professional Corporation, Newport Beach, California, Special Counsel, and certain other conditions. Certain legal matters will be passed upon for the City by the City Attorney and for the Corporation by Foley & Lardner, San Diego, California. It is anticipated that the Certificates will be available in book-entry form for delivery to DTC in New York, New York, on or about June 17, 2003.*

Dated: May __, 2003

---

* *Preliminary, subject to change.*

Exhibit 9
Page 9 of 165

**CITY OF SAN DIEGO, CALIFORNIA**

DICK MURPHY, Mayor

**CITY COUNCIL**

| | |
|---|---|
| SCOTT PETERS<br>District 1 | BRIAN MAIENSCHEIN<br>District 5 |
| MICHAEL ZUCCHET<br>District 2 | DONNA FRYE<br>District 6 |
| TONI ATKINS<br>District 3 | JIM MADAFFER<br>District 7 |
| CHARLES LEWIS,<br>District 4 | RALPH INZUNZA Deputy Mayor<br>District 8 |

**CITY OFFICIALS**

| | |
|---|---|
| MICHAEL T. UBERUAGA<br>City Manager | CASEY GWINN<br>City Attorney |
| ED RYAN<br>City Auditor and Comptroller | MARY E. VATTIMO<br>City Treasurer |

CHARLES G. ABDELNOUR
City Clerk

**SPECIAL SERVICES**

**Bond Counsel and Disclosure Counsel**

Stradling Yocca Carlson & Rauth
A Professional Corporation
Newport Beach, California

**Financial Advisor**

Public Resources Advisory Group
New York, New York

**Trustee**

Wells Fargo Bank, National Association
Los Angeles, California

**Escrow Bank**

BNY Western Trust Company
Los Angeles, California

**Verification Agent**

McGladrey & Pullen, LLP
Minneapolis, Minnesota

Exhibit 9
Page 10 of 165

No dealer, broker, salesperson or other person has been authorized by the City or the Corporation to give any information or to make any representations in connection with the offer or sale of the Certificates other than those contained herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the City or the Corporation. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy nor shall there be any sale of the Certificates by a person in any jurisdiction in which it is unlawful for such person to make such an offer, solicitation or sale.

This Official Statement is not to be construed as a contract with the purchasers or owners of the Certificates. Statements contained in this Official Statement which involve estimates, forecasts or matters of opinion, whether or not expressly so described herein, are intended solely as such and are not to be construed as representations of fact.

This Official Statement and the information contained herein are subject to completion or amendment without notice and neither delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the City or any other parties described herein since the date hereof. These securities may not be sold nor may an offer to buy be accepted prior to the time the Official Statement is delivered in final form. This Official Statement is being submitted in connection with the sale of the Certificates referred to herein and may not be reproduced or used, in whole or in part, for any other purpose, unless authorized in writing by the City. All summaries of documents and laws are made subject to the provisions thereof and do not purport to be complete statements of any or all such provisions.

The Underwriter has provided the following sentence for inclusion in this Official Statement:

The Underwriter has reviewed the information in this Official Statement in accordance with, and as part of, its responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriter does not guarantee the accuracy or completeness of such information.

Certain statements included or incorporated by reference in this Official Statement constitute "forward-looking statements" within the meaning of the United States Private Securities Litigation Reform Act of 1995, Section 21E of the United States Securities Exchange Act of 1934, as amended, and Section 27A of the United States Securities Act of 1933, as amended. Such statements are generally identifiable by the terminology used such as "plan," "expect," "estimate," "project," "budget" or similar words. Such forward-looking statements include, but are not limited to certain statements contained in the information under the captions "CITY FINANCIAL INFORMATION."

**The achievement of certain results or other expectations contained in such forward-looking statements involve known and unknown risks, uncertainties and other factors which may cause actual results, performance or achievements described to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements. The City does not plan to issue any updates or revisions to the forward-looking statements set forth in this Official Statement. In evaluating such statements, potential investors should specifically consider the various factors which could cause actual events or results to differ materially from those indicated by such forward-looking statements.**

**IN CONNECTION WITH THE OFFERING OF THE CERTIFICATES, THE UNDERWRITER MAY OVERALLOT OR EFFECT TRANSACTIONS THAT STABILIZE OR MAINTAIN THE MARKET PRICE OF THE CERTIFICATES AT A LEVEL ABOVE THAT WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME. THE UNDERWRITER MAY OFFER AND SELL THE CERTIFICATES TO CERTAIN DEALERS AND DEALER BANKS AND BANKS ACTING AS AGENT AND OTHERS AT PRICES LOWER THAN THE PUBLIC OFFERING PRICE STATED ON THE COVER PAGE HEREOF AND SAID PUBLIC OFFERING PRICE MAY BE CHANGED FROM TIME TO TIME BY THE UNDERWRITER.**

**THE CERTIFICATES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, IN RELIANCE UPON AN EXEMPTION CONTAINED IN SUCH ACT AND HAVE NOT BEEN REGISTERED OR QUALIFIED UNDER THE SECURITIES LAWS OF ANY STATE.**

Exhibit 9
Page 11 of 165

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ........................................................................................................................1
   General ...................................................................................................................................1
   Security and Sources of Payment for the Certificates ..........................................................1
   Certificate Insurance ............................................................................................................2
   The Certificates ....................................................................................................................2
   Prepayment ...........................................................................................................................2
   Tax Exemption ......................................................................................................................3
   Continuing Disclosure ..........................................................................................................3
   Professionals Involved in the Offering .................................................................................3
   Certificate Owners' Risks .....................................................................................................3
   Miscellaneous .......................................................................................................................3

THE REFUNDING PLAN ..........................................................................................................4

DESCRIPTION OF THE SITE ....................................................................................................5
   The Site .................................................................................................................................5
   Release/Substitution .............................................................................................................5

ESTIMATED SOURCES AND USES OF FUNDS ....................................................................6

THE CERTIFICATES .................................................................................................................6
   General ..................................................................................................................................6
   Prepayment ...........................................................................................................................6
   Prepayment Procedures ........................................................................................................7
   Partial Prepayment ...............................................................................................................8

SECURITY AND SOURCES OF PAYMENT FOR THE CERTIFICATES .............................8
   General ..................................................................................................................................8
   Lease Payments ....................................................................................................................9
   Reserve Fund ........................................................................................................................9
   Additional Payments ..........................................................................................................10
   Insurance .............................................................................................................................10

CERTIFICATE PAYMENT SCHEDULE ................................................................................11

CERTIFICATE INSURANCE ..................................................................................................11
   Payment Pursuant to Financial Guaranty Insurance Policy ...............................................11
   Ambac Assurance Corporation ..........................................................................................13
   Available Information .........................................................................................................13
   Incorporation of Certain Documents by Reference ............................................................13
   The Surety Bond .................................................................................................................14

CITY FINANCIAL INFORMATION ......................................................................................15

LIMITATIONS ON TAXES AND APPROPRIATIONS .........................................................15

RISK FACTORS .......................................................................................................................15
   Abatement ...........................................................................................................................15
   Default ................................................................................................................................15
   Release or Substitution of Site ...........................................................................................16
   Not a Pledge of Taxes .........................................................................................................17
   Additional Obligations of the City .....................................................................................17

i

Exhibit 9
Page 12 of 165

## TABLE OF CONTENTS

**PAGE**

Natural and Manmade Disasters ...................................................................18
Limitations on Remedies; Bankruptcy ..........................................................18
Economic Conditions in California ...............................................................18

THE CORPORATION ...........................................................................................21

TAX EXEMPTION ................................................................................................22

CERTAIN LEGAL MATTERS ..............................................................................23

LITIGATION .........................................................................................................24

RATINGS ..............................................................................................................24

UNDERWRITING .................................................................................................24

FINANCIAL ADVISOR .........................................................................................24

CONTINUING DISCLOSURE ..............................................................................25

FINANCIAL STATEMENTS OF THE CITY ........................................................25

VERIFICATION OF MATHEMATICAL COMPUTATIONS ................................26

MISCELLANEOUS ...............................................................................................26

APPENDIX A     THE CITY OF SAN DIEGO .......................................................A-1
APPENDIX B     THE CITY OF SAN DIEGO AUDITED FINANCIAL STATEMENTS FOR THE
                FISCAL YEAR ENDED JUNE 30, 2002 ......................................B-1
APPENDIX C     SUMMARY OF PRINCIPAL LEGAL DOCUMENTS .................C-1
APPENDIX D     FORM OF LEGAL OPINION ....................................................D-1
APPENDIX E     SPECIMEN MUNICIPAL BOND INSURANCE POLICY ...........E-1
APPENDIX F     FORM OF CONTINUING DISCLOSURE AGREEMENT ...........F-1
APPENDIX G     DTC BOOK-ENTRY SYSTEM ..................................................G-1

Exhibit 9
Page 13 of 165

$17,325,000[*]
**CITY OF SAN DIEGO**
**2003 Certificates of Participation**
**(1993 Balboa Park/Mission Bay Park Refunding)**

**Evidencing Proportionate Interests in Lease Payments to be Made by the**
**CITY OF SAN DIEGO**
**Pursuant to a Lease with the**
**SAN DIEGO FACILITIES AND EQUIPMENT LEASING CORPORATION**

## INTRODUCTION

*This introduction contains only a brief summary of certain of the terms of the Certificates being offered, and a brief description of the Official Statement. All statements contained in this introduction are qualified in their entirety by reference to the entire Official Statement. References to, and summaries of, provisions of the Constitution and laws of the State of California and any documents referred to herein do not purport to be complete and such references are qualified in their entirety by reference to the complete provisions. Capitalized terms used in this Official Statement and not defined elsewhere herein have the meanings given such terms in APPENDIX C — "SUMMARY OF PRINCIPAL LEGAL DOCUMENTS" herein. This Official Statement speaks only as of its date, and the information contained herein is subject to change.*

**General**

This Official Statement, including the cover page and the Appendices attached hereto (the "Official Statement"), provides certain information concerning the execution and delivery of the City of San Diego 2003 Certificates of Participation (1993 Balboa Park/Mission Bay Park Refunding) (the "Certificates") in an aggregate principal amount of $17,325,000[*]. The Certificates will be executed and delivered pursuant to a Trust Agreement, dated as of June 1, 2003 (the "Trust Agreement"), by and among the City of San Diego (the "City"), the San Diego Facilities and Equipment Leasing Corporation (the "Corporation") and Wells Fargo Bank, National Association, as trustee (the "Trustee"). The Certificates represent proportionate undivided interests of the registered owners thereof (the "Owners") in the Lease Payments to be made by the City to the Corporation under that certain Facilities Lease Agreement, dated as of June 1, 2003 (the "Lease Agreement"), by and between the Corporation, as lessor, and the City, as lessee. See "SECURITY AND SOURCES OF PAYMENT FOR THE CERTIFICATES — Lease Payments" herein. The Certificates are being delivered to (i) refund the City's outstanding Certificates of Participation (Balboa Park and Mission Bay Park Capital Improvements Program), Series 1993 (the "Prior Certificates"); (ii) acquire a debt service reserve fund surety bond and a financial guaranty insurance policy for the Certificates; and (iii) pay the costs of issuance incurred in connection with the execution and delivery of the Certificates. See "THE REFUNDING PLAN" and "DESCRIPTION OF THE SITE" herein.

**Security and Sources of Payment for the Certificates**

The Certificates are being executed and delivered pursuant to the Trust Agreement. The City will lease certain real property and improvements thereon at various locations in the City (collectively, the "Site") to the Corporation pursuant to a Site Lease between the City as lessor, and the Corporation, as lessee, dated as of June 1, 2003 (the "Site Lease"). Under the Lease Agreement, the Corporation will lease the Site back to the City. The City is required under the Lease Agreement to pay Lease Payments for the use and possession of the Site, as further described under the caption "DESCRIPTION OF THE SITE" herein. The City is also required to pay any taxes and assessments and the cost of maintenance and repair of the Site.

---

[*] *Preliminary, subject to change.*

1

Exhibit 9
Page 14 of 165

Pursuant to an Assignment Agreement, dated as of June 1, 2003 (the "Assignment Agreement"), by and between the Corporation and the Trustee, the Corporation will assign to the Trustee, for the benefit of the Owners, substantially all of its rights under the Lease Agreement, including its rights to receive and collect Lease Payments and prepayments from the City under the Lease Agreement and rights as may be necessary to enforce payment of Lease Payments and prepayments. All rights assigned by the Corporation pursuant to the Assignment Agreement will be administered by the Trustee in accordance with the provisions of the Trust Agreement for the equal and proportionate benefit of all Owners.

The Certificates evidence proportionate undivided interests in the right to receive Lease Payments and prepayments thereof to be made by the City to the Corporation under the Lease Agreement. The Lease Payments are designed to pay, when due, the principal and interest with respect to the Certificates. The City has covenanted in the Lease Agreement that it will take such action as may be necessary to include the Lease Payments and other payments due under the Lease Agreement in its annual budgets and to make the necessary annual appropriations therefor. The City's obligation to make Lease Payments is subject to complete or partial abatement in the event of the taking of, damage to or loss of use and possession of all or a portion of the Site. See "RISK FACTORS — Abatement" herein.

**The obligation of the City to make Lease Payments does not constitute an obligation of the City for which the City is obligated to levy or pledge any form of taxation or for which the City has levied or pledged any form of taxation. Neither the Certificates nor the obligation of the City to make Lease Payments constitutes an indebtedness of the Corporation, the City, the State of California or any of its political subdivisions within the meaning of any constitutional or statutory debt limitation or restriction.**

## Certificate Insurance

Payment of the principal of and interest represented by the Certificates when due will be insured by a financial guaranty insurance policy (the "Policy") to be issued by Ambac Assurance Corporation, a Wisconsin-domiciled stock insurance corporation (the "Insurer") simultaneously with the delivery of the Certificates. See "CERTIFICATE INSURANCE" herein.

## The Certificates

Interest represented by the Certificates is payable semiannually on May 1 and November 1 of each year, commencing on November 1, 2003 (each an "Interest Payment Date"). See "THE CERTIFICATES — General" herein. The Certificates will be executed and delivered in book-entry form only and, when delivered, will be registered in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"), which will act as securities depository for the Certificates. Individual purchases of the Certificates will be made in book-entry form only. Purchasers of the Certificates will not receive certificates representing their ownership interests in the Certificates purchased. The Certificates will be executed and delivered in the principal amount of $5,000 and integral multiples thereof. Principal, premium, if any, and interest payments due with respect to the Certificates are payable directly to DTC by the Trustee. Upon receipt of payments of principal, premium, if any, and interest, DTC will in turn distribute such payments to the beneficial owners of the Certificates. See "THE CERTIFICATES — General" and APPENDIX G — "DTC BOOK-ENTRY SYSTEM" herein.

## Prepayment

The Certificates are subject to extraordinary, mandatory and optional prepayment prior to maturity, as described herein. See "THE CERTIFICATES — Prepayment" herein.

Exhibit 9
Page 15 of 165

**Tax Exemption**

In the opinion of Stradling Yocca Carlson & Rauth, a Professional Corporation, Newport Beach, California ("Special Counsel"), under existing statutes, regulations, rulings and judicial decisions, and assuming certain representations and compliance with certain covenants and requirements described herein, the interest (and original issue discount) due with respect to the Certificates is excluded from gross income for federal income tax purposes and is not an item of tax preference for purposes of calculating the federal alternative minimum tax imposed on individuals and corporations. In the further opinion of Special Counsel, the interest (and original issue discount) due with respect to the Certificates is exempt from State of California personal income tax. See "TAX EXEMPTION" herein.

**Continuing Disclosure**

The City has covenanted for the benefit of the holders and beneficial owners of the Certificates to provide, or cause to be provided, to each nationally recognized municipal securities information repository and any public or private repository or entity designated by the State as a state repository for purposes of Rule 15c2-12(b)(5) (the "Rule") adopted by the Securities and Exchange Commission (each, a "Repository") certain annual financial information and operating data and, in a timely manner, notice of certain material events. These covenants have been made in order to assist the Underwriter in complying with the Rule. See "CONTINUING DISCLOSURE" herein for a description of the specific nature of the annual report and notices of material events and a summary description of the terms of the disclosure agreement pursuant to which such reports are to be made. The City has never failed to comply in all material respects with any previous undertakings with regard to the Rule.

**Professionals Involved in the Offering**

Wells Fargo Bank, National Association, Los Angeles, California, will act as Trustee with respect to the Certificates. Public Resources Advisory Group, New York, New York will act as financial advisor to the City. The Certificates will be delivered subject to the approval as to their legality by Stradling Yocca Carlson & Rauth, a Professional Corporation, Newport Beach, California, Special Counsel. Certain legal matters will be passed upon for the City by the City Attorney and for the Corporation by Foley & Lardner, San Diego, California. The City's financial statements for the fiscal year ended June 30, 2002 included as Appendix B hereto have been audited by Calderon, Jahum & Osborn, An Accountancy Corporation, San Diego, California (the "Auditor"). See APPENDIX B — "THE CITY OF SAN DIEGO AUDITED FINANCIAL STATEMENTS FOR THE FISCAL YEAR ENDED JUNE 30, 2002" herein. The City's financial statements are public documents and are included within this Official Statement with the prior approval of the Auditor. However, the Auditor has not performed any post-audit of the financial condition of the City.

**Certificate Owners' Risks**

Certain events could affect the ability of the City to make the Lease Payments when due. See "RISK FACTORS" for a discussion of certain factors that should be considered, in addition to other matters set forth herein, in evaluating an investment in the Certificates.

**Miscellaneous**

It is anticipated that the Certificates in book-entry form will be available for delivery to DTC on or about June 17, 2003 (the "Delivery Date").

The description herein of the Trust Agreement, the Lease Agreement, the Site Lease, the Assignment Agreement and any other agreements relating to the Certificates are qualified in their entirety by reference to such documents, and the descriptions herein of the Certificates are qualified in their entirety by the form

Exhibit 9
Page 16 of 165

thereof and the information with respect thereto included in the aforementioned documents. See APPENDIX C — "SUMMARY OF PRINCIPAL LEGAL DOCUMENTS" herein. Copies of the documents are on file and available for inspection at the offices of the Trustee at 707 Wilshire Boulevard, 17th Floor, Los Angeles, California 90017, Attention: Corporate Trust Services.

All capitalized terms used in this Official Statement and not otherwise defined herein have the meanings given such terms in APPENDIX C — "SUMMARY OF PRINCIPAL LEGAL DOCUMENTS" herein.

The information and expressions of opinion herein speak only as of their date and are subject to change without notice. Neither the delivery of this Official Statement nor any sale made hereunder nor any future use of this Official Statement shall, under any circumstances, create any implication that there has been no change in the affairs of the City since the date hereof.

The presentation of information in APPENDIX A — "THE CITY OF SAN DIEGO," including tables of receipt of revenues, is intended to show recent historical information and, except for the budget for fiscal years 2002-03 and 2003-04, is not intended to indicate future or continuing trends in the financial position or other affairs of the City. No representation is made that past experience, as it might be shown by such financial and other information, will necessarily continue or be repeated in the future.

## THE REFUNDING PLAN

The Certificates are being executed and delivered to provide for the refunding of the City's lease payment obligations relating to the Prior Certificates. The proceeds of the Prior Certificates financed improvements to the City's Balboa Park and Mission Bay Park pursuant to the capital improvements program contained in the City's Master Plans for such parks. These improvements included: Balboa Park Safety Lighting and improvements to Balboa Park facilities, including at the Federal Building, House of Charm & Arcades, municipal gym, Japanese Garden, Natural History Museum, Starlight Bowl, Shoreline Reclamation at Mission Bay Park, and other miscellaneous improvements. A portion of the proceeds of the Certificates will be used to establish an irrevocable escrow (the "Escrow Fund") to be held by BNY Western Trust Company, as escrow bank (the "Escrow Bank") pursuant to an Escrow Agreement dated as of June 1, 2003 by and among the Escrow Bank, the City and the Corporation. Moneys in the Escrow Fund will be invested pursuant to instructions of the City. Moneys on deposit in the Escrow Fund will be held as cash or invested solely in non-callable, direct general obligations of the United States of America (including obligations issued or held in book entry form on the books of the Department of the Treasury of the United States of America) (the "Escrowed Federal Securities"). The cash and Escrowed Federal Securities, and the interest accrued with respect thereto, will be held by the Escrow Bank on behalf of the City and for the benefit of the Owners and applied to redeem the outstanding Prior Certificates in full on November 1, 2003, at a redemption price of one hundred one percent (101%) of the principal amount thereof, plus accrued interest. The amounts on deposit in the Escrow Fund shall secure and provide funds to pay or prepay all rental payments to become due under the Lease Agreement dated as of November 1, 1993 (the "1993 Lease") by and between the City and the Corporation. The Escrow Bank, as agent of the City, is irrevocably committed to pay base rental payments under the 1993 Lease as due on and prior to November 1, 2003, and to cause prepayment of the remaining rental payments, including the prepayment premium applicable thereto on November 1, 2003. Upon the establishment of the Escrow Fund and deposit of the cash and Escrowed Federal Securities as described above, the lien of the trust agreement pursuant to which the Prior Certificates were executed and delivered and the proceedings pursuant to which the Prior Certificates were authorized, executed and delivered will cease, terminate and become void with respect to the Prior Certificates, except for the rights of the owners of the Prior Certificates to payments from the Escrow Fund. Upon the delivery of the Certificates, McGladrey & Pullen, LLP, Minneapolis, Minnesota, will deliver a report verifying the sufficiency of the moneys deposited in the Escrow Fund. See "VERIFICATION OF MATHEMATICAL COMPUTATIONS" herein.

Exhibit 9
Page 17 of 165

## DESCRIPTION OF THE SITE

**The Site**

The Site consists of the North Course of the Torrey Pines Municipal Golf Course (the "Golf Course Portion") and the House of Charm (the "House of Charm Portion") in Balboa Park.

*Torrey Pines - North Course.* Torrey Pines Municipal Golf Course facility consists of two regulation championship eighteen hole golf courses, is owned by the City and is operated by the Park and Recreation Department. It is regarded as one of the premiere courses in Southern California and is the site of an annual Professional Golf Association tournament. Torrey Pines consists of the North Course and the South Course, both of which are situated on a bluff overlooking the Pacific Ocean.

Only the North Course of Torrey Pines is subject to the Lease Agreement. The North Course is a par 72 and plays at approximately 6,647 yards at its championship tees. The Lease Agreement does not include other facilities related to the golf course, including the bar/restaurant, pro shop or driving range. The City reports that, in 2002, 175,000 rounds were played on the North Course and South Course combined.

Lease Payments attributable to the North Course are scheduled over a six year period. This portion of the Lease Payments has a principal component of $6,555,000*. **Pursuant to the terms of the Lease Agreement, the Golf Course Portion of the Site is released from the Lease Agreement after November 1, 2008.**

*House of Charm.* The other property that is the subject of the Lease Agreement is the House of Charm. This facility is located adjacent to one of the two main entrances to Balboa Park and consists of approximately 75,000 square feet of building area. The facility was substantially reconstructed with the proceeds of the 1993 Certificates. This portion of the Lease Payments has a principal component of $10,770,000*. The lease term is 21 years. The House of Charm is occupied by three nonprofit corporations pursuant to long-term leases with the City for certain charitable purposes. The tenants are responsible for operation and maintenance of the House of Charm, but do not pay rent. They are The San Diego Art Institute, Mingei International, Inc. and Old Globe Theatre, Inc. The leases are subordinate to the Lease Agreement.

**Release/Substitution**

The Site is subject to change in whole or in part from time to time under the circumstances permitted in the Lease Agreement. As described above, pursuant to the terms of the Lease Agreement, the Golf Course Portion is released from the Lease Agreement after November 1, 2008. See "RISK FACTORS — Release or Substitution of Site."

---

* *Preliminary, subject to change.*

Exhibit 9
Page 18 of 165

## ESTIMATED SOURCES AND USES OF FUNDS

The following table summarizes the estimated sources and uses of Certificate proceeds:

| | |
|---|---|
| *Sources of Funds* | |
| Par Amount of Certificates | $ |
| Net Original Issue Premium | |
| Prior Certificates Proceeds | _____ |
| Total Sources | $ |
| | |
| *Uses of Funds* | |
| Escrow Fund | $ |
| Costs of Issuance[1] | |
| Total Uses | $ |

---

[1]  Includes fees of Special Counsel, Trustee, Financial Advisor, rating agency and other legal fees, costs of printing, and the premium for the Policy and Surety Bond.

## THE CERTIFICATES

### General

The Certificates will be executed and delivered in the form of fully registered Certificates in principal amounts of $5,000 each or any integral multiple thereof. The Certificates will be dated their date of delivery and mature on May 1 in the years set forth on the inside cover page hereof. Each Certificate will be payable with respect to interest on May 1 and November 1 of each year, commencing on November 1, 2003 at the respective rates of interest set forth on the inside front cover page hereof.

The Certificates will be executed and delivered in book-entry form only and, when delivered, will be registered in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"), which will act as securities depository for the Certificates. Individual purchases of the Certificates will be made in book-entry form only. Purchasers of the Certificates will not receive certificates representing their ownership interests in the Certificates purchased. Principal, premium, if any, and interest payments due with respect to the Certificates are payable directly to DTC by the Trustee. Upon receipt of payments of principal, premium, if any, and interest, DTC will in turn distribute such payments to the beneficial owners of the Certificates. See APPENDIX G — "DTC BOOK-ENTRY SYSTEM" herein.

### Prepayment

*Extraordinary Prepayment.* The Certificates are subject to prepayment, without premium, prior to their respective maturity dates on any date, in whole or in part, from Net Proceeds which the Trustee transfers to the Prepayment Fund as provided in the Lease Agreement at least 45 days prior to the date fixed for prepayment, at a prepayment price equal to the principal amount thereof together with the accrued interest to the date fixed for prepayment.

*Optional Prepayment.* The Certificates maturing on or after November 1, 2014 are subject to prepayment prior to maturity in whole or in part on any date on or after November 1, 2013 at the option of the City, in the event the City exercises its option under the Lease Agreement to prepay all or a portion of the principal component of the Lease Payments (in integral multiples of $5,000), at the prepayment price equal to the principal component to be prepaid, plus accrued interest to the date fixed for prepayment, without premium.

6

Exhibit 9
Page 19 of 165

***Mandatory Sinking Account Prepayment.*** The Certificates maturing November 1, 20__ (the "Term Certificates") will be subject to prepayment in part by lot, on November 1 in each of the following years from sinking account payments as set forth below at a prepayment price equal to the principal amount thereof to be prepaid, without premium; provided, however, that if some but not all of the Term Certificates have been prepaid pursuant to an optional or extraordinary prepayment, the total amount of all future sinking account payments will be reduced pro rata by the aggregate principal amount of the Term Certificates so prepaid. In addition, in lieu of prepayment thereof, Term Certificates may be purchased by the City and tendered to the Trustee pursuant to the provisions of the Trust Agreement.

<table>
<tr><td align="center">***Mandatory Prepayment Date***<br>*(November 1)*</td><td align="center">***Sinking Account***<br>***Prepayment***</td></tr>
</table>

---

† Final Maturity

## Prepayment Procedures

Whenever provision is made for the optional prepayment of Certificates and less than all Outstanding Certificates are called for prepayment, the Trustee shall select Certificates for optional prepayment from among maturities selected by the City and by lot within any maturity. For extraordinary prepayment of Certificates, the Trustee will select Certificates for prepayment pro rata among maturities and by lot within any maturity and for mandatory sinking account prepayment by lot.

Notice of prepayment will be mailed by first-class mail, postage prepaid, not less than 30 nor more than 60 days prior to the prepayment date to the respective Owners of any Certificates designated for prepayment at their addresses appearing on the Certificate registration books, and will be sent by first class mail or delivery service, postage prepaid, to the Municipal Securities Depositories (as defined in the Trust Agreement) and to the Information Services (as defined in the Trust Agreement) which the City will designate to the Trustee. Neither failure to receive such notice nor any defect in any notice so mailed will affect the sufficiency of the proceedings for the prepayment of such Certificates. Such notice will specify: (a) the prepayment date, (b) the prepayment price, (c) if less than all of the Outstanding Certificates are to be prepaid, the Certificate numbers (and in the case of partial prepayment, the respective principal amounts), (d) the CUSIP numbers of the Certificates to be prepaid, (e) the place or places where the prepayment will be made, (f) the original date of execution and delivery of the Certificates, (g) any other descriptive information regarding the Certificates needed to identify accurately the Certificates being prepaid. Such notice will further state that on the specified date there will become due and payable upon each Certificate to be prepaid, the portion of the principal amount of such Certificate to be prepaid, together with interest accrued to said date and that from and after such date, provided that moneys therefor have been deposited with the Trustee, interest with respect thereto will cease to accrue and be payable.

With respect to any notice of optional prepayment of Certificates, such notice may state that such prepayment shall be conditional upon the receipt by the Trustee on or prior to the date fixed for such prepayment of moneys sufficient to pay the principal of, premium, if any, and interest with respect to such Certificates to be prepaid and that, if such moneys shall have not been so received, said notice shall be of no force and effect and the Trustee shall not be required to prepay such Certificates. In the event that such notice of prepayment contains such a condition and such moneys are not so received, the prepayment shall not be made, and the Trustee shall within a reasonable time thereafter give notice, in the manner in which the notice of prepayment was given, that such moneys were not so received.

Exhibit 9
Page 20 of 165

So long as DTC is the registered Owner of the Certificates, all such notices will be provided to DTC as the Owner, and not to any beneficial owner of the Certificates. None of the City, the Corporation or the Trustee is responsible for providing notice to the beneficial owners of the Certificates, which is the responsibility of the DTC Participants. See APPENDIX G — "DTC BOOK-ENTRY SYSTEM" herein.

Notice having been given to the Owners of any Certificates being prepaid, and the moneys for the prepayment (including the interest to the applicable date of prepayment), having been set aside in the Prepayment Fund, the Certificates will become due and payable on the date of prepayment, and upon presentation and surrender thereof at the Principal Office of the Trustee such Certificates will be paid at the prepayment price with respect thereto, plus interest accrued and unpaid to the date of prepayment.

If, on the date of prepayment moneys for the prepayment of all the Certificates to be prepaid, together with interest to the date of prepayment, are held by the Trustee so as to be available therefor on such date of prepayment, and, if notice of prepayment thereof has been given as described above, then, from and after the date of prepayment, interest with respect to the Certificates to be prepaid will cease to accrue and become payable. All moneys held by or on behalf of the Trustee for the prepayment of Certificates will be held in trust for the account of the Owners of the Certificates so to be prepaid, without liability for interest thereon.

## Partial Prepayment

Upon surrender by the Owner of a Certificate for partial prepayment at the Principal Office of the Trustee, payment of such partial prepayment of the principal amount of a Certificate will be paid to such Owner. Upon surrender of any Certificate prepaid in part only, the Trustee will execute and deliver to the registered Owner thereof, at the expense of the City, a new Certificate or Certificates which shall be of authorized denominations equal to the unpaid portion of the Certificate surrendered and of the same tenor and maturity. Such partial prepayment will be valid upon payment of the amount thereby required to be paid to such Owner, and the City, the Corporation and the Trustee will be released and discharged from all liability to the extent of such payment.

## SECURITY AND SOURCES OF PAYMENT FOR THE CERTIFICATES

**Neither the Certificates nor the obligation of the City to make Lease Payments constitutes an obligation of the City for which the City is obligated to levy or pledge, or for which the City has levied or pledged, any form of taxation. Neither the Certificates nor the obligation of the City to make Lease Payments constitutes an indebtedness of the Corporation, the City, the State of California or any of its political subdivisions within the meaning of any constitutional limitation or violates any statutory debt limitation or restriction.**

## General

Each Certificate represents a proportionate undivided interest in the Lease Payments and prepayments to be made by the City to the Trustee under the Lease Agreement. The City is obligated to pay Lease Payments from any source of legally available funds, and has covenanted in the Lease Agreement to include all Lease Payments coming due in its annual budgets and to make the necessary annual appropriations therefor. The Corporation, pursuant to the Assignment Agreement, has assigned all of its rights under the Lease Agreement (excepting certain rights as specified therein), including the right to receive Lease Payments and prepayments, to the Trustee for the benefit of the Owners. By the twenty-third (23rd) day of each April and October (or, if such day is not a Business Day, the next succeeding Business Day), the City must pay to the Trustee a Lease Payment (to the extent required under the Lease Agreement) which is expected to equal the amount necessary to pay the principal and interest with respect to the Certificates on the next succeeding Interest Payment Date.

8

Exhibit 9
Page 21 of 165

The City's obligation to make Lease Payments will be abated in whole or in part to the extent of substantial interference with the use and possession of the Site arising from damage, destruction, title defect or taking by eminent domain or condemnation of the Site. Following November 1, 2008, the Site will not include the North Torrey Pines Golf Course. The nonpayment of Lease Payments following an abatement would not constitute a default under the Lease Agreement and the Trustee is not entitled in such event to pursue remedies against the City. See "RISK FACTORS — Abatement" herein.

Under the Lease Agreement, the City agrees to pay certain taxes, assessments, utility charges, and insurance premiums charged with respect to the Site and the Certificates and fees and expenses of the Trustee. The City is responsible for repair and maintenance of the Site during the term of the Lease Agreement. The City may at its own expense in good faith contest such taxes, assessments and utility and other charges if certain requirements set forth in the Lease Agreement are satisfied, including obtaining an opinion of counsel that the Site will not be subjected to loss or forfeiture.

Should the City default under the Lease Agreement, the Trustee, as assignee of the Corporation, may terminate the Lease Agreement and re-lease the Site or may retain the Lease Agreement and hold the City liable for all Lease Payments thereunder on an annual basis. Under no circumstances will the Trustee have the right to accelerate Lease Payments. The exercise of the remedies provided to the Trustee is subject to various practical constraints and limitations on the enforcement of remedies against public agencies. See "RISK FACTORS — Default" herein.

## Lease Payments

Subject to the provisions of the Lease Agreement regarding prepayment of Lease Payments (see the provisions relating to prepayment under the caption "THE CERTIFICATES" above), the City agrees to pay to the Corporation, its successors and assigns, the Lease Payments as annual rental for the use and possession of the Site. The Lease Payments are due and payable on April 23 and October 23 of each year (or, if such day is not a Business Day, the next succeeding Business Day) (each, a "Lease Payment Date").

Any monies held in the Lease Payment Fund on any Lease Payment Date (other than amounts resulting from the prepayment of the Lease Payments in part but not in whole pursuant to the Lease Agreement and other amounts required for payment of past due principal or interest with respect to any Certificates not presented for payment) shall be credited to the payment of Lease Payments due and payable on such Lease Payment Date.

The Trust Agreement requires that Lease Payments be deposited in the Lease Payment Fund maintained by the Trustee. Pursuant to the Trust Agreement, on May 1 and November 1 of each year, commencing November 1, 2003, the Trustee will apply such amounts in the Lease Payment Fund as are necessary to make interest and principal payments, respectively, with respect to the Certificates as the same shall become due and payable, in the amounts specified in the Lease Agreement.

## Reserve Fund

A Reserve Fund is established by the Trust Agreement which is to be maintained in an amount equal to the least of (i) maximum aggregate annual Lease Payments payable under the Lease Agreement in any Certificate Year (exclusive of Lease Payments attributable to Certificates that have been defeased), (ii) 125% of the average annual aggregate Lease Payments (in any Certificate Year) then payable under the Lease Agreement (exclusive of Lease Payments attributable to Certificates that have been defeased), or (iii) 10% of the face amount of the Certificates and/or the Additional Certificates, as applicable (less original issue discount if in excess of two percent of the stated payment amount at maturity) (the "Reserve Requirement"). The full amount available in the Reserve Fund may be used by the Trustee in the event of abatement or a failure by the City to make Lease Payments when due. The Reserve Fund will initially be funded with a debt service reserve

Exhibit 9
Page 22 of 165

fund surety bond (the "Surety Bond") issued by the Insurer in an amount equal to the Reserve Requirement. See "CERTIFICATE INSURANCE — The Surety Bond" herein.

**Additional Payments**

Under the Lease Agreement, the City is to pay such amounts ("Additional Payments") as are required for the payment of all administrative costs of the Corporation relating to the Site or the Certificates, including, without limitation, all expenses, compensation and indemnification of the Trustee payable by the City under the Trust Agreement, taxes of any sort whatsoever payable by the Corporation as a result of its leasehold interest in the Site or undertaking of the transactions contemplated in the Lease Agreement or in the Trust Agreement, fees of auditors, accountants, attorneys or engineers, any and all amounts due to the Insurer (pursuant to the reserve fund surety bond or otherwise) and all other necessary administrative costs of the Corporation or charges required to be paid by it in order to comply with the terms of the Certificates or of the Trust Agreement, including premiums on insurance required to be maintained by the Lease Agreement or to indemnify the Corporation and its officers and directors.

**Insurance**

Pursuant to the Lease Agreement, the City will obtain a CLTA leasehold title insurance policy (with Western Regional Exceptions) on the Site in an amount equal to the aggregate principal component of unpaid Lease Payments. The Lease Agreement also requires that the City maintain casualty insurance on the Site in amount equal to replacement value and, upon delivery of the Site to it, rental interruption insurance to insure against loss of Lease Payments caused by loss or damage to the Site covered under the City's casualty insurance. The rental interruption insurance is to be in an amount not less than the maximum remaining scheduled Lease Payments in any future 24 month period. The City also is obligated under the Lease Agreement to obtain a standard comprehensive general public liability and property damage insurance policy or policies and workers' compensation insurance. See "CITY FINANCIAL INFORMATION — Insurance" and APPENDIX C — "SUMMARY OF PRINCIPAL LEGAL DOCUMENTS — INSURANCE" herein.

The proceeds of any rental interruption insurance will be deposited to (i) the Reserve Fund to make up any deficiency therein and (ii) in the Lease Payment Fund to be credited towards the payment of the Lease Payments in the order in which such Lease Payments become due and payable. The Lease Agreement requires the City to apply the Net Proceeds of any casualty insurance award either to replace or repair the Site or to prepay Certificates if certain certifications with respect to the adequacy of the Net Proceeds to make repairs, and the timing thereof, cannot be made. See APPENDIX C — "SUMMARY OF PRINCIPAL LEGAL DOCUMENTS — DAMAGE, DESTRUCTION AND EMINENT DOMAIN; USE OF NET PROCEEDS." The amount of Lease Payments will be abated and Lease Payments due under the Lease Agreement may be reduced during any period in which by reason of damage, destruction, title defect or taking by eminent domain or condemnation there is substantial interference with the City's use and possession of all or part of the Site. See "RISK FACTORS — Abatement" herein.

Exhibit 9
Page 23 of 165

## CERTIFICATE PAYMENT SCHEDULE*

Lease Payments are required to be made by the City under the Lease Agreement on or before April 23 and October 23 of each year (or, if such day is not a Business Day, the next succeeding Business Day) for the use and possession of the Site for the period commencing as of the date of delivery of the Certificates and terminating on November 1, 2023, or a later date if such date is extended as provided in the Lease Agreement. The Interest Payment Dates with respect to the Certificates are May 1 and November 1, commencing November 1, 2003. The aggregate annual amounts of Certificate payments, comprising interest and principal payable to the Owners, are set forth below for each annual period ending on November 1 of the years indicated.

| Annual Period (Ending November 1) | Principal* | Interest | Total |
|---|---|---|---|
| 2003 | $      455,000 | | |
| 2004 | 1,115,000 | | |
| 2005 | 1,715,000 | | |
| 2006 | 1,740,000 | | |
| 2007 | 1,775,000 | | |
| 2008[†] | 1,815,000 | | |
| 2009 | 445,000 | | |
| 2010 | 460,000 | | |
| 2011 | 475,000 | | |
| 2012 | 490,000 | | |
| 2013 | 505,000 | | |
| 2014 | 525,000 | | |
| 2015 | 550,000 | | |
| 2016 | 575,000 | | |
| 2017 | 590,000 | | |
| 2018 | 615,000 | | |
| 2019 | 640,000 | | |
| 2020 | 665,000 | | |
| 2021 | 695,000 | | |
| 2022 | 725,000 | | |
| 2023 | 755,000 | | |
| Totals | $  17,325,000 | | |

[†] Lease Agreement terminates with respect to the North Torrey Pines Golf Course.

## CERTIFICATE INSURANCE

*The following information has been furnished by the Insurer for use in this Official Statement. Such information has not been independently confirmed or verified by the City. No representation is made herein by the City as to the accuracy or adequacy of such information subsequent to the date hereof, or that the information contained and incorporated herein by reference is correct. Reference is made to Appendix E for a specimen of the Insurer's Financial Guaranty Insurance Policy.*

**Payment Pursuant to Financial Guaranty Insurance Policy**

The Insurer, Ambac Assurance Corporation, has made a commitment to issue the Financial Guaranty Insurance Policy relating to the Certificates effective as of the date of issuance of the Certificates. Under the

_____

* *Preliminary, subject to change.*

terms of the Financial Guaranty Insurance Policy, the Insurer will pay to The Bank of New York, in New York, New York, or any successor thereto (the "Insurance Trustee") that portion of the principal of and interest with respect to the Certificates which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer (as such terms are defined in the Financial Guaranty Insurance Policy). The Insurer will make such payments to the Insurance Trustee on the later of the date on which such principal and interest becomes Due for Payment or within one business day following the date on which the Insurer shall have received notice of Nonpayment from the Trustee. The insurance will extend for the term of the Certificates and, once issued, cannot be cancelled by the Insurer.

The Financial Guaranty Insurance Policy will insure payment only on stated maturity dates, in the case of principal, and on stated dates for payment, in the case of interest. If the Certificates become subject to mandatory prepayment and insufficient funds are available for prepayment of all outstanding Certificates, the Insurer will remain obligated to pay principal of and interest with respect to outstanding Certificates on the originally scheduled interest and principal payment dates. In the event of any acceleration of the principal with respect to the Certificates, the insured payments will be made at such times and in such amounts as would have been made had there not been an acceleration.

In the event the Trustee has notice that any payment of principal of or interest with respect to a Certificate which has become Due for Payment and which is made to a beneficial owner of such Certificate by or on behalf of the City has been deemed preferential transfer and theretofore recovered from its registered owner pursuant to the United States Bankruptcy Code in accordance with a final, nonappealable order of a court of competent jurisdiction, such beneficial owner will be entitled to payment from the Insurer to the extent of such recovery if sufficient funds are not otherwise available.

The Financial Guaranty Insurance Policy does not insure any risk other than Nonpayment, as defined in the Policy. Specifically, the Financial Guaranty Insurance Policy does not cover:

1.   payment on acceleration, as a result of a call for prepayment (other than mandatory sinking fund prepayment) or as a result of any other advancement of maturity.

2.   payment of any prepayment or acceleration premium.

3.   nonpayment of principal or interest caused by the insolvency or negligence of the Trustee or payment agent, if any.

If it becomes necessary to call upon the Financial Guaranty Insurance Policy, payment of principal requires surrender of Certificates to the Insurance Trustee together with an appropriate instrument of assignment so as to permit ownership of such Certificates to be registered in the name of the Insurer to the extent of the payment under the Financial Guaranty Insurance Policy. Payment of interest pursuant to the Financial Guaranty Insurance Policy requires proof of beneficial owner entitlement to interest payments and an appropriate assignment of the beneficial owner's right to payment to the Insurer.

Upon payment of the insurance benefits, the Insurer will become the owner of the Certificate, appurtenant coupon, if any, or right to payment of principal or interest with respect to such Certificate and will be fully subrogated to the surrendering beneficial owner's rights to payment.

In the event that the Insurer were to become insolvent, any claims arising under the Policy would be excluded from coverage by the California Insurance Guaranty Association, established pursuant to the laws of the State of California.

Exhibit 9
Page 25 of 165

**Ambac Assurance Corporation**

The Insurer is a Wisconsin-domiciled stock insurance corporation regulated by the Office of the Commissioner of Insurance of the State of Wisconsin and licensed to do business in 50 states, the District of Columbia, the Territory of Guam and the Commonwealth of Puerto Rico, with admitted assets of approximately $6,115,000,000 (unaudited) and statutory capital of approximately $3,703,000,000 (unaudited) as of December 31, 2002. Statutory capital consists of the Insurer's policyholders' surplus and statutory contingency reserve. Standard & Poor's Credit Markets Services, a division of The McGraw-Hill Companies, Inc., Moody's Investors Service and Fitch, Inc. have each assigned a triple-A financial strength rating to the Insurer.

The Insurer has obtained a ruling from the Internal Revenue Service to the effect that the insuring of an obligation by the Insurer will not affect the treatment for federal income tax purposes of interest on such obligation and that insurance proceeds representing maturing interest paid by the Insurer under policy provisions substantially identical to those contained in its Financial Guaranty Insurance Policy shall be treated for federal income tax purposes in the same manner as if such payments were made by the issuer of the Certificates.

The Insurer makes no representation regarding the Certificates or the advisability of investing in the Certificates and makes no representation regarding, nor has it participated in the preparation of, the Official Statement other than the information supplied by the Insurer and presented under the caption "CERTIFICATE INSURANCE."

**Available Information**

The parent company of the Insurer, Ambac Financial Group, Inc. (the "Company"), is subject to the informational requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and in accordance therewith files reports, proxy statements and other information with the Securities and Exchange Commission (the "SEC"). These reports, proxy statements and other information can be read and copied at the SEC's public reference room at 450 Fifth Street, N.W., Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the public reference room. The SEC maintains an internet site at http://www.sec.gov that contains reports, proxy and information statements and other information regarding companies that file electronically with the SEC, including the Company. These reports, proxy statements and other information can also be read at the offices of the New York Stock Exchange, Inc. (the "NYSE"), 20 Broad Street, New York, New York 10005.

Copies of the Insurer's financial statements prepared in accordance with statutory accounting standards are available from the Insurer. The address of the Insurer's administrative offices and its telephone number are One State Street Plaza, 19th Floor, New York, New York 10004 and (212) 668-0340.

**Incorporation of Certain Documents by Reference**

The following documents filed by the Company with the SEC (File No. 1-10777) are incorporated by reference in this Restated Official Statement:

1.   The Company's Current Report on Form 8-K dated January 23, 2003 and filed on January 24, 2003;

2.   The Company's Current Report on Form 8-K dated February 25, 2003 and filed on February 28, 2003;

3.   The Company's Current Report on Form 8-K dated February 25, 2003 and filed on March 4, 2003;

13

Exhibit 9
Page 26 of 165

4.      The Company's Current Report on Form 8-K dated March 18, 2003 and filed on March 20, 2003;

5.      The Company's Current Report on From 8-K dated March 19, 2003 and filed on March 26, 2003;

6.      The Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2002 and filed on March 28, 2003;

7.      The Company Current Report on Form 8-K dated March 25, 2003 and filed on March 31, 2003; and

8.      The Company's Current Report on Form 8-K dated April 17, 2003 and filed on April 21, 2003.

All documents subsequently filed by the Company pursuant to the requirements of the Exchange Act after the date of this Official Statement will be available for inspection in the same manner as described above in "Available Information."

**The Surety Bond**

The following information has been furnished by the Insurer for use in this Official Statement.

The Trust Agreement requires the establishment of a Reserve Fund in an amount equal to the Reserve Requirement. The Trust Agreement authorizes the City to obtain a surety bond in the place of fully funding the Reserve Fund. Accordingly, application has been made to the Insurer for the issuance of the Surety Bond for the purpose of funding the Reserve Fund. The Certificates will only be delivered upon the issuance of such Surety Bond. The premium on the Surety Bond is to be fully paid at or prior to the issuance and delivery of the Certificates. The Surety Bond provides that upon the later of (i) one (1) day after receipt by the Insurer of a demand for payment executed by the Trustee certifying that provision for the payment of principal of or interest with respect to the Certificates when due has not been made or (ii) the interest payment date specified in the Demand for Payment submitted to the Insurer, the Insurer will promptly deposit funds with the Trustee sufficient to enable the Trustee to make such payments due on the Certificates, but in no event exceeding the Surety Bond Coverage, as defined in the Surety Bond.

Pursuant to the terms of the Surety Bond, the Surety Bond Coverage is automatically reduced to the extent of each payment made by the Insurer under the terms of the Surety Bond and the City is required to reimburse the Insurer for any draws under the Surety Bond with interest at a market rate. Upon such reimbursement, the Surety Bond is reinstated to the extent of each principal reimbursement up to but not exceeding the Surety Bond Coverage. The reimbursement obligation of the City is subordinate to the City's obligations to pay Lease Payments.

In the event the amount on deposit, or credited to the Reserve Fund, exceeds the amount of the Surety Bond, any draw on the Surety Bond shall be made only after all the funds in the Reserve Fund have been expended. In the event that the amount on deposit in, or credited to, the Reserve Fund, in addition to the amount available under the Surety Bond, includes amounts available under a letter of credit, insurance policy, surety bond or other such funding instrument (the "Additional Funding Instrument"), draws on the Surety Bond and the Additional Funding Instrument shall be made on a pro rata basis to fund the insufficiency. The Trust Agreement provides that the Reserve Fund shall be replenished in the following priority: (i) principal and interest on the Surety Bond shall be paid from first available Lease Payments; (ii) after all such amounts are paid in full, amounts necessary to fund the Reserve Fund to the required level, after taking into account the amounts available under the Surety Bond shall be deposited from next available Lease Payments.

14

Exhibit 9
Page 27 of 165

The Surety Bond does not insure against nonpayment caused by the insolvency or negligence of the Trustee.

In the event that the Insurer were to become insolvent, any claims arising under the Surety Bond would be excluded from coverage by the California Insurance Guaranty Association, established pursuant to the laws of the State of California.

None of the City, the Authority nor the Underwriter makes any representation as to the ability of the Insurer to meet its obligations under the Financial Guaranty Insurance Policy or the Surety Bond.

## CITY FINANCIAL INFORMATION

General information about the City and the City's financial information is set forth in APPENDIX A — "THE CITY OF SAN DIEGO."

The City's Financial Statements along with accompanying notes and opinions from the Independent Auditor for the Fiscal Year ended June 30, 2002, are set forth in APPENDIX B — "THE CITY OF SAN DIEGO AUDITED FINANCIAL STATEMENTS FOR THE FISCAL YEAR ENDED JUNE 30, 2002" herein. The City's financial statements are public documents and are included within this Official Statement with the prior approval the Auditor, but the Auditor has not performed any post-audit of the financial condition of the City.

## LIMITATIONS ON TAXES AND APPROPRIATIONS

There are a number of provisions in the State Constitution that limit the ability of the City to raise and expend tax revenues. For a discussion of such provisions, see APPENDIX A — "THE CITY OF SAN DIEGO — LIMITATIONS ON TAXES AND APPROPRIATIONS."

## RISK FACTORS

The following factors, along with all other information in this Official Statement, should be considered by potential investors in evaluating the Certificates.

### Abatement

The City's obligation to make Lease Payments is subject to full or partial abatement and could result in the Trustee having inadequate funds to pay the principal and interest due with respect to the Certificates under certain circumstances related to damage, destruction, condemnation or title defects which cause a substantial interference with the use and occupancy of all or a portion of the Site. See "See APPENDIX C — "SUMMARY OF PRINCIPAL LEGAL DOCUMENTS — AGREEMENT TO LEASE; TERM OF LEASE; LEASE PAYMENTS — Abatement of Lease Payments in the Event of Loss of Use" herein.

### Default

Whenever any event of default referred to in the Lease Agreement happens and continues, the Trustee, as the assignee of the Corporation, is authorized under the terms of the Lease Agreement to exercise any and all remedies available pursuant to law or granted pursuant to the Lease Agreement; provided, however, that notwithstanding anything therein or in the Trust Agreement to the contrary, THERE SHALL BE NO RIGHT UNDER ANY CIRCUMSTANCES TO ACCELERATE THE LEASE PAYMENTS OR OTHERWISE DECLARE ANY LEASE PAYMENTS NOT THEN DUE OR PAST DUE TO BE IMMEDIATELY DUE

Exhibit 9
Page 28 of 165

AND PAYABLE. NEITHER THE CORPORATION NOR ITS ASSIGNEE SHALL HAVE ANY RIGHT TO REENTER OR RELET THE SITE EXCEPT FOLLOWING A DEFAULT UNDER THE LEASE AGREEMENT. Following an event of default, at the direction of the Insurer, the Trustee, as the assignee of the Corporation, may elect either to terminate the Lease Agreement and seek to collect damages from the City or to maintain the Lease Agreement in effect and seek to collect the Lease Payments as they become due. The Lease Agreement further provides that so long as an event of default exists under the Lease Agreement, the Corporation, or its assignee, may re-enter the Site for the purpose of taking possession of any portion of the Site and to re-let the Site and, in addition, at its option, with or without such entry to terminate the Lease Agreement as described therein. See APPENDIX C — "SUMMARY OF PRINCIPAL LEGAL DOCUMENTS — LEASE AGREEMENT — Remedies On Default."

No assurance can be given that the Trustee will be able to re-let the Site so as to provide rental income sufficient to pay principal and interest evidenced by the Certificates in a timely manner or that such re-letting will not adversely affect the exclusion of interest with respect thereto from gross income for federal or State income tax purposes. Furthermore, due to the public purposes of the City the Site serves, it is not certain whether a court would permit the exercise of the remedies of repossession and re-letting with respect to the Site, or whether due to the respective locations or specialized nature of the Site such repossession and re-letting would be economically or physically feasible. Furthermore, pursuant to the Lease Agreement, the Golf Course Portion of the Site is released from the Lease Agreement after November 1, 2008.

In the event of a default, there is no remedy of acceleration of the total Lease Payments due over the term of the Lease Agreement and the Trustee is not empowered to sell the Site and use the proceeds of such sale to prepay the Certificates or pay debt service with respect thereto. The City will be liable only for Lease Payments on an annual basis and, in the event of a default, the Trustee would be required to seek a separate judgment each year for that year's defaulted Lease Payments. Any such suit for money damages would be subject to limitations on legal remedies against municipalities in California, including a limitation on enforcement of judgments against funds of a fiscal year other than the fiscal year in which the Lease Payments were due and against funds needed to serve the public welfare and interest.

**Release or Substitution of Site**

The City has the right from time to time, with the consent of the Insurer, to add other real property and improvements (subject only to Permitted Encumbrances) or to substitute other real property and improvements (subject only to Permitted Encumbrances) for all or a portion of the Site or to release a portion of the real property and improvements constituting the Site, subject to the conditions precedent to such addition, substitution or release as set forth in the Lease Agreement. Pursuant to the Lease Agreement, the Golf Course Portion of the Site is released from the Lease Agreement after November 1, 2008, and after this date the Lease Agreement no longer relates to the Golf Course Portion. The release of the Golf Course Portion of the Site has been pre-approved by the Insurer. See APPENDIX C — "SUMMARY OF PRINCIPAL LEGAL DOCUMENTS — COVENANTS WITH RESPECT TO THE PROPERTY — Substitution or Release of the Site" herein.

In connection with a substitution or release, whether as described above or otherwise, all interests of the Corporation, and the Trustee as its assignee, in the portion of the Site released shall terminate and the Corporation and the Trustee as its assignee shall execute and record with the County Recorder of the County all documents deemed necessary by the City to evidence such termination of interest. Upon satisfaction by the City of the conditions set forth in the Lease Agreement, the Trustee also will execute a Lease Supplement and will not impose on the City any further conditions or prerequisites to the requested addition, substitution or release. The City will cause the Lease Supplement, or another document substantially in the form of the Lease Supplement, to be recorded in the real property records of the County.

All costs and expenses incurred in connection with such addition, substitution or release will be borne by the City. No addition, substitution or release under the Lease Agreement will be, by itself, the basis for any

Exhibit 9
Page 29 of 165

reduction in or abatement of the Lease Payments due from the City thereunder. See APPENDIX C — "SUMMARY OF PRINCIPAL LEGAL DOCUMENTS — COVENANTS WITH RESPECT TO THE PROPERTY — Substitution or Release of the Site" herein.

**Not a Pledge of Taxes**

The obligation of the City to pay the Lease Payments and Additional Payments does not constitute an obligation of the City for which the City is obligated to levy or pledge any form of taxation or for which the City has levied or pledged any form of taxation. The obligation of the City to pay Lease Payments and Additional Payments does not constitute a debt or indebtedness of the Corporation, the City, the State of California or any of its political subdivisions within the meaning of any constitutional or statutory debt limitation or restriction.

Although the Lease Agreement does not create a pledge, lien or encumbrance upon the funds of the City, the City is obligated under the Lease Agreement to pay Lease Payments and Additional Payments from any source of legally available funds (subject to certain exceptions) and the City has covenanted in the Lease Agreement that, for as long as the Site is available for its use and possession, it will make the necessary annual appropriations within its budget for all Lease Payments and Additional Payments. The City is currently liable on other obligations payable from general revenues, including certificates of participation. See "CITY FINANCIAL INFORMATION — Indebtedness" herein.

Certain taxes, assessments, fees and charges presently imposed by the City could be subject to the voter approval requirements of Article XIIIC and Article XIIID of the State Constitution. Based upon the outcome of an election by the voters, such fees, charges, assessments and taxes might no longer be permitted to be imposed, or may be reduced or eliminated and new taxes, assessments fees and charges may not be approved. The City has assessed the potential impact on its financial condition of the provisions of Article XIIIC and Article XIIID of the State Constitution respecting the imposition and increase of taxes, fees, charges and assessments and does not believe that an election by the voters to reduce or eliminate the imposition of certain existing fees, charges, assessments and taxes would materially affect its financial condition. However, the City believes that in the event that the initiative power was exercised so that all local taxes, assessments, fees and charges which may be subject to the provisions of Article XIIIC and Article XIIID of the State Constitution are eliminated or substantially reduced, the financial condition of the City, including its General Fund, could be materially adversely affected. Although the City does not currently anticipate that the provisions of Article XIIIC and Article XIIID of the State Constitution would adversely affect its ability to pay the principal of and interest with respect to the Certificates as and when due and its other obligations payable from the General Fund, no assurance can be given regarding the ultimate interpretation or effect of Article XIIIC and Article XIIID of the State Constitution on the City's finances. See "CITY FINANCIAL INFORMATION — Major Revenues" herein.

**Additional Obligations of the City**

The City is permitted to enter into other obligations which constitute additional charges against its revenues without the consent of Owners of the Certificates. To the extent that additional obligations are incurred by the City, the funds available to pay Lease Payments may be decreased.

The Lease Payments and other payments due under the Lease Agreement (including payment of costs of repair and maintenance of the Site, taxes and other governmental charges levied against the Site) are payable from funds lawfully available to the City. In the event that the amounts which the City is obligated to pay in a fiscal year exceed the City's revenues for such year, the City may choose to make some payments rather than making other payments, including Lease Payments and Additional Payments, based on the perceived needs of the City. The same result could occur if, because of California Constitutional limits on expenditures, the City is not permitted to appropriate and spend all of its available revenues or is required to expend available revenues to preserve the public health, safety and welfare.

Exhibit 9
Page 30 of 165

**Natural and Manmade Disasters**

The occurrence of natural disasters, including earthquakes, fires or floods, or manmade disasters such as arson or acts of terrorism, affecting the Site could result in substantial damage to the Site, and could lead to reduced assessed values for such property.

As required by the Alquist-Priolo Earthquake Fault Zoning Act, the State geologist in 1973 initiated a program to delineate the State's earthquake fault zones and to compile and distribute maps of these zones. Earthquake fault zones are delineated along known active faults. Cities and counties affected by the zones must regulate certain development projects with the zones. As of June 1, 1997, 539 official maps of earthquake fault zones have been issued. The City is not among the 97 California cities affected by the earthquake fault zones.

The most dominant source of potential ground motion at the Site is from the Rose Canyon fault. Earthquakes from this source are expected to have a potential for seismic ground shaking with a maximum credible magnitude of 7.0 and a maximum probable magnitude of 6.25. The "maximum credible earthquake" is defined as the maximum earthquake that appears capable of occurring under the presently known tectonic framework, while the "maximum probable earthquake" is the maximum earthquake that is considered likely to occur during a 100-year time interval.

**Limitations on Remedies; Bankruptcy**

The rights of the owners of the Certificates are subject to the limitations on legal remedies against municipalities in the State, including a limitation on enforcement of judgments against funds needed to serve the public welfare and interest. Additionally, enforceability of the rights and remedies of the owners of the Certificates, and enforcement of the City's obligations under the Lease Agreement, may become subject to the federal bankruptcy code and applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or affecting the enforcement of creditor's rights generally, now or hereafter in effect, equity principles which may limit the specific enforcement under State law of certain remedies, the exercise by the United States of America of the powers delegated to it by the Constitution, the reasonable and necessary exercise, in certain exceptional situations, of the police powers inherent in the sovereignty of the State and its governmental bodies in the interest of serving a significant and legitimate public purpose and the limitations on remedies against counties in the State. Bankruptcy proceedings under Chapter 9 of the Bankruptcy Code (Title 11, United States Code), which governs the bankruptcy proceedings for public agencies such as the City, or the exercise of powers by the federal or State government, if initiated, could subject the owners of the Certificates to judicial discretion and interpretation of their rights in bankruptcy or otherwise, and consequently may entail risks of delay, limitation, or modification of their rights. See "RISK FACTORS — Default" herein.

**Economic Conditions in California**

Since early 2001, the State has been faced with severe financial challenges, which may continue for several years. The State has experienced an economic recession in 2001 and is currently in a sluggish recovery. The major forces in the State's economic downturn were decline in the high technology, internet and telecommunications sectors, lower demand for exports and large stock market declines. These adverse fiscal and economic factors have resulted in a serious erosion of the State's General Fund tax revenues. The bulk of the revenue declines were from personal income taxes, principally from reduced capital gains realizations and stock option income.

This revenue drop resulted in a shortfall between State revenues and anticipated spending demands for the 2001-02 and 2002-03 fiscal years which at the time that the State's 2002 Budget Act (the "2002-03 Budget") was enacted was an estimated $23.6 billion. The shortfall estimated at the time of the 2002-03 Budget was ultimately closed with a combination of expenditure reductions, revenue enhancements, and one-time budgetary actions, such as fund transfers and loans, expenditure deferrals, bond issuances and other

Exhibit 9
Page 31 of 165

actions. Total revenue receipts reported by the State Controller's Office for the three major revenue sources (personal income tax, sales tax and corporation tax) for the first five months of fiscal year 2002-03 have been below the revenue projections included within the 2002-03 Budget. These reduced revenues have led to the proposed mid-year budget reductions discussed below.

In mid-November 2002, the Legislative Analyst issued a report (the "LAO Report") indicating the State is facing dire fiscal conditions. The LAO Report was prepared to provide the Legislature with a baseline from which budget decisions could be made. The LAO Report updated economic conditions, and revenue and expenditure projections based on more recent actual results since the time of the enactment of the 2002-03 Budget. The LAO Report projected that, absent corrective actions, the State General Fund would have a budget deficit of about $6.1 billion by the end of the 2002-03 fiscal year (compared to the 2002-03 Budget which predicted a reserve balance of $1 billion) and a cumulative budget deficit over $21 billion by the end of the 2003-04 fiscal year. Furthermore, even given accelerating economic growth in 2003 and beyond (which is not assured), unless corrective actions are taken, in the Legislative Analyst's view, there would continue to be a substantial deficit between revenues and expenditures, in a potential range from $12-16 billion annually, for several years after fiscal year 2003-04.

The principal causes of the continuing fiscal difficulty were identified in the LAO Report as (i) the use of so many one-time budget solutions to resolve the shortfall projected at the time of the 2002-03 Budget, without enough emphasis on closing the "structural deficit" between ongoing revenue sources (taxes) and ongoing expenditure commitments, (ii) the likelihood that some of the assumptions in the 2002-03 Budget would not be met, and (iii) a significant downward revision in revenue estimates for the period through June 30, 2004. The LAO Report estimated that items (i) and (ii) above would result in a cumulative $10 billion gap between revenues and expenditures (absent further actions) by the end of the 2003-04 fiscal year, consistent with projections the Legislative Analyst had made in the summer of 2002.

In the summer of 2002, the Governor notified all State agencies to prepare 2003-04 budget proposals for a minimum of 20 percent cut in funding. On November 21, 2002, the Governor announced his call for a special session of the Legislature, which began on December 9, 2002, to address needed budget actions, and he further directed State agencies to take immediate action to reduce any non-critical or non-essential activities by not filling any vacant positions, to cancel, postpone or amend contracts, grants, purchase orders and similar commitments, to eliminate additional non-essential vacant positions, to delay construction or signing of new leases for space, to cancel or postpone non-essential trips, and to generate new proposals for current year program reductions. The Governor stated that he would propose spending reductions, recaptures and other changes to accomplish savings over the period through June 30, 2004. The Governor also stated that he believed the budget shortfall would be higher than the $21 billion estimated by the LAO Report.

On December 6, 2002, the Governor released his mid-year spending reduction proposals for consideration at the special session of the Legislature with his proposed reductions and adjustments totaling $10.2 billion for fiscal years 2002-03 and 2003-04. On December 18, 2002, the Governor announced that the estimated budget shortfall through June 30, 2004 is $34.8 billion.

On January 10, 2003, the Governor released his proposed budget for fiscal year 2003-04 (the "Governor's Proposed 2003-04 Budget") in which he addressed deficits under the 2002 Budget Act and 2003-04 fiscal year budget shortfalls—a combined $34.6 billion gap between projected revenues and expenditures over the 2002-03 and 2003-04 fiscal years. To close the balance of the $34.6 billion budget gap, the Governor proposed additional measures that are expected to address the estimated $24.4 billion budget shortfall not addressed in the Governor's December 2002 mid-year spending reductions proposals.

The Governor's Proposed 2003-04 Budget proposes restoration of Executive Branch authority to make mid-year adjustments to the budget when revenues fall significantly below budgeted forecasts. The Governor's Proposed 2003-04 Budget contemplates the creation of a special budget reserve for proceeds from extraordinary revenue growth to be used for one-time expenditures.

Exhibit 9
Page 32 of 165

The LAO, in a report issued on January 15, 2003, contends that the Governor's Proposed 2003-04 Budget overstates both baseline costs and budget program savings in numerous areas of the budget and understates tax revenues. The LAO notes that approximately $8 billion dollars in the difference between the LAO Report November, 2002 projection of a $21.1 billion deficit and the Governor's $34.6 billion deficit prediction is attributable to forecasting differences of revenues and program caseloads that drive expenditures. The balance of the discrepancy between the two agencies projections, according to the LAO, is attributable to definitional differences relating to the baseline used for analyzing expenditure reductions; according to the LAO, the Governor's baseline in some cases reflects additional spending that would be required to achieve the administration's policy goals as well as proposals that have not yet been adopted. The LAO does predict that based on more up-to-date information about revenues and caseload trends and other factors affecting spending, it will update its estimate of the budget shortfall to the $26-plus billion range.

The LAO issued another report on the Governor's Proposed 2003-04 Budget on February 19, 2003 in which it goes into further analysis of the Governor's Proposed 2003-04 Budget and the State's economy. The LAO estimated that the adoption of the Governor's Proposed 2003-04 Budget would result in a positive reserve of about $1.6 billion at the conclusion of 2003-04 and would address the long-term structural imbalance in the State's budget with revenues and expenditures roughly balancing in fiscal year 2004-05. The LAO notes that there are a number of key risk factors that could consume the projected $1.6 billion reserve including a failure to reach agreement on $1.5 billion of revenues from Indian gaming and a reduction in existing federal funding reimbursements. The LAO states that a restoration of California's fiscal health will occur only if the Legislature either (1) adopts the major savings and revenue proposals included in the Governor's Proposed 2003-04 Budget or (2) finds alternative solutions of similar magnitude that are real and largely ongoing in nature. Absent this, the modest positive fiscal balance that the LAO has projected would, in its view, be quickly transformed into a large deficit.

On March 18, 2003, the Governor signed into law legislation passed at the special session of the Legislature regarding mid-year budget costs for fiscal year 2002-03. The legislation approves approximately $3.3 billion of spending reductions and budget adjustments for fiscal year 2002-03 and provides $23 million in savings for fiscal year 2003-04. These reductions and budget adjustments did not have a material impact on the City's General Fund.

On May 14, 2003, the Governor released his May Revision to his proposed budget for fiscal year 2003-04 (the "May Revision to the Proposed 2003-04 Budget") in which he re-addressed deficits under the 2002 Budget Act and 2003-04 fiscal year budget shortfalls. The Governor revised his original estimate of an approximate $34.6 billion budget gap to a $38.2 billion budget gap between projected revenues and expenditures over the 2002-03 and 2003-04 fiscal years. To close the balance of the $38.2 billion budget gap, the Governor proposed new measures to address the additional projected deficit.

The following table compares the measures proposed in the Governor's Proposed 2003-04 Budget and the May Revision to the Proposed 2003-04 Budget which comprises the Governor's overall solution to close the $38.2 billion budget shortfall that he has predicted:

Exhibit 9
Page 33 of 165

**ADDRESSING THE OVERALL $38.2 BILLION GAP**
(Dollars in Millions)

|  | *January Budget* | *May Revision* | *Percentage of Solution* |
|---|---|---|---|
| Cuts/Savings | $ 20,728.3 | $ 18,875.4 | 49.4% |
| Realignments | 8,154.0 | 1,732.4 | 4.5% |
| Fund Shifts | 1,902.7 | 2,076.3 | 5.5% |
| Transfers | 2,114.3 | 1,912.6 | 5.0% |
| Loans/Borrowing | 1,683.3 | 2,901.5 | 7.6% |
| Deficit Financing | – | 10,700.0 | 28.0% |
| Total | $ 34,582.7 | $ 38,198.2 | 100.0% |

Note: Numbers may not add due to rounding.
Source: Governor's Budget May Revision 2003-04.

The May Revision to the Proposed 2003-04 Budget proposes that the State issue deficit financing bonds based on revenues from a temporary one-half cent sales tax increase to fund the accumulated budget deficit. The sales tax will take effect as of October 1, 2003 and automatically cease as soon as the bonds are paid off. The May Revision to the Proposed 2003-04 Budget reduces the realignment shift to counties from the Governor's original estimates of $8.3 billion to $1.8 billion. The May Revision to the Proposed 2003-04 Budget proposes to fund this reduction with the following tax proposals: (i) increasing personal income tax margins to 10.3% for high-income taxpayers (which according to the Governor is expected to generate approximately $1.56 billion in additional revenues during fiscal year 2003-04), and (ii) increasing the cigarette tax $0.23 per pack in fiscal year 2003-04 and increasing it further in fiscal year 2004-05 to $0.40 per pack (which according to the Governor is expected to generate approximately $267 million in additional revenues during fiscal year 2003-04 and $678 million in additional revenues in 2004-05).

Final action on budget adjustments for fiscal year 2002-03 and enactment of the 2003 Budget Act will occur following negotiations between the Legislature and the Governor over the coming months.

The May Revision to the Proposed 2003-04 Budget eliminates the vehicle license fee backfill to cities and counties in fiscal year 2003-04. As a result of the expected automatic trigger of an increase in the vehicle license fee, the State Controller and the Governor in the May Revision to the Proposed 2003-04 Budget state that Section 10754 of the Revenue and Taxation Code would require the Department of Motor Vehicles and the Department of Housing and Community Development, as appropriate, to reduce the vehicle license fee offsets and increase the vehicle license fees to replace the backfill amount. See APPENDIX A — "THE CITY OF SAN DIEGO — MUNICIPAL GOVERNMENT AND FINANCIAL INFORMATION — State Budget Deficit" and "Vehicle License Fee Reduction" for a discussion of the potential impacts of the Governor's Proposed 2003-04 Budget on City revenues and expenditures.

The City cannot predict whether the Legislature will adopt the Governor's Proposed 2003-04 Budget as revised by the May Revision to the Proposed 2003-04 Budget or what actions will be taken in the future by the State Legislature and the Governor to address the State's current or future budget deficits. In particular, the City cannot predict the level of VLF revenues it may expect in future fiscal years, including fiscal year 2003-04. Future State budgets will be affected by national and state economic conditions and other factors over which the City will have no control. To the extent that the State budget process results in reduced revenues or increased expenses for the City, the City will be required to make adjustments to its budget.

**THE CORPORATION**

The Corporation was organized pursuant to the Nonprofit Public Benefit Corporation Law of the State of California (Title 1, Division 2, Part 2 of the California Corporations Code), solely for the purpose of

Exhibit 9
Page 34 of 165

rendering assistance to the City by acquiring, constructing, improving, and financing various public facilities for the use, benefit, and enjoyment of the public. The Corporation was formed at the request of the City. Corporate Directors receive no compensation.

## TAX EXEMPTION

In the opinion of Stradling Yocca Carlson & Rauth, a Professional Corporation, Newport Beach, California, Special Counsel, under existing statutes, regulations, rulings and judicial decisions, interest due with respect to the Certificates is excluded from gross income for federal income tax purposes, and is not an item of tax preference for purposes of calculating the federal alternative minimum tax imposed on individuals and corporations. In the further opinion of Special Counsel, interest due with respect to the Certificates is exempt from State of California personal income tax. Special Counsel notes that, with respect to corporations, interest due with respect to the Certificates may be included as an adjustment in the calculation of alternative minimum taxable income which may affect the alternative minimum tax liability of such corporations.

A portion of the proceeds of the Prior Certificates were expended for the purpose of improving certain facilities located on Balboa Park (including the House of Charm) and used by certain nonprofit corporations, including The San Diego Art Institute, Mingei International, Inc., Old Globe Theatre, Inc., House of Hospitality Association, Inc. and San Diego Hall of Champions, Inc. (collectively, the "Nonprofit Corporations"). Bond Counsel has relied on the opinions of counsel to the respective Nonprofit Corporations that each of the Nonprofit Corporations is an organization described in Section 501(c)(3) of the Code and regarding the intended operation of the facilities to be financed by the Certificates as substantially related to the Nonprofit Corporation's charitable purposes under Section 513 of the Code, and other matters. Such opinions are subject to a number of qualifications and limitations. Neither Bond Counsel nor Nonprofit Corporations' counsels can give or has given any opinion or assurance about the future activities of the respective Nonprofit Corporations, or about the effect of future changes in the Code, the applicable regulations, the interpretation thereof or the resulting changes in enforcement thereof by the Internal Revenue Service ("IRS"). Failure of the Nonprofit Corporations to be organized and operated in accordance with IRS's requirements for the maintenance of their respective status as an organization described in Section 501(c)(3) of the Code may result in the portion of each Lease Payment constituting interest (and original issue discount) with respect to the Certificates being included in federal gross income, possibly from the date of the original issuance of the Certificates.

The difference between the issue price of a Certificate (the first price at which a substantial amount of the Certificates of the same series and maturity is to be sold to the public) and the stated redemption price at maturity with respect to such Certificate constitutes original issue discount. Original issue discount accrues under a constant yield method, and original issue discount will accrue to the owner of the Certificate before receipt of cash attributable to such excludable income. The amount of original issue discount deemed received by the owner of a Certificate will increase the owner's basis in the Certificate. In the opinion of Special Counsel original issue discount that accrues to the owner of a Certificate is excluded from the gross income of such owner for federal income tax purposes, is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations, and is exempt from State of California personal income tax.

Special Counsel's opinion as to the exclusion from gross income of interest (and original issue discount) due with respect to the Certificates is based upon certain representations of fact and certifications made by the City, the Nonprofit Corporations and others and is subject to the condition that the City and the Corporation comply with all requirements of the Internal Revenue Code of 1986, as amended (the "Code"), that must be satisfied subsequent to the execution and delivery of the Certificates to assure that the portion of each Lease Payment constituting interest (and original issue discount) will not become includable in gross income for federal income tax purposes. Failure to comply with such requirements of the Code might cause interest (and original issue discount) due with respect to the Certificates to be included in gross income for

Exhibit 9
Page 35 of 165

federal income tax purposes retroactive to the date of execution and delivery of the Certificates. The City and the Corporation have covenanted to comply with all such requirements applicable to each, respectively.

The amount by which a Certificate Owner's original basis for determining loss on sale or exchange in the applicable Certificate (generally, the purchase price) exceeds the amount payable on maturity (or on an earlier call date) constitutes amortizable Certificate premium, which must be amortized under Section 171 of the Code; such amortizable Certificate premium reduces the Certificate Owner's basis in the applicable Certificate (and the amount of tax-exempt interest received), and is not deductible for federal income tax purposes. The basis reduction as a result of the amortization of Certificate premium may result in a Certificate Owner realizing a taxable gain when a Certificate is sold by the Owner for an amount equal to or less (under certain circumstances) than the original cost of the Certificate to the Owner. Purchasers of the Certificates should consult their own tax advisors as to the treatment, computation and collateral consequences of amortizable Certificate premium.

Special Counsel's opinions may be affected by actions taken (or not taken) or events occurring (or not occurring) after the date hereof. Special Counsel has not undertaken to determine, or to inform any person, whether any such actions or events are taken or do occur. The Trust Agreement, the Lease Agreement, and the Tax Certificate permit certain actions to be taken or to be omitted if a favorable opinion of Special Counsel is provided with respect thereto. Special Counsel expresses no opinion as to the exclusion from gross income for federal income tax purposes of interest (and original issue discount) due with respect to any Certificate if any such action is taken or omitted based upon the advice of counsel other than Stradling Yocca Carlson & Rauth, a Professional Corporation.

The Internal Revenue Service (the "IRS") has initiated an expanded program for the auditing of tax-exempt bond issues, including both random and targeted audits. It is possible that the Certificates will be selected for audit by the IRS. It is also possible that the market value of the Certificates might be affected as a result of such an audit of the Certificates (or by an audit of similar securities).

Although Special Counsel has rendered an opinion that the interest (and original issue discount) due with respect to the Certificates is excluded from gross income for federal income tax purposes provided that the City and the Corporation continue to comply with certain requirements of the Code, the ownership of the Certificates and the accrual or receipt of interest (and original issue discount) with respect to the Certificates may otherwise affect the tax liability of certain persons. Special Counsel expresses no opinion regarding any such tax consequences. Accordingly, before purchasing any of the Certificates, all potential purchasers should consult their tax advisors with respect to collateral tax consequences with respect to the Certificates.

The form of Special Counsel's opinion with respect to the Certificates is attached hereto as Appendix D.

## CERTAIN LEGAL MATTERS

Certain legal matters incident to the authorization, sale, execution and delivery of the Certificates are subject to the approval of Stradling Yocca Carlson & Rauth, a Professional Corporation, Newport Beach, California, Special Counsel. A complete copy of the proposed form of opinion of Special Counsel is contained in Appendix D hereto. Special Counsel has not undertaken any responsibility to the Owners for the accuracy, completeness or fairness of this Official Statement or other offering materials relating to the Certificates and expresses no opinion relating thereto. Certain legal matters will be passed upon for the City by the City Attorney and for the Corporation by Foley & Lardner, San Diego, California. Compensation of Special Counsel and the Financial Advisor is contingent upon the execution and delivery of the Certificates.

Exhibit 9
Page 36 of 165

## LITIGATION

To the City's or the Corporation's knowledge, there is no litigation pending or threatened in any way to restrain or enjoin the execution or delivery of the Certificates, to contest the validity of the Certificates, the Indenture, the Site Lease, the Lease Agreement, or any proceeding of the City or the Corporation with respect thereto. To the knowledge of the Corporation and its counsel, there are no lawsuits or claims pending against the Corporation which will materially affect the Corporation's finances or as to impair its ability to pay the principal of, premium (if any) and interest with respect to the Certificates when due. To the knowledge of the City and the City Attorney, there are pending against the City lawsuits and claims arising in the ordinary course of the City's activities which taken individually or in the aggregate, could materially affect the City's finances. However, taking into account expected insurance and self-insurance reserves expected to be available to pay liability arising from such actions, the City does not expect any or all such claims to impair its ability to make Lease Payments when due. See APPENDIX A — "THE CITY OF SAN DIEGO – LITIGATION POTENTIALLY ADVERSELY AFFECTING THE GENERAL FUNDS OF THE CITY" for a discussion of pending Litigation against the City.

## RATINGS

It is expected that Fitch Ratings ("Fitch"), Moody's Investors Service ("Moody's") and Standard & Poor's Ratings Group ("S&P") have assigned ratings of "Aaa," "AAA" and "AAA," respectively, to the Certificates, with the understanding that, upon delivery of the Certificates, a policy insuring the payment when due of principal of and interest with respect to the Certificates will be issued by the Insurer. Fitch, Moody's and S&P have assigned underlying ratings to the Bonds without respect to the issuance of the Financial Guaranty Insurance Policy of "AA+," "Aa3" and "AA-," respectively. Such ratings reflect only the views of such organizations and any desired explanation of the significance of such ratings should be obtained from the rating agency furnishing the same, at the following addresses: Moody's Investors Service, Inc., 99 Church Street, New York, New York 10007; Standard & Poor's Corporation, 55 Water Street, New York, New York 10041; Fitch Ratings, One State Street Plaza, New York, New York 10004. Generally, a rating agency bases its rating on the information and materials furnished to it and on investigations, studies and assumptions of its own. There is no assurance such ratings will continue for any given period of time or that such ratings will not be revised downward or withdrawn entirely by the rating agencies, if in the judgment of such rating agencies, circumstances so warrant. Any such downward revision or withdrawal of such ratings may have an adverse effect on the market price of the Certificates.

## UNDERWRITING

The Certificates were sold to _____ (the "Underwriter") on _____ following competitive bid. The Certificates are being purchased by the Underwriter for $_____ (representing the par amount of the Certificates, plus net original issue premium of $_____, less an underwriter's discount of $_____). The Underwriter intends to offer the Certificates to the public initially at the interest rates and prices set forth on the inside cover page of this Official Statement. Such prices may subsequently change without any requirement of prior notice. The Certificates may be offered and sold to certain dealers at prices lower than the public offering prices.

## FINANCIAL ADVISOR

The City has retained Public Resources Advisory Group, New York, New York, as Financial Advisor for the sale of the Certificates. The Financial Advisor is not obligated to undertake, and has not undertaken to make, an independent verification or to assume any responsibility for the accuracy, completeness or fairness of the information contained in this Official Statement.

24

Exhibit 9
Page 37 of 165

## CONTINUING DISCLOSURE

Pursuant to a Continuing Disclosure Agreement (the "Disclosure Agreement"), the City has agreed to provide, or cause to be provided, certain annual financial and operating data, including its audited financial statements and certain of the information of the type set forth under the heading APPENDIX A — "CITY OF SAN DIEGO", by no later than 285 days following the end of each Fiscal Year commencing April 11, 2004, to each nationally recognized municipal securities information repository and any public or private repository or entity designated by the State as a state repository for purposes of Rule 15c2-12(b)(5) (the "Rule") adopted by the Securities and Exchange Commission (each, a "Repository").

In addition, the City has agreed to provide, or cause to be provided, to each Repository in a timely manner notice of the following "Listed Events" if determined by the City to be material: (1) principal and interest payment delinquencies; (2) non-payment related defaults; (3) unscheduled draws on the debt service reserves reflecting financial difficulties; (4) unscheduled draws on credit enhancements reflecting financial difficulties; (5) substitution of credit or liquidity providers, or their failure to perform; (6) adverse tax opinions or events affecting the tax-exempt status of the security; (7) modifications to rights of security holders; (8) bond calls; (9) defeasances; (10) release, substitution, or sale of property securing repayment of the securities; and (11) rating changes. These covenants have been made in order to assist the Underwriter in complying with the Rule. The City has never failed to comply in all material respects with any previous undertakings with regard to said Rule to provide annual reports or notices of material events. For a detailed description of the City's responsibilities under the Disclosure Agreement see APPENDIX F — "FORM OF CONTINUING DISCLOSURE AGREEMENT."

## FINANCIAL STATEMENTS OF THE CITY

Included herein as Appendix B are the audited financial statements of the City as of and for the year ended June 30, 2002, together with the report thereon dated November 27, 2002 of Calderon, Jaham & Osborn, An Accountancy Corporation, (the "Auditor"). Such audited financial statements have been included herein in reliance upon the report of the Auditor. The Auditor has not undertaken to update the audited financial statements of the City or its report or to take any action intended or likely to elicit information concerning the accuracy, completeness or fairness of the statements made in this Official Statement, and no opinion is expressed by the Auditor with respect to any event subsequent to its report dated November 27, 2002.

The Governmental Accounting Standards Board (GASB) published its Statement No. 34 "Basic Financial Statements - and Management's Discussion and Analysis - for State and Local Governments" on June 30, 1999. Statement No. 34 provides guidelines to auditors, comptrollers, and financial officers on requirements for financial reporting for all governmental agencies in the United States.

The requirements of Statement No. 34 are effective in three phases based on a government's total annual revenues in the first fiscal year ending after June 15, 1999. Governments with total annual revenues (excluding extraordinary items) of $100 million or more (phase 1) were required to apply Statement No. 34 for periods beginning after June 15, 2001. Governments with at least $10 million but less than $100 million in revenues (phase 2) are required to apply Statement No. 34 for periods beginning after June 15, 2002. Governments with less than $10 million in revenues (phase 3) are required to apply Statement No. 34 for periods beginning after June 15, 2003. Governments that elect early implementation of Statement No. 34 for periods beginning before June 15, 2000, should also implement GASB Statement No. 33, Accounting and Financial Reporting for Nonexchange Transactions, at the same time. If a primary government chooses early implementation of Statement No. 34, all of its component units also should implement this standard early to provide the financial information required for the government-wide financial statements.

Prospective reporting of general infrastructure assets is required at the effective dates of Statement No. 34. Retroactive reporting of all major general governmental infrastructure assets is encouraged at that date.

Exhibit 9
Page 38 of 165

For phase 1 and phase 2 governments, retroactive reporting is required four years after the effective date on the basic provisions for all major general infrastructure assets that were acquired or significantly reconstructed, or that received significant improvements, in fiscal years ending after June 30, 1980. Phase 3 governments are encouraged to report infrastructure retroactively, but may elect to report general infrastructure prospectively only.

The City has implemented the provisions of Statement No. 34 for the fiscal year ending June 30, 2002.

## VERIFICATION OF MATHEMATICAL COMPUTATIONS

Upon delivery of the Certificates, McGladrey & Pullen, LLP, Minneapolis, Minnesota, will deliver a report verifying the mathematical accuracy of certain computations concerning (i) the adequacy of the maturing principal amounts of and interest on the Escrowed Federal Securities to redeem the outstanding Prior Certificates in full on November 1, 2003, as described herein, and (ii) the yield on the Certificates and on such Escrowed Federal Securities considered by Special Counsel in its determination that the portion of Lease Payments designated as and comprising interest and received by owners of the Certificates is excluded from gross income for federal income tax purposes.

## MISCELLANEOUS

Included herein are brief summaries of certain documents and reports, which summaries do not purport to be complete or definitive, and reference is made to such documents and reports for full and complete statements of the contents thereof. Any statements in this Official Statement involving matters of opinion, whether or not expressly so stated, are intended as such and not as representations of fact. This Official Statement is not to be construed as a contract or agreement between the City and the purchasers or Owners of any of the Certificates.

The execution and delivery of this Official Statement has been duly authorized by the City.

CITY OF SAN DIEGO

By: _____
    Deputy City Manager

Exhibit 9
Page 39 of 165

# APPENDIX A
## THE CITY OF SAN DIEGO

*The information and expressions of opinion set forth herein have been obtained from sources believed to be reliable, but such information is not guaranteed as to accuracy or completeness. Statements contained herein which involve estimates, forecasts, or matters of opinion, whether or not expressly so described herein, are intended solely as such and are not to be construed as representations of facts. The information and expressions of opinion herein are subject to change without notice, and neither delivery of this Official Statement nor any sale thereafter of the securities offered hereby shall under any circumstances create any implication that there has been no change in the affairs of the City or in any other information contained herein since the date of the Official Statement.*

## INTRODUCTION

With a total population of approximately 1.3 million in 2002, and a land area of 330 square miles, the City of San Diego (the "City") is the seventh largest city in the nation and the second largest city in California. The City is the county seat for the County of San Diego (the "County") and is the County's business and financial center.

Based on estimates published by the California Department of Finance in May 2002, the City's population grew by 9.7% between 1993 and 2002, with an average increase of approximately 12,300 annually. A major factor in the City's growth is its quality of life. In addition to having a favorable climate, the City offers a wide range of cultural and recreational services to both residents and visitors. With mild temperatures year round, the City's numerous beaches, parks, tennis courts, and golf courses are in constant use.

Another factor in the City's growth is its diversified economy. Recent growth has been concentrated in four major areas: high tech manufacturing and research (including electronics, telecommunications, scientific instruments, drugs, and biomedical equipment); professional services; tourism; and international trade. Historically, the City has also benefited from a stable economic foundation composed of basic manufacturing (ship building, industrial machinery, television & video equipment, and printing & publishing), public and private higher education, health services, military, and local government.

Exhibit 9
Page 40 of 165

## ECONOMIC AND DEMOGRAPHIC INFORMATION

*Data contained under this caption is intended to portray economic, demographic, and business trends within the City. While not constituting direct revenue sources as such, these trends help explain changes in revenue sources such as property taxes, sales taxes, and transient occupancy taxes, which could be affected by changes in economic conditions.*

**Population**

As set forth in Table 1 below, between January 1, 1993, and January 1, 2002, the City's population has increased by 111,000 (or by approximately 12,300 new residents annually during this period).

### Table 1
### POPULATION GROWTH[1]
*Calendar Years 1993 through 2002*

| Calendar Year[2] | City of San Diego | Annual Growth Rate | County of San Diego | Annual Growth Rate | State of California | Annual Growth Rate |
|---|---|---|---|---|---|---|
| 1993 | 1,144,700 | 0.9% | 2,594,100 | 0.8% | 31,150,000 | 1.4% |
| 1994 | 1,144,200 | 0.0% | 2,604,400 | 0.4% | 31,418,000 | 0.9% |
| 1995 | 1,145,400 | 0.1% | 2,613,100 | 0.3% | 31,617,000 | 0.6% |
| 1996 | 1,146,900 | 0.1% | 2,621,100 | 0.3% | 31,837,000 | 0.7% |
| 1997 | 1,159,100 | 1.1% | 2,653,400 | 1.2% | 32,207,000 | 1.2% |
| 1998 | 1,176,900 | 1.5% | 2,702,800 | 1.9% | 32,657,000 | 1.4% |
| 1999 | 1,200,800 | 2.0% | 2,751,000 | 1.8% | 33,140,000 | 1.5% |
| 2000 | 1,221,200 | 1.7% | 2,805,900 | 2.0% | 33,753,000 | 1.8% |
| 2001 | 1,240,200 | 1.6% | 2,859,900 | 1.9% | 34,385,000 | 1.9% |
| 2002 | 1,255,700 | 1.2% | 2,918,300 | 2.0% | 35,037,000 | 1.9% |

(1) In May 2002, the California Department of Finance published revised population estimates for the years 1991 through 1999 in order to account for the 1990 Census undercount. These revised estimates increased the population estimates for the City, the County, and the State of California in the year 1991 and reduced the annual rates of growth in subsequent years.

(2) As of January 1 of the calendar year.

Source: State of California, Department of Finance

As indicated in the following table, attendance in kindergarten through grade 12 in the San Diego Unified School District shows a moderate overall growth in the five-year period from 1998-1999 to 2002-2003 school years. However, there has been a slight decline in enrollment in the last two school years. The San Diego Unified School District's boundaries include 85% of the City of San Diego's land area.

Exhibit 9
Page 41 of 165

**Table 2**
## SAN DIEGO UNIFIED SCHOOL DISTRICT
## ENROLLMENT[1]
*School Year 1998-1999 through 2002-2003*

| School Year | Enrollment |
|-------------|-----------|
| 1998-1999 | 138,974 |
| 1999-2000 | 142,021 |
| 2000-2001 | 143,244 |
| 2001-2002 | 142,430 |
| 2002-2003 | 140,717 |

(1) Enrollment is defined as the total number of students enrolled on a survey date in late September/early October of the school year.

Source: San Diego Unified School District, Pupil Accounting

## Employment Summary

As seen in Table 3, the City's unemployment rate for calendar year 2002 averaged 4.4%, up from a rate of 3.3% during calendar year 2001. The City's 2002 unemployment rate was below both the national rate of 5.8% and the State's rate of 6.7%. During 2002, average employment in the City was up by approximately 10,710 from 2001 levels. Preliminary data for April 2003, the latest available data, indicates that the City's unemployment rate was 4.3%. Data for 2001 and 2002 reflect estimates, which will be revised at a future date.

**Table 3**
## ESTIMATED AVERAGE ANNUAL EMPLOYMENT AND
## UNEMPLOYMENT OF CITY OF SAN DIEGO RESIDENT LABOR FORCE
*Calendar Years 1998 through 2002*

| | 1998 | 1999 | 2000 | 2001[1] | 2002[1] |
|---|------|------|------|---------|---------|
| **Civilian Labor Force** | | | | | |
| City of San Diego | | | | | |
| Employed | 584,100 | 604,700 | 623,200 | 633,620 | 644,330 |
| Unemployed | 21,700 | 19,600 | 19,600 | 21,620 | 29,410 |
| **Unemployment Rates** | | | | | |
| City | 3.6% | 3.1% | 3.1% | 3.3% | 4.4% |
| County | 3.5% | 3.1% | 3.0% | 3.2% | 4.3% |
| California | 5.9% | 5.2% | 4.9% | 5.3% | 6.7% |
| United States | 4.5% | 4.2% | 4.0% | 4.8% | 5.8% |

(1) Subject to future revision.

Source: State of California Employment Development Department, Labor Market Information Division; and the U.S. Department of Labor, Bureau of Labor Statistics.

Exhibit 9
Page 42 of 165

Table 4 provides the California Employment Development Department's estimates of total annual nonagricultural wage and salary employment by major industry in the County from calendar years 1998 through 2002. Annual employment information is not regularly compiled by sector for the City alone. As shown, total nonagricultural wage and salary employment in the County increased by 139,200 new jobs during this period. During calendar year 2002, employment in San Diego County increased by 23,100 new jobs over the prior year.

**Table 4**
**SAN DIEGO COUNTY**
**WAGE AND SALARY EMPLOYMENT**
*Calendar Years 1998 through 2002*

| INDUSTRY CATEGORY | 1998 | 1999 | 2000 | 2001[1] | 2002[1] |
|---|---|---|---|---|---|
| Mining | 300 | 300 | 400 | 300 | 300 |
| Construction | 61,800 | 67,000 | 70,400 | 73,400 | 75,500 |
| Manufacturing | 127,600 | 128,100 | 129,700 | 130,600 | 128,300 |
| Nondurable Goods | 35,800 | 36,500 | 37,800 | 37,500 | 37,600 |
| Durable Goods | 91,800 | 91,600 | 91,900 | 93,100 | 90,700 |
| Transportation, Communications, Utilities[2] | 47,000 | 51,300 | 50,900 | 52,000 | 50,500 |
| Trade | 249,400 | 256,500 | 267,800 | 271,100 | 278,000 |
| Wholesale | 48,300 | 50,300 | 52,300 | 50,300 | 50,200 |
| Retail | 201,100 | 206,100 | 215,500 | 220,800 | 227,800 |
| Finance, Insurance, Real Estate | 65,300 | 68,700 | 69,800 | 70,800 | 72,300 |
| Services | 359,600 | 381,700 | 400,600 | 409,500 | 420,500 |
| Government | 194,500 | 199,300 | 206,800 | 213,900 | 219,400 |
| Federal | 43,300 | 42,500 | 42,600 | 40,100 | 40,000 |
| State and Local | 151,200 | 156,800 | 164,200 | 173,800 | 179,400 |
| TOTAL NONAGRICULTURAL[3] | 1,105,500 | 1,152,900 | 1,196,500 | 1,221,600 | 1,244,700 |

(1) Subject to future revision.
(2) Includes trucking and transit services, telephone and broadcast/cable services, and gas and electric services.
(3) Figures may not add to total due to independent rounding.

Source: State of California Employment Development Department

Since the industry employment data referenced above is organized by standard industrial classification codes, employment in the various high tech categories, such as Telecommunications, Software and Biotechnology may not fall into a single employment sector alone. For example, some telecommunications firms appear in Manufacturing, while others appear in Services.

Several key industry categories exhibited strong employment growth in calendar year 2002. The Services sector (+11,000) alone represented approximately half of total employment growth for the County. Within the Services sector, Health Services recorded the largest net gain, up by 2,500 jobs, followed by an increase of 1,400 jobs in Engineering and Management and an increase of 1,200 jobs in Business Services. Other key employment growth sectors during calendar year 2002 included Construction (+2,100), Wholesale and Retail Trade (+6,900), and Government (+5,500). Among the

A - 4

Exhibit 9
Page 43 of 165

sectors that showed a decline in jobs in the calendar year 2002 were the Manufacturing sector (-2,300) and the Transportation, Communications, and Utilities Sector (-1,500).

The increase in the Government sector, which accounted for 18% of the total nonagricultural wage and salary employment in the County in 2002, occurred in State and local government agencies. Almost all of the increase in State and local government agencies is due to gains in public education and the Other Local Government category, which includes Special Districts and Indian Tribal Governments.

**Taxable Sales**

Taxable transactions at retail and other outlets in the City at the end of the First Quarter of 2002, the most recent data available from the California State Board of Equalization, totaled $3.9 billion, up 0.23% from the end of the First Quarter of 2001. Taxable transactions in the City during calendar year 2001 totaled approximately $16.4 billion, up 1.7% from 2000, and up 32.1% from 1997. The slight increase in taxable sales from calendar years 2000 to 2001 can be attributed to the general slow down of the economy. Table 5 provides annual sales information by type of outlet for calendar years 1997 through 2001.

**Table 5**
**CITY OF SAN DIEGO**
**TAXABLE TRANSACTIONS**
*Calendar Years 1997 through 2001*
*(in thousands)*

|  | 1997 | 1998 | 1999 | 2000 | 2001[1] |
|---|---|---|---|---|---|
| RETAIL STORES |  |  |  |  |  |
| Apparel | $485,551 | $530,734 | $542,041 | $588,012 | $613,179 |
| General Merchandise | 1,354,698 | 1,436,535 | 1,597,102 | 1,794,468 | 1,861,711 |
| Food | 554,625 | 582,183 | 622,909 | 662,346 | 673,384 |
| Eating and Drinking | 1,380,894 | 1,496,032 | 1,603,968 | 1,772,507 | 1,851,358 |
| Home Furnishings and Appliances | 444,930 | 469,158 | 546,746 | 619,383 | 684,858 |
| Building Materials and Farm Implements | 603,365 | 716,231 | 809,022 | 944,386 | 1,093,716 |
| Auto Dealers & Supplies | 1,189,462 | 1,331,411 | 1,519,137 | 1,745,186 | 1,868,692 |
| Service Stations | 673,078 | 614,156 | 742,143 | 977,675 | 966,913 |
| Other | 1,686,807 | 1,790,441 | 1,948,871 | 2,173,098 | 2,114,389 |
| Total Retail Stores | $8,373,410 | $8,966,881 | $9,931,939 | $11,277,061 | $11,731,149 |
| All Other Outlets | 4,024,433 | 4,343,598 | 4,563,715 | 4,822,132 | 4,640,363 |
| TOTAL ALL OUTLETS | $12,397,843 | $13,310,479 | $14,495,654 | $16,099,193 | $16,371,512 |

(1) Data for calendar year 2001 were calculated by adding quarterly reports published by the California State Board of Equalization, and may be subject to future revision.

Source: California State Board of Equalization

A - 5

Exhibit 9
Page 44 of 165

**Tourism**

Based on year-end data for 2002 from Smith Travel Research, San Diego outperformed most major markets, ranking third highest among the top 25 hotel markets in terms of average occupancy rate during 2002 and sixth highest in terms of average daily room rate. For January 2003, due to activity related to the San Diego's hosting of Super Bowl XXXVII, the region far outperformed the other top 25 markets, with room revenues up 33.2% from January 2002.

According to the San Diego Chamber of Commerce, the visitor industry is the County's third largest industry in terms of income generation, behind manufacturing and the military. As shown in Table 6, visitor spending in the County totaled $5.04 billion in 2002, up 7.2% from 1998 but down 1.6% from 2001. According to the San Diego Convention and Visitors Bureau, a decline in business spending, weakening consumer confidence, and the threat and the subsequent outbreak of war in Iraq have had an impact on the tourism industry nationwide. The San Diego Convention and Visitor's Bureau also reported that there were 7.5 million passenger arrivals at Lindberg Field in 2002, down by approximately 1.5% from 2001.

### Table 6
### SAN DIEGO COUNTY
### TOTAL VISITOR SPENDING[1]
### *Calendar Years 1998 through 2002*
### *(in billions)*

| Calendar Year | Amount |
|---------------|--------|
| 1998 | $4.70 |
| 1999 | $4.88 |
| 2000 | $5.23 |
| 2001 | $5.12 |
| 2002 | $5.04 |

(1) Visitor spending is an estimate of total direct and indirect visitor expenditures as derived from the Visitor Activity Model/Visitor Profile Study prepared by CIC Research, Inc. for the San Diego Convention and Visitors Bureau.

Source: San Diego Convention and Visitors Bureau

As shown in Table 7, the City's Transient Occupancy Tax ("TOT") revenues have grown approximately 17% between Fiscal Year 1998 and Fiscal Year 2002, an average annual increase of 4.1%. In the Fiscal Year 2002 TOT revenues decreased by 9.8% from the prior year due in part to the effects of a weak economy and the events of September 11, 2001. The latest available data shows that fiscal year-to-date TOT receipts as of February 2003 totaled approximately $70 million, showing an increase of 10% from the same period in 2002.

Exhibit 9
Page 45 of 165

**Table 7**
**CITY OF SAN DIEGO**
**TRANSIENT OCCUPANCY TAX[1]**
*Fiscal Years 1998 through 2002*
*(in thousands)*

| Fiscal Year | Amount |
|---|---|
| 1998 | $ 85,088 |
| 1999 | $ 92,128 |
| 2000 | $ 96,821 |
| 2001 | $ 109,879 |
| 2002 | $ 99,161 |

(1) Includes both the General Fund portion of TOT (5.5¢ of 10.5¢) and the balance (5¢ of 10.5¢) allocated to Special Promotional Programs.

Source: City of San Diego Comprehensive Annual Financial Report

The City is the focal point for tourism in the County. The Convention Center, approximately 70% of the County's hotel and motel rooms, and most of the County's major tourist attractions, including the world-renowned San Diego Zoo, the San Diego Wild Animal Park, and Sea World, are located in the City. Other attractions located in the City include the Cabrillo National Monument on Point Loma, the historic Gaslamp Quarter in the downtown area, the Old Town State Park, and Balboa Park – home to the San Diego Zoo and a host of other cultural and recreational activities.

In addition to the many permanent attractions available to visitors, the City has also been host to a number of major events. The City annually hosts the Buick Invitational, a Professional Golfers' Association Tour Event played at the Torrey Pines Golf Course, a world-renowned golf course, owned and operated by the City of San Diego. In addition, since 1978, the City has annually hosted the Holiday Bowl, a post season contest of elite college football teams.

The City also hosted the America's Cup in 1992 and 1995, the Super Bowl and World Series in 1998, and more recently the Super Bowl in 2003. In addition, the City was the site for the Republican National Convention held in August 1996. The Torrey Pines' South Course is scheduled to play host to the United States Open Golf Tournament in 2008.

In September 2001, the San Diego Convention Center expansion was completed, doubling the size of the existing facility to 2.6 million total gross square feet. According to the San Diego Convention Center Corporation, in Fiscal Year 2002 the Convention Center generated approximately $363 million in direct delegate spending and an estimated $880 million in total regional economic impact (direct and indirect spending).

A - 7

Exhibit 9
Page 46 of 165

**Military**

Military and related defense spending is the second most important component of the San Diego economy, with only manufacturing making a larger contribution to San Diego County's Gross Regional Product. Prior to 1990, San Diego's civilian defense contractors were primarily concentrated in aerospace manufacturing. During the 1990's, the focus of local defense contracting shifted from aerospace manufacturing to research and development, with shipbuilding and repair remaining an important component. This transformation received additional impetus with the relocation of the Space and Naval Warfare Systems Command (SPAWAR) to San Diego from Virginia, in 1997. SPAWAR is responsible for administering contracts to meet the Navy's continuing need for state-of-the-art command and communications systems.

According to the San Diego Chamber of Commerce, defense related expenditures (active duty payroll and retirement benefits, base expenditures, and defense contracts) in the County during the federal Fiscal Year ended September 30, 2001, totaled approximately $10.0 billion, up from $9.8 billion in 2000. With a total active duty military and civilian payroll of $3.8 billion in the federal Fiscal Year 2001, San Diego continued to lead all counties in the nation in terms of combined military and civilian payrolls. In addition to active duty and civilian payroll, retirement benefits totaled $1.1 billion. Total defense contracts awarded to County-based businesses totaled $3.8 billion during the federal Fiscal Year 2001, of which $2.8 billion were awarded to procurement contracts and another $0.9 billion to various classified contracts and subcontracts of less than $25,000 each. According to the San Diego Chamber of Commerce estimate of June 1, 2001, active duty military personnel in the County totaled 103,982 and the civilian employment totaled 20,500.

**International Trade**

The value of exports presented in the table below is from RAND California, *Merchandise Exports from U.S. Customs District* series. In prior years, exports were reported based on Metropolitan Areas as reported by the International Trade Administration. The Customs District classification has been adopted because of the availability of more current data. Export values reflect exports of merchandise grown, produced, or manufactured in the U.S as well as re-exports of foreign merchandise. The total value of exports from San Diego Customs District grew approximately 31% in the five-year period from 1998 to 2002. While there was a slight decline in annual exports from 2000 to 2001, the latest data indicates a turnaround. At the end of calendar year 2002, the value of exports totaled approximately $12.9 billion, up 4.3% from calendar year 2001.

Exhibit 9
Page 47 of 165

**Table 8**
**VALUATION OF EXPORTS**
**ORIGINATING IN SAN DIEGO**
*Calendar Years 1998 through 2002*
*(in billions)*

| Calendar Year | Total Exports |
|---------------|---------------|
| 1998 | $ 9.8 |
| 1999 | $10.8 |
| 2000 | $12.7 |
| 2001 | $12.3 |
| 2002 | $12.9 |

Source: RAND California, Business and Economic Statistics

**Major Employers**

The City is host to a diverse mix of major employers representing industries ranging from education and health services, to diversified manufacturing, financial services, retail trade and amusement and recreation. Table 9 lists the City's major employers. The list is compiled from information gathered by the City of San Diego. All of the businesses listed in the table have their main offices in the City, with many having branch offices and/or production facilities in other areas of the County. Accordingly, not all employees of these businesses work within the City.

A - 9

Exhibit 9
Page 48 of 165

**Table 9**
**CITY OF SAN DIEGO**
**MAJOR EMPLOYERS[1]**
*As of April 2002*

| Employer | Product/Service |
|---|---|
| **10,000 or More Employees:** | |
| San Diego Unified School District | Education |
| Sharp Health Care | Health Care |
| University of California, San Diego | Higher Education |
| **5,000 - 9,999 Employees:** | |
| Kaiser Permanente | Health Care |
| Qualcomm | Wireless Communications |
| San Diego Community College District | Higher Education |
| Scripps Health | Health Care |
| Sempra Energy | Utility |
| **3,000 - 4,999 Employees:** | |
| ADDECO Employment Services | Employment Services |
| Children's Hospital and Health Care | Health Care |
| Cubic Corporation | Electronic Systems |
| Palomar Pomerado Health System | Health Care |
| Samsung | Electronics |
| San Diego State University | Higher Education |
| SBC/Pacific Bell | Utility |
| Science Applications International Corporation | Research and Development |
| Seaworld of California | Entertainment |
| Solar Turbines | Gas Turbine Manufacturing |
| Sony Technology Center | Electronics |
| UCSD Health Care | Health Care |
| United Parcel Service | Delivery Service |
| University of San Diego | Higher Education |
| **2,000 - 2,999 Employees:** | |
| Jack in the Box Inc. | Restaurants |
| Hewlett Packard Company | Electronic Instruments |
| Manpower Temporary Services | Employment Services |
| National Steel & Shipbuilding Company | Shipbuilding, Repair |
| Nordstrom | Department Store |
| Scripps Research Institute | Biomedical Research |
| YMCA of San Diego County | Family Recreation |
| Zoological Society of San Diego | Entertainment |

(1)  Does not include various major public employers, including the City, the County, and the federal government with a combined total county employment of 116,100 as of April 2002.

Source: City of San Diego

Exhibit 9
Page 49 of 165

**Effective Buying Income**

Table 10 shows the per capita Effective Buying Income (EBI) for the City, the County, the State, and the United States for calendar years 1997 through 2001.

### Table 10
### PER CAPITA EFFECTIVE BUYING INCOME[1]
#### *Calendar Years 1997 through 2001*

| Calendar Year | City of San Diego | County of San Diego | State of California | United States |
|---|---|---|---|---|
| 1997 | $15,804 | $15,618 | $15,797 | $16,281 |
| 1998 | $16,291 | $16,101 | $16,299 | $16,895 |
| 1999 | $17,443 | $17,270 | $17,245 | $17,691 |
| 2000 | $19,238 | $19,498 | $19,081 | $18,426 |
| 2001 | $19,723 | $19,092 | $18,652 | $18,491 |

(1) Effective Buying Income is defined as the aggregate of wages, salaries, interest earnings, and all forms of public assistance income (such as Social Security and unemployment compensation) less personal tax payments, contributions to Social Security, and the value of income "in kind" from food stamps, public housing subsidies, medical care etc. Effective Buying Income is a proxy for "disposable" or "after-tax" income.

Source: Sales & Marketing Management Magazine "Survey of Buying Power"

**Building Permits**

Table 11 provides a summary of the building permit valuations, and the number of new dwelling units authorized in the City, for Fiscal Years 1998 through 2002. The valuation of non-residential permits includes both private, commercial construction and publicly funded, non-tax generating projects.

### Table 11
### CITY OF SAN DIEGO
### BUILDING PERMIT VALUATIONS
### AND NUMBER OF DWELLING UNITS
#### *Fiscal Years Ended June 30, 1998 through 2002*

| | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| **Valuation (in thousands)** | | | | | |
| Residential | $890,476 | $857,747 | $1,185,999 | $1,181,385 | $1,244,917 |
| Nonresidential | 576,170 | 783,106 | 960,479 | 693,687 | 854,831 |
| Total | $1,466,646 | $1,640,853 | $2,146,478 | $1,875,072 | $2,099,748 |
| **Number of New Dwelling Units:** | | | | | |
| Single Family | 3,032 | 2,612 | 2,084 | 2,075 | 2,347 |
| Multiple Family | 3,018 | 2,856 | 5,662 | 3,829 | 4,000 |
| Total | 6,050 | 5,468 | 7,746 | 5,904 | 6,347 |

Source: City of San Diego, Planning and Development Review Department

A - 11

Exhibit 9
Page 50 of 165

**Business Development Program**

The City actively supports economic development and job creation activities. A key element of these activities is the Business Expansion and Retention Program (BEAR Program), a proactive effort on the part of the City to work directly with businesses to retain local firms and help them expand their investment and job growth. This program was created in 1995 by integrating the City's existing business development activities to provide centralized coordination and data management, and to expand operational relationships with partnership agencies such as the San Diego Regional Economic Development Corporation, Sempra Energy, the San Diego Science and Technology Commission, and the San Diego Workforce Partnership. BEAR Program components include business incentives, targeted assistance, and sales and use tax rebates through the Business Cooperation Program, Business Outreach Program, and Business Finance Program.

A further element of the City's overall business development effort has focused on streamlining the permitting process and, when feasible, eliminating or reducing fees and permits. A major component of this streamlining effort has been to reduce development permit processing time by one-half.

The City also operates the Office of Small Business, which provides a broad range of assistance programs for the many small businesses in the City. In 1995, the City Council reduced the annual Business License Tax for all businesses with 12 or fewer employees to a flat fee of $34 per business with no per employee charge. The City charges an annual fee of $125 plus $5 per employee for businesses with 13 or more employees.

**Transportation**

San Diego has a well-developed highway system. Access in and out of the region is provided by five major freeways running north and south and three freeways running east and west.

Public transportation through the City and surrounding communities is provided by the San Diego Metropolitan Transit Development Board ("MTDB"). The San Diego Trolley, Inc. operates a fleet of electric trolleys that provides transportation for commuters and tourists from downtown San Diego to San Ysidro (adjacent to Tijuana), and from downtown San Diego to the southern part of the County and East County. The East Line extension to Santee was completed in 1996. This 3.6-mile extension connects the cities of El Cajon and Santee. The trolley also provides service from downtown San Diego to the waterfront area, including the Convention Center. An extension providing additional service from downtown to the historical Old Town section of the City was completed in 1996. In addition, the Mission Valley extension, which connects Old Town with Qualcomm Stadium and the Mission Valley shopping area, ending at the Mission San Diego, opened in 1997.

Construction is in progress on the 6-mile Mission Valley East Trolley Extension. The project, scheduled for completion in 2004, will extend east from Qualcomm Stadium connecting Mission Valley with San Diego State University, La Mesa, and East County. The extension will include four new trolley stops, including a subterranean station at San Diego State University. The project is estimated to cost approximately $435 million, including $330 million in appropriations from the federal government.

A 43-mile Coaster Commuter rail line from Oceanside to downtown San Diego came into service in 1995. This line links the communities along the coast from Oceanside to Del Mar with downtown San Diego and is operated by North County Transit District.

Exhibit 9
Page 51 of 165

Recently, MTDB granted the rights to operate an east-west rail line to the Carrizo Gorge Railway. It is anticipated that the line, which will connect San Diego and northern Baja California with the rest of Mexico and the United States, will open and begin shipping freight in calendar year 2003. This additional rail line will complement already existing rail service coming into San Diego County from the north and reduce shipping rates and times for companies moving products between San Diego, Mexico, and the Southwest.

In November 1987, voters approved Proposition A which, authorized a one-half cent increase to the local sales tax to fund transportation improvements for the San Diego region. The City's budget for Fiscal Year 2003 included $25.8 million in Proposition A funds. The one-half cent increase to the local sales tax, authorized by Proposition A, is scheduled to expire in 2008.

In June 1990, voters approved State Propositions 108, 111, and 116 which, increased the State gas tax and authorized the sale of rail bonds. The revenues generated from these measures are to be used to implement a comprehensive Statewide transportation funding program. The City's budget for Fiscal Year 2003 included $22.9 million in Proposition 111 funds. Revenues from this source supplement the City's street maintenance and resurfacing program and other street related services, including traffic light and signal maintenance, median maintenance and traffic engineering to ensure efficient traffic flow.

## MUNICIPAL GOVERNMENT AND FINANCIAL INFORMATION

### Governmental Organization

The City is a charter city and operates under the Council-Manager form of government. The City Council is comprised of eight members elected by district to serve overlapping four-year terms. The Mayor, who presides over the City Council, is elected at large to serve a four-year term. The City Council, which acts as the City's legislative and policy-making body, selects the City Manager, who is the City's chief administrator and is responsible for implementing the policies and programs adopted by the City Council.

### Accounting Practices

The City's accounting policies conform to generally accepted accounting principles applicable to governmental entities. The City's Governmental Funds use the modified accrual basis of accounting. Under the modified accrual basis of accounting, revenues are recorded when both available and measurable. Certain fines and forfeitures, however, are recorded when received, as they are not susceptible to accrual. Expenditures are recognized when the related liability is incurred except for (1) principal of and interest on general long-term debt, which are recognized when due, and (2) employee annual leave and claims and judgments for litigation and self-insurance which are recorded in the period due and payable. Proprietary and Pension Trust Funds use the accrual basis of accounting. Under the accrual basis of accounting, revenues are recognized when earned, and expenses are recorded when incurred. Agency Funds also use the accrual basis of accounting to recognize receivables and payables.

The City prepares financial statements annually in conformity with generally accepted accounting principles for governmental entities, which are audited by an independent certified public accountant. The annual audit report is generally available about 180 days after the June 30 close of each Fiscal Year. The City's most recent general purpose financial statements for the Fiscal Year ended June 30, 2002, were audited by Calderon, Jaham & Osborn, CPAs.

A - 13

Exhibit 9
Page 52 of 165

**Budgetary Process**

The City's annual budget, which is adopted in July and published in October, is the culmination of the annual budget process, which begins in the fall of the preceding year. Public input on service and program priorities is solicited. This input serves as part of the City Council's priority setting for the development of the budget.

Based upon City Council budget priorities, departments submit operating and capital improvement project requests to the City Manager for review by the Financial Management Department. The City Manager evaluates and prioritizes the program requirements, determines funding availability, and develops a balanced budget as required by the City Charter. This proposed balanced budget is published and presented to the City Council by their first meeting in May.

During May and June, the Mayor and City Council conduct budget meetings to review the Proposed Budget. Public comment is received at this time. The budget meetings are conducted as Council workshops focusing on policy issues.

As required by the City Charter, the City Council adopts the Annual Budget and Appropriation Ordinance no earlier than the date of the first Council meeting in July and no later than the last meeting in July. The adoption of the Appropriation Ordinance requires two noticed public hearings, which are usually held on consecutive days. The Annual Tax Rate Ordinance is adopted no later than the last City Council meeting in August.

The Financial Management Department works closely with the City Auditor and Comptroller to monitor fund balances, as well as revenue projections, throughout the Fiscal Year. Variations from budget or plans are alleviated in a number of ways, including expenditure reductions or deferrals. As another technique of accomplishing budgetary control, the City also maintains an encumbrance accounting system, under which purchase orders, contracts, and other commitments for the expenditure of funds are recorded in order to reserve that portion of the applicable appropriation.

**Five Year Summary of Financial Results**

Tables 12 and 13 present the Balance Sheet and the Statement of Revenues, Expenditures, and Changes in Fund Balance of the City's General Fund for Fiscal Years 1998 through 2002 in the format presented in the Comprehensive Annual Financial  Report (CAFR). Effective as of the Fiscal Year ending June 30, 2002, there has been a change in the reporting system of CAFR. The City Auditor and Comptroller has implemented accounting and reporting requirements known as GASB Statement No. 34 (GASB 34). GASB 34 requires the preparation of Government-wide statements, which are intended to complement the fund financial statements. The Government-wide statements are prepared on a full-accrual basis, rather than modified accrual basis. GASB 34 requires expense classifications to be presented by major functional activities performed by the government, regardless of the fund in which the activity was accounted for. To satisfy this requirement, the City Auditor and Comptroller re-analyzed the services provided by different departments/divisions and re-grouped them by the function/activity that best describes those services.

Exhibit 9
Page 53 of 165

**Table 12**
**CITY OF SAN DIEGO**
**BALANCE SHEET FOR THE GENERAL FUND**
*Fiscal Years Ended June 30, 1998 through 2002*
*(in thousands)*

|  | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash or Equity in Pooled Cash & Investments | $23,516 | $16,005 | $24,708 | $48,777 | $34,245 |
| Receivables: | | | | | |
| Taxes – Net | 27,739 | 27,491 | 30,182 | 32,431 | 44,277 |
| Accounts – Net | 26,392 | 29,856 | 32,805 | 38,016 | 42,129 |
| Claims – Net | 41 | 9 | 36 | 16 | 48 |
| Notes | -- | -- | -- | -- | -- |
| Accrued Interest | 2,451 | 1,745 | 2,744 | 3,011 | 1,810 |
| From Other Funds | 82,923 | 94,547 | 109,686 | 87,135 | 76,147 |
| From Other Agencies | 613 | 1,068 | 1,068 | 1,635 | 68 |
| Advances to Other Funds | 4,570 | 6,771 | 9,920 | 10,628 | 12,517 |
| Advances to Other Agencies | 350 | 350 | 350 | 350 | 350 |
| Prepaid and Reimbursable Items & Deposits | 357 | 302 | 1,161 | 152 | 74 |
| **Total Assets** | $168,952 | $178,144 | $212,660 | $222,151 | $211,665 |
| **LIABILITIES** | | | | | |
| Accounts Payable | 2,135 | 2,461 | $2,927 | $2,057 | $3,739 |
| Accrued Wages and Benefits | 14,793 | 16,598 | 21,923 | 27,445 | 27,547 |
| Due to other Funds | -- | -- | -- | -- | -- |
| Deferred Revenue | 29,590 | 30,934 | 33,904 | 37,942 | 37,376 |
| Contracts and Notes Payable | 82,000 | 88,500 | 99,500 | 77,000 | 73,000 |
| **Total Liabilities** | $128,518 | $138,493 | $158,254 | $144,444 | $141,662 |
| **FUND EQUITY** | | | | | |
| Reserves: | | | | | |
| Reserved for Encumbrances | $9,181 | $9,542 | $11,628 | $11,150 | $13,431 |
| Reserved for Advances & Deposits | 4,920 | 7,121 | 10,270 | 10,978 | 12,867 |
| Unreserved: | | | | | |
| Designated for Unrealized | 396 | -- | -- | 2,287 | 1,176 |
| Designated for Subsequent Years' Expenditures | 1,936 | 1,818 | 2,972 | 2,132 | 1,768 |
| Undesignated | 24,001 | 21,170 | 29,536 | 51,160 | 40,761 |
| **Total Fund Equity** | $40,434 | $39,651 | $54,406 | $77,707 | $70,003 |
| **Total Liabilities & Fund** | $168,952 | $178,144 | $212,660 | $222,151 | $211,665 |

Source: City of San Diego Comprehensive Annual Financial Report

A - 15

Exhibit 9
Page 54 of 165

**Table 13**
### CITY OF SAN DIEGO
### STATEMENT OF REVENUES, EXPENDITURES,
### AND CHANGES IN FUND BALANCE FOR THE GENERAL FUND
*Fiscal Years Ended June 30, 1998 through 2002 (in thousands)*

|  | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| **REVENUES:** | | | | | |
| Property Taxes | $123,012 | $130,624 | $144,288 | $158,585 | $169,976 |
| Sales Taxes[1] | 117,985 | 128,339 | 130,240 | 142,069 | 139,197 |
| Other Local Taxes | 83,796 | 86,968 | 94,809 | 109,151 | 115,416 |
| Licenses and Permits | 19,272 | 20,630 | 20,693 | 22,154 | 22,062 |
| Fines, Forfeitures and Penalties | 16,170 | 23,613 | 28,410 | 29,776 | 24,250 |
| Revenues from Use of Money and Property | 30,789 | 29,940 | 34,429 | 40,841 | 34,697 |
| Revenues from Federal Agencies | 2,081 | 2,026 | 1,644 | 787 | 1,931 |
| Revenues from Other Agencies | 51,522 | 55,697 | 83,821 | 87,262 | 88,027 |
| Charges for Current Services | 67,825 | 70,244 | 77,469 | 84,156 | 89,936 |
| Other Revenue | 2,871 | 2,526 | 2,777 | 2,606 | 3,291 |
| **Total Revenues** | **$515,323** | **$550,607** | **$618,580** | **$677,387** | **$688,783** |
| **EXPENDITURES:** | | | | | |
| Current: | | | | | |
| General Government | $64,725 | $67,405 | $69,400 | $79,800 | $132,312 [2] |
| Community and Economic Development | 13,967 | 14,740 | 14,661 | 19,778 | — [3] |
| Neighborhood Services | — | — | — | — | 28,626 |
| Public Safety | 295,762 | 315,231 | 348,869 | 369,607 | 382,133 |
| Libraries | 20,677 | 21,824 | 22,820 | 26,494 | — |
| Parks, Recreation and Culture | 41,561 | 44,910 | 49,850 | 56,748 | 89,442 [4] |
| Public Works | 66,931 | 70,413 | 76,300 | 80,999 | — [5] [6] |
| Employee Relations and Special Projects | 633 | 723 | 637 | 548 | — |
| Development Services | — | — | — | — | — |
| Transportation | — | — | — | — | 19,196 |
| Sanitation and Health | — | — | — | — | 34,535 |
| Miscellaneous and Unallocated | 2,260 | 2,505 | 1,881 | 1,367 | — |
| Debt Service: | | | | | |
| Principal Retirement | — | — | — | — | 1,553 |
| Interest | 3,683 | 4,894 | 5,213 | 4,616 | 1,157 |
| **Total Expenditures** | **$510,199** | **$542,645** | **$589,631** | **$639,957** | **$688,954** |
| **EXCESS (DEFICIENCY) OF REVENUES OVER EXPENDITURES** | **$5,124** | **$7,962** | **$28,949** | **$37,430** | **($171)** |
| **OTHER FINANCING SOURCES (USES)** | | | | | |
| Transfers from Proprietary/ Fiduciary Funds | $1,918 | $1,574 | $2,117 | $4,074 | $2,409 |
| Transfers from Other Funds | 37,729 | 28,369 | 30,511 | 29,236 | 27,551 |
| Transfers from Component Unit | 554 | 588 | 324 | 86 | 22 |
| Transfers to Proprietary Funds | (8,352) | (15,816) | (18,976) | (14,274) | (6,699) |
| Transfers to Other Funds | (25,592) | (24,365) | (27,520) | (32,601) | (32,082) |
| Transfers to Component Unit | (900) | (900) | (650) | (650) | (650) |
| Proceeds from Capital Leases | | | | | 1,916 |
| **TOTAL OTHER FINANCING SOURCES (USES)** | **$5,357** | **($10,550)** | **($14,194)** | **($14,129)** | **($7,533)** |
| EXCESS (DEFICIENCY) OF REVENUES AND OTHER FINANCING SOURCES OVER EXPENDITURES AND OTHER FINANCING USES | $10,481 | ($2,588) | $14,755 | $23,301 | ($7,704) |
| **FUND BALANCE AT JULY 1** | **$28,514** | **$40,434** | **$39,651** | **$54,406** | **$77,707** |
| Cumulative Effect of a Change in Accounting Principle | 314 | — | — | — | — |
| Residual Equity Transfers from Other Funds | 1,125 | 1,805 | — | — | — |
| **FUND BALANCE AT FOLLOWING JUNE 30** | **$40,434** | **$39,651** | **$54,406** | **$77,707** | **$ 70,003** |

(1)  Includes Proposition 172 Safety Sales Tax.
(2)  Beginning Fiscal Year 2002, General Government is reclassified as General Government and Other Support Services.  Other Support Services include Engineering & Capital Projects, Employee Relations/Special Projects, and Miscellaneous/Unallocated Expenditure categories.
(3)  Beginning Fiscal Year 2002, Community and Economic Development expenditures have been reclassified under Neighborhood Services.
(4)  Beginning Fiscal Year 2002, Parks, Recreation, Culture and Leisure is reclassified to include Libraries.
(5)  Beginning Fiscal Year 2002, Transportation, which was under Public Works in prior years, is classified separately.
(6)  Beginning Fiscal Year 2002, Sanitation and Health, which was under Public Works, is classified separately.

Source:  City of San Diego Comprehensive Annual Financial Report

The following table presents the operating budget summary for Fiscal Years 2002 through 2004.

**Table 14**
**CITY OF SAN DIEGO**
**OPERATING BUDGET SUMMARY**
*Fiscal Years 2002 - 2004*[1]

| | Actual Results in A Budget Format Fiscal Year 2002 | Adopted Budget Fiscal Year 2003 | Proposed Budget Fiscal Year 2004 |
|---|---|---|---|
| **REVENUE SOURCES:** | | | |
| Property Tax | $169,814,877 | $188,600,000 | $199,750,958 |
| Sales Tax [2] [3] | 139,196,712 | 134,451,875 | 128,203,737 |
| Transient Occupancy Tax | 52,142,966 | 56,676,190 | 57,998,226 |
| Property Transfer Tax | 7,033,670 | 6,300,000 | 8,472,719 |
| Licenses and Permits | 22,027,597 | 21,627,271 | 24,522,914 |
| Fines, Forfeitures and Penalties | 23,935,666 | 26,887,569 | 27,295,786 |
| Interest Earnings | 8,986,088 | 5,900,000 | 1,200,223 |
| Franchises | 56,239,380 | 54,234,644 | 52,086,577 |
| Other Rents and Concessions | 28,156,640 | 27,814,150 | 29,047,278 |
| State Motor Vehicle License Fees | 69,895,140 | 72,200,000 | 74,893,491 |
| Other Revenue from Agencies [4] | 22,277,905 | 7,595,553 | 10,413,422 |
| Charges for Current Services | 90,541,973 | 68,646,721 | 71,334,584 |
| Transfers from Other Funds | 27,724,113 | 38,123,581 | 42,407,502 |
| Other Revenue | 1,905,079 | 872,968 | 1,337,968 |
| Prior Year Fund Balance | 31,700,000 | 19,400,000 | 10,881,568 |
| Total General Fund Revenues | $751,577,806 | $729,330,522 | $739,846,953 |
| | | | |
| **EXPENDITURES:** | | | |
| Public Safety | $382,551,446 | $382,585,564 | $398,745,726 |
| Parks and Recreation | 62,084,484 | 68,082,120 | 66,713,917 |
| Sanitation and Health | 39,675,102 | 40,107,961 | 42,770,700 |
| Transportation [5] | 28,417,405 | 12,440,187 | 12,500,339 |
| Library | 31,301,457 | 36,650,651 | 35,627,407 |
| Neighborhood Services | 32,736,355 | 31,514,492 | 28,504,798 |
| Operations Support | 109,958,971 | 111,228,996 | 107,476,923 |
| Internal Support/Management | 43,294,866 | 46,720,551 | 47,507,143 |
| Total General Fund Expenditures | $730,020,086 | $729,330,522 | $739,846,953 |

---

(1) The budget is prepared on the modified accrual basis of accounting except that (i) encumbrances outstanding at year-end are considered as expenditures and (ii) the increase/decrease in reserve for advances and deposits to other funds and agencies are considered as additions/deductions of expenditures.
(2) Includes Proposition 172 Safety Sales Tax.
(3) In Fiscal Years 2003 and 2004 General Fund support for the Street Division Operating Fund is funded directly through a sales tax allocation rather than through a General Fund transfer.
(4) The City budgets for Tobacco Settlement Revenues one year in arrears, and these revenues appear in the category "Other Revenue from Agencies" in the actual results column, and are included in the Prior Year Fund Balance in the budget columns. The City did not budget for, nor receive any revenues from the State for local fiscal relief in Fiscal Years 2002, 2003, and 2004.
(5) In Fiscal Years 2003 and 2004, General Fund support for the Street Division Operating Fund is funded directly through a sales tax allocation rather than through a General Fund transfer.

Source:    City of San Diego, Financial Management Department

Exhibit 9
Page 56 of 165

**Fiscal Year 2002 (Actuals)**

The actual total General Fund revenues, presented in a budget format equivalent to Table 14, for Fiscal Year 2002 equaled $751.6 million, which represents an increase of $25.9 million or 3.6% more than the actual results for Fiscal Year 2001, and $24.2 million or 3.3% more than the adopted budget for Fiscal Year 2002. The following table shows the change in actual major revenue sources for Fiscal Year 2002 over Fiscal Year 2001.

### Change in Major Revenue Sources
### Actual Results Fiscal Year 2002 over Fiscal Year 2001[1]

|  |  |  |
|---|---|---|
| • Property Tax | + | 7.3% |
| • Sales Tax | + | 3.6% |
| • Transient Occupancy Tax | - | 9.8% |
| • Motor Vehicle License Fees | + | 4.0% |

_____

(1) The above percentages reflect overall growth in these revenue sources, whether or not such revenues are allocated entirely to the General Fund.

Source: City of San Diego, Financial Management Department

Actual total General Fund expenditures, presented in a budget format equivalent to Table 14, for Fiscal Year 2002 equaled $730 million, an increase of $43.8 million or 6.4% more than the actual results for Fiscal Year 2001, and $2.7 million or 0.4% more than the adopted budget for Fiscal Year 2002.

**Fiscal Year 2003 (Adopted Budget)**

Under the City's Fiscal Year 2003 adopted budget, General Fund revenues total $729.3 million, up $2.0 million or 0.3%, from the Fiscal Year 2002 adopted budget. The adopted budget assumed that San Diego will experience modest economic growth in Fiscal Year 2003. The Fiscal Year 2003 adopted budget also anticipated the City to realize additional revenues from hosting the Super Bowl in January 2003. In Fiscal Year 2002, the City did not receive any revenues from the State for local fiscal relief, and does not include any such revenues in its adopted budget for Fiscal Year 2003. The City assumes that the State General Fund will continue to offset a fee reduction on motor vehicle license registration originally enacted in 1999, through Fiscal Year 2003 (see **"Vehicle License Fee Reduction"** below). In addition, the City's adopted budget includes the transfer of $5.2 million from the State to compensate for booking fees the City makes to the County of San Diego for incarcerating criminals. Presented below are budgeted growth rates for the major revenues.

Exhibit 9
Page 57 of 165

## Fiscal Year 2003 Budget Growth Rates[1]

- Property Tax                          +   9.0%
- Sales Tax                             +   4.0%
- Transient Occupancy Tax              +   6.0%
- Motor Vehicle License Fees[2]        +   4.0%

---

(1) The above percentages reflect overall growth in these revenue sources, whether or not such revenues are allocated entirely to the General Fund.

(2) See 'Vehicle License Fee Reduction' below for a discussion of the potential impact on revenues from this source based on the Governor's budget proposal for Fiscal Years 2003 and 2004.

Source: City of San Diego, Financial Management Department

To date, Fiscal Year 2003 General Fund revenue receipts reflect slow economic recovery. Economic activity continues to affect revenue growth rates and the receipts received from major revenue categories in Fiscal Year 2003. Since the economy is not recovering at a pace as was expected earlier, revenues are projected to fall short of budget estimates, not including potential impacts from the State budget deficit. Property Tax, Sales Tax, and Transient Occupancy Tax receipts are projected to have deficits in Fiscal Year 2003 at a combined total of approximately $10 million compared to the budgeted levels. In addition to the major General Fund revenues, another revenue source to the General Fund, Franchise Fees, is expected to be approximately $10 million less than the Fiscal Year 2003 adopted budget. The projected reduction is primarily attributable to a decline in the SDG&E franchise fees due to the unexpected drop in natural gas prices. In Fiscal Year 2003, in order to accommodate revenues not meeting budget expectations and to ensure a balanced budget, measures are being taken to reduce expenditures in the General Fund. Most General Fund departments reduced their budgets by two percent over Fiscal Year 2002 levels in developing the Fiscal Year 2003 Budget. In addition, most General Fund departments have identified additional savings amounting to approximately three percent of their Fiscal Year 2003 budget due to the projected revenue shortfall.

## Fiscal Year 2004 (Proposed Budget)

Under the City's Fiscal Year 2004 proposed budget, General Fund revenues total $739.8 million, a net increase of $10.5 million or 1.4% from the Fiscal Year 2003 adopted budget. The proposed budget revenue estimates reflect an uncertain economy that continues to experience the effects of declining consumer confidence, higher unemployment trends, a weak national economy and potential impacts from the State's budget crisis. Even though San Diego's economy continues to outperform the State and national economies, the recovery remains slower than anticipated. The potential State impact on the City's finances may be significant, although no conclusive information is available as to these impacts. For this reason, the proposed budget excludes any action the State may take that could impact the City's budget. In Fiscal Year 2003, the City did not receive any revenues from the State for local fiscal relief, and does not include any such revenues in its proposed budget for Fiscal Year 2004. Presented below are estimated growth rates for the major revenues.

Exhibit 9
Page 58 of 165

**Projected Change in Major Revenue Sources**
*Proposed Budget Fiscal Year 2004 over Adopted Budget Fiscal Year 2003*[1]

| | | |
|---|---|---|
| • Property Tax | + | 8.0% |
| • Sales Tax | + | 3.0% |
| • Transient Occupancy Tax | + | 5.5% |
| • Motor Vehicle License Fees | + | 3.0% |

---

(1)  The above percentages reflect overall growth in these revenue sources, whether or not such revenues are allocated entirely to the General Fund.

Source: City of San Diego, Financial Management Department

        The General Fund expenditure growth amounted to a total of approximately $46 million, largely a result of annualization of FY 2003 and FY 2004 negotiated salaries and benefits ($20.7 million), retirement contributions ($11.0 million), and workers compensation ($5.8 million).  As the General Fund revenues are not projected to grow at the same pace as the expenditure requirements, corresponding reductions to City operations are required.  Most General Fund departments reduced their Fiscal Year 2004 budgets, which amounted to approximately $30 million.  Further expenditure reductions were made through departmental reorganization and cuts in non-discretionary accounts.

        The proposed budget does not include the use of reserves to balance the General Fund. Service levels have been impacted and some City facilities will see reduced hours of operation.

**State Budget Deficit**

        The State of California's projected budget deficit is between $35 and $38 billion through Fiscal Year 2004. In his budget proposal, Governor Gray Davis included budget savings involving major program reductions and tax increases. The proposal includes discontinuing the State backfill of motor vehicle license fees for an impact of approximately $51 million to the City in the Fiscal Year 2004 General Fund budget, if vehicle license fees are not increased to replace the backfill amount as described below under the caption "Vehicle License Fee Reduction".  Other impacts proposed by the Governor in Fiscal Year 2004 would include an estimated reduction for libraries of approximately $1.2 million and the elimination of $5.2 million in booking fees reimbursement. In addition, a property tax increment shift to the Educational Revenue Augmentation Fund (ERAF) could result in a $5.8 million loss for the City of San Diego's Redevelopment Agency (the "Redevelopment Agency"). The State Legislature, however, has not yet approved these proposals.

        The City cannot predict what actions will be taken in the future by the State Legislature and the Governor to address the State's current and future budget deficits.  Future State Budgets could be affected by national economic conditions and the factors over which the City will have no control.  To the extent that the State budget process results in reduced revenues or increased expenses to the City, the City will be required to make adjustments to its budget.

**Vehicle License Fee Reduction**

        The State's Vehicle License Fee ("VLF") is an annual fee on the ownership of a registered vehicle in California.  Automobiles, motorcycles, pick-up trucks, commercial trucks and trailers, rental cars, and taxicabs are all subject to the VLF.  VLF revenues are distributed by the State to cities and counties.  Approximately three-fourths of VLF revenues (one-half to cities and one-half to counties) can

Exhibit 9
Page 59 of 165

be used for any lawful purpose, with the remaining funds allocated to counties to pay for "realignment" health and social services programs. Under the State of California's Vehicle License Fee Law, beginning January 1, 1999, the vehicle license fee was permanently reduced from 2.0% to 1.5%. The law also provided for a one-year reduction to 1.3% for vehicles with a payment due date during calendar year 2000. Subsequently, the law was amended to reduce the rate to 0.65% through calendar year 2002. Beginning in 2003, the vehicle license fee was scheduled to be reduced permanently to 0.65%.

To ensure that local governments are not impacted by the fee reductions, State law provides for an offset from the State's General Fund equal to the amount of the reduction. Under the offset provisions, the State's General Fund pays local governments for lost VLF revenues on a dollar per dollar matching basis, from state General Fund revenues. The repayment funds are continuously appropriated, and do not need to be approved in the annual budget process. A statutory, continuous appropriation, however, is not a firm guarantee of a continuing replacement and the repayment is subject to the availability of monies for transfer from the State's General Fund.

As noted above, the Governor had proposed to discontinue the vehicle license fee backfill to cities and counties and the Governor's May Revision to the proposed budget for Fiscal Year 2004 (the Governor's May Revision) assumes no backfill is needed because provisions of the state law will trigger an increase in the VLF rate, such that no backfill will be required and local VLF revenues will not be reduced further. VLF is the third largest General Fund revenue source for the City (after property taxes and sales taxes). In Fiscal Year 2002, the City received approximately $69.9 million in VLF revenues, a 4.0% increase over the prior year's actual receipts, representing approximately 9.9% of the total General Fund Revenues. For Fiscal Year 2003, VLF revenues are budgeted at $72.2 million. The State Controller has stated and the Governor's May Revision is based on the assumption that a provision in existing law will trigger an increase in the VLF fees due to the lack of available State revenues to pay the backfill amount. This interpretation may be challenged in court, and no assurance can be given that an increase will be triggered automatically to replace the backfill amount. If the Governor's proposed budget for Fiscal Year 2004 is enacted as proposed and the State Legislature does not continue to backfill the VLF revenues, or does not increase vehicle license fees, or an increase in the VLF fees is not triggered under existing law, the City forecasts that it would lose approximately $51 million in VLF revenues for Fiscal Year 2004 and for each year thereafter. As of the date of this Official Statement, the State has continued to backfill VLF revenues for Fiscal Year 2003. As of April 2003, the City had received approximately $59.4 million in VLF revenues in Fiscal Year 2003.

## Property Taxes

The County assesses property and collects secured and unsecured property taxes for the cities, school districts, and special districts within the County, including the City. Once the property taxes are collected, the County conducts its internal reconciliation for accounting purposes and distributes the City's share of such taxes to the City, generally within a couple of weeks. Prior to distribution, the moneys are deposited in an account established on behalf of the City in the County Treasurer's Investment Pool (the "Pool"). If the County and/or the Pool were at any time to become subject to bankruptcy proceedings, it is possible that City property taxes held in the Pool, if any, could be temporarily unavailable to the City. In the event of such an occurrence, General Fund revenue requirements could be met through the use of other City funds. Ad valorem taxes are subject to constitutional limits as discussed under the section "**LIMITATIONS ON TAXES AND APPROPRIATIONS.**"

Taxes are levied for each fiscal year on taxable real and personal property which is situated

in the City as of the preceding January 1. For assessment and collection purposes, property is classified either as "secured" or "unsecured" and is listed accordingly on separate parts of the assessment roll. The "secured roll" is that part of the assessment roll containing the taxes on which there is a lien on real property sufficient, in the opinion of the County Assessor, to secure payment of the taxes. Other property is assessed on the "unsecured roll."

Property taxes on the secured roll are due in two installments, on November 1 and February 1 of the fiscal year. If unpaid, such taxes become delinquent on December 10 and April 10, respectively, and a 10% penalty attaches to any delinquent payment. If not paid, the property is subject to default. Such property may be redeemed by payment of the delinquent taxes and the delinquent penalty, plus a redemption penalty of 1.5% per month from July 1 of the following year to the time of redemption. If taxes are unpaid for a period of five years or more, the property is subject to sale by the County Tax Collector.

Property taxes on the unsecured roll are due as of the March 1 lien date and become delinquent, if unpaid, on August 31 of the fiscal year. A 10% penalty attaches to delinquent taxes on property on the unsecured roll, and an additional penalty of 1.5% per month begins to accrue beginning November 1 of the fiscal year. The taxing authority has four ways of collecting unsecured personal property taxes: (a) a civil action against the taxpayer; (b) filing a certificate in the office of the County Clerk specifying certain facts in order to obtain a judgment lien on certain property of the taxpayer; (c) filing a certificate of delinquency for record in the County Recorder's Office, in order to obtain a lien on certain property of the taxpayer; and (d) seizure and sale of personal property, improvements or possessory interests belonging or assessed to the assessee.

A supplemental assessment occurs upon a change of ownership of existing property and for new construction upon completion. A supplemental tax bill is issued for the difference in property value resulting from the increase in assessed value prorated for the remainder of the year.

Effective July 1, 1988, Assembly Bill 454, Chapter 921, eliminated the reporting of the unitary valuations pertaining to public utilities such as San Diego Gas and Electric and Pacific Telephone. In lieu of the property tax on these previously included assessed valuations, the City now receives from the State (through the County) an amount of unitary revenue based upon the unitary property tax received in the prior year.

Exhibit 9
Page 61 of 165

Table 15 presents the assessed valuation within the City for each of the last ten Fiscal Years.

## Table 15
## ASSESSED VALUATION[1] [2]
### *Fiscal Years Ended June 30, 1994 through 2003*
### *(in thousands except for percentages)*

| Fiscal Year Ending June 30 | Secured Property | Unsecured Property | Gross Total | Less Exemption [3] | Net Assessed Valuations [4][5] | Annual Assessed Valuation %Change |
|---|---|---|---|---|---|---|
| 1994 | $60,586,129 | $4,218,892 | $64,805,021 | $2,360,741 | $62,444,280 | 1.13 % |
| 1995 | $60,939,995 | $4,371,923 | $65,311,918 | $2,420,027 | $62,891,891 | 0.72% |
| 1996 | $61,793,760 | $4,303,198 | $66,096,958 | $2,489,507 | $63,607,451 | 1.14% |
| 1997 | $61,893,902 | $4,353,543 | $66,247,445 | $2,355,174 | $63,892,271 | 0.45% |
| 1998 | $63,562,588 | $4,988,950 | $68,551,538 | $2,910,753 | $65,640,785 | 2.74% |
| 1999 | $68,648,609 | $5,337,916 | $73,986,525 | $2,994,814 | $70,991,711 | 8.15% |
| 2000 | $75,788,751 | $5,852,822 | $81,641,573 | $2,987,620 | $78,653,953 | 10.79% |
| 2001 | $82,195,239 | $6,347,101 | $88,542,340 | $3,249,480 | $85,292,860 | 8.44% |
| 2002 | $89,259,317 | $6,838,926 | $96,098,243 | $3,572,188 | $92,526,055 | 8.48% |
| 2003 | $96,534,652 | $6,959,602 | $103,494,254 | $3,189,764 | $100,304,49 | 8.41% |

(1)  The official date of assessment is the first day of January preceding the fiscal year during which taxes are levied.  For example, January 1, 2002 is the official assessment date for property taxes due during Fiscal Year 2003.  The City receives preliminary estimates from the County Assessor in March and final assessment estimates in late June, or early July.
(2)  Includes both locally assessed and State assessed utility property.
(3)  Excludes homeowners' and business inventory exemptions.
(4)  Net assessed valuation for tax rate purposes.  Includes both locally assessed and State assessed utility property.
(5)  The City does not participate in the Teeter Plan.

Source:  City of San Diego Comprehensive Annual Financial Report, Fiscal Year 2002.

Exhibit 9
Page 62 of 165

Table 16 shows the City's secured tax collections for each of the ten Fiscal Years.

**Table 16**
**SECURED TAX LEVIES AND COLLECTIONS**
*Fiscal Years Ended June 30, 1993 through 2002*
*(in thousands except for percentages)*

| Fiscal Year Ending June 30 | Tax Levy[1] | Current Year Collections | Current Year Collections as Percentage of Current Tax Levy | Total Tax Collections | Total Collections as Percentage of Current Tax Levy[2] |
|---|---|---|---|---|---|
| 1993 | $120,574 | $114,821 | 95.23% | $119,867 | 99.41% |
| 1994 | $109,881 | $105,911 | 96.39% | $110,738 | 100.78% |
| 1995 | $109,754 | $104,295 | 95.03% | $108,192 | 98.58% |
| 1996 | $111,281 | $108,137 | 97.18% | $110,513 | 99.31% |
| 1997 | $111,719 | $108,676 | 97.28% | $110,563 | 98.96% |
| 1998 | $116,912 | $114,311 | 97.78% | $117,429 | 100.44% |
| 1999 | $127,846 | $124,267 | 97.20% | $126,923 | 99.28% |
| 2000 | $141,963 | $137,859 | 97.11% | $140,225 | 98.78% |
| 2001 | $155,060 | $150,900 | 97.32% | $153,406 | 98.93% |
| 2002 | $167,077 | $163,357 | 97.77% | $165,446 | 99.02% |

(1) Commencing in Fiscal Year 1993, by action of the State Legislature, there was a permanent shift of some property taxes from cities to schools.

(2) Total Collections include unpaid taxes from previous years' tax levies collected in the current fiscal year.

Source: FY 1993 – 2001: City of San Diego Comprehensive Annual Financial Report
        FY 2002: County of San Diego

A - 24

Exhibit 9
Page 63 of 165

Table 17 indicates the ten largest secured and unsecured property taxpayers in the City.

**Table 17**
**PRINCIPAL PROPERTY TAXPAYERS IN CITY OF SAN DIEGO[1]**
*Tax Roll for Fiscal Year 2002-2003*
*(in thousands, except for percentages)*

| Taxpayers | Type of Business | Assessed Valuation [2][3] | Percentage of Net Assessed Valuation [3] | Amount of Tax [4] |
|---|---|---|---|---|
| Kilroy Realty LP | Real Estate | $566,110 | 0.57% | $5,976 |
| Fashion Valley Mall LLC | Shopping Center | 530,665 | 0.54 | 5,485 |
| Qualcomm, Inc. | Electronics | 465,566 | 0.47 | 5,178 |
| Sea World, Inc. | Entertainment | 280,063 | 0.28 | 3,111 |
| Pacific Gateway, LTD | Developer | 250,319 | 0.25 | 2,780 |
| ERP Operating LTD Partnership | Developer/ Property Manager | 239,426 | 0.24 | 2,709 |
| University Towne Centre LLC | Shopping Center | 226,350 | 0.23 | 2,514 |
| Irvine Co | Developer | 248,194 | 0.25 | 2,484 |
| Horton Plaza LLC | Shopping Center | 192,079 | 0.19 | 2,173 |
| Pardee Construction Co. | Developer | 142,520 | 0.14 | 2,163 |
| TOTAL | | $3,141,292 | 3.16% | $34,573 |

(1) This table excludes public utilities, including San Diego Gas & Electric Company, Pacific Bell, and American Telephone and Telegraph, because valuations within the City cannot be readily determined.
(2) Total assessed valuation includes both secured and unsecured property.
(3) Using total Net Assessed Valuation of $98,917,185,000, which excludes homeowners' exemptions.
(4) The City receives approximately 17.2% of total taxes paid.

Source: County of San Diego Assessor's Office

## LIMITATIONS ON TAXES AND APPROPRIATIONS

### Article XIII A of the California Constitution

Section 1(a) of Article XIII A of the California Constitution limits the maximum ad valorem tax on real property to 1% of full cash value (as defined in Section 2 of Article XIII A), to be collected by each county and apportioned among the county and other public agencies and funds according to law. Section 1(b) of Article XIII A provides that the 1% limitation does not apply to ad valorem taxes to pay interest or redemption charges on (a) indebtedness approved by the voters prior to July 1, 1978, or (b) any bonded indebtedness for the acquisition or improvement of real property approved on or after July 1, 1978, by two-thirds of the votes cast by the voters voting on the proposition. Section 2 of Article XIII A defines "full cash value" to mean "the County Assessor's valuation of real property as shown on the 1975/76 tax bill under full cash value or, thereafter, the appraised value of real property when purchased, newly constructed, or a change in ownership has occurred after the 1975 assessment." The full cash value may be adjusted annually to reflect inflation at a rate not to exceed 2% per year or to reflect a reduction in the consumer price index or comparable data for the area under the taxing jurisdiction, or reduced in the event of declining property values caused by substantial damage, destruction, or other factors. Legislation enacted by the State Legislature to implement Article XIII A provides that notwithstanding any other law, local agencies may not levy any ad valorem property tax except to pay debt service on indebtedness approved by the voters as described above.

A - 25

Exhibit 9
Page 64 of 165

In addition, legislation enacted by the California Legislature to implement Article XIII A provides that all taxable property is shown at full assessed value as described above. In conformity with this procedure, all taxable property value included in this Official Statement (except as noted) is shown at 100% of assessed value and all general tax rates reflect the $1 per $100 of taxable value.

On June 3, 1986, California voters approved an amendment to Article XIII A, which added an additional exemption to the 1% tax limitation imposed by Article XIII A. Under this amendment to Article XIII A, local governments and school districts may increase the property tax rate above 1% for the period necessary to retire new general obligation bonds, if two-thirds of those voting in a local election approve the issuance of such bonds and the money raised through the sale of the bonds is used exclusively to purchase or improve real property. Later amendments allow for property tax increases to pay for certain school district general obligation bonds approved by 55% of those voting in a local election.

In the June 1990 election, the voters of the State approved amendments to Article XIII A permitting the State Legislature to extend the replacement dwelling provisions applicable to persons over 55 to severely disabled homeowners for a replacement dwelling purchase or newly constructed on or after June 5, 1990, and to exclude from the definition of "new construction" triggering reassessment improvements to certain dwellings for the purpose of making the dwelling more accessible to severely disabled persons. In the November 1990 election, the voters of the State approved an amendment of Article XIII A to permit the State Legislature to exclude from the definition of "new construction" seismic retrofitting improvements or improvements utilizing earthquake hazard mitigation technologies constructed or installed in existing buildings after November 6, 1990. Since 1990, the voters have approved several other minor exemptions from the reassessment provisions of Article XIII A.

**Article XIIIA Litigation**

In June 1978, Article XIIIA of the California Constitution was amended by Proposition 13 to limit, among other things, a County assessor's ability to adjust for inflation to 2% per year (see **"Constitutional and Statutory Limitations on Taxes and Appropriations-Article XIIIA of the California Constitution"** discussed previously). In a Minute Order issued on November 2, 2001 in *County of Orange v. Orange County Assessment Appeals Board No. 3*, case no. 00CC03385, the Orange County Superior Court held that where a home's taxable value did not increase for two years, due to a flat real estate market, the Orange County assessor violated the two percent inflation adjustment provision of Article XIIIA, when the assessor tried to "recapture" the tax value of the property by increasing its assessed value by 4% in a single year. The assessors in most California Counties, including San Diego County, use a similar methodology in raising the taxable values of property beyond 2% in a single year. The State Board of Equalization has approved this methodology for increasing assessed values. On December 12, 2002, the Orange County Superior Court certified the lawsuit as a class action lawsuit and the case has been submitted on appeal to the State's Fourth District Court of Appeal.

The County of San Diego has advised the City that comparable claims by landowners within the County were rejected by the San Diego County Assessment Appeals Board for the Fiscal Year 2000/01 property tax levy and that such landowners have at least three years from the date of such rejection in which to further prosecute their claims. In another matter, a taxpayer initiated a declaratory relief action in Superior Court seeking comparable relief. In that case, *Linda Pintzuk v. Gregory J. Smith*, case no. GIC 790102, the trial court sustained the County's demurrer without leave to amend and dismissed the action on September 25, 2002. The plaintiff did not file an appeal of the trial court's decision.

A - 26

Exhibit 9
Page 65 of 165

The City cannot predict the outcome of the Orange County litigation, nor whether the landowners whose claims were rejected by the San Diego County Assessment Appeals Board, or other landowners, will further prosecute claims against the County of San Diego. Currently, the trial court's ruling in the Orange County litigation applies only to assessments levied in Orange County. The City cannot predict the effect, if any, that the outcome of either the Orange County litigation or the further prosecution of claims against the County of San Diego would have on property tax revenues to be received by the City, although the effect would be adverse.

## Article XIII B of the California Constitution

Article XIII B of the California Constitution limits the annual appropriations of the State and of any city, county, school district, authority or other political subdivision of the State to the level of appropriations for the prior fiscal year, as adjusted for changes in the cost of living, population, and services for which the fiscal responsibility is shifted to or from the governmental entity. The "base year" for establishing this appropriations limit is Fiscal Year 1979 and the limit is adjusted annually to reflect changes in population, consumer prices and certain increases or decreases in the cost of services provided by these public agencies.

Appropriations of an entity of local government subject to Article XIII B generally include any authorizations to expend during a fiscal year the proceeds of taxes levied by or for the entity, exclusive of certain State subventions, refunds of taxes and benefit payments from retirement, unemployment insurance and disability insurance funds. "Proceeds of Taxes" include, but are not limited to, all tax revenues, most State subventions and the proceeds to the local government entity from (a) regulatory licenses, user charges, and user fees (to the extent that such proceeds exceed the cost reasonably borne by such entity) and (b) the investment of tax revenues. Article XIII B provides that if a governmental entity's revenues in any year exceed the amounts permitted to be spent, the excess must be returned by revising tax rates or fee schedules over the subsequent two years.

Article XIII B does not limit the appropriation of money to pay debt service on indebtedness existing or authorized as of January 1, 1979, or for bonded indebtedness approved thereafter by a vote of the electors of the issuing entity at an election held for that purpose.

In the June 1990 election, the voters of the State approved Proposition 111, which amended the method of calculating State and local appropriations limits. Proposition 111 made several changes to Article XIII B, three of which are reflected in the City's annual computation of its appropriation limit. First, the term "change in the cost of living" was redefined as the change in the California per capita personal income ("CPCPI") from the preceding year. Previously the lower of the CPCPI or the United States Consumer Price Index was used. Second, the appropriations limit for the fiscal year was recomputed by adjusting the Fiscal Year 1987 limit by the CPCPI for the three subsequent years. Third, Proposition 111 excluded appropriation for "all qualified capital outlay projects, as defined by the Legislature" from the definition of "appropriations subject to limitation."

Article XIII B allows voters to approve a temporary waiver of a government's Article XIII B limit. Such a waiver is often referred to as a "Gann limit waiver." The length of any such waiver is limited to four years. In June 1990, San Diego voters approved a four-year increase in the City's Article XIII B limit (for Fiscal Years 1992 through 1995). In the November 1994 election, San Diego voters approved another four-year increase in the City's Article XIII B limit (for Fiscal Years 1996 through 1999). The Gann limit waiver does not provide any additional revenues to the City or allow the City to

Exhibit 9
Page 66 of 165

finance additional services. The City's appropriations limit for Fiscal Year 2003 is established at $684,004,095. It is estimated that the City will be under the Gann Limit by approximately $127.8 million. The impact of the appropriations limit on the City's financial needs in the future is unknown.

**Articles XIII C and XIII D of the California Constitution**

On November 5, 1996, the voters of the State approved Proposition 218, known as the "Right to Vote on Taxes Act." Proposition 218 added Articles XIII C and XIII D to the California Constitution, which contain a number of provisions affecting the ability of the City to levy and collect both existing and future taxes, assessments, fees and charges. The interpretation and application of certain provisions of Proposition 218 will ultimately be determined by the courts with respect to some of the matters discussed below. It is not possible at this time to predict with certainty the future impact of such interpretations. The provisions of Proposition 218, as so interpreted and applied, may affect the City's ability to raise revenues for certain programs and obligations.

Article XIII C requires that all new local taxes be submitted to the electorate before they become effective. Taxes for general governmental purposes of the City require a majority vote and taxes for specific purposes, even if deposited in the City's General Fund, require a two-thirds vote. Further, any general purpose tax which the City imposed, extended or increased, without voter approval, after December 31, 1994, may continue to be imposed only if approved by a majority vote in an election which must be held within two years of November 5, 1996. The City has not imposed, extended, or increased any such taxes which are currently in effect.

Article XIII C also expressly extends the initiative power to give voters the power to reduce or repeal local taxes, assessments, fees and charges, regardless of the date such taxes, assessments, fees and charges were imposed. Article XIII C expands the initiative power to include reducing or repealing assessments, fees, and charges, which had previously been considered administrative rather than legislative matters and therefore beyond the initiative power. This extension of the initiative power is not limited by the terms of Article XIII C to fees imposed after November 6, 1996 and absent other legal authority could result in the retroactive reduction in any existing taxes, assessments, or fees and charges. In addition, certain City Charter amendments, if effective, could further constrain the City in this area (see **"LITIGATION POTENTIALLY ADVERSELY AFFECTING THE GENERAL FUNDS OF THE CITY- City Voter Initiatives"** below).

The voter approval requirements of Article XIII C reduce the flexibility of the City to raise revenues for the General Fund, and no assurance can be given that the City will be able to impose, extend or increase such taxes in the future to meet increased expenditure needs.

Article XIII D added several new provisions relating to how local agencies may levy and maintain "assessments" for municipal services and programs. These provisions include, among other things, (i) a prohibition against assessments which exceed the reasonable cost of the proportional special benefit conferred on a parcel; (ii) a requirement that the assessment must confer a "special benefit," as defined in Article XIII D, over and above any general benefits conferred; and (iii) a majority protest procedure which involves the mailing of a notice and a ballot to the record owner of each affected parcel, a public hearing, and the tabulation of ballots weighted according to the proportional financial obligation of the affected party. "Assessment" in Article XIII D is defined to mean any levy or charge upon real property for a special benefit conferred upon the real property. This definition applies to landscape and maintenance assessments for open space areas, street medians, public rights-of-way, streetlights, parks,

Exhibit 9
Page 67 of 165

and other enhanced services and improvements. If the City is unable to continue to collect assessment revenues for a particular program, the program might have to be curtailed and/or funded by the City's General Fund. Given the approval requirements imposed by Article XIII D, the City is unable to predict whether it will be able to continue to collect assessment revenues for these programs. Since these programs represent additional services, to the extent such assessment revenues cannot be collected, the City Manager would recommend to the City Council that such programs be curtailed rather than supported with amounts in the General Fund. Based upon advice from the City Attorney, the City does not believe that it would be obligated to maintain such programs from the General Fund. To date, the City has conducted 34 mail ballot assessment elections, of which all but one were approved by the property owners.

In addition, Article XIII D added several provisions affecting "fees" and "charges," defined for purposes of Article XIII D to mean "any levy other than an ad valorem tax, a special tax, or an assessment, imposed by a [local government] upon a parcel or upon a person as an incident of property ownership, including a user fee or charge for a property related service." All new and existing property related fees and charges must conform to requirements prohibiting, among other things, fees and charges which (i) generate revenues exceeding the funds required to provide the property related service; (ii) are used for any purpose other than those for which the fees and charges are imposed; (iii) are for a service not actually used by, or immediately available to, the owner of the property in question; or (iv) are used for general governmental services, including police, fire or library services, where the service is available to the public at large in substantially the same manner as it is to property owners. Depending on the interpretation of what constitutes a "property related fee" under Article XIII D, there could be future restrictions on the ability of the City's General Fund to charge its enterprise funds for various services provided. Further, before any property related fee or charge may be imposed or increased, written notice must be given to the record owner of each parcel of land affected by such fee or charge. The City must then hold a hearing upon the proposed imposition or increase, and if written protests against the proposal are presented by a majority of the owners of the identified parcels, the City may not impose or increase the fee or charge. Moreover, except for fees or charges for sewer, water and refuse collection services, or fees for electrical and gas service, no property related fee or charge may be imposed or increased without majority approval by the property owners subject to the fee or charge or, at the option of the local agency, two-thirds voter approval by the electorate residing in the affected area. The City has a number of enterprise funds which are self supporting from fees and charges that may ultimately be determined to be property related for purposes of Article XIII D, e.g. the Sewer Enterprise Fund and the Water Enterprise Fund. The fees and charges of all City enterprise funds may be determined to be fees and charges subject to the initiative power referred to in Article XIII C, as described below. In the event that fees and charges cannot be appropriately increased or are reduced pursuant to exercise of the initiative power, the City may have to decide whether to support any deficiencies in these enterprise funds with moneys from the General Fund or to curtail service, or both.

In addition to the enterprise funds discussed above, the City's stormwater program is funded with fees, which may ultimately be determined to be property related for purposes of Articles XIII C and D. The City is a co-permittee under a National Pollution Discharge Elimination System Permit ("NPDES Permit") for its stormwater program. Pursuant to the NPDES Permit, the City is obligated to undertake substantial capital improvements and implement new operations and maintenance procedures for its stormwater program ("NPDES Permit Requirements"). At the present time, the City is working on a plan of finance for such NPDES Permit Requirements. If the City is not able to increase its stormwater fees to pay for the NPDES Permit Requirements, or if such fees are reduced pursuant to the exercise of the

Exhibit 9
Page 68 of 165

initiative power of Article XIII C, the City will have to identify a plan of finance for same. Such plan of finance may include General Fund moneys not previously identified.

Article XIII C also removes many of the limitations on the initiative power in matters of reducing or repealing any local tax, assessment, fee or charge. No assurance can be given that the voters of the City will not, in the future, approve an initiative or initiatives which reduce or repeal local taxes, assessments, fees or charges currently comprising a substantial part of the City's General Fund. "Assessments," "fees" and "charges" are not defined in Article XIII C, and it is unclear whether these terms are intended to have the same meanings for purposes of Article XIII C as for Article XIII D described above. If not, the scope of the initiative power under Article XIII C potentially could include any General Fund local tax, assessment, or fee not received from or imposed by the federal or State government or derived from investment income.

Both Articles XIII A and XIII B, as well as Articles XIII C and XIII D described above, were adopted as measures that qualified for the ballot pursuant to California's constitutional initiative process. From time to time other initiative measures could be adopted, affecting the ability of the City to increase revenues and to increase appropriations.

**Statutory Spending Limitations**

A statutory initiative ("Proposition 62") was adopted by the voters of the State at the November 4, 1986, General Election which (a) requires that any tax for general governmental purposes imposed by local governmental entities be approved by resolution or ordinance adopted by two-thirds vote of the governmental agency's legislative body and by a majority of the electorate of the governmental entity, (b) requires that any special tax (defined as taxes levied for other than general governmental purposes) imposed by a local governmental entity be approved by a two-thirds vote of the voters within the jurisdiction, (c) restricts the use of revenues from a special tax to the purposes or for the service for which the special tax is imposed, (d) prohibits the imposition of ad valorem taxes on real property by local governmental entities except as permitted by Article XIII A, (e) prohibits the imposition of transaction taxes and sales taxes on the sale of real property by local governmental entities, and (f) requires that any tax imposed by a local governmental entity on or after March 1, 1985, be ratified by a majority vote of the electorate within two years of the adoption of the initiative or be terminated by November 15, 1988. The requirements imposed by Proposition 62 were upheld by the California Supreme Court in *Santa Clara County Local Transportation Authority v. Guardino*, 11 Cal. 4th 220; 45 Cal.Rptr.2d 207 (1995).

The City believes that, notwithstanding the Guardino decision, the provisions of Proposition 62 do not apply to charter cities. The extent of the application of the decision to taxes authorized prior to the date of the decision is also undecided.

Following the Santa Clara decision, several actions were filed challenging taxes imposed by public agencies after the adoption of Proposition 62. On June 4, 2001, the California Supreme Court rendered its opinion in *Howard Jarvis Taxpayers Association v. City of La Habra, et al.* (2001) 25 Cal. 4th 809 holding that an action brought in 1996 challenging the imposition of a 1992 utility users tax imposed for general purposes, without voter approval, was not barred by a three year statute of limitations period because the continued imposition and collection of the tax was an ongoing violation upon which the statute of limitations period begins anew with each collection. However, the court noted that the case did not concern bond issues or other governmental actions that, by state law, are made subject to the accelerated validation procedures of Code of Civil Procedure sections 860 through 870.5.

Exhibit 9
Page 69 of 165

The Santa Clara decision did not decide the question of the applicability of Proposition 62 to charter cities such as the City. Two (2) cases decided by the California Courts of Appeals in 1993, *Fielder v. City of Los Angeles* (1993) 14 Cal. App. 4th 137 (rev. den. May 27, 1993), and *Fisher v. County of Alameda* (1993) 20 Cal. App. 4th 120 (rev. den. Feb. 24, 1994), had held that Proposition 62's restriction on property transfer taxes did not apply to charter cities because charter cities derive their power to enact such taxes under Article XI, Section 5 of the California Constitution relating to public affairs.

Proposition 62, as an initiative statute, does not have the same level of authority as a constitutional initiative, but is analogous to legislation adopted by the State Legislature, except that it may be amended only by a vote of the State's electorate. However, Proposition 218, as a constitutional amendment, is applicable to charter cities and supersedes many of the provisions of Proposition 62.

Since the enactment of Proposition 62 in 1986, the City has instituted certain tax increases, and pursuant to such increases has collected approximately $309.3 million through June 30, 2002. The City did not increase existing taxes or impose new taxes during Fiscal Year 2002 or to-date in Fiscal Year 2003.

While in the opinion of the City Attorney the provisions of Proposition 62 do not apply to charter cities, this position is being challenged by various groups in other jurisdictions and may be the subject of future litigation. If ultimately found valid and applicable to charter cities, Proposition 62 could affect the ability of the City to continue the imposition of certain taxes, such as Sales and Transient Occupancy Taxes, and may further restrict the City's ability to raise revenue.

## LABOR RELATIONS

Most City employees are represented by one of four labor organizations. Currently, the American Federation of State and County Municipal Employees (Local 127) represents approximately 2,276 employees; The Municipal Employees Association (the "MEA") and unrepresented employees (who are a part of the MEA bargaining unit for contract purposes) represents approximately 4,935 employees; The Police Officers Association (the "POA") represents approximately 2,073 employees; and the International Association of Firefighters (Local 145) represents approximately 991 employees.

Labor agreements are in place with Local 127, MEA, and Local 145 through June 30, 2005. MEA and Local 127 will receive the following pay increases: 1% effective December 2002, 2% effective December 2003, 2% effective June 2004, 3 % effective December 2004, and 3% effective June 2005. Local 145 will receive the following pay increases: 1% effective July 2002, 2% effective July 2003, 2% effective December 2003, 4% effective July 2004, and 2% effective December 2004. In addition to increases in paid compensation, MEA, Local 127, and Local 145 will also receive increases in the amount of employee retirement contributions paid by the City on behalf of the employees. Including these retirement benefit increases, over the three-year period of the labor agreements total compensation will increase by 12.6% for MEA and Local 127, and by 15.7% for Local 145.

A labor agreement with POA is in place through June 30, 2003. POA received a 2% pay increase and a 1.7% increase in retirement compensation effective July 2002.

A - 31

Exhibit 9
Page 70 of 165

## PENSION PLAN

All benefited City employees participate with the full-time employees of the San Diego Unified Port District (the "District") in the City Employees' Retirement System ("CERS"). CERS is a public employee retirement system that acts as a common investment and administrative agent for the City and the District. Through various benefit plans, CERS provides retirement benefits to all general, safety (police and fire), and legislative members.

The CERS plans are structured as defined benefit plans in which benefits are based on salary, length of service, and age. City employees are required to contribute a percentage of their annual salary to CERS. State legislation requires the City to contribute to CERS at rates determined by actuarial valuations.

The City's last actuarial valuation dated June 30, 2002 stated the funding ratio (Valuation of Assets available for Benefits to Total Actuarial Accrued Liability), of the CERS fund to be 77.3%. The CERS fund has an Unfunded Actuarial Accrued Liability (UAAL) of $720.7 million as of June 30, 2002, which represents a $436.8 million increase in the UAAL since the previous actuarial calculation dated June 30, 2001. The UAAL is the difference between total actuarial accrued liabilities of $3.169 billion and assets allocated to funding of $2.448 billion. The increase in the UAAL as of June 30, 2002, results primarily from the lower than anticipated investment returns. The UAAL is amortized over a 30-year period, which started July 1, 1991, with each year's amortization payment reflected as a portion of the percentage of payroll representing the employer's contribution rate. As of June 30, 2002, there were 19 years remaining in the amortization period. See "**LITIGATION POTENTIALLY AFFECTING THE GENERAL FUNDS OF THE CITY- Other Litigations and Claims**" for a discussion of a pending litigation relating to the funding of the UAAL.

## INSURANCE, CLAIMS, AND LITIGATION

### Workers' Compensation And Long-Term Disability

The City is self-insured for Workers' Compensation and Long-term Disability. The City's self-insured liability for Workers' Compensation and Long-term Disability is accounted for in the Self Insurance Fund. The Self Insurance Fund for Workers' Compensation and Long-Term Disability is supported by contributions from each of the City's operating funds. These contributions are determined by multiplying an annually established rate by the gross salaries payable from each of the City's operating funds. As of June 30, 2002, there is a fund equity deficit in the Self Insurance Fund of approximately $29.3 million. It is anticipated that individual claim settlements will be funded through participating operating fund contributions subsequent to the filing of a claim and prior to its settlement.

### Employee Group Health Insurance

Employee Group Health coverage is provided to employees and retirees by third party group health insurance carriers through an annual "cafeteria plan" selection process.

### Public Liability Insurance

The City carries public liability insurance in the amount of $54 million in excess of the City's $1 million self-insured retention. This means that the City may pay up to the first $1 million in any one insured public liability loss and that insured losses above $1 million and up to $54 million are paid by

the City's public liability insurance. The City's public liability insurance is purchased in layers, jointly with a number of counties in the California State Association of Counties – Excess Insurance Authority ("CSAC-EIA"), however, there is no sharing of policy limits with other members of CSAC-EIA for public liability claims. The City budgets for public liability claims on an annual basis. The City has incurred total annual liability claims and liability insurance premium payments as shown below in Table 18.

**Table 18**
**CITY OF SAN DIEGO**
**LIABILITY CLAIMS[1] AND PREMIUMS**
*Fiscal Years ended June 30, 1998 through 2002*

| Fiscal Year | Liability Claims Expenses And Settlement Costs | Liability Premium Payments |
|---|---|---|
| 1998 | $ 9,970,097 | $ 1,209,474 |
| 1999 | $ 7,202,644 | $ 1,103,009 |
| 2000 | $ 9,639,750 | $ 1,105,678 |
| 2001 | $ 13,394,697 | $ 1,071,330 |
| 2002 | $ 8,479,308 | $ 1,520,560 |

(1) The City's portion of settlement and investigation expenses for third party public liability claims, and other litigation expenses.

Source: City of San Diego, Risk Management

**Property Insurance**

The City participates in the joint purchase of property insurance including rental interruption and flood insurance through the CSAC-EIA pool; this does not include Earthquake insurance. This joint purchase of the City's "all risk" property insurance, insuring approximately $2 billion of City property, provides coverage for loss to City property up to approximately $400 million per occurrence, with a $25,000 deductible. This limit of insurance includes coverage for rental interruption for lease financed locations. The City also carries boiler and machinery coverage. There is no sharing of limits among the City and member counties of the CSAC-EIA pool, unless the City and member counties are mutually subject to the same loss. Limits and coverages may be adjusted periodically in response to requirements of bond financed projects and in response to changes in the insurance marketplace.

The City's "all risk" property insurance policy effective March 31, 2003, through March 31, 2004, will cost approximately $6 million. This represents an increase of 30% from the prior year, due to several factors including the events of September 11, 2001, a hardening insurance market and a loss of reinsurance capacity.

**Earthquake Insurance**

Earthquake coverage is provided for designated buildings/structures and certain designated City lease financed locations in the amount of $75 million, including coverage for rental interruption caused by Earthquake at certain designated locations. Earthquake coverage is subject to the greater of a 5% or $50,000 per unit deductible, effective through March 31, 2004. The City's earthquake coverage is purchased jointly and shared with the member counties in the CSAC-EIA pool. Due to the potential for geographically concentrated earthquake losses, the CSAC-EIA pool is geographically diverse to minimize any potential sharing of coverage in the case of an earthquake. Depending upon the availability and affordability of such earthquake insurance, the City may elect not to purchase such coverage in the future,

A - 33

Exhibit 9
Page 72 of 165

or the City may elect to increase the deductible or reduce the coverage from present levels.

**Employee Dishonesty and Faithful Performance Insurance**

The City is a public agency subject to liability for the dishonest acts, and negligent acts or omissions of its officers and employees acting within the scope of their duty ("employee dishonesty" and "faithful performance"). The City participates in the joint purchase of insurance covering employee dishonesty and faithful performance through the CSAC-EIA pool. Coverage is provided in the amount of $10 million per occurrence subject to a $25,000 deductible.

## LITIGATION POTENTIALLY ADVERSELY AFFECTING
## THE GENERAL FUNDS OF THE CITY

### No Pending Litigation

There is no litigation against the City pending or, to the knowledge of the officers of the City, threatened, in any court or other tribunal of competent jurisdiction, state or federal, in any way (i) restraining or enjoining the issuance, sale or delivery of any of the securities; (ii) questioning or affecting the validity of the securities; or (iii) questioning or affecting the validity of any of the proceedings for the authorization, sale, execution or delivery of the securities. To the knowledge of the City and the City Attorney, there are pending against the City lawsuits and claims arising in the ordinary course of the City's activities which, taken individually or in the aggregate, could materially affect the City's finances. However, taking into account insurance and self-insurance reserves expected to be available to pay liabilities arising from such actions, the City does not expect any or all of such claims to have a material adverse effect on its ability to repay the securities when due.

### De La Fuente Border Business Park v. City of San Diego

On January 2, 2001, a San Diego County Superior Court jury returned a special verdict in the amount of $94.5 million against the City. The jury award consisted of three parts: $29.2 million for breach of a development agreement; $25.5 million for inverse condemnation relating to planning of a regional airport; and, $39.8 million for inverse condemnation relating to excessive traffic. Claims for interest, costs, and attorneys' fees could bring the total judgment to more than $200.0 million.

The lawsuit arises out of a 1986 development agreement (the "Development Agreement") between the City and Border Business Park, Inc., relating to the development of a 312-acre industrial park in Otay Mesa, a community within the boundaries of the City and just north of the United States-Mexican border. Plaintiff alleges the City engaged in a pattern of conduct aimed at thwarting the developer's rights under the Development Agreement, which resulted in breaches of the Development Agreement and unconstitutional "takings" of private property for public use. Specifically, plaintiff claimed the City "took" plaintiff's property by: (i) publicly discussing a proposal to build an international airport in the Otay Mesa region; and (ii) diverting commercial truck traffic onto public streets adjacent to plaintiff's property.

The specific breaches of the Development Agreement alleged in the lawsuit include: changes in city-wide construction standards; denials of conditional use permits; delays in permit processing; imposition of Housing Trust Fund Fees; diversion of Development Impact Fees; and the mismanagement of adjacent City-owned property. The disclosure of plans for a new regional airport, and the diversion of border-bound traffic, which were the bases for the inverse condemnation awards, were also alleged as contract breaches.

Exhibit 9
Page 73 of 165

Following the special verdict but before entry of the judgment, the trial judge disqualified himself from further proceedings in the case for allegedly failing to disclose personal relationships with one of the plaintiff's attorneys. The case was transferred to another judge outside of San Diego County who will sit for all purposes, including a new trial.

The City has retained two law firms to represent it in post trial motions and any appeals. Such motions and potential appeals pertain to the validity of the disqualified trial judge's pre-trial and trial rulings, and the validity of the underlying verdict.

As the result of a recent hearing on the City's post-trial motions before the newly assigned judge, the judge reduced the plaintiff's pre-judgment interest claim from $144.0 million to about $26.0 million. The court subsequently entered judgment on the verdict amount ($94.5 million), plus the pre-judgment interest for a total of $119.0 million.

In addition, the court has denied the City's motion for judgment notwithstanding the verdict and motion to set aside the verdict on the grounds of fraud. It did, however, grant the City a complete new trial on one legal theory, a contract claim, and set aside award of the damages on that theory (in the amount of $29.2 million of the $94.5 million). The court also found the contract claim largely barred by the time limits in the Government Claims Act.

The court denied the City a new trial on the remaining claims in the case for inverse condemnation, relating to the airport study and truck routing, finding that the Court needed to defer to the original judge on these matters. This has the effect of leaving in place $65.3 million in inverse condemnation damages, plus approximately $26.0 million in pre-judgment interest. The total judgment, including pre-judgment interest, is currently approximately $91.3 million. Appellate counsel for the City has advised that the City should have no obligation to pay these amounts until the appeal is concluded, which will take at least eighteen months to two years. The City will also be responsible for any post-trial interest, which will accrue at the rate of approximately 5.7% per annum, until any judgment is paid.

The City believes that a significant portion of its defense costs — both retroactive to the exhaustion of the self-insured retention of $1.0 million and prospectively through appeal— will be paid in large part by one or more of the City's insurers. The City may have some coverage for damages under its policies of insurance but the amount and scope of the coverage is not presently known. A number of insurers whose policies may cover defense costs and any judgment have challenged the applicability of their policies (see "**Insurance Coverage Issues**" below).

Despite the denial of certain of the post-trial motions, the City believes it has sound legal theories for its appeal; however, no assurance can be given that the City's pursuit of this challenge will be successful. In the event that the City is not successful on appeal, and on retrial, if any, the judgment, including any interest, will have to be paid from the City's treasury, most likely over a period of ten years with additional interest during that period, to the extent that there is not insurance coverage or a shortfall in coverage.

Because there is no final judgment at this time, given the court's partial grant of the City's new trial motion, the City had not included any moneys for the payment of any judgment in this case in its budget for the 2002-2003 Fiscal Year and does not propose to include any moneys in its budget for the 2003-2004 Fiscal Year.

A - 35

Exhibit 9
Page 74 of 165

On November 7, 2001, the plaintiff filed a motion with the trial court asking that the City deposit in trust into the court, the full judgment amount of $92.4 million which includes some post-judgment interest, pending the City's appeal. The court denied the plaintiff's motion. Litigation counsel has advised that if plaintiff seeks discretionary review of the denial of the motion for deposit, the plaintiff must have done so within approximately sixty days after entry of the order on November 19, 2001. As of the date hereof, no such discretionary review has been sought.

## Insurance Coverage Issues

On April 9, 2002, three of the City's general liability insurers filed a federal court lawsuit against the City in the Southern District of California, *Insurance Company of the State of Pennsylvania, et al. v. City of San Diego*, Case No. 02 CV 0693 JM (RBB). These insurers provide coverage to the City for the years 1991 to 2001, and they collectively insure the City for policy limits of $25 million per occurrence per year (less the City's self-insured retention, which ranges from $1 million to $3 million). The insurers' lawsuit seeks a declaration that the insurers are not obligated to defend or indemnify the City for any liability it may suffer in the *De La Fuente* matter.

The City's other two liability insurers did not join in this lawsuit, although they are not precluded from joining in this lawsuit or filing a separate lawsuit. The non-suing liability insurers issued coverage to the City for the 1990-91 policy year, with collective limits of $17 million per occurrence. One of them (with policy limits of $2 million per occurrence) has indicated by letter to outside counsel that it will accept coverage for one occurrence, while reserving its rights to dispute that there is more than one occurrence.

The suing insurers are disputing coverage on the ground that the City allegedly provided late notice of the claims against it, and based upon alleged policy exclusions for breach of contract and inverse condemnation claims. Although one suing insurer has been paying a significant portion of the City's defense costs in the *De La Fuente* matter to date (about 60%), and has orally agreed to continue defending despite filing the coverage lawsuit, that insurer seeks to be relieved of the defense obligation by court order. If the insurers were to prevail on this complaint, the City would lose insurance coverage for its future attorneys' fees and costs incurred in defending the *De La Fuente* matter, and for any damages ultimately awarded in those cases, from these insurers. In the opinion of outside counsel, the City would not owe any damages to the insurance companies, even if it lost coverage, except in the unlikely event that the Court ordered the City to reimburse suing insurer(s) for past defense costs it has paid to the City.

On May 7, 2002, the City filed an answer and counterclaim in the lawsuit. The City seeks a determination that all three suing insurers are obligated to defend the City in the *De La Fuente* matter. In addition, the City seeks to recover damages for breach of contract and bad faith. However, no prediction can be made as to the outcome of this litigation.

## City Voter Initiatives

An initiative proposing an amendment to the San Diego City Charter was submitted to the City voters at the election on the March 5, 2002. This initiative appeared on the ballot as Proposition E. The initiative asked the voters whether the City Charter should be amended to require that any increase in an existing general tax or imposition of any new general tax be levied by the City Council only if the proposed levy has been approved by a two-thirds vote of the qualified electors voting on the proposed tax measure.

Exhibit 9
Page 75 of 165

At that same election, another proposition was submitted to the voters for consideration. This proposition, Proposition F, asked the voters whether the City Charter should be amended to require that, in order to be adopted or effective, any City Charter amendment, ballot proposal, initiative, statute, law, or regulation requiring a greater than simple majority vote of the electorate, and which is proposed to be adopted on or after the date of this election, must be adopted by the same proportionate vote of the electorate. In effect, the City has argued in the litigation described below that, the adoption of this proposition would require that Proposition E would have to be approved by a two-thirds vote of the qualified electors voting in the March 5, 2002 election.

Proposition E was approved by 54.4% and Proposition F was approved by 50.3% of the voters in the March 5, 2002 election. Having received a majority vote, Proposition F was adopted. The City has taken a position that Proposition E, however, by the terms of Proposition F, was not adopted.

There have been two cases filed challenging the results of the March 5, 2002 election pertaining to Propositions E and F; *Teyssier v. City of San Diego, et al. and Howard Jarvis Taxpayers Association v. City of San Diego et al.* Both actions seek declaratory relief contending that Proposition F is unconstitutional. In addition, *Teyssier* seeks a writ of mandate directing the City to certify and record the adoption of Proposition E. Both matters allege (i) that Proposition F is preempted by the California Constitution; (ii) that it cannot affect an election held prior to its effective date; and (iii) that Proposition F, having received fewer votes than Proposition E, an alleged conflicting measure on the same ballot, should have been defeated. The trial court consolidated the two cases.

On April 22, 2003, the City received a minute order of the trial court for the consolidated cases. The Court's ruling declines to invalidate Proposition E. The Court leaves open the question whether Proposition E could require a supermajority for an amendment to the City Charter, which would impose or raise a general tax. The Court's minute order has not been reduced to a judgment. The City has not yet decided to appeal or other wise contest the ruling. Regardless of the outcome of the litigation, these lawsuits are unlikely to have any impact to the City's budget or revenue for Fiscal Year 2003, because they relate only to new or increased taxes. It is currently anticipated that the City's proposed budget for Fiscal Year 2004 would not include projected revenues from any such tax enhancing measures.

**Other Litigation and Claims**

In February 2002, the Public Facilities Financing Authority of the City of San Diego issued lease revenue bonds in the aggregate principal amount of $169,685,000 (the "Ballpark Bonds") for the construction of a state of the art baseball park. The ballpark project has been the subject of a variety of litigations, however, there have not been any new litigation filed regarding the project since the approval of the original Offering Document in 2002. The case *Skane v. City of San Diego*, Court of Appeal case no. D038879 has been finally resolved, the California Supreme Court denying a petition for review on October 2, 2002. On January 30, 2003, the Fourth District Court of Appeal filed an opinion affirming a trial court judgment in favor of the City in the case *Simmons v. City of San Diego*, Court of Appeal case no. D039838. The plaintiffs failed to file a petition for review to the California Supreme Court by the filing deadline of March 11, 2003. The City and Bond Counsel are considering the import of the appellate court's decision on the City's ability to refund the 2002 Bonds (see "**BONDED AND OTHER INDEBTEDNESS- Proposed Additional General Fund Lease Commitments**"). The case *City v. All Persons Interested*, Superior Court case no. GIC763487 was the subject of appeals that were consolidated under Court of Appeal case no D038587 and were further consolidated with Skane. The Court of Appeal affirmed the judgment in favor of the City and the Redevelopment Agency. The California Supreme Court

denied the petitions for review on October 2, 2002.

On March 29, 2002, Brown Field Aviation Park LLC (BFAP) filed a claim seeking damages in excess of $120 million, asserting that the City breached a Memorandum of Understanding that provided BFAP with the exclusive right to negotiate a proposed Development Agreement and Master Lease that would transform Brown Field into a cargo airport with ancillary commercial and industrial uses. BFAP contended that the City breached the MOU by requiring review by the Federal Aviation Administration prior to a City Council hearing. In addition, BFAP claimed the city breached the MOU by failing to present the project for City Council consideration in September 2000, and by failing to continue negotiations after the FAA released a preliminary airspace analysis on September 29, 2000.

On March 4, 2003 the City Council approved a settlement of this case by agreeing to pay BFAP $1.25 million. This sum represents a refund of the money BFAP paid to the City for the right to negotiate the project and for the labor costs incurred by the City staff in reviewing the proposed project. The City's excess liability carrier also agreed to pay $249,000 in settlement of the claim.

On January 16, 2003, a class action complaint (*Gleason v. City of San Diego, et al.*) for declaratory relief was filed in the Superior Court against the City, the City's Employees' Retirement System (SDCERS), and certain named members of the SDCERS board of administration. The plaintiffs, former City employees who receive City retirement benefits, allege that as a result of recent actions taken by the defendants, the SDCERS trust fund has an unfunded accrued liability of $720 million, and that by 2009, the City will owe approximately $2.8 billion to SDCERS, with an annual City budget expense of more than $250 million. In addition to the declaration of their rights, plaintiffs ask for restitution to the SDCERS trust fund, an injunction prohibiting the City from unlawfully underfunding the trust fund in the future, money damages, attorneys' fees, and other relief.

As noted under the heading "**PENSION PLAN**" above, the City's unfunded accrued actuarial liability as of June 30, 2002 is approximately $720 million. The City is defending the case and believes it has complied with applicable law in the funding of the SDCERS trust fund. The case is still in the early stages, and the City has not completed an assessment of the claim. The City cannot predict the outcome of the litigation at this time, but if the plaintiffs are successful, there potentially may be additional expense to the General Fund in the funding of the SDCERS trust fund and otherwise, over and above the City's expected expense in the funding of its pension obligations.

## INVESTMENT OF FUNDS

The Treasurer of the City of San Diego, in accordance with the Charter of the City of San Diego and authority granted by the City Council, is responsible for investing the unexpended cash in the Treasurer's pooled operating investment fund (the "City Pool"). Responsibility for the daily investment of funds in the City Pool is delegated to the City's Chief Investment Officer. The City is the only participant in the City Pool; there are no other City Pool participants either voluntary or involuntary. The investment objectives of the City Pool are preservation of capital, liquidity and return.

**Oversight and Reporting Requirements**

The City Treasurer provides an investment report on a monthly basis to the City Manager, the City Auditor and Comptroller and the City Council and annually presents a statement of investment policy (the "Investment Guidelines") to the City Manager, the City Council and the City Manager's

Investment Advisory Committee. The Investment Advisory Committee was established in 1990 and is comprised of the City Auditor and Comptroller, a Deputy City Manager and three investment professionals from the private sector. The Committee is charged with oversight responsibility to review on an ongoing basis the Investment Guidelines and practices of the City Treasurer and recommend changes. Investments in the City Pool are audited by an independent firm of certified public accountants as part of the overall audit of the City's financial statements.

The City's investment section uses outside services to provide investment portfolio valuations and accounting and reporting services. The service provides monthly portfolio valuation, investment performance statistics and other statistical security reports, which are distributed to the City Treasurer accounting section and the City Auditor and Comptroller's office for review and reconciliation. The City Treasury accounting section prepares a series of monthly reports, which includes portfolio market valuation, and distributes these to the Mayor, City Council, City Manager and other officials.

## Authorized Investments

Investments in the City Pool are governed by State law and further restricted by the City's Investment Guidelines. The Guidelines have been written with safety of principal being the foremost objective. Permitted investments include U.S. Treasury securities, U.S. Agency securities, corporate medium term notes, money market instruments and the Local Agency Investment Fund (California State Pool). Reverse repurchase agreements ("reverse repos") are restricted to 20% of the base value of the portfolio and are governed by various maturity restrictions as well. The main operating funds of the City are being managed in two separate portfolios. In its management of the "Liquidity" portfolio, comprising about 35% of total funds, the City invests in a variety of debt securities with maturities ranging from one day to one year. The remaining 65% of funds are managed in a separate "Core" portfolio that consists of a variety of debt securities ranging from one day to five years; performance is measured against the Merrill Lynch 1 to 3 year U.S. Treasury Index. Safety of principal and liquidity are the paramount considerations in the management of both portfolios.

## Pool Liquidity and Other Characteristics

The City Pool (including both the "Liquidity" and the "Core" portfolios) is highly liquid. As of January 31, 2003, approximately 10% of the pool investments mature within 60 days, 21% within 90 days and 35% within 181 days (on a cumulative basis). As of January 31, 2003, the Pool had a weighted average maturity of 1.59 years (580 days) and its weighted yield was 2.90%. For purposes of calculating weighted average maturity, the City Treasurer treats investments in the State-wide Local Agency Investment Fund (California State Pool) as maturing within one day. The Liquidity portfolio had a duration of 0.35 years and the Core portfolio had a duration of 1.42 years as of January 31, 2003. Duration is a measure of the price volatility of the portfolio and reflects an estimate of the projected increase or decrease in the value of the portfolio based upon a decrease or increase in interest rates. Accordingly, the Liquidity portfolio should decrease in market value by 0.35% for every 1% increase in market interest rates while the Core portfolio should decrease in market value by 1.42% for every 1% increase in market interest rates. The City Pool's composition is designed with a goal of having sufficient liquid funds available to meet disbursement requirements. The composition and value of investments under management in the City Pool will vary from time to time depending on cash flow needs of the City, maturity or sale of investments, purchase of new securities, and fluctuations in interest rates.

Exhibit 9
Page 78 of 165



**Table 19**
**CITY OF SAN DIEGO POOLED OPERATING INVESTMENT FUND** [1]
*at January 31, 2003*
(Unaudited)

| Investment Instrument | Book Value | Market Value | Percent of Total [1] |
|---|---|---|---|
| U.S. Treasury Bills and Notes | $491,710,525 | $495,537,305 | 38.88% |
| Federal Agency Securities | 569,354,218 | 575,278,317 | 45.01% |
| Medium Term Notes (Corporate) [2] | 140,059,070 | 139,036,161 | 11.07% |
| Money Market Instruments [3] | 43,397,533 | 43,443,305 | 3.43% |
| Local Agency Investment Fund | 20,334,871 | 20,334,871 | 1.61% |
| NET ASSETS | $1,264,856,217 | $1,273,629,959 | 100.00% |

(1) Based on Book Value.

(2) These notes consist of both fixed & floating interest rate securities. The notes with floating interest rates are reset at intervals ranging from one day to three months.

(3) These securities consist of commercial paper, negotiable certificates of deposit, term and overnight repurchase agreements, banker's acceptances, bank notes and/or thrift notes.

Source: City of San Diego, Office of the City Treasurer

## Derivatives

As of January 31, 2003, and at least since October 14, 1997, the City Pool has had no assets invested in structured notes or derivatives prohibited in California Government Code 53601. The City Treasurer defines a derivative as a financial instrument whose value is derived from an underlying asset, price, index or rate, e.g., options, futures or interest rate swaps. A structured note is an investment instrument that can contain within its structure various combinations of derivatives such as imbedded calls and interest rate swaps that will offer returns to an investor within a defined set of parameters and interest rate scenarios, e.g., step-ups, multiple-indexed notes, inverse floaters or leveraged constant maturity notes. The City Treasurer does not define fixed rate notes, debentures with call features or single index non-leveraged floating rate notes, e.g. monthly LIBOR plus or minus a spread, as structured notes. The City Treasurer limits structured notes eligible for purchase to those investments which, at the time of purchase, have no risk of principal loss if held to maturity and offer an estimated return at purchase that exceeds the return on a comparable fixed term investment in the judgment of the City's Investment Officer. The City Treasurer does not allow the purchase of securities that have a negative amortization of principal. In addition, California law prohibits the purchase by local governments of inverse floaters, range notes or interest only strips derived from pools of mortgages.

## Reverse Repurchase Agreements

A reverse repo is a transaction in which the City Pool sells a security and concurrently agrees to buy it back from the same party at a later date for a price that includes an interest component for the City Pool's use of the money. Although the City from time to time uses reverse repos, as of January 31, 2003, and since September 18, 1996, the City has had no reverse repos in the City Pool. The Investment Guidelines require that all proceeds of a reverse repo be reinvested in securities whose maturity date or coupon reset date match the maturity of the reverse repo. The Investment Guidelines limit the use of reverse repurchase agreements to 20% of the base value of the City Pool. The City's reverse repo program is monitored daily and reported monthly, as described above under "**Oversight and**

Exhibit 9
Page 79 of 165

Reporting Requirements".

## BONDED AND OTHER INDEBTEDNESS

### General

The City has never failed to pay principal of or interest on any of its debts or lease obligations when due. The City has issued bonds or entered into installment purchase contracts secured by and payable out of loans and installment sale contracts, in order to provide conduit financing for single and multi-family housing, industrial development, and 501 (c) (3) non-profit corporations. These bonds and certificates of participation are not secured by City general funds or revenues.

### Long-Term Obligations

As of June 30, 2002, the City had $58,095,000 aggregate principal amount of long-term general obligation bonded indebtedness outstanding and $566,505,000 aggregate principal amount of long-term general fund lease obligations outstanding. The City's general obligation bond ratings are AAA (Fitch Ratings), Aa1 (Moody's Investors Services) and AA (Standard & Poor's).

The following table is a schedule, by years, of principal and interest payments required to be made by the City or its oversight entities with respect to future obligations, as of June 30, 2002.

### Table 20
### CITY OF SAN DIEGO
### GENERAL OBLIGATION AND GENERAL FUND LEASE OBLIGATIONS
#### As of June 30, 2002
#### (in thousands)

| Fiscal Year Ending June 30 | General Obligation Bonds | General Fund Lease Obligations | Total Principal and Interest Payable |
|---|---|---|---|
| 2003 | $ 9,395 | $ 49,146 | $ 58,541 |
| 2004 | 9,525 | 49,854 | 59,379 |
| 2005 | 9,645 | 49,921 | 59,566 |
| 2006 | 9,777 | 49,497 | 59,274 |
| 2007 | 9,923 | 46,993 | 56,916 |
| Thereafter | 26,337 | 894,774 | 921,111 |
| Subtotal | $ 74,602 | $ 1,140,185 | $ 1,214,787 |
| Less Interest Portion | $ (16,507) | $ (573,680) | $ (590,187) |
| Total Principal Portion | $ 58,095 | $ 566,505 | $ 624,600 |

A - 41

Exhibit 9
Page 80 of 165

The following provides a summary list of outstanding general obligation bonds and General Fund lease commitments as of June 30, 2002.

|  | Principal Outstanding (000's) |
|---|---|
| **General Obligation Bonds** | |
| 1994 – Open Space Park Facility District Refunding | $41,175 |
| 1991 – Public Safety Communications | 16,920 |
| Total Principal of General Obligation Bonds | $58,095 |
| | |
| **General Fund Lease Commitments** | |
| | |
| *Certificates of Participation* | |
| 1993 – Balboa Park/Mission Bay Park Capital Improvements [1] | $19,800 |
| 1996A – Balboa Park/Mission Bay Park Capital Improvements | 25,010 |
| 1996B – Balboa Park/Mission Bay Park Capital Improvements Refunding | 10,440 |
| *Lease Revenue Bonds* | |
| 1993 – City/MTDB Authority for Old Town Trolley Extension [2] | 16,005 |
| 1994 – City/MTDB Authority Refunding - Police CIP and Bayside Extension | 34,560 |
| 1996 – Stadium Improvements | 64,955 |
| 1998 – Convention Center Expansion Authority | 200,980 |
| 2002 – Ballpark and Redevelopment Project | 169,685 |
| 2002 – Fire and Life Safety Improvements | 25,070 |
| Total Principal of General Fund Lease Commitments | $566,505 |

(1) To be refunded by the 2003 Refunding Certificates of Participation (Balboa Park/Mission Bay Park Capital Improvements).
(2) To be refunded by the 2003 Refunding Lease Revenue Bonds (San Diego Old Town Trolley Extension).

Source: City of San Diego, Auditor and Comptroller

## Recent Financings

In June 2002, the Public Facilities Financing Authority of the City of San Diego issued $25.2 million in Lease Revenue Bonds to fund the rehabilitation and construction of fire stations and life safety facilities throughout the City. The total project cost is estimated at approximately $45.1 million, including $10.9 million for life safety improvements and $34.2 for fire improvements. Additional funding is expected to come from bond proceeds in future Fiscal Years. Additionally, in April 2003, the City refunded the 1993 City/MTDB Authority Lease Revenue Bonds (Old Town Trolley Extension).

## Proposed Additional General Fund Lease Commitments

From time to time the City issues debt to fund various capital improvements and projects. The City will be refunding the 1993 Certificates of Participation (Balboa Park/Mission Bay Park Capital Improvements) in May 2003.

In 2004, the City intends to issue approximately $87 million in General Fund obligations to implement the Library System Improvements Program adopted by the City Council in November 2002. The overall program consists of renovation, expansion and addition of new library facilities Citywide at an estimated total project cost of $312 million between Fiscal Years 2003 and 2011. The funding sources include grants and private funds, Development Impact Fees and Facilities Benefit Assessment Fees, Other City Funds and bond proceeds. Upon the initial bond issuance projected to occur in 2004, the remainder of the bond funds is expected to come from phased bond issuances in later Fiscal Years.

In February 2002, the Public Facilities Financing Authority of the City of San Diego issued $169.7 million in Lease Revenue Bonds to fund a portion of the City's contribution to the Ballpark and Redevelopment Project (the "Ballpark Project"). Due to litigation matters concerning the Ballpark Project that were pending at the time of issuance, the bonds, although issued on a tax-exempt basis, were sold at a premium above tax-exempt rates. When the bonds were issued, it was contemplated that if litigation is decided favorably to the City, and depending on market conditions, the City would refund the bonds with bonds bearing lower interest rates. It is currently expected that remaining litigation matters will be resolved as early as Fiscal Year 2003 but no later than Fiscal Year 2004. See "LITIGATION POTENTIALLY AFFECTING THE GENERAL FUNDS OF THE CITY- Other Litigations and Claims" for the status of such litigation. If such matters are resolved favorably to the City, and depending on market conditions, the City would issue refunding bonds shortly thereafter.

## Short-Term Borrowings

The City has issued tax anticipation notes since the mid-1960's (except for Fiscal Year 1979) in anticipation of receipt of taxes and other General Fund revenues. The following table presents a 10-year history of the City's short-term borrowings:

**Table 21**
**CITY OF SAN DIEGO**
**SHORT-TERM BORROWINGS**
*Fiscal Years Ended June 30, 1994 through May 1, 2003*

| Fiscal Year Ended June 30 | Principal Amount |
|---|---|
| 1994 | $ 100,500,000 |
| 1995 | $ 68,000,000 |
| 1996 | $ 53,000,000 |
| 1997 | $ 73,500,000 |
| 1998 | $ 82,000,000 |
| 1999 | $ 88,500,000 |
| 2000 | $ 99,500,000 |
| 2001 | $ 77,000,000 |
| 2002 | $ 73,000,000 |
| 2003 | $ 93,200,000 |

Source: City of San Diego, Auditor and Comptroller

## Prior Years' Defeasance of Debt

In prior years, the City, the San Diego Stadium Authority, the Redevelopment Agency, the San Diego Facilities and Equipment Leasing Corporation, San Diego Open Space Park Facilities District No. 1, City of San Diego/MTDB Authority, and the Public Facilities Financing Authority defeased certain debt obligations by placing the proceeds of refunding bonds in an irrevocable trust to provide for all future debt service payments on the old bonds, through certain applicable redemption dates or maturity. Accordingly, the trust account assets and the liability for the defeased bonds are not included in the City's financial statements. As of June 30, 2002, $27,910,000 of defeased bonds are still held by investors.

## Operating Lease Commitments

The City has entered into various General Fund lease arrangements under which the City

A - 43

Exhibit 9
Page 82 of 165

must make annual payments to occupy facilities necessary for City operations. The table below is a schedule by years of future minimum rental payments required under such leases entered into by the City that have initial or remaining noncancellable lease terms in excess of one year, as of June 30, 2002.

**Table 22**
**CITY OF SAN DIEGO**
**FUTURE MINIMUM RENTAL PAYMENTS**
**GENERAL FUND OPERATING LEASE COMMITMENTS**

| Fiscal Year Ending June 30 | Rent Payable |
|---|---|
| 2003 | $5,132,756 |
| 2004 | 2,481,868 |
| 2005 | 2,274,252 |
| 2006 | 2,259,671 |
| 2007 | 2,249,256 |
| Thereafter | 14,704,794 |
| Total Minimum Payments | $29,102,597 |

Source:  City of San Diego, Auditor and Comptroller and Real Estate Assets Department

**Overlapping Debt and Debt Ratios**

Table 23 presents a statement of direct and overlapping bonded debt of the City as of February 1, 2003. Revenue bonds, tax allocation bonds and special assessment bonds are not included in the tabulation; lease revenue obligations payable from the City's General Fund or equivalent sources are included.

The City contains numerous school districts and special purpose districts, such as for water and sanitation, many of which have issued general obligation bonds. Some of the issues may be payable from self-supporting enterprises or revenue sources other than property taxation.

The City periodically issues special assessment or Community Facilities District Mello-Roos bonds on behalf of petitioning developers or citizens when the City determines that the public facilities to be financed are of a defined extraordinary benefit to the City. These bonds are secured by property owner assessments or special taxes. As of June 30, 2002, there were four 1915 Act Assessment District and one Reassessment District bond issues with aggregate outstanding principal of $43,692,999 and three Community Facilities District (Mello-Roos) bond issues with outstanding principal of $115,010,000.

The reserve funds for each of the City's outstanding Assessment District and Community Facilities District bond issues were fully funded as of June 30, 2002. Although the City is not in any way obligated to make debt service payments for either Assessment or Community Facilities District bond issues, the City has in the past taken proactive measures to protect bondholders.

**Table 23**
**CITY OF SAN DIEGO**
**STATEMENT OF DIRECT AND OVERLAPPING BONDED DEBT**
*as of February 1, 2003*

| | | |
|---|---|---|
| 2002-03 Assessed Valuation: | $104,940,180,862 | |
| Redevelopment Incremental Valuation: | 4,629,088,709 | |
| Adjusted Assessed Valuation: | $100,311,092,153 | |

| DIRECT AND OVERLAPPING TAX AND ASSESSMENT DEBT: | % Applicable | Debt 2/1/03 |
|---|---|---|
| San Diego County Water Authority | 49.271% | $ 810,508 |
| Metropolitan Water District | 8.872 | 44,587,123 |
| Southwestern Community College District | 17.482 | 6,912,383 |
| San Diego Unified School District | 99.911 | 764,304,390 |
| San Diego Unified School District Lease Tax Obligations | 99.911 | 67,784,618 |
| Sweetwater Union High School District | 21.100 | 7,620,265 |
| San Ysidro School District | 92.096 | 17,636,384 |
| Other High School and School Districts | Various | 9,468,043 |
| **City of San Diego** | **100.** | 15,690,000 |
| **San Diego Open Space Park Facilities District No. 1** | **100.** | 36,475,000 |
| City of San Diego Community Facilities District No. 1 | 100. | 52,745,000 |
| City of San Diego Community Facilities District No. 2, Improvement Area Nos. 1 and 3 | 100. | 60,250,000 |
| City of San Diego 1915 Act Bonds | 100. | 40,854,284 |
| North City West School District Community Facilities District | 100. | 92,327,921 |
| Poway Unified School District Community Facilities District No. 1 and 10 | 99.609-100. | 95,361,344 |
| San Dieguito Union High School District Community Facilities District No. 95-1 | 81.063 | 15,048,785 |
| Sweetwater Union High School District Community Facilities Districts | 5.014-100. | 2,861,346 |
| Other Special District 1915 Act Bonds | Various | 1,080,974 |
| TOTAL GROSS DIRECT AND OVERLAPPING TAX AND ASSESSMENT DEBT | | $1,331,818,368 |
| **Less: San Diego Open Space Park Facilities District No. 1 (100% self-supporting)** | | 36,475,000 |
| TOTAL NET DIRECT AND OVERLAPPING TAX AND ASSESSMENT DEBT | | $1,295,343,368 |

| DIRECT AND OVERLAPPING GENERAL FUND OBLIGATION DEBT: | | |
|---|---|---|
| San Diego County General Fund Obligations | 47.537% | $ 233,049,556 |
| San Diego County Pension Obligations | 47.537 | 391,892,651 |
| San Diego Superintendent of Schools Certificates of Participation | 47.537 | 982,827 |
| San Diego Community College District General Fund Obligations | 99.907 | 41,935,963 |
| San Diego Unified School District Certificates of Participation | 99.911 | 30,253,051 |
| Sweetwater Union High School District Certificates of Participation | 21.100 | 5,112,530 |
| Del Mar Union School District Certificates of Participation | 80.659 | 10,029,947 |
| San Ysidro School District Certificates of Participation | 92.096 | 8,993,174 |
| Chula Vista School District General Fund Obligations | 5.663 | 4,492,741 |
| Other School, High School and Community College District Certificates of Participation | Various | 8,185,454 |
| **City of San Diego General Fund Obligations and MTDB Authority** | **100.** | 555,535,000 |
| Otay Municipal Water District Certificates of Participation | 7.800 | 2,030,340 |
| TOTAL GROSS OVERLAPPING GENERAL FUND OBLIGATION DEBT | | $1,292,493,234 |
| Less:   Otay Municipal Water District Certificates of Participation | | 2,030,340 |
| Grossmont Union High School District Certificates of Participation | | |
| (100% self-supporting from tax increment revenues) | | 65,836 |
| TOTAL NET OVERLAPPING GENERAL FUND OBLIGATION DEBT | | $1,290,397,058 |

| | |
|---|---|
| GROSS COMBINED TOTAL DEBT | $2,624,311,602 [1] |
| NET COMBINED TOTAL DEBT | $2,585,740,426 |

(1) Excludes tax and revenue anticipation notes, enterprise revenue, mortgage revenue and tax allocation bonds and non-bonded capital lease obligations.

Exhibit 9
Page 84 of 165

Page 2. City of San Diego

Ratios to 2002-03 Assessed Valuation:
**Direct Debt ($15,690,000)** ............................................................ **0.01%**
Total Gross Direct and Overlapping Tax and Assessment Debt ......................... 1.27%
Total Net Direct and Overlapping Tax and Assessment Debt ........................... 1.23%

Ratios to Adjusted Assessed Valuation:
**Gross Combined Direct Debt ($607,700,000)** [1] ................................... **0.61%**
**Net Combined Direct Debt ($571,225,000)** ....................................... **0.57%**
Gross Combined Total Debt .......................................................... 2.62%
Net Combined Total Debt ............................................................ 2.58%

| | | |
|---|---|---|
| (1) | City | $ 15,690,000 |
| | City Authorities and Certificates of Participation | 555,535,000 |
| | San Diego Open Space Park Facilities District No. 1 | 36,475,000 |
| | | $607,700,000 |

STATE SCHOOL BUILDING AID REPAYABLE AS OF 6/30/02: $2,515,864

Source: California Municipal Statistics, Inc.

A - 46

Exhibit 9
Page 85 of 165

**9**

Exhibit 9
Page 86 of 165

NEW ISSUE - BOOK-ENTRY-ONLY

INSURED RATINGS/UNDERLYING RATINGS:
Fitch: AAA/AA+
Moody's: Aaa/Aa3
Standard & Poor's: AAA/AA-
(See "RATINGS" herein)

*In the opinion of Stradling Yocca Carlson & Rauth, a Professional Corporation, Newport Beach, California ("Special Counsel"), under existing statutes, regulations, rulings and judicial decisions, and assuming the accuracy of certain representations and compliance with certain covenants and requirements described herein, the interest (and original issue discount) due with respect to the Certificates is excluded from gross income for federal income tax purposes and is not an item of tax preference for purposes of calculating the federal alternative minimum tax imposed on individuals and corporations. In the further opinion of Special Counsel, the interest (and original issue discount) due with respect to the Certificates is exempt from State of California personal income tax. See "TAX EXEMPTION" herein.*

$17,425,000
**CITY OF SAN DIEGO**
**2003 Certificates of Participation**
**(1993 Balboa Park/Mission Bay Park Refunding)**
**Evidencing Undivided Proportionate Interests in Lease Payments to be Made by the**
**CITY OF SAN DIEGO**
**Pursuant to a Lease with the**
**SAN DIEGO FACILITIES AND EQUIPMENT LEASING CORPORATION**

Dated: Date of Delivery                                    Due: November, as shown on the inside cover

The City of San Diego (the "City") 2003 Certificates of Participation (1993 Balboa Park/Mission Bay Park Refunding) (the "Certificates") are being executed and delivered to (i) refund the City's outstanding Certificates of Participation (Balboa Park and Mission Bay Park Capital Improvements Program), Series 1993, (ii) acquire a debt service reserve fund surety bond and a financial guaranty insurance policy for the Certificates, and (iii) pay the costs of issuance incurred in connection with the execution and delivery of the Certificates. See "THE REFUNDING PLAN" herein. The Certificates represent undivided proportionate interests of the Owners in the lease payments (the "Lease Payments") to be made by the City to the San Diego Facilities and Equipment Leasing Corporation (the "Corporation"), under the Facilities Lease Agreement, dated as of June 1, 2003, by and between the City and the Corporation (the "Lease Agreement") pursuant to which the City will lease the North Torrey Pines Golf Course and the Balboa Park House of Charm (collectively, the "Site") from the Corporation. See "DESCRIPTION OF THE SITE" herein.

Interest represented by the Certificates is payable semiannually on May 1 and November 1 of each year, commencing on November 1, 2003. The Certificates will be executed and delivered in the principal amount of $5,000 and any integral multiple thereof. See "THE CERTIFICATES – General" herein. The Certificates will be executed and delivered in book-entry form only and, when delivered, will be registered in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"), which will act as securities depository for the Certificates. Individual purchases of the Certificates will be made in book-entry form only. Purchasers of the Certificates will not receive certificates representing their ownership interests in the Certificates purchased. Principal, premium, if any, and interest payments due with respect to the Certificates are payable directly to DTC by Wells Fargo Bank, National Association, as Trustee. Upon receipt of payments of principal, premium, if any, and interest, DTC will in turn distribute such payments to the beneficial owners of the Certificates. See APPENDIX G — "DTC BOOK-ENTRY SYSTEM" herein.

**The Certificates are subject to extraordinary and optional prepayment prior to maturity, as described herein. See "THE CERTIFICATES – Prepayment" herein.**

THE CERTIFICATES DO NOT CONSTITUTE AN OBLIGATION OF THE CORPORATION OR THE CITY FOR WHICH THE CORPORATION OR THE CITY IS OBLIGATED TO LEVY OR PLEDGE ANY FORM OF TAXATION OR FOR WHICH THE CORPORATION OR THE CITY HAS LEVIED OR PLEDGED ANY FORM OF TAXATION. THE OBLIGATION OF THE CITY TO MAKE LEASE PAYMENTS UNDER THE LEASE AGREEMENT DOES NOT CONSTITUTE AN OBLIGATION OF THE CITY FOR WHICH THE CITY IS OBLIGATED TO LEVY OR PLEDGE ANY FORM OF TAXATION OR FOR WHICH THE CITY HAS LEVIED OR PLEDGED ANY FORM OF TAXATION. NEITHER THE CERTIFICATES NOR THE OBLIGATION OF THE CITY TO MAKE LEASE PAYMENTS CONSTITUTES AN INDEBTEDNESS OF THE CORPORATION, THE CITY, THE STATE OF CALIFORNIA OR ANY POLITICAL SUBDIVISION THEREOF WITHIN THE MEANING OF ANY CONSTITUTIONAL OR STATUTORY DEBT LIMITATION OR RESTRICTION.

Payment of the principal of and interest represented by the Certificates when due will be insured by a financial guaranty insurance policy to be issued by Ambac Assurance Corporation, a Wisconsin-domiciled stock insurance corporation, simultaneously with the delivery of the Certificates. See "CERTIFICATE INSURANCE" herein.

## *Ambac*

The purchase of the Certificates involves certain risks which should be considered by investors. See "RISK FACTORS" for a discussion of certain risk factors that should be considered in addition to the other matters set forth herein.

**This cover page contains information for quick reference only. It is not a summary of this issue. Potential purchasers must read the entire Official Statement to obtain information essential to making an informed investment decision.**

MATURITY SCHEDULE
(See Inside Cover Page)

*The Certificates will be offered when, as and if executed and delivered, and received by the Underwriter, subject to the approval as to their legality by Stradling Yocca Carlson & Rauth, a Professional Corporation, Newport Beach, California, Special Counsel, and certain other conditions. Certain legal matters will be passed upon for the City by the City Attorney and for the Corporation by Foley & Lardner, San Diego, California. It is anticipated that the Certificates will be available in book-entry form for delivery to DTC in New York, New York, on or about June 17, 2003.*

### CITIGROUP

Dated: May 29, 2003

Exhibit 9
Page 87 of 165

$17,425,000
**CITY OF SAN DIEGO**
2003 Certificates of Participation
(1993 Balboa Park/Mission Bay Park Refunding)
Evidencing Undivided Proportionate Interests in Lease Payments to be Made by the
**CITY OF SAN DIEGO**
Pursuant to a Lease with the
**SAN DIEGO FACILITIES AND EQUIPMENT LEASING CORPORATION**

Maturity Schedule
$17,425,000 Serial Certificates

| Maturity (November 1) | Principal Amount | Interest Rate | Price/Yield |
|---|---|---|---|
| 2003 | $ 485,000 | 1.00% | 100% |
| 2004 | 1,230,000 | 1.50 | 1.00 |
| 2005 | 1,710,000 | 1.60 | 1.15 |
| 2006 | 1,730,000 | 1.60 | 1.35 |
| 2007 | 1,780,000 | 4.00 | 1.85 |
| 2008 | 1,835,000 | 2.00 | 100 |
| 2009 | 460,000 | 2.30 | 100 |
| 2010 | 470,000 | 2.70 | 2.75 |
| 2011 | 485,000 | 3.00 | 100 |
| 2012 | 495,000 | 3.00 | 3.10 |
| 2013 | 510,000 | 3.20 | 3.25 |
| 2014 | 530,000 | 3.30 | 3.40 |
| 2015 | 545,000 | 3.40 | 3.50 |
| 2016 | 565,000 | 3.60 | 3.65 |
| 2017 | 585,000 | 3.60 | 3.70 |
| 2018 | 605,000 | 3.70 | 3.80 |
| 2019 | 630,000 | 3.875 | 3.95 |
| 2020 | 655,000 | 3.875 | 4.00 |
| 2021 | 680,000 | 4.00 | 4.15 |
| 2022 | 705,000 | 4.00 | 4.20 |
| 2023 | 735,000 | 4.00 | 4.25 |

Exhibit 9
Page 88 of 165

## CITY OF SAN DIEGO, CALIFORNIA

### DICK MURPHY, Mayor

### CITY COUNCIL

SCOTT PETERS
District 1

MICHAEL ZUCCHET
District 2

TONI ATKINS
District 3

CHARLES LEWIS,
District 4

BRIAN MAIENSCHEIN
District 5

DONNA FRYE
District 6

JIM MADAFFER
District 7

RALPH INZUNZA Deputy Mayor
District 8

### CITY OFFICIALS

MICHAEL T. UBERUAGA
City Manager

ED RYAN
City Auditor and Comptroller

CASEY GWINN
City Attorney

MARY E. VATTIMO
City Treasurer

CHARLES G. ABDELNOUR
City Clerk

### SPECIAL SERVICES

**Bond Counsel and Disclosure Counsel**

Stradling Yocca Carlson & Rauth
A Professional Corporation
Newport Beach, California

**Financial Advisor**

Public Resources Advisory Group
New York, New York

**Trustee**

Wells Fargo Bank, National Association
Los Angeles, California

**Escrow Bank**

BNY Western Trust Company
Los Angeles, California

**Verification Agent**

McGladrey & Pullen, LLP
Minneapolis, Minnesota

Exhibit 9
Page 89 of 165

No dealer, broker, salesperson or other person has been authorized by the City or the Corporation to give any information or to make any representations in connection with the offer or sale of the Certificates other than those contained herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the City or the Corporation. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy nor shall there be any sale of the Certificates by a person in any jurisdiction in which it is unlawful for such person to make such an offer, solicitation or sale.

This Official Statement is not to be construed as a contract with the purchasers or owners of the Certificates. Statements contained in this Official Statement which involve estimates, forecasts or matters of opinion, whether or not expressly so described herein, are intended solely as such and are not to be construed as representations of fact.

This Official Statement and the information contained herein are subject to completion or amendment without notice and neither delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the City or any other parties described herein since the date hereof. These securities may not be sold nor may an offer to buy be accepted prior to the time the Official Statement is delivered in final form. This Official Statement is being submitted in connection with the sale of the Certificates referred to herein and may not be reproduced or used, in whole or in part, for any other purpose, unless authorized in writing by the City. All summaries of documents and laws are made subject to the provisions thereof and do not purport to be complete statements of any or all such provisions.

The Underwriter has provided the following sentence for inclusion in this Official Statement:

The Underwriter has reviewed the information in this Official Statement in accordance with, and as part of, its responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriter does not guarantee the accuracy or completeness of such information.

Certain statements included or incorporated by reference in this Official Statement constitute "forward-looking statements" within the meaning of the United States Private Securities Litigation Reform Act of 1995, Section 21E of the United States Securities Exchange Act of 1934, as amended, and Section 27A of the United States Securities Act of 1933, as amended. Such statements are generally identifiable by the terminology used such as "plan," "expect," "estimate," "project," "budget" or similar words. Such forward-looking statements include, but are not limited to certain statements contained in the information under the captions "CITY FINANCIAL INFORMATION."

**The achievement of certain results or other expectations contained in such forward-looking statements involve known and unknown risks, uncertainties and other factors which may cause actual results, performance or achievements described to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements. The City does not plan to issue any updates or revisions to the forward-looking statements set forth in this Official Statement. In evaluating such statements, potential investors should specifically consider the various factors which could cause actual events or results to differ materially from those indicated by such forward-looking statements.**

**IN CONNECTION WITH THE OFFERING OF THE CERTIFICATES, THE UNDERWRITER MAY OVERALLOT OR EFFECT TRANSACTIONS THAT STABILIZE OR MAINTAIN THE MARKET PRICE OF THE CERTIFICATES AT A LEVEL ABOVE THAT WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME. THE UNDERWRITER MAY OFFER AND SELL THE CERTIFICATES TO CERTAIN DEALERS AND DEALER BANKS AND BANKS ACTING AS AGENT AND OTHERS AT PRICES LOWER THAN THE PUBLIC OFFERING PRICE STATED ON THE COVER PAGE HEREOF AND SAID PUBLIC OFFERING PRICE MAY BE CHANGED FROM TIME TO TIME BY THE UNDERWRITER.**

**THE CERTIFICATES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, IN RELIANCE UPON AN EXEMPTION CONTAINED IN SUCH ACT AND HAVE NOT BEEN REGISTERED OR QUALIFIED UNDER THE SECURITIES LAWS OF ANY STATE.**

Exhibit 9
Page 90 of 165

**TABLE OF CONTENTS**

**PAGE**

INTRODUCTION ............................................................................................................................. 1
    General ................................................................................................................................... 1
    Security and Sources of Payment for the Certificates ........................................................ 1
    Certificate Insurance ............................................................................................................ 2
    The Certificates .................................................................................................................... 2
    Prepayment .......................................................................................................................... 2
    Tax Exemption ..................................................................................................................... 2
    Continuing Disclosure ......................................................................................................... 3
    Professionals Involved in the Offering ................................................................................ 3
    Certificate Owners' Risks .................................................................................................... 3
    Miscellaneous ...................................................................................................................... 3

THE REFUNDING PLAN .............................................................................................................. 4

DESCRIPTION OF THE SITE ....................................................................................................... 5
    The Site ................................................................................................................................. 5
    Release/Substitution ............................................................................................................. 5

ESTIMATED SOURCES AND USES OF FUNDS ....................................................................... 6

THE CERTIFICATES ..................................................................................................................... 6
    General ................................................................................................................................. 6
    Prepayment .......................................................................................................................... 6
    Prepayment Procedures ....................................................................................................... 7
    Partial Prepayment .............................................................................................................. 8

SECURITY AND SOURCES OF PAYMENT FOR THE CERTIFICATES ................................. 8
    General ................................................................................................................................. 8
    Lease Payments .................................................................................................................... 9
    Reserve Fund ....................................................................................................................... 9
    Additional Payments ............................................................................................................ 9
    Insurance .............................................................................................................................. 10

LEASE PAYMENT SCHEDULE ................................................................................................... 10

CERTIFICATE INSURANCE ........................................................................................................ 12
    Payment Pursuant to Financial Guaranty Insurance Policy ............................................... 12
    Ambac Assurance Corporation ........................................................................................... 13
    Available Information .......................................................................................................... 13
    Incorporation of Certain Documents by Reference ............................................................ 14
    The Surety Bond .................................................................................................................. 14

CITY FINANCIAL INFORMATION ............................................................................................ 15

LIMITATIONS ON TAXES AND APPROPRIATIONS ............................................................... 15

RISK FACTORS .............................................................................................................................. 15
    Abatement ............................................................................................................................ 16
    Default .................................................................................................................................. 16
    Release or Substitution of Site ............................................................................................ 16
    Not a Pledge of Taxes ......................................................................................................... 17
    Additional Obligations of the City ...................................................................................... 18

i

Exhibit 9
Page 91 of 165

# TABLE OF CONTENTS

**PAGE**

Natural and Manmade Disasters ...............................................................................................18
Limitations on Remedies; Bankruptcy ....................................................................................18
Economic Conditions in California ..........................................................................................19

THE CORPORATION ................................................................................................................22

TAX EXEMPTION ....................................................................................................................22

CERTAIN LEGAL MATTERS .................................................................................................23

LITIGATION ...............................................................................................................................24

RATINGS .....................................................................................................................................24

UNDERWRITING .....................................................................................................................24

FINANCIAL ADVISOR .............................................................................................................25

CONTINUING DISCLOSURE .................................................................................................25

FINANCIAL STATEMENTS OF THE CITY .......................................................................25

VERIFICATION OF MATHEMATICAL COMPUTATIONS ............................................26

MISCELLANEOUS ....................................................................................................................26

APPENDIX A     THE CITY OF SAN DIEGO ..................................................................A-1
APPENDIX B     THE CITY OF SAN DIEGO AUDITED FINANCIAL STATEMENTS FOR THE
                FISCAL YEAR ENDED JUNE 30, 2002 ...................................................B-1
APPENDIX C     SUMMARY OF PRINCIPAL LEGAL DOCUMENTS ...............................C-1
APPENDIX D     FORM OF LEGAL OPINION ...........................................................D-1
APPENDIX E     SPECIMEN MUNICIPAL BOND INSURANCE POLICY .........................E-1
APPENDIX F     FORM OF CONTINUING DISCLOSURE AGREEMENT ........................F-1
APPENDIX G     DTC BOOK-ENTRY SYSTEM ........................................................G-1

Exhibit 9
Page 92 of 165

**$17,425,000**
**CITY OF SAN DIEGO**
**2003 Certificates of Participation**
**(1993 Balboa Park/Mission Bay Park Refunding)**

**Evidencing Proportionate Interests in Lease Payments to be Made by the**
**CITY OF SAN DIEGO**
**Pursuant to a Lease with the**
**SAN DIEGO FACILITIES AND EQUIPMENT LEASING CORPORATION**

## INTRODUCTION

*This introduction contains only a brief summary of certain of the terms of the Certificates being offered, and a brief description of the Official Statement. All statements contained in this introduction are qualified in their entirety by reference to the entire Official Statement. References to, and summaries of, provisions of the Constitution and laws of the State of California and any documents referred to herein do not purport to be complete and such references are qualified in their entirety by reference to the complete provisions. Capitalized terms used in this Official Statement and not defined elsewhere herein have the meanings given such terms in APPENDIX C — "SUMMARY OF PRINCIPAL LEGAL DOCUMENTS" herein. This Official Statement speaks only as of its date, and the information contained herein is subject to change.*

### General

This Official Statement, including the cover page and the Appendices attached hereto (the "Official Statement"), provides certain information concerning the execution and delivery of the City of San Diego 2003 Certificates of Participation (1993 Balboa Park/Mission Bay Park Refunding) (the "Certificates") in an aggregate principal amount of $17,425,000. The Certificates will be executed and delivered pursuant to a Trust Agreement, dated as of June 1, 2003 (the "Trust Agreement"), by and among the City of San Diego (the "City"), the San Diego Facilities and Equipment Leasing Corporation (the "Corporation") and Wells Fargo Bank, National Association, as trustee (the "Trustee"). The Certificates represent proportionate undivided interests of the registered owners thereof (the "Owners") in the Lease Payments to be made by the City to the Corporation under that certain Facilities Lease Agreement, dated as of June 1, 2003 (the "Lease Agreement"), by and between the Corporation, as lessor, and the City, as lessee. See "SECURITY AND SOURCES OF PAYMENT FOR THE CERTIFICATES — Lease Payments" herein. The Certificates are being delivered to (i) refund the City's outstanding Certificates of Participation (Balboa Park and Mission Bay Park Capital Improvements Program), Series 1993 (the "Prior Certificates"); (ii) acquire a debt service reserve fund surety bond and a financial guaranty insurance policy for the Certificates; and (iii) pay the costs of issuance incurred in connection with the execution and delivery of the Certificates. See "THE REFUNDING PLAN" and "DESCRIPTION OF THE SITE" herein.

### Security and Sources of Payment for the Certificates

The Certificates are being executed and delivered pursuant to the Trust Agreement. The City will lease certain real property and improvements thereon at various locations in the City (collectively, the "Site") to the Corporation pursuant to a Site Lease between the City as lessor, and the Corporation, as lessee, dated as of June 1, 2003 (the "Site Lease"). Under the Lease Agreement, the Corporation will lease the Site back to the City. The City is required under the Lease Agreement to pay Lease Payments for the use and possession of the Site, as further described under the caption "DESCRIPTION OF THE SITE" herein. The City is also required to pay any taxes and assessments and the cost of maintenance and repair of the Site.

Pursuant to an Assignment Agreement, dated as of June 1, 2003 (the "Assignment Agreement"), by and between the Corporation and the Trustee, the Corporation will assign to the Trustee, for the benefit of the

1

Exhibit 9
Page 93 of 165

Owners, substantially all of its rights under the Lease Agreement, including its rights to receive and collect Lease Payments and prepayments from the City under the Lease Agreement and rights as may be necessary to enforce payment of Lease Payments and prepayments. All rights assigned by the Corporation pursuant to the Assignment Agreement will be administered by the Trustee in accordance with the provisions of the Trust Agreement for the equal and proportionate benefit of all Owners.

The Certificates evidence proportionate undivided interests in the right to receive Lease Payments and prepayments thereof to be made by the City to the Corporation under the Lease Agreement. The Lease Payments are designed to pay, when due, the principal and interest with respect to the Certificates. The City has covenanted in the Lease Agreement that it will take such action as may be necessary to include the Lease Payments and other payments due under the Lease Agreement in its annual budgets and to make the necessary annual appropriations therefor. The City's obligation to make Lease Payments is subject to complete or partial abatement in the event of the taking of, damage to or loss of use and possession of all or a portion of the Site. See "RISK FACTORS — Abatement" herein.

**The obligation of the City to make Lease Payments does not constitute an obligation of the City for which the City is obligated to levy or pledge any form of taxation or for which the City has levied or pledged any form of taxation. Neither the Certificates nor the obligation of the City to make Lease Payments constitutes an indebtedness of the Corporation, the City, the State of California or any of its political subdivisions within the meaning of any constitutional or statutory debt limitation or restriction.**

### Certificate Insurance

Payment of the principal of and interest represented by the Certificates when due will be insured by a financial guaranty insurance policy (the "Policy") to be issued by Ambac Assurance Corporation, a Wisconsin-domiciled stock insurance corporation (the "Insurer") simultaneously with the delivery of the Certificates. See "CERTIFICATE INSURANCE" herein.

### The Certificates

Interest represented by the Certificates is payable semiannually on May 1 and November 1 of each year, commencing on November 1, 2003 (each an "Interest Payment Date"). See "THE CERTIFICATES — General" herein. The Certificates will be executed and delivered in book-entry form only and, when delivered, will be registered in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"), which will act as securities depository for the Certificates. Individual purchases of the Certificates will be made in book-entry form only. Purchasers of the Certificates will not receive certificates representing their ownership interests in the Certificates purchased. The Certificates will be executed and delivered in the principal amount of $5,000 and integral multiples thereof. Principal, premium, if any, and interest payments due with respect to the Certificates are payable directly to DTC by the Trustee. Upon receipt of payments of principal, premium, if any, and interest, DTC will in turn distribute such payments to the beneficial owners of the Certificates. See "THE CERTIFICATES — General" and APPENDIX G — "DTC BOOK-ENTRY SYSTEM" herein.

### Prepayment

The Certificates are subject to extraordinary and optional prepayment prior to maturity, as described herein. See "THE CERTIFICATES — Prepayment" herein.

### Tax Exemption

In the opinion of Stradling Yocca Carlson & Rauth, a Professional Corporation, Newport Beach, California ("Special Counsel"), under existing statutes, regulations, rulings and judicial decisions, and assuming certain representations and compliance with certain covenants and requirements described herein, the

Exhibit 9
Page 94 of 165

interest (and original issue discount) due with respect to the Certificates is excluded from gross income for federal income tax purposes and is not an item of tax preference for purposes of calculating the federal alternative minimum tax imposed on individuals and corporations. In the further opinion of Special Counsel, the interest (and original issue discount) due with respect to the Certificates is exempt from State of California personal income tax. See "TAX EXEMPTION" herein.

### Continuing Disclosure

The City has covenanted for the benefit of the holders and beneficial owners of the Certificates to provide, or cause to be provided, to each nationally recognized municipal securities information repository and any public or private repository or entity designated by the State as a state repository for purposes of Rule 15c2-12(b)(5) (the "Rule") adopted by the Securities and Exchange Commission (each, a "Repository") certain annual financial information and operating data and, in a timely manner, notice of certain material events. These covenants have been made in order to assist the Underwriter in complying with the Rule. See "CONTINUING DISCLOSURE" herein for a description of the specific nature of the annual report and notices of material events and a summary description of the terms of the disclosure agreement pursuant to which such reports are to be made. The City has never failed to comply in all material respects with any previous undertakings with regard to the Rule.

### Professionals Involved in the Offering

Wells Fargo Bank, National Association, Los Angeles, California, will act as Trustee with respect to the Certificates. Public Resources Advisory Group, New York, New York will act as financial advisor to the City. The Certificates will be delivered subject to the approval as to their legality by Stradling Yocca Carlson & Rauth, a Professional Corporation, Newport Beach, California, Special Counsel. Certain legal matters will be passed upon for the City by the City Attorney and for the Corporation by Foley & Lardner, San Diego, California. The City's financial statements for the fiscal year ended June 30, 2002 included as Appendix B hereto have been audited by Calderon, Jahum & Osborn, An Accountancy Corporation, San Diego, California (the "Auditor"). See APPENDIX B — "THE CITY OF SAN DIEGO AUDITED FINANCIAL STATEMENTS FOR THE FISCAL YEAR ENDED JUNE 30, 2002" herein. The City's financial statements are public documents and are included within this Official Statement with the prior approval of the Auditor. However, the Auditor has not performed any post-audit of the financial condition of the City.

### Certificate Owners' Risks

Certain events could affect the ability of the City to make the Lease Payments when due. See "RISK FACTORS" for a discussion of certain factors that should be considered, in addition to other matters set forth herein, in evaluating an investment in the Certificates.

### Miscellaneous

It is anticipated that the Certificates in book-entry form will be available for delivery to DTC on or about June 17, 2003 (the "Delivery Date").

The description herein of the Trust Agreement, the Lease Agreement, the Site Lease, the Assignment Agreement and any other agreements relating to the Certificates are qualified in their entirety by reference to such documents, and the descriptions herein of the Certificates are qualified in their entirety by the form thereof and the information with respect thereto included in the aforementioned documents. See APPENDIX C — "SUMMARY OF PRINCIPAL LEGAL DOCUMENTS" herein. Copies of the documents are on file and available for inspection at the offices of the Trustee at 707 Wilshire Boulevard, 17th Floor, Los Angeles, California 90017, Attention: Corporate Trust Services.

All capitalized terms used in this Official Statement and not otherwise defined herein have the meanings given such terms in APPENDIX C — "SUMMARY OF PRINCIPAL LEGAL DOCUMENTS" herein.

The information and expressions of opinion herein speak only as of their date and are subject to change without notice. Neither the delivery of this Official Statement nor any sale made hereunder nor any future use of this Official Statement shall, under any circumstances, create any implication that there has been no change in the affairs of the City since the date hereof.

The presentation of information in APPENDIX A — "THE CITY OF SAN DIEGO," including tables of receipt of revenues, is intended to show recent historical information and, except for the budget for fiscal years 2002-03 and 2003-04, is not intended to indicate future or continuing trends in the financial position or other affairs of the City. No representation is made that past experience, as it might be shown by such financial and other information, will necessarily continue or be repeated in the future.

## THE REFUNDING PLAN

The Certificates are being executed and delivered to provide for the refunding of the City's lease payment obligations relating to the Prior Certificates. The proceeds of the Prior Certificates financed improvements to the City's Balboa Park and Mission Bay Park pursuant to the capital improvements program contained in the City's Master Plans for such parks. These improvements included: Balboa Park Safety Lighting and improvements to Balboa Park facilities, including at the Federal Building, House of Charm & Arcades, municipal gym, Japanese Garden, Natural History Museum, Starlight Bowl, Shoreline Reclamation at Mission Bay Park, and other miscellaneous improvements. A portion of the proceeds of the Certificates will be used to establish an irrevocable escrow (the "Escrow Fund") to be held by BNY Western Trust Company, as escrow bank (the "Escrow Bank") pursuant to an Escrow Agreement dated as of June 1, 2003 by and among the Escrow Bank, the City and the Corporation. Moneys in the Escrow Fund will be invested pursuant to instructions of the City. Moneys on deposit in the Escrow Fund will be held as cash or invested solely in non-callable, direct general obligations of the United States of America (including obligations issued or held in book entry form on the books of the Department of the Treasury of the United States of America) (the "Escrowed Federal Securities"). The cash and Escrowed Federal Securities, and the interest accrued with respect thereto, will be held by the Escrow Bank on behalf of the City and for the benefit of the Owners and applied to redeem the outstanding Prior Certificates in full on November 1, 2003, at a redemption price of one hundred one percent (101%) of the principal amount thereof, plus accrued interest. The amounts on deposit in the Escrow Fund shall secure and provide funds to pay or prepay all rental payments to become due under the Lease Agreement dated as of November 1, 1993 (the "1993 Lease") by and between the City and the Corporation. The Escrow Bank, as agent of the City, is irrevocably committed to pay base rental payments under the 1993 Lease as due on and prior to November 1, 2003, and to cause prepayment of the remaining rental payments, including the prepayment premium applicable thereto on November 1, 2003. Upon the establishment of the Escrow Fund and deposit of the cash and Escrowed Federal Securities as described above, the lien of the trust agreement pursuant to which the Prior Certificates were executed and delivered and the proceedings pursuant to which the Prior Certificates were authorized, executed and delivered will cease, terminate and become void with respect to the Prior Certificates, except for the rights of the owners of the Prior Certificates to payments from the Escrow Fund. Upon the delivery of the Certificates, McGladrey & Pullen, LLP, Minneapolis, Minnesota, will deliver a report verifying the sufficiency of the moneys deposited in the Escrow Fund. See "VERIFICATION OF MATHEMATICAL COMPUTATIONS" herein.

Exhibit 9
Page 96 of 165

# DESCRIPTION OF THE SITE

**The Site**

The Site consists of the North Course of the Torrey Pines Municipal Golf Course (the "Golf Course Portion") and the House of Charm (the "House of Charm Portion") in Balboa Park.

*Torrey Pines – North Course.* Torrey Pines Municipal Golf Course facility consists of two regulation championship eighteen hole golf courses, is owned by the City and is operated by the Park and Recreation Department. It is regarded as one of the premiere courses in Southern California and is the site of an annual Professional Golf Association tournament. Torrey Pines consists of the North Course and the South Course, both of which are situated on a bluff overlooking the Pacific Ocean.

Only the North Course of Torrey Pines is subject to the Lease Agreement. The North Course is a par 72 and plays at approximately 6,647 yards at its championship tees. The Lease Agreement does not include other facilities related to the golf course, including the bar/restaurant, pro shop or driving range. The City reports that, in 2002, 175,000 rounds were played on the North Course and South Course combined.

Lease Payments attributable to the North Course are scheduled over a six year period. This portion of the Lease Payments has a principal component of $6,680,000. **Pursuant to the terms of the Lease Agreement, the Golf Course Portion of the Site is released from the Lease Agreement after November 1, 2008.**

*House of Charm.* The other property that is the subject of the Lease Agreement is the House of Charm. This facility is located adjacent to one of the two main entrances to Balboa Park and consists of approximately 75,000 square feet of building area. The facility was substantially reconstructed with the proceeds of the 1993 Certificates. This portion of the Lease Payments has a principal component of $10,745,000. The lease term is 21 years. The House of Charm is occupied by three nonprofit corporations pursuant to long-term leases with the City for certain charitable purposes. The tenants are responsible for operation and maintenance of the House of Charm, but do not pay rent. They are The San Diego Art Institute, Mingei International, Inc. and Old Globe Theatre, Inc. The leases are subordinate to the Lease Agreement.

**Release/Substitution**

The Site is subject to change in whole or in part from time to time under the circumstances permitted in the Lease Agreement. As described above, pursuant to the terms of the Lease Agreement, the Golf Course Portion is released from the Lease Agreement after November 1, 2008. See "RISK FACTORS — Release or Substitution of Site."

## ESTIMATED SOURCES AND USES OF FUNDS

The following table summarizes the estimated sources and uses of Certificate proceeds:

*Sources of Funds*

| | |
|---|---|
| Par Amount of Certificates | $  17,425,000.00 |
| Net Original Issue Premium | 93,232.45 |
| Prior Certificates Proceeds | 2,053,862.75 |
| Total Sources | $  19,572,095.20 |

*Uses of Funds*

| | |
|---|---|
| Escrow Fund | $  19,089,418.23 |
| Underwriter's Discount | 94,645.46 |
| Costs of Issuance[1] | 388,031.51 |
| Total Uses | $  19,572,095.20 |

_____

[1]   Includes fees of Special Counsel, Trustee, Financial Advisor, rating agency and other legal fees, costs of printing, and the premium for the Policy and Surety Bond.


## THE CERTIFICATES

### General

The Certificates will be executed and delivered in the form of fully registered Certificates in principal amounts of $5,000 each or any integral multiple thereof.  The Certificates will be dated their date of delivery and mature on May 1 in the years set forth on the inside cover page hereof.  Each Certificate will be payable with respect to interest on May 1 and November 1 of each year, commencing on November 1, 2003 at the respective rates of interest set forth on the inside front cover page hereof.

The Certificates will be executed and delivered in book-entry form only and, when delivered, will be registered in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"), which will act as securities depository for the Certificates.  Individual purchases of the Certificates will be made in book-entry form only.  Purchasers of the Certificates will not receive certificates representing their ownership interests in the Certificates purchased.  Principal, premium, if any, and interest payments due with respect to the Certificates are payable directly to DTC by the Trustee.  Upon receipt of payments of principal, premium, if any, and interest, DTC will in turn distribute such payments to the beneficial owners of the Certificates.  See APPENDIX G — "DTC BOOK-ENTRY SYSTEM" herein.

### Prepayment

*Extraordinary Prepayment.*  The Certificates are subject to prepayment, without premium, prior to their respective maturity dates on any date, in whole or in part, from Net Proceeds which the Trustee transfers to the Prepayment Fund as provided in the Lease Agreement at least 45 days prior to the date fixed for prepayment, at a prepayment price equal to the principal amount thereof together with the accrued interest to the date fixed for prepayment.

*Optional Prepayment.*  The Certificates maturing on or after November 1, 2014 are subject to prepayment prior to maturity in whole or in part on any date on or after November 1, 2013 at the option of the City, in the event the City exercises its option under the Lease Agreement to prepay all or a portion of the principal component of the Lease Payments (in integral multiples of $5,000), at the prepayment price equal to the principal component to be prepaid, plus accrued interest to the date fixed for prepayment, without premium.

Exhibit 9
Page 98 of 165

## Prepayment Procedures

Whenever provision is made for the optional prepayment of Certificates and less than all Outstanding Certificates are called for prepayment, the Trustee shall select Certificates for optional prepayment from among maturities selected by the City and by lot within any maturity. For extraordinary prepayment of Certificates, the Trustee will select Certificates for prepayment pro rata among maturities and by lot within any maturity.

Notice of prepayment will be mailed by first-class mail, postage prepaid, not less than 30 nor more than 60 days prior to the prepayment date to the respective Owners of any Certificates designated for prepayment at their addresses appearing on the Certificate registration books, and will be sent by first class mail or delivery service, postage prepaid, to the Municipal Securities Depositories (as defined in the Trust Agreement) and to the Information Services (as defined in the Trust Agreement) which the City will designate to the Trustee. Neither failure to receive such notice nor any defect in any notice so mailed will affect the sufficiency of the proceedings for the prepayment of such Certificates. Such notice will specify: (a) the prepayment date, (b) the prepayment price, (c) if less than all of the Outstanding Certificates are to be prepaid, the Certificate numbers (and in the case of partial prepayment, the respective principal amounts), (d) the CUSIP numbers of the Certificates to be prepaid, (e) the place or places where the prepayment will be made, (f) the original date of execution and delivery of the Certificates, (g) any other descriptive information regarding the Certificates needed to identify accurately the Certificates being prepaid. Such notice will further state that on the specified date there will become due and payable upon each Certificate to be prepaid, the portion of the principal amount of such Certificate to be prepaid, together with interest accrued to said date and that from and after such date, provided that moneys therefor have been deposited with the Trustee, interest with respect thereto will cease to accrue and be payable.

With respect to any notice of optional prepayment of Certificates, such notice may state that such prepayment shall be conditional upon the receipt by the Trustee on or prior to the date fixed for such prepayment of moneys sufficient to pay the principal of, premium, if any, and interest with respect to such Certificates to be prepaid and that, if such moneys shall not have been so received, said notice shall be of no force and effect and the Trustee shall not be required to prepay such Certificates. In the event that such notice of prepayment contains such a condition and such moneys are not so received, the prepayment shall not be made, and the Trustee shall within a reasonable time thereafter give notice, in the manner in which the notice of prepayment was given, that such moneys were not so received.

So long as DTC is the registered Owner of the Certificates, all such notices will be provided to DTC as the Owner, and not to any beneficial owner of the Certificates. None of the City, the Corporation or the Trustee is responsible for providing notice to the beneficial owners of the Certificates, which is the responsibility of the DTC Participants. See APPENDIX G — "DTC BOOK-ENTRY SYSTEM" herein.

Notice having been given to the Owners of any Certificates being prepaid, and the moneys for the prepayment (including the interest to the applicable date of prepayment), having been set aside in the Prepayment Fund, the Certificates will become due and payable on the date of prepayment, and upon presentation and surrender thereof at the Principal Office of the Trustee such Certificates will be paid at the prepayment price with respect thereto, plus interest accrued and unpaid to the date of prepayment.

If, on the date of prepayment moneys for the prepayment of all the Certificates to be prepaid, together with interest to the date of prepayment, are held by the Trustee so as to be available therefor on such date of prepayment, and, if notice of prepayment thereof has been given as described above, then, from and after the date of prepayment, interest with respect to the Certificates to be prepaid will cease to accrue and become payable. All moneys held by or on behalf of the Trustee for the prepayment of Certificates will be held in trust for the account of the Owners of the Certificates so to be prepaid, without liability for interest thereon.

Exhibit 9
Page 99 of 165

**Partial Prepayment**

Upon surrender by the Owner of a Certificate for partial prepayment at the Principal Office of the Trustee, payment of such partial prepayment of the principal amount of a Certificate will be paid to such Owner. Upon surrender of any Certificate prepaid in part only, the Trustee will execute and deliver to the registered Owner thereof, at the expense of the City, a new Certificate or Certificates which shall be of authorized denominations equal to the unprepaid portion of the Certificate surrendered and of the same tenor and maturity. Such partial prepayment will be valid upon payment of the amount thereby required to be paid to such Owner, and the City, the Corporation and the Trustee will be released and discharged from all liability to the extent of such payment.

## SECURITY AND SOURCES OF PAYMENT FOR THE CERTIFICATES

**Neither the Certificates nor the obligation of the City to make Lease Payments constitutes an obligation of the City for which the City is obligated to levy or pledge, or for which the City has levied or pledged, any form of taxation. Neither the Certificates nor the obligation of the City to make Lease Payments constitutes an indebtedness of the Corporation, the City, the State of California or any of its political subdivisions within the meaning of any constitutional limitation or violates any statutory debt limitation or restriction.**

**General**

Each Certificate represents a proportionate undivided interest in the Lease Payments and prepayments to be made by the City to the Trustee under the Lease Agreement. The City is obligated to pay Lease Payments from any source of legally available funds, and has covenanted in the Lease Agreement to include all Lease Payments coming due in its annual budgets and to make the necessary annual appropriations therefor. The Corporation, pursuant to the Assignment Agreement, has assigned all of its rights under the Lease Agreement (excepting certain rights as specified therein), including the right to receive Lease Payments and prepayments, to the Trustee for the benefit of the Owners. By the twenty-third (23rd) day of each April and October (or, if such day is not a Business Day, the next succeeding Business Day), the City must pay to the Trustee a Lease Payment (to the extent required under the Lease Agreement) which is expected to equal the amount necessary to pay the principal and interest with respect to the Certificates on the next succeeding Interest Payment Date.

The City's obligation to make Lease Payments will be abated in whole or in part to the extent of substantial interference with the use and possession of the Site arising from damage, destruction, title defect or taking by eminent domain or condemnation of the Site. Following November 1, 2008, the Site will not include the North Torrey Pines Golf Course. The nonpayment of Lease Payments following an abatement would not constitute a default under the Lease Agreement and the Trustee is not entitled in such event to pursue remedies against the City. See "RISK FACTORS — Abatement" herein.

Under the Lease Agreement, the City agrees to pay certain taxes, assessments, utility charges, and insurance premiums charged with respect to the Site and the Certificates and fees and expenses of the Trustee. The City is responsible for repair and maintenance of the Site during the term of the Lease Agreement. The City may at its own expense in good faith contest such taxes, assessments and utility and other charges if certain requirements set forth in the Lease Agreement are satisfied, including obtaining an opinion of counsel that the Site will not be subjected to loss or forfeiture.

Should the City default under the Lease Agreement, the Trustee, as assignee of the Corporation, may terminate the Lease Agreement and re-lease the Site or may retain the Lease Agreement and hold the City liable for all Lease Payments thereunder on an annual basis. Under no circumstances will the Trustee have the right to accelerate Lease Payments. The exercise of the remedies provided to the Trustee is subject to various

Exhibit 9
Page 100 of 165

practical constraints and limitations on the enforcement of remedies against public agencies.  See "RISK FACTORS — Default" herein.

## Lease Payments

Subject to the provisions of the Lease Agreement regarding prepayment of Lease Payments (see the provisions relating to prepayment under the caption "THE CERTIFICATES" above), the City agrees to pay to the Corporation, its successors and assigns, the Lease Payments as annual rental for the use and possession of the Site.  The Lease Payments are due and payable on April 23 and October 23 of each year (or, if such day is not a Business Day, the next succeeding Business Day) (each, a "Lease Payment Date").

Any monies held in the Lease Payment Fund on any Lease Payment Date (other than amounts resulting from the prepayment of the Lease Payments in part but not in whole pursuant to the Lease Agreement and other amounts required for payment of past due principal or interest with respect to any Certificates not presented for payment) shall be credited to the payment of Lease Payments due and payable on such Lease Payment Date.

The Trust Agreement requires that Lease Payments be deposited in the Lease Payment Fund maintained by the Trustee.  Pursuant to the Trust Agreement, on May 1 and November 1 of each year, commencing November 1, 2003, the Trustee will apply such amounts in the Lease Payment Fund as are necessary to make interest and principal payments, respectively, with respect to the Certificates as the same shall become due and payable, in the amounts specified in the Lease Agreement.

## Reserve Fund

A Reserve Fund is established by the Trust Agreement which is to be maintained in an amount equal to the least of (i) maximum aggregate annual Lease Payments payable under the Lease Agreement in any Certificate Year (exclusive of Lease Payments attributable to Certificates that have been defeased), (ii) 125% of the average annual aggregate Lease Payments (in any Certificate Year) then payable under the Lease Agreement (exclusive of Lease Payments attributable to Certificates that have been defeased), or (iii) 10% of the face amount of the Certificates and/or the Additional Certificates, as applicable (less original issue discount if in excess of two percent of the stated payment amount at maturity) (the "Reserve Requirement").  The full amount available in the Reserve Fund may be used by the Trustee in the event of abatement or a failure by the City to make Lease Payments when due.  The Reserve Fund will initially be funded with a debt service reserve fund surety bond (the "Surety Bond") issued by the Insurer in an amount equal to the Reserve Requirement. See "CERTIFICATE INSURANCE — The Surety Bond" herein.

## Additional Payments

Under the Lease Agreement, the City is to pay such amounts ("Additional Payments") as are required for the payment of all administrative costs of the Corporation relating to the Site or the Certificates, including, without limitation, all expenses, compensation and indemnification of the Trustee payable by the City under the Trust Agreement, taxes of any sort whatsoever payable by the Corporation as a result of its leasehold interest in the Site or undertaking of the transactions contemplated in the Lease Agreement or in the Trust Agreement, fees of auditors, accountants, attorneys or engineers, any and all amounts due to the Insurer (pursuant to the reserve fund surety bond or otherwise) and all other necessary administrative costs of the Corporation or charges required to be paid by it in order to comply with the terms of the Certificates or of the Trust Agreement, including premiums on insurance required to be maintained by the Lease Agreement or to indemnify the Corporation and its officers and directors.

Exhibit 9
Page 101 of 165

**Insurance**

Pursuant to the Lease Agreement, the City will obtain a CLTA leasehold title insurance policy (with Western Regional Exceptions) on the Site in an amount equal to the aggregate principal component of unpaid Lease Payments. The Lease Agreement also requires that the City maintain casualty insurance on the Site in amount equal to replacement value and, upon delivery of the Site to it, rental interruption insurance to insure against loss of Lease Payments caused by loss or damage to the Site covered under the City's casualty insurance. The rental interruption insurance is to be in an amount not less than the maximum remaining scheduled Lease Payments in any future 24 month period. The City also is obligated under the Lease Agreement to obtain a standard comprehensive general public liability and property damage insurance policy or policies and workers' compensation insurance. See "CITY FINANCIAL INFORMATION — Insurance" and APPENDIX C — "SUMMARY OF PRINCIPAL LEGAL DOCUMENTS — INSURANCE" herein.

The proceeds of any rental interruption insurance will be deposited to (i) the Reserve Fund to make up any deficiency therein and (ii) in the Lease Payment Fund to be credited towards the payment of the Lease Payments in the order in which such Lease Payments become due and payable. The Lease Agreement requires the City to apply the Net Proceeds of any casualty insurance award either to replace or repair the Site or to prepay Certificates if certain certifications with respect to the adequacy of the Net Proceeds to make repairs, and the timing thereof, cannot be made. See APPENDIX C — "SUMMARY OF PRINCIPAL LEGAL DOCUMENTS — DAMAGE, DESTRUCTION AND EMINENT DOMAIN; USE OF NET PROCEEDS." The amount of Lease Payments will be abated and Lease Payments due under the Lease Agreement may be reduced during any period in which by reason of damage, destruction, title defect or taking by eminent domain or condemnation there is substantial interference with the City's use and possession of all or part of the Site. See "RISK FACTORS — Abatement" herein.

## LEASE PAYMENT SCHEDULE

Lease Payments are required to be made by the City under the Lease Agreement on or before April 23 and October 23 of each year (or, if such day is not a Business Day, the next succeeding Business Day) for the use and possession of the Site for the period commencing as of the date of delivery of the Certificates and terminating on November 1, 2023, or a later date if such date is extended as provided in the Lease Agreement. The Interest Payment Dates with respect to the Certificates are May 1 and November 1, commencing November 1, 2003. The schedule below sets forth the semiannual Lease Payments.

Exhibit 9
Page 102 of 165

| Lease Payment Date | Principal | Interest | Annual Total |
|---|---|---|---|
| 10/23/03 | $ 485,000.00 | $ 182,250.70 | $ 667,250.70 |
| 04/23/04 | | 242,389.38 | |
| 10/23/04 | 1,230,000.00 | 242,389.38 | 1,714,778.76 |
| 04/23/05 | | 233,164.38 | |
| 10/23/05 | 1,710,000.00 | 233,164.38 | 2,176,328.76 |
| 04/23/06 | | 219,484.38 | |
| 10/23/06 | 1,730,000.00 | 219,484.38 | 2,168,968.76 |
| 04/23/07 | | 205,644.38 | |
| 10/23/07 | 1,780,000.00 | 205,644.38 | 2,191,288.76 |
| 04/23/08 | | 170,044.38 | |
| 10/23/08[†] | 1,835,000.00 | 170,044.38 | 2,175,088.76 |
| 04/23/09 | | 151,694.38 | |
| 10/23/09 | 460,000.00 | 151,694.38 | 763,388.76 |
| 04/23/10 | | 146,404.38 | |
| 10/23/10 | 470,000.00 | 146,404.38 | 762,118.76 |
| 04/23/11 | | 140,059.38 | |
| 10/23/11 | 485,000.00 | 140,059.38 | 765,118.76 |
| 04/23/12 | | 132,784.38 | |
| 10/23/12 | 495,000.00 | 132,784.38 | 760,568.76 |
| 04/23/13 | | 125,359.38 | |
| 10/23/13 | 510,000.00 | 125,359.38 | 760,718.76 |
| 04/23/14 | | 117,199.38 | |
| 10/23/14 | 530,000.00 | 117,199.38 | 764,398.76 |
| 04/23/15 | | 108,454.38 | |
| 10/23/15 | 545,000.00 | 108,454.38 | 761,908.76 |
| 04/23/16 | | 99,189.38 | |
| 10/23/16 | 565,000.00 | 99,189.38 | 763,378.76 |
| 04/23/17 | | 89,019.38 | |
| 10/23/17 | 585,000.00 | 89,019.38 | 763,038.76 |
| 04/23/18 | | 78,489.38 | |
| 10/23/18 | 605,000.00 | 78,489.38 | 761,978.76 |
| 04/23/19 | | 67,296.88 | |
| 10/23/19 | 630,000.00 | 67,296.88 | 764,593.76 |
| 04/23/20 | | 55,090.63 | |
| 10/23/20 | 655,000.00 | 55,090.63 | 765,181.26 |
| 04/23/21 | | 42,400.00 | |
| 10/23/21 | 680,000.00 | 42,400.00 | 764,800.00 |
| 04/23/22 | | 28,800.00 | |
| 10/23/22 | 705,000.00 | 28,800.00 | 762,600.00 |
| 04/23/23 | | 14,700.00 | |
| 10/23/23 | 735,000.00 | 14,700.00 | 764,400.00 |
| Total | $ 17,425,00.00 | $ 5,117,587.12 | $ 22,542,587.12 |

[†]  Lease Agreement terminates with respect to the North Torrey Pines Golf Course.

Exhibit 9
Page 103 of 165

## CERTIFICATE INSURANCE

*The following information has been furnished by the Insurer for use in this Official Statement. Such information has not been independently confirmed or verified by the City. No representation is made herein by the City as to the accuracy or adequacy of such information subsequent to the date hereof, or that the information contained and incorporated herein by reference is correct. Reference is made to Appendix E for a specimen of the Insurer's Financial Guaranty Insurance Policy.*

### Payment Pursuant to Financial Guaranty Insurance Policy

The Insurer, Ambac Assurance Corporation, has made a commitment to issue the Financial Guaranty Insurance Policy relating to the Certificates effective as of the date of issuance of the Certificates. Under the terms of the Financial Guaranty Insurance Policy, the Insurer will pay to The Bank of New York, in New York, New York, or any successor thereto (the "Insurance Trustee") that portion of the principal of and interest with respect to the Certificates which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer (as such terms are defined in the Financial Guaranty Insurance Policy). The Insurer will make such payments to the Insurance Trustee on the later of the date on which such principal and interest becomes Due for Payment or within one business day following the date on which the Insurer shall have received notice of Nonpayment from the Trustee. The insurance will extend for the term of the Certificates and, once issued, cannot be cancelled by the Insurer.

The Financial Guaranty Insurance Policy will insure payment only on stated maturity dates, in the case of principal, and on stated dates for payment, in the case of interest. If the Certificates become subject to mandatory prepayment and insufficient funds are available for prepayment of all outstanding Certificates, the Insurer will remain obligated to pay principal of and interest with respect to outstanding Certificates on the originally scheduled interest and principal payment dates. In the event of any acceleration of the principal with respect to the Certificates, the insured payments will be made at such times and in such amounts as would have been made had there not been an acceleration.

In the event the Trustee has notice that any payment of principal of or interest with respect to a Certificate which has become Due for Payment and which is made to a beneficial owner of such Certificate by or on behalf of the City has been deemed preferential transfer and theretofore recovered from its registered owner pursuant to the United States Bankruptcy Code in accordance with a final, nonappealable order of a court of competent jurisdiction, such beneficial owner will be entitled to payment from the Insurer to the extent of such recovery if sufficient funds are not otherwise available.

The Financial Guaranty Insurance Policy does not insure any risk other than Nonpayment, as defined in the Policy. Specifically, the Financial Guaranty Insurance Policy does not cover:

1.  payment on acceleration, as a result of a call for prepayment (other than mandatory sinking fund prepayment) or as a result of any other advancement of maturity.

2.  payment of any prepayment or acceleration premium.

3.  nonpayment of principal or interest caused by the insolvency or negligence of the Trustee or payment agent, if any.

If it becomes necessary to call upon the Financial Guaranty Insurance Policy, payment of principal requires surrender of Certificates to the Insurance Trustee together with an appropriate instrument of assignment so as to permit ownership of such Certificates to be registered in the name of the Insurer to the extent of the payment under the Financial Guaranty Insurance Policy. Payment of interest pursuant to the Financial Guaranty Insurance Policy requires proof of beneficial owner entitlement to interest payments and an appropriate assignment of the beneficial owner's right to payment to the Insurer.

Exhibit 9
Page 104 of 165

Upon payment of the insurance benefits, the Insurer will become the owner of the Certificate, appurtenant coupon, if any, or right to payment of principal or interest with respect to such Certificate and will be fully subrogated to the surrendering beneficial owner's rights to payment.

In the event that the Insurer were to become insolvent, any claims arising under the Policy would be excluded from coverage by the California Insurance Guaranty Association, established pursuant to the laws of the State of California.

## Ambac Assurance Corporation

The Insurer is a Wisconsin-domiciled stock insurance corporation regulated by the Office of the Commissioner of Insurance of the State of Wisconsin and licensed to do business in 50 states, the District of Columbia, the Territory of Guam and the Commonwealth of Puerto Rico, with admitted assets of approximately $6,115,000,000 (unaudited) and statutory capital of approximately $3,703,000,000 (unaudited) as of December 31, 2002. Statutory capital consists of the Insurer's policyholders' surplus and statutory contingency reserve. Standard & Poor's Credit Markets Services, a division of The McGraw-Hill Companies, Inc., Moody's Investors Service and Fitch, Inc. have each assigned a triple-A financial strength rating to the Insurer.

The Insurer has obtained a ruling from the Internal Revenue Service to the effect that the insuring of an obligation by the Insurer will not affect the treatment for federal income tax purposes of interest on such obligation and that insurance proceeds representing maturing interest paid by the Insurer under policy provisions substantially identical to those contained in its Financial Guaranty Insurance Policy shall be treated for federal income tax purposes in the same manner as if such payments were made by the issuer of the Certificates.

The Insurer makes no representation regarding the Certificates or the advisability of investing in the Certificates and makes no representation regarding, nor has it participated in the preparation of, the Official Statement other than the information supplied by the Insurer and presented under the caption "CERTIFICATE INSURANCE."

## Available Information

The parent company of the Insurer, Ambac Financial Group, Inc. (the "Company"), is subject to the informational requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and in accordance therewith files reports, proxy statements and other information with the Securities and Exchange Commission (the "SEC"). These reports, proxy statements and other information can be read and copied at the SEC's public reference room at 450 Fifth Street, N.W., Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the public reference room. The SEC maintains an internet site at http://www.sec.gov that contains reports, proxy and information statements and other information regarding companies that file electronically with the SEC, including the Company. These reports, proxy statements and other information can also be read at the offices of the New York Stock Exchange, Inc. (the "NYSE"), 20 Broad Street, New York, New York 10005.

Copies of the Insurer's financial statements prepared in accordance with statutory accounting standards are available from the Insurer. The address of the Insurer's administrative offices and its telephone number are One State Street Plaza, 19th Floor, New York, New York 10004 and (212) 668-0340.

13

Exhibit 9
Page 105 of 165

**Incorporation of Certain Documents by Reference**

The following documents filed by the Company with the SEC (File No. 1-10777) are incorporated by reference in this Restated Official Statement:

1.    The Company's Current Report on Form 8-K dated January 23, 2003 and filed on January 24, 2003;

2.    The Company's Current Report on Form 8-K dated February 25, 2003 and filed on February 28, 2003;

3.    The Company's Current Report on Form 8-K dated February 25, 2003 and filed on March 4, 2003;

4.    The Company's Current Report on Form 8-K dated March 18, 2003 and filed on March 20, 2003;

5.    The Company's Current Report on From 8-K dated March 19, 2003 and filed on March 26, 2003;

6.    The Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2002 and filed on March 28, 2003;

7.    The Company Current Report on Form 8-K dated March 25, 2003 and filed on March 31, 2003; and

8.    The Company's Current Report on Form 8-K dated April 17, 2003 and filed on April 21, 2003.

All documents subsequently filed by the Company pursuant to the requirements of the Exchange Act after the date of this Official Statement will be available for inspection in the same manner as described above in "Available Information."

**The Surety Bond**

The following information has been furnished by the Insurer for use in this Official Statement.

The Trust Agreement requires the establishment of a Reserve Fund in an amount equal to the Reserve Requirement. The Trust Agreement authorizes the City to obtain a surety bond in the place of fully funding the Reserve Fund. Accordingly, application has been made to the Insurer for the issuance of the Surety Bond for the purpose of funding the Reserve Fund. The Certificates will only be delivered upon the issuance of such Surety Bond. The premium on the Surety Bond is to be fully paid at or prior to the issuance and delivery of the Certificates. The Surety Bond provides that upon the later of (i) one (1) day after receipt by the Insurer of a demand for payment executed by the Trustee certifying that provision for the payment of principal of or interest with respect to the Certificates when due has not been made or (ii) the interest payment date specified in the Demand for Payment submitted to the Insurer, the Insurer will promptly deposit funds with the Trustee sufficient to enable the Trustee to make such payments due on the Certificates, but in no event exceeding the Surety Bond Coverage, as defined in the Surety Bond.

Pursuant to the terms of the Surety Bond, the Surety Bond Coverage is automatically reduced to the extent of each payment made by the Insurer under the terms of the Surety Bond and the City is required to reimburse the Insurer for any draws under the Surety Bond with interest at a market rate. Upon such reimbursement, the Surety Bond is reinstated to the extent of each principal reimbursement up to but not

Exhibit 9
Page 106 of 165

exceeding the Surety Bond Coverage. The reimbursement obligation of the City is subordinate to the City's obligations to pay Lease Payments.

In the event the amount on deposit, or credited to the Reserve Fund, exceeds the amount of the Surety Bond, any draw on the Surety Bond shall be made only after all the funds in the Reserve Fund have been expended. In the event that the amount on deposit in, or credited to, the Reserve Fund, in addition to the amount available under the Surety Bond, includes amounts available under a letter of credit, insurance policy, surety bond or other such funding instrument (the "Additional Funding Instrument"), draws on the Surety Bond and the Additional Funding Instrument shall be made on a pro rata basis to fund the insufficiency. The Trust Agreement provides that the Reserve Fund shall be replenished in the following priority: (i) principal and interest on the Surety Bond shall be paid from first available Lease Payments; (ii) after all such amounts are paid in full, amounts necessary to fund the Reserve Fund to the required level, after taking into account the amounts available under the Surety Bond shall be deposited from next available Lease Payments.

The Surety Bond does not insure against nonpayment caused by the insolvency or negligence of the Trustee.

In the event that the Insurer were to become insolvent, any claims arising under the Surety Bond would be excluded from coverage by the California Insurance Guaranty Association, established pursuant to the laws of the State of California.

None of the City, the Authority nor the Underwriter makes any representation as to the ability of the Insurer to meet its obligations under the Financial Guaranty Insurance Policy or the Surety Bond.

## CITY FINANCIAL INFORMATION

General information about the City and the City's financial information is set forth in APPENDIX A — "THE CITY OF SAN DIEGO."

The City's Financial Statements along with accompanying notes and opinions from the Independent Auditor for the Fiscal Year ended June 30, 2002, are set forth in APPENDIX B — "THE CITY OF SAN DIEGO AUDITED FINANCIAL STATEMENTS FOR THE FISCAL YEAR ENDED JUNE 30, 2002" herein. The City's financial statements are public documents and are included within this Official Statement with the prior approval the Auditor, but the Auditor has not performed any post-audit of the financial condition of the City.

## LIMITATIONS ON TAXES AND APPROPRIATIONS

There are a number of provisions in the State Constitution that limit the ability of the City to raise and expend tax revenues. For a discussion of such provisions, see APPENDIX A — "THE CITY OF SAN DIEGO — LIMITATIONS ON TAXES AND APPROPRIATIONS."

## RISK FACTORS

The following factors, along with all other information in this Official Statement, should be considered by potential investors in evaluating the Certificates.

Exhibit 9
Page 107 of 165

**Abatement**

The City's obligation to make Lease Payments is subject to full or partial abatement and could result in the Trustee having inadequate funds to pay the principal and interest due with respect to the Certificates under certain circumstances related to damage, destruction, condemnation or title defects which cause a substantial interference with the use and occupancy of all or a portion of the Site. See "See APPENDIX C — "SUMMARY OF PRINCIPAL LEGAL DOCUMENTS — AGREEMENT TO LEASE; TERM OF LEASE; LEASE PAYMENTS — Abatement of Lease Payments in the Event of Loss of Use" herein.

**Default**

Whenever any event of default referred to in the Lease Agreement happens and continues, the Trustee, as the assignee of the Corporation, is authorized under the terms of the Lease Agreement to exercise any and all remedies available pursuant to law or granted pursuant to the Lease Agreement; provided, however, that notwithstanding anything therein or in the Trust Agreement to the contrary, THERE SHALL BE NO RIGHT UNDER ANY CIRCUMSTANCES TO ACCELERATE THE LEASE PAYMENTS OR OTHERWISE DECLARE ANY LEASE PAYMENTS NOT THEN DUE OR PAST DUE TO BE IMMEDIATELY DUE AND PAYABLE. NEITHER THE CORPORATION NOR ITS ASSIGNEE SHALL HAVE ANY RIGHT TO REENTER OR RELET THE SITE EXCEPT FOLLOWING A DEFAULT UNDER THE LEASE AGREEMENT. Following an event of default, at the direction of the Insurer, the Trustee, as the assignee of the Corporation, may elect either to terminate the Lease Agreement and seek to collect damages from the City or to maintain the Lease Agreement in effect and seek to collect the Lease Payments as they become due. The Lease Agreement further provides that so long as an event of default exists under the Lease Agreement, the Corporation, or its assignee, may re-enter the Site for the purpose of taking possession of any portion of the Site and to re-let the Site and, in addition, at its option, with or without such entry to terminate the Lease Agreement as described therein. See APPENDIX C — "SUMMARY OF PRINCIPAL LEGAL DOCUMENTS — LEASE AGREEMENT — Remedies On Default."

No assurance can be given that the Trustee will be able to re-let the Site so as to provide rental income sufficient to pay principal and interest evidenced by the Certificates in a timely manner or that such re-letting will not adversely affect the exclusion of interest with respect thereto from gross income for federal or State income tax purposes. Furthermore, due to the public purposes of the City the Site serves, it is not certain whether a court would permit the exercise of the remedies of repossession and re-letting with respect to the Site, or whether due to the respective locations or specialized nature of the Site such repossession and re-letting would be economically or physically feasible. Furthermore, pursuant to the Lease Agreement, the Golf Course Portion of the Site is released from the Lease Agreement after November 1, 2008.

In the event of a default, there is no remedy of acceleration of the total Lease Payments due over the term of the Lease Agreement and the Trustee is not empowered to sell the Site and use the proceeds of such sale to prepay the Certificates or pay debt service with respect thereto. The City will be liable only for Lease Payments on an annual basis and, in the event of a default, the Trustee would be required to seek a separate judgment each year for that year's defaulted Lease Payments. Any such suit for money damages would be subject to limitations on legal remedies against municipalities in California, including a limitation on enforcement of judgments against funds of a fiscal year other than the fiscal year in which the Lease Payments were due and against funds needed to serve the public welfare and interest.

**Release or Substitution of Site**

The City has the right from time to time, with the consent of the Insurer, to add other real property and improvements (subject only to Permitted Encumbrances) or to substitute other real property and improvements (subject only to Permitted Encumbrances) for all or a portion of the Site or to release a portion of the real property and improvements constituting the Site, subject to the conditions precedent to such addition, substitution or release as set forth in the Lease Agreement. Pursuant to the Lease Agreement, the Golf Course

Portion of the Site is released from the Lease Agreement after November 1, 2008, and after this date the Lease Agreement no longer relates to the Golf Course Portion. The release of the Golf Course Portion of the Site has been pre-approved by the Insurer. See APPENDIX C — "SUMMARY OF PRINCIPAL LEGAL DOCUMENTS — COVENANTS WITH RESPECT TO THE PROPERTY — Substitution or Release of the Site" herein.

In connection with a substitution or release, whether as described above or otherwise, all interests of the Corporation, and the Trustee as its assignee, in the portion of the Site released shall terminate and the Corporation and the Trustee as its assignee shall execute and record with the County Recorder of the County all documents deemed necessary by the City to evidence such termination of interest. Upon satisfaction by the City of the conditions set forth in the Lease Agreement, the Trustee also will execute a Lease Supplement and will not impose on the City any further conditions or prerequisites to the requested addition, substitution or release. The City will cause the Lease Supplement, or another document substantially in the form of the Lease Supplement, to be recorded in the real property records of the County.

All costs and expenses incurred in connection with such addition, substitution or release will be borne by the City. No addition, substitution or release under the Lease Agreement will be, by itself, the basis for any reduction in or abatement of the Lease Payments due from the City thereunder. See APPENDIX C — "SUMMARY OF PRINCIPAL LEGAL DOCUMENTS — COVENANTS WITH RESPECT TO THE PROPERTY — Substitution or Release of the Site" herein.

**Not a Pledge of Taxes**

The obligation of the City to pay the Lease Payments and Additional Payments does not constitute an obligation of the City for which the City is obligated to levy or pledge any form of taxation or for which the City has levied or pledged any form of taxation. The obligation of the City to pay Lease Payments and Additional Payments does not constitute a debt or indebtedness of the Corporation, the City, the State of California or any of its political subdivisions within the meaning of any constitutional or statutory debt limitation or restriction.

Although the Lease Agreement does not create a pledge, lien or encumbrance upon the funds of the City, the City is obligated under the Lease Agreement to pay Lease Payments and Additional Payments from any source of legally available funds (subject to certain exceptions) and the City has covenanted in the Lease Agreement that, for as long as the Site is available for its use and possession, it will make the necessary annual appropriations within its budget for all Lease Payments and Additional Payments. The City is currently liable on other obligations payable from general revenues, including certificates of participation. See "CITY FINANCIAL INFORMATION — Indebtedness" herein.

Certain taxes, assessments, fees and charges presently imposed by the City could be subject to the voter approval requirements of Article XIIIC and Article XIIID of the State Constitution. Based upon the outcome of an election by the voters, such fees, charges, assessments and taxes might no longer be permitted to be imposed, or may be reduced or eliminated and new taxes, assessments fees and charges may not be approved. The City has assessed the potential impact on its financial condition of the provisions of Article XIIIC and Article XIIID of the State Constitution respecting the imposition and increase of taxes, fees, charges and assessments and does not believe that an election by the voters to reduce or eliminate the imposition of certain existing fees, charges, assessments and taxes would materially affect its financial condition. However, the City believes that in the event that the initiative power was exercised so that all local taxes, assessments, fees and charges which may be subject to the provisions of Article XIIIC and Article XIIID of the State Constitution are eliminated or substantially reduced, the financial condition of the City, including its General Fund, could be materially adversely affected. Although the City does not currently anticipate that the provisions of Article XIIIC and Article XIIID of the State Constitution would adversely affect its ability to pay the principal of and interest with respect to the Certificates as and when due and its other obligations payable from the General Fund, no assurance can be given regarding the ultimate interpretation or effect of

Exhibit 9
Page 109 of 165

Article XIIIC and Article XIIID of the State Constitution on the City's finances. See "CITY FINANCIAL INFORMATION — Major Revenues" herein.

**Additional Obligations of the City**

The City is permitted to enter into other obligations which constitute additional charges against its revenues without the consent of Owners of the Certificates. To the extent that additional obligations are incurred by the City, the funds available to pay Lease Payments may be decreased.

The Lease Payments and other payments due under the Lease Agreement (including payment of costs of repair and maintenance of the Site, taxes and other governmental charges levied against the Site) are payable from funds lawfully available to the City. In the event that the amounts which the City is obligated to pay in a fiscal year exceed the City's revenues for such year, the City may choose to make some payments rather than making other payments, including Lease Payments and Additional Payments, based on the perceived needs of the City. The same result could occur if, because of California Constitutional limits on expenditures, the City is not permitted to appropriate and spend all of its available revenues or is required to expend available revenues to preserve the public health, safety and welfare.

**Natural and Manmade Disasters**

The occurrence of natural disasters, including earthquakes, fires or floods, or manmade disasters such as arson or acts of terrorism, affecting the Site could result in substantial damage to the Site, and could lead to reduced assessed values for such property.

As required by the Alquist-Priolo Earthquake Fault Zoning Act, the State geologist in 1973 initiated a program to delineate the State's earthquake fault zones and to compile and distribute maps of these zones. Earthquake fault zones are delineated along known active faults. Cities and counties affected by the zones must regulate certain development projects with the zones. As of June 1, 1997, 539 official maps of earthquake fault zones have been issued. The City is not among the 97 California cities affected by the earthquake fault zones.

The most dominant source of potential ground motion at the Site is from the Rose Canyon fault. Earthquakes from this source are expected to have a potential for seismic ground shaking with a maximum credible magnitude of 7.0 and a maximum probable magnitude of 6.25. The "maximum credible earthquake" is defined as the maximum earthquake that appears capable of occurring under the presently known tectonic framework, while the "maximum probable earthquake" is the maximum earthquake that is considered likely to occur during a 100-year time interval.

**Limitations on Remedies; Bankruptcy**

The rights of the owners of the Certificates are subject to the limitations on legal remedies against municipalities in the State, including a limitation on enforcement of judgments against funds needed to serve the public welfare and interest. Additionally, enforceability of the rights and remedies of the owners of the Certificates, and enforcement of the City's obligations under the Lease Agreement, may become subject to the federal bankruptcy code and applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or affecting the enforcement of creditor's rights generally, now or hereafter in effect, equity principles which may limit the specific enforcement under State law of certain remedies, the exercise by the United States of America of the powers delegated to it by the Constitution, the reasonable and necessary exercise, in certain exceptional situations, of the police powers inherent in the sovereignty of the State and its governmental bodies in the interest of serving a significant and legitimate public purpose and the limitations on remedies against counties in the State. Bankruptcy proceedings under Chapter 9 of the Bankruptcy Code (Title 11, United States Code), which governs the bankruptcy proceedings for public agencies such as the City, or the exercise of powers by the federal or State government, if initiated, could subject the owners of the

Certificates to judicial discretion and interpretation of their rights in bankruptcy or otherwise, and consequently may entail risks of delay, limitation, or modification of their rights. See "RISK FACTORS — Default" herein.

## Economic Conditions in California

Since early 2001, the State has been faced with severe financial challenges, which may continue for several years. The State has experienced an economic recession in 2001 and is currently in a sluggish recovery. The major forces in the State's economic downturn were decline in the high technology, internet and telecommunications sectors, lower demand for exports and large stock market declines. These adverse fiscal and economic factors have resulted in a serious erosion of the State's General Fund tax revenues. The bulk of the revenue declines were from personal income taxes, principally from reduced capital gains realizations and stock option income.

This revenue drop resulted in a shortfall between State revenues and anticipated spending demands for the 2001-02 and 2002-03 fiscal years which at the time that the State's 2002 Budget Act (the "2002-03 Budget") was enacted was an estimated $23.6 billion. The shortfall estimated at the time of the 2002-03 Budget was ultimately closed with a combination of expenditure reductions, revenue enhancements, and one-time budgetary actions, such as fund transfers and loans, expenditure deferrals, bond issuances and other actions. Total revenue receipts reported by the State Controller's Office for the three major revenue sources (personal income tax, sales tax and corporation tax) for the first five months of fiscal year 2002-03 have been below the revenue projections included within the 2002-03 Budget. These reduced revenues have led to the proposed mid-year budget reductions discussed below.

In mid-November 2002, the Legislative Analyst issued a report (the "LAO Report") indicating the State is facing dire fiscal conditions. The LAO Report was prepared to provide the Legislature with a baseline from which budget decisions could be made. The LAO Report updated economic conditions, and revenue and expenditure projections based on more recent actual results since the time of the enactment of the 2002-03 Budget. The LAO Report projected that, absent corrective actions, the State General Fund would have a budget deficit of about $6.1 billion by the end of the 2002-03 fiscal year (compared to the 2002-03 Budget which predicted a reserve balance of $1 billion) and a cumulative budget deficit over $21 billion by the end of the 2003-04 fiscal year. Furthermore, even given accelerating economic growth in 2003 and beyond (which is not assured), unless corrective actions are taken, in the Legislative Analyst's view, there would continue to be a substantial deficit between revenues and expenditures, in a potential range from $12-16 billion annually, for several years after fiscal year 2003-04.

The principal causes of the continuing fiscal difficulty were identified in the LAO Report as (i) the use of so many one-time budget solutions to resolve the shortfall projected at the time of the 2002-03 Budget, without enough emphasis on closing the "structural deficit" between ongoing revenue sources (taxes) and ongoing expenditure commitments, (ii) the likelihood that some of the assumptions in the 2002-03 Budget would not be met, and (iii) a significant downward revision in revenue estimates for the period through June 30, 2004. The LAO Report estimated that items (i) and (ii) above would result in a cumulative $10 billion gap between revenues and expenditures (absent further actions) by the end of the 2003-04 fiscal year, consistent with projections the Legislative Analyst had made in the summer of 2002.

In the summer of 2002, the Governor notified all State agencies to prepare 2003-04 budget proposals for a minimum of 20 percent cut in funding. On November 21, 2002, the Governor announced his call for a special session of the Legislature, which began on December 9, 2002, to address needed budget actions, and he further directed State agencies to take immediate action to reduce any non-critical or non-essential activities by not filling any vacant positions, to cancel, postpone or amend contracts, grants, purchase orders and similar commitments, to eliminate additional non-essential vacant positions, to delay construction or signing of new leases for space, to cancel or postpone non-essential trips, and to generate new proposals for current year program reductions. The Governor stated that he would propose spending reductions, recaptures and other

Exhibit 9
Page 111 of 165

changes to accomplish savings over the period through June 30, 2004. The Governor also stated that he believed the budget shortfall would be higher than the $21 billion estimated by the LAO Report.

On December 6, 2002, the Governor released his mid-year spending reduction proposals for consideration at the special session of the Legislature with his proposed reductions and adjustments totaling $10.2 billion for fiscal years 2002-03 and 2003-04. On December 18, 2002, the Governor announced that the estimated budget shortfall through June 30, 2004 is $34.8 billion.

On January 10, 2003, the Governor released his proposed budget for fiscal year 2003-04 (the "Governor's Proposed 2003-04 Budget") in which he addressed deficits under the 2002 Budget Act and 2003-04 fiscal year budget shortfalls—a combined $34.6 billion gap between projected revenues and expenditures over the 2002-03 and 2003-04 fiscal years. To close the balance of the $34.6 billion budget gap, the Governor proposed additional measures that are expected to address the estimated $24.4 billion budget shortfall not addressed in the Governor's December 2002 mid-year spending reductions proposals.

The Governor's Proposed 2003-04 Budget proposes restoration of Executive Branch authority to make mid-year adjustments to the budget when revenues fall significantly below budgeted forecasts. The Governor's Proposed 2003-04 Budget contemplates the creation of a special budget reserve for proceeds from extraordinary revenue growth to be used for one-time expenditures.

The LAO, in a report issued on January 15, 2003, contends that the Governor's Proposed 2003-04 Budget overstates both baseline costs and budget program savings in numerous areas of the budget and understates tax revenues. The LAO notes that approximately $8 billion dollars in the difference between the LAO Report November, 2002 projection of a $21.1 billion deficit and the Governor's $34.6 billion deficit prediction is attributable to forecasting differences of revenues and program caseloads that drive expenditures. The balance of the discrepancy between the two agencies projections, according to the LAO, is attributable to definitional differences relating to the baseline used for analyzing expenditure reductions; according to the LAO, the Governor's baseline in some cases reflects additional spending that would be required to achieve the administration's policy goals as well as proposals that have not yet been adopted. The LAO does predict that based on more up-to-date information about revenues and caseload trends and other factors affecting spending, it will update its estimate of the budget shortfall to the $26-plus billion range.

The LAO issued another report on the Governor's Proposed 2003-04 Budget on February 19, 2003 in which it goes into further analysis of the Governor's Proposed 2003-04 Budget and the State's economy. The LAO estimated that the adoption of the Governor's Proposed 2003-04 Budget would result in a positive reserve of about $1.6 billion at the conclusion of 2003-04 and would address the long-term structural imbalance in the State's budget with revenues and expenditures roughly balancing in fiscal year 2004-05. The LAO notes that there are a number of key risk factors that could consume the projected $1.6 billion reserve including a failure to reach agreement on $1.5 billion of revenues from Indian gaming and a reduction in existing federal funding reimbursements. The LAO states that a restoration of California's fiscal health will occur only if the Legislature either (1) adopts the major savings and revenue proposals included in the Governor's Proposed 2003-04 Budget or (2) finds alternative solutions of similar magnitude that are real and largely ongoing in nature. Absent this, the modest positive fiscal balance that the LAO has projected would, in its view, be quickly transformed into a large deficit.

On March 18, 2003, the Governor signed into law legislation passed at the special session of the Legislature regarding mid-year budget costs for fiscal year 2002-03. The legislation approves approximately $3.3 billion of spending reductions and budget adjustments for fiscal year 2002-03 and provides $23 million in savings for fiscal year 2003-04. These reductions and budget adjustments did not have a material impact on the City's General Fund.

On May 14, 2003, the Governor released his May Revision to his proposed budget for fiscal year 2003-04 (the "May Revision to the Proposed 2003-04 Budget") in which he re-addressed deficits under the

2002 Budget Act and 2003-04 fiscal year budget shortfalls. The Governor revised his original estimate of an approximate $34.6 billion budget gap to a $38.2 billion budget gap between projected revenues and expenditures over the 2002-03 and 2003-04 fiscal years. To close the balance of the $38.2 billion budget gap, the Governor proposed new measures to address the additional projected deficit.

The following table compares the measures proposed in the Governor's Proposed 2003-04 Budget and the May Revision to the Proposed 2003-04 Budget which comprises the Governor's overall solution to close the $38.2 billion budget shortfall that he has predicted:

### ADDRESSING THE OVERALL $38.2 BILLION GAP
#### (Dollars in Millions)

|  | January Budget | May Revision | Percentage of Solution |
|---|---|---|---|
| Cuts/Savings | $ 20,728.3 | $ 18,875.4 | 49.4% |
| Realignments | 8,154.0 | 1,732.4 | 4.5% |
| Fund Shifts | 1,902.7 | 2,076.3 | 5.5% |
| Transfers | 2,114.3 | 1,912.6 | 5.0% |
| Loans/Borrowing | 1,683.3 | 2,901.5 | 7.6% |
| Deficit Financing | – | 10,700.0 | 28.0% |
| Total | $ 34,582.7 | $ 38,198.2 | 100.0% |

Note: Numbers may not add due to rounding.
Source: Governor's Budget May Revision 2003-04.

The May Revision to the Proposed 2003-04 Budget proposes that the State issue deficit financing bonds based on revenues from a temporary one-half cent sales tax increase to fund the accumulated budget deficit. The sales tax will take effect as of October 1, 2003 and automatically cease as soon as the bonds are paid off. The May Revision to the Proposed 2003-04 Budget reduces the realignment shift to counties from the Governor's original estimates of $8.3 billion to $1.8 billion. The May Revision to the Proposed 2003-04 Budget proposes to fund this reduction with the following tax proposals: (i) increasing personal income tax margins to 10.3% for high-income taxpayers (which according to the Governor is expected to generate approximately $1.56 billion in additional revenues during fiscal year 2003-04), and (ii) increasing the cigarette tax $0.23 per pack in fiscal year 2003-04 and increasing it further in fiscal year 2004-05 to $0.40 per pack (which according to the Governor is expected to generate approximately $267 million in additional revenues during fiscal year 2003-04 and $678 million in additional revenues in 2004-05).

Final action on budget adjustments for fiscal year 2002-03 and enactment of the 2003 Budget Act will occur following negotiations between the Legislature and the Governor over the coming months.

The May Revision to the Proposed 2003-04 Budget eliminates the vehicle license fee backfill to cities and counties in fiscal year 2003-04. As a result of the expected automatic trigger of an increase in the vehicle license fee, the State Controller and the Governor in the May Revision to the Proposed 2003-04 Budget state that Section 10754 of the Revenue and Taxation Code would require the Department of Motor Vehicles and the Department of Housing and Community Development, as appropriate, to reduce the vehicle license fee offsets and increase the vehicle license fees to replace the backfill amount. See APPENDIX A — "THE CITY OF SAN DIEGO — MUNICIPAL GOVERNMENT AND FINANCIAL INFORMATION — State Budget Deficit" and "Vehicle License Fee Reduction" for a discussion of the potential impacts of the Governor's Proposed 2003-04 Budget on City revenues and expenditures.

The City cannot predict whether the Legislature will adopt the Governor's Proposed 2003-04 Budget as revised by the May Revision to the Proposed 2003-04 Budget or what actions will be taken in the future by the State Legislature and the Governor to address the State's current or future budget deficits. In particular, the City cannot predict the level of VLF revenues it may expect in future fiscal years, including fiscal year

Exhibit 9
Page 113 of 165

2003-04. Future State budgets will be affected by national and state economic conditions and other factors over which the City will have no control. To the extent that the State budget process results in reduced revenues or increased expenses for the City, the City will be required to make adjustments to its budget.

## THE CORPORATION

The Corporation was organized pursuant to the Nonprofit Public Benefit Corporation Law of the State of California (Title 1, Division 2, Part 2 of the California Corporations Code), solely for the purpose of rendering assistance to the City by acquiring, constructing, improving, and financing various public facilities for the use, benefit, and enjoyment of the public. The Corporation was formed at the request of the City. Corporate Directors receive no compensation.

## TAX EXEMPTION

In the opinion of Stradling Yocca Carlson & Rauth, a Professional Corporation, Newport Beach, California, Special Counsel, under existing statutes, regulations, rulings and judicial decisions, interest due with respect to the Certificates is excluded from gross income for federal income tax purposes, and is not an item of tax preference for purposes of calculating the federal alternative minimum tax imposed on individuals and corporations. In the further opinion of Special Counsel, interest due with respect to the Certificates is exempt from State of California personal income tax. Special Counsel notes that, with respect to corporations, interest due with respect to the Certificates may be included as an adjustment in the calculation of alternative minimum taxable income which may affect the alternative minimum tax liability of such corporations.

A portion of the proceeds of the Prior Certificates were expended for the purpose of improving certain facilities located on Balboa Park (including the House of Charm) and used by certain nonprofit corporations, including The San Diego Art Institute, Mingei International, Inc., Old Globe Theatre, Inc., House of Hospitality Association, Inc. and San Diego Hall of Champions, Inc. (collectively, the "Nonprofit Corporations"). Bond Counsel has relied on the opinions of counsel to the respective Nonprofit Corporations that each of the Nonprofit Corporations is an organization described in Section 501(c)(3) of the Code and regarding the intended operation of the facilities to be financed by the Certificates as substantially related to the Nonprofit Corporation's charitable purposes under Section 513 of the Code, and other matters. Such opinions are subject to a number of qualifications and limitations. Neither Bond Counsel nor Nonprofit Corporations' counsels can give or has given any opinion or assurance about the future activities of the respective Nonprofit Corporations, or about the effect of future changes in the Code, the applicable regulations, the interpretation thereof or the resulting changes in enforcement thereof by the Internal Revenue Service ("IRS"). Failure of the Nonprofit Corporations to be organized and operated in accordance with IRS's requirements for the maintenance of their respective status as an organization described in Section 501(c)(3) of the Code may result in the portion of each Lease Payment constituting interest (and original issue discount) with respect to the Certificates being included in federal gross income, possibly from the date of the original issuance of the Certificates.

The difference between the issue price of a Certificate (the first price at which a substantial amount of the Certificates of the same series and maturity is to be sold to the public) and the stated redemption price at maturity with respect to such Certificate constitutes original issue discount. Original issue discount accrues under a constant yield method, and original issue discount will accrue to the owner of the Certificate before receipt of cash attributable to such excludable income. The amount of original issue discount deemed received by the owner of a Certificate will increase the owner's basis in the Certificate. In the opinion of Special Counsel original issue discount that accrues to the owner of a Certificate is excluded from the gross income of such owner for federal income tax purposes, is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations, and is exempt from State of California personal income tax.

22

Exhibit 9
Page 114 of 165

Special Counsel's opinion as to the exclusion from gross income of interest (and original issue discount) due with respect to the Certificates is based upon certain representations of fact and certifications made by the City, the Nonprofit Corporations and others and is subject to the condition that the City and the Corporation comply with all requirements of the Internal Revenue Code of 1986, as amended (the "Code"), that must be satisfied subsequent to the execution and delivery of the Certificates to assure that the portion of each Lease Payment constituting interest (and original issue discount) will not become includable in gross income for federal income tax purposes. Failure to comply with such requirements of the Code might cause interest (and original issue discount) due with respect to the Certificates to be included in gross income for federal income tax purposes retroactive to the date of execution and delivery of the Certificates. The City and the Corporation have covenanted to comply with all such requirements applicable to each, respectively.

The amount by which a Certificate Owner's original basis for determining loss on sale or exchange in the applicable Certificate (generally, the purchase price) exceeds the amount payable on maturity (or on an earlier call date) constitutes amortizable Certificate premium, which must be amortized under Section 171 of the Code; such amortizable Certificate premium reduces the Certificate Owner's basis in the applicable Certificate (and the amount of tax-exempt interest received), and is not deductible for federal income tax purposes. The basis reduction as a result of the amortization of Certificate premium may result in a Certificate Owner realizing a taxable gain when a Certificate is sold by the Owner for an amount equal to or less (under certain circumstances) than the original cost of the Certificate to the Owner. Purchasers of the Certificates should consult their own tax advisors as to the treatment, computation and collateral consequences of amortizable Certificate premium.

Special Counsel's opinions may be affected by actions taken (or not taken) or events occurring (or not occurring) after the date hereof. Special Counsel has not undertaken to determine, or to inform any person, whether any such actions or events are taken or do occur. The Trust Agreement, the Lease Agreement, and the Tax Certificate permit certain actions to be taken or to be omitted if a favorable opinion of Special Counsel is provided with respect thereto. Special Counsel expresses no opinion as to the exclusion from gross income for federal income tax purposes of interest (and original issue discount) due with respect to any Certificate if any such action is taken or omitted based upon the advice of counsel other than Stradling Yocca Carlson & Rauth, a Professional Corporation.

The Internal Revenue Service (the "IRS") has initiated an expanded program for the auditing of tax-exempt bond issues, including both random and targeted audits. It is possible that the Certificates will be selected for audit by the IRS. It is also possible that the market value of the Certificates might be affected as a result of such an audit of the Certificates (or by an audit of similar securities).

Although Special Counsel has rendered an opinion that the interest (and original issue discount) due with respect to the Certificates is excluded from gross income for federal income tax purposes provided that the City and the Corporation continue to comply with certain requirements of the Code, the ownership of the Certificates and the accrual or receipt of interest (and original issue discount) with respect to the Certificates may otherwise affect the tax liability of certain persons. Special Counsel expresses no opinion regarding any such tax consequences. Accordingly, before purchasing any of the Certificates, all potential purchasers should consult their tax advisors with respect to collateral tax consequences with respect to the Certificates.

The form of Special Counsel's opinion with respect to the Certificates is attached hereto as Appendix D.

## CERTAIN LEGAL MATTERS

Certain legal matters incident to the authorization, sale, execution and delivery of the Certificates are subject to the approval of Stradling Yocca Carlson & Rauth, a Professional Corporation, Newport Beach, California, Special Counsel. A complete copy of the proposed form of opinion of Special Counsel is contained

Exhibit 9
Page 115 of 165

in Appendix D hereto. Special Counsel has not undertaken any responsibility to the Owners for the accuracy, completeness or fairness of this Official Statement or other offering materials relating to the Certificates and expresses no opinion relating thereto. Certain legal matters will be passed upon for the City by the City Attorney and for the Corporation by Foley & Lardner, San Diego, California. Compensation of Special Counsel and the Financial Advisor is contingent upon the execution and delivery of the Certificates.

## LITIGATION

To the City's or the Corporation's knowledge, there is no litigation pending or threatened in any way to restrain or enjoin the execution or delivery of the Certificates, to contest the validity of the Certificates, the Indenture, the Site Lease, the Lease Agreement, or any proceeding of the City or the Corporation with respect thereto. To the knowledge of the Corporation and its counsel, there are no lawsuits or claims pending against the Corporation which will materially affect the Corporation's finances so as to impair its ability to pay the principal of, premium (if any) and interest with respect to the Certificates when due. To the knowledge of the City and the City Attorney, there are pending against the City lawsuits and claims arising in the ordinary course of the City's activities which taken individually or in the aggregate, could materially affect the City's finances. However, taking into account expected insurance and self-insurance reserves expected to be available to pay liability arising from such actions, the City does not expect any or all such claims to impair its ability to make Lease Payments when due. See APPENDIX A — "THE CITY OF SAN DIEGO – LITIGATION POTENTIALLY ADVERSELY AFFECTING THE GENERAL FUNDS OF THE CITY" for a discussion of pending Litigation against the City.

## RATINGS

It is expected that Fitch Ratings ("Fitch"), Moody's Investors Service ("Moody's") and Standard & Poor's Ratings Group ("S&P") have assigned ratings of "Aaa," "AAA" and "AAA," respectively, to the Certificates, with the understanding that, upon delivery of the Certificates, a policy insuring the payment when due of principal of and interest with respect to the Certificates will be issued by the Insurer. Fitch, Moody's and S&P have assigned underlying ratings to the Bonds without respect to the issuance of the Financial Guaranty Insurance Policy of "AA+," "Aa3" and "AA-," respectively. Such ratings reflect only the views of such organizations and any desired explanation of the significance of such ratings should be obtained from the rating agency furnishing the same, at the following addresses: Moody's Investors Service, Inc., 99 Church Street, New York, New York 10007; Standard & Poor's Corporation, 55 Water Street, New York, New York 10041; Fitch Ratings, One State Street Plaza, New York, New York 10004. Generally, a rating agency bases its rating on the information and materials furnished to it and on investigations, studies and assumptions of its own. There is no assurance such ratings will continue for any given period of time or that such ratings will not be revised downward or withdrawn entirely by the rating agencies, if in the judgment of such rating agencies, circumstances so warrant. Any such downward revision or withdrawal of such ratings may have an adverse effect on the market price of the Certificates.

## UNDERWRITING

The Certificates were sold to Citigroup Global Markets Inc. (the "Underwriter") on May 29, 2003 following competitive bid. The Certificates are being purchased by the Underwriter for $17,423,586.99 (representing the par amount of the Certificates, plus net original issue premium of $93,232.45, less an underwriter's discount of $94,645.46). The Underwriter intends to offer the Certificates to the public initially at the interest rates and prices set forth on the inside cover page of this Official Statement. Such prices may subsequently change without any requirement of prior notice. The Certificates may be offered and sold to certain dealers at prices lower than the public offering prices.

Exhibit 9
Page 116 of 165

## FINANCIAL ADVISOR

The City has retained Public Resources Advisory Group, New York, New York, as Financial Advisor for the sale of the Certificates. The Financial Advisor is not obligated to undertake, and has not undertaken to make, an independent verification or to assume any responsibility for the accuracy, completeness or fairness of the information contained in this Official Statement.

## CONTINUING DISCLOSURE

Pursuant to a Continuing Disclosure Agreement (the "Disclosure Agreement"), the City has agreed to provide, or cause to be provided, certain annual financial and operating data, including its audited financial statements and certain of the information of the type set forth under the heading APPENDIX A — "CITY OF SAN DIEGO", by no later than 285 days following the end of each fiscal Year commencing April 11, 2004, to each nationally recognized municipal securities information repository and any public or private repository or entity designated by the State as a state repository for purposes of Rule 15c2-12(b)(5) (the "Rule") adopted by the Securities and Exchange Commission (each, a "Repository").

In addition, the City has agreed to provide, or cause to be provided, to each Repository in a timely manner notice of the following "Listed Events" if determined by the City to be material: (1) principal and interest payment delinquencies; (2) non-payment related defaults; (3) unscheduled draws on the debt service reserves reflecting financial difficulties; (4) unscheduled draws on credit enhancements reflecting financial difficulties; (5) substitution of credit or liquidity providers, or their failure to perform; (6) adverse tax opinions or events affecting the tax-exempt status of the security; (7) modifications to rights of security holders; (8) bond calls; (9) defeasances; (10) release, substitution, or sale of property securing repayment of the securities; and (11) rating changes. These covenants have been made in order to assist the Underwriter in complying with the Rule. The City has never failed to comply in all material respects with any previous undertakings with regard to said Rule to provide annual reports or notices of material events. For a detailed description of the City's responsibilities under the Disclosure Agreement see APPENDIX F — "FORM OF CONTINUING DISCLOSURE AGREEMENT."

## FINANCIAL STATEMENTS OF THE CITY

Included herein as Appendix B are the audited financial statements of the City as of and for the year ended June 30, 2002, together with the report thereon dated November 27, 2002 of Calderon, Jaham & Osborn, An Accountancy Corporation, (the "Auditor"). Such audited financial statements have been included herein in reliance upon the report of the Auditor. The Auditor has not undertaken to update the audited financial statements of the City or its report or to take any action intended or likely to elicit information concerning the accuracy, completeness or fairness of the statements made in this Official Statement, and no opinion is expressed by the Auditor with respect to any event subsequent to its report dated November 27, 2002.

The Governmental Accounting Standards Board (GASB) published its Statement No. 34 "Basic Financial Statements - and Management's Discussion and Analysis - for State and Local Governments" on June 30, 1999. Statement No. 34 provides guidelines to auditors, comptrollers, and financial officers on requirements for financial reporting for all governmental agencies in the United States.

The requirements of Statement No. 34 are effective in three phases based on a government's total annual revenues in the first fiscal year ending after June 15, 1999. Governments with total annual revenues (excluding extraordinary items) of $100 million or more (phase 1) were required to apply Statement No. 34 for periods beginning after June 15, 2001. Governments with at least $10 million but less than $100 million in revenues (phase 2) are required to apply Statement No. 34 for periods beginning after June 15, 2002. Governments with less than $10 million in revenues (phase 3) are required to apply Statement No. 34 for

Exhibit 9
Page 117 of 165

periods beginning after June 15, 2003. Governments that elect early implementation of Statement No. 34 for periods beginning before June 15, 2000, should also implement GASB Statement No. 33, Accounting and Financial Reporting for Nonexchange Transactions, at the same time. If a primary government chooses early implementation of Statement No. 34, all of its component units also should implement this standard early to provide the financial information required for the government-wide financial statements.

Prospective reporting of general infrastructure assets is required at the effective dates of Statement No. 34. Retroactive reporting of all major general governmental infrastructure assets is encouraged at that date. For phase 1 and phase 2 governments, retroactive reporting is required four years after the effective date on the basic provisions for all major general infrastructure assets that were acquired or significantly reconstructed, or that received significant improvements, in fiscal years ending after June 30, 1980. Phase 3 governments are encouraged to report infrastructure retroactively, but may elect to report general infrastructure prospectively only.

The City has implemented the provisions of Statement No. 34 for the fiscal year ending June 30, 2002.

## VERIFICATION OF MATHEMATICAL COMPUTATIONS

Upon delivery of the Certificates, McGladrey & Pullen, LLP, Minneapolis, Minnesota, will deliver a report verifying the mathematical accuracy of certain computations concerning (i) the adequacy of the maturing principal amounts of and interest on the Escrowed Federal Securities to redeem the outstanding Prior Certificates in full on November 1, 2003, as described herein, and (ii) the yield on the Certificates and on such Escrowed Federal Securities considered by Special Counsel in its determination that the portion of Lease Payments designated as and comprising interest and received by owners of the Certificates is excluded from gross income for federal income tax purposes.

## MISCELLANEOUS

Included herein are brief summaries of certain documents and reports, which summaries do not purport to be complete or definitive, and reference is made to such documents and reports for full and complete statements of the contents thereof. Any statements in this Official Statement involving matters of opinion, whether or not expressly so stated, are intended as such and not as representations of fact. This Official Statement is not to be construed as a contract or agreement between the City and the purchasers or Owners of any of the Certificates.

The execution and delivery of this Official Statement has been duly authorized by the City.

CITY OF SAN DIEGO

By:  /s/ Patricia T. Frazier
     Deputy City Manager

periods beginning after June 15, 2003. Governments that elect early implementation of Statement No. 34 for periods beginning before June 15, 2000, should also implement GASB Statement No. 33, Accounting and Financial Reporting for Nonexchange Transactions, at the same time. If a primary government chooses early implementation of Statement No. 34, all of its component units also should implement this standard early to provide the financial information required for the government-wide financial statements.

Prospective reporting of general infrastructure assets is required at the effective dates of Statement No. 34. Retroactive reporting of all major general governmental infrastructure assets is encouraged at that date. For phase 1 and phase 2 governments, retroactive reporting is required four years after the effective date on the basic provisions for all major general infrastructure assets that were acquired or significantly reconstructed, or that received significant improvements, in fiscal years ending after June 30, 1980. Phase 3 governments are encouraged to report infrastructure retroactively, but may elect to report general infrastructure prospectively only.

The City has implemented the provisions of Statement No. 34 for the fiscal year ending June 30, 2002.

## VERIFICATION OF MATHEMATICAL COMPUTATIONS

Upon delivery of the Certificates, McGladrey & Pullen, LLP, Minneapolis, Minnesota, will deliver a report verifying the mathematical accuracy of certain computations concerning (i) the adequacy of the maturing principal amounts of and interest on the Escrowed Federal Securities to redeem the outstanding Prior Certificates in full on November 1, 2003, as described herein, and (ii) the yield on the Certificates and on such Escrowed Federal Securities considered by Special Counsel in its determination that the portion of Lease Payments designated as and comprising interest and received by owners of the Certificates is excluded from gross income for federal income tax purposes.

## MISCELLANEOUS

Included herein are brief summaries of certain documents and reports, which summaries do not purport to be complete or definitive, and reference is made to such documents and reports for full and complete statements of the contents thereof. Any statements in this Official Statement involving matters of opinion, whether or not expressly so stated, are intended as such and not as representations of fact. This Official Statement is not to be construed as a contract or agreement between the City and the purchasers or Owners of any of the Certificates.

The execution and delivery of this Official Statement has been duly authorized by the City.

CITY OF SAN DIEGO

By: /s/ Patricia T. Frazier
      Deputy City Manager

Exhibit 9
Page 119 of 165

## APPENDIX A
## THE CITY OF SAN DIEGO

*The information and expressions of opinion set forth herein have been obtained from sources believed to be reliable, but such information is not guaranteed as to accuracy or completeness. Statements contained herein which involve estimates, forecasts, or matters of opinion, whether or not expressly so described herein, are intended solely as such and are not to be construed as representations of facts. The information and expressions of opinion herein are subject to change without notice, and neither delivery of this Official Statement nor any sale thereafter of the securities offered hereby shall under any circumstances create any implication that there has been no change in the affairs of the City or in any other information contained herein since the date of the Official Statement.*

## INTRODUCTION

With a total population of approximately 1.3 million in 2002, and a land area of 330 square miles, the City of San Diego (the "City") is the seventh largest city in the nation and the second largest city in California. The City is the county seat for the County of San Diego (the "County") and is the County's business and financial center.

Based on estimates published by the California Department of Finance in May 2002, the City's population grew by 9.7% between 1993 and 2002, with an average increase of approximately 12,300 annually. A major factor in the City's growth is its quality of life. In addition to having a favorable climate, the City offers a wide range of cultural and recreational services to both residents and visitors. With mild temperatures year round, the City's numerous beaches, parks, tennis courts, and golf courses are in constant use.

Another factor in the City's growth is its diversified economy. Recent growth has been concentrated in four major areas: high tech manufacturing and research (including electronics, telecommunications, scientific instruments, drugs, and biomedical equipment); professional services; tourism; and international trade. Historically, the City has also benefited from a stable economic foundation composed of basic manufacturing (ship building, industrial machinery, television & video equipment, and printing & publishing), public and private higher education, health services, military, and local government.

Exhibit 9
Page 120 of 165

## ECONOMIC AND DEMOGRAPHIC INFORMATION

*Data contained under this caption is intended to portray economic, demographic, and business trends within the City. While not constituting direct revenue sources as such, these trends help explain changes in revenue sources such as property taxes, sales taxes, and transient occupancy taxes, which could be affected by changes in economic conditions.*

### Population

As set forth in Table 1 below, between January 1, 1993, and January 1, 2002, the City's population has increased by 111,000 (or by approximately 12,300 new residents annually during this period).

### Table 1
### POPULATION GROWTH[1]
### *Calendar Years 1993 through 2002*

| Calendar Year[2] | City of San Diego | Annual Growth Rate | County of San Diego | Annual Growth Rate | State of California | Annual Growth Rate |
|---|---|---|---|---|---|---|
| 1993 | 1,144,700 | 0.9% | 2,594,100 | 0.8% | 31,150,000 | 1.4% |
| 1994 | 1,144,200 | 0.0% | 2,604,400 | 0.4% | 31,418,000 | 0.9% |
| 1995 | 1,145,400 | 0.1% | 2,613,100 | 0.3% | 31,617,000 | 0.6% |
| 1996 | 1,146,900 | 0.1% | 2,621,100 | 0.3% | 31,837,000 | 0.7% |
| 1997 | 1,159,100 | 1.1% | 2,653,400 | 1.2% | 32,207,000 | 1.2% |
| 1998 | 1,176,900 | 1.5% | 2,702,800 | 1.9% | 32,657,000 | 1.4% |
| 1999 | 1,200,800 | 2.0% | 2,751,000 | 1.8% | 33,140,000 | 1.5% |
| 2000 | 1,221,200 | 1.7% | 2,805,900 | 2.0% | 33,753,000 | 1.8% |
| 2001 | 1,240,200 | 1.6% | 2,859,900 | 1.9% | 34,385,000 | 1.9% |
| 2002 | 1,255,700 | 1.2% | 2,918,300 | 2.0% | 35,037,000 | 1.9% |

(1) In May 2002, the California Department of Finance published revised population estimates for the years 1991 through 1999 in order to account for the 1990 Census undercount. These revised estimates increased the population estimates for the City, the County, and the State of California in the year 1991 and reduced the annual rates of growth in subsequent years.

(2) As of January 1 of the calendar year.

Source: State of California, Department of Finance

As indicated in the following table, attendance in kindergarten through grade 12 in the San Diego Unified School District shows a moderate overall growth in the five-year period from 1998-1999 to 2002-2003 school years. However, there has been a slight decline in enrollment in the last two school years. The San Diego Unified School District's boundaries include 85% of the City of San Diego's land area.

Exhibit 9
Page 121 of 165

**Table 2**
## SAN DIEGO UNIFIED SCHOOL DISTRICT
### ENROLLMENT[1]
*School Year 1998-1999 through 2002-2003*

| School Year | Enrollment |
|---|---|
| 1998-1999 | 138,974 |
| 1999-2000 | 142,021 |
| 2000-2001 | 143,244 |
| 2001-2002 | 142,430 |
| 2002-2003 | 140,717 |

(1)  Enrollment is defined as the total number of students enrolled on a survey date in late September/early October of the school year.

Source: San Diego Unified School District, Pupil Accounting

## Employment Summary

As seen in Table 3, the City's unemployment rate for calendar year 2002 averaged 4.4%, up from a rate of 3.3% during calendar year 2001. The City's 2002 unemployment rate was below both the national rate of 5.8% and the State's rate of 6.7%. During 2002, average employment in the City was up by approximately 10,710 from 2001 levels. Preliminary data for April 2003, the latest available data, indicates that the City's unemployment rate was 4.3%. Data for 2001 and 2002 reflect estimates, which will be revised at a future date.

**Table 3**
## ESTIMATED AVERAGE ANNUAL EMPLOYMENT AND
## UNEMPLOYMENT OF CITY OF SAN DIEGO RESIDENT LABOR FORCE
### Calendar Years 1998 through 2002

|  | 1998 | 1999 | 2000 | 2001[1] | 2002[1] |
|---|---|---|---|---|---|
| **Civilian Labor Force** |  |  |  |  |  |
| City of San Diego |  |  |  |  |  |
| Employed | 584,100 | 604,700 | 623,200 | 633,620 | 644,330 |
| Unemployed | 21,700 | 19,600 | 19,600 | 21,620 | 29,410 |
| **Unemployment Rates** |  |  |  |  |  |
| City | 3.6% | 3.1% | 3.1% | 3.3% | 4.4% |
| County | 3.5% | 3.1% | 3.0% | 3.2% | 4.3% |
| California | 5.9% | 5.2% | 4.9% | 5.3% | 6.7% |
| United States | 4.5% | 4.2% | 4.0% | 4.8% | 5.8% |

(1)  Subject to future revision.

Source:  State of California Employment Development Department, Labor Market Information Division; and the U.S. Department of Labor, Bureau of Labor Statistics

Exhibit 9
Page 122 of 165

Table 4 provides the California Employment Development Department's estimates of total annual nonagricultural wage and salary employment by major industry in the County from calendar years 1998 through 2002. Annual employment information is not regularly compiled by sector for the City alone. As shown, total nonagricultural wage and salary employment in the County increased by 139,200 new jobs during this period. During calendar year 2002, employment in San Diego County increased by 23,100 new jobs over the prior year.

**Table 4**
**SAN DIEGO COUNTY**
**WAGE AND SALARY EMPLOYMENT**
*Calendar Years 1998 through 2002*

| INDUSTRY CATEGORY | 1998 | 1999 | 2000 | 2001[1] | 2002[1] |
|---|---|---|---|---|---|
| Mining | 300 | 300 | 400 | 300 | 300 |
| Construction | 61,800 | 67,000 | 70,400 | 73,400 | 75,500 |
| Manufacturing | 127,600 | 128,100 | 129,700 | 130,600 | 128,300 |
| Nondurable Goods | 35,800 | 36,500 | 37,800 | 37,500 | 37,600 |
| Durable Goods | 91,800 | 91,600 | 91,900 | 93,100 | 90,700 |
| Transportation, Communications, Utilities[2] | 47,000 | 51,300 | 50,900 | 52,000 | 50,500 |
| Trade | 249,400 | 256,500 | 267,800 | 271,100 | 278,000 |
| Wholesale | 48,300 | 50,300 | 52,300 | 50,300 | 50,200 |
| Retail | 201,100 | 206,100 | 215,500 | 220,800 | 227,800 |
| Finance, Insurance, Real Estate | 65,300 | 68,700 | 69,800 | 70,800 | 72,300 |
| Services | 359,600 | 381,700 | 400,600 | 409,500 | 420,500 |
| Government | 194,500 | 199,300 | 206,800 | 213,900 | 219,400 |
| Federal | 43,300 | 42,500 | 42,600 | 40,100 | 40,000 |
| State and Local | 151,200 | 156,800 | 164,200 | 173,800 | 179,400 |
| TOTAL NONAGRICULTURAL[3] | 1,105,500 | 1,152,900 | 1,196,500 | 1,221,600 | 1,244,700 |

(1) Subject to future revision.
(2) Includes trucking and transit services, telephone and broadcast/cable services, and gas and electric services.
(3) Figures may not add to total due to independent rounding.

Source: State of California Employment Development Department

Since the industry employment data referenced above is organized by standard industrial classification codes, employment in the various high tech categories, such as Telecommunications, Software and Biotechnology may not fall into a single employment sector alone. For example, some telecommunications firms appear in Manufacturing, while others appear in Services.

Several key industry categories exhibited strong employment growth in calendar year 2002. The Services sector (+11,000) alone represented approximately half of total employment growth for the County. Within the Services sector, Health Services recorded the largest net gain, up by 2,500 jobs, followed by an increase of 1,400 jobs in Engineering and Management and an increase of 1,200 jobs in Business Services. Other key employment growth sectors during calendar year 2002 included Construction (+2,100), Wholesale and Retail Trade (+6,900), and Government (+5,500). Among the

sectors that showed a decline in jobs in the calendar year 2002 were the Manufacturing sector (-2,300) and the Transportation, Communications, and Utilities Sector (-1,500).

The increase in the Government sector, which accounted for 18% of the total nonagricultural wage and salary employment in the County in 2002, occurred in State and local government agencies. Almost all of the increase in State and local government agencies is due to gains in public education and the Other Local Government category, which includes Special Districts and Indian Tribal Governments.

**Taxable Sales**

Taxable transactions at retail and other outlets in the City at the end of the First Quarter of 2002, the most recent data available from the California State Board of Equalization, totaled $3.9 billion, up 0.23% from the end of the First Quarter of 2001. Taxable transactions in the City during calendar year 2001 totaled approximately $16.4 billion, up 1.7% from 2000, and up 32.1% from 1997. The slight increase in taxable sales from calendar years 2000 to 2001 can be attributed to the general slow down of the economy. Table 5 provides annual sales information by type of outlet for calendar years 1997 through 2001.

**Table 5**
**CITY OF SAN DIEGO**
**TAXABLE TRANSACTIONS**
*Calendar Years 1997 through 2001*
*(in thousands)*

|  | 1997 | 1998 | 1999 | 2000 | 2001[1] |
|---|---|---|---|---|---|
| RETAIL STORES |  |  |  |  |  |
| Apparel | $485,551 | $530,734 | $542,041 | $588,012 | $613,179 |
| General Merchandise | 1,354,698 | 1,436,535 | 1,597,102 | 1,794,468 | 1,861,711 |
| Food | 554,625 | 582,183 | 622,909 | 662,346 | 673,384 |
| Eating and Drinking | 1,380,894 | 1,496,032 | 1,603,968 | 1,772,507 | 1,851,358 |
| Home Furnishings and Appliances | 444,930 | 469,158 | 546,746 | 619,383 | 684,858 |
| Building Materials and Farm Implements | 603,365 | 716,231 | 809,022 | 944,386 | 1,093,716 |
| Auto Dealers & Supplies | 1,189,462 | 1,331,411 | 1,519,137 | 1,745,186 | 1,868,692 |
| Service Stations | 673,078 | 614,156 | 742,143 | 977,675 | 966,913 |
| Other | 1,686,807 | 1,790,441 | 1,948,871 | 2,173,098 | 2,114,389 |
| Total Retail Stores | $8,373,410 | $8,966,881 | $9,931,939 | $11,277,061 | $11,731,149 |
| All Other Outlets | 4,024,433 | 4,343,598 | 4,563,715 | 4,822,132 | 4,640,363 |
| TOTAL ALL OUTLETS | $12,397,843 | $13,310,479 | $14,495,654 | $16,099,193 | $16,371,512 |

[1] Data for calendar year 2001 were calculated by adding quarterly reports published by the California State Board of Equalization, and may be subject to future revision.

Source: California State Board of Equalization

Exhibit 9
Page 124 of 165

## Tourism

Based on year-end data for 2002 from Smith Travel Research, San Diego outperformed most major markets, ranking third highest among the top 25 hotel markets in terms of average occupancy rate during 2002 and sixth highest in terms of average daily room rate. For January 2003, due to activity related to the San Diego's hosting of Super Bowl XXXVII, the region far outperformed the other top 25 markets, with room revenues up 33.2% from January 2002.

According to the San Diego Chamber of Commerce, the visitor industry is the County's third largest industry in terms of income generation, behind manufacturing and the military. As shown in Table 6, visitor spending in the County totaled $5.04 billion in 2002, up 7.2% from 1998 but down 1.6% from 2001. According to the San Diego Convention and Visitors Bureau, a decline in business spending, weakening consumer confidence, and the threat and the subsequent outbreak of war in Iraq have had an impact on the tourism industry nationwide. The San Diego Convention and Visitor's Bureau also reported that there were 7.5 million passenger arrivals at Lindberg Field in 2002, down by approximately 1.5% from 2001.

### Table 6
### SAN DIEGO COUNTY
### TOTAL VISITOR SPENDING[1]
### *Calendar Years 1998 through 2002*
### *(in billions)*

| Calendar Year | Amount |
|---|---|
| 1998 | $4.70 |
| 1999 | $4.88 |
| 2000 | $5.23 |
| 2001 | $5.12 |
| 2002 | $5.04 |

[1] Visitor spending is an estimate of total direct and indirect visitor expenditures as derived from the Visitor Activity Model/Visitor Profile Study prepared by CIC Research, Inc. for the San Diego Convention and Visitors Bureau.

Source: San Diego Convention and Visitors Bureau

As shown in Table 7, the City's Transient Occupancy Tax ("TOT") revenues have grown approximately 17% between Fiscal Year 1998 and Fiscal Year 2002, an average annual increase of 4.1%. In the Fiscal Year 2002 TOT revenues decreased by 9.8% from the prior year due in part to the effects of a weak economy and the events of September 11, 2001. The latest available data shows that fiscal year-to-date TOT receipts as of February 2003 totaled approximately $70 million, showing an increase of 10% from the same period in 2002.

Exhibit 9
Page 125 of 165

**Table 7**
**CITY OF SAN DIEGO**
**TRANSIENT OCCUPANCY TAX**[1]
*Fiscal Years 1998 through 2002*
*(in thousands)*

| Fiscal Year | Amount |
| --- | --- |
| 1998 | $ 85,088 |
| 1999 | $ 92,128 |
| 2000 | $ 96,821 |
| 2001 | $ 109,879 |
| 2002 | $ 99,161 |

(1) Includes both the General Fund portion of TOT (5.5¢ of 10.5¢) and the balance (5¢ of 10.5¢) allocated to Special Promotional Programs.

Source: City of San Diego Comprehensive Annual Financial Report

The City is the focal point for tourism in the County. The Convention Center, approximately 70% of the County's hotel and motel rooms, and most of the County's major tourist attractions, including the world-renowned San Diego Zoo, the San Diego Wild Animal Park, and Sea World, are located in the City. Other attractions located in the City include the Cabrillo National Monument on Point Loma, the historic Gaslamp Quarter in the downtown area, the Old Town State Park, and Balboa Park – home to the San Diego Zoo and a host of other cultural and recreational activities.

In addition to the many permanent attractions available to visitors, the City has also been host to a number of major events. The City annually hosts the Buick Invitational, a Professional Golfers' Association Tour Event played at the Torrey Pines Golf Course, a world-renowned golf course, owned and operated by the City of San Diego. In addition, since 1978, the City has annually hosted the Holiday Bowl, a post season contest of elite college football teams.

The City also hosted the America's Cup in 1992 and 1995, the Super Bowl and World Series in 1998, and more recently the Super Bowl in 2003. In addition, the City was the site for the Republican National Convention held in August 1996. The Torrey Pines' South Course is scheduled to play host to the United States Open Golf Tournament in 2008.

In September 2001, the San Diego Convention Center expansion was completed, doubling the size of the existing facility to 2.6 million total gross square feet. According to the San Diego Convention Center Corporation, in Fiscal Year 2002 the Convention Center generated approximately $363 million in direct delegate spending and an estimated $880 million in total regional economic impact (direct and indirect spending).

Exhibit 9
Page 126 of 165

**Military**

Military and related defense spending is the second most important component of the San Diego economy, with only manufacturing making a larger contribution to San Diego County's Gross Regional Product. Prior to 1990, San Diego's civilian defense contractors were primarily concentrated in aerospace manufacturing. During the 1990's, the focus of local defense contracting shifted from aerospace manufacturing to research and development, with shipbuilding and repair remaining an important component. This transformation received additional impetus with the relocation of the Space and Naval Warfare Systems Command (SPAWAR) to San Diego from Virginia, in 1997. SPAWAR is responsible for administering contracts to meet the Navy's continuing need for state-of-the-art command and communications systems.

According to the San Diego Chamber of Commerce, defense related expenditures (active duty payroll and retirement benefits, base expenditures, and defense contracts) in the County during the federal Fiscal Year ended September 30, 2001, totaled approximately $10.0 billion, up from $9.8 billion in 2000. With a total active duty military and civilian payroll of $3.8 billion in the federal Fiscal Year 2001, San Diego continued to lead all counties in the nation in terms of combined military and civilian payrolls. In addition to active duty and civilian payroll, retirement benefits totaled $1.1 billion. Total defense contracts awarded to County-based businesses totaled $3.8 billion during the federal Fiscal Year 2001, of which $2.8 billion were awarded to procurement contracts and another $0.9 billion to various classified contracts and subcontracts of less than $25,000 each. According to the San Diego Chamber of Commerce estimate of June 1, 2001, active duty military personnel in the County totaled 103,982 and the civilian employment totaled 20,500.

**International Trade**

The value of exports presented in the table below is from RAND California, *Merchandise Exports from U.S. Customs District* series. In prior years, exports were reported based on Metropolitan Areas as reported by the International Trade Administration. The Customs District classification has been adopted because of the availability of more current data. Export values reflect exports of merchandise grown, produced, or manufactured in the U.S as well as re-exports of foreign merchandise. The total value of exports from San Diego Customs District grew approximately 31% in the five-year period from 1998 to 2002. While there was a slight decline in annual exports from 2000 to 2001, the latest data indicates a turnaround. At the end of calendar year 2002, the value of exports totaled approximately $12.9 billion, up 4.3% from calendar year 2001.

Exhibit 9
Page 127 of 165

**Table 8**
**VALUATION OF EXPORTS**
**ORIGINATING IN SAN DIEGO**
*Calendar Years 1998 through 2002*
*(in billions)*

| Calendar Year | Total Exports |
|---------------|---------------|
| 1998 | $ 9.8 |
| 1999 | $10.8 |
| 2000 | $12.7 |
| 2001 | $12.3 |
| 2002 | $12.9 |

Source: RAND California, Business and Economic Statistics

**Major Employers**

The City is host to a diverse mix of major employers representing industries ranging from education and health services, to diversified manufacturing, financial services, retail trade and amusement and recreation. Table 9 lists the City's major employers. The list is compiled from information gathered by the City of San Diego. All of the businesses listed in the table have their main offices in the City, with many having branch offices and/or production facilities in other areas of the County. Accordingly, not all employees of these businesses work within the City.

**Table 9**
**CITY OF SAN DIEGO**
**MAJOR EMPLOYERS[1]**
*As of April 2002*

| Employer | Product/Service |
|---|---|
| **10,000 or More Employees:** | |
| San Diego Unified School District | Education |
| Sharp Health Care | Health Care |
| University of California, San Diego | Higher Education |
| **5,000 – 9,999 Employees:** | |
| Kaiser Permanente | Health Care |
| Qualcomm | Wireless Communications |
| San Diego Community College District | Higher Education |
| Scripps Health | Health Care |
| Sempra Energy | Utility |
| **3,000 – 4,999 Employees:** | |
| ADDECO Employment/Services | Employment Services |
| Children's Hospital and Health Care | Health Care |
| Cubic Corporation | Electronic Systems |
| Palomar Pomerado Health System | Health Care |
| Samsung | Electronics |
| San Diego State University | Higher Education |
| SBC/Pacific Bell | Utility |
| Science Applications International Corporation | Research and Development |
| Seaworld of California | Entertainment |
| Solar Turbines | Gas Turbine Manufacturing |
| Sony Technology Center | Electronics |
| UCSD Health Care | Health Care |
| United Parcel Service | Delivery Service |
| University of San Diego | Higher Education |
| **2,000 – 2,999 Employees:** | |
| Jack in the Box Inc. | Restaurants |
| Hewlett Packard Company | Electronic Instruments |
| Manpower Temporary Services | Employment Services |
| National Steel & Shipbuilding Company | Shipbuilding, Repair |
| Nordstrom | Department Store |
| Scripps Research Institute | Biomedical Research |
| YMCA of San Diego County | Family Recreation |
| Zoological Society of San Diego | Entertainment |

(1) Does not include various major public employers, including the City, the County, and the federal government with a combined total county employment of 116,100 as of April 2002.

Source: City of San Diego

Exhibit 9
Page 129 of 165

**Effective Buying Income**

Table 10 shows the per capita Effective Buying Income (EBI) for the City, the County, the State, and the United States for calendar years 1997 through 2001.

**Table 10**
**PER CAPITA EFFECTIVE BUYING INCOME[1]**
*Calendar Years 1997 through 2001*

| Calendar Year | City of San Diego | County of San Diego | State of California | United States |
|---|---|---|---|---|
| 1997 | $15,804 | $15,618 | $15,797 | $16,281 |
| 1998 | $16,291 | $16,101 | $16,299 | $16,895 |
| 1999 | $17,443 | $17,270 | $17,245 | $17,691 |
| 2000 | $19,238 | $19,498 | $19,081 | $18,426 |
| 2001 | $19,723 | $19,092 | $18,652 | $18,491 |

_____
(1) Effective Buying Income is defined as the aggregate of wages, salaries, interest earnings, and all forms of public assistance income (such as Social Security and unemployment compensation) less personal tax payments, contributions to Social Security, and the value of income "in kind" from food stamps, public housing subsidies, medical care etc. Effective Buying Income is a proxy for "disposable" or "after-tax" income.

Source: Sales & Marketing Management Magazine "Survey of Buying Power"

**Building Permits**

Table 11 provides a summary of the building permit valuations, and the number of new dwelling units authorized in the City, for Fiscal Years 1998 through 2002. The valuation of non-residential permits includes both private, commercial construction and publicly funded, non-tax generating projects.

**Table 11**
**CITY OF SAN DIEGO**
**BUILDING PERMIT VALUATIONS**
**AND NUMBER OF DWELLING UNITS**
*Fiscal Years Ended June 30, 1998 through 2002*

| | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| **Valuation (in thousands)** | | | | | |
| Residential | $890,476 | $857,747 | $1,185,999 | $1,181,385 | $1,244,917 |
| Nonresidential | 576,170 | 783,106 | 960,479 | 693,687 | 854,831 |
| Total | $1,466,646 | $1,640,853 | $2,146,478 | $1,875,072 | $2,099,748 |
| **Number of New Dwelling Units:** | | | | | |
| Single Family | 3,032 | 2,612 | 2,084 | 2,075 | 2,347 |
| Multiple Family | 3,018 | 2,856 | 5,662 | 3,829 | 4,000 |
| Total | 6,050 | 5,468 | 7,746 | 5,904 | 6,347 |

_____
Source: City of San Diego, Planning and Development Review Department

Exhibit 9
Page 130 of 165

**Business Development Program**

The City actively supports economic development and job creation activities. A key element of these activities is the Business Expansion and Retention Program (BEAR Program), a proactive effort on the part of the City to work directly with businesses to retain local firms and help them expand their investment and job growth. This program was created in 1995 by integrating the City's existing business development activities to provide centralized coordination and data management, and to expand operational relationships with partnership agencies such as the San Diego Regional Economic Development Corporation, Sempra Energy, the San Diego Science and Technology Commission, and the San Diego Workforce Partnership. BEAR Program components include business incentives, targeted assistance, and sales and use tax rebates through the Business Cooperation Program, Business Outreach Program, and Business Finance Program.

A further element of the City's overall business development effort has focused on streamlining the permitting process and, when feasible, eliminating or reducing fees and permits. A major component of this streamlining effort has been to reduce development permit processing time by one-half.

The City also operates the Office of Small Business, which provides a broad range of assistance programs for the many small businesses in the City. In 1995, the City Council reduced the annual Business License Tax for all businesses with 12 or fewer employees to a flat fee of $34 per business with no per employee charge. The City charges an annual fee of $125 plus $5 per employee for businesses with 13 or more employees.

**Transportation**

San Diego has a well-developed highway system. Access in and out of the region is provided by five major freeways running north and south and three freeways running east and west.

Public transportation through the City and surrounding communities is provided by the San Diego Metropolitan Transit Development Board ("MTDB"). The San Diego Trolley, Inc. operates a fleet of electric trolleys that provides transportation for commuters and tourists from downtown San Diego to San Ysidro (adjacent to Tijuana), and from downtown San Diego to the southern part of the County and East County. The East Line extension to Santee was completed in 1996. This 3.6-mile extension connects the cities of El Cajon and Santee. The trolley also provides service from downtown San Diego to the waterfront area, including the Convention Center. An extension providing additional service from downtown to the historical Old Town section of the City was completed in 1996. In addition, the Mission Valley extension, which connects Old Town with Qualcomm Stadium and the Mission Valley shopping area, ending at the Mission San Diego, opened in 1997.

Construction is in progress on the 6-mile Mission Valley East Trolley Extension. The project, scheduled for completion in 2004, will extend east from Qualcomm Stadium connecting Mission Valley with San Diego State University, La Mesa, and East County. The extension will include four new trolley stops, including a subterranean station at San Diego State University. The project is estimated to cost approximately $435 million, including $330 million in appropriations from the federal government.

A 43-mile Coaster Commuter rail line from Oceanside to downtown San Diego came into service in 1995. This line links the communities along the coast from Oceanside to Del Mar with downtown San Diego and is operated by North County Transit District.

Exhibit 9
Page 131 of 165

Recently, MTDB granted the rights to operate an east-west rail line to the Carrizo Gorge Railway. It is anticipated that the line, which will connect San Diego and northern Baja California with the rest of Mexico and the United States, will open and begin shipping freight in calendar year 2003. This additional rail line will complement already existing rail service coming into San Diego County from the north and reduce shipping rates and times for companies moving products between San Diego, Mexico, and the Southwest.

In November 1987, voters approved Proposition A which, authorized a one-half cent increase to the local sales tax to fund transportation improvements for the San Diego region. The City's budget for Fiscal Year 2003 included $25.8 million in Proposition A funds. The one-half cent increase to the local sales tax, authorized by Proposition A, is scheduled to expire in 2008.

In June 1990, voters approved State Propositions 108, 111, and 116 which, increased the State gas tax and authorized the sale of rail bonds. The revenues generated from these measures are to be used to implement a comprehensive Statewide transportation funding program. The City's budget for Fiscal Year 2003 included $22.9 million in Proposition 111 funds. Revenues from this source supplement the City's street maintenance and resurfacing program and other street related services, including traffic light and signal maintenance, median maintenance and traffic engineering to ensure efficient traffic flow.

## MUNICIPAL GOVERNMENT AND FINANCIAL INFORMATION

### Governmental Organization

The City is a charter city and operates under the Council-Manager form of government. The City Council is comprised of eight members elected by district to serve overlapping four-year terms. The Mayor, who presides over the City Council, is elected at large to serve a four-year term. The City Council, which acts as the City's legislative and policy-making body, selects the City Manager, who is the City's chief administrator and is responsible for implementing the policies and programs adopted by the City Council.

### Accounting Practices

The City's accounting policies conform to generally accepted accounting principles applicable to governmental entities. The City's Governmental Funds use the modified accrual basis of accounting. Under the modified accrual basis of accounting, revenues are recorded when both available and measurable. Certain fines and forfeitures, however, are recorded when received, as they are not susceptible to accrual. Expenditures are recognized when the related liability is incurred except for (1) principal of and interest on general long-term debt, which are recognized when due, and (2) employee annual leave and claims and judgments for litigation and self-insurance which are recorded in the period due and payable. Proprietary and Pension Trust Funds use the accrual basis of accounting. Under the accrual basis of accounting, revenues are recognized when earned, and expenses are recorded when incurred. Agency Funds also use the accrual basis of accounting to recognize receivables and payables.

The City prepares financial statements annually in conformity with generally accepted accounting principles for governmental entities, which are audited by an independent certified public accountant. The annual audit report is generally available about 180 days after the June 30 close of each Fiscal Year. The City's most recent general purpose financial statements for the Fiscal Year ended June 30, 2002, were audited by Calderon, Jaham & Osborn, CPAs.

Exhibit 9
Page 132 of 165

**Budgetary Process**

The City's annual budget, which is adopted in July and published in October, is the culmination of the annual budget process, which begins in the fall of the preceding year. Public input on service and program priorities is solicited. This input serves as part of the City Council's priority setting for the development of the budget.

Based upon City Council budget priorities, departments submit operating and capital improvement project requests to the City Manager for review by the Financial Management Department. The City Manager evaluates and prioritizes the program requirements, determines funding availability, and develops a balanced budget as required by the City Charter. This proposed balanced budget is published and presented to the City Council by their first meeting in May.

During May and June, the Mayor and City Council conduct budget meetings to review the Proposed Budget. Public comment is received at this time. The budget meetings are conducted as Council workshops focusing on policy issues.

As required by the City Charter, the City Council adopts the Annual Budget and Appropriation Ordinance no earlier than the date of the first Council meeting in July and no later than the last meeting in July. The adoption of the Appropriation Ordinance requires two noticed public hearings, which are usually held on consecutive days. The Annual Tax Rate Ordinance is adopted no later than the last City Council meeting in August.

The Financial Management Department works closely with the City Auditor and Comptroller to monitor fund balances, as well as revenue projections, throughout the Fiscal Year. Variations from budget or plans are alleviated in a number of ways, including expenditure reductions or deferrals. As another technique of accomplishing budgetary control, the City also maintains an encumbrance accounting system, under which purchase orders, contracts, and other commitments for the expenditure of funds are recorded in order to reserve that portion of the applicable appropriation.

**Five Year Summary of Financial Results**

Tables 12 and 13 present the Balance Sheet and the Statement of Revenues, Expenditures, and Changes in Fund Balance of the City's General Fund for Fiscal Years 1998 through 2002 in the format presented in the Comprehensive Annual Financial Report (CAFR). Effective as of the Fiscal Year ending June 30, 2002, there has been a change in the reporting system of CAFR. The City Auditor and Comptroller has implemented accounting and reporting requirements known as GASB Statement No. 34 (GASB 34). GASB 34 requires the preparation of Government-wide statements, which are intended to complement the fund financial statements. The Government-wide statements are prepared on a full-accrual basis, rather than modified accrual basis. GASB 34 requires expense classifications to be presented by major functional activities performed by the government, regardless of the fund in which the activity was accounted for. To satisfy this requirement, the City Auditor and Comptroller re-analyzed the services provided by different departments/divisions and re-grouped them by the function/activity that best describes those services.

Exhibit 9
Page 133 of 165

**Table 12**
**CITY OF SAN DIEGO**
**BALANCE SHEET FOR THE GENERAL FUND**
*Fiscal Years Ended June 30, 1998 through 2002*
*(in thousands)*

|  | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash or Equity in Pooled Cash & Investments | $23,516 | $16,005 | $24,708 | $48,777 | $34,245 |
| Receivables: | | | | | |
| Taxes – Net | 27,739 | 27,491 | 30,182 | 32,431 | 44,277 |
| Accounts – Net | 26,392 | 29,856 | 32,805 | 38,016 | 42,129 |
| Claims – Net | 41 | 9 | 36 | 16 | 48 |
| Notes | -- | -- | -- | -- | -- |
| Accrued Interest | 2,451 | 1,745 | 2,744 | 3,011 | 1,810 |
| From Other Funds | 82,923 | 94,547 | 109,686 | 87,135 | 76,147 |
| From Other Agencies | 613 | 1,068 | 1,068 | 1,635 | 68 |
| Advances to Other Funds | 4,570 | 6,771 | 9,920 | 10,628 | 12,517 |
| Advances to Other Agencies | 350 | 350 | 350 | 350 | 350 |
| Prepaid and Reimbursable Items & Deposits | 357 | 302 | 1,161 | 152 | 74 |
| **Total Assets** | $168,952 | $178,144 | $212,660 | $222,151 | $211,665 |
| **LIABILITIES** | | | | | |
| Accounts Payable | 2,135 | 2,461 | $2,927 | $2,057 | $3,739 |
| Accrued Wages and Benefits | 14,793 | 16,598 | 21,923 | 27,445 | 27,547 |
| Due to other Funds | -- | -- | -- | -- | -- |
| Deferred Revenue | 29,590 | 30,934 | 33,904 | 37,942 | 37,376 |
| Contracts and Notes Payable | 82,000 | 88,500 | 99,500 | 77,000 | 73,000 |
| **Total Liabilities** | $128,518 | $138,493 | $158,254 | $144,444 | $141,662 |
| **FUND EQUITY** | | | | | |
| Reserves: | | | | | |
| Reserved for Encumbrances | $9,181 | $9,542 | $11,628 | $11,150 | $13,431 |
| Reserved for Advances & Deposits | 4,920 | 7,121 | 10,270 | 10,978 | 12,867 |
| Unreserved: | | | | | |
| Designated for Unrealized | 396 | -- | -- | 2,287 | 1,176 |
| Designated for Subsequent Years' Expenditures | 1,936 | 1,818 | 2,972 | 2,132 | 1,768 |
| Undesignated | 24,001 | 21,170 | 29,536 | 51,160 | 40,761 |
| **Total Fund Equity** | $40,434 | $39,651 | $54,406 | $77,707 | $70,003 |
| **Total Liabilities & Fund** | $168,952 | $178,144 | $212,660 | $222,151 | $211,665 |

Source: City of San Diego Comprehensive Annual Financial Report

A - 15

Exhibit 9
Page 134 of 165

**Table 13**
**CITY OF SAN DIEGO**
**STATEMENT OF REVENUES, EXPENDITURES,**
**AND CHANGES IN FUND BALANCE FOR THE GENERAL FUND**
*Fiscal Years Ended June 30, 1998 through 2002 (in thousands)*

| | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| **REVENUES:** | | | | | |
| Property Taxes | $123,012 | $130,624 | $144,288 | $158,585 | $169,976 |
| Sales Taxes [1] | 117,985 | 128,339 | 130,240 | 142,069 | 139,197 |
| Other Local Taxes | 83,796 | 86,968 | 94,809 | 109,151 | 115,416 |
| Licenses and Permits | 19,272 | 20,630 | 20,693 | 22,154 | 22,062 |
| Fines, Forfeitures and Penalties | 16,170 | 23,613 | 28,410 | 29,776 | 24,250 |
| Revenues from Use of Money and Property | 30,789 | 29,940 | 34,429 | 40,841 | 34,697 |
| Revenues from Federal Agencies | 2,081 | 2,026 | 1,644 | 787 | 1,931 |
| Revenues from Other Agencies | 51,522 | 55,697 | 83,821 | 87,262 | 88,027 |
| Charges for Current Services | 67,825 | 70,244 | 77,469 | 84,156 | 89,936 |
| Other Revenue | 2,871 | 2,526 | 2,777 | 2,606 | 3,291 |
| **Total Revenues** | **$515,323** | **$550,607** | **$618,580** | **$677,387** | **$688,783** |
| **EXPENDITURES:** | | | | | |
| Current: | | | | | |
| General Government | $64,725 | $67,405 | $69,400 | $79,800 | $132,312 [2] |
| Community and Economic Development | 13,967 | 14,740 | 14,661 | 19,778 | -- [3] |
| Neighborhood Services | | | | | 28,626 |
| Public Safety | 295,762 | 315,231 | 348,869 | 369,607 | 382,133 |
| Libraries | 20,677 | 21,824 | 22,820 | 26,494 | -- |
| Parks, Recreation and Culture | 41,561 | 44,910 | 49,850 | 56,748 | 89,442 [4] |
| Public Works | 66,931 | 70,413 | 76,300 | 80,999 | -- [5][6] |
| Employee Relations and Special Projects | 633 | 723 | 637 | 548 | -- |
| Development Services | -- | -- | -- | -- | -- |
| Transportation | -- | -- | -- | -- | 19,196 |
| Sanitation and Health | -- | -- | -- | -- | 34,535 |
| Miscellaneous and Unallocated | 2,260 | 2,505 | 1,881 | 1,367 | -- |
| Debt Service: | | | | | |
| Principal Retirement | -- | -- | -- | -- | 1,553 |
| Interest | 3,683 | 4,894 | 5,213 | 4,616 | 1,157 |
| **Total Expenditures** | **$510,199** | **$542,645** | **$589,631** | **$639,957** | **$688,954** |
| **EXCESS (DEFICIENCY) OF REVENUES OVER EXPENDITURES** | **$5,124** | **$7,962** | **$28,949** | **$37,430** | **($171)** |
| **OTHER FINANCING SOURCES (USES)** | | | | | |
| Transfers from Proprietary/ Fiduciary Funds | $1,918 | $1,574 | $2,117 | $4,074 | $2,409 |
| Transfers from Other Funds | 37,729 | 28,369 | 30,511 | 29,236 | 27,551 |
| Transfers from Component Unit | 554 | 588 | 324 | 86 | 22 |
| Transfers to Proprietary Funds | (8,352) | (15,816) | (18,976) | (14,274) | (6,699) |
| Transfers to Other Funds | (25,592) | (24,365) | (27,520) | (32,601) | (32,082) |
| Transfers to Component Unit | (900) | (900) | (650) | (650) | (650) |
| Proceeds from Capital Leases | | | | | 1,916 |
| **TOTAL OTHER FINANCING SOURCES (USES)** | **$5,357** | **($10,550)** | **($14,194)** | **($14,129)** | **($7,533)** |
| **EXCESS (DEFICIENCY) OF REVENUES AND OTHER FINANCING SOURCES OVER EXPENDITURES AND OTHER FINANCING USES** | $10,481 | ($2,588) | $14,755 | $23,301 | ($7,704) |
| **FUND BALANCE AT JULY 1** | **$28,514** | **$40,434** | **$39,651** | **$54,406** | **$77,707** |
| Cumulative Effect of a Change in Accounting Principle | 314 | -- | -- | -- | -- |
| Residual Equity Transfers from Other Funds | 1,125 | 1,805 | = | = | = |
| **FUND BALANCE AT FOLLOWING JUNE 30** | **$40,434** | **$39,651** | **$54,406** | **$77,707** | **$ 70,003** |

(1)  Includes Proposition 172 Safety Sales Tax.
(2)  Beginning Fiscal Year 2002, General Government is reclassified as General Government and Other Support Services.  Other Support Services include Engineering & Capital Projects, Employee Relations/Special Projects, and Miscellaneous/Unallocated Expenditure categories.
(3)  Beginning Fiscal Year 2002, Community and Economic Development expenditures have been reclassified under Neighborhood Services.
(4)  Beginning Fiscal Year 2002, Parks, Recreation, Culture and Leisure is reclassified to include Libraries.
(5)  Beginning Fiscal Year 2002, Transportation, which was under Public Works in prior years, is classified separately.
(6)  Beginning Fiscal Year 2002, Sanitation and Health, which was under Public Works, is classified separately.

Source:  City of San Diego Comprehensive Annual Financial Report

Exhibit 9
Page 135 of 165

The following table presents the operating budget summary for Fiscal Years 2002 through 2004.

**Table 14**
**CITY OF SAN DIEGO**
**OPERATING BUDGET SUMMARY**
*Fiscal Years 2002 - 2004[1]*

| | Actual Results in A Budget Format Fiscal Year 2002 | Adopted Budget Fiscal Year 2003 | Proposed Budget Fiscal Year 2004 |
|---|---|---|---|
| **REVENUE SOURCES:** | | | |
| Property Tax | $169,814,877 | $188,600,000 | $199,750,958 |
| Sales Tax [2][3] | 139,196,712 | 134,451,875 | 128,203,737 |
| Transient Occupancy Tax | 52,142,966 | 56,676,190 | 57,998,226 |
| Property Transfer Tax | 7,033,670 | 6,300,000 | 8,472,719 |
| Licenses and Permits | 22,027,597 | 21,627,271 | 24,522,914 |
| Fines, Forfeitures and Penalties | 23,935,666 | 26,887,569 | 27,295,786 |
| Interest Earnings | 8,986,088 | 5,900,000 | 1,200,223 |
| Franchises | 56,239,380 | 54,234,644 | 52,086,577 |
| Other Rents and Concessions | 28,156,640 | 27,814,150 | 29,047,278 |
| State Motor Vehicle License Fees | 69,895,140 | 72,200,000 | 74,893,491 |
| Other Revenue from Agencies [4] | 22,277,905 | 7,595,553 | 10,413,422 |
| Charges for Current Services | 90,541,973 | 68,646,721 | 71,334,584 |
| Transfers from Other Funds | 27,724,113 | 38,123,581 | 42,407,502 |
| Other Revenue | 1,905,079 | 872,968 | 1,337,968 |
| Prior Year Fund Balance | 31,700,000 | 19,400,000 | 10,881,568 |
| Total General Fund Revenues | $751,577,806 | $729,330,522 | $739,846,953 |
| **EXPENDITURES:** | | | |
| Public Safety | $382,551,446 | $382,585,564 | $398,745,726 |
| Parks and Recreation | 62,084,484 | 68,082,120 | 66,713,917 |
| Sanitation and Health | 39,675,102 | 40,107,961 | 42,770,700 |
| Transportation [5] | 28,417,405 | 12,440,187 | 12,500,339 |
| Library | 31,301,457 | 36,650,651 | 35,627,407 |
| Neighborhood Services | 32,736,355 | 31,514,492 | 28,504,798 |
| Operations Support | 109,958,971 | 111,228,996 | 107,476,923 |
| Internal Support/Management | 43,294,866 | 46,720,551 | 47,507,143 |
| Total General Fund Expenditures | $730,020,086 | $729,330,522 | $739,846,953 |

(1) The budget is prepared on the modified accrual basis of accounting except that (i) encumbrances outstanding at year-end are considered as expenditures and (ii) the increase/decrease in reserve for advances and deposits to other funds and agencies are considered as additions/deductions of expenditures.
(2) Includes Proposition 172 Safety Sales Tax.
(3) In Fiscal Years 2003 and 2004 General Fund support for the Street Division Operating Fund is funded directly through a sales tax allocation rather than through a General Fund transfer.
(4) The City budgets for Tobacco Settlement Revenues one year in arrears, and these revenues appear in the category "Other Revenue from Agencies" in the actual results column, and are included in the Prior Year Fund Balance in the budget columns. The City did not budget for, nor receive any revenues from the State for local fiscal relief in Fiscal Years 2002, 2003, and 2004.
(5) In Fiscal Years 2003 and 2004, General Fund support for the Street Division Operating Fund is funded directly through a sales tax allocation rather than through a General Fund transfer.

Source:    City of San Diego, Financial Management Department

A - 17

Exhibit 9
Page 136 of 165

**Fiscal Year 2002 (Actuals)**

The actual total General Fund revenues, presented in a budget format equivalent to Table 14, for Fiscal Year 2002 equaled $751.6 million, which represents an increase of $25.9 million or 3.6% more than the actual results for Fiscal Year 2001, and $24.2 million or 3.3% more than the adopted budget for Fiscal Year 2002. The following table shows the change in actual major revenue sources for Fiscal Year 2002 over Fiscal Year 2001.

**Change in Major Revenue Sources**
**Actual Results Fiscal Year 2002 over Fiscal Year 2001[1]**

- Property Tax                    +   7.3%
- Sales Tax                       +   3.6%
- Transient Occupancy Tax         -   9.8%
- Motor Vehicle License Fees      +   4.0%

(1) The above percentages reflect overall growth in these revenue sources, whether or not such revenues are allocated entirely to the General Fund.

Source: City of San Diego, Financial Management Department

Actual total General Fund expenditures, presented in a budget format equivalent to Table 14, for Fiscal Year 2002 equaled $730 million, an increase of $43.8 million or 6.4% more than the actual results for Fiscal Year 2001, and $2.7 million or 0.4% more than the adopted budget for Fiscal Year 2002.

**Fiscal Year 2003 (Adopted Budget)**

Under the City's Fiscal Year 2003 adopted budget, General Fund revenues total $729.3 million, up $2.0 million or 0.3%, from the Fiscal Year 2002 adopted budget. The adopted budget assumed that San Diego will experience modest economic growth in Fiscal Year 2003. The Fiscal Year 2003 adopted budget also anticipated the City to realize additional revenues from hosting the Super Bowl in January 2003. In Fiscal Year 2002, the City did not receive any revenues from the State for local fiscal relief, and does not include any such revenues in its adopted budget for Fiscal Year 2003. The City assumes that the State General Fund will continue to offset a fee reduction on motor vehicle license registration originally enacted in 1999, through Fiscal Year 2003 (see **"Vehicle License Fee Reduction"** below). In addition, the City's adopted budget includes the transfer of $5.2 million from the State to compensate for booking fees the City makes to the County of San Diego for incarcerating criminals. Presented below are budgeted growth rates for the major revenues.

Exhibit 9
Page 137 of 165

### Fiscal Year 2003 Budget Growth Rates[1]

- Property Tax                                    +    9.0%
- Sales Tax                                       +    4.0%
- Transient Occupancy Tax                         +    6.0%
- Motor Vehicle License Fees[2]                   +    4.0%

(1) The above percentages reflect overall growth in these revenue sources, whether or not such revenues are allocated entirely to the General Fund.

(2) See 'Vehicle License Fee Reduction' below for a discussion of the potential impact on revenues from this source based on the Governor's budget proposal for Fiscal Years 2003 and 2004.

Source: City of San Diego, Financial Management Department

To date, Fiscal Year 2003 General Fund revenue receipts reflect slow economic recovery. Economic activity continues to affect revenue growth rates and the receipts received from major revenue categories in Fiscal Year 2003. Since the economy is not recovering at a pace as was expected earlier, revenues are projected to fall short of budget estimates, not including potential impacts from the State budget deficit. Property Tax, Sales Tax, and Transient Occupancy Tax receipts are projected to have deficits in Fiscal Year 2003 at a combined total of approximately $10 million compared to the budgeted levels. In addition to the major General Fund revenues, another revenue source to the General Fund, Franchise Fees; is expected to be approximately $10 million less than the Fiscal Year 2003 adopted budget. The projected reduction is primarily attributable to a decline in the SDG&E franchise fees due to the unexpected drop in natural gas prices. In Fiscal Year 2003, in order to accommodate revenues not meeting budget expectations and to ensure a balanced budget, measures are being taken to reduce expenditures in the General Fund. Most General Fund departments reduced their budgets by two percent over Fiscal Year 2002 levels in developing the Fiscal Year 2003 Budget. In addition, most General Fund departments have identified additional savings amounting to approximately three percent of their Fiscal Year 2003 budget due to the projected revenue shortfall.

## Fiscal Year 2004 (Proposed Budget)

Under the City's Fiscal Year 2004 proposed budget, General Fund revenues total $739.8 million, a net increase of $10.5 million or 1.4% from the Fiscal Year 2003 adopted budget. The proposed budget revenue estimates reflect an uncertain economy that continues to experience the effects of declining consumer confidence, higher unemployment trends, a weak national economy and potential impacts from the State's budget crisis. Even though San Diego's economy continues to outperform the State and national economies, the recovery remains slower than anticipated. The potential State impact on the City's finances may be significant, although no conclusive information is available as to these impacts. For this reason, the proposed budget excludes any action the State may take that could impact the City's budget. In Fiscal Year 2003, the City did not receive any revenues from the State for local fiscal relief, and does not include any such revenues in its proposed budget for Fiscal Year 2004. Presented below are estimated growth rates for the major revenues.

## Projected Change in Major Revenue Sources
### Proposed Budget Fiscal Year 2004 over Adopted Budget Fiscal Year 2003[1]

| | | |
|---|---|---|
| • Property Tax | + | 8.0% |
| • Sales Tax | + | 3.0% |
| • Transient Occupancy Tax | + | 5.5% |
| • Motor Vehicle License Fees | + | 3.0% |

(1)  The above percentages reflect overall growth in these revenue sources, whether or not such revenues are allocated entirely to the General Fund.

Source: City of San Diego, Financial Management Department

The General Fund expenditure growth amounted to a total of approximately $46 million, largely a result of annualization of FY 2003 and FY 2004 negotiated salaries and benefits ($20.7 million), retirement contributions ($11.0 million), and workers compensation ($5.8 million). As the General Fund revenues are not projected to grow at the same pace as the expenditure requirements, corresponding reductions to City operations are required. Most General Fund departments reduced their Fiscal Year 2004 budgets, which amounted to approximately $30 million. Further expenditure reductions were made through departmental reorganization and cuts in non-discretionary accounts.

The proposed budget does not include the use of reserves to balance the General Fund. Service levels have been impacted and some City facilities will see reduced hours of operation.

## State Budget Deficit

The State of California's projected budget deficit is between $35 and $38 billion through Fiscal Year 2004. In his budget proposal, Governor Gray Davis included budget savings involving major program reductions and tax increases. The proposal includes discontinuing the State backfill of motor vehicle license fees for an impact of approximately $51 million to the City in the Fiscal Year 2004 General Fund budget, if vehicle license fees are not increased to replace the backfill amount as described below under the caption "Vehicle License Fee Reduction". Other impacts proposed by the Governor in Fiscal Year 2004 would include an estimated reduction for libraries of approximately $1.2 million and the elimination of $5.2 million in booking fees reimbursement. In addition, a property tax increment shift to the Educational Revenue Augmentation Fund (ERAF) could result in a $5.8 million loss for the City of San Diego's Redevelopment Agency (the "Redevelopment Agency"). The State Legislature, however, has not yet approved these proposals.

The City cannot predict what actions will be taken in the future by the State Legislature and the Governor to address the State's current and future budget deficits. Future State Budgets could be affected by national economic conditions and the factors over which the City will have no control. To the extent that the State budget process results in reduced revenues or increased expenses to the City, the City will be required to make adjustments to its budget.

## Vehicle License Fee Reduction

The State's Vehicle License Fee ("VLF") is an annual fee on the ownership of a registered vehicle in California. Automobiles, motorcycles, pick-up trucks, commercial trucks and trailers, rental cars, and taxicabs are all subject to the VLF. VLF revenues are distributed by the State to cities and counties. Approximately three-fourths of VLF revenues (one-half to cities and one-half to counties) can

be used for any lawful purpose, with the remaining funds allocated to counties to pay for "realignment" health and social services programs. Under the State of California's Vehicle License Fee Law, beginning January 1, 1999, the vehicle license fee was permanently reduced from 2.0% to 1.5%. The law also provided for a one-year reduction to 1.3% for vehicles with a payment due date during calendar year 2000. Subsequently, the law was amended to reduce the rate to 0.65% through calendar year 2002. Beginning in 2003, the vehicle license fee was scheduled to be reduced permanently to 0.65%.

To ensure that local governments are not impacted by the fee reductions, State law provides for an offset from the State's General Fund equal to the amount of the reduction. Under the offset provisions, the State's General Fund pays local governments for lost VLF revenues on a dollar per dollar matching basis, from state General Fund revenues. The repayment funds are continuously appropriated, and do not need to be approved in the annual budget process. A statutory, continuous appropriation, however, is not a firm guarantee of a continuing replacement and the repayment is subject to the availability of monies for transfer from the State's General Fund.

As noted above, the Governor had proposed to discontinue the vehicle license fee backfill to cities and counties and the Governor's May Revision to the proposed budget for Fiscal Year 2004 (the "Governor's May Revision") assumes no backfill is needed because provisions of the state law will trigger an increase in the VLF rate, such that no backfill will be required and local VLF revenues will not be reduced further. VLF is the third largest General Fund revenue source for the City (after property taxes and sales taxes). In Fiscal Year 2002, the City received approximately $69.9 million in VLF revenues, a 4.0% increase over the prior year's actual receipts, representing approximately 9.9% of the total General Fund Revenues. For Fiscal Year 2003, VLF revenues are budgeted at $72.2 million. The State Controller has stated and the Governor's May Revision is based on the assumption that a provision in existing law will trigger an increase in the VLF fees due to the lack of available State revenues to pay the backfill amount. This interpretation may be challenged in court, and no assurance can be given that an increase will be triggered automatically to replace the backfill amount. If the Governor's proposed budget for Fiscal Year 2004 is enacted as proposed and the State Legislature does not continue to backfill the VLF revenues, or does not increase vehicle license fees, or an increase in the VLF fees is not triggered under existing law, the City forecasts that it would lose approximately $51 million in VLF revenues for Fiscal Year 2004 and for each year thereafter. As of the date of this Official Statement, the State has continued to backfill VLF revenues for Fiscal Year 2003. As of April 2003, the City had received approximately $59.4 million in VLF revenues in Fiscal Year 2003.

**Property Taxes**

The County assesses property and collects secured and unsecured property taxes for the cities, school districts, and special districts within the County, including the City. Once the property taxes are collected, the County conducts its internal reconciliation for accounting purposes and distributes the City's share of such taxes to the City, generally within a couple of weeks. Prior to distribution, the moneys are deposited in an account established on behalf of the City in the County Treasurer's Investment Pool (the "Pool"). If the County and/or the Pool were at any time to become subject to bankruptcy proceedings, it is possible that City property taxes held in the Pool, if any, could be temporarily unavailable to the City. In the event of such an occurrence, General Fund revenue requirements could be met through the use of other City funds. Ad valorem taxes are subject to constitutional limits as discussed under the section **"LIMITATIONS ON TAXES AND APPROPRIATIONS."**

Taxes are levied for each fiscal year on taxable real and personal property which is situated

in the City as of the preceding January 1. For assessment and collection purposes, property is classified either as "secured" or "unsecured" and is listed accordingly on separate parts of the assessment roll. The "secured roll" is that part of the assessment roll containing the taxes on which there is a lien on real property sufficient, in the opinion of the County Assessor, to secure payment of the taxes. Other property is assessed on the "unsecured roll."

Property taxes on the secured roll are due in two installments, on November 1 and February 1 of the fiscal year. If unpaid, such taxes become delinquent on December 10 and April 10, respectively, and a 10% penalty attaches to any delinquent payment. If not paid, the property is subject to default. Such property may be redeemed by payment of the delinquent taxes and the delinquent penalty, plus a redemption penalty of 1.5% per month from July 1 of the following year to the time of redemption. If taxes are unpaid for a period of five years or more, the property is subject to sale by the County Tax Collector.

Property taxes on the unsecured roll are due as of the March 1 lien date and become delinquent, if unpaid, on August 31 of the fiscal year. A 10% penalty attaches to delinquent taxes on property on the unsecured roll, and an additional penalty of 1.5% per month begins to accrue beginning November 1 of the fiscal year. The taxing authority has four ways of collecting unsecured personal property taxes: (a) a civil action against the taxpayer; (b) filing a certificate in the office of the County Clerk specifying certain facts in order to obtain a judgment lien on certain property of the taxpayer; (c) filing a certificate of delinquency for record in the County Recorder's Office, in order to obtain a lien on certain property of the taxpayer; and (d) seizure and sale of personal property, improvements or possessory interests belonging or assessed to the assessee.

A supplemental assessment occurs upon a change of ownership of existing property and for new construction upon completion. A supplemental tax bill is issued for the difference in property value resulting from the increase in assessed value prorated for the remainder of the year.

Effective July 1, 1988, Assembly Bill 454, Chapter 921, eliminated the reporting of the unitary valuations pertaining to public utilities such as San Diego Gas and Electric and Pacific Telephone. In lieu of the property tax on these previously included assessed valuations, the City now receives from the State (through the County) an amount of unitary revenue based upon the unitary property tax received in the prior year.

Exhibit 9
Page 141 of 165

Table 15 presents the assessed valuation within the City for each of the last ten Fiscal Years.

**Table 15**
**ASSESSED VALUATION[1] [2]**
*Fiscal Years Ended June 30, 1994 through 2003*
*(in thousands except for percentages)*

| Fiscal Year Ending June 30 | Secured Property | Unsecured Property | Gross Total | Less Exemption [3] | Net Assessed Valuations [4][5] | Annual Assessed Valuation %Change |
|---|---|---|---|---|---|---|
| 1994 | $60,586,129 | $4,218,892 | $64,805,021 | $2,360,741 | $62,444,280 | 1.13 % |
| 1995 | $60,939,995 | $4,371,923 | $65,311,918 | $2,420,027 | $62,891,891 | 0.72% |
| 1996 | $61,793,760 | $4,303,198 | $66,096,958 | $2,489,507 | $63,607,451 | 1.14% |
| 1997 | $61,893,902 | $4,353,543 | $66,247,445 | $2,355,174 | $63,892,271 | 0.45% |
| 1998 | $63,562,588 | $4,988,950 | $68,551,538 | $2,910,753 | $65,640,785 | 2.74% |
| 1999 | $68,648,609 | $5,337,916 | $73,986,525 | $2,994,814 | $70,991,711 | 8.15% |
| 2000 | $75,788,751 | $5,852,822 | $81,641,573 | $2,987,620 | $78,653,953 | 10.79% |
| 2001 | $82,195,239 | $6,347,101 | $88,542,340 | $3,249,480 | $85,292,860 | 8.44% |
| 2002 | $89,259,317 | $6,838,926 | $96,098,243 | $3,572,188 | $92,526,055 | 8.48% |
| 2003 | $96,534,652 | $6,959,602 | $103,494,254 | $3,189,764 | $100,304,49 | 8.41% |

(1) The official date of assessment is the first day of January preceding the fiscal year during which taxes are levied. For example, January 1, 2002 is the official assessment date for property taxes due during Fiscal Year 2003. The City receives preliminary estimates from the County Assessor in March and final assessment estimates in late June, or early July.
(2) Includes both locally assessed and State assessed utility property.
(3) Excludes homeowners' and business inventory exemptions.
(4) Net assessed valuation for tax rate purposes. Includes both locally assessed and State assessed utility property.
(5) The City does not participate in the Teeter Plan.

Source: City of San Diego Comprehensive Annual Financial Report, Fiscal Year 2002.

A - 23

Exhibit 9
Page 142 of 165

Table 16 shows the City's secured tax collections for each of the ten Fiscal Years.

**Table 16**
**SECURED TAX LEVIES AND COLLECTIONS**
*Fiscal Years Ended June 30, 1993 through 2002*
*(in thousands except for percentages)*

| Fiscal Year Ending June 30 | Tax Levy[1] | Current Year Collections | Current Year Collections as Percentage of Current Tax Levy | Total Tax Collections | Total Collections as Percentage of Current Tax Levy[2] |
|---|---|---|---|---|---|
| 1993 | $120,574 | $114,821 | 95.23% | $119,867 | 99.41% |
| 1994 | $109,881 | $105,911 | 96.39% | $110,738 | 100.78% |
| 1995 | $109,754 | $104,295 | 95.03% | $108,192 | 98.58% |
| 1996 | $111,281 | $108,137 | 97.18% | $110,513 | 99.31% |
| 1997 | $111,719 | $108,676 | 97.28% | $110,563 | 98.96% |
| 1998 | $116,912 | $114,311 | 97.78% | $117,429 | 100.44% |
| 1999 | $127,846 | $124,267 | 97.20% | $126,923 | 99.28% |
| 2000 | $141,963 | $137,859 | 97.11% | $140,225 | 98.78% |
| 2001 | $155,060 | $150,900 | 97.32% | $153,406 | 98.93% |
| 2002 | $167,077 | $163,357 | 97.77% | $165,446 | 99.02% |

(1) Commencing in Fiscal Year 1993, by action of the State Legislature, there was a permanent shift of some property taxes from cities to schools.
(2) Total Collections include unpaid taxes from previous years' tax levies collected in the current fiscal year.

Source: FY 1993 – 2001: City of San Diego Comprehensive Annual Financial Report
        FY 2002: County of San Diego

Table 17 indicates the ten largest secured and unsecured property taxpayers in the City.

**Table 17**
**PRINCIPAL PROPERTY TAXPAYERS IN CITY OF SAN DIEGO[1]**
*Tax Roll for Fiscal Year  2002-2003*
*(in thousands, except for percentages)*

| Taxpayers | Type of Business | Assessed Valuation [2][3] | Percentage of Net Assessed Valuation [3] | Amount of Tax [4] |
|---|---|---|---|---|
| Kilroy Realty LP | Real Estate | $566,110 | 0.57% | $5,976 |
| Fashion Valley Mall LLC | Shopping Center | 530,665 | 0.54 | 5,485 |
| Qualcomm, Inc. | Electronics | 465,566 | 0.47 | 5,178 |
| Sea World, Inc. | Entertainment | 280,063 | 0.28 | 3,111 |
| Pacific Gateway, LTD | Developer | 250,319 | 0.25 | 2,780 |
| ERP Operating LTD Partnership | Developer/ Property Manager | 239,426 | 0.24 | 2,709 |
| University Towne Centre LLC | Shopping Center | 226,350 | 0.23 | 2,514 |
| Irvine Co | Developer | 248,194 | 0.25 | 2,484 |
| Horton Plaza LLC | Shopping Center | 192,079 | 0.19 | 2,173 |
| Pardee Construction Co. | Developer | 142,520 | 0.14 | 2,163 |
| TOTAL | | $3,141,292 | 3.16% | $34,573 |

(1)  This table excludes public utilities, including San Diego Gas & Electric Company, Pacific Bell, and American Telephone and Telegraph, because valuations within the City cannot be readily determined.
(2)  Total assessed valuation includes both secured and unsecured property.
(3)  Using total Net Assessed Valuation of $98,917,185,000, which excludes homeowners' exemptions.
(4)  The City receives approximately 17.2% of total taxes paid.

Source: County of San Diego Assessor's Office

## LIMITATIONS ON TAXES AND APPROPRIATIONS

### Article XIII A of the California Constitution

Section 1(a) of Article XIII A of the California Constitution limits the maximum ad valorem tax on real property to 1% of full cash value (as defined in Section 2 of Article XIII A), to be collected by each county and apportioned among the county and other public agencies and funds according to law.  Section 1(b) of Article XIII A provides that the 1% limitation does not apply to ad valorem taxes to pay interest or redemption charges on (a) indebtedness approved by the voters prior to July 1, 1978, or (b) any bonded indebtedness for the acquisition or improvement of real property approved on or after July 1, 1978, by two-thirds of the votes cast by the voters voting on the proposition.  Section 2 of Article XIII A defines "full cash value" to mean "the County Assessor's valuation of real property as shown on the 1975/76 tax bill under full cash value or, thereafter, the appraised value of real property when purchased, newly constructed, or a change in ownership has occurred after the 1975 assessment."  The full cash value may be adjusted annually to reflect inflation at a rate not to exceed 2% per year or to reflect a reduction in the consumer price index or comparable data for the area under the taxing jurisdiction, or reduced in the event of declining property values caused by substantial damage, destruction, or other factors.  Legislation enacted by the State Legislature to implement Article XIII A provides that notwithstanding any other law, local agencies may not levy any ad valorem property tax except to pay debt service on indebtedness approved by the voters as described above.

Exhibit 9
Page 144 of 165

In addition, legislation enacted by the California Legislature to implement Article XIII A provides that all taxable property is shown at full assessed value as described above. In conformity with this procedure, all taxable property value included in this Official Statement (except as noted) is shown at 100% of assessed value and all general tax rates reflect the $1 per $100 of taxable value.

On June 3, 1986, California voters approved an amendment to Article XIII A, which added an additional exemption to the 1% tax limitation imposed by Article XIII A. Under this amendment to Article XIII A, local governments and school districts may increase the property tax rate above 1% for the period necessary to retire new general obligation bonds, if two-thirds of those voting in a local election approve the issuance of such bonds and the money raised through the sale of the bonds is used exclusively to purchase or improve real property. Later amendments allow for property tax increases to pay for certain school district general obligation bonds approved by 55% of those voting in a local election.

In the June 1990 election, the voters of the State approved amendments to Article XIII A permitting the State Legislature to extend the replacement dwelling provisions applicable to persons over 55 to severely disabled homeowners for a replacement dwelling purchase or newly constructed on or after June 5, 1990, and to exclude from the definition of "new construction" triggering reassessment improvements to certain dwellings for the purpose of making the dwelling more accessible to severely disabled persons. In the November 1990 election, the voters of the State approved an amendment of Article XIII A to permit the State Legislature to exclude from the definition of "new construction" seismic retrofitting improvements or improvements utilizing earthquake hazard mitigation technologies constructed or installed in existing buildings after November 6, 1990. Since 1990, the voters have approved several other minor exemptions from the reassessment provisions of Article XIII A.

**Article XIIIA Litigation**

In June 1978, Article XIIIA of the California Constitution was amended by Proposition 13 to limit, among other things, a County assessor's ability to adjust for inflation to 2% per year (see **"Constitutional and Statutory Limitations on Taxes and Appropriations-Article XIIIA of the California Constitution"** discussed previously). In a Minute Order issued on November 2, 2001 in *County of Orange v. Orange County Assessment Appeals Board No. 3,* case no. 00CC03385, the Orange County Superior Court held that where a home's taxable value did not increase for two years, due to a flat real estate market, the Orange County assessor violated the two percent inflation adjustment provision of Article XIIIA, when the assessor tried to "recapture" the tax value of the property by increasing its assessed value by 4% in a single year. The assessors in most California Counties, including San Diego County, use a similar methodology in raising the taxable values of property beyond 2% in a single year. The State Board of Equalization has approved this methodology for increasing assessed values. On December 12, 2002, the Orange County Superior Court certified the lawsuit as a class action lawsuit and the case has been submitted on appeal to the State's Fourth District Court of Appeal.

The County of San Diego has advised the City that comparable claims by landowners within the County were rejected by the San Diego County Assessment Appeals Board for the Fiscal Year 2000/01 property tax levy and that such landowners have at least three years from the date of such rejection in which to further prosecute their claims. In another matter, a taxpayer initiated a declaratory relief action in Superior Court seeking comparable relief. In that case, *Linda Pintzuk v. Gregory J. Smith,* case no. GIC 790102, the trial court sustained the County's demurrer without leave to amend and dismissed the action on September 25, 2002. The plaintiff did not file an appeal of the trial court's decision.

The City cannot predict the outcome of the Orange County litigation, nor whether the landowners whose claims were rejected by the San Diego County Assessment Appeals Board, or other landowners, will further prosecute claims against the County of San Diego. Currently, the trial court's ruling in the Orange County litigation applies only to assessments levied in Orange County. The City cannot predict the effect, if any, that the outcome of either the Orange County litigation or the further prosecution of claims against the County of San Diego would have on property tax revenues to be received by the City, although the effect would be adverse.

**Article XIII B of the California Constitution**

Article XIII B of the California Constitution limits the annual appropriations of the State and of any city, county, school district, authority or other political subdivision of the State to the level of appropriations for the prior fiscal year, as adjusted for changes in the cost of living, population, and services for which the fiscal responsibility is shifted to or from the governmental entity. The "base year" for establishing this appropriations limit is Fiscal Year 1979 and the limit is adjusted annually to reflect changes in population, consumer prices and certain increases or decreases in the cost of services provided by these public agencies.

Appropriations of an entity of local government subject to Article XIII B generally include any authorizations to expend during a fiscal year the proceeds of taxes levied by or for the entity, exclusive of certain State subventions, refunds of taxes and benefit payments from retirement, unemployment insurance and disability insurance funds. "Proceeds of Taxes" include, but are not limited to, all tax revenues, most State subventions and the proceeds to the local government entity from (a) regulatory licenses, user charges, and user fees (to the extent that such proceeds exceed the cost reasonably borne by such entity) and (b) the investment of tax revenues. Article XIII B provides that if a governmental entity's revenues in any year exceed the amounts permitted to be spent, the excess must be returned by revising tax rates or fee schedules over the subsequent two years.

Article XIII B does not limit the appropriation of money to pay debt service on indebtedness existing or authorized as of January 1, 1979, or for bonded indebtedness approved thereafter by a vote of the electors of the issuing entity at an election held for that purpose.

In the June 1990 election, the voters of the State approved Proposition 111, which amended the method of calculating State and local appropriations limits. Proposition 111 made several changes to Article XIII B, three of which are reflected in the City's annual computation of its appropriation limit. First, the term "change in the cost of living" was redefined as the change in the California per capita personal income ("CPCPI") from the preceding year. Previously the lower of the CPCPI or the United States Consumer Price Index was used. Second, the appropriations limit for the fiscal year was recomputed by adjusting the Fiscal Year 1987 limit by the CPCPI for the three subsequent years. Third, Proposition 111 excluded appropriation for "all qualified capital outlay projects, as defined by the Legislature" from the definition of "appropriations subject to limitation."

Article XIII B allows voters to approve a temporary waiver of a government's Article XIII B limit. Such a waiver is often referred to as a "Gann limit waiver." The length of any such waiver is limited to four years. In June 1990, San Diego voters approved a four-year increase in the City's Article XIII B limit (for Fiscal Years 1992 through 1995). In the November 1994 election, San Diego voters approved another four-year increase in the City's Article XIII B limit (for Fiscal Years 1996 through 1999). The Gann limit waiver does not provide any additional revenues to the City or allow the City to

finance additional services. The City's appropriations limit for Fiscal Year 2003 is established at $684,004,095. It is estimated that the City will be under the Gann Limit by approximately $127.8 million. The impact of the appropriations limit on the City's financial needs in the future is unknown.

**Articles XIII C and XIII D of the California Constitution**

On November 5, 1996, the voters of the State approved Proposition 218, known as the "Right to Vote on Taxes Act." Proposition 218 added Articles XIII C and XIII D to the California Constitution, which contain a number of provisions affecting the ability of the City to levy and collect both existing and future taxes, assessments, fees and charges. The interpretation and application of certain provisions of Proposition 218 will ultimately be determined by the courts with respect to some of the matters discussed below. It is not possible at this time to predict with certainty the future impact of such interpretations. The provisions of Proposition 218, as so interpreted and applied, may affect the City's ability to raise revenues for certain programs and obligations.

Article XIII C requires that all new local taxes be submitted to the electorate before they become effective. Taxes for general governmental purposes of the City require a majority vote and taxes for specific purposes, even if deposited in the City's General Fund, require a two-thirds vote. Further, any general purpose tax which the City imposed, extended or increased, without voter approval, after December 31, 1994, may continue to be imposed only if approved by a majority vote in an election which must be held within two years of November 5, 1996. The City has not imposed, extended, or increased any such taxes which are currently in effect.

Article XIII C also expressly extends the initiative power to give voters the power to reduce or repeal local taxes, assessments, fees and charges, regardless of the date such taxes, assessments, fees and charges were imposed. Article XIII C expands the initiative power to include reducing or repealing assessments, fees, and charges, which had previously been considered administrative rather than legislative matters and therefore beyond the initiative power. This extension of the initiative power is not limited by the terms of Article XIII C to fees imposed after November 6, 1996 and absent other legal authority could result in the retroactive reduction in any existing taxes, assessments, or fees and charges. In addition, certain City Charter amendments, if effective, could further constrain the City in this area (see **"LITIGATION POTENTIALLY ADVERSELY AFFECTING THE GENERAL FUNDS OF THE CITY- City Voter Initiatives"** below).

The voter approval requirements of Article XIII C reduce the flexibility of the City to raise revenues for the General Fund, and no assurance can be given that the City will be able to impose, extend or increase such taxes in the future to meet increased expenditure needs.

Article XIII D added several new provisions relating to how local agencies may levy and maintain "assessments" for municipal services and programs. These provisions include, among other things, (i) a prohibition against assessments which exceed the reasonable cost of the proportional special benefit conferred on a parcel; (ii) a requirement that the assessment must confer a "special benefit," as defined in Article XIII D, over and above any general benefits conferred; and (iii) a majority protest procedure which involves the mailing of a notice and a ballot to the record owner of each affected parcel, a public hearing, and the tabulation of ballots weighted according to the proportional financial obligation of the affected party. "Assessment" in Article XIII D is defined to mean any levy or charge upon real property for a special benefit conferred upon the real property. This definition applies to landscape and maintenance assessments for open space areas, street medians, public rights-of-way, streetlights, parks,

Exhibit 9
Page 147 of 165

and other enhanced services and improvements. If the City is unable to continue to collect assessment revenues for a particular program, the program might have to be curtailed and/or funded by the City's General Fund. Given the approval requirements imposed by Article XIII D, the City is unable to predict whether it will be able to continue to collect assessment revenues for these programs. Since these programs represent additional services, to the extent such assessment revenues cannot be collected, the City Manager would recommend to the City Council that such programs be curtailed rather than supported with amounts in the General Fund. Based upon advice from the City Attorney, the City does not believe that it would be obligated to maintain such programs from the General Fund. To date, the City has conducted 34 mail ballot assessment elections, of which all but one were approved by the property owners.

In addition, Article XIII D added several provisions affecting "fees" and "charges," defined for purposes of Article XIII D to mean "any levy other than an ad valorem tax, a special tax, or an assessment, imposed by a [local government] upon a parcel or upon a person as an incident of property ownership, including a user fee or charge for a property related service." All new and existing property related fees and charges must conform to requirements prohibiting, among other things, fees and charges which (i) generate revenues exceeding the funds required to provide the property related service; (ii) are used for any purpose other than those for which the fees and charges are imposed; (iii) are for a service not actually used by, or immediately available to, the owner of the property in question; or (iv) are used for general governmental services, including police, fire or library services, where the service is available to the public at large in substantially the same manner as it is to property owners. Depending on the interpretation of what constitutes a "property related fee" under Article XIII D, there could be future restrictions on the ability of the City's General Fund to charge its enterprise funds for various services provided. Further, before any property related fee or charge may be imposed or increased, written notice must be given to the record owner of each parcel of land affected by such fee or charge. The City must then hold a hearing upon the proposed imposition or increase, and if written protests against the proposal are presented by a majority of the owners of the identified parcels, the City may not impose or increase the fee or charge. Moreover, except for fees or charges for sewer, water and refuse collection services, or fees for electrical and gas service, no property related fee or charge may be imposed or increased without majority approval by the property owners subject to the fee or charge or, at the option of the local agency, two-thirds voter approval by the electorate residing in the affected area. The City has a number of enterprise funds which are self supporting from fees and charges that may ultimately be determined to be property related for purposes of Article XIII D, e.g. the Sewer Enterprise Fund and the Water Enterprise Fund. The fees and charges of all City enterprise funds may be determined to be fees and charges subject to the initiative power referred to in Article XIII C, as described below. In the event that fees and charges cannot be appropriately increased or are reduced pursuant to exercise of the initiative power, the City may have to decide whether to support any deficiencies in these enterprise funds with moneys from the General Fund or to curtail service, or both.

In addition to the enterprise funds discussed above, the City's stormwater program is funded with fees, which may ultimately be determined to be property related for purposes of Articles XIII C and D. The City is a co-permittee under a National Pollution Discharge Elimination System Permit ("NPDES Permit") for its stormwater program. Pursuant to the NPDES Permit, the City is obligated to undertake substantial capital improvements and implement new operations and maintenance procedures for its stormwater program ("NPDES Permit Requirements"). At the present time, the City is working on a plan of finance for such NPDES Permit Requirements. If the City is not able to increase its stormwater fees to pay for the NPDES Permit Requirements, or if such fees are reduced pursuant to the exercise of the

Exhibit 9
Page 148 of 165

initiative power of Article XIII C, the City will have to identify a plan of finance for same. Such plan of finance may include General Fund moneys not previously identified.

Article XIII C also removes many of the limitations on the initiative power in matters of reducing or repealing any local tax, assessment, fee or charge. No assurance can be given that the voters of the City will not, in the future, approve an initiative or initiatives which reduce or repeal local taxes, assessments, fees or charges currently comprising a substantial part of the City's General Fund. "Assessments," "fees" and "charges" are not defined in Article XIII C, and it is unclear whether these terms are intended to have the same meanings for purposes of Article XIII C as for Article XIII D described above. If not, the scope of the initiative power under Article XIII C potentially could include any General Fund local tax, assessment, or fee not received from or imposed by the federal or State government or derived from investment income.

Both Articles XIII A and XIII B, as well as Articles XIII C and XIII D described above, were adopted as measures that qualified for the ballot pursuant to California's constitutional initiative process. From time to time other initiative measures could be adopted, affecting the ability of the City to increase revenues and to increase appropriations.

## Statutory Spending Limitations

A statutory initiative ("Proposition 62") was adopted by the voters of the State at the November 4, 1986, General Election which (a) requires that any tax for general governmental purposes imposed by local governmental entities be approved by resolution or ordinance adopted by two-thirds vote of the governmental agency's legislative body and by a majority of the electorate of the governmental entity, (b) requires that any special tax (defined as taxes levied for other than general governmental purposes) imposed by a local governmental entity be approved by a two-thirds vote of the voters within the jurisdiction, (c) restricts the use of revenues from a special tax to the purposes or for the service for which the special tax is imposed, (d) prohibits the imposition of ad valorem taxes on real property by local governmental entities except as permitted by Article XIII A, (e) prohibits the imposition of transaction taxes and sales taxes on the sale of real property by local governmental entities, and (f) requires that any tax imposed by a local governmental entity on or after March 1, 1985, be ratified by a majority vote of the electorate within two years of the adoption of the initiative or be terminated by November 15, 1988. The requirements imposed by Proposition 62 were upheld by the California Supreme Court in *Santa Clara County Local Transportation Authority v. Guardino*, 11 Cal. 4th 220; 45 Cal.Rptr.2d 207 (1995).

The City believes that, notwithstanding the Guardino decision, the provisions of Proposition 62 do not apply to charter cities. The extent of the application of the decision to taxes authorized prior to the date of the decision is also undecided.

Following the Santa Clara decision, several actions were filed challenging taxes imposed by public agencies after the adoption of Proposition 62. On June 4, 2001, the California Supreme Court rendered its opinion in *Howard Jarvis Taxpayers Association v. City of La Habra, et al.* (2001) 25 Cal. 4th 809 holding that an action brought in 1996 challenging the imposition of a 1992 utility users tax imposed for general purposes, without voter approval, was not barred by a three year statute of limitations period because the continued imposition and collection of the tax was an ongoing violation upon which the statute of limitations period begins anew with each collection. However, the court noted that the case did not concern bond issues or other governmental actions that, by state law, are made subject to the accelerated validation procedures of Code of Civil Procedure sections 860 through 870.5.

The Santa Clara decision did not decide the question of the applicability of Proposition 62 to charter cities such as the City. Two (2) cases decided by the California Courts of Appeals in 1993, *Fielder v. City of Los Angeles* (1993) 14 Cal. App. 4th 137 (rev. den. May 27, 1993), and *Fisher v. County of Alameda* (1993) 20 Cal. App. 4th 120 (rev. den. Feb. 24, 1994), had held that Proposition 62's restriction on property transfer taxes did not apply to charter cities because charter cities derive their power to enact such taxes under Article XI, Section 5 of the California Constitution relating to public affairs.

Proposition 62, as an initiative statute, does not have the same level of authority as a constitutional initiative, but is analogous to legislation adopted by the State Legislature, except that it may be amended only by a vote of the State's electorate. However, Proposition 218, as a constitutional amendment, is applicable to charter cities and supersedes many of the provisions of Proposition 62.

Since the enactment of Proposition 62 in 1986, the City has instituted certain tax increases, and pursuant to such increases has collected approximately $309.3 million through June 30, 2002. The City did not increase existing taxes or impose new taxes during Fiscal Year 2002 or to-date in Fiscal Year 2003.

While in the opinion of the City Attorney the provisions of Proposition 62 do not apply to charter cities, this position is being challenged by various groups in other jurisdictions and may be the subject of future litigation. If ultimately found valid and applicable to charter cities, Proposition 62 could affect the ability of the City to continue the imposition of certain taxes, such as Sales and Transient Occupancy Taxes, and may further restrict the City's ability to raise revenue.

## LABOR RELATIONS

Most City employees are represented by one of four labor organizations. Currently, the American Federation of State and County Municipal Employees (Local 127) represents approximately 2,276 employees; The Municipal Employees Association (the "MEA") and unrepresented employees (who are a part of the MEA bargaining unit for contract purposes) represents approximately 4,935 employees; The Police Officers Association (the "POA") represents approximately 2,073 employees; and the International Association of Firefighters (Local 145) represents approximately 991 employees.

Labor agreements are in place with Local 127, MEA, and Local 145 through June 30, 2005. MEA and Local 127 will receive the following pay increases: 1% effective December 2002, 2% effective December 2003, 2% effective June 2004, 3 % effective December 2004, and 3% effective June 2005. Local 145 will receive the following pay increases: 1% effective July 2002, 2% effective July 2003, 2% effective December 2003, 4% effective July 2004, and 2% effective December 2004. In addition to increases in paid compensation, MEA, Local 127, and Local 145 will also receive increases in the amount of employee retirement contributions paid by the City on behalf of the employees. Including these retirement benefit increases, over the three-year period of the labor agreements total compensation will increase by 12.6% for MEA and Local 127, and by 15.7% for Local 145.

A labor agreement with POA is in place through June 30, 2003. POA received a 2% pay increase and a 1.7% increase in retirement compensation effective July 2002.

## PENSION PLAN

All benefited City employees participate with the full-time employees of the San Diego Unified Port District (the "District") in the City Employees' Retirement System ("CERS"). CERS is a public employee retirement system that acts as a common investment and administrative agent for the City and the District. Through various benefit plans, CERS provides retirement benefits to all general, safety (police and fire), and legislative members.

The CERS plans are structured as defined benefit plans in which benefits are based on salary, length of service, and age. City employees are required to contribute a percentage of their annual salary to CERS. State legislation requires the City to contribute to CERS at rates determined by actuarial valuations.

The City's last actuarial valuation dated June 30, 2002 stated the funding ratio (Valuation of Assets available for Benefits to Total Actuarial Accrued Liability), of the CERS fund to be 77.3%. The CERS fund has an Unfunded Actuarial Accrued Liability (UAAL) of $720.7 million as of June 30, 2002, which represents a $436.8 million increase in the UAAL since the previous actuarial calculation dated June 30, 2001. The UAAL is the difference between total actuarial accrued liabilities of $3.169 billion and assets allocated to funding of $2.448 billion. The increase in the UAAL as of June 30, 2002, results primarily from the lower than anticipated investment returns. The UAAL is amortized over a 30-year period, which started July 1, 1991, with each year's amortization payment reflected as a portion of the percentage of payroll representing the employer's contribution rate. As of June 30, 2002, there were 19 years remaining in the amortization period. See "**LITIGATION POTENTIALLY AFFECTING THE GENERAL FUNDS OF THE CITY- Other Litigations and Claims**" for a discussion of a pending litigation relating to the funding of the UAAL.

## INSURANCE, CLAIMS, AND LITIGATION

### Workers' Compensation And Long-Term Disability

The City is self-insured for Workers' Compensation and Long-term Disability. The City's self-insured liability for Workers' Compensation and Long-term Disability is accounted for in the Self Insurance Fund. The Self Insurance Fund for Workers' Compensation and Long-Term Disability is supported by contributions from each of the City's operating funds. These contributions are determined by multiplying an annually established rate by the gross salaries payable from each of the City's operating funds. As of June 30, 2002, there is a fund equity deficit in the Self Insurance Fund of approximately $29.3 million. It is anticipated that individual claim settlements will be funded through participating operating fund contributions subsequent to the filing of a claim and prior to its settlement.

### Employee Group Health Insurance

Employee Group Health coverage is provided to employees and retirees by third party group health insurance carriers through an annual "cafeteria plan" selection process.

### Public Liability Insurance

The City carries public liability insurance in the amount of $54 million in excess of the City's $1 million self-insured retention. This means that the City may pay up to the first $1 million in any one insured public liability loss and that insured losses above $1 million and up to $54 million are paid by

Exhibit 9
Page 151 of 165

the City's public liability insurance. The City's public liability insurance is purchased in layers, jointly with a number of counties in the California State Association of Counties – Excess Insurance Authority ("CSAC-EIA"), however, there is no sharing of policy limits with other members of CSAC-EIA for public liability claims. The City budgets for public liability claims on an annual basis. The City has incurred total annual liability claims and liability insurance premium payments as shown below in Table 18.

**Table 18**
**CITY OF SAN DIEGO**
**LIABILITY CLAIMS[1] AND PREMIUMS**
*Fiscal Years ended June 30, 1998 through 2002*

| Fiscal Year | Liability Claims Expenses And Settlement Costs | Liability Premium Payments |
|---|---|---|
| 1998 | $ 9,970,097 | $ 1,209,474 |
| 1999 | $ 7,202,644 | $ 1,103,009 |
| 2000 | $ 9,639,750 | $ 1,105,678 |
| 2001 | $ 13,394,697 | $ 1,071,330 |
| 2002 | $ 8,479,308 | $ 1,520,560 |

(1) The City's portion of settlement and investigation expenses for third party public liability claims, and other litigation expenses.

Source: City of San Diego, Risk Management

**Property Insurance**

The City participates in the joint purchase of property insurance including rental interruption and flood insurance through the CSAC-EIA pool; this does not include Earthquake insurance. This joint purchase of the City's "all risk" property insurance, insuring approximately $2 billion of City property, provides coverage for loss to City property up to approximately $400 million per occurrence, with a $25,000 deductible. This limit of insurance includes coverage for rental interruption for lease financed locations. The City also carries boiler and machinery coverage. There is no sharing of limits among the City and member counties of the CSAC-EIA pool, unless the City and member counties are mutually subject to the same loss. Limits and coverages may be adjusted periodically in response to requirements of bond financed projects and in response to changes in the insurance marketplace.

The City's "all risk" property insurance policy effective March 31, 2003, through March 31, 2004, will cost approximately $6 million. This represents an increase of 30% from the prior year, due to several factors including the events of September 11, 2001, a hardening insurance market and a loss of reinsurance capacity.

**Earthquake Insurance**

Earthquake coverage is provided for designated buildings/structures and certain designated City lease financed locations in the amount of $75 million, including coverage for rental interruption caused by Earthquake at certain designated locations. Earthquake coverage is subject to the greater of a 5% or $50,000 per unit deductible, effective through March 31, 2004. The City's earthquake coverage is purchased jointly and shared with the member counties in the CSAC-EIA pool. Due to the potential for geographically concentrated earthquake losses, the CSAC-EIA pool is geographically diverse to minimize any potential sharing of coverage in the case of an earthquake. Depending upon the availability and affordability of such earthquake insurance, the City may elect not to purchase such coverage in the future,

or the City may elect to increase the deductible or reduce the coverage from present levels.

**Employee Dishonesty and Faithful Performance Insurance**

The City is a public agency subject to liability for the dishonest acts, and negligent acts or omissions of its officers and employees acting within the scope of their duty ("employee dishonesty" and "faithful performance"). The City participates in the joint purchase of insurance covering employee dishonesty and faithful performance through the CSAC-EIA pool. Coverage is provided in the amount of $10 million per occurrence subject to a $25,000 deductible.

## LITIGATION POTENTIALLY ADVERSELY AFFECTING
## THE GENERAL FUNDS OF THE CITY

**No Pending Litigation**

There is no litigation against the City pending or, to the knowledge of the officers of the City, threatened, in any court or other tribunal of competent jurisdiction, state or federal, in any way (i) restraining or enjoining the issuance, sale or delivery of any of the securities; (ii) questioning or affecting the validity of the securities; or (iii) questioning or affecting the validity of any of the proceedings for the authorization, sale, execution or delivery of the securities. To the knowledge of the City and the City Attorney, there are pending against the City lawsuits and claims arising in the ordinary course of the City's activities which, taken individually or in the aggregate, could materially affect the City's finances. However, taking into account insurance and self-insurance reserves expected to be available to pay liabilities arising from such actions, the City does not expect any or all of such claims to have a material adverse effect on its ability to repay the securities when due.

*De La Fuente Border Business Park v. City of San Diego*

On January 2, 2001, a San Diego County Superior Court jury returned a special verdict in the amount of $94.5 million against the City. The jury award consisted of three parts: $29.2 million for breach of a development agreement; $25.5 million for inverse condemnation relating to planning of a regional airport; and, $39.8 million for inverse condemnation relating to excessive traffic. Claims for interest, costs, and attorneys' fees could bring the total judgment to more than $200.0 million.

The lawsuit arises out of a 1986 development agreement (the "Development Agreement") between the City and Border Business Park, Inc., relating to the development of a 312-acre industrial park in Otay Mesa, a community within the boundaries of the City and just north of the United States-Mexican border. Plaintiff alleges the City engaged in a pattern of conduct aimed at thwarting the developer's rights under the Development Agreement, which resulted in breaches of the Development Agreement and unconstitutional "takings" of private property for public use. Specifically, plaintiff claimed the City "took" plaintiff's property by: (i) publicly discussing a proposal to build an international airport in the Otay Mesa region; and (ii) diverting commercial truck traffic onto public streets adjacent to plaintiff's property.

The specific breaches of the Development Agreement alleged in the lawsuit include: changes in city-wide construction standards; denials of conditional use permits; delays in permit processing; imposition of Housing Trust Fund Fees; diversion of Development Impact Fees; and the mismanagement of adjacent City-owned property. The disclosure of plans for a new regional airport, and the diversion of border-bound traffic, which were the bases for the inverse condemnation awards, were also alleged as contract breaches.

A - 34

Exhibit 9
Page 153 of 165

Following the special verdict but before entry of the judgment, the trial judge disqualified himself from further proceedings in the case for allegedly failing to disclose personal relationships with one of the plaintiff's attorneys. The case was transferred to another judge outside of San Diego County who will sit for all purposes, including a new trial.

The City has retained two law firms to represent it in post trial motions and any appeals. Such motions and potential appeals pertain to the validity of the disqualified trial judge's pre-trial and trial rulings, and the validity of the underlying verdict.

As the result of a recent hearing on the City's post-trial motions before the newly assigned judge, the judge reduced the plaintiff's pre-judgment interest claim from $144.0 million to about $26.0 million. The court subsequently entered judgment on the verdict amount ($94.5 million), plus the pre-judgment interest for a total of $119.0 million.

In addition, the court has denied the City's motion for judgment notwithstanding the verdict and motion to set aside the verdict on the grounds of fraud. It did, however, grant the City a complete new trial on one legal theory, a contract claim, and set aside award of the damages on that theory (in the amount of $29.2 million of the $94.5 million). The court also found the contract claim largely barred by the time limits in the Government Claims Act.

The court denied the City a new trial on the remaining claims in the case for inverse condemnation, relating to the airport study and truck routing, finding that the Court needed to defer to the original judge on these matters. This has the effect of leaving in place $65.3 million in inverse condemnation damages, plus approximately $26.0 million in pre-judgment interest. The total judgment, including pre-judgment interest, is currently approximately $91.3 million. Appellate counsel for the City has advised that the City should have no obligation to pay these amounts until the appeal is concluded, which will take at least eighteen months to two years. The City will also be responsible for any post-trial interest, which will accrue at the rate of approximately 5.7% per annum, until any judgment is paid.

The City believes that a significant portion of its defense costs — both retroactive to the exhaustion of the self-insured retention of $1.0 million and prospectively through appeal— will be paid in large part by one or more of the City's insurers. The City may have some coverage for damages under its policies of insurance but the amount and scope of the coverage is not presently known. A number of insurers whose policies may cover defense costs and any judgment have challenged the applicability of their policies (see **"Insurance Coverage Issues"** below).

Despite the denial of certain of the post-trial motions, the City believes it has sound legal theories for its appeal; however, no assurance can be given that the City's pursuit of this challenge will be successful. In the event that the City is not successful on appeal, and on retrial, if any, the judgment, including any interest, will have to be paid from the City's treasury, most likely over a period of ten years with additional interest during that period, to the extent that there is not insurance coverage or a shortfall in coverage.

Because there is no final judgment at this time, given the court's partial grant of the City's new trial motion, the City had not included any moneys for the payment of any judgment in this case in its budget for the 2002-2003 Fiscal Year and does not propose to include any moneys in its budget for the 2003-2004 Fiscal Year.

Exhibit 9
Page 154 of 165

On November 7, 2001, the plaintiff filed a motion with the trial court asking that the City deposit in trust into the court, the full judgment amount of $92.4 million which includes some post-judgment interest, pending the City's appeal. The court denied the plaintiff's motion. Litigation counsel has advised that if plaintiff seeks discretionary review of the denial of the motion for deposit, the plaintiff must have done so within approximately sixty days after entry of the order on November 19, 2001. As of the date hereof, no such discretionary review has been sought.

## Insurance Coverage Issues

On April 9, 2002, three of the City's general liability insurers filed a federal court lawsuit against the City in the Southern District of California, *Insurance Company of the State of Pennsylvania, et al. v. City of San Diego*, Case No. 02 CV 0693 JM (RBB). These insurers provide coverage to the City for the years 1991 to 2001, and they collectively insure the City for policy limits of $25 million per occurrence per year (less the City's self-insured retention, which ranges from $1 million to $3 million). The insurers' lawsuit seeks a declaration that the insurers are not obligated to defend or indemnify the City for any liability it may suffer in the *De La Fuente* matter.

The City's other two liability insurers did not join in this lawsuit, although they are not precluded from joining in this lawsuit or filing a separate lawsuit. The non-suing liability insurers issued coverage to the City for the 1990-91 policy year, with collective limits of $17 million per occurrence. One of them (with policy limits of $2 million per occurrence) has indicated by letter to outside counsel that it will accept coverage for one occurrence, while reserving its rights to dispute that there is more than one occurrence.

The suing insurers are disputing coverage on the ground that the City allegedly provided late notice of the claims against it, and based upon alleged policy exclusions for breach of contract and inverse condemnation claims. Although one suing insurer has been paying a significant portion of the City's defense costs in the *De La Fuente* matter to date (about 60%), and has orally agreed to continue defending despite filing the coverage lawsuit, that insurer seeks to be relieved of the defense obligation by court order. If the insurers were to prevail on this complaint, the City would lose insurance coverage for its future attorneys' fees and costs incurred in defending the *De La Fuente* matter, and for any damages ultimately awarded in those cases, from these insurers. In the opinion of outside counsel, the City would not owe any damages to the insurance companies, even if it lost coverage, except in the unlikely event that the Court ordered the City to reimburse suing insurer(s) for past defense costs it has paid to the City.

On May 7, 2002, the City filed an answer and counterclaim in the lawsuit. The City seeks a determination that all three suing insurers are obligated to defend the City in the *De La Fuente* matter. In addition, the City seeks to recover damages for breach of contract and bad faith. However, no prediction can be made as to the outcome of this litigation.

## City Voter Initiatives

An initiative proposing an amendment to the San Diego City Charter was submitted to the City voters at the election on the March 5, 2002. This initiative appeared on the ballot as Proposition E. The initiative asked the voters whether the City Charter should be amended to require that any increase in an existing general tax or imposition of any new general tax be levied by the City Council only if the proposed levy has been approved by a two-thirds vote of the qualified electors voting on the proposed tax measure.

Exhibit 9
Page 155 of 165

At that same election, another proposition was submitted to the voters for consideration. This proposition, Proposition F, asked the voters whether the City Charter should be amended to require that, in order to be adopted or effective, any City Charter amendment, ballot proposal, initiative, statute, law, or regulation requiring a greater than simple majority vote of the electorate, and which is proposed to be adopted on or after the date of this election, must be adopted by the same proportionate vote of the electorate. In effect, the City has argued in the litigation described below that, the adoption of this proposition would require that Proposition E would have to be approved by a two-thirds vote of the qualified electors voting in the March 5, 2002 election.

Proposition E was approved by 54.4% and Proposition F was approved by 50.3% of the voters in the March 5, 2002 election. Having received a majority vote, Proposition F was adopted. The City has taken a position that Proposition E, however, by the terms of Proposition F, was not adopted.

There have been two cases filed challenging the results of the March 5, 2002 election pertaining to Propositions E and F; *Teyssier v. City of San Diego, et al. and Howard Jarvis Taxpayers Association v. City of San Diego et al.* Both actions seek declaratory relief contending that Proposition F is unconstitutional. In addition, *Teyssier* seeks a writ of mandate directing the City to certify and record the adoption of Proposition E. Both matters allege (i) that Proposition F is preempted by the California Constitution; (ii) that it cannot affect an election held prior to its effective date; and (iii) that Proposition F, having received fewer votes than Proposition E, an alleged conflicting measure on the same ballot, should have been defeated. The trial court consolidated the two cases.

On April 22, 2003, the City received a minute order of the trial court for the consolidated cases. The Court's ruling declines to invalidate Proposition E. The Court leaves open the question whether Proposition E could require a supermajority for an amendment to the City Charter, which would impose or raise a general tax. The Court's minute order has not been reduced to a judgment. The City has not yet decided to appeal or other wise contest the ruling. Regardless of the outcome of the litigation, these lawsuits are unlikely to have any impact to the City's budget or revenue for Fiscal Year 2003, because they relate only to new or increased taxes. It is currently anticipated that the City's proposed budget for Fiscal Year 2004 would not include projected revenues from any such tax enhancing measures.

**Other Litigation and Claims**

In February 2002, the Public Facilities Financing Authority of the City of San Diego issued lease revenue bonds in the aggregate principal amount of $169,685,000 (the "Ballpark Bonds") for the construction of a state of the art baseball park. The ballpark project has been the subject of a variety of litigations, however, there has not been any new litigation filed regarding the project since the approval of the original Offering Document in 2002. The case *Skane v. City of San Diego*, Court of Appeal case no. D038879 has been finally resolved, the California Supreme Court denying a petition for review on October 2, 2002. On January 30, 2003, the Fourth District Court of Appeal filed an opinion affirming a trial court judgment in favor of the City in the case *Simmons v. City of San Diego*, Court of Appeal case no. D039838. The plaintiffs failed to file a petition for review to the California Supreme Court by the filing deadline of March 11, 2003. The City and Bond Counsel are considering the import of the appellate court's decision on the City's ability to refund the 2002 Bonds (see "**BONDED AND OTHER INDEBTEDNESS- Proposed Additional General Fund Lease Commitments**"). The case *City v. All Persons Interested*, Superior Court case no. GIC763487 was the subject of appeals that were consolidated under Court of Appeal case no D038587 and were further consolidated with Skane. The Court of Appeal affirmed the judgment in favor of the City and the Redevelopment Agency. The California Supreme Court

Exhibit 9
Page 156 of 165

denied the petitions for review on October 2, 2002.

On March 29, 2002, Brown Field Aviation Park LLC (BFAP) filed a claim seeking damages in excess of $120 million, asserting that the City breached a Memorandum of Understanding that provided BFAP with the exclusive right to negotiate a proposed Development Agreement and Master Lease that would transform Brown Field into a cargo airport with ancillary commercial and industrial uses. BFAP contended that the City breached the MOU by requiring review by the Federal Aviation Administration prior to a City Council hearing. In addition, BFAP claimed the city breached the MOU by failing to present the project for City Council consideration in September 2000, and by failing to continue negotiations after the FAA released a preliminary airspace analysis on September 29, 2000.

On March 4, 2003 the City Council approved a settlement of this case by agreeing to pay BFAP $1.25 million. This sum represents a refund of the money BFAP paid to the City for the right to negotiate the project and for the labor costs incurred by the City staff in reviewing the proposed project. The City's excess liability carrier also agreed to pay $249,000 in settlement of the claim.

On January 16, 2003, a class action complaint (*Gleason v. City of San Diego, et al.*) for declaratory relief was filed in the Superior Court against the City, the City's Employees' Retirement System (SDCERS), and certain named members of the SDCERS board of administration. The plaintiffs, former City employees who receive City retirement benefits, allege that as a result of recent actions taken by the defendants, the SDCERS trust fund has an unfunded accrued liability of $720 million, and that by 2009, the City will owe approximately $2.8 billion to SDCERS, with an annual City budget expense of more than $250 million. In addition to the declaration of their rights, plaintiffs ask for restitution to the SDCERS trust fund, an injunction prohibiting the City from unlawfully underfunding the trust fund in the future, money damages, attorneys' fees, and other relief.

As noted under the heading "**PENSION PLAN**" above, the City's unfunded accrued actuarial liability as of June 30, 2002 is approximately $720 million. The City is defending the case and believes it has complied with applicable law in the funding of the SDCERS trust fund. The case is still in the early stages, and the City has not completed an assessment of the claim. The City cannot predict the outcome of the litigation at this time, but if the plaintiffs are successful, there potentially may be additional expense to the General Fund in the funding of the SDCERS trust fund and otherwise, over and above the City's expected expense in the funding of its pension obligations.

## INVESTMENT OF FUNDS

The Treasurer of the City of San Diego, in accordance with the Charter of the City of San Diego and authority granted by the City Council, is responsible for investing the unexpended cash in the Treasurer's pooled operating investment fund (the "City Pool"). Responsibility for the daily investment of funds in the City Pool is delegated to the City's Chief Investment Officer. The City is the only participant in the City Pool; there are no other City Pool participants either voluntary or involuntary. The investment objectives of the City Pool are preservation of capital, liquidity and return.

### Oversight and Reporting Requirements

The City Treasurer provides an investment report on a monthly basis to the City Manager, the City Auditor and Comptroller and the City Council and annually presents a statement of investment policy (the "Investment Guidelines") to the City Manager, the City Council and the City Manager's

Investment Advisory Committee. The Investment Advisory Committee was established in 1990 and is comprised of the City Auditor and Comptroller, a Deputy City Manager and three investment professionals from the private sector. The Committee is charged with oversight responsibility to review on an ongoing basis the Investment Guidelines and practices of the City Treasurer and recommend changes. Investments in the City Pool are audited by an independent firm of certified public accountants as part of the overall audit of the City's financial statements.

The City's investment section uses outside services to provide investment portfolio valuations and accounting and reporting services. The service provides monthly portfolio valuation, investment performance statistics and other statistical security reports, which are distributed to the City Treasurer accounting section and the City Auditor and Comptroller's office for review and reconciliation. The City Treasury accounting section prepares a series of monthly reports, which includes portfolio market valuation, and distributes these to the Mayor, City Council, City Manager and other officials.

**Authorized Investments**

Investments in the City Pool are governed by State law and further restricted by the City's Investment Guidelines. The Guidelines have been written with safety of principal being the foremost objective. Permitted investments include U.S. Treasury securities, U.S. Agency securities, corporate medium term notes, money market instruments and the Local Agency Investment Fund (California State Pool). Reverse repurchase agreements ("reverse repos") are restricted to 20% of the base value of the portfolio and are governed by various maturity restrictions as well. The main operating funds of the City are being managed in two separate portfolios. In its management of the "Liquidity" portfolio, comprising about 35% of total funds, the City invests in a variety of debt securities with maturities ranging from one day to one year. The remaining 65% of funds are managed in a separate "Core" portfolio that consists of a variety of debt securities ranging from one day to five years; performance is measured against the Merrill Lynch 1 to 3 year U.S. Treasury Index. Safety of principal and liquidity are the paramount considerations in the management of both portfolios.

**Pool Liquidity and Other Characteristics**

The City Pool (including both the "Liquidity" and the "Core" portfolios) is highly liquid. As of January 31, 2003, approximately 10% of the pool investments mature within 60 days, 21% within 90 days and 35% within 181 days (on a cumulative basis). As of January 31, 2003, the Pool had a weighted average maturity of 1.59 years (580 days) and its weighted yield was 2.90%. For purposes of calculating weighted average maturity, the City Treasurer treats investments in the State-wide Local Agency Investment Fund (California State Pool) as maturing within one day. The Liquidity portfolio had a duration of 0.35 years and the Core portfolio had a duration of 1.42 years as of January 31, 2003. Duration is a measure of the price volatility of the portfolio and reflects an estimate of the projected increase or decrease in the value of the portfolio based upon a decrease or increase in interest rates. Accordingly, the Liquidity portfolio should decrease in market value by 0.35% for every 1% increase in market interest rates while the Core portfolio should decrease in market value by 1.42% for every 1% increase in market interest rates. The City Pool's composition is designed with a goal of having sufficient liquid funds available to meet disbursement requirements. The composition and value of investments under management in the City Pool will vary from time to time depending on cash flow needs of the City, maturity or sale of investments, purchase of new securities, and fluctuations in interest rates.

## Table 19
## CITY OF SAN DIEGO POOLED OPERATING INVESTMENT FUND [1]
### at January 31, 2003
(Unaudited)

| Investment Instrument | Book Value | Market Value | Percent of Total [1] |
|---|---|---|---|
| U.S. Treasury Bills and Notes | $491,710,525 | $495,537,305 | 38.88% |
| Federal Agency Securities | 569,354,218 | 575,278,317 | 45.01% |
| Medium Term Notes (Corporate) [2] | 140,059,070 | 139,036,161 | 11.07% |
| Money Market Instruments [3] | 43,397,533 | 43,443,305 | 3.43% |
| Local Agency Investment Fund | 20,334,871 | 20,334,871 | 1.61% |
| NET ASSETS | $1,264,856,217 | $1,273,629,959 | 100.00% |

(1) Based on Book Value.
(2) These notes consist of both fixed & floating interest rate securities. The notes with floating interest rates are reset at intervals ranging from one day to three months.
(3) These securities consist of commercial paper, negotiable certificates of deposit, term and overnight repurchase agreements, banker's acceptances, bank notes and/or thrift notes.

Source: City of San Diego, Office of the City Treasurer

### Derivatives

As of January 31, 2003, and at least since October 14, 1997, the City Pool has had no assets invested in structured notes or derivatives prohibited in California Government Code 53601. The City Treasurer defines a derivative as a financial instrument whose value is derived from an underlying asset, price, index or rate, e.g., options, futures or interest rate swaps. A structured note is an investment instrument that can contain within its structure various combinations of derivatives such as imbedded calls and interest rate swaps that will offer returns to an investor within a defined set of parameters and interest rate scenarios, e.g., step-ups, multiple-indexed notes, inverse floaters or leveraged constant maturity notes. The City Treasurer does not define fixed rate notes, debentures with call features or single index non-leveraged floating rate notes, e.g. monthly LIBOR plus or minus a spread, as structured notes. The City Treasurer limits structured notes eligible for purchase to those investments which, at the time of purchase, have no risk of principal loss if held to maturity and offer an estimated return at purchase that exceeds the return on a comparable fixed term investment in the judgment of the City's Investment Officer. The City Treasurer does not allow the purchase of securities that have a negative amortization of principal. In addition, California law prohibits the purchase by local governments of inverse floaters, range notes or interest only strips derived from pools of mortgages.

### Reverse Repurchase Agreements

A reverse repo is a transaction in which the City Pool sells a security and concurrently agrees to buy it back from the same party at a later date for a price that includes an interest component for the City Pool's use of the money. Although the City from time to time uses reverse repos, as of January 31, 2003, and since September 18, 1996, the City has had no reverse repos in the City Pool. The Investment Guidelines require that all proceeds of a reverse repo be reinvested in securities whose maturity date or coupon reset date match the maturity of the reverse repo. The Investment Guidelines limit the use of reverse repurchase agreements to 20% of the base value of the City Pool. The City's reverse repo program is monitored daily and reported monthly, as described above under "**Oversight and**

A - 40

Exhibit 9
Page 159 of 165

Reporting Requirements".

## BONDED AND OTHER INDEBTEDNESS

### General

The City has never failed to pay principal of or interest on any of its debts or lease obligations when due.  The City has issued bonds or entered into installment purchase contracts secured by and payable out of loans and installment sale contracts, in order to provide conduit financing for single and multi-family housing, industrial development, and 501 (c) (3) non-profit corporations.  These bonds and certificates of participation are not secured by City general funds or revenues.

### Long-Term Obligations

As of June 30, 2002, the City had $58,095,000 aggregate principal amount of long-term general obligation bonded indebtedness outstanding and $566,505,000 aggregate principal amount of long-term general fund lease obligations outstanding.  The City's general obligation bond ratings are AAA (Fitch Ratings), Aa1 (Moody's Investors Services) and AA (Standard & Poor's).

The following table is a schedule, by years, of principal and interest payments required to be made by the City or its oversight entities with respect to future obligations, as of June 30, 2002.

### Table 20
### CITY OF SAN DIEGO
### GENERAL OBLIGATION AND GENERAL FUND LEASE OBLIGATIONS
*As of June 30, 2002*
*(in thousands)*

| Fiscal Year Ending June 30 | General Obligation Bonds | General Fund Lease Obligations | Total Principal and Interest Payable |
|---|---|---|---|
| 2003 | $   9,395 | $   49,146 | $   58,541 |
| 2004 | 9,525 | 49,854 | 59,379 |
| 2005 | 9,645 | 49,921 | 59,566 |
| 2006 | 9,777 | 49,497 | 59,274 |
| 2007 | 9,923 | 46,993 | 56,916 |
| Thereafter | 26,337 | 894,774 | 921,111 |
| Subtotal | $ 74,602 | $ 1,140,185 | $ 1,214,787 |
| Less Interest Portion | $ (16,507) | $ (573,680) | $ (590,187) |
| Total Principal Portion | $   58,095 | $   566,505 | $   624,600 |

A - 41

Exhibit 9
Page 160 of 165

The following provides a summary list of outstanding general obligation bonds and General Fund lease commitments as of June 30, 2002.

| | Principal Outstanding (000's) |
|---|---|
| **General Obligation Bonds** | |
| 1994 – Open Space Park Facility District Refunding | $41,175 |
| 1991 – Public Safety Communications | 16,920 |
| Total Principal of General Obligation Bonds | $58,095 |
| | |
| **General Fund Lease Commitments** | |
| | |
| *Certificates of Participation* | |
| 1993 – Balboa Park/Mission Bay Park Capital Improvements [1] | $19,800 |
| 1996A – Balboa Park/Mission Bay Park Capital Improvements | 25,010 |
| 1996B – Balboa Park/Mission Bay Park Capital Improvements Refunding | 10,440 |
| *Lease Revenue Bonds* | |
| 1993 – City/MTDB Authority for Old Town Trolley Extension [2] | 16,005 |
| 1994 – City/MTDB Authority Refunding - Police CIP and Bayside Extension | 34,560 |
| 1996 – Stadium Improvements | 64,955 |
| 1998 – Convention Center Expansion Authority | 200,980 |
| 2002 – Ballpark and Redevelopment Project | 169,685 |
| 2002 – Fire and Life Safety Improvements | 25,070 |
| Total Principal of General Fund Lease Commitments | $566,505 |

(1)  To be refunded by the 2003 Refunding Certificates of Participation (Balboa Park/Mission Bay Park Capital Improvements).
(2)  To be refunded by the 2003 Refunding Lease Revenue Bonds (San Diego Old Town Trolley Extension).

Source:  City of San Diego, Auditor and Comptroller

## Recent Financings

In June 2002, the Public Facilities Financing Authority of the City of San Diego issued $25.2 million in Lease Revenue Bonds to fund the rehabilitation and construction of fire stations and life safety facilities throughout the City.  The total project cost is estimated at approximately $45.1 million, including $10.9 million for life safety improvements and $34.2 for fire improvements.  Additional funding is expected to come from bond proceeds in future Fiscal Years.  Additionally, in April 2003, the City refunded the 1993 City/MTDB Authority Lease Revenue Bonds (Old Town Trolley Extension).

## Proposed Additional General Fund Lease Commitments

From time to time the City issues debt to fund various capital improvements and projects. The City will be refunding the 1993 Certificates of Participation (Balboa Park/Mission Bay Park Capital Improvements) in May 2003.

In 2004, the City intends to issue approximately $87 million in General Fund obligations to implement the Library System Improvements Program adopted by the City Council in November 2002. The overall program consists of renovation, expansion and addition of new library facilities Citywide at an estimated total project cost of $312 million between Fiscal Years 2003 and 2011.  The funding sources include grants and private funds, Development Impact Fees and Facilities Benefit Assessment Fees, Other City Funds and bond proceeds.  Upon the initial bond issuance projected to occur in 2004, the remainder of the bond funds is expected to come from phased bond issuances in later Fiscal Years.

Exhibit 9
Page 161 of 165

In February 2002, the Public Facilities Financing Authority of the City of San Diego issued $169.7 million in Lease Revenue Bonds to fund a portion of the City's contribution to the Ballpark and Redevelopment Project (the "Ballpark Project"). Due to litigation matters concerning the Ballpark Project that were pending at the time of issuance, the bonds, although issued on a tax-exempt basis, were sold at a premium above tax-exempt rates. When the bonds were issued, it was contemplated that if litigation is decided favorably to the City, and depending on market conditions, the City would refund the bonds with bonds bearing lower interest rates. It is currently expected that remaining litigation matters will be resolved as early as Fiscal Year 2003 but no later than Fiscal Year 2004. See "**LITIGATION POTENTIALLY AFFECTING THE GENERAL FUNDS OF THE CITY- Other Litigations and Claims**" for the status of such litigation. If such matters are resolved favorably to the City, and depending on market conditions, the City would issue refunding bonds shortly thereafter.

**Short-Term Borrowings**

The City has issued tax anticipation notes since the mid-1960's (except for Fiscal Year 1979) in anticipation of receipt of taxes and other General Fund revenues. The following table presents a 10-year history of the City's short-term borrowings:

**Table 21**
**CITY OF SAN DIEGO**
**SHORT-TERM BORROWINGS**
*Fiscal Years Ended June 30, 1994 through May 1, 2003*

| Fiscal Year Ended June 30 | Principal Amount |
|---|---|
| 1994 | $ 100,500,000 |
| 1995 | $ 68,000,000 |
| 1996 | $ 53,000,000 |
| 1997 | $ 73,500,000 |
| 1998 | $ 82,000,000 |
| 1999 | $ 88,500,000 |
| 2000 | $ 99,500,000 |
| 2001 | $ 77,000,000 |
| 2002 | $ 73,000,000 |
| 2003 | $ 93,200,000 |

Source: City of San Diego, Auditor and Comptroller

**Prior Years' Defeasance of Debt**

In prior years, the City, the San Diego Stadium Authority, the Redevelopment Agency, the San Diego Facilities and Equipment Leasing Corporation, San Diego Open Space Park Facilities District No. 1, City of San Diego/MTDB Authority, and the Public Facilities Financing Authority defeased certain debt obligations by placing the proceeds of refunding bonds in an irrevocable trust to provide for all future debt service payments on the old bonds, through certain applicable redemption dates or maturity. Accordingly, the trust account assets and the liability for the defeased bonds are not included in the City's financial statements. As of June 30, 2002, $27,910,000 of defeased bonds are still held by investors.

**Operating Lease Commitments**

The City has entered into various General Fund lease arrangements under which the City

must make annual payments to occupy facilities necessary for City operations. The table below is a schedule by years of future minimum rental payments required under such leases entered into by the City that have initial or remaining noncancellable lease terms in excess of one year, as of June 30, 2002.

### Table 22
### CITY OF SAN DIEGO
### FUTURE MINIMUM RENTAL PAYMENTS
### GENERAL FUND OPERATING LEASE COMMITMENTS

| Fiscal Year Ending June 30 | Rent Payable |
| --- | --- |
| 2003 | $5,132,756 |
| 2004 | 2,481,868 |
| 2005 | 2,274,252 |
| 2006 | 2,259,671 |
| 2007 | 2,249,256 |
| Thereafter | 14,704,794 |
| Total Minimum Payments | $29,102,597 |

Source: City of San Diego, Auditor and Comptroller and Real Estate Assets Department

## Overlapping Debt and Debt Ratios

Table 23 presents a statement of direct and overlapping bonded debt of the City as of February 1, 2003. Revenue bonds, tax allocation bonds and special assessment bonds are not included in the tabulation; lease revenue obligations payable from the City's General Fund or equivalent sources are included.

The City contains numerous school districts and special purpose districts, such as for water and sanitation, many of which have issued general obligation bonds. Some of the issues may be payable from self-supporting enterprises or revenue sources other than property taxation.

The City periodically issues special assessment or Community Facilities District Mello-Roos bonds on behalf of petitioning developers or citizens when the City determines that the public facilities to be financed are of a defined extraordinary benefit to the City. These bonds are secured by property owner assessments or special taxes. As of June 30, 2002, there were four 1915 Act Assessment District and one Reassessment District bond issues with aggregate outstanding principal of $43,692,999 and three Community Facilities District (Mello-Roos) bond issues with outstanding principal of $115,010,000.

The reserve funds for each of the City's outstanding Assessment District and Community Facilities District bond issues were fully funded as of June 30, 2002. Although the City is not in any way obligated to make debt service payments for either Assessment or Community Facilities District bond issues, the City has in the past taken proactive measures to protect bondholders.

Exhibit 9
Page 163 of 165

**Table 23**
**CITY OF SAN DIEGO**
**STATEMENT OF DIRECT AND OVERLAPPING BONDED DEBT**
*as of February 1, 2003*

| | |
|---|---|
| 2002-03 Assessed Valuation: | $104,940,180,862 |
| Redevelopment Incremental Valuation: | 4,629,088,709 |
| Adjusted Assessed Valuation: | $100,311,092,153 |

| DIRECT AND OVERLAPPING TAX AND ASSESSMENT DEBT: | % Applicable | Debt 2/1/03 |
|---|---|---|
| San Diego County Water Authority | 49.271% | $ 810,508 |
| Metropolitan Water District | 8.872 | 44,587,123 |
| Southwestern Community College District | 17.482 | 6,912,383 |
| San Diego Unified School District | 99.911 | 764,304,390 |
| San Diego Unified School District Lease Tax Obligations | 99.911 | 67,784,618 |
| Sweetwater Union High School District | 21.100 | 7,620,265 |
| San Ysidro School District | 92.096 | 17,636,384 |
| Other High School and School Districts | Various | 9,468,043 |
| **City of San Diego** | **100.** | **15,690,000** |
| **San Diego Open Space Park Facilities District No. 1** | **100.** | **36,475,000** |
| City of San Diego Community Facilities District No. 1 | 100. | 52,745,000 |
| City of San Diego Community Facilities District No. 2, Improvement Area Nos. 1 and 3 | 100. | 60,250,000 |
| City of San Diego 1915 Act Bonds | 100. | 40,854,284 |
| North City West School District Community Facilities District | 100. | 92,327,921 |
| Poway Unified School District Community Facilities District No. 1 and 10 | 99.609-100. | 95,361,344 |
| San Dieguito Union High School District Community Facilities District No. 95-1 | 81.063 | 15,048,785 |
| Sweetwater Union High School District Community Facilities Districts | 5.014-100. | 2,861,346 |
| Other Special District 1915 Act Bonds | Various | 1,080,974 |
| TOTAL GROSS DIRECT AND OVERLAPPING TAX AND ASSESSMENT DEBT | | $1,331,818,368 |
| Less: San Diego Open Space Park Facilities District No. 1 (100% self-supporting) | | 36,475,000 |
| TOTAL NET DIRECT AND OVERLAPPING TAX AND ASSESSMENT DEBT | | $1,295,343,368 |

| DIRECT AND OVERLAPPING GENERAL FUND OBLIGATION DEBT: | | |
|---|---|---|
| San Diego County General Fund Obligations | 47.537% | $ 233,049,556 |
| San Diego County Pension Obligations | 47.537 | 391,892,651 |
| San Diego Superintendent of Schools Certificates of Participation | 47.537 | 982,827 |
| San Diego Community College District General Fund Obligations | 99.907 | 41,935,963 |
| San Diego Unified School District Certificates of Participation | 99.911 | 30,253,051 |
| Sweetwater Union High School District Certificates of Participation | 21.100 | 5,112,530 |
| Del Mar Union School District Certificates of Participation | 80.659 | 10,029,947 |
| San Ysidro School District Certificates of Participation | 92.096 | 8,993,174 |
| Chula Vista School District General Fund Obligations | 5.663 | 4,492,741 |
| Other School, High School and Community College District Certificates of Participation | Various | 8,185,454 |
| **City of San Diego General Fund Obligations and MTDB Authority** | **100.** | **555,535,000** |
| Otay Municipal Water District Certificates of Participation | 7.800 | 2,030,340 |
| TOTAL GROSS OVERLAPPING GENERAL FUND OBLIGATION DEBT | | $1,292,493,234 |
| Less: Otay Municipal Water District Certificates of Participation | | 2,030,340 |
| Grossmont Union High School District Certificates of Participation | | |
| (100% self-supporting from tax increment revenues) | | |
| TOTAL NET OVERLAPPING GENERAL FUND OBLIGATION DEBT | | 65,836 |
| | | $1,290,397,058 |

| | |
|---|---|
| GROSS COMBINED TOTAL DEBT | $2,624,311,602 [1] |
| NET COMBINED TOTAL DEBT | $2,585,740,426 |

(1) Excludes tax and revenue anticipation notes, enterprise revenue, mortgage revenue and tax allocation bonds and non-bonded capital lease obligations.

Exhibit 9
Page 164 of 165

Page 2. City of San Diego

Ratios to 2002-03 Assessed Valuation:
  Direct Debt  ($15,690,000) ..................................................................................... 0.01%
  Total Gross Direct and Overlapping Tax and Assessment Debt .................................. 1.27%
  Total Net Direct and Overlapping Tax and Assessment Debt ..................................... 1.23%

Ratios to Adjusted Assessed Valuation:
  Gross Combined Direct Debt ($607,700,000) [1] ...................................................... 0.61%
  Net Combined Direct Debt ($571,225,000) .............................................................. 0.57%
  Gross Combined Total Debt ....................................................................................... 2.62%
  Net Combined Total Debt ........................................................................................... 2.58%

| (1) | City | $ 15,690,000 |
| | City Authorities and Certificates of Participation | 555,535,000 |
| | San Diego Open Space Park Facilities District No. 1 | 36,475,000 |
| | | $607,700,000 |

STATE SCHOOL BUILDING AID REPAYABLE AS OF 6/30/02: $2,515,864

Source: California Municipal Statistics, Inc.

A - 46

Exhibit 9
Page 165 of 165