# EXHIBIT 10

THE CITY OF SAN DIEGO, CALIFORNIA
MINUTES FOR REGULAR COUNCIL MEETING
OF
MONDAY, MARCH 3, 2003
AT 2:00 P.M.
IN THE COUNCIL CHAMBERS - 12TH FLOOR

Table of Contents

CHRONOLOGY OF THE MEETING: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ATTENDANCE DURING THE MEETING: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ITEM-1:      ROLL CALL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ITEM-10:     INVOCATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ITEM-20:     PLEDGE OF ALLEGIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ITEM-30:     Bill Anderson Day. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

* ITEM-50:   Joint Use Cooperative Agreement Between the City of San Diego
             and the San Diego Unified School District. . . . . . . . . . . . . . . . . . . . . . . . . 6

* ITEM-51:   Exempting a Retirement Division Manager Position from the Classified Service.  7

* ITEM-52:   Exempting a Council Representative I Position from the Classified Service. . . . . 8

* ITEM-53:   Torrey Hills Center. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

* ITEM-60:   Two actions related to Equipment and Vehicle Financing Program (EVFP). . . . . 9

ITEM-61:     Four actions related to Refunding of 1993 Lease Revenue Bonds (Old Town
             Trolley) and 1993 Certificates of Participation (Balboa Park and Mission Bay Park
             Improvements) and authorization to replace Cash in Debt Reserve Funds of
             Refunding Issuances with Surety Policies. . . . . . . . . . . . . . . . . . . . . . . . . . 11

* ITEM-100:  Mesa Verde Neighborhood Park Lot Tot Improvements. . . . . . . . . . . . . . . . . 13

ITEM-101:    Scripps Ranch Community Park Sports Field Lighting. . . . . . . . . . . . . . . . . 14

Exhibit 10
Page 1 of 6

Minutes of Monday, March 3, 2003
Table of Contents (Continued)                                             Page 2

\* ITEM-102:  Environmental Justice Transportation/Land Use Planning Grant
             for the Barrio Logan Area. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

\* ITEM-103:  Inviting Bids and Award of Contract for Water Department
             General Requirements Contract. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

\* ITEM-104:  READ/San Diego Day. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

\* ITEM-105:  Appointment of Ms. Kathryn Ashworth to the Civil Service Commission. . . . . 21

\* ITEM-106:  Appointment of Mr. Gil Ontai to the San Diego Planning Commission. . . . . . . 21

  ITEM-150:  Two actions related to Inviting Bids and Award of Contract for
             the Construction of Water and Sewer Group Job 464C. . . . . . . . . . . . . . . . . 22

  ITEM-151:  Two actions related to Authorizing the Transfer of Funds for
             Chollas Valley Trunk Sewer Phase II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

  ITEM-200:  Conference with Real Property Negotiator, pursuant to
             California Government Code Section 54956.8: . . . . . . . . . . . . . . . . . . . . . . . 27

  ITEM-250:  Notice of Completion and Acceptance of Subdivision Improvement
             Agreement - Siempre Viva Business Park-Central Phase. . . . . . . . . . . . . . . 29

  ITEM-251:  Notice of Pending Final Map Approval - Skyline Terrace Estates. . . . . . . . . . 29

  ITEM-S400: Rose Marie Starns Day. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

\* ITEM-S401: Resolution to adjourn the City Council Meeting of May 27, 2003. . . . . . . . . . 31

  ITEM-S402: Change in Funding Source for Existing Underground Conversion Districts. . . . 31

  ITEM-S403: Change in Funding Source for Existing CPUC Rule 20-A Underground
             Conversion Districts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

  ITEM-S404: Various Underground Utility Districts with Mitigation Monitoring
             and Reporting Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

  ITEM-S405: Amendment to the Undergrounding of Utilities 2003 Calendar Year
             Annual Allocation, and Deletion of Council Policy 600-08. . . . . . . . . . . . . . . 36

Exhibit 10
Page 2 of 6

**Minutes of Monday, March 3, 2003**
**Table of Contents (Continued)**                                              **Page 3**

ITEM-S406: Public Hearing: Various Surcharge Funded Underground Utility Districts. .... 37

ITEM-S407: Public Hearing: Various CPUC 20A Underground Utility Districts. ......... 39

NON-DOCKET ITEMS: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

ADJOURNMENT: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Exhibit 10
Page 3 of 6

Minutes of the Council of the City of San Diego
for the Regular Meeting of Monday, March 3, 2003                          **Page 11**

FILE LOCATION:          SUBITEM A: NONE
                        SUBITEM B: MEET

COUNCIL ACTION:         (Time duration: 2:27 p.m. - 2:28 p.m.)

CONSENT MOTION BY ATKINS TO INTRODUCE THE ORDINANCE IN
SUBITEM A; AND ADOPT THE RESOLUTION IN SUBITEM B.  Second by
Madaffer.  Passed by the following vote: Peters-yea, Zucchet-yea, Atkins-yea, Lewis-yea,
Maienschein-yea, Frye-yea, Madaffer-yea, Inzunza-yea, Mayor Murphy-yea.

ITEM-61:    <u>Four</u> actions related to Refunding of 1993 Lease Revenue Bonds (Old Town
            Trolley) and 1993 Certificates of Participation (Balboa Park and Mission Bay Park
            Improvements) and authorization to replace Cash in Debt Reserve Funds of
            Refunding Issuances with Surety Policies.

            (See City Manager Report CMR-03-029.)

**CITY MANAGER'S RECOMMENDATION:**

   Introduce the following Ordinances in Subitems A and B, and adopt the Resolutions in
   Subitems C and D:

   Subitem-A:  .(O-2003-121 Cor.Copy)        INTRODUCED, TO BE ADOPTED ON
                                             MONDAY, MARCH 17, 2003

       Introduction of an Ordinance authorizing a Facilities Lease and Site Lease with the
       San Diego Facilities and Equipment Leasing Corporation, and a Trust Agreement,
       and approving the Form of an Assignment Agreement relating to the Delivery of
       Certificates of Participation in an amount not to exceed  <u>$22,000,000</u>
       $27,000,000 for a term not exceeding 32 Years (1993 Balboa Park/Mission Bay
       Park Refunding), and such other necessary actions in connection therewith.

       **NOTE:** **6** votes required pursuant to Section 99 of the City Charter.

   Subitem-B:  (O-2003-122 Cor.Copy)         INTRODUCED, TO BE ADOPTED
                                             ON MONDAY, MARCH 17, 2003

Exhibit 10
Page 4 of 6

**Minutes of the Council of the City of San Diego
for the Regular Meeting of Monday, March 3, 2003**                    **Page 12**

Introduction of an Ordinance authorizing a Lease Agreement with the City of San Diego/MTDB Authority, a Sublease Agreement with the San Diego Metropolitan Transit Development Board, and the authorization for the City of San Diego/MTDB Authority to issue its Lease Revenue Refunding bonds in an amount not to exceed $18.5 million, pursuant to Section 99 of the City Charter relating to the refunding of certain Lease Finance Obligations Related to the Old Town Light Rail Transit Extension and Financing of Certain Other Public Capital Improvements.

**NOTE:** <u>6</u> votes required pursuant to Section 99 of the City Charter.

Subitem-C:  (R-2003-1024 Cor.Copy)          ADOPTED AS AMENDED AS
                                             RESOLUTION R-297692

Authorizing the Sale of not to exceed  <u>$22,000,000</u> $27,000,000 Certificates of Participation by the City of San Diego, California; approving a Trust Agreement, Facilities Lease, Site Lease, Assignment Agreement, Escrow Agreement, Form of The Official Bid Form, The Notice Inviting Bids, and the Preliminary Official Statement; and authorizing and directing certain actions with respect thereto.

Subitem-D:  (R-2003-1025 Cor.Copy)          ADOPTED AS RESOLUTION R-297693

Authorizing the City of San Diego/MTDB Authority to issue its Lease Revenue Refunding Bonds in an amount not to exceed $18.5 million pertaining to The Old Town Light Rail Transit Extension and certain other public capital improvements.

<u>FILE LOCATION:</u>          SUBITEMS A & B: NONE
                              SUBITEMS C & D: MEET

<u>COUNCIL ACTION:</u>          (Time duration: 2:32 p.m. - 2:59 p.m.)

MOTION BY ATKINS TO INTRODUCE THE ORDINANCES IN SUBITEMS A AND B AND ADOPT THE RESOLUTIONS IN SUBITEMS C AND D WITH THE FOLLOWING AMENDMENT:  THAT $2.3 MILLION BE PLACED IN A RESERVE ACCOUNT FOR DEFERRED MAINTENANCE IN BALBOA PARK AND MISSION BAY PARK, BUT DEFER A DECISION ON HOW THAT MONEY IS SPENT UNTIL THE NEXT FISCAL YEAR CYCLE.

Exhibit 10
Page 5 of 6

Minutes of the Council of the City of San Diego
for the Regular Meeting of Monday, March 3, 2003                    Page 13

ACCEPT COUNCIL MEMBER ZUCCHET'S RECOMMENDATION TO INCLUDE
LANGUAGE IN THE RESOLUTION THAT THE CASH FUNDS RELEASED WILL
BE USED ON CAPITAL IMPROVEMENTS IN BALBOA PARK AND MISSION
BAY PARK WHICH ARE DETERMINED TO BE ELIGIBLE FOR FUNDING WITH
BOND PROCEEDS, WITH THE UNDERSTANDING THAT THE CITY MANAGER
AND THE CITY COUNCIL HAS THE RIGHT TO REVISIT THE ISSUE DURING
THE BUDGET NEGOTIATIONS AND HEARINGS.

Second by Madaffer. Passed by the following vote: Peters-yea, Zucchet-yea, Atkins-yea,
Lewis-yea, Maienschein-yea, Frye-yea, Madaffer-yea, Inzunza-yea, Mayor Murphy-yea.

* ITEM-100:  Mesa Verde Neighborhood Park Lot Tot Improvements.

(Mira Mesa Community Area.  District-5.)

**CITY MANAGER'S RECOMMENDATION:**

Adopt the following resolution:

(R-2003-994)            ADOPTED AS RESOLUTION R-297694

Authorizing the City Auditor and Comptroller to increase the Fiscal Year 2003
Capital Improvements Program Budget by an amount not to exceed $42,000 in
CIP-29-414.0, Mesa Verde Neighborhood Park Tot Lot Improvements in Fund
79006, Mira Mesa FBA Fund;

Authorizing the additional expenditure of an amount not to exceed $42,000 from
CIP-29-414.0, Mesa Verde Neighborhood Park Fund 79006, Mira Mesa FBA
Fund, solely and exclusively for the purpose of completing construction of the
Project and related costs, provided that the City Auditor and Comptroller first
furnishes one or more certificates certifying that the funds are, or will be, on
deposit with the City Treasurer;

Exhibit 10
Page 6 of 6

# EXHIBIT 11

# City of San Diego
## State of California

**Comprehensive Annual Financial Report**



Fiscal Year Ended June 30, 2006

Exhibit 11
Page 1 of 8

# CITY OF SAN DIEGO
# STATE OF CALIFORNIA

## COMPREHENSIVE ANNUAL
## FINANCIAL REPORT

### FOR FISCAL YEAR ENDED JUNE 30, 2006



**Prepared Under the Supervision of
Gregory Levin, CPA
Comptroller**

Exhibit 11
Page 2 of 8

# Table of Contents

For the Fiscal Year Ended June 30, 2006

INTRODUCTORY SECTION

Letter of Transmittal.................................................................................................................. 9

City of San Diego Officials as of June 30, 2006 ..................................................................... 26

Organization Chart as of June 30, 2006.................................................................................. 27

FINANCIAL SECTION

Independent Auditor's Report.................................................................................................. 31

Management's Discussion and Analysis (Required Supplementary Information) .................... 33

Basic Financial Statements .................................................................................................... 47

*Government-Wide Financial Statements*

    Statement of Net Assets .................................................................................................. 50

    Statement of Activities ..................................................................................................... 52

*Governmental Funds Financial Statements*

    Balance Sheet .................................................................................................................. 54

    Statement of Revenues, Expenditures, and Changes in Fund Balances......................... 56

    Reconciliation of the Statement of Revenues, Expenditures, and Changes in Fund Balances of Governmental
    Funds to the Statement of Activities ................................................................................ 57

*Proprietary Funds Financial Statements*

    Statement of Net Assets .................................................................................................. 58

    Statement of Revenues, Expenses, and Changes in Fund Net Assets............................ 59

    Statement of Cash Flows.................................................................................................. 60

*Fiduciary Funds Financial Statements*

    Statement of Fiduciary Net Assets................................................................................... 61

    Statement of Changes in Fiduciary Net Assets ............................................................... 62

*Notes to the Financial Statements*

    1. Summary of Significant Accounting Policies .............................................................. 63

    2. Reconciliation of Government-Wide and Fund Financial Statements........................... 76

    3. Cash and Investments ................................................................................................. 79

    4. Capital Assets .............................................................................................................. 101

4

Exhibit 11
Page 3 of 8

# Table of Contents

For the Fiscal Year Ended June 30, 2006

5.  Governmental Activities Long-Term Liabilities ............................................................................ 104

6.  Business-Type Activities Long-Term Liabilities ........................................................................... 112

7.  Discretely Presented Component Units Long-Term Debt ........................................................... 114

8.  Short-Term Notes Payable .......................................................................................................... 116

9.  Joint Venture ............................................................................................................................... 117

10. Lease Commitments .................................................................................................................... 118

11. Deferred Compensation Plan ...................................................................................................... 119

12. Pension Plans .............................................................................................................................. 120

13. Other Post Employment Benefits ................................................................................................ 133

14. Interfund Receivables, Payables, and Transfers ........................................................................ 134

15. Risk Management ........................................................................................................................ 136

16. Fund Deficit ................................................................................................................................. 137

17. Commitments ............................................................................................................................... 138

18. Contingencies .............................................................................................................................. 141

19. Third Party Debt .......................................................................................................................... 148

20. Closure and Post Closure Care Cost .......................................................................................... 149

21. Operating Agreements ................................................................................................................ 150

22. Subsequent Events ..................................................................................................................... 151

*Required Supplementary Information*

Pension Trust Funds Analysis of Funding Progress .......................................................................... 154

General Fund Budgetary Information ................................................................................................... 155

Note to Required Supplementary Information ..................................................................................... 159

*Supplementary Information*

Supplementary Information - General Fund ........................................................................................ 161

Exhibit 11
Page 4 of 8

# Table of Contents

For the Fiscal Year Ended June 30, 2006

Non-Major Governmental Funds .................................................................................. 187

    Special Revenue ....................................................................................................... 191

    Debt Service ............................................................................................................. 219

    Capital Projects ........................................................................................................ 229

    Permanent ................................................................................................................ 243

Non-Major Business-Type Funds - Enterprise ........................................................... 251

Internal Service Funds ................................................................................................ 261

Fiduciary Funds ........................................................................................................... 271

### STATISTICAL SECTION

Table 1: Net Assets by Category ................................................................................. 279

Table 2: Changes in Net Assets ................................................................................. 280

Table 3: Fund Balances of Governmental Funds ........................................................ 282

Table 4: Changes in Fund Balances of Governmental Funds ..................................... 284

Table 5: Assessed Value and Estimated Actual Value of Taxable Property ............... 286

Table 6: Direct and Overlapping Property Tax Rates .................................................. 288

Table 7: Principal Property Tax Payers ....................................................................... 289

Table 8: Property Tax Levies and Collections ............................................................. 290

Table 9: Ratios of Outstanding Debt by Type ............................................................. 292

Table 10: Ratios of General Bonded Debt Outstanding .............................................. 294

Table 11: Direct and Overlapping Debt ....................................................................... 296

Table 12: Legal Debt Margin Schedule ....................................................................... 298

Table 13-1: Pledged-Revenue Coverage - Water Bonds ........................................... 300

Table 13-2: Pledged-Revenue Coverage - Sewer Bonds .......................................... 302

Table 14: Demographic and Economic Statistics ....................................................... 303

Table 15: Principal Employers ..................................................................................... 304

Table 16: Full-time and Part-time City Employees by Function .................................. 305

Table 17: Operating Indicators by Function ................................................................ 306

Table 18: Capital Asset Statistics by Function ........................................................... 308

Exhibit 11
Page 5 of 8



## JERRY SANDERS
### MAYOR

March 21, 2008

Honorable City Council Members and the Citizens of the
City of San Diego, California

San Diego City Charter § 111 requires the City to submit an annual report, including a Statement of Net Assets, and requires that all accounts of the City be audited by an independent auditor. Pursuant to this requirement, the Comprehensive Annual Financial Report ("CAFR") of the City of San Diego ("City") for the fiscal year ended June 30, 2006, is hereby submitted. The audit firm of Macias Gini & O'Connell LLP has issued an unqualified opinion on the City of San Diego's financial statements. The independent auditor's report is located at the front of the financial section of this report.

The CAFR has been prepared in conformance with the principles and standards for reporting as set forth by the Governmental Accounting Standards Board (GASB). Responsibility for both the accuracy of the data and the completeness and fairness of the presentation, including all disclosures, rests with the management of the City and its related agencies. Our objective is to provide you with reasonable, rather than absolute, assurance that the financial statements are free of any material misstatements. Additionally, the City continues to construct and improve a comprehensive internal control framework in order to ensure acceptable management of taxpayer funds.

To the best of our knowledge and belief, the data as presented, is accurate in all material respects; it is presented in a manner designed to present fairly the financial position and results of operations of the governmental activities, business-type activities, the aggregate discretely presented component units, each major fund, and the aggregate remaining funds of the City and its related agencies; and all disclosures necessary to enable the reader to gain an understanding of the City's, as well as its related agencies', financial activities have been included.

The City wishes to bring to the attention of the reader for careful consideration Notes 12, 13, and 18 to the Financial Statements, which address, among other matters, (1) the cease-and-desist order imposed on the City by the Securities and Exchange Commission for violations of the federal securities laws that occurred in 2002 and 2003, (2) related investigative reports of Vinson & Elkins LLP, Kroll Inc. and the law offices of Willkie, Farr and Gallagher LLP, serving as the audit committee for the City of San Diego (Kroll Report), Navigant Consulting, Inc. (as it relates to San Diego City Employees Retirement System (SDCERS)), and the City Attorney of the City of San Diego, and (3) the unfunded actuarial accrued liabilities of the City's pension and retiree health obligations. These notes, along with the other financial and operational data included in the City's CAFR, must be read in their entirety to obtain a complete understanding of the City's financial position.

A narrative introduction, overview, and analysis of the financial statements can be found in Management's Discussion and Analysis (MD&A) which immediately follows the independent auditor's report. The MD&A complements this letter of transmittal and should be read in conjunction with it.

The CAFR is organized into three sections:

- **The introductory section** includes information about the organizational structure of the City, the City's economy, and selected other financial information.

- **The financial section** is prepared in accordance with Governmental Accounting Standards. It includes the MD&A, the independent auditor's report, the audited basic financial statements, notes to the basic financial statements, required supplementary information, and supporting statements and schedules.

- **The statistical section** contains historical statistical data on the City's financial data and debt statistics, as well as miscellaneous physical, demographic, economic, and social data of the City.

Exhibit 11
Page 6 of 8

CITY OF SAN DIEGO                              COMPREHENSIVE ANNUAL FINANCIAL REPORT

### San Diego City Employees' Retirement System (City of San Diego)

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | June 30, 2007 | June 30, 2006 | % Change |
| **Membership** | | | |
| Total Members (active, disabled, beneficiaries and retired) | 17,779 | 17,647 | 0.7% |
| **Assets and Liabilities** | | | |
| Total Actuarial Liability | $ 5,597,652,861 | $ 5,191,961,325 | 7.8% |
| Market Value of Assets | 4,641,340,923 | 3,981,931,694 | 16.6% |
| Actuarial Value of Assets | 4,413,410,812 | 3,981,931,694 | 10.8% |
| Unfunded Actuarial Liability | $ 1,184,242,049 | $ 1,210,029,631 | -2.1% |
| Funding Ratio | 78.8% | 76.7% | 2.1% |

The actuarial valuations performed for SDCERS for the fiscal years 1992 through 2006 calculated actuarial liabilities in accordance with the Projected Unit Credit (PUC) actuarial cost method. The change from PUC to EAN has negatively impacted the unfunded actuarial liability reported in the actuarial valuation for the fiscal year ended June 30, 2007. A comparison of the two valuation methods for the fiscal year ended June 30, 2007 was included in the June 30, 2007 actuarial valuation and is provided below for informational purposes only:

### Unfunded Actuarial Liability
### Projected Unit Credit (PUC) vs. Entry Age Normal (EAN)
### For the Fiscal Year Ended June 30, 2007

| | PUC | EAN | % Change |
| --- | --- | --- | --- |
| Actuarial Value of Liability (Cheiron*) | $ 5,345,495,550 | $ 5,597,652,861 | 4.7% |
| Actuarial Value of Assets (Cheiron*) | 4,413,410,812 | 4,413,410,812 | 0.0% |
| Unfunded Actuarial Liability | 932,084,738 | 1,184,242,049 | 27.1% |
| Funding Ratio | 82.6% | 78.8% | -3.8% |

*SDCERS Actuary

The implementation of the EAN method resulted in an increase in the UAAL of approximately $252.2 million and an annual required contribution of $161.7 million payable in fiscal year 2009. The following schedule shows the effect, as of June 30, 2007, of the specific components of the total change of the Unfunded Actuarial Accrued Liability between fiscal years 2006 and 2007:

### SDCERS - City of San Diego
### Source of Changes in Unfunded Actuarial Accrued Liability
### (In Millions)

| UAAL Change Due to Experience Factors | | |
| --- | --- | --- |
| 1. Investment experience | $ | (74.9) |
| 2. Purchased service credits paid for during the year | | 1.5 |
| 3. Liability experience | | 38.2 |
| **UAAL Change Due to Contribution Factors** | | |
| 4. Contributions paid in excess of expected | | (20.4) |
| **UAAL Change Due to Actuarial Method Changes** | | |
| 5. Removal of liabilities in excess of IRC § 415 limits - Non Drop members | | (3.7) |
| 6. Removal of liabilities in excess of IRC § 415 limits - Drop members | | (2.7) |
| 7. Change in actuarial funding method to EAN | | 252.2 |
| **Total** | | |
| 8. Total net overall change: sum 1 through 7 | | 190.2 |
| 9. Expected change in UAAL | | (6.7) |
| 10. Total change in UAAL: 8 + 9 | $ | 183.5 |

Exhibit 11
Page 7 of 8

18.    **CONTINGENCIES (In Thousands)**

FEDERAL AND STATE GRANTS

The City recognizes revenue grant monies received as reimbursement for costs incurred in certain Federal and State programs it administers. Although the County's Federal grant programs are audited in accordance with the requirements of the Federal Single Audit Act of 1984, the Single Audit Act Amendments of 1996 and the related U.S. Office of Management and Budget Circular A-133, these programs may be subject to financial and compliance audits by the reimbursing agencies. The amount, if any, of expenditures which may be disallowed by the granting agencies cannot be determined at this time. The Single Audit for fiscal year 2004 was completed by Macias Gini & O'Connell LLP and has been received and filed by the City Council.  Macias Gini & O'Connell LLP also completed the Single Audit for fiscal year 2005; however, this report has not yet been received and filed by the City Council.  Additionally, Macias Gini & O'Connell LLP is still in the process of completing the Single Audit for fiscal year 2006.

Additionally, the local unit of the U.S. Department of Housing and Urban Development (HUD) has recently conducted an audit of the City's Community Development Block Grant (CDBG) program.  The overall objective of the audit was to determine whether management complied with applicable laws, regulations, and requirements of HUD's CDBG program. After review of the program, HUD determined that the City may not be in compliance with CFR 85.25.  Specifically, HUD is concerned with CDBG loans to the Redevelopment Agency, "Re-Loans", and other program eligibility issues.  The Office of the Inspector General is currently conducting a preliminary review to determine if an additional audit is required.

CONTINUING DISCLOSURE OBLIGATIONS

The City, in connection with all bond offerings since the effective date (July 1995) of the continuing disclosure requirements of SEC Rule 15c2-12, has contractually obligated itself to provide annual financial information, including audited financial statements, within certain specified time periods (generally nine months) after the end of each fiscal year.  The City completed, and Council has received and filed, its financial statements for fiscal year ended June 30, 2004 and June 30, 2005.  The City has not yet released its audited financial statements for the fiscal year ended June 30, 2007.  Accordingly, the City has not been able to timely satisfy its contractual obligations to provide to the national repositories audited financial statements, or financial information and operating data derived from the financial statements.  At the time of each deadline, the City did, as required by its continuing disclosure contractual obligations, provide to the national repositories a notice of the failure to file the audited annual financial statements information.

REGULATORY AND OTHER INDEPENDENT INVESTIGATIONS

In November 2006, the Securities and Exchange Commission (SEC) entered an Order sanctioning the City of San Diego for committing securities fraud by failing to disclose, in 2002 and 2003, important information about its pension and retiree health care obligations in connection with disclosures relating to the sale of its municipal bonds.  To settle the action, the City agreed to cease and desist from future securities fraud violations and to retain an independent consultant for three years to foster compliance with its disclosure obligations under the federal securities laws.

In issuing the Order, the SEC made the following determinations:

- The City failed to disclose that the City's unfunded liability to its pension plan was projected to increase to an estimated $2 billion at the beginning of fiscal year 2009, and that the City knew and failed to disclose that its health care liability would be in excess of $1.1 billion.  (The information presented in the SDCERS actuarial valuation for the fiscal year ended June 30, 2007, which will be incorporated in the City's fiscal year 2009 financial statements, reported the unfunded actuarial liability to be $1.183 billion.)

Exhibit 11
Page 8 of 8

# EXHIBIT 12

# ORIGINAL PRONOUNCEMENTS

# GOVERNMENTAL ACCOUNTING
# and
# FINANCIAL REPORTING STANDARDS
## Volume II

as of June 30, 2005

- GASB Statements



Exhibit 12
Page 1 of 3

**GASBS 45**

# Statement No. 45 of the Governmental Accounting Standards Board

## Accounting and Financial Reporting by Employers for Postemployment Benefits Other Than Pensions

## STATUS

Issued: June 2004

Effective Date: The requirements of this Statement are effective in three phases based on a government's total annual revenues in the first fiscal year ending after June 15, 1999:

- Governments that were phase 1 governments for the purpose of implementation of Statement 34—those with annual revenues of $100 million or more—are required to implement this Statement in financial statements for periods beginning after December 15, 2006.

- Governments that were phase 2 governments for the purpose of implementation of Statement 34—those with total annual revenues of $10 million or more but less than $100 million—are required to implement this Statement in financial statements for periods beginning after December 15, 2007.

- Governments that are phase 3 governments for the purpose of implementation of Statement 34—those with total annual revenues of less than $10 million—are required to implement this Statement in financial statements for periods beginning after December 15, 2008.

Earlier application of this Statement is encouraged. All component units should implement the requirements of this Statement no later than the same year as their primary government.

Affects: Will supersede GASBS 12; GASBS 27, ¶24
Will amend NCGAI 6, ¶5; GASBS 10, ¶2; GASBS 16, ¶n6 and ¶n7; GASBS 27, ¶6, ¶7, and ¶39; and GASBI 6, ¶7

Affected by: Paragraph 8 will be amended by GASBS 47, ¶3 and ¶8
Paragraph 40 will be amended by GASBS 47, ¶3

Primary Codification Section References: Will be codified in P50

### Summary

In addition to pensions, many state and local governmental employers provide other postemployment benefits (OPEB) as part of the total compensation offered to attract and retain qualified employees. OPEB includes postemployment healthcare, as well as other forms of postemployment benefits (for example, life insurance) when provided separately from a pension plan. This Statement establishes standards for the measurement, recognition, and display of OPEB expense/expenditures and related liabilities, note disclosures, and, if applicable, required supplementary information (RSI) in the financial reports of state and local governmental employers.

The approach followed in this Statement generally is consistent with the approach adopted in Statement No. 27, Accounting for Pensions by State and Local Governmental Employers, with modifications to reflect differences between pension benefits and OPEB. Statement No. 43, Financial Reporting for Postemployment Benefit Plans Other Than Pension Plans, addresses financial statement and disclosure requirements for reporting by administrators or trustees of OPEB plan assets or by employers or sponsors that include OPEB plan assets as trust or agency funds in their financial reports.

**GASBS 45**

## Accounting and Financial Reporting by Employers for Postemployment Benefits Other Than Pensions

### How This Statement Improves Financial Reporting

Postemployment benefits (OPEB as well as pensions) are part of an exchange of salaries and benefits for employee services rendered. Of the total benefits offered by employers to attract and retain qualified employees, some benefits, including salaries and active-employee healthcare, are taken while the employees are in active service, whereas other benefits, including postemployment healthcare and other OPEB, are taken after the employees' services have ended. Nevertheless, both types of benefits constitute compensation for employee services.

From an accrual accounting perspective, the cost of OPEB, like the cost of pension benefits, generally should be associated with the periods in which the exchange occurs, rather than with the periods (often many years later) when benefits are paid or provided. However, in current practice, most OPEB plans are financed on a pay-as-you-go basis, and financial statements generally do not report the financial effects of OPEB until the promised benefits are paid. As a result, current financial reporting generally fails to:

- Recognize the cost of benefits in periods when the related services are received by the employer
- Provide information about the actuarial accrued liabilities for promised benefits associated with past services and whether and to what extent those benefits have been funded
- Provide information useful in assessing potential demands on the employer's future cash flows.

This Statement improves the relevance and usefulness of financial reporting by (a) requiring systematic, accrual-basis measurement and recognition of OPEB cost (expense) over a period that approximates employees' years of service and by (b) providing information about actuarial accrued liabilities associated with OPEB and whether and to what extent progress is being made in funding the plan.

### Summary of Standards

#### Measurement (the Parameters)

Employers that participate in single-employer or agent multiple-employer defined benefit OPEB plans (sole and agent employers) are required to measure and disclose an amount for annual OPEB cost on the accrual basis of accounting. Annual OPEB cost is equal to the employer's annual required contribution to the plan (ARC), with certain adjustments if the employer has a net OPEB obligation for past under- or overcontributions.

The ARC is defined as the employer's required contributions for the year, calculated in accordance with certain parameters, and includes (a) the normal cost for the year and (b) a component for amortization of the total unfunded actuarial accrued liabilities (or funding excess) of the plan over a period not to exceed thirty years. The parameters include requirements for the frequency and timing of actuarial valuations as well as for the actuarial methods and assumptions that are acceptable for financial reporting. If the methods and assumptions used in determining a plan's funding requirements meet the parameters, the same methods and assumptions are required for financial reporting by (a) both a plan and its participating employer(s). However, if a plan's method of financing does not meet the parameters (for example, the plan is financed on a pay-as-you-go basis), the parameters nevertheless apply for financial reporting purposes.

For financial reporting purposes, an actuarial valuation is required at least biennially for OPEB plans with a total membership (including employees in active service, terminated employees who have accumulated benefits but are not yet receiving them, and retired employees and beneficiaries currently receiving benefits) of 200 or more, or at least triennially for plans with a total membership of fewer than 200. The projection of benefits should include all benefits covered by the current substantive plan (the plan as understood by the employer and plan members) at the time of each valuation and should take into consideration the pattern of sharing of benefit costs between the employer and plan members to that point, as well as certain legal or contractual caps on benefits to be provided.

Exhibit 12
Page 2 of 3

**GASBS 45**        **GASB Statement of Standards**

The parameters require that the selection of actuarial assumptions, including the *healthcare cost trend rate* for postemployment healthcare plans, be guided by applicable actuarial standards.

*Alternative Measurement Method*

A sole employer in a plan with fewer than one hundred total plan members (including employees in active service, terminated employees who have accumulated benefits but are not yet receiving them, and retirees and beneficiaries currently receiving benefits) has the option to apply a simplified *alternative measurement method* instead of obtaining actuarial valuations. The option also is available to an agent employer with fewer than one hundred plan members, in circumstances in which the *employer's* use of the alternative measurement method would not conflict with a requirement that the *agent multiple-employer plan* obtain an actuarial valuation for plan reporting purposes. Those circumstances are:

• The plan issues a financial report prepared in conformity with the requirements of Statement 43 but is not required to obtain an actuarial valuation because (a) the plan has fewer than one hundred total plan members (all employers) and (b) is eligible to use the alternative measurement method, or (b) the plan is not administered as a qualifying trust, or equivalent arrangement, for which Statement 43 requires the presentation of actuarial information.

• The plan does not issue a financial report prepared in conformity with the requirements of Statement 43.

This alternative method includes the same broad measurement steps as an actuarial valuation (projecting future cash outlays for benefits, discounting projected benefits to present value, and allocating the present value of benefits to periods using an actuarial cost method). However, it permits simplification of certain assumptions to make the method potentially usable by nonspecialists.

*Net OPEB Obligation—Measurement*

An employer's net OPEB obligation is defined as the cumulative difference between annual OPEB cost and the employer's contributions to a plan, including the OPEB liability or asset at transition, if any. (Because retroactive application of the measurement requirements of this Statement is not required for most employers the OPEB liability at the beginning of the transition year will be zero.) An employer with a net OPEB obligation is required to measure annual OPEB cost equal to (a) the ARC, (b) one year's interest on the net OPEB obligation, and (c) an adjustment to the ARC to offset the effect of actuarial amortization of past under- or overcontributions.

*Financial Statement Recognition and Disclosure*

Sole and agent employers should recognize OPEB expense in an amount equal to annual OPEB cost in government-wide financial statements and in the financial statements of proprietary funds and fiduciary funds from which OPEB contributions are made. OPEB expenditures should be recognized on a modified accrual basis in governmental fund financial statements. Net OPEB obligations, if any, including amounts associated with under- or overcontributions from governmental funds, should be displayed as liabilities (or assets) in government-wide financial statements. Similarly, net OPEB obligations associated with proprietary or fiduciary funds from which contributions are made should be displayed as liabilities (or assets) in the financial statements of those funds.

Employers are required to disclose descriptive information about each defined benefit OPEB plan in which they participate, including the funding policy followed. In addition, sole and agent employers are required to disclose information about contributions made in comparison to annual OPEB cost, changes in the net OPEB obligation, the funded status of each plan as of the most recent actuarial valuation date, and the nature of the actuarial valuation process and significant methods and assumptions used. Sole and agent employers also are required to present as *RSI* a schedule of funding progress for the most recent valuation and the two preceding valuations, accompanied by notes regarding factors that significantly affect the identification of trends in the amounts reported.

---

**Accounting and Financial Reporting by Employers for        GASBS 45**
**Postemployment Benefits Other Than Pensions**

*Cost-Sharing Employers*

Employers participating in *cost-sharing multiple-employer plans* that are administered as trusts, or equivalent arrangements, in which (a) employer contributions to the plan are irrevocable, (b) plan assets are dedicated to providing benefits to retirees and their beneficiaries in accordance with the terms of the plan, and (c) plan assets are legally protected from creditors of the employers or plan administrator, should report as cost-sharing employers. Employers participating in multiple-employer plans that do not meet those criteria instead are required to apply the requirements of this Statement that are applicable to agent employers.

Cost-sharing employers are required to recognize OPEB expense/expenditures for their *contractually required contributions* to the plan on the accrual or modified accrual basis, as applicable. Required disclosures include identification of the way that the contractually required contribution rate is determined (for example, by statute or contract or on an actuarially determined basis). Employers participating in a cost-sharing plan are required to present as RSI schedules of funding progress and employer contributions to the plan as a whole if a plan financial report, prepared in accordance with Statement 43, is not issued and made publicly available and the plan is not included in the financial report of a public employee retirement system or another entity.

*Other Guidance*

Employers that participate in *defined contribution* OPEB plans are required to recognize OPEB expense/expenditures for their required contributions to the plan and a liability for unpaid required contributions on the accrual or modified accrual basis, as applicable.

This Statement also includes guidance for employers that finance OPEB as insured benefits (as defined by this Statement) and for special funding situations.

*Effective Dates and Transition*

This Statement generally provides for prospective implementation—that is, that employers set the beginning net OPEB obligation at zero as of the beginning of the initial year. Implementation is required in three phases based on a government's total annual revenues in the first fiscal year ending after June 15, 1999. The definitions and cutoff points for that purpose are the same as those in Statement No. 34, *Basic Financial Statements—and Management's Discussion and Analysis—for State and Local Governments*. This Statement is effective for periods beginning after December 15, 2006, for *phase 1 governments* (those with total annual revenues of $100 million or more); after December 15, 2007, for *phase 2 governments* (those with total annual revenues of $10 million or more but less than $100 million); and after December 15, 2008, for *phase 3 governments* (those with total annual revenues of less than $10 million). Earlier implementation is encouraged.

Unless otherwise specified, pronouncements of the GASB apply to financial reports of all state and local governmental entities, including general purpose governments; public benefit corporations and authorities; public employee retirement systems; and public utilities, hospitals and other healthcare providers; and colleges and universities. Paragraphs 4 and 6 discuss the applicability of this Statement.

Exhibit 12
Page 3 of 3

# EXHIBIT 13



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**PACIFIC REGIONAL OFFICE**
11TH FLOOR
5670 WILSHIRE BOULEVARD
LOS ANGELES, CALIFORNIA 90036-3648

DIRECT DIAL: (323) 965-3859
FAX NUMBER: (323) 965-3812

February 14, 2004

**VIA FEDERAL EXPRESS**

Mr. Michael T. Uberuaga
City Manager
c/o Office of the City Attorney
Civic Center Plaza
1200 Third Avenue, Suite 1620
San Diego, CA 92101

Re:   In the Matter of Certain San Diego Municipal Bond
      Securities Offerings (MLA-2842)

Dear Mr. Uberuaga:

The staff of the Securities and Exchange Commission is conducting an investigation in the matter identified above. The enclosed request has been issued to you as part of this investigation. The request asks you to give us documents. Please read the request and this letter carefully. This letter answers some questions you may have about the request. You should also read the enclosed SEC Form 1662.

**Producing Documents**

*What materials do I have to produce?*

The request asks you to give us the documents described in the attachment to the letter. You should provide these documents by February 27, 2004. The attachment to the letter defines some terms (such as "document") before listing what you are asked to provide.

Please note that if copies of a document differ in any way, they are considered separate documents and you are asked to send each one. For example, if you have two copies of the same letter, but only one of them has handwritten notes on it, please send both the clean copy and the one with notes.

If you prefer, you may send us photocopies of the originals. The Commission cannot reimburse you for the copying costs. The copies should be identical to the originals, including even faint marks or print. If you choose to send copies, please keep the originals in a safe place. The staff will accept the copies for now, but may ask you to produce the originals later.

If you <u>do</u> send us photocopies, please put an identifying notation on each page of each document to indicate that it was produced by you, and number the pages of all the documents

Exhibit 13
Page 1 of 10

Mr. Michael T. Uberuaga
February 14, 2004
Page 2

submitted.  (For example, if Jane Doe sends documents to the staff, she may number the pages JD-1, JD-2, JD-3, etc., in a blank corner of the documents.)  Please make sure the notation and number do not conceal any writing or marking on the document.  If you send us originals, please <u>do not</u> add any identifying notations.

*Do I need to send anything else?*

Please enclose a list briefly describing each item you send.  The list should state which paragraph(s) in the attachment each item responds to.

Please include a cover letter stating whether you believe you have produced everything called for by the attachment.

*What if I do not send everything described in the attachment to the letter?*

If, for any reason -- including a claim of attorney-client privilege -- you do not produce something called for by the request, please submit a list of what you are not producing.  The list should describe each item separately, noting:

- its author(s);
- its date;
- its subject matter;
- the name of the person who has the item now, or the last person known to have it;
- the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents; and
- the reason you did not produce the item.

If you withhold anything on the basis of a claim of attorney-client privilege or attorney work product protection, please identify the attorney and client involved.

*Where should I send the materials?*

Please send the materials to:

**Martin J. Murphy and Emily A. Breckenridge**
**U.S. Securities and Exchange Commission**
**5670 Wilshire Blvd., 11th Floor**
**Los Angeles, CA 90036-3648**

## Testifying

We may require your testimony at a later time.

## Other Important Information

*May I have a lawyer help me respond to the request?*

Yes.  You have the right to consult with and be represented by your own lawyer in this matter.  We cannot give you legal advice.

Exhibit 13
Page 2 of 10

Mr. Michael T. Uberuaga
February 14, 2004
Page 3

*What will the Commission do with the materials I send?*

The enclosed SEC Form 1662 includes a List of Routine Uses of information provided to the Commission. This form has other important information for you. Please read it carefully.

*Has the Commission determined that anyone has done anything wrong?*

This investigation is a non-public, fact-finding inquiry. We are trying to determine whether there have been any violations of the federal securities laws. The investigation and the request do not mean that we have concluded that you or anyone else has broken the law. Also, the investigation does not mean that we have a negative opinion of any person, entity or security.

*Important Policy Concerning Settlements*

Please note that, in any matter in which enforcement action is ultimately deemed to be warranted, the Division of Enforcement will not recommend any settlement to the Commission unless the party wishing to settle certifies, under penalty of perjury, that all documents responsive to Commission subpoenas and formal and informal document requests in this matter have been produced.

*I have read this letter, the attachment, and the SEC Form 1662, but I still have questions. What should I do?*

If you have any other questions, you may call either Martin J. Murphy at (323) 965-3859 or Emily A. Breckenridge at (323) 965-3865. If you are represented by a lawyer, you should have your lawyer contact us.

Very truly yours,

Martin J. Murphy
Attorney

Enclosures:    Attachment
                SEC Form 1662

Exhibit 13
Page 3 of 10

Attachment
**In the Matter of Certain San Diego Municipal Bond Securities Offerings, (MLA-2846)**
February 14, 2004

I.        **Instructions and Definitions**

This request seeks the production of certain documents, as specified in Paragraph II of this attachment. The documents should be produced in accordance with the following requirements:

A.        Submit all documents that are in your possession, custody, or subject to your control, regardless of whether the documents are in your possession.

B.        As used in this attachment, the term "documents" refers to all written or graphic matter, however produced or reproduced onto any other tangible record, including, but not limited to, all writings or recordings, whether handwritten, typewritten, printed, photostated, photographed, recorded magnetically, mechanically or electronically, and any drafts of all documents, whether or not used or circulated. Specifically, the term "documents" includes, but is not limited to, email transmissions, books, papers, files, notes, account statements, confirmations, reports, correspondence, memoranda, ledger sheets, telegrams, telexes, telephone bills, messages or logs, notes or minutes of conversations or meetings, contracts, agreements, calendars, rolodexes, date books, address books, diaries, schedules, itineraries, travel logs, bank statements, worksheets, summaries, desk files, invoices, bills, records of billings, checks (front and back), wire transfers, drafts for money, records of payment, tape recordings, disks, diskettes, disk packs and other electronic media, microfilm, microfiche and storage devices. The term "documents" includes, but is not limited to, all versions of electronic and hard copy working papers.

C.        "Communications" means and includes, without limitation, any correspondence, memoranda, notes, electronic mail, telephone conversations, and other conversations, conferences or meetings.

D.        As used in this attachment, the term "City of San Diego" means the City of San Diego and all entities in which the City of San Diego has or had a controlling interest, all subsidiaries, affiliates, predecessors, predecessor subsidiaries and affiliates, successors, elected officials, officers, employees, agents, general partners, limited partners, partnerships and aliases, code names, trade or business names used by any of the foregoing, all business-type activities of the City of San Diego, including, but not limited to, Airports, Store Development Service, Environmental Service, Golf Course, Recycling, Sewer Utility, Water Utility, San Diego Data Processing Corporation, San Diego Convention Center Corporation, San Diego Housing Commission, San Diego Medical Services Enterprise, LLC, Ballpark and Redevelopment Project, Fire and Safety Improvements, and the Public Facilities Financing Authority.

Exhibit 13
Page 4 of 10

Attachment
In the Matter of Certain San Diego Municipal Securities Offerings, (MLA-2846)
February 12, 2004
Page 2

E.    "Calderon, Jahan & Osborn" refers to Calderon, Jahan & Osborn, an accountancy
       corporation, and all entities in which Calderon, Jahan & Osborn has or had a
       controlling interest, all subsidiaries, affiliates, predecessors, predecessor
       subsidiaries and affiliates, successors, officers, directors, employees, agents,
       general partners, limited partners, partnerships and aliases, code names or trade or
       business names used by any of the foregoing.

F.    "Caporicci & Larson" refers to Caporicci & Larson, Certified Public Accountants
       and all entities in which it has a controlling interest, all subsidiaries, affiliates,
       predecessors, predecessor subsidiaries and affiliates, successors, officers,
       directors, employees, agents, general partners, limited partners, partnerships and
       aliases, code names or trade or business names used by any of the foregoing.

G.    As used in this attachment, the terms "concern" and "concerning," mean relating
       to, referring to, regarding, describing, evidencing, or constituting. The terms
       "reflect", "pertain to" and "pertaining to" mean containing, embodying,
       comprising, reflecting, identifying, stating, referring to, responding to, relating to,
       commenting on, describing, inquiring about, regarding or analyzing.

H.    Produce the entirety of each and every document described below, without
       alteration, deletion or obliteration of any information contained therein, even though
       such information is not specifically requested.

I.    The following rules of construction apply to this attachment:

      1.    the connectives "and" and "or" shall be construed either disjunctively or
             conjunctively as necessary to bring within the scope of the attachment all
             responses that might otherwise be construed to be outside of its scope; and

      2.    the use of the singular form of any word includes the plural and vice versa.

II.    **Documents Requested**

       **From January 1, 1996 to the present**

A.    All documents concerning the offer and sale of bonds, including, but not limited
       to, general obligation, revenue, tax anticipation, certificates of participation, and
       lease revenue bonds, by the City of San Diego. Such documents should include
       complete transcripts of the closing documents for each offering from January 1,
       1996 to the present.

B.    All documents concerning Continuing Disclosure by the City of San Diego for
       purposes of Securities and Exchange Commission Rule 15c2-12, 17 Code of
       Federal Regulations Section 240.15c2-12, Municipal Securities Disclosure.

Exhibit 13
Page 5 of 10

Attachment
In the Matter of Certain San Diego Municipal Securities Offerings, (MLA-2846)
February 12, 2004
Page 3

C.    All documents, including all correspondence, drafts, e-mails, handwritten notes, draft schedules and actuarial documents, concerning the City of San Diego Municipal Securities Secondary Market Disclosure Information Report dated January 27, 2004.

D.    All documents concerning San Diego City Council action, discussion, and review of bond offerings and disclosure.

E.    All documents concerning disclosure of pension obligations, Deferred Retirement Option Program, and post retirement health care obligations of the City of San Diego, San Diego City Employees' Retirement System funding methodologies and agreements, including, but not limited to, the 1996 Agreement, the 2002 Agreement, the Corridor Funding Method, including, but not limited to, disclosure to underwriters, bond counsel, financial advisors, rating agencies, and investors.

F.    All documents concerning necessary City of San Diego pension payments to the San Diego City Employee Retirement System, by year, and the required percentage of the City of San Diego budget such payments represent.

G.    All documents concerning the cost and projected cost of City of San Diego Deferred Retirement Option Program and post retirement health care benefits, by year, and the required percentage of the City of San Diego budget such costs represent.

H.    All documents that benchmark the pension obligations, Deferred Retirement Option Program, and post retirement health care obligations of the City of San Diego against other government agencies and against private industry norms, adjusted for employee contributions and benefits from social security.

I.    All documents concerning review by bond counsel of disclosure concerning pension obligations, Deferred Retirement Option Program, and post retirement health care obligations of the City of San Diego, including, but not limited to: Stradling, Yocca, Carlson & Rauth, A Professional Corporation; and Orrick, Herrington & Sutcliff LLP.

J.    All documents concerning review by financial advisors of disclosure concerning actual and potential pension obligations, Deferred Retirement Option Program, and post retirement health care obligations of the City of San Diego, including, but not limited to, Public Resources Advisory Group of New York.

K.    All documents concerning review by actuaries of disclosure concerning actual and potential pension obligations, Deferred Retirement Option Program, and post retirement health care obligations of the City of San Diego.

Exhibit 13
Page 6 of 10

L.    All documents concerning review by fiduciary counsel for the San Diego City Employees' Retirement System, including, but not limited to, Robert A. Blum, Esq. and Constance M. Hiatt, Esq., Hanson Bridgett Marcus Vlahos Rudy LLP, of possible conflicts of interest of board members and others, and disclosure concerning actual and potential pension, Deferred Retirement Option Program, and post retirement health care obligations of the City of San Diego, and disclosure of possible conflicts of interest, including, but not limited to, conflicts of interest concerning the 1996 Agreement, the 2002 Agreement, the Corridor Funding Method.

M.    All documents concerning possible conflicts of interest by members of the board of the San Diego City Employees' Retirement System concerning pension, Deferred Retirement Option Program, and post retirement health care obligations of the City of San Diego.

N.    All documents concerning possible conflicts of interest of persons reviewing and approving bond offerings and bond disclosure documents for the City of San Diego.

O.    All documents concerning review by underwriters of disclosure concerning actual and potential pension obligations, Deferred Retirement Option Program, and post retirement health care obligations of the City of San Diego, including, but not limited to:  UBS Financial Services, Inc.; Banc of America Securities LLC; and Goldman, Sachs & Co.

P.    All documents concerning actuarial reports, valuations, assumptions, estimates, alternatives and recommendations concerning the San Diego City Employees' Retirement System, including, but not limited, to documents concerning amounts of money that the City of San Diego may be obligated to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees.

Q.    All documents that model on an actuarial basis the necessary annual funding for pension obligations, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees and the percentage of the City of San Diego City budget that such payments represent, all annual actuarial valuations of the unfunded actuarially accrued liability ("UAAL"), all documents concerning Net Pension Obligation, including documents that define and explain the use of that term as used by the City of San Diego.

R.    All documents that analyze and report on the causes of the under funded status of the City of San Diego Employees' Retirement System and the shortfall of contributions versus true actuarial requirements.

Exhibit 13
Page 7 of 10

Attachment
<u>In the Matter of Certain San Diego Municipal Securities Offerings, (MLA-2846)</u>
February 12, 2004
Page 5

S.     All documents concerning Rick A. Roeder and Gabriel, Roeder, Smith & Company, including but not limited to, actuarial reports, e-mails, handwritten notes, memoranda, drafts, and draft disclosures concerning amounts of money that the City of San Diego may be obligated to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees.

T.     All documents concerning audits and reviews by outside persons and entities, including audits and reviews of key actuarial assumptions, audits of best practices and investment operations, and audits of actuarial reports and other work performed by Gabriel, Roeder, Smith & Company.

U.     All documents concerning City of San Diego Comprehensive Annual Financial Reports and amounts of money that the City of San Diego may be obligated to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees.

V.     All documents concerning audits and reviews by independent auditors of amounts of money that the City of San Diego may have to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees, including, but not limited to, audits and reviews by Calderon, Jaham & Osborn, and Caporicci & Larson.

W.     All documents concerning audits and reviews by the City Auditor and Comptroller, including, but not limited to, Ed Ryan and Terri Webster, of amounts of money that the City of San Diego may be obligated to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees.

X.     All documents concerning Callan Associates, including but not limited to, e-mails, handwritten notes, memoranda, drafts, and draft disclosures concerning amounts of money that the City of San Diego may be obligated to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees.

Y.     All documents concerning City of San Diego bond ratings and changes in bond rating as a result of amounts of money that the City of San Diego may be obligated to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees, including, but not limited to, possible changes due to changes in the unfunded actuarial accrued liability and the funded ratio (valuation of assets available for benefits to total actuarial valuation).

Z.     All documents concerning advice from the City Attorney concerning amounts of money that the City of San Diego may be obligated to pay for pension, Deferred

Exhibit 13
Page 8 of 10

Attachment
**In the Matter of Certain San Diego Municipal Securities Offerings, (MLA-2846)**
**February 12, 2004**
Page 6

Retirement Option Program, post retirement health care and other benefits to employees and retirees.

AA.   All documents concerning communications with the City Treasurer regarding amounts of money that the City of San Diego may be obligated to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees.

BB.   All documents concerning payments to the San Diego City Employees' Retirement System of less than the full accrued actuarial liability for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees.

CC.   All documents concerning actuarial, investment, best practices and other reports commissioned by the San Diego City Employees' Retirement System, including, but not limited to, documents prepared by Mercer.

DD.   All documents concerning Meet and Confer meetings including, but not limited to, all documents concerning voting by members of the board of the San Diego City Employees' Retirement System who participated in Meet and Confer meetings on the City of San Diego's obligation to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees.

EE.   All documents concerning voting by members of the board of the San Diego City Employees' Retirement System on the City of San Diego's obligation to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees, including, but not limited to, all documents concerning conflicts of interest relating to enhanced benefits for board members.

FF.   All documents concerning the location and value of San Diego City Employees' Retirement System assets and liabilities, including names and addresses of financial institutions, including, but not limited to, all banks an broker-dealers, and all account numbers.

GG.   All documents concerning San Diego City Employees' Retirement System amortization determinations, projections and schedules of Deferred Retirement Option Program, post retirement health care and other benefits to employees, including but not limited to, all documents concerning the UAAL.

HH.   All electronic data, including archived information, concerning the above documents.

Exhibit 13
Page 9 of 10

Attachment
In the Matter of Certain San Diego Municipal Securities Offerings, (MLA-2846)
February 12, 2004
Page 7

II.    All documents concerning the composition and identities of the San Diego City Employees' Retirement System Board members.

JJ.    All documents concerning minutes, votes, and any other action of the San Diego City Employees' Retirement System.

Exhibit 13
Page 10 of 10

# EXHIBIT 14



**UNITED STATES**
S<small>ECURITIES AND</small> E<small>XCHANGE</small> C<small>OMMISSION</small>
**PACIFIC REGIONAL OFFICE**
11<small>TH</small> F<small>LOOR</small>
5670 W<small>ILSHIRE</small> B<small>OULEVARD</small>
L<small>OS</small> A<small>NGELES</small>, C<small>ALIFORNIA</small> 90036-3648

D<small>IRECT</small> D<small>IAL</small>: (323) 965-3858
F<small>AX</small> N<small>UMBER</small>: (323) 965-3812

February 23, 2005

**VIA FEDERAL EXPRESS**

Mr. Michael Uberuaga
c/o Robert S. Brewer, Jr.
McKenna Long & Aldridge LLP
750 B Street
Suite 3300, Symphony Towers
San Diego, CA 92101

        Re:    City of San Diego Bond Offerings (LA-2842)

Dear Mr. Uberuaga:

        The staff of the Securities and Exchange Commission is conducting an investigation in the matter identified above.  The enclosed subpoena has been issued to you as part of this investigation.  The subpoena requires you to give us documents and provide sworn testimony.

        Please read the subpoena and this letter carefully.  This letter answers some questions you may have about the subpoena.  You should also read the enclosed SEC Form 1662.  You must comply with the subpoena.  You may be subject to a fine and/or imprisonment if you do not.

**Producing Documents**

*What materials do I have to produce?*

        The subpoena requires you to give us the documents described in the attachment to the subpoena.  You must provide these documents by March 14, 2005.  You also are requested to complete the background questionnaire and provide it to the staff by March 14, 2005.  The attachment to the subpoena defines some terms (such as "document") before listing what you must provide.

        Please note that if copies of a document differ in any way, they are considered separate documents and you must send each one.  For example, if you have two copies of the same letter, but only one of them has handwritten notes on it, you must send both the clean copy and the one with notes.

        If you prefer, you may send us photocopies of the originals.  The Commission cannot reimburse you for the copying costs.  The copies must be identical to the originals, including even faint marks or print.  If you choose to send copies, you <u>must</u> keep the originals in a safe

RECEIVED

FEB 2 4 2005

Exhibit 14
Page 1 of 12

Mr. Michael Uberuaga
February 23, 2005
Page 2

place.  The staff will accept the copies for now, but may require you to produce the originals later.

　　　If you <u>do</u> send us photocopies, please put an identifying notation on each page of each document to indicate that it was produced by you, and number the pages of all the documents submitted.  (For example, if Jane Doe sends documents to the staff, she may number the pages JD-1, JD-2, JD-3, etc., in a blank corner of the documents.)  Please make sure the notation and number do not conceal any writing or marking on the document.  If you send us originals, please <u>do</u> <u>not</u> add any identifying notations.

*Do I need to send anything else?*

　　　You should enclose a list briefly describing each item you send.  The list should state which paragraph(s) in the subpoena attachment each item responds to.

　　　Please include a cover letter stating whether you believe you have met your obligations under the subpoena by searching carefully and thoroughly for everything called for by the subpoena, and sending it all to us.

*What if I do not send everything described in the attachment to the subpoena?*

　　　The subpoena requires you to send <u>all</u> the materials described in it.  If, for any reason -- including a claim of attorney-client privilege -- you do not produce something called for by the subpoena, you should submit a list of what you are not producing.  The list should describe each item separately, noting:

- its author(s);
- its date;
- its subject matter;
- the name of the person who has the item now, or the last person known to have it;
- the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents; and
- the reason you did not produce the item.

If you withhold anything on the basis of a claim of attorney-client privilege or attorney work product protection, you should also identify the attorney and client involved.

*Where should I send the materials?*

　　　Please send the materials to:

　　　　　Catherine Wimberly
　　　　　U.S. Securities and Exchange Commission
　　　　　Pacific Regional Office
　　　　　5670 Wilshire Blvd., 11th Floor
　　　　　Los Angeles, CA 90036

Exhibit 14
Page 2 of 12

Mr. Michael Uberuaga
February 23, 2005
Page 3

**Testifying**

*Where and when do I testify?*

     The subpoena requires you to come to the Federal Office Building, 880 Front Street, Room 6293, San Diego, California 92101-8893 on May 5 and May 6, 2005 at 10:00 a.m., to testify under oath in the matter identified on the subpoena.

     During your testimony we intend to ask you background questions concerning, among other things, your residences, telephone numbers, education and employment. To make this portion of your testimony go more quickly, we ask that you voluntarily complete the questionnaire enclosed with this letter and send it to us by March 14, 2005. Please note that we may question you in testimony concerning the matters in the questionnaire; however, we anticipate that our receipt of the requested information will reduce time needed to discuss these matters on the record.

**Other Important Information**

*May I have a lawyer help me respond to the subpoena?*

     Yes. You have the right to consult with and be represented by your own lawyer in this matter. Your lawyer may also advise and accompany you when you testify. We cannot give you legal advice.

*What will the Commission do with the materials I send and/or the testimony I provide?*

     The enclosed SEC Form 1662 includes a List of Routine Uses of information provided to the Commission. This form has other important information for you. Please read it carefully.

*Has the Commission determined that anyone has done anything wrong?*

     This investigation is a non-public, fact-finding inquiry. We are trying to determine whether there have been any violations of the federal securities laws. The investigation and the subpoena do not mean that we have concluded that you or anyone else has broken the law. Also, the investigation does not mean that we have a negative opinion of any person, entity or security.

*Important Policy Concerning Settlements*

     Please note that, in any matter in which enforcement action is ultimately deemed to be warranted, the Division of Enforcement will not recommend any settlement to the Commission unless the party wishing to settle certifies, under penalty of perjury, that all documents responsive to Commission subpoenas and formal and informal document requests in this matter have been produced.

Exhibit 14
Page 3 of 12

Mr. Michael Uberuaga
February 23, 2005
Page 4

*I have read this letter, the subpoena, and the SEC Form 1662, but I still have questions. What should I do?*

If you have any other questions, you should have your lawyer contact me at (323) 965-3858.

Very truly yours,

Catherine A. Wimberly
Attorney

Enclosures:    Subpoena with Attachment
Background Questionnaire
SEC Form 1662

Exhibit 14
Page 4 of 12



## SUBPOENA

# UNITED STATES OF AMERICA
## SECURITIES AND EXCHANGE COMMISSION

### City of San Diego Bond Offerings (LA-2842)

To:    Mr. Michael Uberuaga
       c/o Robert S. Brewer, Jr., Esq.
       McKenna Long & Aldridge LLP
       750 B Street
       Suite 3300, Symphony Towers
       San Diego, CA  92101

---

☒    **YOU MUST PRODUCE** everything specified in the Attachment to this subpoena to
officers of the Securities and Exchange Commission, at the place, date and time specified below.

5670 Wilshire Blvd., 11th Fl., Los Angeles, CA  90036-3648, on March 14, 2005, by 5:00 p.m.

---

☒    **YOU MUST TESTIFY** before officers of the Securities and Exchange Commission, at the
place, date and time specified below.

Federal Office Building, 880 Front Street, Room 6293, San Diego, CA  92101-8893, on May 5 and
May 6, 2005, at 10:00 am.

---

### FEDERAL LAW REQUIRES YOU TO COMPLY WITH THIS SUBPOENA.
Failure to comply may subject you to a fine and/or imprisonment.

By:    _Catherine A. Wimberly_          Date: _2/23/05_
       Catherine A. Wimberly
       Attorney, Office of Enforcement

I am an officer of the Securities and Exchange Commission authorized to issue subpoenas in this
matter.  The Securities and Exchange Commission has issued a formal order authorizing this
investigation under Section 20(a) of the Securities Act of 1933 and Section 21(a) of the Securities
Exchange Act of 1934.

Exhibit 14
Page 5 of 12

---

NOTICE TO WITNESS:    If you claim a witness fee or mileage, submit this subpoena with the claim voucher.

**Attachment**
**City of San Diego Bond Offerings (LA-2842)**
**February 23, 2005**

I.      **Instructions and Definitions**

This request seeks the production of certain documents, as specified in Paragraph II of this attachment. The documents should be produced in accordance with the following requirements:

A.      Submit all documents that are in your possession, custody, or subject to your control, regardless of whether the documents are in your possession.

B.      As used in this attachment, the term "documents" refers to all written or graphic matter, however produced or reproduced onto any other tangible record, including, but not limited to, all writings or recordings, whether handwritten, typewritten, printed, photostated, photographed, recorded magnetically, mechanically or electronically, and any drafts of all documents, whether or not used or circulated. Specifically, the term "documents" includes, but is not limited to, email transmissions, books, papers, files, notes, account statements, confirmations, reports, correspondence, memoranda, ledger sheets, telegrams, telexes, telephone bills, messages or logs, notes or minutes of conversations or meetings, contracts, agreements, calendars, rolodexes, date books, address books, diaries, schedules, itineraries, travel logs, bank statements, worksheets, summaries, desk files, invoices, bills, records of billings, checks (front and back), wire transfers, drafts for money, records of payment, tape recordings, disks, diskettes, disk packs and other electronic media, microfilm, microfiche and storage devices. The term "documents" includes, but is not limited to, all versions of electronic and hard copy working papers.

C.      "Communications" means and includes, without limitation, any correspondence, memoranda, notes, electronic mail, telephone conversations, and other conversations, conferences or meetings.

D.      As used in this attachment, the term "City of San Diego" means the City of San Diego and all entities in which the City of San Diego has or had a controlling interest, all subsidiaries, affiliates, predecessors, predecessor subsidiaries and affiliates, successors, elected officials, officers, employees, agents, general partners, limited partners, partnerships and aliases, code names, trade or business names used by any of the foregoing, all business-type activities of the City of San Diego, including, but not limited to, Airports, Store Development Service, Environmental Service, Golf Course, Recycling, Sewer Utility, Water Utility, San Diego Data Processing Corporation, San Diego Convention Center Corporation, San Diego Housing Commission, San Diego Medical Services Enterprise, LLC, Ballpark and Redevelopment Project, Fire and Safety Improvements, and the Public Facilities Financing Authority.

Exhibit 14
Page 6 of 12

Attachment
City of San Diego Bond Offerings (LA-2842)
February 23, 2005
Page 2

E.      "Calderon, Jahan & Osborn" refers to Calderon, Jahan & Osborn, an accountancy
        corporation, and all entities in which Calderon, Jahan & Osborn has or had a
        controlling interest, all subsidiaries, affiliates, predecessors, predecessor
        subsidiaries and affiliates, successors, officers, directors, employees, agents,
        general partners, limited partners, partnerships and aliases, code names or trade or
        business names used by any of the foregoing.

F.      "Caporicci & Larson" refers to Caporicci & Larson, Certified Public Accountants
        and all entities in which it has a controlling interest, all subsidiaries, affiliates,
        predecessors, predecessor subsidiaries and affiliates, successors, officers,
        directors, employees, agents, general partners, limited partners, partnerships and
        aliases, code names or trade or business names used by any of the foregoing.

G.      As used in this attachment, the terms "concern" and "concerning," mean relating
        to, referring to, regarding, describing, evidencing, or constituting. The terms
        "reflect", "pertain to" and "pertaining to" mean containing, embodying,
        comprising, reflecting, identifying, stating, referring to, responding to, relating to,
        commenting on, describing, inquiring about, regarding or analyzing.

H.      Produce the entirety of each and every document described below, without
        alteration, deletion or obliteration of any information contained therein, even though
        such information is not specifically requested.

I.      The following rules of construction apply to this attachment:

        1.      the connectives "and" and "or" shall be construed either disjunctively or
                conjunctively as necessary to bring within the scope of the attachment all
                responses that might otherwise be construed to be outside of its scope; and

        2.      the use of the singular form of any word includes the plural and vice versa.

II.     **Documents Requested[1]**

**From January 1, 1996 to the present**

A.      All documents concerning the offer and sale of bonds, including, but not limited
        to, general obligation, revenue, tax anticipation, certificates of participation, and
        lease revenue bonds, by the City of San Diego. Such documents should include

---

[1] As noted in Item I of the instructions, you must submit all documents required to be produced
by the subpoena that are in your possession, custody, or subject to your control. It is not
necessary to produce documents in your possession, custody, or control that you previously
produced to the Commission in this enforcement investigation. Items A – JJ were previously
included in a request for voluntary production to you dated February 14, 2004.

Exhibit 14
Page 7 of 12

complete transcripts of the closing documents for each offering from January 1, 1996 to the present.

B.      All documents concerning Continuing Disclosure by the City of San Diego for purposes of Securities and Exchange Commission Rule 15c2-12, 17 Code of Federal Regulations Section 240.15c2-12, Municipal Securities Disclosure.

C.      All documents, including all correspondence, drafts, e-mails, handwritten notes, draft schedules and actuarial documents, concerning the City of San Diego Municipal Securities Secondary Market Disclosure Information Report dated January 27, 2004.

D.      All documents concerning San Diego City Council action, discussion, and review of bond offerings and disclosure.

E.      All documents concerning disclosure of pension obligations, Deferred Retirement Option Program, and post retirement health care obligations of the City of San Diego, San Diego City Employees' Retirement System funding methodologies and agreements, including, but not limited to, the 1996 Agreement, the 2002 Agreement, the Corridor Funding Method, including, but not limited to, disclosure to underwriters, bond counsel, financial advisors, rating agencies, and investors.

F.      All documents concerning necessary City of San Diego pension payments to the San Diego City Employee Retirement System, by year, and the required percentage of the City of San Diego budget such payments represent.

G.      All documents concerning the cost and projected cost of City of San Diego Deferred Retirement Option Program and post retirement health care benefits, by year, and the required percentage of the City of San Diego budget such costs represent.

H.      All documents that benchmark the pension obligations, Deferred Retirement Option Program, and post retirement health care obligations of the City of San Diego against other government agencies and against private industry norms, adjusted for employee contributions and benefits from social security.

I.      All documents concerning review by bond counsel of disclosure concerning pension obligations, Deferred Retirement Option Program, and post retirement health care obligations of the City of San Diego, including, but not limited to: Stradling, Yocca, Carlson & Rauth, A Professional Corporation; and Orrick, Herrington & Sutcliff LLP.

J.      All documents concerning review by financial advisors of disclosure concerning actual and potential pension obligations, Deferred Retirement Option Program,

Exhibit 14
Page 8 of 12

and post retirement health care obligations of the City of San Diego, including, but not limited to, Public Resources Advisory Group of New York.

K.   All documents concerning review by actuaries of disclosure concerning actual and potential pension obligations, Deferred Retirement Option Program, and post retirement health care obligations of the City of San Diego.

L.   All documents concerning review by fiduciary counsel for the San Diego City Employees' Retirement System, including, but not limited to, Robert A. Blum, Esq. and Constance M. Hiatt, Esq., Hanson Bridgett Marcus Vlahos Rudy LLP, of possible conflicts of interest of board members and others, and disclosure concerning actual and potential pension, Deferred Retirement Option Program, and post retirement health care obligations of the City of San Diego, and disclosure of possible conflicts of interest, including, but not limited to, conflicts of interest concerning the 1996 Agreement, the 2002 Agreement, the Corridor Funding Method.

M.   All documents concerning possible conflicts of interest by members of the board of the San Diego City Employees' Retirement System concerning pension, Deferred Retirement Option Program, and post retirement health care obligations of the City of San Diego.

N.   All documents concerning possible conflicts of interest of persons reviewing and approving bond offerings and bond disclosure documents for the City of San Diego.

O.   All documents concerning review by underwriters of disclosure concerning actual and potential pension obligations, Deferred Retirement Option Program, and post retirement health care obligations of the City of San Diego, including, but not limited to:  UBS Financial Services, Inc.; Banc of America Securities LLC; and Goldman, Sachs & Co.

P.   All documents concerning actuarial reports, valuations, assumptions, estimates, alternatives and recommendations concerning the San Diego City Employees' Retirement System, including, but not limited, to documents concerning amounts of money that the City of San Diego may be obligated to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees.

Q.   All documents that model on an actuarial basis the necessary annual funding for pension obligations, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees and the percentage of the City of San Diego City budget that such payments represent, all annual actuarial valuations of the unfunded actuarially accrued liability ("UAAL"), all documents concerning Net Pension Obligation, including documents that define and explain the use of that term as used by the City of San Diego.

Exhibit 14
Page 9 of 12

R.    All documents that analyze and report on the causes of the under funded status of the City of San Diego Employees' Retirement System and the shortfall of contributions versus true actuarial requirements.

S.    All documents concerning Rick A. Roeder and Gabriel, Roeder, Smith & Company, including but not limited to, actuarial reports, e-mails, handwritten notes, memoranda, drafts, and draft disclosures concerning amounts of money that the City of San Diego may be obligated to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees.

T.    All documents concerning audits and reviews by outside persons and entities, including audits and reviews of key actuarial assumptions, audits of best practices and investment operations, and audits of actuarial reports and other work performed by Gabriel, Roeder, Smith & Company.

U.    All documents concerning City of San Diego Comprehensive Annual Financial Reports and amounts of money that the City of San Diego may be obligated to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees.

V.    All documents concerning audits and reviews by independent auditors of amounts of money that the City of San Diego may have to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees, including, but not limited to, audits and reviews by Calderon, Jaham & Osborn, and Caporicci & Larson.

W.    All documents concerning audits and reviews by the City Auditor and Comptroller, including, but not limited to, Ed Ryan and Terri Webster, of amounts of money that the City of San Diego may be obligated to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees.

X.    All documents concerning Callan Associates, including but not limited to, e-mails, handwritten notes, memoranda, drafts, and draft disclosures concerning amounts of money that the City of San Diego may be obligated to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees.

Y.    All documents concerning City of San Diego bond ratings and changes in bond rating as a result of amounts of money that the City of San Diego may be obligated to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees, including, but not limited to, possible changes due to changes in the unfunded actuarial accrued liability and the funded ratio (valuation of assets available for benefits to total actuarial valuation).

Exhibit 14
Page 10 of 12

Z.   All documents concerning advice from the City Attorney concerning amounts of money that the City of San Diego may be obligated to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees.

AA.   All documents concerning communications with the City Treasurer regarding amounts of money that the City of San Diego may be obligated to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees.

BB.   All documents concerning payments to the San Diego City Employees' Retirement System of less than the full accrued actuarial liability for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees.

CC.   All documents concerning actuarial, investment, best practices and other reports commissioned by the San Diego City Employees' Retirement System, including, but not limited to, documents prepared by Mercer.

DD.   All documents concerning Meet and Confer meetings including, but not limited to, all documents concerning voting by members of the board of the San Diego City Employees' Retirement System who participated in Meet and Confer meetings on the City of San Diego's obligation to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees.

EE.   All documents concerning voting by members of the board of the San Diego City Employees' Retirement System on the City of San Diego's obligation to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees, including, but not limited to, all documents concerning conflicts of interest relating to enhanced benefits for board members.

FF.   All documents concerning the location and value of San Diego City Employees' Retirement System assets and liabilities, including names and addresses of financial institutions, including, but not limited to, all banks an broker-dealers, and all account numbers.

GG.   All documents concerning San Diego City Employees' Retirement System amortization determinations, projections and schedules of Deferred Retirement Option Program, post retirement health care and other benefits to employees, including but not limited to, all documents concerning the UAAL.

HH.   All electronic data, including archived information, concerning the above documents.

Exhibit 14
Page 11 of 12

Attachment
**City of San Diego Bond Offerings (LA-2842)**
**February 23, 2005**
Page 7

       II.      All documents concerning the composition and identities of the San Diego City Employees' Retirement System Board members.

      JJ.      All documents concerning minutes, votes, and any other action of the San Diego City Employees' Retirement System.

Exhibit 14
Page 12 of 12

# EXHIBIT 15

**U.S. Securities and Exchange Commission**

## SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C.

**SECURITIES ACT OF 1933**
**Rel. No. 8213 / March 21, 2003**

**SECURITIES EXCHANGE ACT OF 1934**
**Rel. No. 47552 / March 21, 2003**

**Admin. Proc. File No. 3-10022**

---

In the Matter of

THE CITY OF MIAMI, FLORIDA

:
:
:
:

---

OPINION OF THE COMMISSION

CEASE-AND-DESIST PROCEEDING

Grounds for Remedial Action

Fraud in the offer and sale of securities

Municipal securities issuer distributed offering documents and an annual financial report that contained material misstatements and omitted material facts concerning its financial condition. Held, it is in the public interest to order the municipal securities issuer to cease and desist from committing or causing any violation or future violation of the antifraud provisions of the federal securities laws.

APPEARANCES:

Thomas Tew, and Daniel S. Newman of Tew Cardenas Rebak Kellogg Lehman DeMaria Tague Raymond & Levine, LLP, for the City of Miami, Florida.

Teresa J. Verges, for the Division of Enforcement.

Appeal filed: October 16, 2001

Last brief received: December 10, 2001

Exhibit 15
Page 1 of 18

I.

The City of Miami, Florida ("City" or "Miami") appeals from the decision of an

administrative law judge. The law judge found that the City willfully violated Section 17(a) of the Securities Act of 1933,[1] Section 10(b) of the Securities Exchange Act of 1934,[2] and Exchange Act Rule 10b-5[3] with respect to its offer and sale of three municipal bond issues. The law judge ordered the City to cease and desist from committing or causing any violation or any future violation of the antifraud provisions. We base our findings on an independent review of the record, except with respect to those findings that are not challenged on appeal.[4]

II.

A. The City

During the period under review, the City had an annual budget of approximately $250 million and about 3,300 employees. The City had an elected City Commission form of government, consisting of the Mayor, Vice Mayor, and three Commissioners. The City Commission delegated the responsibility for the day-to-day management of the City's affairs to a City Manager, appointed by the Mayor. The City Manager had responsibility for all City departments and supervision of all City employees.

Cesar Odio was the City Manager from 1985 until his resignation in September 1996. At the time, Manohar Surana was the City's Director of Management and Budget.[5] In February 1995, when Carlos E. Garcia retired as the City's Director of Finance, Odio consolidated the Departments of Finance and of Management and Budget and named Surana Director. Although not an accountant, Surana was directly responsible for preparation of the City's fiscal year ("FY") 1995 financial statements and the FY 1995 budget.

B. Miami's Financial Reporting

Miami's fiscal year began on October 1 and ended on September 30 the following year (e.g., the City's FY 1995 began on October 1, 1994 and ended on September 30, 1995). The largest component of the City's operating budget was the General Fund. The General Fund accounted for most of the City's core activities, such as the fire and police departments. Miami also maintained a series of separate funds. The Enterprise Funds recorded the operations that were supposed to be financed through the collection of user fees. The Internal Service Funds accounted for goods or services provided by one department or agency to another. The Capital Projects Funds accounted for the acquisition and construction of major capital facilities. During the period under review, Miami used "pooled accounting," that is, the City deposited cash for all funds in one account. No records were maintained to identify the amount of cash belonging to each fund.

C. The Gates Judgment

Further complicating the City's finances was a 1985 consent decree, the so-called "Gates Judgment," requiring Miami to repay money transferred from City pension funds. The City's obligation under the Gates Judgment was projected to total $473 million through 2012. Payments under the Gates Judgment and other annual pension payments totaled approximately $32 million per year. The City made these payments from the General Fund. Odio testified that in 1985, his first year as City Manager, he calculated that, unless the Gates Judgment was refinanced, by the mid-1990s Miami would face a fiscal crisis and experience a $66.5 million deficit.

### D. Miami's FY 1994 - 1995 Financial Condition

#### 1. The FY 1995 Budget

Under Florida law, Miami's annual budget was required to be balanced.[6] The City had sustained deficits in the General Fund for several years and had borrowed from other funds to satisfy operating expenses. The record demonstrates that, by the end of FY 1994, Miami's ongoing financial problems were well known to City officials.

On September 22, 1994, Miami's City Commission approved a $222 million budget for FY 1995.[7] This budget included $9 million dollars that were to come from the federal government in the form of a Crime Bill grant and $3 million in revenue to be generated from the sale of land fill. Earlier that month, City officials and City Commissioners had been informed that Miami should expect to receive the Crime Bill funds "starting in FY 1996." On September 21, 1994, the day before the budget was approved, Surana sent a memo to the City's Police Chief, with a copy to Odio, stating that program authorization for the Crime Bill would not begin until 1996.[8] Dipak Parekh ("D. Parekh"), the City's then Revenue Management Administrator who drafted the memo, testified that he gave this information to Odio. D. Parekh further testified that prior to the first bond offering, there was "no basis to believe that the City would ever get that $9 million."[9]

#### 2. Financial Advisers Warn Miami Of A Deficit

Miami retained two financial advisers: Howard Gary & Company ("HG & Co.") and Raymond James & Associates, Inc., ("Raymond James"). Kishor Parekh ("K. Parekh"), a partner of HG & Co. and D. Parekh's brother, was the HG & Co. primary contact with Miami.[10] By letter dated September 30, 1994, addressed to Garcia, then Director of Finance, the financial advisers warned Miami that "the City's general credit rating will experience a downgrade in the near future." The letter highlighted Miami's "low level of unreserved General Fund balances, the City's reliance on non-recurring revenue initiatives, asset sales, basic infrastructure maintenance needs, as well as the City's overall revenue inflexibility." The financial advisers believed that Miami's fiscal health was approaching a "precarious situation."[11]

According to K. Parekh, Garcia chastised him for sending the letter and instructed that in the future any similar concerns should be raised only orally. Less than three weeks following the financial advisers' warning, Standard & Poor's ("S & P") downgraded Miami's outstanding general obligation bonds from A+ to A. S & P cited "continuing fiscal stress arising primarily from revenue inflexibility, which has caused the City to utilize nonrecurring sources to support operations."[12]

#### 3. Auditor Tells Miami That It Will Run Out Of Cash

Deloitte & Touche, LLP ("Deloitte") was Miami's outside auditor from 1989 through 1995. Francisco Paredes was the partner who supervised the City's account for FY 1994 and FY 1995. During the FY 1994 audit, Deloitte determined that Miami faced a potential shortfall of $35 - $40 million for FY 1995, and that the City could run out of cash by May 1995. During a meeting in December 1994 or early January 1995, Paredes informed Garcia and Odio of Miami's cash flow problems. This conversation alerted Odio to the increased seriousness of the City's cash flow deficiency because it was

Exhibit 15
Page 3 of 18

the first time that Paredes had ever discussed Miami's finances directly with him.

### 4. Operation Right Size

Shortly after being confronted with Deloitte's warnings, Odio, Surana, Paredes, one of the City's Commissioners, and representatives of "all the City staff" met at the Orange Bowl to discuss the $35-$40 million deficit projected by Deloitte. Odio testified that those in attendance did not consider increasing taxes or service fees to raise needed revenue because they knew that the City Commission had rejected this option in the past for "political reasons."[13] Following the Orange Bowl meeting, Miami initiated a program called Operation Right Size, which required every city department to review its budget for possible savings, according to Odio to "salvage the situation." Operation Right Size, starting June 1, 1995, was expected to reduce City expenditures by $15 million to $25 million in succeeding years by, among other things, reducing the number of City employees and introducing a two-tiered salary structure that would replace long-time workers with lower-cost employees. However, in February 1995, Odio informed Paredes that, despite the City's best efforts to reduce expenditures through Operation Right Size, Miami would be expected to save only $5 million from the program in FY 1995. Odio testified that Miami's cash flow problems for FY 1995 could not be solved solely by implementing Operation Right Size. He added that making up a $35 million deficit in a $222 million budget would have been "kind of a miracle."

Deloitte debated whether it had to qualify its opinion on Miami's FY 1994 financial statements with respect to whether Miami would remain a going concern.[14] A Deloitte work paper, dated March 1995, stated that "it appears the City is approximately $20 to $40 million behind in cash flows," and projected that "the City will definitely have a deficit cash flow deficit in the General Fund at September 30, 1995." The work paper also included best-case and worst-case analyses of Miami's finances for FY 1995, based on projections prepared by Garcia using actual revenues through November 1994.[15] Both analyses assumed that Miami would sell bonds.

Paredes testified that Miami's leadership was "well aware" of Deloitte's prognosis for the City's finances, and that the City officials planned to issue $20 million in Self Insurance Bonds "if cash flow [] necessitated."[16] Odio admitted that Miami had to sell bonds to survive FY 1995 stating, "[T]hat's the only choice we had, to borrow money."

Deloitte did not qualify its opinion on Miami's financial statements.[17] According to Paredes, Miami avoided issuance of a going concern qualification on its FY 1994 financial statements because the City intended to sell bonds. Paredes testified that he also based his decision on his view that the City was "progressing as planned," many City employees hadagreed to take early retirement, and there had been discussions about the sewer and pension bonds.[18]

### 5. 1994 CAFR

During the period under review, the City prepared and disseminated a yearly Comprehensive Annual Financial Report ("CAFR") containing the City's yearly audited General Purpose Financial Statements and a transmittal letter from the City Manager and other city officials to the Mayor and the City Commission. Miami sent its CAFR biannually to credit rating agencies, and widely disseminated the CAFR to bond insurers, and

Exhibit 15
Page 4 of 18

investors.

The 1994 CAFR included the independent auditor's report on the City's financial statements, and a transmittal letter to the Mayor and City Commissioners from the City Manager and Finance Director. The transmittal letter stated that:

> To the best of our knowledge and belief, the enclosed data is accurate in all material respects and is reported in a manner designed to present fairly the financial position and results of operations of the various funds and account groups of the City. All disclosures necessary to enable the reader to gain an understanding of the City's financial activities have been included.

Note 9 to the financial statements discussed a deficit of about $80 million in the City's Enterprise and Internal Service Funds. Note 9, titled "Fund Equity," stated that:

> The following schedule lists fund deficits for Governmental and Trust and Agency type funds as of September 30, 1994 (in thousands):
>
> Rescue Services Special Revenue ($285)
>
> Self Insurance Trust Fund ($6,472)
>
> Pension Administration Trust Fund ($34)

> In addition to the above fund deficits, the City also experienced cash deficits in several of its operating funds which were temporarily remedied by loans from other funds. See Note 5.[19] It is management's intention to replenish these deficits and, accordingly, in February 1995, the City initiated a review process to "right-size" its operations with the goal of reducing its FY 95-96 budget by $30 million. As part of this initiative, significant concessions obtained from the sanitation union are expected to reduce the Solid Waste Department's FY 95-96 budget by $10 million. In addition, several departments are being consolidated and certain operations not directly related to the City's basic services are expected to be discontinued by September 30, 1995. Early retirement plans have been agreed to in principle by the City's administration and union's leadership with the purpose of reducing the City's workforce by approximately 400 employees by September 30, 1995. The implementation of the proposals discussed above are expected to strengthen the City's financial condition.

## 6. Miami's Financial Condition Continues to Deteriorate

In March 1995, Surana directed Miami's financial advisers to explore various financing alternatives that would raise cash immediately. Ultimately, K. Parekh informed Surana that none of the proposed options was feasible. On May 9, 1995, K. Parekh was summoned to a meeting with Surana, Odio, other City officials, and representatives of the financial advisers. K. Parekh testified that the participants discussed "the City's inability to meet its obligations. They were running out of money." According to K. Parekh's contemporaneous handwritten notes, Surana

stressed that, it was imperative that the City's "[a]ctual cash deficit <u>must</u> be solved by Mid-June [1995]" and that "[a]ll GF/Budget <u>must</u> be solved by [September 1995]" (emphasis in original). Surana warned that, if the cash crunch was not resolved prior to this date, City employees' paychecks would bounce.

In advance of the May 9 meeting, K. Parekh and Miami's Debt Service Coordinator prepared an analysis demonstrating that, although Miami's financial statements showed a positive $3.167 million General Fund balance as of September 30, 1994, in reality, the account had a $3.156 million deficit.

7. <u>The Bond Issues</u>

a) Sewer Bonds

On May 25, 1995 the City Commission authorized the sale of the $22.5 million general obligation Sewer Bonds for improvements to the City's sewer system and to pay pensionliabilities for the fiscal year ending September 30, 1995. The Official Statement[20] for the Sewer Bonds included the City's FY 1994 audited financial statements, including Note 9, and incorporated a certificate executed by Miami's City Manager stating that the Official Statement was free of misstatements and omissions of material facts, and that there had been no material adverse change in Miami's financial condition since September 30, 1994, the close of the prior fiscal year.[21] The Official Statement also contained a summary of Miami's $222 million FY 1995 budget, claiming that the City anticipated receiving $9 million in Crime Bill monies and the $3 million proceeds from the sale of land fill, and represented that the City's "Revenues and Other Financing Sources" equaled "Expenditures and Other Uses" (the "balanced budget summary").

The Sewer Bonds were sold on June 27, 1995. Following the bond sale, Miami transferred $8.8 million, or 39 percent, of the bond proceeds into the General Fund in order to address the impending operating fund deficiency. The Sewer Bonds were insured by Financial Guaranty Insurance Company ("FGIC").

On June 9, 1995, Surana, Odio, K. Parekh, representatives of the City's employees, and representatives of Rauscher Pierce Refsnes, Inc. ("Rauscher Pierce"), an underwriter, met to discuss the City's cash flow problems. K. Parekh testified that, although the attendees expressed concern that Miami "was running out of money," it was "obvious" that the City had found a solution to its cash flow crunch because, in contrast to the prior month's meeting, "people weren't running around as crazy as they used to before" and no one talked about the City running out of cash by mid-June.

b) FP & L Bonds

On August 24, 1995, the City sold the $22 million Special Obligation Non-Ad Valorem Revenue Bonds ("FP & L Bonds"). According to the Official Statement, proceeds from the bond sale were to be used to purchase property, to make capital improvements, and to acquire an administration building. Financial disclosures in the Official Statement for the FP & L Bonds were the same as those for the Sewer Bonds. The FP & L Bonds were also insured by FGIC. The City transferred $21 million of the bond proceeds to the General Fund for an ending balance of $26 million on September 30,

1995.

c) Pension Bonds

Miami asked Rauscher Pierce to examine refinancing strategies that would provide immediate cash flow. In a letter to Deloitte dated June 14, 1995, Rauscher Pierce made clear that Miami was looking for a "big bang" to solve the City's fiscal problems. On the same day, Rauscher Pierce's Sarasota, Florida office faxed a document to its Miami office concerning a proposed issuance of Pension Bonds. The Sarasota office concluded that, if the bond proceeds were used directly for operating expenses, the City's liability would in essence be doubled, and the financing would be "pure deficit financing," which was prohibited by Florida law. The document also noted that "[t]his instrument is a deferral of the budget problem from one year to the next. So in essence, it buys one year's time."[22]

On July 13, 1995, the City Commission adopted a resolution that gave the City Manager authority to issue bonds totaling $309 million between 1995 and 2008 (the "pension bonds resolution"). Pursuant to this resolution, the City Manager had sole authority to issue bonds up to $22 million annually in order to make payments under the Gates Judgement and for other pension costs.[23]

On October 19, 1995, K. Parekh again met with Surana and others to discuss the City's cash flow needs.[24] In a follow-up letter dated November 7, 1995, K. Parekh reminded Suranathat one aim of the July 1995 pension bonds resolution was to "reduce (to the maximum possible extent) the amount of 'fiscal stress' upon the City." K. Parekh testified that later in November Surana telephoned him at home and reported that Miami was "out of money."

On December 12, 1995 the City's sold its first offering pursuant to the July 13, 1995 pension bonds resolution, a negotiated offering of $72 million Non-Ad Valorem Revenue Bonds (the "Pension Bonds"). The Official Statement declared the bond proceeds would be used to pay accrued and future liabilities to City pension plans and to reimburse the City for payments made in FY 1995. Financial disclosures in the Official Statement for the Pension Bonds were the same as those for the Sewer Bonds and the FP & L Bonds. The Pension Bonds were insured by AMBAC Insurance.

8. Appointment of the Oversight Board

On September 13, 1996, following the resignations of Odio and Surana, the City appointed an Interim City Manager. In December 1996, the Mayor and City Commissioners declared a fiscal emergency, causing Florida's Governor to put the City under the aegis of a Financial Emergency Oversight Board ("Oversight Board"). The Oversight Board was to have "continuous existence until three years after the City had produced two successive years of balanced operations and none of the statutory conditions for determining a local government financial emergency exists."

III.

Antifraud Violations

The antifraud provisions of the securities laws prohibit fraudulent and deceptive acts and practices in connection with the offer, purchase, or sale

Exhibit 15
Page 7 of 18

of a security.[25] In 1989, when the Commission adopted Exchange Act Rule 15c2-12, "Municipal Securities Disclosure," the Commission noted that municipal "issuers are primarily responsible for the content of their disclosure documents and may be held liable under the federal securities laws for misleading disclosure."[26] We have long emphasized the need for adequate disclosure in the sale of municipal securities.[27]

Early in FY 1995, Miami learned that it was facing an unprecedented cash flow shortage and would not be able to meet its obligations by May 1995, unless it took drastic steps both to generate cash flow and reduce expenses. To survive the year, Miami had to sell bonds and use the proceeds to meet its operational expenses. Miami officials knew that Operation Right Size would not turn around the City's financial crisis in FY 1995. Contrary to the "balanced budget" summary included in the Official Statements, before the first of the three bond issues was sold the City knew that it faced at least a $12 million deficit because it would not receive either the land fill or Crime Bill monies, and that the City would experience a deficit in FY 1995.

Note 9 to Miami's financial statements, included in the 1994 CAFR and Official Statements, failed to reveal Miami's cash flow problem and, instead, gave the misleading impression that the City was taking steps that would allow it to finish FY 1995 in a stronger financial position than in FY 1994. Miami did not disclose that the City was facing such severe cash flow challenges that, absent borrowing funds, it might be unable to pay municipal workers in FY 1995. Nor did it disclose that Deloitte had informed Miami of a projected $35 - $40 million deficit for FY 1995.

Miami claims that "Note 9 made it absolutely clear that the majority of the savings from the right-sizing efforts were not anticipated to be realized until FY 1996, and this fact was obvious to any reader, as were the consequences of the right-sizing efforts not being successful." The disclosures regarding Operation Right Size were anything but "obvious." Note 9 did not disclose that Operation Right Size would generate only $5 million in savings in FY 1995. It also did not state that Miami would have to sell bonds to stay afloat in FY 1995. Paredes admitted that Note 9 only "implied" that Miami would incur cash deficits in FY 1995.[28]

The certificate stating that there was no material change in Miami's financial condition included in the Official Statements for the bond offerings was false because it did not represent the financial facts that existed at the time of the bond sales. Soon after September 30, 1994, City officials became aware that the City's finances were deteriorating significantly. Odio testified that FY 1995 was the worst threat to City finances he had confronted in his fifteen years with the City. Although it appeared that the City had met payroll and paid other ongoing expenses, and had achieved a positive General Fund balance in FY 1995, in reality, the ever-growing budget deficit was masked by transfers from other funds and the use of bond proceeds. The Interim City Manager concluded that in the summer of 1995 the City's financial situation:

> had to be shaky, certainly because of the cannibalization, if you will, of storm water trust money, of unfunded liabilities, utilizing pension bond issue proceeds to meet annual budget requirements for the pension funds. So you've got clear indications of fiscal shortfalls and questionable accounting, official policy.

In light of the City's critical cash flow shortfall, the certification was a material misrepresentation. The balanced budget summary[29] was misleading because, throughout FY 1995, Miami's operating expenses exceeded budgeted operating revenues by millions of dollars and Miami knew that it would not receive some of the projected revenues.

Miami's cash flow crisis and the consequent possibility that it would not meet its operating expenses would be viewed by a reasonable investor as a material factor in deciding whether to purchase Miami's debt.[30] A reasonable investor would have considered it important to know that Miami could not generate sufficient revenues to pay its bills or its employees. The fact that Miami needed to use bond proceeds to satisfy operational expenses demonstrated the gravity of its cash flow deficit, and, thus, the City's need to disclose this fact to public investors and the marketplace. Miami's financial disclosures would be no less important to investors, who held previously issued City bonds, and were entitled not to be mislead about Miami's current financial condition in deciding whether to hold or sell their bonds. "Information about the issuer and other obligated persons is as critical to the secondary market . . . as it is in primary offerings."[31]

Miami argues that it was excused from disclosing that the City was experiencing cash flow stress and would be unable to meet its obligations because Deloitte did not issue a "going concern" qualification.[32] Miami erroneously equates the absence of a going concern qualification with the absence of adverse financial conditions that should have been disclosed. A going concern qualification discloses that the client will not meet its obligation in the coming twelve months. Paredes testified that, although Miami's cash position was "very tight," the City avoided a "going concern" qualification only because City officials represented that bonds would be issued to address any cash needs - - the very bonds at issue here. Although Miami's plan to survive the fiscal year by selling bonds may have removed the need for a going concern qualification, it did not relieve Miami of its obligation to disclose adequately the City's cash crisis or the role of those bonds in remedying the crisis. We have previously found antifraud violations where a municipal issuer failed to disclose that its cash flow position had materially declined (since the close of the prior fiscal year's financial statements included with its Official Statements) and misrepresented that there had been no material change in its financial condition.[33]

Miami asserts that the law judge erred in concluding that the balanced budget summary, included in the Official Statements, was a material misrepresentation because the summary "reflected historical information." Although the City Commission's approval of the FY 1995 budget was "historical," publication of the budget summary in the Official Statement was misleading. Before the first offering, City officials knew that Miami's FY 1995 budget was not balanced and that the City would not receive the Crime Bill Funds or much, if any, revenue from the sale of landfill. We conclude that the misrepresentations, false statements and omissions made by Miami in the Official Statements and 1994 CAFR were material.[34]

Scienter is a necessary element of a violation of Section 17(a) (1) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder.[35] Proof of scienter need not be direct, but may be "a matter of inference from circumstantial evidence."[36] Scienter has been defined by the Supreme Court as "a mental state embracing intent to deceive, manipulate, or defraud."[37] A showing of recklessness or actual knowledge can satisfy the scienter requirement.[38]

Miami argues that the Division failed to meet its burden of proving scienter because the Division failed to establish that Miami "did not act in good faith." As made clear above, in the face of obvious indicators to the contrary, Miami was at least reckless in misstating that its FY 1995 budget was balanced, downplaying its cash flow crisis, failing to disclose that Miami needed to issue debt to resolve its crisis, and misrepresenting that there were no material changesin its financial condition. Miami's officials ignored the City's disclosure responsibilities. Odio admitted that he was not familiar with Miami's disclosure requirements and dismissed the importance of the bond offering documents.

> Let me ask you this, does anybody read this [Official Statement]? I mean, only experts read this . . . . [M]ost people don't read this, nobody reads this. They go by what the raters, that is Moody's, Standard & Poor's, saying that these bonds are safe to buy. By rating them AAA, they're a very good buy. Therefore, they wouldn't go reading through this. Nobody does.

Bond insurance did not give Miami license to misrepresent its financial condition or withhold material information from the marketplace.[39]

Miami further asserts that the City relied on Deloitte, and other professionals who participated in the bond offerings, to advise the City on its disclosure in the Official Statements.[40] Primary responsibility for the accuracy of information filed with the Commission and disseminated among investors rests upon the municipality.[41] A city does not discharge this obligation by the employment of independent public accountants or other professionals.[42] As we have repeatedly emphasized, issuers of municipal securities "are primarily responsible for the content of their disclosure documents and may be held liable under the federal securities laws for misleading disclosure."[43] Municipal issuers have an affirmativeobligation to know the contents of their securities disclosure documents, including their financial statements.[44]

Moreover, the record is unclear as to whether and to what extent Miami consulted with or relied on professionals.[45] Miami does not point to any professional advice that it received with respect to its certificate of no material change or its budget summary. Miami claims that Deloitte drafted Note 9 to its 1994 financial statements. However, Paredes testified that he recommended that Miami disclose the "cash deficits that were being funded by other funds," and that as the result of a "consultative type process" Miami decided to add Note 9. Paredes further testified that he could not "specifically recall exactly who wrote the first draft of Note 9."

Even if Paredes drafted Note 9, however, Miami knew that Note 9 did not disclose the scope of its cash flow predicament or the necessity to issue debt to remedy that problem. If a company officer knows that "financial statements are false or misleading and yet proceeds to file them, the willingness of an accountant to give an unqualified opinion with respect to them does not negative the existence of the requisite intent or establish good faith reliance."[46]

Accordingly, we find that Miami willfully violated Sections 17(a)(1)-(3) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in connection with the offer and sale of the three bond issues. We further find that Miami willfully violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in connection with its outstanding bonds by makingmaterially false and misleading statements and omitting material

Exhibit 15
Page 10 of 18

information in its 1994 CAFR.[47]

IV.

Sanctions

In assessing whether a cease-and-desist order is an appropriate sanction, we focus on the risk of future violations.[48] "This inquiry is a flexible one and no one factor is dispositive. This inquiry is undertaken not to determine whether there is a 'reasonable likelihood' of future violations but to guide our discretion."[49] In the ordinary case, and absent evidence to the contrary, a finding of past violation raises a risk of future violation sufficient to support our ordering a respondent to cease and desist. "To put it another way, evidence showing that a respondent violated the law once probably also shows a risk of repetition that merits our ordering to cease and desist."[50] We also consider:

> the seriousness of the violation, the isolated or recurrent nature of the violation, the respondent's state of mind, the sincerity of the respondent's assurances against future violations, the respondent's recognition of the wrongful nature of his or her conduct, and the respondent's opportunity to commit future violations. In addition, we consider whether the violation is recent, the degree of harm to investors or the marketplace resulting from the violation, and the remedial function to be served by the cease-and-desist order in the context of any other sanctions being sought in the same proceeding.[51]

We further may consider the function a cease-and-desist order will serve in alerting the public that a respondent has violated the securities laws.[52]

Miami argues that the cease-and-desist order is inappropriate because the violative conduct giving rise to the sanction occurred approximately seven years ago, and the officials involved with that conduct are no longer with the City. The Division emphasizes that the mere passage of years alone cannot determine whether Miami will commit violations in the future, and that the departure from City government of officials responsible for Miami's financial misrepresentations and omissions is not determinative of the appropriateness of a cease-and-desist order. We agree with the Division. The departures of Odio and Surana from City government provide no assurance that Miami will not commit similar violations in the future.

Miami's actions were not the result of an isolated incident but were recurrent and stretched from one fiscal year and into the next. In the three bond issues, the City used financial statements that failed to warn investors about its ongoing financial stress; falsely certified that there had been "no material adverse change" in its financial condition since FY 1994, even though Miami faced a cash shortfall of over $30 million; and depicted a balanced budget, knowing that $12 million in revenue would not be forthcoming. These violations were committed with at least recklessness.

Miami argues that its conduct did not result in harm to either public investors or the market place. This is not true. Because Miami failed to make full and accurate disclosures about its financial condition, investors purchased the City's debt without full information.

Miami also asserts that appointment of the Oversight Board negates the

Exhibit 15
Page 11 of 18

need for a cease-and-desist order. The Oversight Board was not a permanent watchdog over Miami's finances. Miami has not adduced evidence of what changes in policy and financial controls have been introduced to eliminate the "possible risk" of future violation. We disagree with Miami's contention that a cease-and-desist order will serve no remedial purpose. We believe that the order will help prevent future violations.

Miami still maintains that it did nothing wrong. The fact that Miami has pointed its finger at Deloitte, and other bond professionals, without taking any responsibility for its own conduct, suggests that Miami has not accepted fully its responsibility for the City's financial disclosures. It is likely that Miami will sell bonds in the future. The City must be given the clear message that Miami is responsible for the adequacy of its financial disclosures when seeking

money from the investing public. Accordingly, we will order Miami to cease-and-desist from committing or causing any violations or future violations of the antifraud provisions of the securities laws.

An appropriate order will issue. 53

By the Commission (Chairman DONALDSON and Commissioners GLASSMAN, GOLDSCHMID and ATKINS); Commissioner CAMPOS not participating.

Jonathan G. Katz
Secretary

UNITED STATES OF AMERICA
before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Rel. No.

Admin. Proc. File No. 3-10022

---

| In the Matter of | : |
| THE CITY OF MIAMI, FLORIDA | : |

---

ORDER IMPOSING REMEDIAL SANCTIONS

On the basis of the Commission's opinion issued this day, it is

ORDERED that the City of Miami cease and desist from committing or causing any violations or future violations of Section 17 (a) of the Securities Act of 1933, Section 10 (b) of the Securities Exchange Act of 1934, and Exchange Act Rule 10b-5.

By the Commission.

Jonathan G. Katz
Secretary

---

1    15 U.S.C. § 77q.

2    15 U.S.C. § 78j.

3    17 C.F.R. § 240.10b-5.

4    Miami requests that we conduct a de novo review of the record and "reject" the law judge's decision. Rule of Practice 410 requires the petitioner to "set forth the specific findings and conclusions of the initial decision as to which exception is taken." In our discretion, we may deem that the petitioner waived any exception not stated in the petition for review.

     Under Rule of Practice 411, we "make any findings or conclusions that in [our] judgment are proper and on the basis of the record." We give "considerable weight and deference" to the trier of fact's credibility determinations and reject them only where there is substantial evidence for doing so. Jay Houston Meadows, 52 S.E.C. 778, 784 (1996), aff'd, 119 F. 3d 1219 (5th Cir. 1997).

5    Odio and Surana, who were respondents in this proceeding, resigned their positions as the result of a joint state/federal investigation of corruption in Miami's municipal government, known as Operation Green Palm. The Commission subsequently accepted Odio's and Surana's Offers of Settlement. Without admitting or denying liability, Odio and Surana agreed to cease and desist from committing or causing any violations or future violations of Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. Our findings here with respect to Odio and Surana are solely for the purpose of this opinion. Manohar Surana, Securities Act Rel. No. 1110 (Sept. 22, 2000) 73 SEC Docket 869; Cesar Odio, Securities Act Rel. No. 7851 (Apr. 14, 2000) 72 SEC Docket 614.

6    The governing body of each municipality "shall make appropriations for each fiscal year which, in any one year, shall not exceed the amount to be received from taxation or other revenue sources." Fla. Stat. Ann. § 166.241(3).

7    According to minutes of the Commission meeting at which the budget was approved, the Vice-Mayor observed: "This is the same method of budget balancing we do each year. OK? Now, you see it; now, you don't. OK? That nine million dollars will never show up anyplace but on paper, and it will be shifted around from place to place []. You will never see nine million dollars." Another Commissioner responded: "Tell my colleague it goes back to his old saying of 'voodoo economics.'"

8    During his testimony at the hearing, Odio could not recall receiving the document.

9    Miami asserts that D. Parekh's statement about when Miami found out that the Crime Bill had changed from a block grant to a discretionary program was impeached by his prior investigative testimony. D. Parekh initially testified that in January or February 1995, after the FY 1995 budget had been approved, the City learned that the nature of the program had changed. Miami concludes that this is also when the City came to know the timing of its receipt of funds under the Crime Bill. We find no connection between the two events. D. Parekh testified that, before the FY 1995 budget had been approved, City officials learned that the Crime Bill monies would not be received until FY 1996. The law judge found D. Parekh to be a credible witness; D. Parekh's hearing testimony is consistent with substantial documentary evidence in the record including the Suranamemo and the discussion at the City Commission meeting. See nn.4, 7 supra.

10   Howard Gary, the president, CEO, and principal of HG & Co., was Miami's City Manager prior to Odio. Miami terminated its contract with HG & Co. in late 1996.

Exhibit 15
Page 13 of 18

11  K. Parekh testified that the financial advisers put their concerns in writing to ensure that Miami understood that the City's "deteriorating fiscal condition" would continue to decline, and was "extremely important" to address. K. Parekh further testified that in deviation from their usual practice, the financial advisers captioned the letter to Miami, "PRIVILEGED AND CONFIDENTIAL," in order to stress the sensitivity of the issues raised.

12  For example, in September 1994, the City issued $18 million Pension Bonds to finance payments under the Gates Judgement. The financial advisers had informed Miami that they opposed issuing these bonds because they felt it was inappropriate to fund an operating expense (like a legal settlement) with municipal securities having a 20-year maturity.

13  For example, from 1990 through 1995 Miami charged each citizen $160 annually for garbage fees when the service actually cost over $380 per year. This shortfall, which cost Miami between $12 million and $15 million per year, was paid from the General Fund.

The Florida Constitution permitted the City to levy ad valorem taxes up to $10 per thousand dollars of assessed valuation for general governmental services. For the FY ending September 30, 1995, the rate was $9.5995 per thousand dollars; the same level since 1988. Witnesses testified that raising the rate would not have been sufficient to close the deficit.

For the six years prior to the period under review, Miami issued Tax Anticipation Notes ("TAN") in October to finance operations until the subsequent year's tax revenues were collected in December. Miami could not issue additional TANs until October 1, 1995.

14  Pursuant to Statement of Auditing Standards No. 59, an auditor must conduct a "going concern" review to determine a client's ability to meet its operating expenses and debt service for the twelve months following the date of the audited financial statements. Where there is doubt about the client's ability to do so, the auditor must evaluate management's plans to mitigate those concerns, and determine whether to issue a "going concern" qualification on the audit report.

15  Deloitte's work papers noted that Miami's projected FY 1995 budget "included the Federal Crime Bill, land sales and others, whose realizeability was not assured." Miami knew that it would not realize the $3 million from the sale of land fill included in its budget for FY 1995. In his "Best Case" projection, Paredes assumed that Miami would receive only $500,000 from the sale of land fill. Ultimately, no revenue was realized from the sale of land fill in FY 1995.

16  Miami did not issue the Self Insurance Bonds but sold the three bonds at issue here.

17  Paredes testified that: "Because the City had plans and was instituting processes . . . . They had the capacity to issue debt and sell assets which all generate resources to make their ends meet. I think we need to understand that this analysis was done to see if there was a going-concern need in the opinion. We concluded clearly that there was no need for that."

18  Deloitte completed its fieldwork for the FY 1994 audit on February 28, 1995, the date appearing on the signed audit opinion. However, the record is unclear as to when the City received the FY 1994 audit. Miami asserts that the law judge improperly concluded that the City received the FY 1994 audit in February or March 1995.

Odio testified that he received Deloitte's Management Letter on February 28. However, Paredes testified, based Deloitte's Record of Report Issuance, that the audited financial statements were delivered to the City on May 31, 1995. Notwithstanding the dispute about the date of Miami's receipt of the audit opinion, the record is clear that the City was aware of its serious cash flow problems by February 1995.

Exhibit 15
Page 14 of 18

19  Note 5 to the financial statements showed that almost $20 million of the $23.8 million "Due from Other Funds" came from five Capital Improvement Funds.

20  An Official Statement is the "municipal equivalent of a corporate prospectus." It constitutes "financial disclosure by a state or local government planning a municipal securities offering that states the purpose for the issue and . . . discloses pertinent information on the issuer's financial condition." Barron's Dictionary of Finance and Investment Terms, 318, 408, 475 (4th ed. 1995).

21  The certificate was required for the Official Statement for each of the three bond issues, as well as for the bond purchase agreements for the FP & L and Pension Bonds. K. Parekh testified that none of the bond transactions could have closed without the representations in the certificate.

22  On September 27, 2001, pursuant to Rauscher Pierce's Offer of Settlement, the Commission issued an Order Instituting Proceedings and Cease-and-Desist Proceedings, Making Findings and Imposing Remedial Sanctions ("Order") against Rauscher Pierce in connection with its role as underwriter of Miami's Pension Bonds in December 1995. The Order required Rauscher Pierce to cease-and-desist from committing or causing any violations and any future violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act, Section 15B (c)(1) of the Exchange Act, and MSRB Rule G-17, and ordered Rauscher Pierce to pay a civil penalty in the amount of $200,000. See Rauscher Pierce Refsnes, Inc., Exchange Act Rel. No. 44864 (Sept. 27, 2001), 75 SEC Docket 2510, 2516.

23  Griffith Pitcher, Miami's bond counsel on the Pension Bonds, testified that it would be "very unusual" for any City Commission to delegate to the City Manager discretion as to the timing and amount of debt to issue.

24  K. Parekh testified that Surana had suggested a number of novel transactions, including "Yankee bonds, issuing Yen-denominated securities, to securities issued in Austrian shillings, to currency swaps to interest rate swaps, and lots of innovative and interestingstructures." According to K. Parekh, during the October 19 meeting, he advised Surana that some of those financing scenarios were "illegal" or "extremely improper." K. Parekh further testified that in response Surana berated him for two hours and told him that he was "incompetent."

In an attempt to discredit K. Parekh's testimony about Miami's ongoing cash deficiency, the City asserts that K. Parekh fabricated the October 19 dispute between Surana and himself because he had an "ax to grind" with Surana. Miami claims that Griffith Pritcher, bond counsel, contradicted K. Parekh's testimony that Surana berated Parekh by testifying that he had no recollection of the incident. Regardless of what occurred at this meeting, K. Parekh's overall testimony regarding Miami's financial condition is corroborated independently by other testimony and substantial record evidence. See e.g., pp. 5-6 supra and 10-11 supra.

25  See U.S. v. Naftalin, 441 U.S. 768 (1979).

26  17 C.F.R. § 240.15c2-12. See Release Adopting Exchange Act Rule 15c2-12, 54 FR 28799, 28811 n.84 (July 10, 1989). See also County of Nevada, Securities Act Rel. No. 7535 (May 5, 1998), 67 SEC Docket 256 (settlement to cease-and-desist order finding violations of Sections 17(a)(2) and (a)(3) in sale of municipal bonds); Maricopa County, Securities Act Rel. No. 7354 (Oct. 3, 1996), 62 SEC Docket 2834 (settlement to cease-and-desist order finding violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule l0b-5 thereunder); County of Orange, California, Exchange Act Rel. No. 36761 (Jan. 24, 1996), 61 SEC Docket 487 (public issuers are primarily liable for the content of their disclosure documents and are subject to proscriptions under the antifraud provisions); and County of Nevada, Initial Decision Rel. No. 153 (Oct. 29, 1999), 70 SEC Docket 3303 (municipal bonds subject to Section 17(a) of the Securities Act and Section 10 (b) of the Exchange Act and Rule l0b-5 thereunder).

27  See Statement of the Commission Regarding Disclosure Obligations of

Municipal Securities Issuers and Others," Securities Act Rel. No. 7049, 59 FR 12748 (March 17, 1994) (municipal issuer that releases information that is reasonably expected to reach investors and the trading markets is subject to the antifraud provisions).

28  In contrast, in its 1995 CAFR (issued after the sale of the subject three bond issues), Miami admitted that it had initiated Operation Right Size because a net deficiency of $26 million "became apparent in February 1995 and the City immediately began the process of correcting the deficiency through several actions including workforce reductions, cost reductions and operating efficiencies."

29  See pp.11-12 supra.

30  See, e.g., Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (in order to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available") (quoting TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).

31  "Municipal Securities Disclosure," Exchange Act Rel. No. 34961 (Nov. 10, 1994), 57 SEC Docket 2993, 2993-94.

32  Miami's argument would not be a defense to the City's affirmatively misrepresenting in the three bond sales that there had been no material adverse change in Miami's financial condition since the prior fiscal year, and that its budget was balanced.

33  See Maricopa County, 62 SEC Docket at 2836.

34  The law judge found that Miami's failure to disclose in the Official Statements that S & P had downgraded the City's general obligation bonds from A+ to A was a material omission. Miami argues that the Order Instituting Proceedings did not allege this violation. We do not reach the question of whether Miami's failure to disclose the downgrade constituted a material omission.

35  See Aaron v. S.E.C., 446 U.S. 680, 695 (1980); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976); Steadman v. S.E.C., 603 F.2d 1126, 1132 (5th Cir. 1979), aff'd, 450 U.S. 91 (1981). Scienter need not be found to establish a violation of Section 17(a)(2) or (3) of the Securities Act. Aaron v. SEC, 446 U.S. at 697; SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 193 (1963); Steadman, 603 F.2d at 1134.

36  Herman & MacLean v. Huddleston, 459 U.S. 375, 390 n.30 (1983); Pagel, Inc. v. SEC, 803 F.2d 942, 946 (8th Cir. 1986); In re Meyer Blinder, 50 S.E.C. 1215, 1230 (1992).

37  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976).

38  See Howard v. Everex Systems, Inc., 228 F. 3d 1057, 1063 (9th Cir 2000). The Ninth Circuit defined recklessness as: "an extreme departure from the standards of ordinary care [] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Id.

39  See Release Adopting Exchange Act Rule 15c2-12, 54 FR at 28812 and n.89 ("The presence of credit enhancements generally would not be a substitute for material disclosure concerning the primary obligor on municipal bonds.").

40  Courts have held that, in order to successfully assert a reliance-on-professionals defense, an issuer must demonstrate that it: (1) made complete disclosure to its counsel or accountant; (2) requested the professional's advice as to the legality of the contemplated action; (3) received advice that the conduct was legal; and (4) relied in good faith on that advice. See SEC v. Goldfield Deep Mines, 758 F.2d 459, 467 (9th Cir. 1985) (accountant and counsel). See also, SEC v. Caserta, 75 F. Supp.2d 79, 95 (E.D.N.Y. 1999) (accountants).

41  See nn.26 and 27 supra.

42   See Kahler Corp., 55 SEC Docket 24, 36 n.8 (Sept. 17, 1993) (settlement) (Unqualified opinion from independent auditors did not relieve issuer liability because "financial statements are management's responsibility.").

43   In re Citisource, Inc. Sec. Lit., 694 F. Supp. 1069, 1072-75 (S.D.N.Y. 1988) (municipality can be held liable under Section 10(b) of the Exchange Act); In re Washington Public Power Supply Syst. Sec. Lit., 673 F. Supp. 411 (W.D. Wash. 1987), aff'd, 823 F.2d 1349 (9th Cir. 1987) (issuers of municipal securities can be held liable under Section 10(b) of the Exchange Act and Rule l0b-5 thereunder); In re Washington Public Power Supply System Sec. Lit, 650 F. Supp. 1346 (W.D. Wash. 1986); New York City Municipal Sec., 507 F. Supp. 169, 184-85 (S.D.N.Y. 1980) (issuers of municipal securities must comply with antifraud provisions of the federal securities laws).

44   County of Orange, California, 61 SEC Docket at 501. See also County of Nevada, 67 SEC Docket at 259.

45   Miami's financial advisers expressly disavowed responsibility for any of the financial information contained in the Official Statements. A disclaimer in the Official Statements stated that:

> The Financial Advisors are not obligated to undertake, and have not undertaken to make, an independent verification or to assume responsibility for the accuracy, completeness, or fairness of the information contained in this Official Statement or any exhibits, schedules, or appendices hereto.

K. Parekh testified that, although it was "unusual" to include such a disclaimer, he did so because he "did not have any comfort as to the accuracy of any of the information that I was receiving from the City."

In his investigative testimony, Griffith Pritcher, bond counsel, denied any role in Miami's financial disclosures. Pritcher testified that: "[my legal] opinion doesn't go to the financial aspect of it [the Official Statement] . . . ." The audit opinion letter declared that "no opinion is expressed as to . . . any financial, demographic, or statistical data set forth therein." Robert Moore, the analyst at AMBAC Insurance, noted during his investigative testimony that AMBAC relied on financial information provided by Miami in performing its credit analysis for the Pension Bonds. Moore further testified that he did not speak with anyone in connection with performing the credit analysis and relied solely on the Official Statements and the FY 1994 financial statements.

Paredes admits that he carried out certain "due diligence procedures" for Miami prior to each bond offering. However, Paredes testified that this "subsequent events analysis" was not extensive and consisted of obtaining assurances from Miami officials that there had been no changes that impacted City's FY1994 financials. Paredes noted that Miami provided Deloitte a letter confirming that "[n]o events have occurred subsequent to September 30, 1994 that have a material effect on the financial statements that should be disclosed." Paredes testified that he had no interaction with the City's financial advisers, underwriters, or bond counsel. Paredes further testified that Deloitte did not look at any interim financial information and did not make any inquiries regarding Miami's cash flow. The City sued Deloitte claiming that each and every financial statement from 1989 through 1995, including the financial statement used to sell the three bond issues in 1995, was false and misleading.

We do not reach the issue of whether these bond professionals fulfilled their responsibilities with respect to these offerings.

46   See U.S. v. Erickson, 601 F.2d 296, 305 (7th Cir. 1979) (criminal case); See U.S. v. Colasurdo, 453 F.2d 585, 594 (2nd Cir. 1971). See also Mishkin v. Peat, Marwick, Mitchell & Co., 744 F. Supp. 531, 538 (S.D.N.Y. 1990) (management is responsible for entity's financial statements).

The Order Instituting Proceedings charged only that the CAFR violated

Exhibit 15
Page 17 of 18

47  Exchange Act Section 10(b) and Rule 10b-5 thereunder.

48  Exchange Act Section 21C(a) authorizes the Commission to order persons to cease and desist from committing securities laws violations or future securities law violations if it finds that "any person is violating, has violated, or is about to violate any provision" of the Exchange Act. 15 U.S.C. § 78u-3 (a).

49  KPMG Peat Marwick LLP, Exchange Act Rel. No. 43862 (Jan. 19, 2001), 74 SEC Docket 384, 436, motion for reconsideration denied, Exchange Act Rel. No.44050 (Mar. 9, 2001), 74 SEC Docket 1351, petition denied, 289 F.3d 109 (D.C. Cir. 2002).

50  74 SEC Docket at 430.

51  Id. at 436.

52  Id. at n.148.

53  We have considered all of the arguments and contentions made by the parties. We reject or accept these arguments and contentions to the extent that they are inconsistent or in accord with the views expressed in this opinion.

*http://www.sec.gov/litigation/opinions/33-8213.htm*

Home | Previous Page                                  Modified: 03/21/2003

Exhibit 15
Page 18 of 18