1  LA BELLA & MCNAMARA LLP
   THOMAS W. MCNAMARA (SBN 127280)
2  CHRYSTA L. ELLIOTT (SBN 253298)
   401 West "A" Street, Suite 1150
3  San Diego, California 92101
   Telephone: (619) 696-9200
4  Facsimile: (619) 696-9269

5  Attorneys *Specially Appearing* For Defendant Patricia Frazier

6

7

8                 UNITED STATES DISTRICT COURT

9              SOUTHERN DISTRICT OF CALIFORNIA

10  SECURITIES AND EXCHANGE              ) Case No.: 08-CV-0625-DMS (LSP)
11  COMMISSION,                          )
                                         ) **DEFENDANT PATRICIA FRAZIER'S**
12              Plaintiff,               ) **MEMORANDUM OF POINTS AND**
                                         ) **AUTHORITIES IN SUPPORT OF HER**
           v.                            ) **MOTION TO DISMISS THE**
13                                       ) **COMPLAINT**
    MICHAEL T. UBERUAGA, EDWARD P.       )
14  RYAN, PATRICIA FRAZIER, TERESA A.    )
    WEBSTER, and MARY E. VATTIMO,        ) Date:  November 7, 2008
15                                       ) Time:  1:30 p.m.
                                         ) Judge: Hon. Dana M. Sabraw
16              Defendants.              ) Ctrm:  10, 2nd Floor
                                         )
17                                       )
                                         )
18  _____ )

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28

38688

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION....................................................................................2

II.     FACTUAL BACKGROUND .................................................................3

    A.    Ms. Frazier Was Involved in the Issuance of City Bond Offerings As Deputy City Manager for Finance........................................................3

    B.    The City Council Delegated Legislative Authority to Ms. Frazier With Regard To The 2002 Fire and Life Safety Bond, Five Continuing Disclosures in 2003 and Rating Agency Presentations By Express Legislation............................................................................................5

        1.   2002 Fire and Life Safety Bond.............................................5

        2.   2003 Continuing Disclosures.................................................6

        3.   2003 Ratings Agencies Presentations.....................................6

        4.   2003 Park Refunding Bond....................................................7

    C.    The Bond Offerings Contained all Material Disclosures..................7

    D.    No Investor Lost Money; The Bonds Were Fully Insured; and Ms. Frazier Received No Personal Benefit.............................................10

III.    ARGUMENT........................................................................................10

    A.    Motion to Dismiss In General..........................................................10

    B.    The Commission is Time Barred From Seeking a Fine On the 2002 Fire and Life Safety Bond; and Time Barred From Seeking Injunctive Relief With Regard to All Allegations.................................................11

    C.    Legislative Immunity Requires Dismissal of the Complaint in its Entirety....13

        1.   Legislative Immunity In General..........................................13

        2.   Legislative Immunity Applies to Municipal Bonds.............14

            a.   The Issuance Of Municipal Bonds Constitutes The Formulation Of Policy, Rather Than Ad Hoc Decision Making.................................................................15

            b.   The Issuance Of Municipal Bonds Affects The Public At Large.....................................................16

38688

              c.     The Issuance Of Municipal Bonds Is Formally Legislative In Character.............................................................17

              d.     The Issuance Of Municipal Bonds Bears All The Hallmarks Of Traditional Legislation......................................17

        3.     Legislative Immunity Applies To Ms. Frazier And The Entire Complaint Must Be Dismissed...........................................................18

  E.     The Complaint Must be Dismissed as it Contains Only Which State Elements That Cannot Possibly Be Established....................................19

        1.     Both Claims Must Be Dismissed Due To Lack Of Materiality..........20

  F.     The Complaint Should Be Dismissed With Prejudice ....................................22

VIII.  CONCLUSION............................................................................................22

# TABLE OF AUTHORITIES

__Federal Cases__                                                                          __Page__

*Aitchison v. Raffiani*
    708 F.2d 96, 99-100 (3rd Cir. 1983)........................................16, 17

*Alexander v. Holden*
    66 F.3d 62, 66 (4th Cir. 1995).............................................15

*Bannum, Inc. v. City of Beaumont*
    236 F. Supp. 2d 633, 634-35, 637 (E.D. Tex. 2002) ...................14

*Bogan v. Scott-Harris*
    523 U.S. 44, 45 (1998) ......................................13, 16, 17

*Chateaubriand v. Gaspard*
    97 F.3d 1218, 1220 (9th Cir. 1996) ........................13, 18

*Freeman v. Decio*
    584 F.2d 186, 199-200 (7th Cir. 1978) ..........................21

*Gorman Towers, Inc. v. Bogoslavsky*
    626 F.2d 607, 614 (8th Cir. 1980) .............................14

*Gravel v. United States*
    408 U.S. 606, 625 (1972) ..........................................17

*In re JP Morgan Chase Securities Litigation*
    363 F. Supp. 2d 595, 634 (S.D.N.Y. 2005) ....................21

*In re Lyondell Petrochemical Co. Sec. Litig.*
    984 F.2d 1050, 1052-53 (9th Cir. 1993) ........................21

*James v. Gerber Prods., Co.*
    587 F.2d 324, 327 (6th Cir. 1978) ................................21

*Johnson v. S.E.C.*
    87 F.3d 484, 492 (D.C. Cir. 1996) ...........................11, 12

*Kaahumanu v. County of Maui*
    315 F.3d 1215, 1219 (9th Cir. 2003) .......................14, 15, 16

*Levine v. NL Indus.*
    Inc., 926 F.2d 199, 203 (2d Cir.1991) ..........................21

*Lukens Steel Co.*
    454 F.Supp. 1182, 1185, n. 2 (D.C. Cir. 1978) ................11

*MGIC Indem. Corp. v. Weisman*
    803 F.2d 500, 504 (9th Cir. 1986) ...................................................................11

*Navarro v. Block*
    250 F.3d 729, 732 (9th Cir. 2001) ..................................................................10

*Orange v. County of Suffolk*
    830 F. Supp. 701, 706 (E.D.N.Y. 1993) ..........................................................14

*Panter v. Marshall Field & Co.*
    646 F.2d 271, 292 (7th Cir. 1981) ..................................................................21

*Rateree v. Rockett*
    852 F.2d 946, 950 (7th Cir. 1988) ......................................................14, 16, 19

*Robertson v. Dean Witter Reynolds, Inc.*
    749 F.2d 530, 534 (9th Cir. 1984) ..................................................................11

*Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc.*
    806 F.2d 1393, 1401 (9th Cir. 1986) ..............................................................22

*SEC v. Baxter*
    2007 WL 2013958, *3 (N.D. Cal. 2007) .........................................................11

*SEC v. Berry*
    2008 WL 2002537, *6 (N.D. Cal. 2008) .........................................................11

*SEC v. Geotek*
    426 F. Supp. 715, 727 (N.D. Cal. 1976), affirmed, 590 F. 2d 785 (1976).................13

*SEC v. Glick*
    1980 WL 1414, *2 (D.Nev. 1980) ..................................................................13

*SEC v. Koracorp Industries, Inc.*
    575 F. 2d 692, 697 (9th Cir. 1978) ..................................................................13

*SEC v. Rind*
    991 F.2d 1486, 1492 (9th Cir. 1993) ..............................................................12

*SEC v. Yuen*
    221 F.R.D. 631, 634 (C.D. Cal. 2004)..............................................................11

*Sup. Ct. of Virginia v. Consumers Union*
    446 U.S. 719, 731-32 (1980) ....................................................................13, 16

*Tenney v. Brandhove*
    341 U.S. 367, 376 (1951) .........................................................................13, 16

*Terry v. Bobb*
    827 F. Supp. 366, 368 (E.D. Va. 1993) ............................................................14

*United States v. Brewster*
    408 U.S. 501, 515-16 (1972) ...........................................................................13

*United States v. W. T. Grant Co.*
    345 U.S. 629, 635 (1953) .................................................................................13

*Vaughn v. Teledyne, Inc,*
    628 F.2d 1214, 1221 (9th Cir. 1980) ...............................................................21

*Vess v. Ciba-Geigy Corp. USA*
    317 F.3d 1097, 1106 (9th Cir. 2003) ...............................................................11

*Williams v. County of Greene*
    734 F. Supp. 235, 236 (W.D. Va. 1990) ..........................................................17

**Statutes and Rules:**

17 C.F.R. § 240.10b-5............................................................................................2
17 C.F.R. § 240.15c2-12.........................................................................................6
15 U.S.C. § 77q(a)..................................................................................................2
15 U.S.C. § 77q(a)(1)-(3)......................................................................................20
15 U.S.C. § 78j(b)...................................................................................................2
28 U.S.C. § 2462............................................................................................11, 12
Fed. R. Civ. P. 9(b)...............................................................................................11
Securities Exchange Act of 1934....................................................................2, 6, 12

Case No. 08cv0625-DSM (LSP)
Defendant Patricia Frazier's Motion to Dismiss

## I.   __INTRODUCTION__

Nearly *six years* after the first bond at issue, and *four years* after it began its investigation,[1] the Securities and Exchange Commission (the "Commission") filed its complaint on April 7, 2008 (the "Complaint"), naming as defendants Patricia Frazier ("Ms. Frazier") and four other former employees of the City of San Diego (the "City").  The Commission alleges two civil claims against Ms. Frazier—the first, under Section 17(a) of the Securities Act of 1933 ("Section 17(a)")[2], and the second under Section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)")[3] and Rule 10b-5 thereunder ("Rule 10b-5")[4]—in connection with the issuance a 2002 City bond, a 2003 City bond, and five continuing disclosures and ratings agencies presentations in 2003.  The Complaint seeks a civil penalty, as well as a permanent injunction.

As a preliminary matter, the Commission is unequivocally time-barred from bringing suit for a civil fine against Ms. Frazier with regard to any actions in connection with the 2002 City bond.  There is a five year statute of limitations for bringing civil penalty actions with regard to Section 17(a), Section 10(b) and Rule 10b-5.  The Commission brought this action almost six years after the 2002 bond was issued.

Similarly, the Commission is equitably time-barred from seeking a permanent injunction **at all** against Ms. Frazier.  Ms. Frazier—after serving the City for 30 years—retired in 2005 and has no plans to return to the workforce.[5]  And, for its part, the City entered into a settlement with the Commission almost two years ago in which it agreed to cease and desist committing or causing any violations and any future violations of Section 17(a), Section 10(b) and Rule 10b-5.  In short, there is no future conduct to enjoin.  The issue is moot.

As to the 2003 City bond—for which Ms. Frazier is alleged to have certified the attached appendix A—the Commission got it wrong.  Ms. Frazier did not certify the

---

[1] April 22, 2004 SEC Document Request to Ms. Frazier, Ex. 1 to RJN.
[2] 15 U.S.C. § 77q(a)
[3] 15 U.S.C. § 78j(b)
[4] 17 C.F.R. § 240.10b-5

appendix A.  Indeed, the Complaint correctly alleges that the City Manager certified the appendix A for this bond;[6] but just two paragraphs later erroneously alleges that Ms. Frazier certified the same appendix A.[7]  So, the underpinning for this allegation is simply non-existent.

There is also an overarching issue—Ms Frazier's legislative immunity—which dictates that the entire suit should be dismissed with prejudice.  In signing various documents with regards to the City's bond offerings, and in meeting with ratings agencies, Ms. Frazier was carrying out legislative duties delegated to her by the San Diego City Council ("City Council") through a series of City resolutions and ordinances.  But for Ms. Frazier's actions, the City Council—the City's legislative body—would have been required to carry out her duties in connection with the issuance of the City's bonds.

Finally, the Complaint is fatally flawed for another fundamental reason.  Section 17(a), as well as Section 10(b) and Rule 10b-5, require that the information allegedly omitted from the City's bond disclosures be *material.*  As a matter of law, the Commission cannot establish materiality because, among other things, (1) the information the Commission alleges was material to investors was disclosed, and (2) the bonds at issue were entirely insured against loss—no investor could lose a cent on the bonds.  Without the ability to demonstrate materiality, both civil claims against Ms. Frazier must be dismissed, and since no amendment can cure this defect, they must be dismissed with prejudice.

## II.     FACTUAL BACKGROUND

### A.     Ms. Frazier Was Involved in the Issuance of City Bond Offerings As Deputy City Manager for Finance

Ms. Frazier was appointed Deputy City Manager for Finance in 1997.[8]  The Deputy City Manager for Finance assists the City Manager, a City Council appointee, in carrying out

---

[5] *See* Complaint ¶ 8.
[6] *See* Complaint ¶ 36.
[7] *See* Complaint ¶ 38.
[8] *See* Complaint ¶ 8.

1    his or her duties as the City's Chief Budget Officer.[9]  In accord with these duties, Ms. Frazier

2    was involved in various bond offerings authorized by the City Council to raise money for

3    City purposes.  She was delegated authority by the City Council through ordinances and/or

4    resolutions to finalize, certify and authorize the release of City bonds.  In 2002 and 2003, the

5    City Council passed ordinances and/or resolutions authorizing the issuance of five municipal

6    bond offerings.

7           In the Complaint, Ms. Frazier is alleged to have "recklessly certified that appendix A

8    [for two of the bond offerings] did not contain false or misleading statements."[10]  The two

9    bond offerings are (1) the June 2002 Fire and Life Safety Bond offering, which, among other

10   things, financed certain real property and improvements to various fire and life safety

11   facilities in the City ("2002 Fire and Life Safety Bond"),[11] and (2) the May 2003 Balboa Park

12   and Mission Bay Park bond offering, which refinanced a 1993 bond relating to the

13   acquisition, construction, and installation of public improvements in Balboa and Mission Bay

14   Parks ("2003 Park Refunding Bond").[12]   The Complaint also alleges Ms. Frazier was

15   "reckless" because she signed five unnamed City continuing disclosure statements in fiscal

16   year 2003, which purportedly included the same appendix A which was attached to the 2003

17   Park Refunding Bond, and in reviewing and making unspecified presentations to ratings

18   agencies in 2003 in connection with the City's bond offerings.[13]

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25

26   [9] City of San Diego City Charter, Art. V, §§ 27-29, Ex. 2 to Ms. Frazier's Request for Judicial Notice in
     Support of Her Motion to Dismiss the Complaint ("RJN").

27   [10] Complaint ¶ 38.
     [11] *See generally*, 2002 Fire and Life Safety Bond, Ex. 3 to RJN.
     [12] *See generally*, 2003 Park Refunding Bond, Ex. 4 to RJN.

28   [13] Complaint ¶ 38.

**B.    The City Council Delegated Legislative Authority to Ms. Frazier With Regard To The 2002 Fire and Life Safety Bond, Five Continuing Disclosures in 2003 and Rating Agency Presentations By Express Legislation**

**1.    2002 Fire and Life Safety Bond**

On April 29, 2002, the City Council adopted Ordinance Number O-19054 (the "Ordinance") with regard to the 2002 Fire and Life Safety Bond.[14] In the Ordinance, the City Council expressly delegated to Ms. Frazier the legislative authority to take numerous actions in connection with the 2002 Fire and Life Safety Bond.[15] Specifically, the Ordinance— which was passed to raise funds for the purpose of acquiring, constructing and installing certain fire and life safety facilities for the City—provided Ms. Frazier with the following authority:

> The City Manager or his designee, any ***Deputy City Manager*** of the City, the City Attorney, any Deputy City Attorney, the City Clerk and any Assistant City Clerk of the City [each, a Designated Officer], and each of them acting alone or together, are ***hereby authorized and directed, for and in the name of and on behalf of the City, to take such actions, and to execute such documents and certificates as may be necessary to effectuate the purposes of this Ordinance.*** [16]

In accordance with this authority, Ms. Frazier signed the "Closing and No Litigation Certificate" of the City. ***But for*** this express delegation, the City Council would have been required to perform the legislative task of certifying the City's bond offerings, as it is among the City Council's responsibilities to issue bonds whenever it determines "that the public interest or necessity demands the acquisition, construction or completion of any municipal improvement."[17]

///

///

///

---

[14] *See generally* City Council Ordinance Number O-19054, Ex. 5 to RJN.
[15] *Id.*
[16] *Id.* at ¶ 14 (emphasis added).
[17] City of San Diego City Charter, Art. VII, § 90, Ex. 2 to RJN.

### 2.    2003 Continuing Disclosures

The City must execute a continuing disclosure agreement for each bond it issues in accordance with Rule 15c2-12(b)(5) adopted by the Commission under the Securities Exchange Act of 1934.[18]  The continuing disclosure agreement requires the City to provide each Nationally Recognized Municipal Securities Information Repository with an annual report detailing the requisite disclosures set forth in the agreement.[19]  By way of ordinance or resolution, the City Council expressly delegates the legislative authority to execute the continuing disclosure agreements, and thereby the annual reports, to the City Manager, the Deputy City Manager, and their authorized designees.[20]  In accordance with this delegation of legislative authority, Ms. Frazier executed continuing disclosures containing annual reports for five bond offerings in 2003.  But for this delegation of legislative authority, the City Council would have been required to perform this task.

### 3.    2003 Ratings Agencies Presentations

The City is also required to obtain a rating for each individual bond, separate and apart from the City's general bond rating, before a bond can be issued.  In order to obtain these ratings, the City makes presentations to the various ratings agencies.  In 2003, the City Council, through a series of ordinances and resolutions, delegated legislative authority to Ms. Frazier, among others, to make these presentations.[21]  Again, but for this delegation of authority, the City Council would have been required to perform this legislative task associated with issuing bonds that it deemed desirable and in furtherance of a public purpose.[22]

///

---

[18] *See* 17 C.F.R. § 240.15c2-12.
[19] *Id.; See, e.g.,* Continuing Disclosure Agreement for the Park Refunding Bond, Ex. 6 to RJN.
[20] *See, e.g.,* City Council Resolution Number R-297692 adopted on March 3, 2003, ¶ 8, Ex. 7 to RJN.
[21] *See* City Council Resolution Number R-297692 adopted on March 3, 2003, Ex. 7 to RJN; City Council Resolution Number R-296500 adopted on May 14, 2002, Ex. 8 to RJN; and City Council Resolution Number R-297693 adopted on March 3, 2003, Ex. 9 to RJN.
[22] *See* San Diego City Charter, Art. III § 90 (1986), Ex. 2 to RJN.

Case No. 08cv0625-DSM (LSP)
Defendant Patricia Frazier's Motion to Dismiss

### 4.    2003 Park Refunding Bond

Finally, the Complaint contains a significant mistake. It alleges that *both* Ms. Frazier and Mr. Uberuaga, the City Manager, "certified" that appendix A in the 2003 Park Refunding Bond "did not contain any false or misleading statements."[23] In fact, Ms. Frazier made **no** certification with regard to appendix A in the 2003 Park Refunding Bond. Ms. Frazier merely signed the Official Statement,[24] and the City Manager—not Ms. Frazier—certified the statements in the Official Statement.[25] Resolution Number R-297692, which authorized and directed certain actions with respect to the bond, provided that the City Manager, or his designee,

> ... *execute a statement that the facts contained within the Final Official Statement*, and any supplement or amendment thereto ... *were*, at the time of sale of the Certificates, *true and correct in all material respects and that the Final Official Statement did not*, on the date of sale of the Certificates, and does not, as of the date of delivery of the Certificates, *contain any untrue statement of material fact* with respect to the City required to be stated where necessary to make a statement not misleading in light of the circumstances under which it was made.[26]

In accordance with this legislatively delegated task, the City Manager signed the "Closing Certificate of the City." [27] Ms. Frazier, therefore, did not certify anything with regard to the Official Statement for the 2003 Park Refunding Bond, let alone certify the disclosures in the attached appendix A.

### C.    The Bond Offerings Contained all Material Disclosures

In its Complaint, the Commission alleges that "at least three concepts were **material**" to investors concerning the City's pension obligations and its funding of those obligations:

(a) CERS's[28] funded ratio, *i.e.*, the ratio of its assets to liabilities;

---

[23] Complaint, ¶¶ 36, 38.
[24] 2003 Park Refunding Bond, Ex. 4 to RJN.
[25] Closing Certificate of the City, 2003 Park Refunding Bond, Ex. 10 to RJN.
[26] City Council Resolution Number R-297692, Ex. 7 to RJN.
[27] Closing Certificate of the City, 2003 Park Refunding Bond, ¶ 5. Ex. 10 to RJN.
[28] The San Diego City Employees' Retirement System ("CERS").

1        (b) The City's unfunded liability to CERS, *i.e.*, the dollar shortfall

2 between CERS's assets and liabilities; and

3        (c) The City's net pension obligation, also called the NPO, *i.e.*, the

4 cumulative difference between what the City actually contributed to CERS

5 and the amount that the City would have contributed had it conformed to a

6 funding method recognized by the Government Accounting Standards

7 Board ("GASB").[29]

8       Ironically—and fatally to the Commission's action—the City did in fact disclose in

9 appendix A what the Commission contends were the three **material concepts** about the

10 City's pension obligations and its funding of those obligations: (a) CER's funded ratio; (b)

11 the City's unfunded liability to CERS; and (c) the City's net pension obligation.[30] In

12 appendix A to the 2002 Fire and Life Safety Bond, the City disclosed the following:

14       The City's last actuarial valuation dated June 30, 2000 stated the funding
ratio . . . of the CERS fund to be 97.3%. The CERS fund has an Unfunded
Actuarial Accrued Liability (UAAL) of $68.959 million as of June 30, 2000
15       . . . The CERS Retirement Board has received the Actuary's report on the
results of the actuarial valuation for the year ended June 30, 2001. In the
16       report, the new UAAL as of June 30, 2001, is $283.89 million.[31]

18 In the appendix A to the 2003 Park Refunding Bond, the City continued to disclose the rising

19 UAAL and pension obligations:

20       The City's last actuarial valuation dated June 30, 2002 stated the funding
ratio . . . of the CERS fund to be 77.3%. The CERS fund has an Unfunded
21       Actuarial Accrued Liability (UAAL) of $720.7 million as of June 30, 2002,
which represents a $436.8 million increase in the UAAL since the previous
22       actuarial calculation dated June 30, 2001.[32]

23 The appendix A to the 2003 Park Refunding Bond also highlighted litigation against the City

24 concerning pension obligation growth:

---

[29] Complaint ¶ 14(a)-(c).

[30] Complaint ¶ 14.

[31] Appendix A to the 2002 Fire and Life Safety Bond, p. A-31, Ex. 11 to RJN.

[32] Appendix A to the 2003 Park Refunding Bond, p. A-32, Ex. 12 to RJN.

Case No. 08cv0625-DSM (LSP)
Defendant Patricia Frazier's Motion to Dismiss

1
2
3
4
5
6

On January 16, 2003, a class action complaint (*Gleason v. City of San Diego, et al.*) for declaratory relief was filed . . . The plaintiffs . . . allege that as a result of recent actions taken by the defendants, the SDCERS trust fund has an unfunded accrued liability of $720 million, and that by 2009, the City will owe approximately $2.8 billion to SDCERS, with an annual City budget expense of more than $250 million . . . The City cannot predict the outcome of the litigation at this time, but if the plaintiffs are successful, there potentially may be additional expense to the General Fund in the funding of SDCERS trust fund and otherwise, over and above the City's expected expense in the funding of its pension obligations.[33]

7    In both disclosures, the **material concepts**, which showed a rapidly rising UAAL and

8    underfunding of the pension system, were addressed.    So, even as alleged by the

9    Commission, the material disclosures were made in appendix A.

10        In its Complaint, the Commission ignores the fact that the City indeed disclosed the

11   **material concepts** to investors, and instead relies on the failure to include speculative

12   projections concerning the pension fund.  In paragraph 31 of the Complaint, the Commission

13   alleges that appendix A was deficient because it failed to disclose (1) the City's looming

14   financial crisis or that it resulted from various City's decisions regarding the funding of its

15   pension plan and related benefits; (2) that certain sums relating to a lawsuit settlement were

16   excluded from the City's pension calculations of the unfunded liability which would have

17   substantially increased such unfunded liability; (3) that the City's unfunded liability to its

18   pension plan was expected to dramatically increase by 2009; (4) that two of the City's

19   proposals to underfund its pension system contributed significantly to the projected increases

20   in the City's unfunded liability and annual pension contribution; and (5) the estimated

21   present value of the City's liability for retiree health care and how it was being paid.[34]

22        The disclosures in appendix A were consistent with Ms. Frazier's knowledge and

23   understanding of materiality at the time they were released.   Albeit an experienced City

24   official, Ms. Frazier did not sit on the CERS Board, nor did she have the requisite knowledge

25   and experience to make an independent determination of materiality.   The City hired

26   professionals—financial advisors, underwriters, bond and disclosure counsel—and utilized

27

28

[33] *Id.* at p. A-38.
[34] Complaint ¶ 31.

1   in-house lawyers from the City Attorney's Office—to guide and ensure that the requisite

2   disclosures were contained in the bond offerings.

3         Significantly, the Complaint does not allege that Ms. Frazier has any degree,

4   experience, or training as an accountant, attorney, or securities professional; that the City

5   provided Ms. Frazier with any training on securities disclosures; that Ms. Frazier drafted any

6   portion of any security document or disclosure; or that Ms. Frazier failed to follow, or acted

7   contrary to, the advice of any accounting, legal, or securities professional.[35]    Moreover,

8   neither the review nor approval of securities disclosures fell within the City Manager's, and

9   thereby Ms. Frazier's, many defined job duties and responsibilities, as outlined by the City

10  Charter.[36]   Thus, considering Ms. Frazier's lack of training relating to securities, there is no

11  reason to believe that Ms. Frazier knew or should have known what projections—if any—

12  should be included in the City bond offerings, particularly on the topic of the City's pension

13  system, an area in which Ms. Frazier was not involved.

14
            **D.    No Investor Lost Money; The Bonds Were Fully Insured; and Ms.**
15          **Frazier Received No Personal Benefit**

16        Finally, the Complaint also fails to note that: (1) no investor lost a penny or has

17  otherwise been harmed in connection with the bonds; (2) the bonds are fully secured by

18  insurance, and will certainly be repaid in full;[37] and (3) Ms. Frazier is not alleged to have

19  received *any* personal benefit in connection with the bonds.[38]

20

21  **III.    ARGUMENT**

22
            **A.    Motion to Dismiss In General**
23
          A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests
24
    the legal sufficiency of a claim.[39]   In ruling on a Rule 12(b)(6) motion to dismiss, "the Court
25

26  ---
    [35] *See generally* Complaint.
27  [36] *See* San Diego City Charter, Art. V, § 28 (1977), Ex. 2 to RJN.
    [37] 2002 Fire and Life Safety Bond, pp. 11-13, Ex. 3 to RJN; 2003 Park Refunding Bond, p. 10, Ex. 4 to RJN.
28  [38] *See generally* Complaint.
    [39] *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

1   must accept well-pleaded allegations as true, but it is not required to accept 'legal

2   conclusions cast in the form of factual allegations if those conclusions cannot reasonably be

3   drawn from the facts alleged.'"[40]   The Court may consider materials that are subject to

4   judicial notice when ruling on a motion to dismiss.[41]   A complaint is properly dismissed

5   where either: (1) it lacks a cognizable legal theory for recovery; or (2) where the plaintiff

6   alleges insufficient facts to support a cognizable legal theory.[42]

7       Even under the so-called "notice pleading" standard of Rule 8(a)(2), the Commission

8   is required to plead facts with particularity that, if proven, would establish its claims under

9   Section 17(a), Section 10b, and Rule 10b-5.[43]   In other words, plaintiffs must allege "'the

10  who, what, when, where, and how' of the misconduct charged."[44]   This requirement applies

11  not only to fraud claims, but also to non-fraud claims grounded in allegations of fraudulent

12  conduct,[45] such as the Complaint's allegation that Ms. Frazier's acts were reckless.[46]

13      **B.    The Commission is Time Barred From Seeking a Fine On the 2002 Fire
14          and Life Safety Bond; and Time Barred From Seeking Injunctive Relief
            With Regard to All Allegations**

15

16      The Commission is time barred from seeking any penalty with regard to the April

17  2002 Fire and Life Safety Bond.  The federal "catch-all" statute of limitations, 28 U.S.C. §

18  2462, imposes a five-year window on enforcement proceedings seeking "any civil fine,

19  penalty, or forfeiture, pecuniary or otherwise."[47]   In its Prayer for Relief, the Commission

20  seeks a civil penalty (*i.e.*, fine), in addition to a judgment permanently enjoining Ms. Frazier

21  from future violations of Section 17(a), Section 10(b) and Rule 10b-5 thereunder. [48]   The

22

---

[40] *SEC v. Yuen,* 221 F.R.D. 631, 634 (C.D. Cal. 2004) (quoting *Clegg v. Cult Awareness Network,* 18 F.3d 752, 754-55 (9th Cir. 1994)).
[41] *MGIC Indem. Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir. 1986).
[42] *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 534 (9th Cir. 1984).
[43] Fed. R. Civ. P. 9(b).
[44] *Vess v. Ciba-Geigy Corp. USA,* 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting *Cooper v. Pickett,* 137 F.3d 616, 627 (9th Cir. 1997)).
[45] *Vess,* 317 F.3d at 1103-04; *SEC v. Baxter,* 2007 WL 2013958, *3 (N.D. Cal. 2007).
[46] Complaint ¶ 38.
[47] 28 U.S.C. § 2462. *See Johnson v. S.E.C.,* 87 F.3d 484, 492 (D.C. Cir. 1996); *.F.T.C. v. Lukens Steel Co.,* 454 F.Supp. 1182, 1185, n. 2 (D.C. Cir. 1978); *SEC v. Berry,* 2008 WL 2002537, *6 (N.D. Cal. 2008).
[48] Complaint, p. 17.

Case No. 08cv0625-DSM (LSP)
                              Defendant Patricia Frazier's Motion to Dismiss

1  Commission did not file its Complaint until April 2008. Therefore, any civil fine with regard

2  to the April 2002 Fire and Life Safety Bond is clearly time barred by the plain language of

3  the statute.[49]

4       Additionally, any injunctive relief is time barred because such relief under the

5  circumstances of this case would constitute a civil penalty. The courts recognize that, in

6  certain circumstances, injunctive relief may be seen as a civil penalty within the scope of 28

7  U.S.C. § 2462.[50]  Where a penalty is a form of punishment "going beyond remedying the

8  damage caused to the harmed parties by the defendant's action," the five year statute of

9  limitations of § 2462 applies.[51]  In this case, injunctive relief is not being requested for a

10  remedial purpose. Rather, the Commission knows and understands that Ms. Frazier retired in

11  2005, after a long career with the City, and has no intention of returning.[52] Furthermore, the

12  Commission entered into a Cease and Desist Order with the City in 2006 instituting

13  injunctive relief.[53]  At this point, any injunctive relief would solely serve to punish Ms.

14  Frazier and to cause her further embarrassment and public humiliation.  Therefore, the

15  Commission should be time-barred from asserting any injunctive relief relating to Ms.

16  Frazier's actions with regard to the 2002 Fire and Life Safety Bond.

17       For the same reason, all injunctive relief requested by the Commission against Ms.

18  Frazier should be barred.  The Ninth Circuit has recognized that "[a] court can and should

19  consider the remoteness of the defendant's past violations in deciding whether to grant the

20  requested equitable relief."[54]    The fact that the Commission, "when seeking purely

21  injunctive relief, is not bound by any specifically delineated statute of limitations does not

22

23  [49] This calculation takes into account a tolling agreement signed between Ms. Frazier and the Commission
    suspending the statute of limitations from February 29, 2008 until this action was filed.

24  [50] *Johnson v. SEC*, 87 F.3d at 492 (D.C. Cir. 1996) (holding that a Commission proceeding resulting in a
    censure and a six-month disciplinary suspension constituted a penalty within the meaning of 28 U.S.C. § 2462).

25  [51] *Id.* at 488.
    [52] *See* Complaint ¶ 8.

26  [53] Order Instituting Cease and Desist Proceedings, Making Findings, and Imposing a Cease-and-Desist Order
    Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934

27  dated November 14, 2006, in *In the Matter of City of San Diego, California* ("Cease and Desist Order"), Ex. 13
    to RJN.

28  [54] *SEC v. Rind*, 991 F.2d 1486, 1492 (9th Cir. 1993).

1    mean that it possesses unlimited or perpetual power to obtain injunctive relief for past

2    conduct."[55]  Before it can obtain injunctive relief, the Commission must first show that there

3    is a "reasonable likelihood" or "expectation" that a defendant will commit further violations

4    of the securities laws.[56]    Again, given the circumstances of this case—Ms. Frazier's

5    retirement in 2005, and the Commission's Cease and Desist Order entered into with the City

6    in 2006—there is *zero* likelihood or expectation that Ms. Frazier will commit any further

7    violation of securities law.  All requested injunctive relief against Ms. Frazier should

8    therefore be barred.

9

    **C.    Legislative Immunity Requires Dismissal of the Complaint in its Entirety**

10

11        **1.    *Legislative Immunity In General***

12        Local government officials are absolutely immune from suit for actions taken "in the

13    sphere of legitimate legislative activity."[57]  This immunity guarantees government officials

14    the freedom to discharge their legislative duties without fear of prosecution,[58] and further

15    ensures that "the exercise of legislative discretion [will] not be inhibited by judicial

16    interference or distorted by the fear of personal liability."[59]

17        Because legislative immunity aims to protect the integrity of the legislative process, it

18    applies to *any* act undertaken by a government official that serves "the due functioning of the

19    [legislative] process," irrespective of his or her specific title or position.[60]  In other words,

20    whether legislative immunity applies to an individual turns on the *nature* of the act in

21    question, rather than the specific duties or title of the individual asserting immunity.[61]

22    Applying this functional approach to legislative immunity, courts routinely have applied

23

---

24    [55] *SEC v. Glick*, 1980 WL 1414, *2 (D.Nev. 1980).
    [56] *See United States v. W. T. Grant Co.*, 345 U.S. 629, 635 (1953); *SEC v. Koracorp Industries, Inc.*, 575 F. 2d

25    692, 697 (9th Cir. 1978); *SEC v. Geotek*, 426 F. Supp. 715, 727 (N.D. Cal. 1976), affirmed, 590 F. 2d 785
    (1976).

26    [57] *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951); *see also Bogan v. Scott-Harris*, 523 U.S. 44, 45 (1998); *Sup.
    Ct. of Virginia v. Consumers Union*, 446 U.S. 719, 731-32 (1980).

27    [58] *Tenney*, 341 U.S. at 376-77.
    [59] *Bogan*, 523 U.S. at 52.

28    [60] *United States v. Brewster*, 408 U.S. 501, 515-16 (1972).
    [61] *Chateaubriand v. Gaspard*, 97 F.3d 1218, 1220 (9th Cir. 1996).

1  legislative immunity not only to local legislators, but also to local officials—including city

2  managers, directors, and other executives—performing legislative functions.[62]  Unlike

3  qualified official immunity, which is broader in scope than legislative immunity, and which

4  also applies to Mr. Frazier's alleged acts, legislative immunity does not require any showing

5  of good faith and is appropriately raised on a motion to dismiss.[63]

6

        **2.    *Legislative Immunity Applies to Municipal Bonds***

7

8          The Complaint challenges the adequacy or completeness of the disclosures

9  accompanying the 2002 Fire and Life Safety Bond and the 2003 Park Refunding Bond, as

10 well as various continuing disclosures and unspecified presentations to ratings agencies in

11 2003,[64] all of which were designed to raise money for City purposes.  The decision to raise

12 and spend public money is a legislative task,[65] and one that is the general responsibility of the

13 City Council.[66]  The issuance of municipal bonds—including the formulation of policy

14 relating to the completion of tasks referenced in the ordinances and/or resolutions, which

15 constitute mandatory acts precedent to the raising and spending of public money via the two

16 bonds—should be protected by absolute legislative immunity.

17         To determine whether the issuance of municipal bonds constitutes a legislative act for

18 purposes of legislative immunity, four factors must be considered: (1) whether the act

19 involves formulation of policy or *ad hoc* decision making; (2) whether the act applies to few

20 individuals or broadly to several; (3) whether the act is formally legislative in character; and

21

22

[62] *Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d 607, 614 (8th Cir. 1980); *Bannum, Inc. v. City of Beaumont*, 236 F. Supp. 2d 633, 634-35, 637 (E.D. Tex. 2002); *Terry v. Bobb*, 827 F. Supp. 366, 368 (E.D. Va. 1993); *Orange v. County of Suffolk*, 830 F. Supp. 701, 706 (E.D.N.Y. 1993).
[63] *See Kaahumanu v. County of Maui*, 315 F.3d 1215, 1219 (9th Cir. 2003).
[64] As previously discussed, the Commission is time-barred from seeking relief with regard to the 2002 Fire and Life Safety Bond, and Ms. Frazier did not certify anything with regard to the 2003 Park Refunding Bond. However, given the multiple resolutions delegating legislative authority to Ms. Frazier with regard to the ratings agencies presentations and continuing disclosures in 2003, this analysis will apply to each of the Commission's allegations.
[65] *Rateree v. Rockett*, 852 F.2d 946, 950 (7th Cir. 1988).
[66] *See, e.g.*, San Diego City Charter, Art. III § 11.1 (1986) ; City of San Diego City Charter, Art. VII, § 90, Ex. 2 to RJN.

1   (4) whether the act bears "all the hallmarks of traditional legislation."[67]   The allegations

2   contained within the Complaint, as well as judicially noticeable facts, establish that each of

3   these criteria is met here.

4

5                    a.    *The Issuance Of Municipal Bonds Constitutes The Formulation
                           Of Policy, Rather Than Ad Hoc Decision Making*

6

7        A decision is *ad hoc* if it applies only to a particular case or in particular

    circumstances and does not effectuate policy or creates a binding rule of conduct.[68]   The

8   distinction between policy making (*i.e.*, legislative) and *ad hoc* decision making

9   (*i.e.*, administrative) lies between the general and the specific:

10

11       If the underlying facts relate to particular individuals or situations and the
         decision impacts specific individuals or singles out specifiable individuals,

12       the decision is administrative.  On the other hand, the action is legislative if
         the facts involve generalization concerning a policy or state of affairs and the

13       establishment of a general policy affecting the larger population.[69]

14

15       In this case, the ordinances and/or resolutions authorizing the issuance of the various

16  bonds and their accompanying documents involved the financing of public projects.[70]   The

17  decisions to enact the ordinances and/or resolutions and issue the bonds—all of which

    concerned the budgetary priorities of the City—were a prospective measure and inherently

18  policy-driven.[71]   After all, "budgetmaking is a quintessential legislative function,"[72] and city

19  budgeting involves raising and spending money via municipal securities.  Also, the bonds

20  affected and benefitted millions of taxpayers and local citizens.

21       Equally prospective and policy-driven were decisions made and actions performed by

22  authority from, and at the direction of, the City Council in connection with the issuance of

23  the bonds, since they were necessary conditions precedent to the City's ability to raise and

24  spend public money via those particular securities; and, therefore "in the sphere of legitimate

25

26  _____
    [67] *Kaahumanu*, 315 F.3d at 1220.
    [68] *Id.*
27  [69] *Alexander v. Holden,* 66 F.3d 62, 66 (4th Cir. 1995) (citations and quotation marks omitted).
    [70] *See generally* City Council Resolution Number R-297692, Ex. 7 to RJN.
28  [71] *Id.* at 1-5.

                                                       15          Case No. 08cv0625-DSM (LSP)
                                                                   Defendant Patricia Frazier's Motion to Dismiss

1   legislative activity,"[73] and/or "in direct assistance of legislative activity."[74]  No bonds would

2   have been issued, and no public money would have been raised and thereafter spent, but for

3   persons referenced in the ordinances and/or resolutions, acting as agents of the City Council,

4   and formulating policy for the performance of acts authorized by the City Council.  Further,

5   as the City Council was generally the legislative body of the City, simple logic dictates that

6   City employees authorized and directed by the City Council to make decisions and perform

7   actions in connection with a City security, and the attendant raising and spending of public

8   money, are engaged in legislative action.

9          Therefore, the issuance of the various bonds, including the decisions made and

10  actions performed at the direction of the City Council, were not *ad hoc*, but rather constituted

11  a policy-driven exercise.

12                    b.      *The Issuance Of Municipal Bonds Affects The Public At Large*

13

14         Legislative immunity is disfavored for acts that apply to a few individuals rather than

15  to the public at large.[75]  The quintessential example of a legislative act that applies to a few

16  individuals, and thus lacks the protection of legislative immunity, is the decision to reject an

17  individual's application for a building permit.[76]  In contrast, the City Council's votes to

18  authorize the ordinances and/or resolutions, the decisions and actions required to effectuate

19  the ordinances and/or resolutions, the actual issuance of the various bonds, and the

20  expenditure of funds raised by the bonds, all broadly affected the community at large, as

21  would any decision or action designed to raise and save the City money, to protect millions

22  of citizens and to benefit parks enjoyed by a countless number of people each year.

23  ///

24  ///

25

---

26  [72] *Rateree*, 852 F.2d at 950.
27  [73] *Tenney*, 341 U.S. at 376; *see also Bogan*, 523 U.S. at 45; *Sup. Ct. of Virginia*, 446 U.S. at 731-32.
    [74] *Aitchison v. Raffiani*, 708 F.2d 96, 99-100 (3rd Cir. 1983).
28  [75] *Kaahumanu*, 315 F.3d at 1222.
    [76] *Id.*

c.     *The Issuance Of Municipal Bonds Is Formally Legislative In Character*

The votes to enact the ordinances and/or resolutions are clearly entitled to legislative immunity, as voting is "quintessentially legislative."[77] Equally legislative is the "deliberative and communicative" process involved in a decision to pass legislation,[78] including Mr. Frazier's recommendations to the City Council that they adopt the various ordinances and/or resolutions and issue the bonds.[79]   Similarly legislative are the tasks performed "in direct assistance of legislative activity,"[80] including the acts now challenged by the Commission.  This is especially true since the City Council is ultimately responsible for this otherwise delegated task[81] and, in enacting the 2002 Fire and Life Safety Bond and 2003 Park Refunding Bond, for example, voted to approve for distribution the disclosures contained in appendix A as it existed in the City's Preliminary Official Statement.[82]

d.     *The Issuance Of Municipal Bonds Bears All The Hallmarks Of Traditional Legislation*

The hallmarks of the traditional legislative process are not particularly complicated. In the case of a tax increase, for example, a bill would be introduced, debated, and passed (or not).   Not surprisingly, local legislators are immune from suit for the enactment of tax ordinances.[83]  The process for issuing a municipal bond, merely an alternative form of city financing, is no different.  Here, the Resolution for the 2003 Park Refunding Bond, for example, was introduced because it stood to save the City approximately $2.3 million.[84]  Ms. Frazier, as Deputy City Manager, weighed in on the issue and recommended that the City

---

[77] *Bogan*, 523 U.S. at 55.
[78] *Gravel v. United States*, 408 U.S. 606, 625 (1972).
[79] *See, e.g.*, City Manager's Report for the 2002 Fire and Life Safety Bond, Report No. 02-063, Ex. 14 to RJN; City Manager's Report for the 2003 Park Refunding Bond, Report No. 03-029, Ex. 15 to RJN.
[80] *Aitchison*, 708 F.2d at 99-100.
[81] *See, e.g.*, San Diego City Charter, Art. III § 11.1 (1986), Ex. 2 to RJN.
[82] *See, e.g.*, City Council Resolution Number R-297692 ¶ 10, Ex. 7; City Council Ordinance Number O-19054, Section 8, Ex. 5 to RJN.
[83] *See Williams v. County of Greene*, 734 F. Supp. 235, 236 (W.D. Va. 1990).
[84] City Council Resolution Number R-297692 at 5, Ex. 7 to RJN.

1  Council adopt the Resolution.[85]   The City Council then unanimously voted to adopt the

2  Resolution,[86] and delegated to Ms. Frazier the performance of all tasks needed to "effectuate

3  the purposes of this Resolution,"[87] which was otherwise the ultimate responsibility of the

4  City Council.[88]   And because no bond could have been issued, and no money raised and

5  thereafter spent, without the performance of each of these tasks, they are all necessarily

6  hallmarks of the traditional legislative process of raising and spending public money.

7         In sum, legislative immunity should apply to the issuance of the various bonds at

8  issue, including but not limited to, all decisions and actions in accordance with the

9  ordinances and/or resolutions, which constitute mandatory conditions precedent to the raising

10  and spending of public money via that particular City bond offering.   Such legislative

11  immunity requires dismissal of Ms. Frazier from this case.

12

13  **3.     *Legislative Immunity Applies To Ms. Frazier And The Entire Complaint Must Be Dismissed***

14         The Commission's allegation that Ms. Frazier "knew or was reckless in not knowing

15  that the disclosures" in the 2002 Fire and Life Safety Bond and 2003 Park Refunding Bond,

16  as well as the continuing disclosures and rating agency presentation(s), were misleading, are

17  the *only* allegations against Ms. Frazier.[89] Each of these acts directly relates to authority

18  delegated to Ms. Frazier via the City's ordinances and/or resolutions.

19         It makes no difference that Ms. Frazier, not a City Council member, certified

20  appendix A in 2002, or performed any other act referenced in the ordinances and/or

21  resolutions: "[i]f the legislative assistant's conduct would be immune if performed by the

22  legislator himself, the legislative assistant shares the immunity."[90]   Moreover, the City

23  Council itself voted to approve the Preliminary Official Statements and corresponding

24

25  ----

[85] City Manager's Report for the 2003 Park Refunding Bond, Report No. 03-029, Ex. 15 to RJN.

26  [86] City Council Resolution Number R-297692 at p. 11, Ex. 7 to RJN.
[87] *Id.* at ¶ 3.

27  [88] *See, e.g., San Diego City Charter, Art. III § 11.1 (1986); City of San Diego City Charter, Art. VII, § 90, Ex. 2 to RJN.

28  [89] Complaint ¶ 38.
[90] *Chateaubriand,* 97 F.3d at 1220, n. 2.

1  appendix As for distribution before Ms. Frazier signed any documents or certifications with

2  regards to the 2002 Fire and Life Safety Bond and 2003 Park Refunding Bond.[91]

3      It is important to note that even without the ordinances and/or resolutions or any other

4  City Council action, absolute legislative immunity extends to Ms. Frazier.  Even if the City

5  Council did not pass the ordinances and/or resolutions expressly authorizing and delegating

6  legislative tasks which were conditions precedent to raising and spending public money via

7  the security, Ms. Frazier's acts in connection with the issuance of the bonds still constituted

8  legislative activity, since they constituted an integral part of the traditional legislative

9  function of budget making,[92] which the City Charter specifically granted to the City

10  Manager, who correspondingly delegated it to his Deputy City Manager:

11

12  It shall be the duty of the Manager to . . . prepare and submit to the Council the annual budget estimate and such reports as may be required by the body .

13  . . The Manager, as Chief Budget Officer of the City, shall be responsible for planning the activities of the City government and for adjusting such

14  activities to the finances available . . . He shall be charged with the bringing together of estimates covering the financial needs of the City, with the

15  checking of these estimates against the information relative to past expenditures and income, with the preparation of budget document and

16  supporting schedules and with the presentation of the budget to the Council.[93]

17  Accordingly, the Complaint must be dismissed in its entirety.

18

19  **E.    The Complaint Must be Dismissed as it Contains Only Claims Which State Elements That Cannot Possibly Be Established**

20

21      The Complaint contains just two claims: the first under Section 17(a),[94] and the

22  second under Section 10(b) and Rule 10b-5 thereunder.[95]  As to both claims, the Complaint

23  must allege, *inter alia*, facts that, if proven true, would show that Ms. Frazier

24  either: (a) employed devices, schemes, or artifices to defraud; (b) made a misstatement or

25

26  [91] *See* City Council Resolution Number R-297692 ¶ 10, Ex. 7; City Council Ordinance Number O-19054, Section 8, Ex. 5 to RJN.
[92] *Rateree,* 852 F.2d at 950.

27  [93] *See* San Diego City Charter, Art. V, § 28 (1977), Ex. 2 to RJN.
[94] Complaint ¶ 44.

28  [95] *Id.* ¶ 47.

1    omission of *material* fact; or (c) engaged in transactions, acts, practices, or courses of

2    business which operated or would operate as a fraud or deceit upon other persons.[96]  The

3    Complaint itself, and judicially noticeable facts, establish that the two claims are fatally

4    deficient and cannot be remedied, as they contain elements that cannot possibly be

5    established.

6
7              1.    *Both Claims Must Be Dismissed Due To Lack Of Materiality*

8           As discussed above, the City disclosed in appendix A what the Commission contends

9    were the three **material concepts** about the City's pension obligations and its funding of

10   those obligations: (a) CER's funded ratio; (b) the City's unfunded liability to CERS; and (c)

11   the City's net pension obligation.[97]  These disclosures clearly showed a rapidly rising UAAL

12   and the City's underfunding of its pension system.  In 2003, appendix A even highlighted a

13   lawsuit claiming that the City potentially owed approximately $2.8 billion to CERS.  Given

14   these disclosures, the Commission cannot now allege that the City omitted material

15   information.

16          Furthermore, none of the five supposed categories of omissions from appendix A, as

17   alleged in Paragraph 31 of the Complaint, are material.  An omitted fact is only material if

18   there is a "substantial likelihood that the disclosure of the omitted fact would have been

19   viewed by the reasonable investor as having significantly altered the 'total mix' of

20   information made available."[98]  In this case, the "total mix" of information made available to

21   investors included critical facts which the Commission ignores and which conclusively

22   renders the alleged omissions immaterial.

23          None of the categories of alleged omissions concerning projections relied upon by the

24   Commission satisfy the materiality requirement.  The actuarial projections regarding pension

25   liabilities and estimates of retiree health care liability are highly speculative and uncertain in

26   nature, as demonstrated by the gross inaccuracies of the figures referenced in the Complaint,

27
28   [96] 15 U.S.C. § 77q(a)(1)-(3); 17 C.F.R. § 240.10b-5(a)-(c).
     [97] Complaint ¶ 14.

1  and, as a result, are non-discloseable and immaterial as a matter of law.[99] Because the City

2  had no duty in 2003 to disclose its *potential* future retiree health care liability, the

3  Commission's action alleging failure to disclose must be dismissed as there was no duty to

4  disclose.

5      The alleged omissions are immaterial as a matter of law for another reason as well.

6  The 2002 Fire and Life Safety Bond and 2003 Park Refunding Bond were, and are, secured

7  by insurance policies.  MBIA Insurance Corporation secured the 2002 Fire and Life Safety

8  Bond, and Ambac Assurance Corporation secured the 2003 Park Refunding Bond.[100] Thus,

9  even in the unlikely event that the City is somehow unable to meet its obligations under the

10  bond for *any* reason, investors are still *guaranteed* payment.

11      The courts have recognized that the failure to disclose potential exposure is

12  immaterial if the defendant is insured against the loss.[101] The courts have reasoned that since

13  there is "no plausible way ... shareholders could suffer financially from the consequences of

14  the alleged ... violations ... a reasonable investor would not consider ... [the] asserted

15  violations of ... law important information significantly altering the *total mix* of information

16  made available to the investor."[102] Accordingly, because the 2002 Fire and Life Safety Bond

17  and 2003 Park Refunding Bond were, and are, secured by insurance policies, the alleged

18  omissions are immaterial as a matter of law in light of the "total mix" of available

19  information.

20      In sum, the Complaint does not allege that Ms. Frazier made any *material*

21  misstatement or omission in connection with the 2002 Fire and Life Safety Bond, 2003 Park

22  Refunding Bond, continuing disclosures and ratings agency presentations.  And this lack of

[98] *TSC Indus., Inc.*, 426 U.S. at 449; *see also Basic Inc.*, 485 U.S. at 232.
[99] *See Panter v. Marshall Field & Co.*, 646 F.2d 271, 292 (7th Cir. 1981); *see also James v. Gerber Prods., Co.*, 587 F.2d 324, 327 (6th Cir. 1978); *Vaughn v. Teledyne, Inc*,. 628 F.2d 1214, 1221 (9th Cir. 1980); *Freeman v. Decio*, 584 F.2d 186, 199-200 (7th Cir. 1978); *In re Lyondell Petrochemical Co. Sec. Litig.*, 984 F.2d 1050, 1052-53 (9th Cir. 1993).
[100] 2002 Fire and Life Safety Bond, pp. 11-13, Ex. 3 to RJN; 2003 Park Refunding Bond, p. 10, Ex. 4 to RJN.
[101] *In re JP Morgan Chase Securities Litigation*, 363 F. Supp. 2d 595, 634 (S.D.N.Y. 2005) (failure to disclose existence of significant liabilities was not a material omission because the liabilities were insured); *Levine v. NL Indus., Inc.*, 926 F.2d 199, 203 (2d Cir.1991) (failure to disclose exposure was not material because the Department of Energy had agreed to indemnify the defendant against loss).

materiality defect cannot possibly be remedied since, for example, the bonds were, and are, secured by insurance policies. Therefore, the Complaint must be dismissed.

### F.    THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

The Commission has been investigating the City's securities offerings since early 2004.[103] The Commission and the City entered into the Cease-and-Desist Order dated November 14, 2006.[104] On April 7, 2008, nearly a year and a half later, the Commission filed the present action. Despite its lengthy investigation, the Commission has not and cannot allege all the necessary elements of the claims brought since certain facts— *e.g.,* statute of limitations, legislative immunity, insurance coverage and lack of materiality, etc.—will never change. And because these facts will never change, no amendment "could . . . possibly cure the deficiency," and the Court should therefore dismiss the Complaint with prejudice.[105]

### VIII.   CONCLUSION

For the reasons set forth above, the Court should dismiss the Commission's complaint with prejudice.

Dated: September 8, 2008             **LA BELLA & MCNAMARA, LLP**


By:  /S/ Thomas W. McNamara             .
     Thomas W. McNamara
     Chrysta L. Elliott
     Attorneys *Specially Appearing* for Defendant Patricia
     Frazier

---

[102] *Id.* (emphasis added).
[103] February 13, 2004 SEC Document Request to Ms. Frazier, Ex. 1 to RJN.
[104] *See generally* Cease and Desist Order, Ex. 13 to RJN.
[105] *Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc.,* 806 F.2d 1393, 1401 (9th Cir. 1986).

## PROOF OF SERVICE

*Securities and Exchange Commission  v. Michael T. Uberuaga, et al.*
United States District Court of the Southern District of California
Case Number:  08-CV-0625 DMS (LSP)

I, Allison M. Myers, declare as follows:

      I am an employee of a member of the bar of this Court at whose direction was made in the County of San Diego, State of California.  I am over the age of 18 and not a party to the within action; my business address is 401 West "A" Street, Suite 1150, San Diego, California 92101.

      On September 8, 2008, I served the foregoing document(s) described as:

- **DEFENDANT PATRICIA FRAZIER'S NOTICE OF MOTION AND MOTION TO DISMISS THE COMPLAINT**

- **DEFENDANT PATRICIA FRAZIER'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HER MOTION TO DISMISS THE COMPLAINT**

- **DEFENDANT PATRICIA FRAZIER'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT**

on interested parties in this action by placing ☐ the original ☒ true copy(ies) thereof enclosed in sealed envelopes as follows:

| | |
|---|---|
| David J. Van Havermaat, Esq. | ***Attorneys for Plaintiff*** |
| Securities and Exchange Commission | ***Securities and Exchange Commission*** |
| 5670 Wilshire Boulevard, 11th Floor | |
| Los Angeles, California 90036 | |
| Tel:  (323) 965-3998 | |
| Fax:  (323) 965-3908 | |
| Email: vanhavermaatd@sec.gov | |
| | |
| Robert S. Brewer, Jr. | ***Attorneys for Defendant*** |
| McKenna Long & Aldridge, LLP | ***Michael T. Uberuaga*** |
| 750 B Street, Suite 2200 | |
| San Diego, CA 92101 | |
| Tel:  (619) 595-5400 | |
| Fax: (619) 595-5450 | |
| E-mail:  rbrewer@mckennalong.com | |

32361

PROOF OF SERVICE



Frank J. Ragen, Esq.                    ***Attorneys for Defendant***
105 West F Street, Suite 215            ***Edward P. Ryan***
San Diego, CA 92101
Tel: (619) 231-4330
Email: fjragen@aol.com

Frank T. Vecchione, Esq.                ***Attorneys for Defendant***
105 W. F Street, Suite 215              ***Teresa A. Webster***
San Diego, CA 92101
Tel: (619) 231-3653
Email: FTVLAW@aol.com

David Hahn, Esq.                        ***Attorneys for Defendant***
Hahn & Adema                            ***Mary E. Vattimo***
501 West Broadway, Suite 1600
San Diego, CA 92101
Tel: (619) 235-2100/Fax:  (619) 235-2101
Email: dhahn@hahnadema.com

☒ **BY EMAIL/ ECF** by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them via email as indicated above.

☐ **BY FIRST CLASS MAIL** I am readily familiar with the firm's practice of collection and processing correspondence for mailing with the United States Postal Service.  Under that practice, it would be deposited with United States postal service on that same day with postage thereon fully prepaid at San Diego, California in the ordinary course of business.  The envelope was sealed and placed for collection and mailing on that date following ordinary business practices.

☐ **BY OVERNIGHT DELIVERY** I am readily familiar with the firm's practice of collection and processing correspondence for mailing with Overnite Express and Federal Express.  Under that practice, it would be deposited with Overnite Express and/or Federal Express on that same day thereon fully prepaid at San Diego California in the ordinary course of business.  The envelope was sealed and placed for collection and mailing on that date following ordinary business practices.

☐ **BY FACSIMILE** Based on agreement of the parties to accept service by fax transmission, I faxed the documents on this date to the person(s) at the fax numbers listed.  No error was reported by the fax machine that I used.  A copy of the record of the fax transmission, which I

2

32361

1  printed out, is attached.

2  ☐ **BY PERSONAL SERVICE** I served the documents by placing them in an envelope or

3  package addressed to the person(s) at the addresses listed and providing them to a professional

4  messenger service for service on this date.

5  ☐ (STATE) I declare under penalty of perjury under the laws of the State of California that

6  the above is true and correct.

7  ☒ (FEDERAL)  I declare that I am employed in the office of a member of the bar of this

8  court at whose direction the service was made.

9       Executed September 8, 2008, in San Diego, California.

10

11       /s/ Allison M. Myers

12  Allison M. Myers

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

32361

PROOF OF SERVICE