1  LA BELLA & MCNAMARA LLP
   THOMAS W. MCNAMARA (SBN 127280)
2  CHRYSTA L. ELLIOTT (SBN 253298)
   401 West "A" Street, Suite 1150
3  San Diego, California 92101
   Telephone: (619) 696-9200
4  Facsimile: (619) 696-9269

5  Attorneys *Specially Appearing* For Defendant Patricia Frazier

6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10  SECURITIES AND EXCHANGE            ) Case No.: 08-CV-0625-DMS (LSP)
11  COMMISSION,                        )
                                       ) **DEFENDANT PATRICIA FRAZIER'S**
12            Plaintiff,               ) **REQUEST FOR JUDICIAL NOTICE IN**
                                       ) **SUPPORT OF MOTION TO DISMISS**
13       v.                            ) **THE COMPLAINT**
                                       )
14  MICHAEL T. UBERUAGA, EDWARD P.     )
    RYAN, PATRICIA FRAZIER, TERESA A.  ) Date:  November 7, 2008
15  WEBSTER, and MARY E. VATTIMO,      ) Time:  1:30 p.m.
                                       ) Judge: Hon. Dana M. Sabraw
16                                     ) Ctrm:  10, 2nd Floor
              Defendants.              )
17                                     )
                                       )
18

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1    Pursuant to Federal Rule of Evidence 201(b) and (d), Defendant PATRICIA

2  FRAZIER ("Ms. Frazier" or "Defendant") hereby requests that the Court take judicial notice

3  of the following documents, and the facts contained therein, submitted in support of her

4  Motion to Dismiss:

5    1.    Attached hereto as **Exhibit 1** is a true and correct copy of Securities and

6  Exchange Commission ("Commission") Subpoena served on the City of San Diego, dated

7  April 22, 2004.

8    2.    Attached hereto as **Exhibit 2** is a true and correct copy of relevant portions of

9  the City of San Diego ("City") Charter.

10    3.    Attached hereto as **Exhibit 3** is a true and correct copy of the "Official

11  Statement" for the *Public Facilities Financing Authority of the City of San Diego Lease*

12  *Revenue Bonds, Series 2002B, Fire and Life Safety Facilities Project*, dated June 15, 2002

13  ("2002 Fire and Life Safety Bond").

14    4.    Attached hereto as **Exhibit 4** is a true and correct copy of the "Official

15  Statement" for the *City of San Diego, 2003 Certificates of Participation, 1993 Balboa*

16  *Park/Mission Bay Park Refunding, Evidencing Undivided Proportionate Interests in Lease*

17  *Payments to be Made by the City of San Diego, Pursuant to a Lease with the San Diego*

18  *Facilities and Equipment Leasing Corporation*, dated May 29, 2003 ("2003 Park Refunding

19  Bond").

20    5.    Attached hereto as **Exhibit 5** is a true and correct copy of City Council

21  Ordinance Number O-19054, adopted on April 29, 2002.

22    6.    Attached hereto as **Exhibit 6** is a true and correct copy of the Continuing

23  Disclosure Agreement for the "Park Refunding Bond."

24    7.    Attached hereto as **Exhibit 7** is a true and correct copy of City Council

25  Resolution Number R-297692 adopted on March 3, 2003.

26    8.    Attached hereto as **Exhibit 8** is a true and correct copy of City Council

27  Resolution Number R-296500 adopted on May 14, 2002.

28

1    9.    Attached hereto as **Exhibit 9** is a true and correct copy of City Council

2  Resolution Number R-297693 adopted on March 3, 2003.

3    10.    Attached hereto as **Exhibit 10** is a true and correct copy of the "Closing

4  Certificate of the City" for the 2003 Park Refunding Bond.

5    11.    Attached hereto as **Exhibit 11** is a true and correct copy of the appendix A

6  attached to the 2002 Fire and Life Safety Bond.

7    12.    Attached hereto as **Exhibit 12** is a true and correct copy of the appendix A

8  attached to the 2003 Park Refunding Bond.

9    13.    Attached hereto as **Exhibit 13** is a true and correct copy of *Order Instituting*

10  *Cease and Desist Proceedings, Making Findings, and Imposing a Cease-and-Desist Order*

11  *Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities*

12  *Exchange Act of 1934*, dated November 14, 2006, in *In the Matter of City of San Diego,*

13  *California.*

14    14.    Attached hereto as **Exhibit 14** is a true and correct copy of the City Manager's

15  Report for the 2002 Fire and Life Safety Bond, Report No. 02-063, issued March 27, 2002.

16    15.    Attached hereto as **Exhibit 15** is a true and correct copy of the City Manager's

17  Report for the 2003 Park Refunding Bond, Report No. 03-029, issued February 27, 2003.

18    The Court may take judicial notice of material that is properly submitted as part of a

19  complaint, including documents which are either physically attached to the complaint, or

20  those upon which "the plaintiff's complaint necessarily relies" and whose "authenticity … is

21  not contested."[1]  Paragraphs 26, 31 and 38 of the Commission's initial complaint filed on

22  April 7, 2008 (the "Complaint") reference **Exhibits 3, 4, 11 and 12** hereto.  The complaint

23  necessarily relies on the exhibits, as the disclosures accompanying the exhibits are allegedly

24  misleading.  Thus, judicial notice of both Exhibits 3, 4, 11 and 12 is appropriate.

25    The Court may also take judicial notice of matters of public record, defined as a fact

26  "not subject to reasonable dispute in that it is capable of accurate and ready determination by

27

28  _____
[1] *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001)(internal quotations omitted).

1    resort to sources whose accuracy cannot be reasonably questioned."[2] **Exhibits 2-15** hereto

2    constitute matters of public record not subject to reasonable dispute, and judicial notice of

3    these exhibits is proper.

4        Further, **Exhibits 2-15** hereto, constitute records of the City, and as government data

5    and/or publications,[3] they are not subject to reasonable dispute and are judicially noticeable.

6        Also **Exhibits 1 and 13** hereto, constitute records of the Commission, and because "a

7    court may take judicial notice of records and reports of administrative bodies,"[4] they are not

8    subject to reasonable dispute and are judicially noticeable.

9        In addition to taking judicial notice of **Exhibits 1-15** hereto, the Court may also take

10    judicial notice of "facts that are contained in materials of which the court may take judicial

11    notice."[5]

12        Accordingly, defendant Ms. Frazier respectfully requests that the Court grant her

13    Request for Judicial Notice and consider the foregoing documents, and facts contained

14    therein, in ruling on her Motion to Dismiss.

15

16

17    Dated: September 8, 2008           **LA BELLA & McNAMARA, LLP**

18

19                    By:  /S/ Thomas W. McNamara      .

20                        Thomas W. McNamara
                          Chrysta L. Elliott

21                        Attorneys *Specially Appearing* for Defendant Patricia
                          Frazier

22

23

24

25

26

---

27    [2] *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1025 n.2 (9th Cir. 2006).
      [3] *Id.*

28    [4] *Mack v. South Bay Beer Dist.*, 798 F.2d 1279, 1282 (9th cir. 1986) (internal quotations omitted).
      [5] *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999) (internal quotations omitted.)

1

## PROOF OF SERVICE

2  *Securities and Exchange Commission  v. Michael T. Uberuaga, et al.*
United States District Court of the Southern District of California

3  Case Number:  08-CV-0625 DMS (LSP)

4

5  I, Allison M. Myers, declare as follows:

6          I am an employee of a member of the bar of this Court at whose direction was made in

7  the County of San Diego, State of California.  I am over the age of 18 and not a party to the

8  within action; my business address is 401 West "A" Street, Suite 1150, San Diego, California

9  92101.

10          On September 8, 2008, I served the foregoing document(s) described as:

11      ▪ **DEFENDANT PATRICIA FRAZIER'S NOTICE OF MOTION AND
MOTION TO DISMISS THE COMPLAINT**

12

13      ▪ **DEFENDANT PATRICIA FRAZIER'S MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF HER MOTION TO DISMISS
THE COMPLAINT**

14

15      ▪ **DEFENDANT PATRICIA FRAZIER'S REQUEST FOR JUDICIAL
NOTICE IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT**

16

17  on interested parties in this action by placing ☐ the original ☒ true copy(ies) thereof

18  enclosed in sealed envelopes as follows:

19  David J. Van Havermaat, Esq.                    *Attorneys for Plaintiff*
Securities and Exchange Commission       *Securities and Exchange Commission*
5670 Wilshire Boulevard, 11th Floor

20  Los Angeles, California 90036

21  Tel:  (323) 965-3998
Fax:  (323) 965-3908

22  Email: vanhavermaatd@sec.gov

23  Robert S. Brewer, Jr.                             *Attorneys for Defendant*
McKenna Long & Aldridge, LLP          *Michael T. Uberuaga*

24  750 B Street, Suite 2200
San Diego, CA 92101

25  Tel: (619) 595-5400
Fax: (619) 595-5450

26  E-mail:  rbrewer@mckennalong.com

27

28

1

PROOF OF SERVICE

1

Frank J. Ragen, Esq.                    ***Attorneys for Defendant***
105 West F Street, Suite 215            ***Edward P. Ryan***

2

San Diego, CA 92101
Tel: (619) 231-4330

3

Email: fjragen@aol.com

4

Frank T. Vecchione, Esq.                ***Attorneys for Defendant***
105 W. F Street, Suite 215              ***Teresa A. Webster***

5

San Diego, CA 92101

6

Tel: (619) 231-3653
Email: FTVLAW@aol.com

7

David Hahn, Esq.                        ***Attorneys for Defendant***

8

Hahn & Adema                            ***Mary E. Vattimo***
501 West Broadway, Suite 1600

9

San Diego, CA 92101

10

Tel: (619) 235-2100/Fax: (619) 235-2101
Email: dhahn@hahnadema.com

11

12  ☒ **BY EMAIL/ ECF** by electronically filing the foregoing with the Clerk of the District Court

13  using its ECF System, which electronically notifies them via email as indicated above.

14  ☐ **BY FIRST CLASS MAIL** I am readily familiar with the firm's practice of collection and

15  processing correspondence for mailing with the United States Postal Service. Under that

16  practice, it would be deposited with United States postal service on that same day with postage

17  thereon fully prepaid at San Diego, California in the ordinary course of business. The envelope

18  was sealed and placed for collection and mailing on that date following ordinary business

19  practices.

20  ☐ **BY OVERNIGHT DELIVERY** I am readily familiar with the firm's practice of collection and

21  processing correspondence for mailing with Overnite Express and Federal Express. Under that

22  practice, it would be deposited with Overnite Express and/or Federal Express on that same day

23  thereon fully prepaid at San Diego California in the ordinary course of business. The envelope

24  was sealed and placed for collection and mailing on that date following ordinary business

25  practices.

26  ☐ **BY FACSIMILE** Based on agreement of the parties to accept service by fax transmission, I

27  faxed the documents on this date to the person(s) at the fax numbers listed. No error was

28  reported by the fax machine that I used. A copy of the record of the fax transmission, which I

32361

2

PROOF OF SERVICE

1  printed out, is attached.

2  ☐ **BY PERSONAL SERVICE** I served the documents by placing them in an envelope or

3  package addressed to the person(s) at the addresses listed and providing them to a professional

4  messenger service for service on this date.

5  ☐ (STATE) I declare under penalty of perjury under the laws of the State of California that

6  the above is true and correct.

7  ☒ (FEDERAL)  I declare that I am employed in the office of a member of the bar of this

8  court at whose direction the service was made.

9      Executed September 8, 2008, in San Diego, California.

11      /s/ Allison M. Myers
        Allison M. Myers

32361

PROOF OF SERVICE

1

## **Table of Contents:**

2

Exhibit 1................................................................................................................1-12

Exhibit 2..............................................................................................................13-18

Exhibit 3..............................................................................................................19-50

Exhibit 4..............................................................................................................51-82

Exhibit 5..............................................................................................................83-92

Exhibit 6..............................................................................................................93-99

Exhibit 7............................................................................................................100-110

Exhibit 8............................................................................................................111-114

Exhibit 9............................................................................................................115-118

Exhibit 10..........................................................................................................119-120

Exhibit 11..........................................................................................................121-160

Exhibit 12..........................................................................................................161-206

Exhibit 13..........................................................................................................207-228

Exhibit 14..........................................................................................................229-243

Exhibit 15..........................................................................................................244-248

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 1

01/03/2005 14:54 FAX   202 639 6804          VINSON & ELKIN                     ☑002/013



## SUBPOENA

# UNITED STATES OF AMERICA
## SECURITIES AND EXCHANGE COMMISSION

### City of San Diego Bond Offerings (LA-2842)

To:   Custodian of Records, City of San Diego
      c/o Paul S. Maco, Esq.
      Vinson & Elkins LLP
      1455 Pennsylvania Avenue, N.W.
      Washington, D.C. 20004-1008

☒  **YOU MUST PRODUCE** everything specified in the Attachment to this subpoena to officers of the Securities and Exchange Commission, at the place, date and time specified below.

5670 Wilshire Blvd., 11ᵗʰ Fl., Los Angeles, CA  90036-3648, on May 7, 2004, by 5 p.m.

☐  **YOU MUST TESTIFY** before officers of the Securities and Exchange Commission, at the place, date and time specified below.

5670 Wilshire Blvd., 11ᵗʰ Fl., Los Angeles, CA  90036-3648, on May 7, 2004 at 10:00 a.m.

**FEDERAL LAW REQUIRES YOU TO COMPLY WITH THIS SUBPOENA.**
Failure to comply may subject you to a fine and/or imprisonment.

By: _Emily A. Breckenridge_          Date: _4/22/04_
    Emily A. Breckenridge
    Attorney, Office of Enforcement

I am an officer of the Securities and Exchange Commission authorized to issue subpoenas in this matter. The Securities and Exchange Commission has issued a formal order authorizing this investigation under Section 20(a) of the Securities Act of 1933 and Section 21(a) of the Securities Exchange Act of 1934.

NOTICE TO WITNESS:      If you claim a witness fee or mileage, submit this subpoena with the claim voucher.

~ 1 ~

01/03/2005 14:54 FAX  202 839 8804        VINSON & ELKIN                      ☒003/013

**Attachment to Subpoena**
**Issued to Custodian of Records, City of San Diego**
**City of San Diego Bond Offerings, (LA-2842)**
**April 22, 2004**

I.      **Instructions and Definitions**

This request seeks the production of certain documents, as specified in Paragraph II of
this attachment. The documents should be produced in accordance with the following
requirements:

A.      Submit all documents that are in your possession, custody, or subject to your control,
regardless of whether the documents are in your possession.

B.      As used in this attachment, the term "documents" refers to all written or graphic
matter, however produced or reproduced onto any other tangible record, including,
but not limited to, all writings or recordings, whether handwritten, typewritten,
printed, photostated, photographed, recorded magnetically, mechanically or
electronically, and any drafts of all documents, whether or not used or circulated.
Specifically, the term "documents" includes, but is not limited to, e-mail
transmissions, books, papers, files, notes, account statements, confirmations, reports,
correspondence, memoranda, ledger sheets, telegrams, telexes, telephone bills,
messages or logs, notes or minutes of conversations or meetings, contracts,
agreements, calendars, rolodexes, date books, address books, diaries, schedules,
itineraries, travel logs, bank statements, worksheets, summaries, desk files, invoices,
bills, records of billings, checks (front and back), wire transfers, drafts for money,
records of payment, tape recordings, disks, diskettes, disk packs and other
electronic media, microfilm, microfiche and storage devices. The term
"documents" includes, but is not limited to, all versions of electronic and hard
copy working papers.

C.      "Communications" means and includes, without limitation, any correspondence,
memoranda, notes, electronic mail, telephone conversations, and other
conversations, conferences or meetings.

D.      As used in this attachment, the term "City of San Diego" means the City of San
Diego and all entities in which the City of San Diego has or had a controlling
interest, all subsidiaries, affiliates, predecessors, predecessor subsidiaries and
affiliates, successors, elected officials, officers, employees, agents, general
partners, limited partners, partnerships and aliases, code names, trade or business
names used by any of the foregoing, all business-type activities of the City of San
Diego, including, but not limited to, Airports, Store Development Service,
Environmental Service, Golf Course, Recycling, Sewer Utility, Water Utility, San
Diego Data Processing Corporation, San Diego Convention Center Corporation,
San Diego Housing Commission, San Diego Medical Services Enterprise, LLC,
Ballpark and Redevelopment Project, Fire and Safety Improvements, and the
Public Facilities Financing Authority.

01/03/2005 14:54 FAX  202 838 8804        VINSON & ELKIN                      ☑004/013

**Attachment to Subpoena**
**Issued to Custodian of Records, City of San Diego**
City of San Diego Bond Offerings (LA-2842)
**April 22, 2004**
Page 2

E.    "Calderon, Jahan & Osborn" refers to Calderon, Jahan & Osborn, an accountancy corporation, and all entities in which Calderon, Jahan & Osborn has or had a controlling interest, all subsidiaries, affiliates, predecessors, predecessor subsidiaries and affiliates, successors, directors, employees, agents, general partners, limited partners, partnerships and aliases, code names or trade or business names used by any of the foregoing.

F.    "Caporicci & Larson" refers to Caporicci & Larson, Certified Public Accountants and all entities in which it has a controlling interest, all subsidiaries, affiliates, predecessors, predecessor subsidiaries and affiliates, successors, officers, directors, employees, agents, general partners, limited partners, partnerships and aliases, code names or trade or business names used by any of the foregoing.

G.    As used in this attachment, the terms "concern" and "concerning," mean relating to, referring to, regarding, describing, evidencing, or constituting. The terms "reflect", "pertain to" and "pertaining to" mean containing, embodying, comprising, reflecting, identifying, stating, referring to, responding to, relating to, commenting on, describing, inquiring about, regarding or analyzing.

H.    Produce the entirety of each and every document described below, without alteration, deletion or obliteration of any information contained therein, even though such information is not specifically requested.

I.    The following rules of construction apply to this attachment:

   1.    the connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the attachment all responses that might otherwise be construed to be outside of its scope; and

   2.    the use of the singular form of any word includes the plural and vice versa.

II.    Documents Requested[1]

From January 1, 1996 to the present
(February 12, 2004 Request)

A.    All documents concerning the offer and sale of bonds, including, but not limited to, general obligation, revenue, tax anticipation, certificates of participation, and

---

[1]    As noted in Item I of the instructions, you must submit all documents required to be produced by the subpoena that are in you possession, custody, or subject to your control. It is not necessary to produce documents in your possession, custody and control that you previously produced to the Commission in this enforcement investigation.

01/03/2005 14:55 FAX  202 639 6604      VINSON & ELKIN                    ☑ 005/013

**Attachment to Subpoena**
**Issued to Custodian of Records, City of San Diego**
**City of San Diego Bond Offerings (LA-2842)**
**April 22, 2004**
**Page 3**

        lease revenue bonds, by the City of San Diego. Such documents should include complete transcripts of the closing documents for each offering from January 1, 1996 to the present.

B.     All documents concerning Continuing Disclosure by the City of San Diego for purposes of Securities and Exchange Commission Rule 15c2-12, 17 Code of Federal Regulations Section 240.15c2-12, Municipal Securities Disclosure.

C.     All documents, including all correspondence, drafts, e-mails, handwritten notes, draft schedules and actuarial documents, concerning the City of San Diego Municipal Securities Secondary Market Disclosure Information Report dated January 27, 2004.

D.     All documents concerning San Diego City Council action, discussion, and review of bond offerings and disclosure.

E.     All documents concerning disclosure of pension obligations, Deferred Retirement Option Program, and post retirement health care obligations of the City of San Diego, San Diego City Employees' Retirement System funding methodologies and agreements, including, but not limited to, the 1996 Agreement, the 2002 Agreement, the Corridor Funding Method, including, but not limited to, disclosure to underwriters, bond counsel, financial advisors, rating agencies, and investors.

F.     All documents concerning necessary City of San Diego pension payments to the San Diego City Employees' Retirement System, by year, and the required percentage of the City of San Diego budget such payments represent.

G.     All documents concerning the cost and projected cost of City of San Diego Deferred Retirement Option Program and post retirement health care benefits, by year, and the required percentage of the City of San Diego budget such costs represent.

H.     All documents that benchmark the pension obligations, Deferred Retirement Option Program, and post retirement health care obligations of the City of San Diego against other government agencies and against private industry norms, adjusted for employee contributions and benefits from social security.

I.     All documents concerning review by bond counsel of disclosure concerning pension obligations, Deferred Retirement Option Program, and post retirement health care obligations of the City of San Diego, including, but not limited to: Stradling, Yocca, Carlson & Rauth, A Professional Corporation; and Orrick, Herrington & Sutcliffe LLP.

01/03/2005 14:55 FAX  202 839 8604      VINSON & ELKIN                    ☑008/013

**Attachment to Subpoena**
**Issued to Custodian of Records, City of San Diego**
<u>City of San Diego Bond Offerings (LA-2842)</u>
**April 22, 2004**
Page 4

J.    All documents concerning review by financial advisors of disclosure concerning actual and potential pension obligations, Deferred Retirement Option Program, and post retirement health care obligations of the City of San Diego, including, but not limited to, Public Resources Advisory Group of New York.

K.    All documents concerning review by actuaries of disclosure concerning actual and potential pension obligations, Deferred Retirement Option Program, and post retirement health care obligations of the City of San Diego.

L.    All documents concerning review by fiduciary counsel for the San Diego City Employees' Retirement System, including, but not limited to, Robert A. Blum, Esq. and Constance M. Hiatt, Esq., Hanson Bridgett Marcus Vlahos Rudy LLP, of possible conflicts of interest of board members and others, and disclosure concerning actual and potential pension, Deferred Retirement Option Program, and post retirement health care obligations of the City of San Diego, and disclosure of possible conflicts of interest, including, but not limited to, conflicts of interest concerning the 1996 Agreement, the 2002 Agreement, the Corridor Funding Method.

M.    All documents concerning possible conflicts of interest by members of the board of the San Diego City Employees' Retirement System concerning pension, Deferred Retirement Option Program, and post retirement health care obligations of the City of San Diego.

N.    All documents concerning possible conflicts of interest of persons reviewing and approving bond offerings and bond disclosure documents for the City of San Diego.

O.    All documents concerning review by underwriters of disclosure concerning actual and potential pension obligations, Deferred Retirement Option Program, and post retirement health care obligations of the City of San Diego, including, but not limited to: UBS Financial Services, Inc.; Banc of America Securities LLC; and Goldman, Sachs & Co.

P.    All documents concerning actuarial reports, valuations, assumptions, estimates, alternatives and recommendations concerning the San Diego City Employees' Retirement System, including, but not limited, to documents concerning amounts of money that the City of San Diego may be obligated to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees.

Q.    All documents that model on an actuarial basis the necessary annual funding for pension obligations, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees and the percentage of the City of

01/03/2005 14:55 FAX  202 639 8604        VINSON & ELKIN                    Ø007/013

Attachment to Subpoena
Issued to Custodian of Records, City of San Diego
City of San Diego Bond Offerings (LA-2842)
April 22, 2004
Page 5

San Diego City budget that such payments represent, all annual actuarial valuations of the unfunded actuarially accrued liability ("UAAL"), all documents concerning Net Pension Obligation, including documents that define and explain the use of that term as used by the City of San Diego.

R.    All documents that analyze and report on the causes of the under funded status of the City of San Diego Employees' Retirement System and the shortfall of contributions versus true actuarial requirements.

S.    All documents concerning Rick A. Roeder and Gabriel, Roeder, Smith & Company, including but not limited to, actuarial reports, e-mails, handwritten notes, memoranda, drafts, and draft disclosures concerning amounts of money that the City of San Diego may be obligated to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees.

T.    All documents concerning audits and reviews by outside persons and entities, including audits and reviews of key actuarial assumptions, audits of best practices and investment operations, and audits of actuarial reports and other work performed by Gabriel, Roeder, Smith & Company.

U.    All documents concerning City of San Diego Comprehensive Annual Financial Reports and amounts of money that the City of San Diego may be obligated to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees.

V.    All documents concerning audits and reviews by independent auditors of amounts of money that the City of San Diego may have to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees, including, but not limited to, audits and reviews by Calderon, Jaham & Osborn, and Caporicci & Larson.

W.    All documents concerning audits and reviews by the City Auditor and Comptroller, including, but not limited to, Ed Ryan and Terri Webster, of amounts of money that the City of San Diego may be obligated to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees.

X.    All documents concerning Callan Associates, including but not limited to, e-mails, handwritten notes, memoranda, drafts, and draft disclosures concerning amounts of money that the City of San Diego may be obligated to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees.

01/03/2005 14:56 FAX  202 639 6604      VINSON & ELKIN                    ☑ 008/013

**Attachment to Subpoena**
**Issued to Custodian of Records, City of San Diego**
**City of San Diego Bond Offerings (LA-2842)**
**April 22, 2004**
Page 6

Y.    All documents concerning City of San Diego bond ratings and changes in bond rating as a result of amounts of money that the City of San Diego may be obligated to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees, including, but not limited to, possible changes due to changes in the unfunded actuarial accrued liability and the funded ratio (valuation of assets available for benefits to total actuarial valuation).

Z.    All documents concerning advice from the City Attorney concerning amounts of money that the City of San Diego may be obligated to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees.

AA.   All documents concerning communications with the City Treasurer regarding amounts of money that the City of San Diego may be obligated to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees.

BB.   All documents concerning payments to the San Diego City Employees' Retirement System of less than the full accrued actuarial liability for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees.

CC.   All documents concerning actuarial, investment, best practices and other reports commissioned by the San Diego City Employees' Retirement System, including, but not limited to, documents prepared by Mercer.

DD.   All documents concerning Meet and Confer meetings including, but not limited to, all documents concerning voting by members of the board of the San Diego City Employees' Retirement System who participated in Meet and Confer meetings on the City of San Diego's obligation to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees.

EE.   All documents concerning voting by members of the board of the San Diego City Employees' Retirement System on the City of San Diego's obligation to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees, including, but not limited to, all documents concerning conflicts of interest relating to enhanced benefits for board members.

FF.   All documents concerning the location and value of San Diego City Employees' Retirement System assets and liabilities, including names and addresses of

01/03/2005 14:56 FAX  202 639 6604       VINSON & ELKIN                    ☑ 009/013

Attachment to Subpoena
Issued to Custodian of Records, City of San Diego
City of San Diego Bond Offerings (LA-2842)
April 22, 2004
Page 7

financial institutions, including, but not limited to, all banks an broker-dealers, and all account numbers.

GG.  All documents concerning San Diego City Employees' Retirement System amortization determinations, projections and schedules of Deferred Retirement Option Program, post retirement health care and other benefits to employees, including but not limited to, all documents concerning the UAAL.

HH.  All electronic data, including archived information, concerning the above documents.

II.  All documents concerning the composition and identities of the San Diego City Employees' Retirement System Board members.

JJ.  All documents concerning minutes, votes, and any other action of the San Diego City Employees' Retirement System.

(February 18, 2004 Request)

KK.  Transcripts of the closing documents for each offering from January 1, 2002 to the present, including withdrawn offerings such as the $505,550,000 Subordinated Sewer Revenue Bonds. Exclude the fully repaid 2002 tax anticipation note offering.

LL.  Copies of specific statutes authorizing the above 2002 and 2003 offerings.

MM.  Request for proposal, contract of purchase, bond purchase agreement, notes of meetings, including kick-off meeting, assurances, representations, 10b-5 comfort letters, disclosure time and responsibility schedules, responsibility for drafting and reviewing the official statements, including role of bond and disclosure counsel, for the above 2002 and 2003 bond offerings.

NN.  The individual name, firm name, address and telephone number of the issuer and authority (e.g. City of San Diego/MTDB Authority), issuer's counsel, underwriter, underwriter's counsel, financial adviser, credit enhancer, accountant, bond counsel, disclosure counsel, and tax counsel, for each of the above 2002 and 2003 bond offerings.

OO.  Persons presenting and attending presentations and materials presented to rating agencies from January 1, 2002 to the present, including disclosure concerning the amounts of money that the City of San Diego may be obligated to pay for

01/03/2005 14:56 FAX  202 639 8804     VINSON & ELKIN                    ☑010/013

Attachment to Subpoena
Issued to Custodian of Records, City of San Diego
City of San Diego Bond Offerings (LA-2842)
April 22, 2004
Page 8

pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees.

PP.  Correspondence, drafts, e-mails, handwritten notes, draft schedules and actuarial documents, concerning the City of San Diego Municipal Securities Secondary Market Disclosure Information Report dated January 27, 2004.

QQ.  Persons presenting and attending presentations and materials presented to any members of the San Diego City Employees' Retirement System Board or to the San Diego City Council from January 1, 2002 to the present, concerning the amounts of money that the City of San Diego may be obligated to pay for pension, Deferred Retirement Option Program, postretirement health care and other benefits to employees and retirees.

RR.  Correspondence, drafts, e-mails, handwritten notes, drafts schedules and actuarial documents concerning the San Diego City Employees' Retirement System Annual Actuarial Valuation for years 1995 to 2003.

SS.  Reports, e-mails and memoranda to the San Diego City Council, and action, discussion and review by the San Diego City Council of 2002 and 2003 bond offerings and January 27, 2004 Secondary Market Disclosure Information.

TT.  Correspondence files concerning the 2002 and 2003 bond offerings and January 27, 2004 Secondary Market Disclosure.

UU.  Present actuarial value and estimated actuarial value of future City of San Diego pension, Deferred Retirement Option Program and post retirement health care benefits, by year, and the required percentage of the City of San Diego budget that payment for such costs represent, including the costs based upon payment of the full Annual Actuarial Valuation as of June 30, 2003.

VV.  Documents concerning disclosure in Official Statements of estimated future health insurance costs for post-retirement health benefits.

WW.  City Attorney and outside counsel and fiduciary counsel opinions and memoranda of law concerning City of San Diego pension, Deferred Retirement Option Program and post retirement health care benefits.

XX.  Deferred Retirement Option Program applications by trustees of the San Diego City Employees' retirement System, including, but not limited to, Ron Saathoff and Terri Webster.

YY.  Agreements and understandings, relating to the 1996 Manager's Proposal 1, and 2002 Manager's Proposal 2, including, but not limited to, documents concerning

~ 9 ~

01/03/2005 14:57 FAX  202 639 6604      VINSON & ELKIN                      ☑011/013

Attachment to Subpoena
Issued to Custodian of Records, City of San Diego
City of San Diego Bond Offerings (LA-2842)
April 22, 2004
Page 9

agreements to improve retirement benefits contingent upon the City of San Diego reaching an agreement with the San Diego City Employees' Retirement System Board not to require payment of the full Annual Actuarial Valuation actuarially computed contribution rates, from 1996 to the present. Include disclosure of those agreements and understandings to participants in the bond offerings.

ZZ.    Opinions and all drafts of opinions and memoranda of law by fiduciary counsel from January 1, 1995 to the present concerning possible conflicts of interest by trustees of the San Diego City Employees' Retirement System Board concerning pension, Deferred Retirement Option Program, and post retirement health care obligations of the City of San Diego.

AAA.    Documents concerning disclosure in the City of San Diego's 2002 and 2003 audited financial statements of the amounts of money that the City of San Diego may be obligated to pay for pension, Deferred Retirement Option Program, post retirement health care and other benefits to employees and retirees, including the names of persons and entities who prepared and reviewed the disclosure.

BBB.    Disclosure that may be required by Government Accounting Standards Board Revised Exposure Draft E-57, "Accounting and Financial Reporting by Employers for Postemployment Benefits Other Than Pensions," including disclosure of the City of San Diego post retirement health care and other benefits to employees and retirees.

(March 4, 2004 Request)

CCC.    All forecasts of the City of San Diego's required pension contributions that are based upon the City of San Diego's historical experience, including, but not limited to, actuarial forecasts of pension contributions based upon historical investment returns earned by the San Diego City Employees' Retirement System and the existing agreement with the San Diego City Employees' Retirement System to amortize the unfunded actuarial accrued liability over a 30-year period, which started July 1, 1991.

DDD.    All forecasts of the City of San Diego's pension contributions that reflect past increases in payroll costs. (The January 27, 2004 Voluntary Report assumed that payroll costs will rise an average of 4.25% per year. In a footnote to its January 27, 2004 Voluntary Report, however, the City of San Diego disclosed that payroll increases in each of the three years ended June 30, 2002 increased by 8%.)

EEE.    All documents concerning projected future annual cash and accrued costs of the Supplemental and Contingent Payments for Annual Supplement Benefit Payments, Corbett Contingency Payments, Interest on DROP Reserves, COLA,

~ 10 ~

Attachment to Subpoena
Issued to Custodian of Records, City of San Diego
City of San Diego Bond Offerings (LA-2842)
April 22, 2004
Page 10

Employee Contribution Rate Increase and Retiree Health Insurance. (These items are listed on page 15 of the January 27, 2004 Voluntary Report.)

FFF.   All forecasts of the City of San Diego's annual post-retirement health care obligations, including, but not limited to, forecasts of estimated annual cash payments to insurance companies and providers to provide post-retirement health care.

GGG.  All documents concerning the projected accrued cost for post-retirement health care under the Proposed Statement of the Government Accounting Standards Board "Accounting and Financial Reporting by Employers for Postemployment Benefits Other Than Pensions."

HHH.  All forecasts of the City of San Diego's General Fund revenues and expenses that reflect costs for payroll, pension, Deferred Retirement Option Program, and post-retirement health care obligations.

III.    The City of San Diego's projected General Fund annual cash flow statements prepared during the period from January 1, 2002 to the present.

JJJ.    All forecasts of the City of San Diego's pension contributions and post-retirement health benefits for the fiscal years ending June 30, 2005 through June 30, 2015, or for whatever shorter or longer period the City of San Diego or its agents create such forecasts, prepared during the period from January 1, 2002 to the present.

KKK.  All documents concerning forecasts of the City of San Diego's pension contributions and post-retirement health benefits that the City of San Diego had in 2002 for future fiscal years, including, but not limited to, documents reflecting whether these forecasts were provided to bond, disclosure and fiduciary counsel, underwriters, rating agencies, financial advisers and others.

(April 17, 2004 Request)

LLL.   All documents concerning the City of San Diego's estimates of unfunded liability for post-retirement health care benefits referred to in the City Attorney's July 7, 1993 Memorandum of Law to Lawrence B. Grissom, Retirement Administrator for the San Diego City Employees' Retirement System.

(Additional Requests)

MMM. All documents concerning the disclosure obligations of municipal securities issuers and others, including, but not limited to, documents concerning the disclosure obligations of participants in the municipal securities markets under the

01/03/2005 14:58 FAX   202 639 6604        VINSON & ELKIN                    ☑ 013/013

Attachment to Subpoena
Issued to Custodian of Records, City of San Diego
City of San Diego Bond Offerings (LA-2842)
April 22, 2004
Page 11

antifraud provisions of the federal securities laws, both in connection with primary offerings and on a continuing basis with respect to the secondary market.

NNN. All documents concerning the responsibilities of local government officials who authorize the issuance of municipal securities and related disclosure documents and the role such officials play with respect to the representations contained in the official statements for those securities.

OOO. All documents reflecting the source, date, and persons who prepared, received and distributed copies of the documents requested in "MMM." and "NNN." above concerning disclosure obligations of municipal securities issuers and others, including documents that were provided to or received from bond, disclosure and fiduciary counsel, underwriters, rating agencies, financial advisers, and trustees of the San Diego City Employees' Retirement System Board and its staff, and others.

PPP. All e-mails sent or received by the following people regarding requests "A." through "OOO." above: Mike Carrier, Jeanne Cole, Valerie DanDeweghe, Rick Duvernay, P. Lamont Ewell, Patricia T. Frazier, Leslie J. Girard, D. Cruz Gonzalez, Rudy Graciano, Bruce Herring, Elizabeth Kelly, Lakshmi Kommi, Cathy Lexin, Jacqueline Lindsay, Tracy McCraner, Jack McGrory, Darlene Morrow-Truver, Jyothi Panthulu, Cecilia San Pedro, Mike Phillips, Phil Phillips, Tom Rhodes, Ed Ryan, Ron Saathoff, Kelly Salt, Michael Uberuaga, Mary Vattimo, Terri Webster, Jeff Witt, Ed Wochaski, members of the city council, and the mayor.

QQQ. Electronic copies of the depositions taken in Gleason, et al. v. San Diego City Employees' Retirement System, et al., San Diego Superior Court No. GIC803779.

# EXHIBIT 2

## Section 27:    The City Manager

The Council shall elect a Manager under this Charter, who shall be the chief administrative officer of the City. The Manager shall be chosen by the Council solely on the basis of his proven administrative qualifications. The Manager need not, when elected, be a resident of the City or State, but must be a citizen of the United States. He shall, upon his election, immediately become a resident of the City. No member of the Council shall, during the time for which he was elected, or for one (1) year thereafter, be eligible to hold the position of Manager. The Manager shall be elected for an indefinite term, but may be removed at the pleasure of the Council; provided, however, that the Manager shall not be removed unless a majority of the members of the Council shall vote in favor of such removal. Before the Manager may be removed he shall, if he shall so demand, be given a written statement of the reasons alleged for his removal and the right to be heard publicly thereon at a meeting of the Council prior to the final vote on the question of his removal, but pending and during such hearing the Council may suspend him from office. At least two weeks shall be given the Manager between notice and hearing for the preparation of his answer to the reasons for removal. The action of the Council in suspending or removing the Manager shall be final and conclusive on everyone, it being the intention of this Charter to vest all authority and fix all responsibility for such suspension or removal in the Council. He shall receive a salary to be fixed in the annual appropriation ordinance. The salary set in the appropriation ordinance shall not be reduced while the Manager holds office, but may be subject to increase by the Council at its discretion. The Manager shall designate one of his subordinates as Assistant Manager, who shall serve as Manager in case of the absence or disability of the Manager.

In the event of a vacancy in the office of City Manager, the Council shall fill the same within sixty (60) days after the vacancy occurs; provided, however, that it shall require the affirmative vote of a majority of the members of the Council to elect a person to the office of Manager.
*(Amendment voted 12-19-1933; effective 01-18-1935.)*
*(Amendment voted 09-17-1963; effective 02-11-1964.)*
*(Section 27 is superceded in its entirety by Charter sections 260 and 265 during the operative period of Charter Article XV. See Charter § 260(a).)*

## Section 28:    Duties of the Manager

It shall be the duty of the Manager to supervise the administration of the affairs of the City except as otherwise specifically provided in this Charter; to make such recommendation to the Council concerning the affairs of the City as may seem to him desirable; to keep the Council advised of the financial condition and future needs of the City; to prepare and submit to the Council the annual budget estimate and such reports as may be required by that body, including an annual report of all the Departments of the

City; to see that the ordinances of the City and the laws of the State are enforced; and to perform such other duties as may be prescribed by this Charter or required of him by ordinance or resolution of the Council. Except as otherwise provided in this Charter, all other administrative powers conferred by the laws of the State upon any municipal official shall be exercised by the Manager or persons designated by him. He shall assume the position of Director of any Department under his control for which a Director has not been appointed. The Directors, or heads of the administrative Departments under the Manager shall be immediately responsible to him for the efficient administration of their respective Departments. The Manager may set aside any action taken by a Director or Department subordinate responsible to him, and may supersede him in authority in the functions of his office or employment. Where no provision has been made by ordinance authorizing a subordinate official to act as departmental head in case of a vacancy, the Manager may designate an interim acting head or perform personally the functions of the office. The Manager, as Chief Budget Officer of the City, shall be responsible for planning the activities of the City government and for adjusting such activities to the finances available. To this end he shall prepare annually a complete financial plan for the ensuing year and shall be responsible for the administration of such a plan when adopted by the Council. He shall be charged with the bringing together of estimates covering the financial needs of the City, with the checking of these estimates against the information relative to past expenditures and income, with the preparation of the budget document and supporting schedules and with the presentation of the budget to the Council. He shall have the power to employ experts, or consultants to perform work or give advice connected with the Departments of the City when such work or advice is necessary in connection therewith. If the cost of hiring said expert or consultant exceeds a sum to be established by ordinance of the City Council, no such expert or consultant shall be hired without approval of the Council. The Council shall provide sufficient funds in the annual appropriation ordinance or by supplemental appropriation ordinances for such purposes and shall charge such additional services against the appropriation of the respective Departments.

The Manager shall execute all contracts for the Departments under his control. He shall approve all requisitions and vouchers for said Departments in person or through such assistants as he may designate for the purpose.

The Manager may prescribe such general rules and regulations as he may deem necessary or expedient for the general conduct of the administrative Departments. The Director of each Department shall in like manner prescribe such rules and regulations as may be deemed necessary and expedient for the proper conduct of each Department, not inconsistent with the general rules and regulations prescribed by the Manager.

In order to expedite the work of any department or to adequately administer an increase in the duties which may devolve on any Department or to cope with periodic or seasonal changes, the Manager, subject to Civil Service regulations, is empowered to transfer

employees temporarily from one Department to perform similar duties in another Department. Likewise each Department head shall have power to transfer employees from one Division to another within his Department.

The Manager may direct any Department or Division to perform work for any other Department or Division. Such powers to transfer employees or to direct the performance of work shall not apply to the Police or Fire Departments.

During January of each year the Manager shall present to the Council an annual report of the City's affairs for the previous fiscal year.

In case of general conflagration, rioting, flood, or other emergency menacing life and property, the Manager shall marshal all the forces of the different Departments of the City for the maintenance of the general security, and shall have the power to deputize or otherwise employ such other persons as he may consider necessary for the purpose of protecting the City and its residents. The Council may, however, in any such emergencies authorize the Mayor to take command of the police, maintain order and enforce the law.

And in such authorized emergencies the Manager shall be subordinate to and shall carry out such duties as may be assigned to him by the Mayor.
*(Amendment voted 11-02-1976; effective 01-12-1977.)*

### Section 29:  Responsibility of Manager - Powers of Appointment and Removal

The Manager shall be responsible to the Council for the proper administration of all affairs of the City placed in his charge, and to that end, subject to the Civil Service provisions of this Charter and except as otherwise provided herein, he shall have the power to appoint and remove all officers and employees in the administrative service of the City under his control; but the Manager may authorize the head of a Department or officer responsible to him to appoint and remove subordinates in such Department or office. Appointments made by, or under the authority of, the Manager, shall be on the basis of administrative ability and of the training and experience of such appointees in the work which they are to perform. All such appointments shall be without definite term unless for temporary service not to exceed sixty days. No person directly related to the City Manager by blood or marriage shall be eligible for employment unless such relative was in the employ of the City at the time of the appointment of the City Manager.
*(Amendment voted 09-17-1963; effective 02-11-1964.)*

# ARTICLE III

## LEGISLATIVE POWER

**Section 11:    Legislative Power**

All legislative powers of the City shall be vested, subject to the terms of this Charter and of the Constitution of the State of California, in the Council, except such legislative powers as are reserved to the people by the Charter and the Constitution of the State.

**Section 11.1:  Legislative Power — Nondelegable**

The same prohibition against delegation of the legislative power which is imposed on the State Legislature by Article XI, Section 11a of the Constitution of the State of California shall apply to the City Council of The City of San Diego, so that its members shall not delegate legislative power or responsibility which they were elected to exercise in the adoption of any ordinance or resolution which raises or spends public monies, including but not limited to the City's annual budget ordinance or any part thereof, and the annual ordinance setting compensation for City employees, or any ordinance or resolution setting public policy.

The City Council shall annually adopt an ordinance establishing salaries for all City employees.  The City Council shall adopt this ordinance not later than May 30 of each year after considering all relevant evidence including but not limited to the needs of the citizens of the City of San Diego for municipal services, the ability of the citizens to pay for those services, local economic conditions and other relevant factors as the Council deems appropriate.  The City Council shall give priority in the funding of municipal services to the need of the citizens for police protection in considering adoption of this salary ordinance and the annual budget ordinance.

The prohibition imposed by this section against unlawful delegation of the legislative responsibility to set compensation for city employees shall extend to any scheme or formula which seeks to fix the compensation of City of San Diego employees at the level of compensation paid to employees of any other public agency whose governing board is not elected by and not accountable to the people of the City of San Diego.  This prohibition shall also extend to any scheme or formula which seeks to fix, establish, or adjust the compensation of City of San Diego employees at the level of the largest cities in California or the State of California.
*(Addition voted 06-03-1980; effective 07-16-1980.)*
*(Amendment voted 11-04-1980; effective 12-31-1980.)*
*(Amendment voted 06-03-1986; effective 09-08-1986.)*

the time they become due, turn them into the City Treasury daily, obtain a receipt
therefor, and report the same to the City Auditor and Comptroller weekly; provided,
however, that in the case of employees located in distant parts of the city or county who
in the course of their duties collect money belonging to the City, which collections can be
deposited in the City Treasury daily only with difficulty and undue cost to the City, such
collections may be deposited in the City Treasury within one week after their receipt by
the employee collecting the same. All such moneys and all fines or pecuniary penalties
or forfeitures which may accrue to the City, and all funds which may remain in the
possession of the City unclaimed after a period of one year from the date when due and
payable, shall be credited to the general fund of the City, and shall be applicable to any
purpose to which the Council may appropriate them and the Council shall appropriate
from this fund whatever sum may be necessary to pay valid claims of more than one
year's standing.
*(Amendment voted 04-22-1941; effective 05-08-1941.)*

**Section 87:    Uniform Accounts and Reports**

The Auditor and Comptroller shall prescribe uniform forms of accounts which shall be
observed by all officers and Departments of the City which receive or disburse City
moneys. Whenever an act shall be passed by the legislature of the State providing for
uniform municipal accounts or reports, the City Council may elect to conform thereto.

**Section 88:    Monthly Reports of Officers**

At least monthly every officer authorized by law to charge any fee, commission,
percentage, allowance or compensation, must make a written report to the Auditor and
Comptroller of all moneys received by him during the preceding accounting period.
*(Amendment voted 06-04-1974; effective 08-13-1974.)*

**Section 89:    Monthly Statements by the Auditor and Comptroller**

The Auditor and Comptroller shall prepare for submission to the Council at least
monthly, or when requested, a summary statement of revenues and expenses for the
preceding accounting period, detailed as to appropriations and funds in such manner as to
show the exact financial condition of the City and of each Department and Division
thereof as of the last day of the previous accounting period.
*(Amendment voted 06-04-1974; effective 08-13-1974.)*

**Section 90:    Contracting Bonded Indebtedness**

(a)    Whenever the Council shall determine that the public interest or necessity
demands the acquisition, construction or completion of any municipal
improvement authorized to be acquired, constructed, completed or maintained by

The City of San Diego, the cost of which will be too great to be paid out of the ordinary annual income and revenue of said City, the Council may contract bonded indebtedness for said purposes or any of them, pledging the credit of the City or the property or revenue of any public utility owned by the City and the proceedings taken for incurring such indebtedness shall·be in accordance with the mode and manner prescribed by the provisions of the general laws of the State of California relative to incurring bonded indebtedness by municipalities in force at the time such proceedings are taken.  Every ordinance or resolution determining that the public interest or necessity demands such improvement shall be adopted only by a vote of five members of the Council and it shall require a vote of two-thirds of the electors voting on each proposition at a regular or special election for the issuance of such bonds before said indebtedness or liability for said improvements may be incurred, except ordinances authorizing such bond issues as are specified in Section 92 of this Article.  No bonds, except such bonds as have been heretofore or maybe hereafter issued for the purpose of acquiring, constructing or completing improvements for the development, conservation and furnishing of water as hereinafter provided, shall be issued on the credit of the City which will increase the bonded indebtedness of said City beyond ten per cent of the assessed valuation of all real and personal property of said City subject to direct taxation as shown by the last preceding valuation for City taxes.

(b)     Whenever the Council shall determine that the public interest or necessity demands the acquisition, construction or completion of any municipal improvement for the development, conservation and furnishing of water, whether in the County of San Diego or elsewhere, the Council may contract bonded indebtedness for such improvement for the development,  conservation and furnishing of water whenever authorized to do so by a vote of two-thirds of the electors voting at an election held for that purpose in the manner and mode prescribed by the general laws of the State of California in force at the time of holding said election.  Bonds issued by virtue of the authority of this paragraph (b) including all bonds now outstanding for the purpose of development, conservation and furnishing of water, shall not exceed in amount the sum of fifteen per cent of the assessed valuation of all real and personal property of said City subject to direct taxation as shown by the last preceding valuation for City taxes.  The fifteen per cent limitation contained herein shall be in addition to the amount authorized to be issued for other improvements as set forth in paragraph (a) of this section, it being the intent and purpose of this language to permit the City to incur a bonded indebtedness in an amount not to exceed ten per cent for all municipal improvements other than the development, conservation and furnishing of water, and in addition thereto to authorize bonds in an amount not to exceed fifteen per cent of the assessed valuation for the development, conservation or furnishing of water; provided, however, that indebtedness and liability for

# EXHIBIT 3

<u>NEW ISSUE – BOOK ENTRY ONLY</u>

| | **Insured Ratings** | **Underlying Ratings** |
|---|---|---|
| | Moody's:  Aaa | Moody's:  Aa3 |
| | Fitch:  AAA | Fitch:  AA+ |
| | S&P:  AAA | S&P:  AA- |

(See "MISCELLANEOUS – Ratings" herein.)

*In the opinion of Hawkins, Delafield & Wood, Bond Counsel, under existing statutes and court decisions and assuming continuing compliance with certain tax covenants described herein, interest on the Bonds is excluded from gross income for Federal income tax purposes pursuant to Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"). Interest on the Bonds is not treated as a preference item in calculating the alternative minimum tax imposed on individuals and corporations under the Code; such interest, however, is included in the adjusted current earnings of certain corporations for purposes of calculating the alternative minimum tax imposed on such corporations. In the opinion of Bond Counsel, under existing statutes, interest on the Bonds is exempt from personal income taxes imposed by the State of California. See "LEGAL MATTERS – Tax Exemption" herein.*

**$25,070,000**
**PUBLIC FACILITIES FINANCING AUTHORITY OF THE CITY OF SAN DIEGO**
**LEASE REVENUE BONDS**
**SERIES 2002B**
**(FIRE AND LIFE SAFETY FACILITIES PROJECT)**

**Dated:  June 15, 2002**                                     **Due:  April 1, as shown below**

The proceeds of the $25,070,000 Public Facilities Financing Authority of the City of San Diego Lease Revenue Bonds, Series 2002B (Fire and Life Safety Facilities Project) (the "Bonds") will be used to (i) finance certain real property and improvements to certain fire and life safety facilities of the City of San Diego (the "Project"); (ii) fund capitalized interest; (iii) fund a Reserve Account for the Bonds; and (iv) pay costs of issuance with respect to the Bonds. In order to effect such financing, the Public Facilities Financing Authority of the City of San Diego (the "Authority") and the City of San Diego (the "City") will enter into a site lease, dated as of June 1, 2002 (the "Site Lease"), between the City, as lessor, and the Authority, as lessee. Concurrently with the execution of the Site Lease, the City and the Authority will enter into a lease, dated as of June 1, 2002 (the "Lease") with the Authority as lessor and the City as lessee. The Bonds will be issued pursuant to an indenture dated as of June 1, 2002 (the "Indenture"), between the Authority and Wells Fargo Bank, National Association as trustee (the "Trustee"). The Bonds are payable from and secured by a pledge of Revenues (as defined in the Indenture), consisting primarily of Base Rental Payments (as defined herein) to be paid by the City and received by the Authority with respect to the property leased to the City (the "Leased Property") pursuant to the Lease, and certain other monies as described in the Indenture. The Base Rental Payments are subject to abatement in the event of damage, destruction, condemnation or title defects with respect to the Leased Property as more particularly described in the Lease. See "RISK FACTORS" herein.

Interest due on the Bonds is payable semiannually on October 1 and April 1 of each year, commencing October 1, 2002. See "THE BONDS – General Provisions" herein. The Bonds will be initially registered in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"). DTC will act as securities depository of the Bonds as described in "APPENDIX E – BOOK-ENTRY SYSTEM." The City shall make Base Rental Payments to the Trustee, as assignee of the Authority under the Assignment Agreement (as defined herein) for the use and possession of the Leased Property during each annual period. The Trustee shall deposit such Base Rental Payments in the Bond Fund established under the Indenture. Such Base Rental Payments, if paid in full, will be sufficient, in both time and amount, to pay when due the principal of and interest on the Bonds. Pursuant to the Indenture, the Trustee will, on each Interest Payment Date, apply funds available in the Bond Fund, in the amounts required to make principal and interest payments due with respect to the Bonds.

The Bonds are subject to optional, mandatory and extraordinary redemption as described herein. See "THE BONDS – Redemption Provisions" herein.

~ 19 ~

Neither the Bonds nor the obligation of the City to make Base Rental Payments under the Lease constitutes an obligation of the City for which the City is obligated to levy or pledge any form of taxation or for which the City has levied or pledged any form of taxation. The Authority has no taxing power. Neither the Bonds nor the obligation of the City to make such Base Rental Payments constitutes an indebtedness of the City, the State of California or any political subdivision thereof within the meaning of any constitutional or statutory debt limitation or restriction. See "SECURITY AND SOURCES OF PAYMENT FOR THE BONDS" and "RISK FACTORS" herein.

The scheduled payment of principal and interest on the Bonds when due will be guaranteed under a municipal bond insurance policy to be issued concurrently with the delivery of the Bonds by MBIA Insurance Corporation. See "MUNICIPAL BOND INSURANCE POLICY" herein.

**MBIA**

### MATURITY SCHEDULE
#### $14,375,000 Serial Bonds

| Maturity (April 1) | Principal Amount | Interest Rate | Yield | Maturity (April 1) | Principal Amount | Interest Rate | Yield |
|---|---|---|---|---|---|---|---|
| 2004 | $405,000 | 7.00% | 2.00% | 2015 | $ 685,000 | 4.50% | 4.50% |
| 2005 | 430,000 | 7.00 | 2.40 | 2016 | 715,000 | 4.60 | 4.60 |
| 2006 | 455,000 | 7.00 | 2.75 | 2017 | 750,000 | 4.70 | 4.70 |
| 2007 | 475,000 | 7.00 | 3.10 | 2018 | 785,000 | 4.75 | 4.80 |
| 2008 | 500,000 | 7.00 | 3.40 | 2019 | 825,000 | 4.75 | 4.90 |
| 2009 | 525,000 | 3.55 | 3.55 | 2020 | 865,000 | 4.75 | 4.95 |
| 2010 | 550,000 | 3.75 | 3.75 | 2021 | 910,000 | 4.80 | 5.00 |
| 2011 | 580,000 | 3.90 | 3.90 | 2022 | 960,000 | 5.00 | 5.00 |
| 2012 | 605,000 | 4.00 | 4.00 | 2023 | 1,010,000 | 5.00 | 5.00 |
| 2013 | 630,000 | 4.10 | 4.15 | 2024 | 1,060,000 | 5.00 | 5.00 |
| 2014 | 655,000 | 4.25 | 4.30 | | | | |

$3,515,000 5.00% Term Bonds maturing April 1, 2027 Yield 5.00%.
$7,180,000 5.00% Term Bonds maturing April 1, 2032 Yield 5.18%.

This cover page contains certain information for quick reference only. It is not a summary of this issue. Investors must read the entire Official Statement to obtain information essential to make an informed investment decision.

*The Bonds will be offered when, as and if executed, subject to the approval as to legality by Hawkins, Delafield & Wood, Los Angeles, California, Bond Counsel, and to certain other conditions. Certain legal matters for the City will be passed upon by Quateman & Zidell LLP, Los Angeles, California, Disclosure Counsel, and for the Authority and the City by Casey Gwinn, Esq., City Attorney of the City of San Diego and General Counsel to the Authority. It is anticipated that the Bonds will be available for delivery through the facilities of DTC on or about June 28, 2002.*

**Morgan Stanley DW Inc.**

Dated: June 12, 2002

No dealer, broker, salesperson or other person has been authorized by the Authority or the City to give any information or to make any representations other than as contained herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the Authority or the City. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy nor shall there be any sale of the Bonds by a person in any jurisdiction in which it is unlawful for such person to make such an offer, solicitation or sale.

This Official Statement is not to be construed as a contract with the purchasers of the Bonds. Statements contained in this Official Statement which involve estimates, forecasts or matters of opinion, whether or not expressly so described herein, are intended solely as such and are not to be construed as representations of fact. The summaries or references to the Indenture, the Lease, the Assignment Agreement, the Continuing Disclosure Agreement and other documents, agreements and statutes referred to herein, and the description of the Bonds included in this Official Statement, do not purport to be comprehensive or definitive, and such summaries, references and descriptions are qualified in their entirety by reference to each such document or statute. All capitalized terms used in this Official Statement (unless otherwise defined herein) shall have the meanings set forth in the Indenture or the Lease.

The information set forth herein has been obtained from official sources which are believed to be reliable. The information and expressions of opinions herein are subject to change without notice and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Authority or the City since the date hereof. This Official Statement is submitted in connection with the sale of the Bonds referred to herein and may not be reproduced or used, in whole or in part, for any other purpose.

Certain statements included or incorporated by reference in the following information constitute "forward-looking statements." Such statements are generally identifiable by the terminology used such as "plan," "expect," "estimate," "budget" or other similar words. The achievement of certain results or other expectations contained in such forward-looking statements involve known and unknown risks, uncertainties and other factors which may cause actual results, performance or achievements described to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements. No assurance is given that actual results will meet City or Authority forecasts in any way, regardless of the level of optimism communicated in the information. Neither the City nor the Authority plans to issue any updates or revisions to those forward-looking statements if or when its expectations, or events, conditions or circumstances on which such statements are based occur.

IN CONNECTION WITH THIS OFFERING, THE UNDERWRITERS MAY OVERALLOT OR EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICE OF THE BONDS AT A LEVEL ABOVE THAT WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME. THE UNDERWRITERS MAY OFFER AND SELL THE BONDS TO CERTAIN DEALERS, DEALER BANKS AND BANKS ACTING AS AGENT AT PRICES LOWER THAN THE PUBLIC OFFERING PRICE STATED ON THE COVER PAGE HEREOF AND SAID PUBLIC OFFERING PRICE MAY BE CHANGED FROM TIME TO TIME BY THE UNDERWRITERS.

# TABLE OF CONTENTS

**Page**

**Page**

INTRODUCTION .................................................. 1
  General ............................................................ 1
  Continuing Disclosure .................................... 2
THE BONDS ......................................................... 2
  General Provisions ......................................... 2
  Debt Service Payment Schedule.................... 2
  Redemption Provisions ................................... 4
SECURITY AND SOURCES OF PAYMENT
  FOR THE BONDS ........................................... 6
  Pledge of Revenues ....................................... 6
  Base Rental Payments .................................... 6
  Reserve Account ............................................ 7
  Substitution and Removal of Leased
    Property ....................................................... 7
  Insurance ........................................................ 8
  Title Insurance ............................................... 9
  Additional Bonds ...........................................10
SOURCES AND USES OF BOND
  PROCEEDS.....................................................11
MUNICIPAL BOND INSURANCE POLICY ............11
  The MBIA Insurance Corporation Insurance
    Policy ..........................................................11
  The Insurer ....................................................12
  Insurer Financial Information .......................12
  Financial Strength Ratings of the Insurer .............13
THE PROJECT .....................................................13
  General .........................................................13
  *Fire Station Projects*.....................................14
  *Lifeguard Station Projects*...........................15
THE LEASED PROPERTY ....................................16
RISK FACTORS ....................................................17
  Bonds Not General Obligation Debt of City
    or State.........................................................17
  Base Rental Payments ...................................17
  Abatement......................................................17
  Seismic Considerations .................................18
  Hazardous Substances ..................................18
  Limited Recourse on Default; No
    Acceleration of Base Rental ...............................18
  Possible Insufficiency of Insurance

  Proceeds........................................................ 19
Limitations on Remedies Available to
  Owners of the Bonds .................................... 19
  Other Financial Matters................................. 19
THE AUTHORITY ................................................ 20
LEGAL MATTERS .............................................. 20
  Tax Exemption ............................................. 20
  Certain Ongoing Federal Tax Requirements
    and Covenants............................................ 20
  Certain Collateral Federal Tax
    Consequences............................................. 20
  Original Issue Discount.................................. 21
  Bond Premium .............................................. 21
  Legal Opinions ............................................. 21
  Litigation Matters.......................................... 22
  Insurance Coverage Issues........................... 23
  City Voter Initiatives .................................... 24
  Other Litigation ........................................... 24
  Legality for Investment in California.................... 25
UNDERWRITING ................................................ 25
MISCELLANEOUS ............................................... 25
  Ratings ......................................................... 25
  Financial Advisor .......................................... 25
  Additional Information .................................. 26
  Execution and Delivery................................. 26

APPENDIX A  THE CITY OF SAN DIEGO
APPENDIX B  EXCERPTS FROM THE CITY'S
            COMPREHENSIVE ANNUAL FINANCIAL
            REPORT FOR THE FISCAL YEAR ENDED
            JUNE 30, 2001
APPENDIX C  DEFINITIONS AND SUMMARY OF CERTAIN
            PROVISIONS OF THE LEGAL
            DOCUMENTS
APPENDIX D  FORM OF CONTINUING DISCLOSURE
            AGREEMENT
APPENDIX E  BOOK-ENTRY SYSTEM
APPENDIX F  PROPOSED OPINION OF BOND COUNSEL
APPENDIX G  FORM OF MUNICIPAL BOND INSURANCE
            POLICY OF MBIA INSURANCE
            CORPORATION

(THIS PAGE INTENTIONALLY LEFT BLANK)

**CITY OF SAN DIEGO**
**CITY COUNCIL**

**Dick Murphy,** *Mayor*

| | |
|---|---|
| Toni Atkins | Brian Maienschein |
| Donna Frye | Scott Peters |
| Ralph Inzunza | George Stevens |
| Jim Madaffer | Byron Wear |

**CITY OFFICIALS**

| | |
|---|---|
| Michael T. Uberuaga | Casey Gwinn, Esq. |
| *City Manager* | *City Attorney* |
| | |
| Ed Ryan | Patricia T. Frazier |
| *City Auditor and Comptroller* | *Deputy City Manager* |
| | |
| Charles Abdelnour | Mary E. Vattimo |
| *City Clerk* | *City Treasurer* |

**PUBLIC FACILITIES FINANCING AUTHORITY OF THE CITY OF SAN DIEGO**
**BOARD OF COMMISSIONERS**

| | |
|---|---|
| Joseph W. Craver | Samuel Brown |
| *Chairman* | *Vice Chairman* |
| | |
| Ed Ryan | L. Renée Comeau |
| *Treasurer* | *Secretary* |

Michael T. Uberuaga
*Commissioner*

**BOND COUNSEL**

Hawkins, Delafield & Wood
*Los Angeles, California*

**DISLOSURE COUNSEL**

Quateman & Zidell LLP
*Los Angeles, California*

**FINANCIAL ADVISOR**

Kelling, Northcross & Nobriga
*Oakland, California*

**TRUSTEE**

Wells Fargo Bank, National Association
***Los Angeles, California***

~ 24 ~

OFFICIAL STATEMENT

$25,070,000
PUBLIC FACILITIES FINANCING AUTHORITY OF THE CITY OF SAN DIEGO
LEASE REVENUE BONDS
SERIES 2002B
(FIRE AND LIFE SAFETY FACILITIES PROJECT)

INTRODUCTION

**General**

This Official Statement, which includes the cover page and appendices hereto, is provided to furnish certain information in connection with the issuance and sale of the Public Facilities Financing Authority of the City of San Diego Lease Revenue Bonds, Series 2002B (Fire and Life Safety Facilities Project) in the aggregate principal amount of $25,070,000 (the "Bonds"). The Bonds, in book-entry form, will be issued pursuant to an indenture, dated as of June 1, 2002 (the "Indenture"), between the Public Facilities Financing Authority of the City of San Diego, a California joint powers authority (the "Authority"), and Wells Fargo Bank, National Association, as trustee (the "Trustee"). The proceeds of the Bonds will be used to (i) finance certain real property and improvements to certain fire and life safety facilities of the City of San Diego (the "Project"); (ii) fund capitalized interest; (iii) fund a Reserve Account for the Bonds; and (iv) pay costs of issuance with respect to the Bonds

This Introduction is not a summary of this Official Statement. It is only a brief description of and guide to, and is qualified by, more complete and detailed information contained in the entire Official Statement, including the cover page and appendices hereto, and the documents summarized or described herein. A full review should be made of the entire Official Statement. The offering of the Bonds to potential investors is made only by means of the entire Official Statement.

The Bonds are payable from and secured by a pledge of Revenues (as defined in the Indenture), consisting primarily of lease payments made by the City of San Diego (the "City") under a lease, dated as of June 1, 2002 (the "Lease"), between the City and the Authority. Such lease payments are defined as "Base Rental Payments" or "Base Rental," and are designed to be sufficient, in both time and amount, to pay when due the principal of and interest on the Bonds. The City shall make Base Rental Payments to the Trustee, as assignee of the Authority under the Assignment Agreement, dated as of June 1, 2002 (the "Assignment Agreement"), between the Authority and the Trustee, for the use and possession of the real property encumbered by the Lease (the "Leased Property") during each annual period. The Trustee shall deposit such Base Rental Payments in the Bond Fund established under the Indenture. The Indenture provides that the Trustee will apply Base Rental Payments (as defined herein) and other monies received by it for the benefit of the registered owners of the Bonds (the "Owners") to the payment of principal of, premium, if any, and interest on the Bonds, and will perform certain other functions. See "APPENDIX C – DEFINITIONS AND SUMMARY OF CERTAIN PROVISIONS OF THE LEGAL DOCUMENTS – The Indenture." As used herein, the term "Bonds" means the Bonds, and any Additional Bonds issued under the Indenture.

The Leased Property will consist of certain fire station properties located within the City limits. See "THE LEASED PROPERTY" and "RISK FACTORS – Substitution and Removal of Leased Property."

Neither the Bonds nor the obligation of the City to make Base Rental Payments under the Lease constitutes an obligation of the City for which the City is obligated to levy or pledge any form of taxation or for which the City has levied or pledged any form of taxation. Neither the Bonds nor the obligation of the City to make such Base Rental Payments constitutes an indebtedness of the City, the State of California or any political subdivision thereof within the meaning of any constitutional or statutory debt limitation or restriction. See "SECURITY AND SOURCES OF PAYMENT FOR THE BONDS" and "RISK FACTORS."

Brief descriptions of the Bonds, Security and Sources of Payment for the Bonds, the Project, the Leased Property, Risk Factors and the Authority follow. A brief description of the City is provided in "APPENDIX A – THE

CITY OF SAN DIEGO." Certain audited financial statement information relating to the City's General Fund is provided in "**APPENDIX B – EXCERPTS FROM THE CITY'S COMPREHENSIVE ANNUAL FINANCIAL REPORT FOR THE FISCAL YEAR ENDED JUNE 30, 2001.**" Summaries of the Indenture, the Lease, the Site Lease and the Assignment Agreement are provided in "**APPENDIX C – DEFINITIONS AND SUMMARY OF CERTAIN PROVISIONS OF THE LEGAL DOCUMENTS.**" A form of the Continuing Disclosure Agreement of the City with respect to the Bonds is provided in "**APPENDIX D – FORM OF CONTINUING DISCLOSURE AGREEMENT.**" Such descriptions and summaries do not purport to be comprehensive or definitive. All references made to various documents herein are qualified in their entirety by reference to the actual forms thereof, copies of which may be obtained from the Trustee. All capitalized terms used in this Official Statement (unless otherwise defined herein) shall have the meanings set forth in the Indenture or the Lease. See "**APPENDIX C – DEFINITIONS AND SUMMARY OF CERTAIN PROVISIONS OF THE LEGAL DOCUMENTS.**"

**Continuing Disclosure**

The Authority has determined that no financial or operating data concerning the Authority is material to an evaluation of the offering of the Bonds or to any decision to purchase, hold or sell the Bonds and the Authority will not provide any such information. The City has undertaken all responsibilities for any continuing disclosure to Owners of the Bonds as described below, and the Authority shall have no liability to the Owners of the Bonds or any other person with respect to Rule 15c2-12 of the Securities and Exchange Commission under the Securities Exchange Act of 1934 (the "Rule").

The City has covenanted for the benefit of Owners and Beneficial Owners of the Bonds to provide certain financial information and operating data relating to the City by not later than 285 days following the end of the City's Fiscal Year (which Fiscal Year currently ends on June 30) (the "Annual Report"), commencing with the City's Annual Report for the Fiscal Year ended June 30, 2002, and to provide notices of the occurrence of certain enumerated events, if material. The Annual Report will be filed by the City with each Nationally Recognized Municipal Securities Information Repository and the State Information Depository. Currently, there is no State Information Depository. The notices of material events will be filed by the City with the Municipal Securities Rulemaking Board, each Nationally Recognized Municipal Securities Information Repository and the State Information Depository. The specific nature of the information to be contained in the Annual Report or the notices of material events is summarized in "**APPENDIX D – FORM OF CONTINUING DISCLOSURE AGREEMENT.**" The City has never failed to comply in all material respects with any previous undertakings with regard to said Rule to provide annual reports or notices of material events.

## THE BONDS

**General Provisions**

The Bonds will be executed and delivered in the aggregate principal amount of $25,070,000, will be dated June 15, 2002, will be payable as to interest from June 15, 2002 at the rates set forth on the cover page hereof, semiannually on each October 1 and April 1 (each an "Interest Payment Date"), commencing October 1, 2002, and will mature on April 1 in each of the designated years and in the principal amounts shown on the cover page hereof.

**Debt Service Payment Schedule**

Base Rental Payments are required to be made by the City to the Trustee under the Lease and the Assignment Agreement, for the use and possession of the Leased Property during each annual period. The Trustee shall deposit such Base Rental Payments in the Bond Fund established under the Indenture. Such Base Rental Payments, if paid in full, will be sufficient, in both time and amount, to pay when due the principal of and interest on the Bonds. Pursuant to the Indenture, the Trustee will, on each Interest Payment Date, apply funds available in the Bond Fund in the amounts required to make principal and interest payments due on the Bonds.

The table on the following page presents the debt service requirements with respect to the Bonds. See "**SECURITY AND SOURCES OF PAYMENT FOR THE BONDS – Base Rental Payments.**"

2

**Public Facilities Financing Authority of the City of San Diego**
**Lease Revenue Bonds, Series 2002B**
**Debt Service Payment Schedule**

| Bond Payment Dates | Principal | Interest | Fiscal Year Total |
|---|---|---|---|
| October 1, 2002 | | $    366,511.93 | |
| April 1, 2003 | | 622,378.75 | $    988,890.68 |
| October 1, 2003 | | 622,378.75 | |
| April 1, 2004 | $    405,000 | 622,378.75 | 1,649,757.50 |
| October 1, 2004 | | 608,203.75 | |
| April 1, 2005 | 430,000 | 608,203.75 | 1,646,407.50 |
| October 1, 2005 | | 593,153.75 | |
| April 1, 2006 | 455,000 | 593,153.75 | 1,641,307.50 |
| October 1, 2006 | | 577,228.75 | |
| April 1, 2007 | 475,000 | 577,228.75 | 1,629,457.50 |
| October 1, 2007 | | 560,603.75 | |
| April 1, 2008 | 500,000 | 560,603.75 | 1,621,207.50 |
| October 1, 2008 | | 543,103.75 | |
| April 1, 2009 | 525,000 | 543,103.75 | 1,611,207.50 |
| October 1, 2009 | | 533,785.00 | |
| April 1, 2010 | 550,000 | 533,785.00 | 1,617,570.00 |
| October 1, 2010 | | 523,472.50 | |
| April 1, 2011 | 580,000 | 523,472.50 | 1,626,945.00 |
| October 1, 2011 | | 512,162.50 | |
| April 1, 2012 | 605,000 | 512,162.50 | 1,629,325.00 |
| October 1, 2012 | | 500,062.50 | |
| April 1, 2013 | 630,000 | 500,062.50 | 1,630,125.00 |
| October 1, 2013 | | 487,147.50 | |
| April 1, 2014 | 655,000 | 487,147.50 | 1,629,295.00 |
| October 1, 2014 | | 473,228.75 | |
| April 1, 2015 | 685,000 | 473,228.75 | 1,631,457.50 |
| October 1, 2015 | | 457,816.25 | |
| April 1, 2016 | 715,000 | 457,816.25 | 1,630,632.50 |
| October 1, 2016 | | 441,371.25 | |
| April 1, 2017 | 750,000 | 441,371.25 | 1,632,742.50 |
| October 1, 2017 | | 423,746.25 | |
| April 1, 2018 | 785,000 | 423,746.25 | 1,632,492.50 |
| October 1, 2018 | | 405,102.50 | |
| April 1, 2019 | 825,000 | 405,102.50 | 1,635,205.00 |
| October 1, 2019 | | 385,508.75 | |
| April 1, 2020 | 865,000 | 385,508.75 | 1,636,017.50 |
| October 1, 2020 | | 364,965.00 | |
| April 1, 2021 | 910,000 | 364,965.00 | 1,639,930.00 |
| October 1, 2021 | | 343,125.00 | |
| April 1, 2022 | 960,000 | 343,125.00 | 1,646,250.00 |
| October 1, 2022 | | 319,125.00 | |
| April 1, 2023 | 1,010,000 | 319,125.00 | 1,648,250.00 |
| October 1, 2023 | | 293,875.00 | |
| April 1, 2024 | 1,060,000 | 293,875.00 | 1,647,750.00 |
| October 1, 2024 | | 267,375.00 | |
| April 1, 2025 | 1,115,000 | 267,375.00 | 1,649,750.00 |
| October 1, 2025 | | 239,500.00 | |
| April 1, 2026 | 1,170,000 | 239,500.00 | 1,649,000.00 |
| October 1, 2026 | | 210,250.00 | |
| April 1, 2027 | 1,230,000 | 210,250.00 | 1,650,500.00 |
| October 1, 2027 | | 179,500.00 | |
| April 1, 2028 | 1,295,000 | 179,500.00 | 1,654,000.00 |
| October 1, 2028 | | 147,125.00 | |
| April 1, 2029 | 1,360,000 | 147,125.00 | 1,654,250.00 |
| October 1, 2029 | | 113,125.00 | |
| April 1, 2030 | 1,435,000 | 113,125.00 | 1,661,250.00 |
| October 1, 2030 | | 77,250.00 | |
| April 1, 2031 | 1,505,000 | 77,250.00 | 1,659,500.00 |
| October 1, 2031 | | 39,625.00 | |
| April 1, 2032 | 1,585,000 | 39,625.00 | 1,664,250.00 |
| TOTALS | $25,070,000 | $23,474,723.18 | $48,544,723.18 |

3

~ 27 ~

**Redemption Provisions**

*Extraordinary Redemption.* The Bonds are subject to redemption, in whole or in part, on any date, from prepaid Base Rental Payments made by the City from Net Proceeds received by the City pursuant to the title insurance policies required to be maintained under the Lease or due to a casualty loss or award in eminent domain for any portion of the Leased Property, at a redemption price equal to the principal amount thereof together with accrued interest to the date fixed for redemption, without premium. The Lease requires the City to apply casualty insurance proceeds to repair, reconstruct or replace the Leased Property if to do so would fully restore the Leased Property. In the event that the casualty insurance proceeds are not sufficient to fully restore the Leased Property, the City may elect to budget and appropriate additional funds and fully restore the Leased Property. If the City does not make such an election and the available casualty proceeds are at least sufficient to redeem all of the Outstanding Bonds, at par plus accrued interest, then the proceeds shall be used for that purpose; in the event the proceeds are not so sufficient, the City may elect to budget and appropriate additional funds so that the available casualty proceeds and such additional funds are sufficient to redeem all of the Outstanding Bonds at par plus accrued interest, in which case the same shall be used for this purpose. Further, the Lease provides that if there are not sufficient Net Proceeds received from casualty insurance so as to redeem all of the Outstanding Bonds and the City elects not to budget and appropriate additional funds necessary to redeem all of the Outstanding Bonds, then such proceeds may be used to redeem a portion of the Outstanding Bonds provided that the fair rental value of the portions of the Leased Property not damaged, destroyed, incomplete or otherwise available for use or occupancy by the City, as determined by the City, is equal to or greater than the debt service on the Bonds that will remain outstanding following the redemption of Bonds in part from such Net Proceeds. Its decision with respect to an award in condemnation or payment under a title insurance policy will depend upon the extent of the condemnation of, or title defects relating to, the Leased Property. If any portion of the Leased Property has been affected by condemnation or a title defect which will result in an abatement of Base Rental Payments payable by the City under the Lease, then the Trustee shall use Net Proceeds available from condemnation or any policy of title insurance to redeem Outstanding Bonds. For a discussion of the insurance required to be maintained by the City, see "**SECURITY AND SOURCES OF PAYMENT FOR THE BONDS – Insurance**" and "**APPENDIX C – DEFINITIONS AND SUMMARY OF CERTAIN PROVISIONS OF THE LEGAL DOCUMENTS – The Lease.**"

*Optional Redemption.* The Bonds maturing on or before April 1, 2012 are not subject to optional redemption prior to their respective stated maturities. The Bonds maturing on or after April 1, 2013 shall be subject to redemption prior to their respective stated maturities at the option of the Authority on or after April 1, 2012, as a whole, or in part (in such maturities as are designated to the Trustee by the Authority no later than 45 days prior to the redemption date or, if the Authority fails to designate such maturities, on a proportional basis among maturities) on any date, from funds derived by the Authority from any source at the principal amount thereof, together with interest accrued thereon to the date fixed for redemption:

| Redemption Date | Redemption Price |
|---|---|
| April 1, 2012 and thereafter | 100% |

*Mandatory Sinking Fund Redemption.* The term Bonds maturing on April 1, 2027 are also subject to redemption prior to their stated maturity, in part by lot, from sinking account payments deposited in the Sinking Account, on any April 1 on or after April 1, 2025 at the principal amount thereof and interest accrued thereon to the date fixed for redemption, without premium, according to the following schedule:

| Year (April 1,) | Principal Amount |
|---|---|
| 2025 | $1,115,000 |
| 2026 | 1,170,000 |
| 2027* | 1,230,000 |

---

\* Maturity

4

The term Bonds maturing on April 1, 2032 are also subject to redemption prior to their stated maturity, in part by lot, from sinking account payments deposited in the Sinking Account, on any April 1 on or after April 1, 2028 at the principal amount thereof and interest accrued thereon to the date fixed for redemption, without premium, according to the following schedule:

| Year (April 1,) | Principal Amount |
|---|---|
| 2028 | $1,295,000 |
| 2029 | 1,360,000 |
| 2030 | 1,435,000 |
| 2031 | 1,505,000 |
| 2032* | 1,585,000 |

\* Maturity

*Method of Selection for Redemption.* If less than all Outstanding Bonds are to be redeemed at any time from Net Proceeds, the Trustee shall use the net insurance proceeds or condemnation awards attributable to the portion of the Leased Property destroyed, damaged, stolen or taken, to redeem, on a pro rata basis among all maturities of Bonds, as directed in writing by the City, pursuant to the Lease. Subject to the foregoing, the Trustee shall select the Bonds of such maturity date to be redeemed in any manner that it deems appropriate; provided, however, that if the remaining Base Rental Payments will not be reasonably level after such prepayment of Outstanding Bonds, the City shall deliver to the Trustee an Opinion of Counsel that the Lease will continue to be a valid and binding obligation of the City after such redemption.

*Notice of Redemption.* Notice of redemption shall be mailed by the Trustee, not less than 30 nor more than 60 days prior to the redemption date to (i) the respective Owners of the Bonds designated for redemption at their addresses appearing on the registration books of the Trustee by first class mail; (ii) the Securities Depositories; and (iii) the Information Services. Notice of redemption to the Securities Depositories and the Information Services shall be given by registered mail or by overnight delivery. Each notice of redemption shall state the date of such notice, the redemption price, the name and appropriate address of the Trustee, the CUSIP number (if any) of the maturity or maturities, and, if less than all of any such maturity is to be redeemed, the distinctive certificate numbers of the Bonds of such maturity to be redeemed and, in the case of Bonds to be redeemed in part only, the respective portions of the principal amount thereof to be redeemed. Each such notice shall also state that on said date there will become due and payable on each of said Bonds thereof and in the case of a 2002B Bond to be redeemed in part only, the specified portion of the principal amount thereof to be redeemed, together with interest accrued thereon to the redemption date, and that from and after such redemption date interest thereon shall cease to accrue, and shall require that such Bonds be then surrendered at the address of the Trustee specified in the redemption notice. As long as a book-entry method is used for the Bonds, such notice shall be sent by the Trustee to the securities depository for the Bonds, initially DTC or its nominee. Beneficial owners of interests in the Bonds are to receive notification of such redemption as described in **"APPENDIX E – BOOK-ENTRY SYSTEM."**

The Indenture provides that if notice of redemption has been duly given as provided in the Indenture and money for the payment of the redemption price of the Bonds called for redemption is held by the Trustee, then on the redemption date designated in such notice the Bonds shall become due and payable, and from and after the date so designated, interest on the Bonds so called for redemption shall cease to accrue, and the Owners of such Bonds shall have no rights in respect thereof except to receive payment of the redemption price thereof.

Failure by the Trustee to give notice to any one or more of the Information Services or Securities Depositories, or the insufficiency of any such notices, shall not affect the sufficiency of the proceedings for redemption. Failure by the Trustee to mail or otherwise provide notice of redemption to any one or more of the respective Owners of any Bonds designated for redemption shall not affect the sufficiency of the proceedings for redemption with respect to the Owners to whom such notice was mailed.

5

## SECURITY AND SOURCES OF PAYMENT FOR THE BONDS

**Pledge of Revenues**

The Bonds are payable from and secured by Revenues and certain amounts on deposit in the funds and accounts established under the Indenture. Revenues consist primarily of all Base Rental Payments made by the City pursuant to the Lease. Base Rental Payments shall be paid by the City from any and all legally available funds. The City has covenanted under the Lease to take such action as may be necessary to include all Base Rental Payments and Additional Rental payments due under the Lease in its operating budget for each fiscal year and to make all necessary appropriations for such Base Rental Payments and Additional Rental payments and, to the extent permitted by law, the City covenants to take such action as may be necessary to amend or supplement the budget appropriations for payments under the Lease at any time and from time to time during any fiscal year in the event that the actual Base Rental Payments and Additional Rental paid in any fiscal year exceeds the pro rata portion of the appropriations then contained in the City's budget. As and to the extent set forth in the Indenture, all Revenues and amounts on deposit in the funds, accounts and subaccounts established under the Indenture (other than the Rebate Fund) are irrevocably pledged to payment of the principal of, premium, if any, and interest on the Bonds and any Additional Bonds Outstanding; provided, however, that out of Revenues there may be allocated such sums for such purposes as are expressly permitted by the Indenture.

The City's obligation to make Base Rental Payments is subject to abatement if, by reason of material damage to, destruction or condemnation of, or title defect with respect to, the Leased Property, there is substantial interference with the City's right to use and possess the Leased Property. See **"RISK FACTORS – Abatement."**

Neither the Bonds nor the obligation of the City to make Base Rental Payments under the Lease constitutes an obligation of the City for which the City is obligated to levy or pledge any form of taxation or for which the City has levied or pledged any form of taxation. Neither the Bonds nor the obligation of the City to make such Base Rental Payments constitutes an indebtedness of the City, the State of California or any political subdivision thereof within the meaning of any constitutional or statutory debt limitation or restriction.

**Base Rental Payments**

The Bonds are payable from Base Rental Payments made by the City under the Lease for the use and possession of the Leased Property during each annual period. See **"THE LEASED PROPERTY"** and **"RISK FACTORS – Substitution and Removal of Leased Property."** The Indenture requires that Base Rental Payments be deposited in the Bond Fund maintained by the Trustee. Pursuant to the Indenture, on October 1 and April 1 of each year, commencing October 1, 2002, the Trustee will apply amounts in the Bond Fund to make principal and interest payments with respect to the Bonds as the same shall become due and payable and in amounts sufficient to meet the payment schedule above under **"THE BONDS – Debt Service Payment Schedule."**

Pursuant to the Lease and the Assignment Agreement, the City is required to make Base Rental Payments to the Trustee seven Business Days preceding each October 1 and each April 1 in each fiscal year during the term of the Lease, commencing October 1, 2002. Amounts received by the Trustee will be held as security for the payments due on the Bonds. The amount of Base Rental Payments is designed to be sufficient to pay principal of and interest and redemption premiums, if any, on the Bonds when due. The Lease also provides that Base Rental Payments and Additional Rental shall be abated in whole or in part if there is substantial interference with the City's use and possession of any portion of the Leased Property due to damage, destruction, title defect or condemnation. The amount of abatement shall be such that the resulting Base Rental Payments and Additional Rental represent fair consideration for the use and possession of the remaining portions of the Leased Property as to which such damage, destruction, title defect or condemnation do not substantially interfere with the use and right of possession by the City. Such abatement shall continue for the period commencing with the date of the substantial interference due to damage, destruction, title defect or condemnation and ending with the substantial completion of the work of repair or replacement of the portions of the Leased Property so damaged, destroyed, defective or condemned. See **"RISK FACTORS – Abatement."**

The City is obligated to make Base Rental Payments from any and all General Fund monies legally available to the City, although the City's General Fund is not pledged to secure the payment of Base Rental Payments. For certain economic, demographic and financial information relating to the City, see **"APPENDIX A – THE CITY OF SAN DIEGO."** For certain audited financial statement information relating to the City's General Fund, see **"APPENDIX B –**

~ 30 ~

EXCERPTS FROM THE CITY'S COMPREHENSIVE ANNUAL FINANCIAL REPORT FOR THE FISCAL YEAR ENDED JUNE 30, 2001."

**Reserve Account**

The Reserve Account is established within the Bond Fund under the Indenture. The Reserve Account will be funded initially from the proceeds of the Bonds in the amount of $1,664,250 and as contemplated by any Supplemental Indenture authorizing the issuance of Additional Bonds, in order that the aggregate amount therein is equal to the least of (i) 10% of the stated principal amount of the Bonds; (ii) Maximum Annual Debt Service for the current or any future Bond Year; or (iii) 125% of average Annual Debt Service (the "Reserve Requirement").

The City may satisfy all or part of the Reserve Requirement with a line of credit, letter of credit, insurance policy, surety bond or other credit source deposited with the Trustee and rated not lower than Aa/AA by the Rating Agencies, subject to the further requirements of the Indenture. See **"APPENDIX C – DEFINITIONS AND SUMMARY OF CERTAIN PROVISIONS OF THE LEGAL DOCUMENTS – The Indenture."**

All amounts in the Reserve Account shall be used and withdrawn by the Trustee for the purpose of replenishing the Interest Account or the Principal Account in such order, in the event of any deficiency at any time in either of such accounts, or for the purposes of paying the principal of and interest and redemption premiums, if any, on the Bonds and any Additional Bonds in the event that no other money of the Authority is lawfully available therefor, or for the retirement of all the Bonds and any Additional Bonds then Outstanding. All interest income received by the Trustee from the investment of moneys in the Reserve Account (as well as from the investment of moneys in other Funds and Accounts) shall be transferred to the Interest Account of the Bond Fund, or, at the direction of the City, to the Construction Fund, until such time as the Project is completed, and thereafter to the Principal Account of the Bond Fund; provided, however, that such interest income shall be transferred to the Rebate Fund as and when required by the Indenture and retained in the Reserve Account to the extent that amounts therein have been transferred to make up a deficiency in the Interest Account or the Principal Account. See **"APPENDIX C – DEFINITIONS AND SUMMARY OF CERTAIN PROVISIONS OF THE LEGAL DOCUMENTS."**

**Substitution and Removal of Leased Property**

The City and the Authority may amend the Lease to substitute additional real property and/or improvements (the "Substituted Property") for the existing Leased Property (a "Substitution") or to remove real property (including undivided interests therein) or improvements from the definition of Leased Property (a "Removal"), upon compliance with all of the conditions set forth in the Lease and described below. After a Substitution or Removal, the portion of the Leased Property for which the Substitution or Removal has been effected shall be released from the leasehold encumbrance of the Lease.

No Substitution or Removal shall take place under the Lease until the City delivers to the Authority and the Trustee, among other documents, the items listed below. Also see **"APPENDIX C – DEFINITIONS AND SUMMARY OF CERTAIN PROVISIONS OF THE LEGAL DOCUMENTS – Lease."**

(i)     A Certificate of the City accompanied by an MAI fair market appraisal or a fair market appraisal utilizing appropriate valuation methodology from an appraiser, who may but need not be an employee of the City, evidencing that the annual fair rental value of the Substituted Property which will constitute the Leased Property after such substitution or removal will be at least equal to 100% of the maximum amount of the Base Rental Payments becoming due in the then current fiscal year or in any subsequent fiscal year; and stating that the useful economic life of the Substituted Property is at least equal to the remaining term of this Lease; and

(ii)     In the event of a Substitution, a policy of title insurance in an amount equal to the same proportion of the principal amount as the principal portion of Base Rental Payments for the Substituted Property bears to the total principal portion of Base Rental Payments, insuring the Authority's interest in the Substituted Property (except any portion thereof which is not real property) subject to Permitted Encumbrances (as defined in the Lease), together with an endorsement thereto making said policy payable to the Trustee for the benefit of the Owners of the Bonds and any Additional Bonds.

**Insurance**

The Lease requires the City to procure or cause to be procured and maintain or cause to be maintained throughout the term thereof for the Leased Property insurance against the following risks in the following respective amounts:

(i)      Insurance against loss or damage to the Leased Property caused by fire, lightning or earthquake, with an extended coverage endorsement covering the risk of vandalism and malicious mischief, sprinkler system leakage and boiler loss; provided that earthquake coverage shall be required only if: (a) available from reputable insurers at commercially reasonable rates; and (b) the Leased Property cannot satisfy any earthquake standards which may be imposed by any Rating Agency then rating the Bonds or any Additional Bonds. In the event the City is unable to obtain earthquake coverage on any Leased Property which it previously has maintained, it will promptly so notify all Rating Agencies then rating the Bonds or any Additional Bonds. It is anticipated that the City will not obtain earthquake insurance on the Leased Property. The insurance described in this paragraph (i) shall be in an amount equal to the lesser of (a) replacement cost (without deduction for depreciation) of improvements located or to be located on the Leased Property or, if lower, $50,000,000 in the case of earthquake insurance, or (b) the remaining unpaid principal amount of Bonds Outstanding plus the amount of use and occupancy coverage described in paragraph (ii) below, except that such insurance may be subject to deductible clauses of not to exceed the first one hundred thousand dollars ($100,000) of the amount of any one loss (or ten percent (10%) of the amount insured, in the case of earthquake). Insurance described in this paragraph (i) and in paragraph (ii) below may be in the form of a policy which covers the Leased Property and one or more additional parcels of real property; provided that the amount of coverage available thereunder shall be at least equal to the cumulative replacement values of the Leased Property and any other such property which is the subject of a lease, installment purchase or other financing arrangement ("Financed Property") for which bonds, certificates of participation or other obligations shall have been issued ("Obligations") plus the amount of use and occupancy coverage required by paragraph (ii) below. In the event the City elects to obtain insurance for the Leased Property and one or more additional parcels of real property and the amount of the insurance proceeds available to pay all claims thereunder is not sufficient to cover the replacement values of all such properties, then any such proceeds shall be used first to rebuild or repair the Leased Property and all Financed Properties or to repay all Obligations, the Bonds and any Additional Bonds.

(ii)      Use and occupancy insurance against loss, total or partial, of the use and occupancy of the Leased Property as a result of any of the hazards covered by the insurance described in paragraph (i) immediately above, in an amount sufficient to pay the Base Rental Payments attributable to the Leased Property for a twenty-four month period; provided, that the amount of such insurance need not exceed the total remaining Base Rental Payments attributable to the Leased Property; and provided further, that such insurance may be part of a policy described in paragraph (i) above, which policy may provide that insurance proceeds paid for coverage described in paragraph (i) above may reduce amounts payable under coverage described in this paragraph (ii) and vice-versa. The City may obtain use and occupancy insurance covering the Leased Property as well as other parcels of property owned by the City, provided that the cumulative amount thereof is at least equal to the cumulative amount of use and occupancy insurance required by the Lease and any similar agreements relating to Financed Property in respect of which Obligations are outstanding. There can be no assurance that the coverage afforded by such insurance will be adequate to prevent a reduction in Base Rental Payments. See **"RISK FACTORS – Abatement"** herein.

(iii)      Workers' compensation insurance or an approved self-insurance or self-funding method or plan covering all employees working in or on the Project and the Leased Property; and the City shall require any other person or entity working in or on the Project and the Leased Property to carry the workers' compensation insurance in connection with statutory requirements; any such policy may provide for a deductible so long as the deductible is covered by a self-insurance or self-funding method or plan permitted by the Lease.

(iv)      Standard, commercial general liability insurance to protect the Authority and the City and their directors, officers and employees, indemnifying and defending such parties against direct or contingent loss or liability for damages for personal injury, death or property damage related to the possession, operation or use of the Leased Property, with a minimum combined single limit of ten million dollars ($10,000,000) for personal injury or death of one or more persons, and for property damage, in each accident or event (subject to a

self-insured retention clause of not to exceed one million dollars ($1,000,000) or such greater amount as may be covered by any self-insurance or self-funding method or plan permitted by the Lease).

The insurance required by paragraphs (i), (iii) and (iv) above may be maintained as part of or in conjunction with any other liability insurance coverage carried by the City, and may be maintained through a joint exercise of powers authority created for the purpose or in the form of self-insurance by the City. See "**APPENDIX C – DEFINITIONS AND SUMMARY OF CERTAIN PROVISIONS OF THE LEGAL DOCUMENTS – The Lease – Maintenance; Taxes; Insurance and other Charges.**" Any such self-insurance or self-funding maintained by the City pursuant to (i) above, shall, unless waived with the consent of the Insurer (as defined herein), comply with the following terms:

(a)     The self-insurance program shall be approved by an Insurance Consultant;

(b)     The self-insurance program shall be maintained on an actuarially sound basis and MBIA Insurance Corporation (the "Insurer") will annually receive a certified actuarial statement attesting to the sufficiency of the program's assets;

(c)     The self-insurance fund shall be held in a separate trust fund by an independent trustee; and

(d)     In the event the self-insurance program is discontinued, the actuarial soundness of the claim reserve fund shall be maintained.

Any insurance policy issued pursuant to paragraph (i) above shall be so written or endorsed as to make losses, if any, payable to the City, the Authority and the Trustee as their respective interests may appear and the net proceeds of the insurance described in paragraph (i) above shall be applied as provided in the Lease. The net proceeds, if any, of the insurance policy described in paragraph (i) above shall, to the extent that such proceeds are paid on account of loss or damage to the Leased Property, be payable to the Trustee and deposited in the Insurance Proceeds and Condemnation Awards Fund and applied as described in the Indenture. The net proceeds, if any, of the insurance policy described in paragraph (ii) above shall, to the extent that such proceeds relate to the use and occupancy of the Leased Property, be payable to the Trustee and deposited in the Bond Fund. Each insurance policy provided for in the Lease shall contain a provision to the effect that the insurance company shall not cancel the policy or modify it materially and adversely to the interests of the Authority and the Trustee without first giving written notice thereof to the Authority and the Trustee at least 60 days in advance of such intended cancellation or modification.

**Title Insurance**

The City further covenants and agrees in the Lease to deliver or cause to be delivered to the Trustee on the date of issuance of the Bonds a California Land Title Association leasehold policy or policies, or a commitment for such policy or policies, with respect to the Leased Property with liability in the aggregate amount equal to the principal amount represented by the Bonds. Such policy or policies, when issued, will name the Trustee as the insured and will insure the leasehold estate of the Authority in the Leased Property subject only to such exceptions as do not materially affect the City's right to the use and occupancy of the Leased Property.

See "**APPENDIX C – DEFINITIONS AND SUMMARY OF CERTAIN PROVISIONS OF THE LEGAL DOCUMENTS – The Lease – Maintenance; Taxes; Insurance and Other Charges**" for additional information regarding the insurance requirements under the Lease.

~ 33 ~

**Additional Bonds**

The Authority may at any time issue Additional Bonds payable from Revenues as provided in the Indenture and secured by a pledge of Revenues on a parity with the pledge securing the Outstanding Bonds, subject to certain conditions set forth in the Indenture, including the following:

(i)    The Authority shall be in compliance with all agreements and covenants contained in the Indenture and no Event of Default shall have occurred and be continuing under the Lease.

(ii)    The issuance of such Additional Bonds shall have been authorized by the Authority and shall have been provided for by a Supplemental Indenture which shall specify, among other things, the following:

(a)    The purpose for which such Additional Bonds are to be issued; provided that proceeds of such Additional Bonds shall be applied solely for the purpose of (1) financing, acquiring, constructing, maintaining, operating, improving and leasing the Project (as defined in the Indenture) and costs incidental thereto; and/or (2) funding any increase in the Reserve Requirement; and/or (3) the purpose of refunding any Bonds or Additional Bonds, then Outstanding; and

(b)    The amount to be deposited from the proceeds of sale of such Additional Bonds in the Reserve Account, which amount shall be sufficient to cause the amount on deposit in the Reserve Account to equal the Reserve Requirement upon the issuance of such Additional Bonds.

(iii)    The Lease shall have been further amended so as to increase the aggregate Base Rental payable by the City thereunder by an amount at least sufficient to pay the interest on and principal of such Additional Bonds as the same become due, subject to the limitation that the increase in Base Rental together with existing Base Rental Payments shall not in any year be in excess of the annual fair rental of the Leased Property determined as of the time the Additional Bonds are issued.

(iv)    The Authority shall have received confirmation in writing from the Rating Agencies then providing a rating on any Outstanding Bonds that the issuance of such Additional Bonds will not, in and of itself, cause a downgrading or withdrawal of such rating. The Authority need not seek such a confirmation in writing if the annual amount of interest and principal, including sinking fund payments, payable on the Additional Bonds does not exceed the corresponding amount of such payments on the Outstanding Bonds being refunded, provided, that the term of the Additional Bonds does not exceed the term on the Outstanding Bonds being refunded.

For additional information with respect to the issuance of Additional Bonds under the Indenture, see **"APPENDIX C – DEFINITIONS AND SUMMARY OF CERTAIN PROVISIONS OF THE LEGAL DOCUMENTS – The Indenture."**

## SOURCES AND USES OF BOND PROCEEDS

The estimated sources and uses of proceeds from the sale of the securities offered hereby, less accrued interest, are set forth below.

**Sources:**

| | |
|---|---|
| Principal Amount | $25,070,000.00 |
| Accrued Interest | 44,949.58 |
| Net Premium | 68,237.25 |
| Total | $25,183,186.83 |

**Uses:**

| | |
|---|---|
| Deposit to Construction Fund | $21,580,758.90 |
| Deposit to Interest Account [1] | 988,890.68 |
| Deposit to Reserve Account | 1,664,250.00 |
| Costs of Issuance [2] | 505,000.00 |
| Underwriter's Discount [3] | 444,287.25 |
| Total | $25,183,186.83 |

[1]  Includes capitalized interest in the amount of $943,941.10.
[2]  Costs of Issuance include fees and expenses of the Financial Advisor, Bond Counsel, Disclosure Counsel and the Trustee, expenses for obtaining ratings for the Bonds, Official Statement printing costs and other costs related to the issuance of the Bonds.
[3]  Includes premium of $252,000.00 for municipal bond insurance policy.

## MUNICIPAL BOND INSURANCE POLICY

**The MBIA Insurance Corporation Insurance Policy**

The following information has been furnished by the Insurer for use in this Official Statement. Reference is made to APPENDIX G for a specimen of the Insurer's policy.

The Insurer's policy unconditionally and irrevocably guarantees the full and complete payment required to be made by or on behalf of the Authority to the Trustee or its successor of an amount equal to (i) the principal of (either at the stated maturity or by an advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the Bonds as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed by the Insurer's policy shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any owner of the Bonds pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law (a "Preference").

The Insurer's policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Bond. The Insurer's policy does not, under any circumstance, insure against loss relating to: (i) optional or mandatory redemptions (other than mandatory sinking fund redemptions); (ii) any payments to be made on an accelerated basis; (iii) payments of the purchase price of the Bonds upon tender by an owner thereof; or (iv) any Preference relating to (i) through (iii) above. The Insurer's policy also does not insure against nonpayment of principal of or interest on the Bonds resulting from the insolvency, negligence or any other act or omission of the Trustee or any other paying agent for the Bonds.

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by the Insurer from the Trustee or any owner of a Bond the payment of an insured amount for which is then due, that such required payment has not been made, the Insurer on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with State Street Bank and Trust Company, N.A., in New York, New York, or its

successor, sufficient for the payment of any such insured amounts which are then due. Upon presentment and surrender of such Bonds or presentment of such other proof of ownership of the Bonds, together with any appropriate instruments of assignment to evidence the assignment of the insured amounts due on the Bonds as are paid by the Insurer, and appropriate instruments to effect the appointment of the Insurer as agent for such owners of the Bonds in any legal proceeding related to payment of insured amounts on the Bonds, such instruments being in a form satisfactory to State Street Bank and Trust Company, N.A., State Street Bank and Trust Company, N.A. shall disburse to such owners or the Trustee payment of the insured amounts due on such Bonds, less any amount held by the Trustee for the payment of such insured amounts and legally available therefor.

**The Insurer**

The Insurer is the principal operating subsidiary of MBIA Inc., a New York Stock Exchange listed company (the "Company"). The Company is not obligated to pay the debts of or claims against the Insurer. The Insurer is domiciled in the State of New York and licensed to do business in and subject to regulation under the laws of all 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, the Virgin Islands of the United States and the Territory of Guam. The Insurer has three branches, one in the Republic of France, one in the Republic of Singapore and one in the Kingdom of Spain. New York has laws prescribing minimum capital requirements, limiting classes and concentrations of investments and requiring the approval of policy rates and forms. State laws also regulate the amount of both the aggregate and individual risks that may be insured, the payment of dividends by the Insurer, changes in control and transactions among affiliates. Additionally, the Insurer is required to maintain contingency reserves on its liabilities in certain amounts and for certain periods of time.

The Insurer does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding the Insurer's policy and the Insurer set forth under the heading "**MUNICIPAL BOND INSURANCE POLICY.**" Additionally, the Insurer makes no representation regarding the Bonds or the advisability of investing in the Bonds.

The Financial Guaranty Insurance Policies are not covered by the Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance Law.

**Insurer Financial Information**

The following documents filed by the Company with the Securities and Exchange Commission (the "SEC") are incorporated herein by reference:

(1)     The Company's Annual Report on Form 10-K for the year ended December 31, 2001; and

(2)     The Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2002.

Any documents filed by the Company pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended, after the date of this Official Statement and prior to the termination of the offering of the securities offered hereby shall be deemed to be incorporated by reference in this Official Statement and to be a part hereof. Any statement contained in a document incorporated or deemed to be incorporated by reference herein, or contained in this Official Statement, shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any other subsequently filed document which also is or is deemed to be incorporated by reference herein modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Company files annual, quarterly and special reports, information statements and other information with the SEC under File No. 1-9583. Copies of the SEC filings (including (1) the Company's Annual Report on Form 10-K for the year ended December 31, 2001 and (2) the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2002) are available (i) over the Internet at the SEC's web site at http://www.sec.gov; (ii) at the SEC's public reference room in Washington, D.C.; (iii) over the Internet at the Company's web site at http://www.mbia.com; and (iv) at no cost, upon request to MBIA Insurance Corporation, 113 King Street, Armonk, New York 10504. The telephone number of MBIA is (914) 273-4545.

~ 36 ~

As of December 31, 2001, the Insurer had admitted assets of $8.5 billion (audited), total liabilities of $5.6 billion (audited), and total capital and surplus of $2.9 billion (audited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities. As of March 31, 2002, the Insurer had admitted assets of $8.6 billion (unaudited), total liabilities of $5.7 billion (unaudited), and total capital and surplus of $2.9 billion (unaudited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities.

**Financial Strength Ratings of the Insurer**

Moody's Investors Service, Inc. rates the financial strength of the Insurer "Aaa."

Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. rates the financial strength of the Insurer "AAA."

Fitch, Inc. rates the financial strength of the Insurer "AAA."

Each rating of the Insurer should be evaluated independently. The ratings reflect the respective rating agency's current assessment of the creditworthiness of the Insurer and its ability to pay claims on its policies of insurance. Any further explanation as to the significance of the above ratings may be obtained only from the applicable rating agency.

The above ratings are not recommendations to buy, sell or hold the Bonds, and such ratings may be subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of the Bonds. The Insurer does not guaranty the market price of the Bonds nor does it guaranty that the ratings on the Bonds will not be revised or withdrawn.

In the event the Insurer were to become insolvent, any claims arising under a policy of financial guaranty insurance are excluded from coverage by the California Insurance Guaranty Association, established pursuant to Article 14.2 (commencing with Section 1063) of Chapter 1 of Part 2 of Division 1 of the California Insurance Code.

There can be no assurances that payments made by the Insurer representing interest on the Bonds will be excluded from gross income, for federal tax purposes, in the event of nonappropriation by the political subdivision.

## THE PROJECT

**General**

The Project will consist, generally, of the construction or improvement of fire and lifeguard stations throughout the City, capital improvements to certain fire stations and/or to repair facilities and the acquisition of land for the future construction of fire and/or lifeguard facilities. Each project will have a unique design and construction schedule, however it is currently projected that all projects will be completed by March 2007.

Subject to receipt of City Council and any other necessary approvals, the Project is expected to be financed with cash and two series of bonds. Of the approximately $45 million required, approximately $4 million will be cash funded and $41 million financed with bonds. The Bonds are expected to fund the Project's financing needs (approximately $22 million) through May 2004. A second series of bonds is expected to fund the Project's financing needs (approximately $19 million) from June 2004 through March 2007. The construction of some fire and/or lifeguard facilities will be initiated with the Bonds and would be completed with funds from the second series of bonds. If for any reason the issuance of such a second series of bonds were to be delayed or otherwise not take place, the City may be obligated to postpone or modify aspects of the Project construction schedule.

A brief description of the individual projects intended to be funded with the proceeds of the Bonds as of the date hereof is set out below, and is subject to change.

~ 37 ~

*Fire Station Projects*

**Fire Station 1:** This project is a major renovation of the primary downtown fire station. The station is 30 years old and is located at 1222 First Avenue. The station size is approximately 16,100 square feet. It houses one battalion vehicle, two engines, one truck, one ambulance, one light and air support apparatus, one Explosive Ordinance Disposal rig, a Metro Arson Strike Team (MAST) vehicle and several other support vehicles. There are eighteen fire personnel assigned to a 24-hour per day assignment. There are several other personnel representing other agencies involved in MAST assigned here for an eight-hour workday. The remodel project is designed to correct numerous problems including: removal of asbestos, providing individual dormitories, providing a separate HVAC system, providing a separate hot water system, and providing a vehicle exhaust extraction system. The total cost estimate for this project is $2,756,000.

**Fire Station 2:** This is a new fire station that will be located in Mission Valley at Friars Rd. and Mission Village Dr. The 16,700 square foot facility will house one battalion vehicle, two engines, one truck and one ambulance. It will also house the Hazardous Materials Response Team. There will be individual dorm space for fifteen fire personnel assigned to a 24-hour per day shift. The new fire station will be a two-story building built on City property on the north side of Friars Road, west of Mission Village Drive. The total cost estimate for this project is $5,022,000.

**Fire Station 5:** This project will demolish the current 49-year-old station located at 3902 9th Ave. and University Ave. in Hillcrest and build a new station on the same location. The new 8,300 square foot facility will house one battalion vehicle, one engine and one truck. There will be individual dorm space for nine fire personnel and three apparatus bays. The current station is too small for modern day fire apparatus. The total cost estimate for this project is $2,406,000.

**Fire Station 12:** This project will demolish the current 52-year-old station located at 4964 Imperial Ave. and build a new station at the same location. The new 10,890 square foot facility will house one battalion vehicle, one engine, and one truck and one ambulance. There will be individual dorm space for eleven fire personnel and four apparatus bays. The total cost estimate for this project is $3,018,800.

**Fire Station 17:** This project will demolish the current 51-year-old station located at 4206 Chamoune Ave. and build a new station at the same location. The new 6,400 square foot facility will house one engine and one ambulance. There will be individual dorm space for six fire personnel and two apparatus bays. The total cost estimate for this project is $2,087,000.

**Fire Station 22:** This project is a major renovation of a 57-year-old station. Located at 1055 Catalina Blvd. in Point Loma, the station will be enlarged from 2,270 to 4,220 square feet. A new apparatus bay will be constructed and the existing station remodeled and refurbished to meet current housing standards. There will be individual dorm space for four fire personnel. The total cost estimate for this project is $1,180,000.

**Fire Station 29:** This new station will be built across the street from the current 37-year-old station at 179 West San Ysidro Blvd. The new 10,020 square foot facility will house one engine, one truck, one ambulance, and one brush rig. There will be individual dorm space for eleven fire personnel and three apparatus bays. The total cost estimate for this project is $3,993,000.

**Fire Station 31:** This project will demolish the current 41-year-old station at 6002 Camino Rico in Del Cerro and replace it with a new station at the same location. The new 8,089 square foot facility will house one engine and one ambulance. There will be individual dorm space for six fire personnel and three apparatus bays. The total cost estimate for this project is $2,293,800.

**Fire Station 32:** This 40 year old station, located at 484 Briarwood Road, will be relocated to the vicinity of Skyline Dr. and Sychar Rd. The new 6,400 square foot facility will house one engine and one ambulance. The current crew and apparatus will be relocated to the new location. There will be individual dorm space for six fire personnel and two apparatus bays. The total cost estimate for this project is $3,333,000.

**Fire Station 54:** This project will construct a new fire station in the vicinity of Saipan Dr. and Potomac St. in Paradise Hills. The 6,400 square foot facility will house one engine and one ambulance. There will be individual dorm space for six fire personnel and two apparatus bays. The total cost estimate for this project is $3,112,000.

**Major Components:** This project will consist of capital improvements at numerous fire stations throughout the City. They include: electrical upgrades (9 stations), new apparatus doors (17 stations), new emergency generators (21 stations), new roofs (14 stations), exterior renovations (19 stations), interior remodels (38 stations), and driveway repair (20 stations). Phase I of this project is scheduled to be completed by the end of April 2002 and Phase II is scheduled to be completed by mid-2005. The total cost estimate for this project is $4,200,000.

**Kearny Villa Repair Facility:** This project provides for improvements to a 35-year-old vehicle repair shop. The total cost estimate for this project is $428,000.

*Lifeguard Station Projects*

**South Pacific Beach Lifeguard Station & Restroom:** The proposed project will remove the existing station and will design and construct a new 4,341 square foot lifeguard station with an observation tower, ready room/kitchen, first aid room, reception area, flexible locker rooms, staff restrooms, office space for two, sleeping quarters, stairwell, corridor with washer/dryer area, equipment room, garage for four vehicles and two boats. The project will also design and build a separate 1,025 square foot comfort station and will create a plaza by improving 21,888 square feet of hard scape and landscape around the two buildings. The total cost estimate for this project is $1,989,000.

**North Pacific Beach Lifeguard Station:** The proposed project will remove the existing seasonal lifeguard station and the sand mound and will design and construct a new 3,213 square foot lifeguard station with an observation tower, ready room/kitchen, first aid room, reception area, flexible locker rooms, staff restrooms, office space for one, stairwell, corridor with washer/dryer area, workout room, equipment room, garage for two vehicles and one boat. The total cost estimate for this project is $1,232,000.

**La Jolla Shores Lifeguard Station:** The proposed project will remove the interior improvements of the existing station and will design and construct a new 3,317 square foot addition to the lifeguard station. The total building size will be approximately 3,872 square feet with an observation tower, ready room/kitchen, first aid room, reception area, flexible locker rooms, staff restrooms, office space for two, sleeping quarters, stairwell, corridor with washer/dryer area, workout room, equipment room, garage for three vehicles and one boat. The total cost estimate for this project is $1,252,000.

**South Mission Beach Lifeguard Station:** The proposed project will remove the existing station and will design and construct a new 3,258 square foot lifeguard station. The new station will have an observation tower, ready room/kitchen, first aid room, reception area, flexible locker rooms, staff restrooms, office space for one, stairwell, corridor with washer/dryer area, workout room, equipment room, and a garage for two vehicles and one boat. The total cost estimate for this project is $1,141,000.

**La Jolla Cove Lifeguard Station:** The proposed project will remove the existing station and will design and construct a new 826 square foot lifeguard station. The new station will have an observation tower, ready room/kitchen (2 staff max), first aid room (1 person), reception area, flexible locker rooms, staff restrooms (unisex), stairwell, and an equipment room. The total cost estimate for this project is $481,000.

**Children's Pool Lifeguard Station:** The proposed project will remove the existing station and will design and construct a new 1,526 square foot lifeguard station. The new station will have an observation tower, ready room/kitchen, first aid room (1 person), small reception area, flexible locker rooms, office space for two, sleeping quarters, stairwell, and an equipment room. The total cost estimate for this project is $643,000.

**Ocean Beach Lifeguard Station:** The proposed project will modify and upgrade the existing facility to better accommodate the needs of the lifeguards. The total cost estimate for this project is $470,000.

**Mission Beach Lifeguard Station:** The proposed project will modify and upgrade the existing facility to better accommodate the needs of the lifeguards. The total cost estimate for this project is $429,000.

**Lifeguard Headquarters and Boating Safety Unit Dock:** The proposed new building would accommodate 36 lifeguards, including 24 hour staff, and storage for boating safety equipment, cliff rescue equipment and river rescue equipment. In addition, replacement of the existing dock which was also built in 1956 is needed to accommodate the Lifeguard Service's fleet of vessels. This project is part of the Mission Bay Headquarters Project which includes

construction of the lifeguard, police, and park and recreation headquarters for a total cost of $8.3 million. The estimated cost for the lifeguard portion of this project, expected to be funded with the proceeds of the Bonds, is $2,300,000.

**Old Mission Beach Station:** This project involves the acquisition of land for a permanent facility to replace the existing seasonal station which is inadequate to serve the area. This project does not involve the design or construction of a new facility, only the land acquisition for development at a later date. The future permanent facility would include an observation tower, first aid room, reception area, kitchen, locker room/restroom area for males and females and a garage for rescue vehicles and equipment. The land acquisition process is currently projected to begin in FY 2003. The land acquisition is not expected to require environmental assessment or Coastal Commission permits. The total estimated cost for the land acquisition is $1,000,000.

The Lease provides that the City shall have the right to substitute the Project or any component thereof for another Project or, in the event the actual cost of construction or acquisition of the Project is less than that estimated by the City, to add a new component of the Project (or any part thereof) in an amount equal to the difference between such estimated and actual cost of construction or acquisition, but only: (i) by providing the Trustee with an amendment or supplement to the Lease providing for the substitution; and (ii) by delivering or causing to be delivered to the Authority a bill of sale or other evidence of cost therefor.

## THE LEASED PROPERTY

The City will be obligated to make Base Rental Payments pursuant to the Lease for the use and occupancy of the Leased Property. On the delivery date of the Bonds, the Leased Property is expected to consist of the following distinct parcels of real property, all of which are currently used as fire stations:

| Station No. | Location | Building Size Sq. Ft. | Year Built | Site Size (Acres) | Construction Material |
|---|---|---|---|---|---|
| 9 | 7870 Ardath Lane | 6,482 | 1979 | 1.15 | Wood/Stucco |
| 11 | 945 25th Street | 11,050 | 1995 | 0.29 | Wood Frame |
| 14 | 4011 32nd Street | 7,129 | 1992 | 0.32 | Wood Frame |
| 16 | 2110 V. Casa Alta, La Jolla | 3,036 | 1983 | 0.82 | Wood Frame |
| 20 | 3305 Kemper (Sports Arena) | 7,280 | 1993 | 0.71 | Concrete Block |
| 24 | 13077 Hartfield | 6,809 | 1993 | 1.91 | Concrete Block |
| 28 | 3750 Kearny Villa/Aero | 11,563 | 1990 | 1.47 | Wood Frame |
| 37 | 11640 Spring Canyon | 8,400 | 2001 | 1.09 | Concrete Block |
| 41 | 4914 Carroll Canyon Road | 7,227 | 1990 | 1.03 | Concrete Block |
| 42 | 12110 World Trade Drive | 5,100 | 1988 | 1.00 | Wood/Stucco |
| 44 | 10011 Black Mountain Road | 9,430 | 2000 | 1.64 | Wood Frame & PEB (steel) |

The City has determined that the aggregate fair market rental value of the Leased Property is equal to or greater than the Base Rental payable under the Lease in each fiscal year of the City.

The City has agreed to maintain, preserve and keep the Leased Property in good repair, working order and condition, and from time to time make or cause to be made all necessary and proper repairs, replacements and renewals. The Authority has no responsibility for such matters. The City must pay or cause to be paid all taxes, governmental charges and assessments and utility charges with respect to the Leased Property. See **"APPENDIX C – DEFINITIONS AND SUMMARY OF CERTAIN PROVISIONS OF THE LEGAL DOCUMENTS – The Lease."**

The City and the Authority have the power to amend the Lease to substitute additional real property and/or improvements for existing Leased Property or to remove real property or improvements from the definition of Leased Property, upon compliance with all of the conditions set forth for such substitution or removal of Leased Property in the Facilities Facility Lease. See **"RISK FACTORS – Substitution and Removal of Leased Property."**

## RISK FACTORS

The following factors, along with all other information in this Official Statement, should be considered by potential investors in evaluating the investment risks inherent in purchasing the Bonds.

### Bonds Not General Obligation Debt of City or State

Neither the Bonds nor the obligation of the City to make Base Rental Payments under the Lease constitutes an obligation of the City for which the City is obligated to levy or pledge any form of taxation or for which the City has levied or pledged any form of taxation. The Authority has no taxing power. Neither the Bonds nor the obligation of the City to make such Base Rental Payments constitutes an indebtedness of the City, the State of California or any political subdivision thereof within the meaning of any constitutional or statutory debt limitation or restriction.

### Base Rental Payments

Base Rental Payments are to be paid by the City from any and all General Fund monies legally available to the City. In the event the City's revenue sources are less than its total Base Rental obligations, the City could choose to fund other municipal services before making Base Rental Payments. (Should such a failure occur, it would be an Event of Default under the Lease and the Trustee could pursue available remedies.) The same result could occur if, because of State Constitutional limits on expenditures, the City is not permitted to appropriate and spend all of its available revenues. The City's appropriations currently do not exceed the limitation on appropriations under Article XIII B of the California Constitution. See "APPENDIX A – THE CITY OF SAN DIEGO – Limitations on Taxes and Appropriations."

There are no legal limitations on the ability of the City to enter into other obligations that may constitute additional charges against its General Fund monies. To the extent that additional obligations are incurred by the City, the General Fund monies available to make Base Rental Payments may be decreased. The City is currently liable on other obligations payable from its General Fund and may incur additional obligations payable from its General Fund. See "APPENDIX A – THE CITY OF SAN DIEGO – Bonded and Other Indebtedness."

### Abatement

Base Rental Payments and Additional Rental may be abated in accordance with the Lease if there is substantial interference with the City's use and possession of any portion of the Leased Property due to damage, destruction, title defect or condemnation. The amount of abatement shall be such that the resulting Base Rental Payments and Additional Rental represent fair consideration for the use and possession of the remaining portions of the Leased Property as to which such damage, destruction, title defect or condemnation do not substantially interfere with the use and right of possession by the City. Such abatement shall continue for the period commencing with the date of the substantial interference due to damage, destruction, title defect or condemnation and ending with the substantial completion of the work of repair or replacement of the portions of the Leased Property so damaged, destroyed, defective or condemned. Such reduced or abated Base Rental Payments and Additional Rental, together with other monies available to the Trustee, may not be sufficient, after exhaustion of applicable use and occupancy insurance proceeds and depletion of amounts in the Reserve Account and in the Interest and Principal Accounts of the Bond Fund, to pay principal of and interest on the Bonds in full or in a timely manner. The failure of the City to make Base Rental Payments or Additional Rental Payments because of an abatement would not, under such circumstances, constitute a default under the Lease.

Under the Lease, the City must maintain use and occupancy insurance coverage in an amount sufficient to make Base Rental Payments for a period of at least twenty-four months during which the use of the Leased Property is interrupted as a result of any of the hazards covered by the fire, lightning, earthquake and extended coverage insurance which the City is required to maintain. Such insurance shall be maintained throughout the term of the Lease. There can be no assurance that in the event of such interruption any amounts will be payable pursuant to such insurance or will be adequate to cover Base Rental Payments abated or reduced during the period of interruption.

The Lease requires the City to apply insurance proceeds to repair, reconstruct or replace the Leased Property if to do so would fully restore the Leased Property. In the event that the insurance proceeds are not sufficient to fully restore the Leased Property, the City may elect to budget and appropriate additional funds and fully restore the Leased

Property. If the City does not make such an election and the available insurance proceeds are at least sufficient to redeem all of the Outstanding Bonds, at par plus accrued interest, then the insurance proceeds shall be used for that purpose; in the event the insurance proceeds are not so sufficient, the City may elect to (i) budget and appropriate additional funds so that the available insurance proceeds and such additional funds are sufficient to redeem all of the Outstanding Bonds at par plus accrued interest, in which case the same shall be used for this purpose, or (ii) to redeem a portion of the Outstanding Bonds, provided that the fair rental value of the portions of the Leased Property not damaged, destroyed, incomplete or otherwise available for use and occupancy by the City, as determined by the City, is equal to or greater than the debt service on the Bonds that will remain outstanding following the redemption of the Bonds in part from such insurance proceeds. Further, the Lease provides that if there are not sufficient Net Proceeds received from casualty insurance so as to redeem all of the Outstanding Bonds and the City elects not to budget and appropriate additional funds necessary to redeem all of the Outstanding Bonds, then such proceeds will be used to repair, reconstruct or replace the Leased Property. See "SECURITY AND SOURCES OF PAYMENT FOR THE BONDS – Insurance" and "APPENDIX C – DEFINITIONS AND SUMMARY OF CERTAIN PROVISIONS OF THE LEGAL DOCUMENTS – The Lease."

The application of proceeds received from an award in condemnation or payment under a title insurance policy will depend upon the extent of the condemnation of, or title defects relating to, the Leased Property. If any portion of the Leased Property has been affected by condemnation or a title defect which will result in an abatement of Base Rental Payments payable by the City under the Lease, then the Trustee shall use the proceeds available from condemnation or any policy of title insurance to redeem Outstanding Bonds.

**Seismic Considerations**

The areas in and surrounding the Leased Property, like those in much of California, may be subject to unpredictable seismic activity. The Leased Property is located near active fault lines. An occurrence of severe seismic activity in the area of the Leased Property could result in substantial damage to and interference with the City's right to use and occupy all or a portion of the Leased Premises, which could further result in Base Rental payments being subject to abatement. See "Abatement" above. See "THE LEASED PROPERTY" herein.

**Hazardous Substances**

Among the most serious factors in terms of the potential reduction in the sale and/or rental value of real property are costs or liabilities in connection with the presence of hazardous substances. In general, the owners and operators of real property may be required by law to remedy conditions relating to releases or threatened releases of hazardous substances. The federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, sometimes referred to as "CERCLA" or "Superfund Act," is the most well known and widely applicable of these laws, but California laws with regard to hazardous substances are also stringent and similar. Under many of these laws, the owner (or operator) is obligated to remedy a hazardous substance condition of property whether or not the owner (or operator) has anything to do with creating or handling the hazardous substance. It is possible that the discovery of a hazardous substance could affect the ability of the Trustee to re-let the Leased Property or the amount of rent that could be obtained for the Leased Property if the City were to default on its obligations under the Lease, in which event, the holders of the Bonds would not receive their respective payments when due. Also, the effect, should the Leased Property be affected by a hazardous substance, is to reduce its marketability and value by the costs of remedying the condition and the amount of related damages and expenses.

The City is not aware of any hazardous substance problems at the Leased Property which would have a material effect on the value of the collateral for the Bonds. It is possible that liabilities may arise in the future with respect to the Leased Property resulting from the existence of a substance not presently classified as hazardous, but which may in the future be so classified. Such liabilities may arise not simply from the existence of a hazardous substance, but from the method of handling it. All of these possibilities could significantly affect both the sale and the fair rental value of the Leased Property.

**Limited Recourse on Default; No Acceleration of Base Rental**

Failure by the City to make Base Rental Payments or other payments required to be made under the Lease, or failure to observe and perform any other terms, covenants or conditions contained in the Lease or in the Indenture for a period of 30 days after written notice of such failure and request that it be remedied has been given to the City by the

18

Authority or the Trustee, constitute events of default under the Lease and permit the Trustee or the Authority to pursue any and all remedies available. In the event of a default, notwithstanding anything in the Lease or in the Indenture to the contrary, THERE SHALL BE NO RIGHT UNDER ANY CIRCUMSTANCES TO ACCELERATE THE BASE RENTAL PAYMENTS OR OTHERWISE DECLARE ANY BASE RENTAL PAYMENTS NOT THEN IN DEFAULT TO BE IMMEDIATELY DUE AND PAYABLE, NOR SHALL THE AUTHORITY OR THE TRUSTEE HAVE ANY RIGHT TO REENTER OR RELET THE LEASED PROPERTY EXCEPT AS DESCRIBED IN THE LEASE.

The enforcement of any remedies provided in the Lease and the Indenture could prove both expensive and time consuming. If the City defaults on its obligation to make Base Rental Payments with respect to the Leased Property, the Authority or the Trustee may retain the Lease and hold the City liable for all Base Rental Payments as each becomes due and enforce any other term or provision of the Lease to be kept or performed by the City. There is no remedy of acceleration of the total Base Rental Payments due over the term of the Lease, and the Trustee would be required to seek a separate judgment each year for that year's defaulted Base Rental Payments.

Alternatively, the Authority or the Trustee may terminate the Lease, retake possession of the Leased Property and proceed against the City to recover damages pursuant to the Lease. Due to the specialized nature of the Leased Property or any property substituted therefor pursuant to the Lease, no assurance can be given that the Trustee will be able to re-let the Leased Property so as to provide rental income sufficient to make all payments of principal of and interest on the Bonds when due, and the Trustee is not empowered to sell the Leased Property for the benefit of the Owners of the Bonds. Any suit for money damages would be subject to limitations on legal remedies against cities in California, including a limitation on enforcement of judgments against funds needed to serve the public welfare and interest. See "SECURITY AND SOURCES OF PAYMENT FOR THE BONDS" and "APPENDIX C – DEFINITIONS AND SUMMARY OF CERTAIN PROVISIONS OF THE LEGAL DOCUMENTS."

**Possible Insufficiency of Insurance Proceeds**

The Lease obligates the City to keep in force various forms of insurance, subject to deductibles, for repair or replacement of the Leased Property in the event of damage, destruction or title defects, subject to certain exceptions. The City and the Authority make no representation as to the ability of any insurer to fulfill its obligations under any insurance policy obtained pursuant to the Lease and no assurance can be given as to the adequacy of any such insurance to fund necessary repair or replacement or to pay principal of and interest on the Bonds when due. In addition, certain risks, such as earthquakes, may not always be covered by such insurance and in any event the required earthquake insurance amount is only $50 million. See "SECURITY AND SOURCES OF PAYMENT FOR THE Bonds – Insurance."

**Limitations on Remedies Available to Owners of the Bonds**

The enforceability of the rights and remedies of the Owners of the Bonds and the obligations incurred by the City are subject to the following: the Federal Bankruptcy Code and applicable bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or affecting the enforcement of creditors' rights generally, now or hereafter in effect; equity principles which may limit the specific enforcement under State law of certain remedies; the exercise by the United States of America of the powers delegated to it by the Federal Constitution; and the reasonable and necessary exercise, in certain exceptional situations, of the police power inherent in the sovereignty of the State of California and its governmental bodies in the interest of serving a significant and legitimate public purpose. Bankruptcy proceedings, or the exercise of powers by the federal or State government, if initiated, could subject the Owners of the Bonds to judicial discretion and interpretation of their rights in bankruptcy or otherwise, and consequently entail risks of delay, limitation, or modification of the principal legal documents or their rights.

**Other Financial Matters**

See "APPENDIX A – THE CITY OF SAN DIEGO – Municipal Government and Financial Information – Fiscal Year 2001" and "Fiscal Year 2002 (Adopted Budget)," and "Proposed Vehicle License Fee Reduction"; see also "APPENDIX A – Bonded And Other Indebtedness – Possible Additional General Fund Lease Obligations" for information on the possible incurrence by the City of additional financial obligations payable from the General Fund on a parity with Base Rental Payments.

See also "LEGAL MATTERS – Litigation Matters."

19

~ 43 ~

## THE AUTHORITY

The Authority is a joint powers authority formed by a Joint Exercise of Powers Agreement dated as of May 14, 1991, as amended and restated as of January 11, 1999, between the City and the Redevelopment Agency of the City of San Diego by authority of Sections 6500 *et seq.* of the California Government Code. The Authority was established to assist the City with respect to the financing of public capital improvements.

## LEGAL MATTERS

### Tax Exemption

In the opinion of Hawkins, Delafield & Wood, Bond Counsel, under existing statutes and court decisions and assuming continuing compliance with certain tax covenants described herein, interest on the Bonds is excluded from gross income for Federal income tax purposes pursuant to Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"). Interest on the Bonds is not treated as a preference item in calculating the alternative minimum tax imposed on individuals and corporations under the Code; such interest, however, is included in the adjusted current earnings of certain corporations for purposes of calculating the alternative minimum tax imposed on such corporations. In rendering its opinion, Bond Counsel has relied on certain representations, certifications of fact, and statements of reasonable expectations made by the Authority and the City in connection with the Bonds, and Bond Counsel has assumed compliance by the Authority and the City with certain ongoing covenants to comply with applicable requirements of the Code to assure the exclusion of interest on the Bonds from gross income under Section 103 of the Code.

In addition, in the opinion of Bond Counsel, under existing statutes, interest on the Bonds is exempt from personal income taxes imposed by the State of California.

Bond Counsel expresses no opinion regarding any other Federal or state tax consequences with respect to the Bonds. Bond Counsel renders its opinion under existing statutes and court decisions as of the issue date, and assumes no obligation to update its opinion after the issue date to reflect any future action, fact or circumstance, or change in law or interpretation, or otherwise. Bond Counsel expresses no opinion on the effect of any action hereafter taken or not taken in reliance upon an opinion of other counsel on the exclusion from gross income for Federal income tax purposes of interest on the Bonds, or under state and local tax law.

### Certain Ongoing Federal Tax Requirements and Covenants

The Code establishes certain ongoing requirements that must be met subsequent to the issuance and delivery of the Bonds in order that interest on the Bonds be and remain excluded from gross income under Section 103 of the Code. These requirements include, but are not limited to, requirements relating to use and expenditure of gross proceeds of the Bonds, yield and other restrictions on investments of gross proceeds, and the arbitrage rebate requirement that certain excess earnings on gross proceeds be rebated to the Federal government. Noncompliance with such requirements may cause interest on the Bonds to become included in gross income for Federal income tax purposes retroactive to their issue date, irrespective of the date on which such noncompliance occurs or is discovered. The Authority and the City have covenanted to comply with certain applicable requirements of the Code to assure the exclusion of interest on the Bonds from gross income under Section 103 of the Code.

### Certain Collateral Federal Tax Consequences

The following is a brief discussion of certain collateral Federal income tax matters with respect to the Bonds. It does not purport to address all aspects of Federal taxation that may be relevant to a particular owner of a Bond. Prospective investors, particularly those who may be subject to special rules, are advised to consult their own tax advisors regarding the Federal tax consequences of owning and disposing of the Bonds.

Prospective owners of the Bonds should be aware that the ownership of such obligations may result in collateral Federal income tax consequences to various categories of persons, such as corporations (including S corporations and foreign corporations), financial institutions, property and casualty and life insurance companies, individual recipients of Social Security and railroad retirement benefits, individuals otherwise eligible for the earned income tax credit, and

taxpayers deemed to have incurred or continued indebtedness to purchase or carry obligations the interest on which is not included in gross income for Federal income tax purposes. Interest on the Bonds may be taken into account in determining the tax liability of foreign corporations subject to the branch profits tax imposed by Section 884 of the Code.

Legislation affecting municipal bonds is regularly under consideration by the United States Congress. There can be no assurance that legislation enacted or proposed after the date of issuance of the Bonds will not have an adverse effect on the tax-exempt status or market price of the Bonds.

## Original Issue Discount

Original issue discount ("OID") is the excess of the sum of all amounts payable at the stated maturity of a Bond (excluding certain "qualified stated interest" that is unconditionally payable at least annually at prescribed rates) over the issue price of that maturity. In general, the "issue price" of a maturity means the first price at which a substantial amount of the Bonds of that maturity was sold (excluding sales to bond houses, brokers, or similar persons acting in the capacity as underwriters, placement agents, or wholesalers). In general, the issue price for each maturity of Bonds is expected to be the initial public offering price set forth on the cover page of this Official Statement. Bond Counsel further is of the opinion that, for any Bonds having OID (a "Discount Bond"), OID that has accrued and is properly allocable to the owners of the Discount Bonds under Section 1288 of the Code is excludable from gross income for Federal income tax purposes to the same extent as other interest on the Bonds.

In general, under Section 1288 of the Code, OID on a Discount Bond accrues under a constant yield method, based on periodic compounding of interest over prescribed accrual periods using a compounding rate determined by reference to the yield on that Discount Bond. An Owner's adjusted basis in a Discount Bond is increased by accrued OID for purposes of determining gain or loss on sale, exchange, or other disposition of such Bond. Accrued OID may be taken into account as an increase in the amount of tax-exempt income received or deemed to have been received for purposes of determining various other tax consequences of owning a Discount Bond even though there will not be a corresponding cash payment.

Owners of Discount Bonds should consult their own tax advisors with respect to the treatment of original issue discount for Federal income tax purposes, including various special rules relating thereto, and the state and local tax consequences of acquiring, holding, and disposing of Discount Bonds.

## Bond Premium

In general, if an Owner acquires a Bond for a purchase price (excluding accrued interest) or otherwise at a tax basis that reflects a premium over the sum of all amounts payable on the Bond after the acquisition date (excluding certain "qualified stated interest" that is unconditionally payable at least annually at prescribed rates), that premium constitutes "bond premium" on that Bond (a "Premium Bond"). In general, under Section 171 of the Code, an owner of a Premium Bond must amortize the bond premium over the remaining term of the Premium Bond, based on the owner's yield over the remaining term of the Premium Bond, determined based on constant yield principles. An Owner of a Premium Bond must amortize the bond premium by offsetting the qualified stated interest allocable to each interest accrual period under the owner's regular method of accounting against the bond premium allocable to that period. In the case of a tax-exempt Premium Bond, if the bond premium allocable to an accrual period exceeds the qualified stated interest allocable to that accrual period, the excess is a nondeductible loss. Under certain circumstances, the Owner of a Premium Bond may realize a taxable gain upon disposition of the Premium Bond even though it is sold or redeemed for an amount less than or equal to the owner's original acquisition cost. Owners of any Premium Bonds should consult their own tax advisors regarding the treatment of bond premium for Federal income tax purposes, including various special rules relating thereto, and state and local tax consequences, in connection with the acquisition, ownership, amortization of bond premium on, sale, exchange, or other disposition of Premium Bonds.

## Legal Opinions

Bond Counsel will render an opinion with respect to the validity of the Bonds. A complete copy of the proposed opinion of Bond Counsel is set forth in Appendix F hereto. Certain legal matters will be passed upon for the Authority and the City by the City Attorney.

~ 45 ~

**Litigation Matters**

*No Pending Litigation.* There is no litigation against the Authority or the City pending or, to the knowledge of the officers of the Authority and the City, threatened, in any court or other tribunal of competent jurisdiction, state or federal, in any way (i) restraining or enjoining the issuance, sale or delivery of any of the Bonds; (ii) questioning or affecting the validity of the Bonds; (iii) questioning or affecting the validity of any of the proceedings for the authorization, sale, execution or delivery of the Bonds; or (iv) questioning or affecting the validity or enforceability of the Lease or the Indenture. To the knowledge of the Authority, the City and the City Attorney, there are pending against the City lawsuits and claims arising in the ordinary course of the City's activities which, taken individually or in the aggregate, could materially affect the City's finances. However, taking into account insurance and self-insurance reserves expected to be available to pay liabilities arising from such actions, the City does not expect any or all of such claims to have a material adverse effect on its ability to make Base Rental Payments when due.

*De La Fuente Border Business Park v. City of San Diego.* On January 2, 2001, a San Diego County Superior Court jury returned a special verdict in the amount of $94.5 million against the City. The jury award consisted of three parts: $29.2 million for breach of a development agreement; $25.5 million for inverse condemnation relating to planning of a regional airport; and, $39.8 million for inverse condemnation relating to excessive traffic. Claims for interest, costs, and attorneys' fees could bring the total judgment to more than $200.0 million.

The lawsuit arises out of a 1986 development agreement (the "Development Agreement") between the City and Border Business Park, Inc., relating to the development of a 312-acre industrial park in Otay Mesa, a community within the boundaries of the City and just north of the United States-Mexican border. Plaintiff alleges the City engaged in a pattern of conduct aimed at thwarting the developer's rights under the Development Agreement, which resulted in breaches of the Development Agreement and unconstitutional "takings" of private property for public use. Specifically, plaintiff claimed the City "took" plaintiff's property by: (i) publicly discussing a proposal to build an international airport in the Otay Mesa region; and (ii) diverting commercial truck traffic onto public streets adjacent to plaintiff's property.

The specific breaches of the Development Agreement alleged in the lawsuit include: changes in city-wide construction standards; denials of conditional use permits; delays in permit processing; imposition of Housing Trust Fund Fees; diversion of Development Impact Fees; and the mismanagement of adjacent City-owned property. The disclosure of plans for a new regional airport, and the diversion of border-bound traffic, which were the bases for the inverse condemnation awards, were also alleged as contract breaches.

Following the special verdict but before entry of the judgment, the trial judge disqualified himself from further proceedings in the case for allegedly failing to disclose personal relationships with one of the plaintiff's attorneys. The case was transferred to another judge outside of San Diego County who will sit for all purposes, including a new trial.

The City has retained two law firms to represent it in post trial motions and any appeals. Such motions and potential appeals pertain to the validity of the disqualified trial judge's pre-trial and trial rulings, and the validity of the underlying verdict.

As the result of a recent hearing on the City's post-trial motions before the newly assigned judge, the judge reduced the plaintiff's pre-judgment interest claim from $144.0 million to about $26.0 million. The court subsequently entered judgment on the verdict amount ($94.5 million), plus the pre-judgment interest for a total of $119.0 million.

In addition, the court has denied the City's motion for judgment notwithstanding the verdict and motion to set aside the verdict on the grounds of fraud. It did, however, grant the City a complete new trial on one legal theory, a contract claim, and set aside award of the damages on that theory (in the amount of $29.2 million of the $94.5 million). The court also found the contract claim largely barred by the time limits in the Government Claims Act.

The court denied the City a new trial on the remaining claims in the case for inverse condemnation, relating to the airport study and truck routing, finding that he needed to defer to the original judge on these matters. This has the effect of leaving in place $65.3 million in inverse condemnation damages, plus approximately $26.0 million in pre-judgment interest. The total judgment, including pre-judgment interest, is currently approximately $91.3 million.

22

Appellate counsel for the City has advised that the City should have no obligation to pay these amounts until the appeal is concluded, which will take at least eighteen months to two years. The City will also be responsible for any post-trial interest, which will accrue at the rate of approximately 5.7% per annum, until any judgment is paid.

The City believes that a significant portion of its defense costs—both retroactive to the exhaustion of the self-insured retention of $1.0 million and prospectively through appeal— will be paid in large part by one or more of the City's insurers. The City may have some coverage for damages under its policies of insurance but the amount and scope of the coverage is not presently known. A number of insurers whose policies may cover defense costs and any judgment have challenged the applicability of their policies. Please see "Insurance Coverage Issues" below.

Despite the denial of certain of the post-trial motions, the City believes it has sound legal theories for its appeal; however, no assurance can be given that the City's pursuit of this challenge will be successful. In the event that the City is not successful on appeal, and on retrial, if any, the judgment, including any interest, will have to be paid from the City's treasury, most likely over a period of ten years with additional interest during that period, to the extent that there is not insurance coverage or a shortfall in coverage.

Because there is no final judgment at this time, given the court's partial grant of the City's new trial motion, the City has not included in its budget for the 2002-2003 Fiscal Year any moneys for the payment of any judgment in this case.

On November 7, 2001, the plaintiff filed a motion with the trial court asking that the City deposit in trust into the court, the full judgment amount of $92.4 million which includes some post-judgment interest, pending the City's appeal. The court denied the plaintiff's motion. Litigation counsel has advised that if plaintiff seeks discretionary review of the denial of the motion for deposit, the plaintiff must have done so within approximately sixty days after entry of the order on November 19, 2001. As of the date hereof, no such discretionary review has been sought.

While the City believes that it will prevail in any appeal of the denial of the motion for deposit, there can be no assurance that either the trial court or an appellate court will not impose a duty to deposit. Should that occur, the City would expect to deposit the funds from general funds of the City, if it is unsuccessful in obtaining a favorable outcome in an appellate court. If the City must fund the full amount of the deposit from its general funds, this could have an adverse effect on its ability to fund its budgeted expenditure items.

**Insurance Coverage Issues**

On April 9, 2002, three of the City's general liability insurers filed a federal court lawsuit against the City in the Southern District of California, *Insurance Company of the State of Pennsylvania, et al.* v. *City of San Diego*, Case No. 02 CV 0693 JM (RBB). These insurers provided coverage to the City for the years 1991 to 2001, and they collectively insured the City for policy limits of $25 million per occurrence per year (less the City's self-insured retention, which ranges from $1 million to $3 million). The insurers' lawsuit seeks a declaration that the insurers are not obligated to defend or indemnify the City for any liability it may suffer in the *De La Fuente* matter.

The City's other two liability insurers did not join in this lawsuit, although they are not precluded from joining in this lawsuit or filing a separate lawsuit. The non-suing liability insurers issued coverage to the City for the 1990-91 policy year, with collective limits of $17 million per occurrence. One of them (with policy limits of $2 million per occurrence) has indicated by letter to outside counsel that it will accept coverage for one occurrence, while reserving its rights to dispute that there is more than one occurrence.

The suing insurers are disputing coverage on the ground that the City allegedly provided late notice of the claims against it, and based upon alleged policy exclusions for breach of contract and inverse condemnation claims. Although one suing insurer has been paying a significant portion of the City's defense costs in the *De La Fuente* matter to date (about 60%), and has orally agreed to continue defending despite filing the coverage lawsuit, that insurer seeks to be relieved of the defense obligation by court order. If the insurers were to prevail on this complaint, the City would lose insurance coverage for its future attorneys' fees and costs incurred in defending the *De La Fuente* matter, and for any damages ultimately awarded in those cases, from these insurers. In the opinion of outside counsel, the City would not owe

~ 47 ~

any damages to the insurance companies, even if it lost coverage, except in the unlikely event that the Court ordered the City to reimburse suing insurer(s) for past defense costs it has paid to the City.

On May 7, 2002, the City filed an answer and counterclaim in the lawsuit. The City seeks a determination that a suing insurer is obligated to defend the City in the *De La Fuente* matter. In addition, the City seeks to recover damages for breach of contract and bad faith. However, no prediction can be made as to the outcome of this litigation.

**City Voter Initiatives**

An initiative proposing an amendment to the San Diego City Charter was submitted to the City voters at the election on the March 5, 2002. This initiative appeared on the ballot as Proposition E. The initiative asked the voters whether the City Charter should be amended to require that any increase in an existing general tax or imposition of any new general tax be levied by the City Council only if the proposed levy has been approved by a two-thirds vote of the qualified electors voting on the proposed tax measure.

At that same election, another proposition was submitted to the voters for consideration. This proposition, Proposition F, asked the voters whether the City Charter should be amended to require that, in order to be adopted or effective, any City Charter amendment, ballot proposal, initiative, statute, law, or regulation requiring a greater than simple majority vote of the electorate, and which is proposed to be adopted on or after the date of this election, must be adopted by the same proportionate vote of the electorate. In effect, the adoption of this proposition would require that Proposition E would have to be approved by a two-thirds vote of the qualified electors voting in the March 5, 2002 election.

Proposition E was approved by 54.4% and Proposition F was approved by 50.3% of the voters in the March 5, 2002 election. Having received a majority vote, Proposition F was adopted. Proposition E, however, by the terms of Proposition F, was not adopted.

There have been two cases filed challenging the results of the March 5, 2002 election pertaining to Propositions E and F, *Teyssier v. City of San Diego, et. al.* and *Howard Jarvis Taxpayers Association v. City of San Diego et. al.* Both actions seek declaratory relief contending that Proposition F is unconstitutional. In addition, *Teyssier* seeks a writ of mandate directing the City to certify and record the adoption of Proposition E. Both matters allege (i) that Proposition F is preempted by the California Constitution, (ii) that it cannot affect an election held prior to its effective date, and (iii) that Proposition F, having received fewer votes than Proposition E, an alleged conflicting measure on the same ballot, should have been defeated.

The City believes that it will either prevail in the litigation or that if Proposition F fails, Proposition E will fail on the same grounds. Regardless of the outcome of the litigation, these lawsuits are unlikely to have any impact to the City's budget or revenue for Fiscal Year 2003, because they relate only to new or increased taxes. The City's proposed budget for Fiscal Year 2003 includes no projected revenues from any such tax enhancing measures.

**Other Litigation**

In February 2002, the Public Facilities Financing Authority of the City issued lease revenue bonds in the aggregate principal amount of $169,685,000 for the construction of a state-of-the art baseball park (the "Ballpark Bonds"). The Ballpark has been the subject of a variety of litigation. There are two actions pending in which alleged conflicts of interest of a former City Council member are addressed. The first of these actions is *Skane v. City of San Diego* (San Diego County Superior Court, Case No. GIC 752505), a taxpayers lawsuit, and the second is *City of San Diego, et al. v. All Persons Interested* (San Diego County Superior Court, Case No. GIC 763487), a validation action brought by the City. A third action, *Simmons v. City of San Diego, et al.* (San Diego County Superior Court, Case No. GIC 779299), is a purported "reverse" validation and a "citizen resident action" brought against the City, the Public Facilities Financing Authority of the City and others. On February 8, 2002, the City obtained a validation action judgment from the trial court in the *Simmons* matter. *Simmons* filed an appeal from the judgment against him, and that appeal is in process in the appellate court. The legal opinions delivered in connection with the Ballpark Bonds were qualified in certain respects. The validity of the Ballpark Bonds in light of the above mentioned actions remains undecided. Ballpark Bonds are payable from lease payments charged against the General Fund. The City cannot predict the outcome of the litigation or the impact of the

litigation on the General Fund. If the validity of the Ballpark Bonds is overturned, it is possible that claims by other parties related to the Ballpark Bonds could be made which may potentially involve expense to the General Fund.

On March 29, 2002, Brown Field Aviation Park, LLC ("BFAP"), filed a claim seeking damages in excess of $120 million, asserting that the City breached a Memorandum of Understanding regarding BFAP's exclusive right to negotiate its proposal to lease Brown Field and redevelop it. BFAP contends that when the City did not allow them to present their project to City Council the City failed to perform its contractual obligations and denied BFAP its contractual rights and a proper hearing. The City believes that BFAP's claim is without merit. On May 13, 2002, the City filed a denial of the claim. BFAP will have six months from the date of denial to file a complaint. The City cannot predict whether litigation may be filed, the outcome of the litigation or the impact of the litigation, if any, on the General Fund. If litigation is filed, and is successful, such litigation may potentially involve expense to the General Fund.

There are pending against the City, other lawsuits and claims arising in the ordinary course of the City's activities, which, taken individually or in the aggregate, could materially affect the City's finances. However and except as noted above, taking into account insurance and self-insurance reserves expected to be available to pay liabilities arising from such actions, the City does not expect any or all of such claims to have a material adverse effect on its ability to make Base Rental Payments when due.

**Legality for Investment in California**

Under provisions of the California Financial Code, the Bonds are legal investments for commercial banks in California to the extent that the Bonds, in the informed opinion of the bank, are prudent for the investment of funds of depositors, and, under provisions of the California Government Code, the Bonds are eligible for security for deposits of public moneys in the State.

## UNDERWRITING

The securities offered hereby are to be purchased by Morgan Stanley DW Inc. (the "Underwriter"). The Underwriter has agreed to purchase the Bonds offered hereby at a purchase price of $24,738,899.58 consisting of $25,070,000 principal amount of Bonds plus accrued interest of $44,949.58 and net premium of $68,237.25 less an underwriter's discount, including bond insurance premium, of $444,287.25. The Underwriter will purchase all the Bonds offered hereby if any are purchased. The Bonds may be offered and sold to certain dealers (including dealers depositing these securities into investment trusts) and others at prices lower than the initial public offering price, and the public offering price may be changed from time to time by the Underwriter.

## MISCELLANEOUS

**Ratings**

Fitch Ratings ("Fitch"), Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies ("S&P") have assigned their municipal bond ratings of "AAA", "Aaa" and "AAA", respectively to the Bonds, based upon the issuance by MBIA Insurance Corporation of a financial guaranty insurance policy. Fitch, Moody's and S&P have assigned underlying ratings of "AA+," "Aa3," and "AA-," respectively, to the Bonds. The ratings issued reflect only the views of such rating agencies, and any explanation of the significance of such ratings should be obtained from such rating agencies. There is no assurance that such ratings will be retained for any given period of time or that the same will not be revised downward or withdrawn entirely by such respective rating agencies if, in the judgment of such rating agencies, circumstances so warrant. Under its Continuing Disclosure Agreement (see **APPENDIX D**), the City has agreed to give notice of rating changes as an enumerated event, if material, in the manner described under "**CONTINUING DISCLOSURE.**" Any downward revision or withdrawal of any rating obtained may have an adverse effect on the market price of the Bonds.

**Financial Advisor**

The City has entered into an agreement with Kelling, Northcross & Nobriga (the "Financial Advisor"), a division of Zions First National Bank, whereunder the Financial Advisor provides financial recommendations and guidance

~ 49 ~

to the City with respect to preparation for sale of the Bonds, timing of sale, tax-exempt bond market conditions, costs of issuance and other factors related to the sale of the Bonds. The Financial Advisor has read and participated in the drafting of certain portions of this Official Statement. The Financial Advisor has not audited, authenticated or otherwise verified the information set forth in the Official Statement.

**Additional Information**

Copies of the Indenture, the Lease, the Site Lease, the Assignment Agreement and the Continuing Disclosure Agreement are available upon request with payment of copying, mailing and handling charges by contacting the City at the following address:

> The City of San Diego
> Office of the City Clerk
> City Administration Building
> 202 "C" Street, MS 2A
> San Diego, California 92101

**Execution and Delivery**

The execution and delivery of this Official Statement has been duly authorized by the Authority.

> PUBLIC FACILITIES FINANCING AUTHORITY
> OF THE CITY OF SAN DIEGO
>
>
> By: /s/ Joseph W. Craver
>        Chairman

~ 50 ~