EXHIBIT 12

**APPENDIX A**
**THE CITY OF SAN DIEGO**

*The information and expressions of opinion set forth herein have been obtained from sources believed to be reliable, but such information is not guaranteed as to accuracy or completeness. Statements contained herein which involve estimates, forecasts, or matters of opinion, whether or not expressly so described herein, are intended solely as such and are not to be construed as representations of facts. The information and expressions of opinion herein are subject to change without notice, and neither delivery of this Official Statement nor any sale thereafter of the securities offered hereby shall under any circumstances create any implication that there has been no change in the affairs of the City or in any other information contained herein since the date of the Official Statement.*

**INTRODUCTION**

With a total population of approximately 1.3 million in 2002, and a land area of 330 square miles, the City of San Diego (the "City") is the seventh largest city in the nation and the second largest city in California. The City is the county seat for the County of San Diego (the "County") and is the County's business and financial center.

Based on estimates published by the California Department of Finance in May 2002, the City's population grew by 9.7% between 1993 and 2002, with an average increase of approximately 12,300 annually. A major factor in the City's growth is its quality of life. In addition to having a favorable climate, the City offers a wide range of cultural and recreational services to both residents and visitors. With mild temperatures year round, the City's numerous beaches, parks, tennis courts, and golf courses are in constant use.

Another factor in the City's growth is its diversified economy. Recent growth has been concentrated in four major areas: high tech manufacturing and research (including electronics, telecommunications, scientific instruments, drugs, and biomedical equipment); professional services; tourism; and international trade. Historically, the City has also benefited from a stable economic foundation composed of basic manufacturing (ship building, industrial machinery, television & video equipment, and printing & publishing), public and private higher education, health services, military, and local government.

A - 1

## ECONOMIC AND DEMOGRAPHIC INFORMATION

*Data contained under this caption is intended to portray economic, demographic, and business trends within the City. While not constituting direct revenue sources as such, these trends help explain changes in revenue sources such as property taxes, sales taxes, and transient occupancy taxes, which could be affected by changes in economic conditions.*

### Population

As set forth in Table 1 below, between January 1, 1993, and January 1, 2002, the City's population has increased by 111,000 (or by approximately 12,300 new residents annually during this period).

### Table 1
### POPULATION GROWTH[1]
*Calendar Years 1993 through 2002*

| Calendar Year[2] | City of San Diego | Annual Growth Rate | County of San Diego | Annual Growth Rate | State of California | Annual Growth Rate |
|---|---|---|---|---|---|---|
| 1993 | 1,144,700 | 0.9% | 2,594,100 | 0.8% | 31,150,000 | 1.4% |
| 1994 | 1,144,200 | 0.0% | 2,604,400 | 0.4% | 31,418,000 | 0.9% |
| 1995 | 1,145,400 | 0.1% | 2,613,100 | 0.3% | 31,617,000 | 0.6% |
| 1996 | 1,146,900 | 0.1% | 2,621,100 | 0.3% | 31,837,000 | 0.7% |
| 1997 | 1,159,100 | 1.1% | 2,653,400 | 1.2% | 32,207,000 | 1.2% |
| 1998 | 1,176,900 | 1.5% | 2,702,800 | 1.9% | 32,657,000 | 1.4% |
| 1999 | 1,200,800 | 2.0% | 2,751,000 | 1.8% | 33,140,000 | 1.5% |
| 2000 | 1,221,200 | 1.7% | 2,805,900 | 2.0% | 33,753,000 | 1.8% |
| 2001 | 1,240,200 | 1.6% | 2,859,900 | 1.9% | 34,385,000 | 1.9% |
| 2002 | 1,255,700 | 1.2% | 2,918,300 | 2.0% | 35,037,000 | 1.9% |

(1) In May 2002, the California Department of Finance published revised population estimates for the years 1991 through 1999 in order to account for the 1990 Census undercount. These revised estimates increased the population estimates for the City, the County, and the State of California in the year 1991 and reduced the annual rates of growth in subsequent years.

(2) As of January 1 of the calendar year.

Source: State of California, Department of Finance

As indicated in the following table, attendance in kindergarten through grade 12 in the San Diego Unified School District shows a moderate overall growth in the five-year period from 1998–1999 to 2002-2003 school years. However, there has been a slight decline in enrollment in the last two school years. The San Diego Unified School District's boundaries include 85% of the City of San Diego's land area.

A-2

**Table 2**
**SAN DIEGO UNIFIED SCHOOL DISTRICT**
**ENROLLMENT[1]**
*School Year 1998-1999 through 2002-2003*

| School Year | Enrollment |
|---|---|
| 1998-1999 | 138,974 |
| 1999-2000 | 142,021 |
| 2000-2001 | 143,244 |
| 2001-2002 | 142,430 |
| 2002-2003 | 140,717 |

(1)  Enrollment is defined as the total number of students enrolled on a survey date in late September/early October of the school year.

Source: San Diego Unified School District, Pupil Accounting

**Employment Summary**

As seen in Table 3, the City's unemployment rate for calendar year 2002 averaged 4.4%, up from a rate of 3.3% during calendar year 2001. The City's 2002 unemployment rate was below both the national rate of 5.8% and the State's rate of 6.7%. During 2002, average employment in the City was up by approximately 10,710 from 2001 levels. Preliminary data for April 2003, the latest available data, indicates that the City's unemployment rate was 4.3%. Data for 2001 and 2002 reflect estimates, which will be revised at a future date.

**Table 3**
**ESTIMATED AVERAGE ANNUAL EMPLOYMENT AND**
**UNEMPLOYMENT OF CITY OF SAN DIEGO RESIDENT LABOR FORCE**
*Calendar Years 1998 through 2002*

|  | 1998 | 1999 | 2000 | 2001[1] | 2002[1] |
|---|---|---|---|---|---|
| **Civilian Labor Force** | | | | | |
| City of San Diego | | | | | |
| Employed | 584,100 | 604,700 | 623,200 | 633,620 | 644,330 |
| Unemployed | 21,700 | 19,600 | 19,600 | 21,620 | 29,410 |
| **Unemployment Rates** | | | | | |
| City | 3.6% | 3.1% | 3.1% | 3.3% | 4.4% |
| County | 3.5% | 3.1% | 3.0% | 3.2% | 4.3% |
| California | 5.9% | 5.2% | 4.9% | 5.3% | 6.7% |
| United States | 4.5% | 4.2% | 4.0% | 4.8% | 5.8% |

(1) Subject to future revision.

Source:  State of California Employment Development Department, Labor Market Information Division; and the U.S. Department of Labor, Bureau of Labor Statistics

Table 4 provides the California Employment Development Department's estimates of total annual nonagricultural wage and salary employment by major industry in the County from calendar years 1998 through 2002. Annual employment information is not regularly compiled by sector for the City alone. As shown, total nonagricultural wage and salary employment in the County increased by 139,200 new jobs during this period. During calendar year 2002, employment in San Diego County increased by 23,100 new jobs over the prior year.

**Table 4**
**SAN DIEGO COUNTY**
**WAGE AND SALARY EMPLOYMENT**
*Calendar Years 1998 through 2002*

| INDUSTRY CATEGORY | 1998 | 1999 | 2000 | 2001[1] | 2002[1] |
|---|---|---|---|---|---|
| Mining | 300 | 300 | 400 | 300 | 300 |
| Construction | 61,800 | 67,000 | 70,400 | 73,400 | 75,500 |
| Manufacturing | 127,600 | 128,100 | 129,700 | 130,600 | 128,300 |
|   Nondurable Goods | 35,800 | 36,500 | 37,800 | 37,500 | 37,600 |
|   Durable Goods | 91,800 | 91,600 | 91,900 | 93,100 | 90,700 |
| Transportation, Communications, Utilities[2] | 47,000 | 51,300 | 50,900 | 52,000 | 50,500 |
| Trade | 249,400 | 256,500 | 267,800 | 271,100 | 278,000 |
|   Wholesale | 48,300 | 50,300 | 52,300 | 50,300 | 50,200 |
|   Retail | 201,100 | 206,100 | 215,500 | 220,800 | 227,800 |
| Finance, Insurance, Real Estate | 65,300 | 68,700 | 69,800 | 70,800 | 72,300 |
| Services | 359,600 | 381,700 | 400,600 | 409,500 | 420,500 |
| Government | 194,500 | 199,300 | 206,800 | 213,900 | 219,400 |
|   Federal | 43,300 | 42,500 | 42,600 | 40,100 | 40,000 |
|   State and Local | 151,200 | 156,800 | 164,200 | 173,800 | 179,400 |
| TOTAL NONAGRICULTURAL[3] | 1,105,500 | 1,152,900 | 1,196,500 | 1,221,600 | 1,244,700 |

(1) Subject to future revision.
(2) Includes trucking and transit services, telephone and broadcast/cable services, and gas and electric services.
(3) Figures may not add to total due to independent rounding.

Source: State of California Employment Development Department

Since the industry employment data referenced above is organized by standard industrial classification codes, employment in the various high tech categories, such as Telecommunications, Software and Biotechnology may not fall into a single employment sector alone. For example, some telecommunications firms appear in Manufacturing, while others appear in Services.

Several key industry categories exhibited strong employment growth in calendar year 2002. The Services sector (+11,000) alone represented approximately half of total employment growth for the County. Within the Services sector, Health Services recorded the largest net gain, up by 2,500 jobs, followed by an increase of 1,400 jobs in Engineering and Management and an increase of 1,200 jobs in Business Services. Other key employment growth sectors during calendar year 2002 included Construction (+2,100), Wholesale and Retail Trade (+6,900), and Government (+5,500). Among the

A - 4

sectors that showed a decline in jobs in the calendar year 2002 were the Manufacturing sector (-2,300) and the Transportation, Communications, and Utilities Sector (-1,500).

The increase in the Government sector, which accounted for 18% of the total nonagricultural wage and salary employment in the County in 2002, occurred in State and local government agencies. Almost all of the increase in State and local government agencies is due to gains in public education and the Other Local Government category, which includes Special Districts and Indian Tribal Governments.

**Taxable Sales**

Taxable transactions at retail and other outlets in the City at the end of the First Quarter of 2002, the most recent data available from the California State Board of Equalization, totaled $3.9 billion, up 0.23% from the end of the First Quarter of 2001. Taxable transactions in the City during calendar year 2001 totaled approximately $16.4 billion, up 1.7% from 2000, and up 32.1% from 1997. The slight increase in taxable sales from calendar years 2000 to 2001 can be attributed to the general slow down of the economy. Table 5 provides annual sales information by type of outlet for calendar years 1997 through 2001.

**Table 5**
**CITY OF SAN DIEGO**
**TAXABLE TRANSACTIONS**
*Calendar Years 1997 through 2001*
*(in thousands)*

|  | 1997 | 1998 | 1999 | 2000 | 2001[1] |
|---|---|---|---|---|---|
| **RETAIL STORES** |  |  |  |  |  |
| Apparel | $485,551 | $530,734 | $542,041 | $588,012 | $613,179 |
| General Merchandise | 1,354,698 | 1,436,535 | 1,597,102 | 1,794,468 | 1,861,711 |
| Food | 554,625 | 582,183 | 622,909 | 662,346 | 673,384 |
| Eating and Drinking | 1,380,894 | 1,496,032 | 1,603,968 | 1,772,507 | 1,851,358 |
| Home Furnishings and Appliances | 444,930 | 469,158 | 546,746 | 619,383 | 684,858 |
| Building Materials and Farm Implements | 603,365 | 716,231 | 809,022 | 944,386 | 1,093,716 |
| Auto Dealers & Supplies | 1,189,462 | 1,331,411 | 1,519,137 | 1,745,186 | 1,868,692 |
| Service Stations | 673,078 | 614,156 | 742,143 | 977,675 | 966,913 |
| Other | 1,686,807 | 1,790,441 | 1,948,871 | 2,173,098 | 2,114,389 |
| Total Retail Stores | $8,373,410 | $8,966,881 | $9,931,939 | $11,277,061 | $11,731,149 |
| All Other Outlets | 4,024,433 | 4,343,598 | 4,563,715 | 4,822,132 | 4,640,363 |
| TOTAL ALL OUTLETS | $12,397,843 | $13,310,479 | $14,495,654 | $16,099,193 | $16,371,512 |

(1) Data for calendar year 2001 were calculated by adding quarterly reports published by the California State Board of Equalization, and may be subject to future revision.

Source: California State Board of Equalization

A - 5

**Tourism**

Based on year-end data for 2002 from Smith Travel Research, San Diego outperformed most major markets, ranking third highest among the top 25 hotel markets in terms of average occupancy rate during 2002 and sixth highest in terms of average daily room rate. For January 2003, due to activity related to the San Diego's hosting of Super Bowl XXXVII, the region far outperformed the other top 25 markets, with room revenues up 33.2% from January 2002.

According to the San Diego Chamber of Commerce, the visitor industry is the County's third largest industry in terms of income generation, behind manufacturing and the military. As shown in Table 6, visitor spending in the County totaled $5.04 billion in 2002, up 7.2% from 1998 but down 1.6% from 2001. According to the San Diego Convention and Visitors Bureau, a decline in business spending, weakening consumer confidence, and the threat and the subsequent outbreak of war in Iraq have had an impact on the tourism industry nationwide. The San Diego Convention and Visitor's Bureau also reported that there were 7.5 million passenger arrivals at Lindberg Field in 2002, down by approximately 1.5% from 2001.

**Table 6**
**SAN DIEGO COUNTY**
**TOTAL VISITOR SPENDING[1]**
*Calendar Years 1998 through 2002*
*(in billions)*

| Calendar Year | Amount |
|---|---|
| 1998 | $4.70 |
| 1999 | $4.88 |
| 2000 | $5.23 |
| 2001 | $5.12 |
| 2002 | $5.04 |

(1) Visitor spending is an estimate of total direct and indirect visitor expenditures as derived from the Visitor Activity Model/Visitor Profile Study prepared by CIC Research, Inc. for the San Diego Convention and Visitors Bureau.

Source: San Diego Convention and Visitors Bureau

As shown in Table 7, the City's Transient Occupancy Tax ("TOT") revenues have grown approximately 17% between Fiscal Year 1998 and Fiscal Year 2002, an average annual increase of 4.1%. In the Fiscal Year 2002 TOT revenues decreased by 9.8% from the prior year due in part to the effects of a weak economy and the events of September 11, 2001. The latest available data shows that fiscal year-to-date TOT receipts as of February 2003 totaled approximately $70 million, showing an increase of 10% from the same period in 2002.

**Table 7**
**CITY OF SAN DIEGO**
**TRANSIENT OCCUPANCY TAX[1]**
*Fiscal Years 1998 through 2002*
*(in thousands)*

| Fiscal Year | Amount |
|---|---|
| 1998 | $ 85,088 |
| 1999 | $ 92,128 |
| 2000 | $ 96,821 |
| 2001 | $ 109,879 |
| 2002 | $ 99,161 |

(1) Includes both the General Fund portion of TOT (5.5¢ of 10.5¢) and the balance (5¢ of 10.5¢) allocated to Special Promotional Programs.

Source: City of San Diego Comprehensive Annual Financial Report

The City is the focal point for tourism in the County. The Convention Center, approximately 70% of the County's hotel and motel rooms, and most of the County's major tourist attractions, including the world-renowned San Diego Zoo, the San Diego Wild Animal Park, and Sea World, are located in the City. Other attractions located in the City include the Cabrillo National Monument on Point Loma, the historic Gaslamp Quarter in the downtown area, the Old Town State Park, and Balboa Park – home to the San Diego Zoo and a host of other cultural and recreational activities.

In addition to the many permanent attractions available to visitors, the City has also been host to a number of major events. The City annually hosts the Buick Invitational, a Professional Golfers' Association Tour Event played at the Torrey Pines Golf Course, a world-renowned golf course, owned and operated by the City of San Diego. In addition, since 1978, the City has annually hosted the Holiday Bowl, a post season contest of elite college football teams.

The City also hosted the America's Cup in 1992 and 1995, the Super Bowl and World Series in 1998, and more recently the Super Bowl in 2003. In addition, the City was the site for the Republican National Convention held in August 1996. The Torrey Pines' South Course is scheduled to play host to the United States Open Golf Tournament in 2008.

In September 2001, the San Diego Convention Center expansion was completed, doubling the size of the existing facility to 2.6 million total gross square feet. According to the San Diego Convention Center Corporation, in Fiscal Year 2002 the Convention Center generated approximately $363 million in direct delegate spending and an estimated $880 million in total regional economic impact (direct and indirect spending).

## Military

Military and related defense spending is the second most important component of the San Diego economy, with only manufacturing making a larger contribution to San Diego County's Gross Regional Product. Prior to 1990, San Diego's civilian defense contractors were primarily concentrated in aerospace manufacturing. During the 1990's, the focus of local defense contracting shifted from aerospace manufacturing to research and development, with shipbuilding and repair remaining an important component. This transformation received additional impetus with the relocation of the Space and Naval Warfare Systems Command (SPAWAR) to San Diego from Virginia, in 1997. SPAWAR is responsible for administering contracts to meet the Navy's continuing need for state-of-the-art command and communications systems.

According to the San Diego Chamber of Commerce, defense related expenditures (active duty payroll and retirement benefits, base expenditures, and defense contracts) in the County during the federal Fiscal Year ended September 30, 2001, totaled approximately $10.0 billion, up from $9.8 billion in 2000. With a total active duty military and civilian payroll of $3.8 billion in the federal Fiscal Year 2001, San Diego continued to lead all counties in the nation in terms of combined military and civilian payrolls. In addition to active duty and civilian payroll, retirement benefits totaled $1.1 billion. Total defense contracts awarded to County-based businesses totaled $3.8 billion during the federal Fiscal Year 2001, of which $2.8 billion were awarded to procurement contracts and another $0.9 billion to various classified contracts and subcontracts of less than $25,000 each. According to the San Diego Chamber of Commerce estimate of June 1, 2001, active duty military personnel in the County totaled 103,982 and the civilian employment totaled 20,500.

## International Trade

The value of exports presented in the table below is from RAND California, *Merchandise Exports from U.S. Customs District* series. In prior years, exports were reported based on Metropolitan Areas as reported by the International Trade Administration. The Customs District classification has been adopted because of the availability of more current data. Export values reflect exports of merchandise grown, produced, or manufactured in the U.S as well as re-exports of foreign merchandise. The total value of exports from San Diego Customs District grew approximately 31% in the five-year period from 1998 to 2002. While there was a slight decline in annual exports from 2000 to 2001, the latest data indicates a turnaround. At the end of calendar year 2002, the value of exports totaled approximately $12.9 billion, up 4.3% from calendar year 2001.

**Table 8**
**VALUATION OF EXPORTS**
**ORIGINATING IN SAN DIEGO**
*Calendar Years 1998 through 2002*
*(in billions)*

| Calendar Year | Total Exports |
|---------------|---------------|
| 1998 | $ 9.8 |
| 1999 | $10.8 |
| 2000 | $12.7 |
| 2001 | $12.3 |
| 2002 | $12.9 |

Source: RAND California, Business and Economic Statistics

**Major Employers**

        The City is host to a diverse mix of major employers representing industries ranging from education and health services, to diversified manufacturing, financial services, retail trade and amusement and recreation. Table 9 lists the City's major employers. The list is compiled from information gathered by the City of San Diego. All of the businesses listed in the table have their main offices in the City, with many having branch offices and/or production facilities in other areas of the County. Accordingly, not all employees of these businesses work within the City.

**Table 9**
**CITY OF SAN DIEGO**
**MAJOR EMPLOYERS[1]**
*As of April 2002*

| Employer | Product/Service |
|---|---|
| **10,000 or More Employees:** | |
| San Diego Unified School District | Education |
| Sharp Health Care | Health Care |
| University of California, San Diego | Higher Education |
| **5,000 - 9,999 Employees:** | |
| Kaiser Permanente | Health Care |
| Qualcomm | Wireless Communications |
| San Diego Community College District | Higher Education |
| Scripps Health | Health Care |
| Sempra Energy | Utility |
| **3,000 - 4,999 Employees:** | |
| ADDECO Employment Services | Employment Services |
| Children's Hospital and Health Care | Health Care |
| Cubic Corporation | Electronic Systems |
| Palomar Pomerado Health System | Health Care |
| Samsung | Electronics |
| San Diego State University | Higher Education |
| SBC/Pacific Bell | Utility |
| Science Applications International Corporation | Research and Development |
| Seaworld of California | Entertainment |
| Solar Turbines | Gas Turbine Manufacturing |
| Sony Technology Center | Electronics |
| UCSD Health Care | Health Care |
| United Parcel Service | Delivery Service |
| University of San Diego | Higher Education |
| **2,000 - 2,999 Employees:** | |
| Jack in the Box Inc. | Restaurants |
| Hewlett Packard Company | Electronic Instruments |
| Manpower Temporary Services | Employment Services |
| National Steel & Shipbuilding Company | Shipbuilding, Repair |
| Nordstrom | Department Store |
| Scripps Research Institute | Biomedical Research |
| YMCA of San Diego County | Family Recreation |
| Zoological Society of San Diego | Entertainment |

_____
(1) Does not include various major public employers, including the City, the County, and the federal government with a combined total county employment of 116,100 as of April 2002.

Source: City of San Diego

A - 10

~ 170 ~

**Effective Buying Income**

Table 10 shows the per capita Effective Buying Income (EBI) for the City, the County, the State, and the United States for calendar years 1997 through 2001.

**Table 10**
**PER CAPITA EFFECTIVE BUYING INCOME[1]**
*Calendar Years 1997 through 2001*

| Calendar Year | City of San Diego | County of San Diego | State of California | United States |
|---|---|---|---|---|
| 1997 | $15,804 | $15,618 | $15,797 | $16,281 |
| 1998 | $16,291 | $16,101 | $16,299 | $16,895 |
| 1999 | $17,443 | $17,270 | $17,245 | $17,691 |
| 2000 | $19,238 | $19,498 | $19,081 | $18,426 |
| 2001 | $19,723 | $19,092 | $18,652 | $18,491 |

[1] Effective Buying Income is defined as the aggregate of wages, salaries, interest earnings, and all forms of public assistance income (such as Social Security and unemployment compensation) less personal tax payments, contributions to Social Security, and the value of income "in kind" from food stamps, public housing subsidies, medical care etc. Effective Buying Income is a proxy for "disposable" or "after-tax" income.

Source: Sales & Marketing Management Magazine "Survey of Buying Power"

**Building Permits**

Table 11 provides a summary of the building permit valuations, and the number of new dwelling units authorized in the City, for Fiscal Years 1998 through 2002. The valuation of non-residential permits includes both private, commercial construction and publicly funded, non-tax generating projects.

**Table 11**
**CITY OF SAN DIEGO**
**BUILDING PERMIT VALUATIONS**
**AND NUMBER OF DWELLING UNITS**
*Fiscal Years Ended June 30, 1998 through 2002*

|  | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| **Valuation (in thousands)** | | | | | |
| Residential | $890,476 | $857,747 | $1,185,999 | $1,181,385 | $1,244,917 |
| Nonresidential | 576,170 | 783,106 | 960,479 | 693,687 | 854,831 |
| Total | $1,466,646 | $1,640,853 | $2,146,478 | $1,875,072 | $2,099,748 |
| **Number of New Dwelling Units:** | | | | | |
| Single Family | 3,032 | 2,612 | 2,084 | 2,075 | 2,347 |
| Multiple Family | 3,018 | 2,856 | 5,662 | 3,829 | 4,000 |
| Total | 6,050 | 5,468 | 7,746 | 5,904 | 6,347 |

Source: City of San Diego, Planning and Development Review Department

**Business Development Program**

The City actively supports economic development and job creation activities. A key element of these activities is the Business Expansion and Retention Program (BEAR Program), a proactive effort on the part of the City to work directly with businesses to retain local firms and help them expand their investment and job growth. This program was created in 1995 by integrating the City's existing business development activities to provide centralized coordination and data management, and to expand operational relationships with partnership agencies such as the San Diego Regional Economic Development Corporation, Sempra Energy, the San Diego Science and Technology Commission, and the San Diego Workforce Partnership. BEAR Program components include business incentives, targeted assistance, and sales and use tax rebates through the Business Cooperation Program, Business Outreach Program, and Business Finance Program.

A further element of the City's overall business development effort has focused on streamlining the permitting process and, when feasible, eliminating or reducing fees and permits. A major component of this streamlining effort has been to reduce development permit processing time by one-half.

The City also operates the Office of Small Business, which provides a broad range of assistance programs for the many small businesses in the City. In 1995, the City Council reduced the annual Business License Tax for all businesses with 12 or fewer employees to a flat fee of $34 per business with no per employee charge. The City charges an annual fee of $125 plus $5 per employee for businesses with 13 or more employees.

**Transportation**

San Diego has a well-developed highway system. Access in and out of the region is provided by five major freeways running north and south and three freeways running east and west.

Public transportation through the City and surrounding communities is provided by the San Diego Metropolitan Transit Development Board ("MTDB"). The San Diego Trolley, Inc. operates a fleet of electric trolleys that provides transportation for commuters and tourists from downtown San Diego to San Ysidro (adjacent to Tijuana), and from downtown San Diego to the southern part of the County and East County. The East Line extension to Santee was completed in 1996. This 3.6-mile extension connects the cities of El Cajon and Santee. The trolley also provides service from downtown San Diego to the waterfront area, including the Convention Center. An extension providing additional service from downtown to the historical Old Town section of the City was completed in 1996. In addition, the Mission Valley extension, which connects Old Town with Qualcomm Stadium and the Mission Valley shopping area, ending at the Mission San Diego, opened in 1997.

Construction is in progress on the 6-mile Mission Valley East Trolley Extension. The project, scheduled for completion in 2004, will extend east from Qualcomm Stadium connecting Mission Valley with San Diego State University, La Mesa, and East County. The extension will include four new trolley stops, including a subterranean station at San Diego State University. The project is estimated to cost approximately $435 million, including $330 million in appropriations from the federal government.

A 43-mile Coaster Commuter rail line from Oceanside to downtown San Diego came into service in 1995. This line links the communities along the coast from Oceanside to Del Mar with downtown San Diego and is operated by North County Transit District.

Recently, MTDB granted the rights to operate an east-west rail line to the Carrizo Gorge Railway. It is anticipated that the line, which will connect San Diego and northern Baja California with the rest of Mexico and the United States, will open and begin shipping freight in calendar year 2003. This additional rail line will complement already existing rail service coming into San Diego County from the north and reduce shipping rates and times for companies moving products between San Diego, Mexico, and the Southwest.

In November 1987, voters approved Proposition A which, authorized a one-half cent increase to the local sales tax to fund transportation improvements for the San Diego region. The City's budget for Fiscal Year 2003 included $25.8 million in Proposition A funds. The one-half cent increase to the local sales tax, authorized by Proposition A, is scheduled to expire in 2008.

In June 1990, voters approved State Propositions 108, 111, and 116 which, increased the State gas tax and authorized the sale of rail bonds. The revenues generated from these measures are to be used to implement a comprehensive Statewide transportation funding program. The City's budget for Fiscal Year 2003 included $22.9 million in Proposition 111 funds. Revenues from this source supplement the City's street maintenance and resurfacing program and other street related services, including traffic light and signal maintenance, median maintenance and traffic engineering to ensure efficient traffic flow.

## MUNICIPAL GOVERNMENT AND FINANCIAL INFORMATION

### Governmental Organization

The City is a charter city and operates under the Council-Manager form of government. The City Council is comprised of eight members elected by district to serve overlapping four-year terms. The Mayor, who presides over the City Council, is elected at large to serve a four-year term. The City Council, which acts as the City's legislative and policy-making body, selects the City Manager, who is the City's chief administrator and is responsible for implementing the policies and programs adopted by the City Council.

### Accounting Practices

The City's accounting policies conform to generally accepted accounting principles applicable to governmental entities. The City's Governmental Funds use the modified accrual basis of accounting. Under the modified accrual basis of accounting, revenues are recorded when both available and measurable. Certain fines and forfeitures, however, are recorded when received, as they are not susceptible to accrual. Expenditures are recognized when the related liability is incurred except for (1) principal of and interest on general long-term debt, which are recognized when due, and (2) employee annual leave and claims and judgments for litigation and self-insurance which are recorded in the period due and payable. Proprietary and Pension Trust Funds use the accrual basis of accounting. Under the accrual basis of accounting, revenues are recognized when earned, and expenses are recorded when incurred. Agency Funds also use the accrual basis of accounting to recognize receivables and payables.

The City prepares financial statements annually in conformity with generally accepted accounting principles for governmental entities, which are audited by an independent certified public accountant. The annual audit report is generally available about 180 days after the June 30 close of each Fiscal Year. The City's most recent general purpose financial statements for the Fiscal Year ended June 30, 2002, were audited by Calderon, Jaham & Osborn, CPAs.

**Budgetary Process**

The City's annual budget, which is adopted in July and published in October, is the culmination of the annual budget process, which begins in the fall of the preceding year. Public input on service and program priorities is solicited. This input serves as part of the City Council's priority setting for the development of the budget.

Based upon City Council budget priorities, departments submit operating and capital improvement project requests to the City Manager for review by the Financial Management Department. The City Manager evaluates and prioritizes the program requirements, determines funding availability, and develops a balanced budget as required by the City Charter. This proposed balanced budget is published and presented to the City Council by their first meeting in May.

During May and June, the Mayor and City Council conduct budget meetings to review the Proposed Budget. Public comment is received at this time. The budget meetings are conducted as Council workshops focusing on policy issues.

As required by the City Charter, the City Council adopts the Annual Budget and Appropriation Ordinance no earlier than the date of the first Council meeting in July and no later than the last meeting in July. The adoption of the Appropriation Ordinance requires two noticed public hearings, which are usually held on consecutive days. The Annual Tax Rate Ordinance is adopted no later than the last City Council meeting in August.

The Financial Management Department works closely with the City Auditor and Comptroller to monitor fund balances, as well as revenue projections, throughout the Fiscal Year. Variations from budget or plans are alleviated in a number of ways, including expenditure reductions or deferrals. As another technique of accomplishing budgetary control, the City also maintains an encumbrance accounting system, under which purchase orders, contracts, and other commitments for the expenditure of funds are recorded in order to reserve that portion of the applicable appropriation.

**Five Year Summary of Financial Results**

Tables 12 and 13 present the Balance Sheet and the Statement of Revenues, Expenditures, and Changes in Fund Balance of the City's General Fund for Fiscal Years 1998 through 2002 in the format presented in the Comprehensive Annual Financial Report (CAFR). Effective as of the Fiscal Year ending June 30, 2002, there has been a change in the reporting system of CAFR. The City Auditor and Comptroller has implemented accounting and reporting requirements known as GASB Statement No. 34 (GASB 34). GASB 34 requires the preparation of Government-wide statements, which are intended to complement the fund financial statements. The Government-wide statements are prepared on a full-accrual basis, rather than modified accrual basis. GASB 34 requires expense classifications to be presented by major functional activities performed by the government, regardless of the fund in which the activity was accounted for. To satisfy this requirement, the City Auditor and Comptroller re-analyzed the services provided by different departments/divisions and re-grouped them by the function/activity that best describes those services.

**Table 12**
**CITY OF SAN DIEGO**
**BALANCE SHEET FOR THE GENERAL FUND**
*Fiscal Years Ended June 30, 1998 through 2002*
*(in thousands)*

|  | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash or Equity in Pooled Cash & Investments | $23,516 | $16,005 | $24,708 | $48,777 | $34,245 |
| Receivables: | | | | | |
|   Taxes – Net | 27,739 | 27,491 | 30,182 | 32,431 | 44,277 |
|   Accounts – Net | 26,392 | 29,856 | 32,805 | 38,016 | 42,129 |
|   Claims – Net | 41 | 9 | 36 | 16 | 48 |
|   Notes | -- | -- | -- | -- | -- |
|   Accrued Interest | 2,451 | 1,745 | 2,744 | 3,011 | 1,810 |
|   From Other Funds | 82,923 | 94,547 | 109,686 | 87,135 | 76,147 |
|   From Other Agencies | 613 | 1,068 | 1,068 | 1,635 | 68 |
|   Advances to Other Funds | 4,570 | 6,771 | 9,920 | 10,628 | 12,517 |
|   Advances to Other Agencies | 350 | 350 | 350 | 350 | 350 |
|   Prepaid and Reimbursable Items & Deposits | 357 | 302 | 1,161 | 152 | 74 |
| **Total Assets** | $168,952 | $178,144 | $212,660 | $222,151 | $211,665 |
| **LIABILITIES** | | | | | |
| Accounts Payable | 2,135 | 2,461 | $2,927 | $2,057 | $3,739 |
| Accrued Wages and Benefits | 14,793 | 16,598 | 21,923 | 27,445 | 27,547 |
| Due to other Funds | -- | -- | -- | -- | -- |
| Deferred Revenue | 29,590 | 30,934 | 33,904 | 37,942 | 37,376 |
| Contracts and Notes Payable | 82,000 | 88,500 | 99,500 | 77,000 | 73,000 |
| **Total Liabilities** | $128,518 | $138,493 | $158,254 | $144,444 | $141,662 |
| **FUND EQUITY** | | | | | |
| Reserves: | | | | | |
|   Reserved for Encumbrances | $9,181 | $9,542 | $11,628 | $11,150 | $13,431 |
|   Reserved for Advances & Deposits | 4,920 | 7,121 | 10,270 | 10,978 | 12,867 |
| Unreserved: | | | | | |
|   Designated for Unrealized | 396 | -- | -- | 2,287 | 1,176 |
|   Designated for Subsequent Years' Expenditures | 1,936 | 1,818 | 2,972 | 2,132 | 1,768 |
|   Undesignated | 24,001 | 21,170 | 29,536 | 51,160 | 40,761 |
| **Total Fund Equity** | $40,434 | $39,651 | $54,406 | $77,707 | $70,003 |
| **Total Liabilities & Fund** | $168,952 | $178,144 | $212,660 | $222,151 | $211,665 |

Source: City of San Diego Comprehensive Annual Financial Report

**Table 13**
**CITY OF SAN DIEGO**
**STATEMENT OF REVENUES, EXPENDITURES,**
**AND CHANGES IN FUND BALANCE FOR THE GENERAL FUND**
*Fiscal Years Ended June 30, 1998 through 2002 (in thousands)*

| | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| **REVENUES:** | | | | | |
| Property Taxes | $123,012 | $130,624 | $144,288 | $158,585 | $169,976 |
| Sales Taxes [1] | 117,985 | 128,339 | 130,240 | 142,069 | 139,197 |
| Other Local Taxes | 83,796 | 86,968 | 94,809 | 109,151 | 115,416 |
| Licenses and Permits | 19,272 | 20,630 | 20,693 | 22,154 | 22,062 |
| Fines, Forfeitures and Penalties | 16,170 | 23,613 | 28,410 | 29,776 | 24,250 |
| Revenues from Use of Money and Property | 30,789 | 29,940 | 34,429 | 40,841 | 34,697 |
| Revenues from Federal Agencies | 2,081 | 2,026 | 1,644 | 787 | 1,931 |
| Revenues from Other Agencies | 51,522 | 55,697 | 83,821 | 87,262 | 88,027 |
| Charges for Current Services | 67,825 | 70,244 | 77,469 | 84,156 | 89,936 |
| Other Revenue | 2,871 | 2,526 | 2,777 | 2,606 | 3,291 |
| **Total Revenues** | **$515,323** | **$550,607** | **$618,580** | **$677,387** | **$688,783** |
| **EXPENDITURES:** | | | | | |
| Current: | | | | | |
| General Government | $64,725 | $67,405 | $69,400 | $79,800 | $132,312 [2] |
| Community and Economic Development | 13,967 | 14,740 | 14,661 | 19,778 | -- [3] |
| Neighborhood Services | -- | -- | -- | -- | 28,626 |
| Public Safety | 295,762 | 315,231 | 348,869 | 369,607 | 382,133 |
| Libraries | 20,677 | 21,824 | 22,820 | 26,494 | -- |
| Parks, Recreation and Culture | 41,561 | 44,910 | 49,850 | 56,748 | 89,442 [4] |
| Public Works | 66,931 | 70,413 | 76,300 | 80,999 | -- [5][6] |
| Employee Relations and Special Projects | 633 | 723 | 637 | 548 | -- |
| Development Services | -- | -- | -- | -- | -- |
| Transportation | -- | -- | -- | -- | 19,196 |
| Sanitation and Health | -- | -- | -- | -- | 34,535 |
| Miscellaneous and Unallocated | 2,260 | 2,505 | 1,881 | 1,367 | -- |
| Debt Service: | | | | | |
| Principal Retirement | -- | -- | -- | -- | 1,553 |
| Interest | 3,683 | 4,894 | 5,213 | 4,616 | 1,157 |
| **Total Expenditures** | **$510,199** | **$542,645** | **$589,631** | **$639,957** | **$688,954** |
| EXCESS (DEFICIENCY) OF REVENUES OVER EXPENDITURES | $5,124 | $7,962 | $28,949 | $37,430 | ($171) |
| **OTHER FINANCING SOURCES (USES)** | | | | | |
| Transfers from Proprietary/ Fiduciary Funds | $1,918 | $1,574 | $2,117 | $4,074 | $2,409 |
| Transfers from Other Funds | 37,729 | 28,369 | 30,511 | 29,236 | 27,551 |
| Transfers from Component Unit | 554 | 588 | 324 | 86 | 22 |
| Transfers to Proprietary Funds | (8,352) | (15,816) | (18,976) | (14,274) | (6,699) |
| Transfers to Other Funds | (25,592) | (24,365) | (27,520) | (32,601) | (32,082) |
| Transfers to Component Unit | (900) | (900) | (650) | (650) | (650) |
| Proceeds from Capital Leases | | | | | 1,916 |
| **TOTAL OTHER FINANCING SOURCES (USES)** | **$5,357** | **($10,550)** | **($14,194)** | **($14,129)** | **($7,533)** |
| EXCESS (DEFICIENCY) OF REVENUES AND OTHER FINANCING SOURCES OVER EXPENDITURES AND OTHER FINANCING USES | $10,481 | ($2,588) | $14,755 | $23,301 | ($7,704) |
| **FUND BALANCE AT JULY 1** | **$28,514** | **$40,434** | **$39,651** | **$54,406** | **$77,707** |
| Cumulative Effect of a Change in Accounting Principle | 314 | -- | -- | -- | -- |
| Residual Equity Transfers from Other Funds | 1,125 | 1,805 | = | = | = |
| **FUND BALANCE AT FOLLOWING JUNE 30** | **$40,434** | **$39,651** | **$54,406** | **$77,707** | **$ 70,003** |

(1)  Includes Proposition 172 Safety Sales Tax.
(2)  Beginning Fiscal Year 2002, General Government is reclassified as General Government and Other Support Services. Other Support Services include Engineering & Capital Projects, Employee Relations/Special Projects, and Miscellaneous/Unallocated Expenditure categories.
(3)  Beginning Fiscal Year 2002, Community and Economic Development expenditures have been reclassified under Neighborhood Services.
(4)  Beginning Fiscal Year 2002, Parks, Recreation, Culture and Leisure is reclassified to include Libraries.
(5)  Beginning Fiscal Year 2002, Transportation, which was under Public Works in prior years, is classified separately.
(6)  Beginning Fiscal Year 2002, Sanitation and Health, which was under Public Works, is classified separately.

Source:  City of San Diego Comprehensive Annual Financial Report

The following table presents the operating budget summary for Fiscal Years 2002 through 2004.

**Table 14**
**CITY OF SAN DIEGO**
**OPERATING BUDGET SUMMARY**
*Fiscal Years 2002 - 2004[1]*

| | Actual Results in A Budget Format Fiscal Year 2002 | Adopted Budget Fiscal Year 2003 | Proposed Budget Fiscal Year 2004 |
|---|---|---|---|
| **REVENUE SOURCES:** | | | |
| Property Tax | $169,814,877 | $188,600,000 | $199,750,958 |
| Sales Tax [2] [3] | 139,196,712 | 134,451,875 | 128,203,737 |
| Transient Occupancy Tax | 52,142,966 | 56,676,190 | 57,998,226 |
| Property Transfer Tax | 7,033,670 | 6,300,000 | 8,472,719 |
| Licenses and Permits | 22,027,597 | 21,627,271 | 24,522,914 |
| Fines, Forfeitures and Penalties | 23,935,666 | 26,887,569 | 27,295,786 |
| Interest Earnings | 8,986,088 | 5,900,000 | 1,200,223 |
| Franchises | 56,239,380 | 54,234,644 | 52,086,577 |
| Other Rents and Concessions | 28,156,640 | 27,814,150 | 29,047,278 |
| State Motor Vehicle License Fees | 69,895,140 | 72,200,000 | 74,893,491 |
| Other Revenue from Agencies [4] | 22,277,905 | 7,595,553 | 10,413,422 |
| Charges for Current Services | 90,541,973 | 68,646,721 | 71,334,584 |
| Transfers from Other Funds | 27,724,113 | 38,123,581 | 42,407,502 |
| Other Revenue | 1,905,079 | 872,968 | 1,337,968 |
| Prior Year Fund Balance | 31,700,000 | 19,400,000 | 10,881,568 |
| Total General Fund Revenues | $751,577,806 | $729,330,522 | $739,846,953 |
| | | | |
| **EXPENDITURES:** | | | |
| Public Safety | $382,551,446 | $382,585,564 | $398,745,726 |
| Parks and Recreation | 62,084,484 | 68,082,120 | 66,713,917 |
| Sanitation and Health | 39,675,102 | 40,107,961 | 42,770,700 |
| Transportation [5] | 28,417,405 | 12,440,187 | 12,500,339 |
| Library | 31,301,457 | 36,650,651 | 35,627,407 |
| Neighborhood Services | 32,736,355 | 31,514,492 | 28,504,798 |
| Operations Support | 109,958,971 | 111,228,996 | 107,476,923 |
| Internal Support/Management | 43,294,866 | 46,720,551 | 47,507,143 |
| Total General Fund Expenditures | $730,020,086 | $729,330,522 | $739,846,953 |

---

(1)  The budget is prepared on the modified accrual basis of accounting except that (i) encumbrances outstanding at year-end are considered as expenditures and (ii) the increase/decrease in reserve for advances and deposits to other funds and agencies are considered as additions/deductions of expenditures.
(2)  Includes Proposition 172 Safety Sales Tax.
(3)  In Fiscal Years 2003 and 2004 General Fund support for the Street Division Operating Fund is funded directly through a sales tax allocation rather than through a General Fund transfer.
(4)  The City budgets for Tobacco Settlement Revenues one year in arrears, and these revenues appear in the category "Other Revenue from Agencies" in the actual results column, and are included in the Prior Year Fund Balance in the budget columns. The City did not budget for, nor receive any revenues from the State for local fiscal relief in Fiscal Years 2002, 2003, and 2004.
(5)  In Fiscal Years 2003 and 2004, General Fund support for the Street Division Operating Fund is funded directly through a sales tax allocation rather than through a General Fund transfer.

Source:    City of San Diego, Financial Management Department

**Fiscal Year 2002 (Actuals)**

The actual total General Fund revenues, presented in a budget format equivalent to Table 14, for Fiscal Year 2002 equaled $751.6 million, which represents an increase of $25.9 million or 3.6% more than the actual results for Fiscal Year 2001, and $24.2 million or 3.3% more than the adopted budget for Fiscal Year 2002. The following table shows the change in actual major revenue sources for Fiscal Year 2002 over Fiscal Year 2001.

<div align="center">

**Change in Major Revenue Sources**
**Actual Results Fiscal Year 2002 over Fiscal Year 2001[1]**

</div>

- Property Tax                   +   7.3%
- Sales Tax                      +   3.6%
- Transient Occupancy Tax        -   9.8%
- Motor Vehicle License Fees     +   4.0%

_____

(1) The above percentages reflect overall growth in these revenue sources, whether or not such revenues are allocated entirely to the General Fund.

Source: City of San Diego, Financial Management Department

Actual total General Fund expenditures, presented in a budget format equivalent to Table 14, for Fiscal Year 2002 equaled $730 million, an increase of $43.8 million or 6.4% more than the actual results for Fiscal Year 2001, and $2.7 million or 0.4% more than the adopted budget for Fiscal Year 2002.

**Fiscal Year 2003 (Adopted Budget)**

Under the City's Fiscal Year 2003 adopted budget, General Fund revenues total $729.3 million, up $2.0 million or 0.3%, from the Fiscal Year 2002 adopted budget. The adopted budget assumed that San Diego will experience modest economic growth in Fiscal Year 2003. The Fiscal Year 2003 adopted budget also anticipated the City to realize additional revenues from hosting the Super Bowl in January 2003. In Fiscal Year 2002, the City did not receive any revenues from the State for local fiscal relief, and does not include any such revenues in its adopted budget for Fiscal Year 2003. The City assumes that the State General Fund will continue to offset a fee reduction on motor vehicle license registration originally enacted in 1999, through Fiscal Year 2003 (see "**Vehicle License Fee Reduction**" below). In addition, the City's adopted budget includes the transfer of $5.2 million from the State to compensate for booking fees the City makes to the County of San Diego for incarcerating criminals. Presented below are budgeted growth rates for the major revenues.

### Fiscal Year 2003 Budget Growth Rates[1]

| | |
|---|---|
| • Property Tax | + 9.0% |
| • Sales Tax | + 4.0% |
| • Transient Occupancy Tax | + 6.0% |
| • Motor Vehicle License Fees[2] | + 4.0% |

(1) The above percentages reflect overall growth in these revenue sources, whether or not such revenues are allocated entirely to the General Fund.

(2) See 'Vehicle License Fee Reduction' below for a discussion of the potential impact on revenues from this source based on the Governor's budget proposal for Fiscal Years 2003 and 2004.

Source: City of San Diego, Financial Management Department

To date, Fiscal Year 2003 General Fund revenue receipts reflect slow economic recovery. Economic activity continues to affect revenue growth rates and the receipts received from major revenue categories in Fiscal Year 2003. Since the economy is not recovering at a pace as was expected earlier, revenues are projected to fall short of budget estimates, not including potential impacts from the State budget deficit. Property Tax, Sales Tax, and Transient Occupancy Tax receipts are projected to have deficits in Fiscal Year 2003 at a combined total of approximately $10 million compared to the budgeted levels. In addition to the major General Fund revenues, another revenue source to the General Fund, Franchise Fees, is expected to be approximately $10 million less than the Fiscal Year 2003 adopted budget. The projected reduction is primarily attributable to a decline in the SDG&E franchise fees due to the unexpected drop in natural gas prices. In Fiscal Year 2003, in order to accommodate revenues not meeting budget expectations and to ensure a balanced budget, measures are being taken to reduce expenditures in the General Fund. Most General Fund departments reduced their budgets by two percent over Fiscal Year 2002 levels in developing the Fiscal Year 2003 Budget. In addition, most General Fund departments have identified additional savings amounting to approximately three percent of their Fiscal Year 2003 budget due to the projected revenue shortfall.

**Fiscal Year 2004 (Proposed Budget)**

Under the City's Fiscal Year 2004 proposed budget, General Fund revenues total $739.8 million, a net increase of $10.5 million or 1.4% from the Fiscal Year 2003 adopted budget. The proposed budget revenue estimates reflect an uncertain economy that continues to experience the effects of declining consumer confidence, higher unemployment trends, a weak national economy and potential impacts from the State's budget crisis. Even though San Diego's economy continues to outperform the State and national economies, the recovery remains slower than anticipated. The potential State impact on the City's finances may be significant, although no conclusive information is available as to these impacts. For this reason, the proposed budget excludes any action the State may take that could impact the City's budget. In Fiscal Year 2003, the City did not receive any revenues from the State for local fiscal relief, and does not include any such revenues in its proposed budget for Fiscal Year 2004. Presented below are estimated growth rates for the major revenues.

### Projected Change in Major Revenue Sources
*Proposed Budget Fiscal Year 2004 over Adopted Budget Fiscal Year 2003*[1]

| | | |
|---|---|---|
| • Property Tax | + | 8.0% |
| • Sales Tax | + | 3.0% |
| • Transient Occupancy Tax | + | 5.5% |
| • Motor Vehicle License Fees | + | 3.0% |

(1)   The above percentages reflect overall growth in these revenue sources, whether or not such revenues are allocated entirely
        to the General Fund.

Source: City of San Diego, Financial Management Department

The General Fund expenditure growth amounted to a total of approximately $46 million, largely a result of annualization of FY 2003 and FY 2004 negotiated salaries and benefits ($20.7 million), retirement contributions ($11.0 million), and workers compensation ($5.8 million).  As the General Fund revenues are not projected to grow at the same pace as the expenditure requirements, corresponding reductions to City operations are required.  Most General Fund departments reduced their Fiscal Year 2004 budgets, which amounted to approximately $30 million.  Further expenditure reductions were made through departmental reorganization and cuts in non-discretionary accounts.

The proposed budget does not include the use of reserves to balance the General Fund. Service levels have been impacted and some City facilities will see reduced hours of operation.

**State Budget Deficit**

The State of California's projected budget deficit is between $35 and $38 billion through Fiscal Year 2004. In his budget proposal, Governor Gray Davis included budget savings involving major program reductions and tax increases. The proposal includes discontinuing the State backfill of motor vehicle license fees for an impact of approximately $51 million to the City in the Fiscal Year 2004 General Fund budget, if vehicle license fees are not increased to replace the backfill amount as described below under the caption "Vehicle License Fee Reduction".  Other impacts proposed by the Governor in Fiscal Year 2004 would include an estimated reduction for libraries of approximately $1.2 million and the elimination of $5.2 million in booking fees reimbursement. In addition, a property tax increment shift to the Educational Revenue Augmentation Fund (ERAF) could result in a $5.8 million loss for the City of San Diego's Redevelopment Agency (the "Redevelopment Agency"). The State Legislature, however, has not yet approved these proposals.

The City cannot predict what actions will be taken in the future by the State Legislature and the Governor to address the State's current and future budget deficits.  Future State Budgets could be affected by national economic conditions and the factors over which the City will have no control.  To the extent that the State budget process results in reduced revenues or increased expenses to the City, the City will be required to make adjustments to its budget.

**Vehicle License Fee Reduction**

The State's Vehicle License Fee ("VLF") is an annual fee on the ownership of a registered vehicle in California.  Automobiles, motorcycles, pick-up trucks, commercial trucks and trailers, rental cars, and taxicabs are all subject to the VLF.  VLF revenues are distributed by the State to cities and counties.  Approximately three-fourths of VLF revenues (one-half to cities and one-half to counties) can

be used for any lawful purpose, with the remaining funds allocated to counties to pay for "realignment" health and social services programs. Under the State of California's Vehicle License Fee Law, beginning January 1, 1999, the vehicle license fee was permanently reduced from 2.0% to 1.5%. The law also provided for a one-year reduction to 1.3% for vehicles with a payment due date during calendar year 2000. Subsequently, the law was amended to reduce the rate to 0.65% through calendar year 2002. Beginning in 2003, the vehicle license fee was scheduled to be reduced permanently to 0.65%.

To ensure that local governments are not impacted by the fee reductions, State law provides for an offset from the State's General Fund equal to the amount of the reduction. Under the offset provisions, the State's General Fund pays local governments for lost VLF revenues on a dollar per dollar matching basis, from state General Fund revenues. The repayment funds are continuously appropriated, and do not need to be approved in the annual budget process. A statutory, continuous appropriation, however, is not a firm guarantee of a continuing replacement and the repayment is subject to the availability of monies for transfer from the State's General Fund.

As noted above, the Governor had proposed to discontinue the vehicle license fee backfill to cities and counties and the Governor's May Revision to the proposed budget for Fiscal Year 2004 (the Governor's May Revision) assumes no backfill is needed because provisions of the state law will trigger an increase in the VLF rate, such that no backfill will be required and local VLF revenues will not be reduced further. VLF is the third largest General Fund revenue source for the City (after property taxes and sales taxes). In Fiscal Year 2002, the City received approximately $69.9 million in VLF revenues, a 4.0% increase over the prior year's actual receipts, representing approximately 9.9% of the total General Fund Revenues. For Fiscal Year 2003, VLF revenues are budgeted at $72.2 million. The State Controller has stated and the Governor's May Revision is based on the assumption that a provision in existing law will trigger an increase in the VLF fees due to the lack of available State revenues to pay the backfill amount. This interpretation may be challenged in court, and no assurance can be given that an increase will be triggered automatically to replace the backfill amount. If the Governor's proposed budget for Fiscal Year 2004 is enacted as proposed and the State Legislature does not continue to backfill the VLF revenues, or does not increase vehicle license fees, or an increase in the VLF fees is not triggered under existing law, the City forecasts that it would lose approximately $51 million in VLF revenues for Fiscal Year 2004 and for each year thereafter. As of the date of this Official Statement, the State has continued to backfill VLF revenues for Fiscal Year 2003. As of April 2003, the City had received approximately $59.4 million in VLF revenues in Fiscal Year 2003.

**Property Taxes**

The County assesses property and collects secured and unsecured property taxes for the cities, school districts, and special districts within the County, including the City. Once the property taxes are collected, the County conducts its internal reconciliation for accounting purposes and distributes the City's share of such taxes to the City, generally within a couple of weeks. Prior to distribution, the moneys are deposited in an account established on behalf of the City in the County Treasurer's Investment Pool (the "Pool"). If the County and/or the Pool were at any time to become subject to bankruptcy proceedings, it is possible that City property taxes held in the Pool, if any, could be temporarily unavailable to the City. In the event of such an occurrence, General Fund revenue requirements could be met through the use of other City funds. Ad valorem taxes are subject to constitutional limits as discussed under the section **"LIMITATIONS ON TAXES AND APPROPRIATIONS."**

Taxes are levied for each fiscal year on taxable real and personal property which is situated

in the City as of the preceding January 1.  For assessment and collection purposes, property is classified either as "secured" or "unsecured" and is listed accordingly on separate parts of the assessment roll.  The "secured roll" is that part of the assessment roll containing the taxes on which there is a lien on real property sufficient, in the opinion of the County Assessor, to secure payment of the taxes.  Other property is assessed on the "unsecured roll."

Property taxes on the secured roll are due in two installments, on November 1 and February 1 of the fiscal year.  If unpaid, such taxes become delinquent on December 10 and April 10, respectively, and a 10% penalty attaches to any delinquent payment.  If not paid, the property is subject to default.  Such property may be redeemed by payment of the delinquent taxes and the delinquent penalty, plus a redemption penalty of 1.5% per month from July 1 of the following year to the time of redemption.  If taxes are unpaid for a period of five years or more, the property is subject to sale by the County Tax Collector.

Property taxes on the unsecured roll are due as of the March 1 lien date and become delinquent, if unpaid, on August 31 of the fiscal year.  A 10% penalty attaches to delinquent taxes on property on the unsecured roll, and an additional penalty of 1.5% per month begins to accrue beginning November 1 of the fiscal year.  The taxing authority has four ways of collecting unsecured personal property taxes:  (a) a civil action against the taxpayer; (b) filing a certificate in the office of the County Clerk specifying certain facts in order to obtain a judgment lien on certain property of the taxpayer; (c) filing a certificate of delinquency for record in the County Recorder's Office, in order to obtain a lien on certain property of the taxpayer; and (d) seizure and sale of personal property, improvements or possessory interests belonging or assessed to the assessee.

A supplemental assessment occurs upon a change of ownership of existing property and for new construction upon completion.  A supplemental tax bill is issued for the difference in property value resulting from the increase in assessed value prorated for the remainder of the year.

Effective July 1, 1988, Assembly Bill 454, Chapter 921, eliminated the reporting of the unitary valuations pertaining to public utilities such as San Diego Gas and Electric and Pacific Telephone.  In lieu of the property tax on these previously included assessed valuations, the City now receives from the State (through the County) an amount of unitary revenue based upon the unitary property tax received in the prior year.

Table 15 presents the assessed valuation within the City for each of the last ten Fiscal Years.

**Table 15**
**ASSESSED VALUATION[1] [2]**
*Fiscal Years Ended June 30, 1994 through 2003*
*(in thousands except for percentages)*

| Fiscal Year Ending June 30 | Secured Property | Unsecured Property | Gross Total | Less Exemption [3] | Net Assessed Valuations [4][5] | Annual Assessed Valuation %Change |
|---|---|---|---|---|---|---|
| 1994 | $60,586,129 | $4,218,892 | $64,805,021 | $2,360,741 | $62,444,280 | 1.13 % |
| 1995 | $60,939,995 | $4,371,923 | $65,311,918 | $2,420,027 | $62,891,891 | 0.72% |
| 1996 | $61,793,760 | $4,303,198 | $66,096,958 | $2,489,507 | $63,607,451 | 1.14% |
| 1997 | $61,893,902 | $4,353,543 | $66,247,445 | $2,355,174 | $63,892,271 | 0.45% |
| 1998 | $63,562,588 | $4,988,950 | $68,551,538 | $2,910,753 | $65,640,785 | 2.74% |
| 1999 | $68,648,609 | $5,337,916 | $73,986,525 | $2,994,814 | $70,991,711 | 8.15% |
| 2000 | $75,788,751 | $5,852,822 | $81,641,573 | $2,987,620 | $78,653,953 | 10.79% |
| 2001 | $82,195,239 | $6,347,101 | $88,542,340 | $3,249,480 | $85,292,860 | 8.44% |
| 2002 | $89,259,317 | $6,838,926 | $96,098,243 | $3,572,188 | $92,526,055 | 8.48% |
| 2003 | $96,534,652 | $6,959,602 | $103,494,254 | $3,189,764 | $100,304,49 | 8.41% |

(1) The official date of assessment is the first day of January preceding the fiscal year during which taxes are levied. For example, January 1, 2002 is the official assessment date for property taxes due during Fiscal Year 2003. The City receives preliminary estimates from the County Assessor in March and final assessment estimates in late June, or early July.
(2) Includes both locally assessed and State assessed utility property.
(3) Excludes homeowners' and business inventory exemptions.
(4) Net assessed valuation for tax rate purposes. Includes both locally assessed and State assessed utility property.
(5) The City does not participate in the Teeter Plan.

Source: City of San Diego Comprehensive Annual Financial Report, Fiscal Year 2002.

Table 16 shows the City's secured tax collections for each of the ten Fiscal Years.

**Table 16**
**SECURED TAX LEVIES AND COLLECTIONS**
*Fiscal Years Ended June 30, 1993 through 2002*
*(in thousands except for percentages)*

| Fiscal Year Ending June 30 | Tax Levy[1] | Current Year Collections | Current Year Collections as Percentage of Current Tax Levy | Total Tax Collections | Total Collections as Percentage of Current Tax Levy[2] |
|---|---|---|---|---|---|
| 1993 | $120,574 | $114,821 | 95.23% | $119,867 | 99.41% |
| 1994 | $109,881 | $105,911 | 96.39% | $110,738 | 100.78% |
| 1995 | $109,754 | $104,295 | 95.03% | $108,192 | 98.58% |
| 1996 | $111,281 | $108,137 | 97.18% | $110,513 | 99.31% |
| 1997 | $111,719 | $108,676 | 97.28% | $110,563 | 98.96% |
| 1998 | $116,912 | $114,311 | 97.78% | $117,429 | 100.44% |
| 1999 | $127,846 | $124,267 | 97.20% | $126,923 | 99.28% |
| 2000 | $141,963 | $137,859 | 97.11% | $140,225 | 98.78% |
| 2001 | $155,060 | $150,900 | 97.32% | $153,406 | 98.93% |
| 2002 | $167,077 | $163,357 | 97.77% | $165,446 | 99.02% |

(1) Commencing in Fiscal Year 1993, by action of the State Legislature, there was a permanent shift of some property taxes from cities to schools.
(2) Total Collections include unpaid taxes from previous years' tax levies collected in the current fiscal year.

Source: FY 1993 – 2001: City of San Diego Comprehensive Annual Financial Report
         FY 2002: County of San Diego

A - 24

Table 17 indicates the ten largest secured and unsecured property taxpayers in the City.

**Table 17**
**PRINCIPAL PROPERTY TAXPAYERS IN CITY OF SAN DIEGO[1]**
*Tax Roll for Fiscal Year 2002-2003*
*(in thousands, except for percentages)*

| Taxpayers | Type of Business | Assessed Valuation [2][3] | Percentage of Net Assessed Valuation [3] | Amount of Tax [4] |
|---|---|---|---|---|
| Kilroy Realty LP | Real Estate | $566,110 | 0.57% | $5,976 |
| Fashion Valley Mall LLC | Shopping Center | 530,665 | 0.54 | 5,485 |
| Qualcomm, Inc. | Electronics | 465,566 | 0.47 | 5,178 |
| Sea World, Inc. | Entertainment | 280,063 | 0.28 | 3,111 |
| Pacific Gateway, LTD | Developer | 250,319 | 0.25 | 2,780 |
| ERP Operating LTD Partnership | Developer/ Property Manager | 239,426 | 0.24 | 2,709 |
| University Towne Centre LLC | Shopping Center | 226,350 | 0.23 | 2,514 |
| Irvine Co | Developer | 248,194 | 0.25 | 2,484 |
| Horton Plaza LLC | Shopping Center | 192,079 | 0.19 | 2,173 |
| Pardee Construction Co. | Developer | 142,520 | 0.14 | 2,163 |
| TOTAL | | $3,141,292 | 3.16% | $34,573 |

(1) This table excludes public utilities, including San Diego Gas & Electric Company, Pacific Bell, and American Telephone and Telegraph, because valuations within the City cannot be readily determined.
(2) Total assessed valuation includes both secured and unsecured property.
(3) Using total Net Assessed Valuation of $98,917,185,000,which excludes homeowners' exemptions.
(4) The City receives approximately 17.2% of total taxes paid.

Source: County of San Diego Assessor's Office

## LIMITATIONS ON TAXES AND APPROPRIATIONS

### Article XIII A of the California Constitution

Section 1(a) of Article XIII A of the California Constitution limits the maximum ad valorem tax on real property to 1% of full cash value (as defined in Section 2 of Article XIII A), to be collected by each county and apportioned among the county and other public agencies and funds according to law. Section 1(b) of Article XIII A provides that the 1% limitation does not apply to ad valorem taxes to pay interest or redemption charges on (a) indebtedness approved by the voters prior to July 1, 1978, or (b) any bonded indebtedness for the acquisition or improvement of real property approved on or after July 1, 1978, by two-thirds of the votes cast by the voters voting on the proposition. Section 2 of Article XIII A defines "full cash value" to mean "the County Assessor's valuation of real property as shown on the 1975/76 tax bill under full cash value or, thereafter, the appraised value of real property when purchased, newly constructed, or a change in ownership has occurred after the 1975 assessment." The full cash value may be adjusted annually to reflect inflation at a rate not to exceed 2% per year or to reflect a reduction in the consumer price index or comparable data for the area under the taxing jurisdiction, or reduced in the event of declining property values caused by substantial damage, destruction, or other factors. Legislation enacted by the State Legislature to implement Article XIII A provides that notwithstanding any other law, local agencies may not levy any ad valorem property tax except to pay debt service on indebtedness approved by the voters as described above.

In addition, legislation enacted by the California Legislature to implement Article XIII A provides that all taxable property is shown at full assessed value as described above. In conformity with this procedure, all taxable property value included in this Official Statement (except as noted) is shown at 100% of assessed value and all general tax rates reflect the $1 per $100 of taxable value.

On June 3, 1986, California voters approved an amendment to Article XIII A, which added an additional exemption to the 1% tax limitation imposed by Article XIII A. Under this amendment to Article XIII A, local governments and school districts may increase the property tax rate above 1% for the period necessary to retire new general obligation bonds, if two-thirds of those voting in a local election approve the issuance of such bonds and the money raised through the sale of the bonds is used exclusively to purchase or improve real property. Later amendments allow for property tax increases to pay for certain school district general obligation bonds approved by 55% of those voting in a local election.

In the June 1990 election, the voters of the State approved amendments to Article XIII A permitting the State Legislature to extend the replacement dwelling provisions applicable to persons over 55 to severely disabled homeowners for a replacement dwelling purchase or newly constructed on or after June 5, 1990, and to exclude from the definition of "new construction" triggering reassessment improvements to certain dwellings for the purpose of making the dwelling more accessible to severely disabled persons. In the November 1990 election, the voters of the State approved an amendment of Article XIII A to permit the State Legislature to exclude from the definition of "new construction" seismic retrofitting improvements or improvements utilizing earthquake hazard mitigation technologies constructed or installed in existing buildings after November 6, 1990. Since 1990, the voters have approved several other minor exemptions from the reassessment provisions of Article XIII A.

**Article XIIIA Litigation**

In June 1978, Article XIIIA of the California Constitution was amended by Proposition 13 to limit, among other things, a County assessor's ability to adjust for inflation to 2% per year (see **"Constitutional and Statutory Limitations on Taxes and Appropriations-Article XIIIA of the California Constitution"** discussed previously). In a Minute Order issued on November 2, 2001 in *County of Orange v. Orange County Assessment Appeals Board No. 3*, case no. 00CC03385, the Orange County Superior Court held that where a home's taxable value did not increase for two years, due to a flat real estate market, the Orange County assessor violated the two percent inflation adjustment provision of Article XIIIA, when the assessor tried to "recapture" the tax value of the property by increasing its assessed value by 4% in a single year. The assessors in most California Counties, including San Diego County, use a similar methodology in raising the taxable values of property beyond 2% in a single year. The State Board of Equalization has approved this methodology for increasing assessed values. On December 12, 2002, the Orange County Superior Court certified the lawsuit as a class action lawsuit and the case has been submitted on appeal to the State's Fourth District Court of Appeal.

The County of San Diego has advised the City that comparable claims by landowners within the County were rejected by the San Diego County Assessment Appeals Board for the Fiscal Year 2000/01 property tax levy and that such landowners have at least three years from the date of such rejection in which to further prosecute their claims. In another matter, a taxpayer initiated a declaratory relief action in Superior Court seeking comparable relief. In that case, *Linda Pintzuk v. Gregory J. Smith*, case no. GIC 790102, the trial court sustained the County's demurrer without leave to amend and dismissed the action on September 25, 2002. The plaintiff did not file an appeal of the trial court's decision.

The City cannot predict the outcome of the Orange County litigation, nor whether the landowners whose claims were rejected by the San Diego County Assessment Appeals Board, or other landowners, will further prosecute claims against the County of San Diego. Currently, the trial court's ruling in the Orange County litigation applies only to assessments levied in Orange County. The City cannot predict the effect, if any, that the outcome of either the Orange County litigation or the further prosecution of claims against the County of San Diego would have on property tax revenues to be received by the City, although the effect would be adverse.

**Article XIII B of the California Constitution**

Article XIII B of the California Constitution limits the annual appropriations of the State and of any city, county, school district, authority or other political subdivision of the State to the level of appropriations for the prior fiscal year, as adjusted for changes in the cost of living, population, and services for which the fiscal responsibility is shifted to or from the governmental entity. The "base year" for establishing this appropriations limit is Fiscal Year 1979 and the limit is adjusted annually to reflect changes in population, consumer prices and certain increases or decreases in the cost of services provided by these public agencies.

Appropriations of an entity of local government subject to Article XIII B generally include any authorizations to expend during a fiscal year the proceeds of taxes levied by or for the entity, exclusive of certain State subventions, refunds of taxes and benefit payments from retirement, unemployment insurance and disability insurance funds. "Proceeds of Taxes" include, but are not limited to, all tax revenues, most State subventions and the proceeds to the local government entity from (a) regulatory licenses, user charges, and user fees (to the extent that such proceeds exceed the cost reasonably borne by such entity) and (b) the investment of tax revenues. Article XIII B provides that if a governmental entity's revenues in any year exceed the amounts permitted to be spent, the excess must be returned by revising tax rates or fee schedules over the subsequent two years.

Article XIII B does not limit the appropriation of money to pay debt service on indebtedness existing or authorized as of January 1, 1979, or for bonded indebtedness approved thereafter by a vote of the electors of the issuing entity at an election held for that purpose.

In the June 1990 election, the voters of the State approved Proposition 111, which amended the method of calculating State and local appropriations limits. Proposition 111 made several changes to Article XIII B, three of which are reflected in the City's annual computation of its appropriation limit. First, the term "change in the cost of living" was redefined as the change in the California per capita personal income ("CPCPI") from the preceding year. Previously the lower of the CPCPI or the United States Consumer Price Index was used. Second, the appropriations limit for the fiscal year was recomputed by adjusting the Fiscal Year 1987 limit by the CPCPI for the three subsequent years. Third, Proposition 111 excluded appropriation for "all qualified capital outlay projects, as defined by the Legislature" from the definition of "appropriations subject to limitation."

Article XIII B allows voters to approve a temporary waiver of a government's Article XIII B limit. Such a waiver is often referred to as a "Gann limit waiver." The length of any such waiver is limited to four years. In June 1990, San Diego voters approved a four-year increase in the City's Article XIII B limit (for Fiscal Years 1992 through 1995). In the November 1994 election, San Diego voters approved another four-year increase in the City's Article XIII B limit (for Fiscal Years 1996 through 1999). The Gann limit waiver does not provide any additional revenues to the City or allow the City to

~ 187 ~

finance additional services.  The City's appropriations limit for Fiscal Year 2003 is established at $684,004,095.  It is estimated that the City will be under the Gann Limit by approximately $127.8 million. The impact of the appropriations limit on the City's financial needs in the future is unknown.

**Articles XIII C and XIII D of the California Constitution**

On November 5, 1996, the voters of the State approved Proposition 218, known as the "Right to Vote on Taxes Act."  Proposition 218 added Articles XIII C and XIII D to the California Constitution, which contain a number of provisions affecting the ability of the City to levy and collect both existing and future taxes, assessments, fees and charges.  The interpretation and application of certain provisions of Proposition 218 will ultimately be determined by the courts with respect to some of the matters discussed below.  It is not possible at this time to predict with certainty the future impact of such interpretations.  The provisions of Proposition 218, as so interpreted and applied, may affect the City's ability to raise revenues for certain programs and obligations.

Article XIII C requires that all new local taxes be submitted to the electorate before they become effective.  Taxes for general governmental purposes of the City require a majority vote and taxes for specific purposes, even if deposited in the City's General Fund, require a two-thirds vote.  Further, any general purpose tax which the City imposed, extended or increased, without voter approval, after December 31, 1994, may continue to be imposed only if approved by a majority vote in an election which must be held within two years of November 5, 1996.  The City has not imposed, extended, or increased any such taxes which are currently in effect.

Article XIII C also expressly extends the initiative power to give voters the power to reduce or repeal local taxes, assessments, fees and charges, regardless of the date such taxes, assessments, fees and charges were imposed.  Article XIII C expands the initiative power to include reducing or repealing assessments, fees, and charges, which had previously been considered administrative rather than legislative matters and therefore beyond the initiative power.  This extension of the initiative power is not limited by the terms of Article XIII C to fees imposed after November 6, 1996 and absent other legal authority could result in the retroactive reduction in any existing taxes, assessments, or fees and charges. In addition, certain City Charter amendments, if effective, could further constrain the City in this area (see **"LITIGATION POTENTIALLY ADVERSELY AFFECTING THE GENERAL FUNDS OF THE CITY- City Voter Initiatives"** below).

The voter approval requirements of Article XIII C reduce the flexibility of the City to raise revenues for the General Fund, and no assurance can be given that the City will be able to impose, extend or increase such taxes in the future to meet increased expenditure needs.

Article XIII D added several new provisions relating to how local agencies may levy and maintain "assessments" for municipal services and programs.  These provisions include, among other things, (i) a prohibition against assessments which exceed the reasonable cost of the proportional special benefit conferred on a parcel; (ii) a requirement that the assessment must confer a "special benefit," as defined in Article XIII D, over and above any general benefits conferred; and (iii) a majority protest procedure which involves the mailing of a notice and a ballot to the record owner of each affected parcel, a public hearing, and the tabulation of ballots weighted according to the proportional financial obligation of the affected party.  "Assessment" in Article XIII D is defined to mean any levy or charge upon real property for a special benefit conferred upon the real property.  This definition applies to landscape and maintenance assessments for open space areas, street medians, public rights-of-way, streetlights, parks,

and other enhanced services and improvements. If the City is unable to continue to collect assessment revenues for a particular program, the program might have to be curtailed and/or funded by the City's General Fund. Given the approval requirements imposed by Article XIII D, the City is unable to predict whether it will be able to continue to collect assessment revenues for these programs. Since these programs represent additional services, to the extent such assessment revenues cannot be collected, the City Manager would recommend to the City Council that such programs be curtailed rather than supported with amounts in the General Fund. Based upon advice from the City Attorney, the City does not believe that it would be obligated to maintain such programs from the General Fund. To date, the City has conducted 34 mail ballot assessment elections, of which all but one were approved by the property owners.

In addition, Article XIII D added several provisions affecting "fees" and "charges," defined for purposes of Article XIII D to mean "any levy other than an ad valorem tax, a special tax, or an assessment, imposed by a [local government] upon a parcel or upon a person as an incident of property ownership, including a user fee or charge for a property related service." All new and existing property related fees and charges must conform to requirements prohibiting, among other things, fees and charges which (i) generate revenues exceeding the funds required to provide the property related service; (ii) are used for any purpose other than those for which the fees and charges are imposed; (iii) are for a service not actually used by, or immediately available to, the owner of the property in question; or (iv) are used for general governmental services, including police, fire or library services, where the service is available to the public at large in substantially the same manner as it is to property owners. Depending on the interpretation of what constitutes a "property related fee" under Article XIII D, there could be future restrictions on the ability of the City's General Fund to charge its enterprise funds for various services provided. Further, before any property related fee or charge may be imposed or increased, written notice must be given to the record owner of each parcel of land affected by such fee or charge. The City must then hold a hearing upon the proposed imposition or increase, and if written protests against the proposal are presented by a majority of the owners of the identified parcels, the City may not impose or increase the fee or charge. Moreover, except for fees or charges for sewer, water and refuse collection services, or fees for electrical and gas service, no property related fee or charge may be imposed or increased without majority approval by the property owners subject to the fee or charge or, at the option of the local agency, two-thirds voter approval by the electorate residing in the affected area. The City has a number of enterprise funds which are self supporting from fees and charges that may ultimately be determined to be property related for purposes of Article XIII D, e.g. the Sewer Enterprise Fund and the Water Enterprise Fund. The fees and charges of all City enterprise funds may be determined to be fees and charges subject to the initiative power referred to in Article XIII C, as described below. In the event that fees and charges cannot be appropriately increased or are reduced pursuant to exercise of the initiative power, the City may have to decide whether to support any deficiencies in these enterprise funds with moneys from the General Fund or to curtail service, or both.

In addition to the enterprise funds discussed above, the City's stormwater program is funded with fees, which may ultimately be determined to be property related for purposes of Articles XIII C and D. The City is a co-permittee under a National Pollution Discharge Elimination System Permit ("NPDES Permit") for its stormwater program. Pursuant to the NPDES Permit, the City is obligated to undertake substantial capital improvements and implement new operations and maintenance procedures for its stormwater program ("NPDES Permit Requirements"). At the present time, the City is working on a plan of finance for such NPDES Permit Requirements. If the City is not able to increase its stormwater fees to pay for the NPDES Permit Requirements, or if such fees are reduced pursuant to the exercise of the

A - 29

initiative power of Article XIII C, the City will have to identify a plan of finance for same. Such plan of finance may include General Fund moneys not previously identified.

Article XIII C also removes many of the limitations on the initiative power in matters of reducing or repealing any local tax, assessment, fee or charge. No assurance can be given that the voters of the City will not, in the future, approve an initiative or initiatives which reduce or repeal local taxes, assessments, fees or charges currently comprising a substantial part of the City's General Fund. "Assessments," "fees" and "charges" are not defined in Article XIII C, and it is unclear whether these terms are intended to have the same meanings for purposes of Article XIII C as for Article XIII D described above. If not, the scope of the initiative power under Article XIII C potentially could include any General Fund local tax, assessment, or fee not received from or imposed by the federal or State government or derived from investment income.

Both Articles XIII A and XIII B, as well as Articles XIII C and XIII D described above, were adopted as measures that qualified for the ballot pursuant to California's constitutional initiative process. From time to time other initiative measures could be adopted, affecting the ability of the City to increase revenues and to increase appropriations.

**Statutory Spending Limitations**

A statutory initiative ("Proposition 62") was adopted by the voters of the State at the November 4, 1986, General Election which (a) requires that any tax for general governmental purposes imposed by local governmental entities be approved by resolution or ordinance adopted by two-thirds vote of the governmental agency's legislative body and by a majority of the electorate of the governmental entity, (b) requires that any special tax (defined as taxes levied for other than general governmental purposes) imposed by a local governmental entity be approved by a two-thirds vote of the voters within the jurisdiction, (c) restricts the use of revenues from a special tax to the purposes or for the service for which the special tax is imposed, (d) prohibits the imposition of ad valorem taxes on real property by local governmental entities except as permitted by Article XIII A, (e) prohibits the imposition of transaction taxes and sales taxes on the sale of real property by local governmental entities, and (f) requires that any tax imposed by a local governmental entity on or after March 1, 1985, be ratified by a majority vote of the electorate within two years of the adoption of the initiative or be terminated by November 15, 1988. The requirements imposed by Proposition 62 were upheld by the California Supreme Court in *Santa Clara County Local Transportation Authority v. Guardino*, 11 Cal. 4th 220; 45 Cal.Rptr.2d 207 (1995).

The City believes that, notwithstanding the Guardino decision, the provisions of Proposition 62 do not apply to charter cities. The extent of the application of the decision to taxes authorized prior to the date of the decision is also undecided.

Following the Santa Clara decision, several actions were filed challenging taxes imposed by public agencies after the adoption of Proposition 62. On June 4, 2001, the California Supreme Court rendered its opinion in *Howard Jarvis Taxpayers Association v. City of La Habra, et al.* (2001) 25 Cal. 4th 809 holding that an action brought in 1996 challenging the imposition of a 1992 utility users tax imposed for general purposes, without voter approval, was not barred by a three year statute of limitations period because the continued imposition and collection of the tax was an ongoing violation upon which the statute of limitations period begins anew with each collection. However, the court noted that the case did not concern bond issues or other governmental actions that, by state law, are made subject to the accelerated validation procedures of Code of Civil Procedure sections 860 through 870.5.

The Santa Clara decision did not decide the question of the applicability of Proposition 62 to charter cities such as the City. Two (2) cases decided by the California Courts of Appeals in 1993, *Fielder v. City of Los Angeles* (1993) 14 Cal. App. 4th 137 (rev. den. May 27, 1993), and *Fisher v. County of Alameda* (1993) 20 Cal. App. 4th 120 (rev. den. Feb. 24, 1994), had held that Proposition 62's restriction on property transfer taxes did not apply to charter cities because charter cities derive their power to enact such taxes under Article XI, Section 5 of the California Constitution relating to public affairs.

Proposition 62, as an initiative statute, does not have the same level of authority as a constitutional initiative, but is analogous to legislation adopted by the State Legislature, except that it may be amended only by a vote of the State's electorate. However, Proposition 218, as a constitutional amendment, is applicable to charter cities and supersedes many of the provisions of Proposition 62.

Since the enactment of Proposition 62 in 1986, the City has instituted certain tax increases, and pursuant to such increases has collected approximately $309.3 million through June 30, 2002. The City did not increase existing taxes or impose new taxes during Fiscal Year 2002 or to-date in Fiscal Year 2003.

While in the opinion of the City Attorney the provisions of Proposition 62 do not apply to charter cities, this position is being challenged by various groups in other jurisdictions and may be the subject of future litigation. If ultimately found valid and applicable to charter cities, Proposition 62 could affect the ability of the City to continue the imposition of certain taxes, such as Sales and Transient Occupancy Taxes, and may further restrict the City's ability to raise revenue.

## LABOR RELATIONS

Most City employees are represented by one of four labor organizations. Currently, the American Federation of State and County Municipal Employees (Local 127) represents approximately 2,276 employees; The Municipal Employees Association (the "MEA") and unrepresented employees (who are a part of the MEA bargaining unit for contract purposes) represents approximately 4,935 employees; The Police Officers Association (the "POA") represents approximately 2,073 employees; and the International Association of Firefighters (Local 145) represents approximately 991 employees.

Labor agreements are in place with Local 127, MEA, and Local 145 through June 30, 2005. MEA and Local 127 will receive the following pay increases: 1% effective December 2002, 2% effective December 2003, 2% effective June 2004, 3 % effective December 2004, and 3% effective June 2005. Local 145 will receive the following pay increases: 1% effective July 2002, 2% effective July 2003, 2% effective December 2003, 4% effective July 2004, and 2% effective December 2004. In addition to increases in paid compensation, MEA, Local 127, and Local 145 will also receive increases in the amount of employee retirement contributions paid by the City on behalf of the employees. Including these retirement benefit increases, over the three-year period of the labor agreements total compensation will increase by 12.6% for MEA and Local 127, and by 15.7% for Local 145.

A labor agreement with POA is in place through June 30, 2003. POA received a 2% pay increase and a 1.7% increase in retirement compensation effective July 2002.

## PENSION PLAN

All benefited City employees participate with the full-time employees of the San Diego Unified Port District (the "District") in the City Employees' Retirement System ("CERS"). CERS is a public employee retirement system that acts as a common investment and administrative agent for the City and the District. Through various benefit plans, CERS provides retirement benefits to all general, safety (police and fire), and legislative members.

The CERS plans are structured as defined benefit plans in which benefits are based on salary, length of service, and age. City employees are required to contribute a percentage of their annual salary to CERS. State legislation requires the City to contribute to CERS at rates determined by actuarial valuations.

The City's last actuarial valuation dated June 30, 2002 stated the funding ratio (Valuation of Assets available for Benefits to Total Actuarial Accrued Liability), of the CERS fund to be 77.3%. The CERS fund has an Unfunded Actuarial Accrued Liability (UAAL) of $720.7 million as of June 30, 2002, which represents a $436.8 million increase in the UAAL since the previous actuarial calculation dated June 30, 2001. The UAAL is the difference between total actuarial accrued liabilities of $3.169 billion and assets allocated to funding of $2.448 billion. The increase in the UAAL as of June 30, 2002, results primarily from the lower than anticipated investment returns. The UAAL is amortized over a 30-year period, which started July 1, 1991, with each year's amortization payment reflected as a portion of the percentage of payroll representing the employer's contribution rate. As of June 30, 2002, there were 19 years remaining in the amortization period. See **"LITIGATION POTENTIALLY AFFECTING THE GENERAL FUNDS OF THE CITY- Other Litigations and Claims"** for a discussion of a pending litigation relating to the funding of the UAAL.

## INSURANCE, CLAIMS, AND LITIGATION

### Workers' Compensation And Long-Term Disability

The City is self-insured for Workers' Compensation and Long-term Disability. The City's self-insured liability for Workers' Compensation and Long-term Disability is accounted for in the Self Insurance Fund. The Self Insurance Fund for Workers' Compensation and Long-Term Disability is supported by contributions from each of the City's operating funds. These contributions are determined by multiplying an annually established rate by the gross salaries payable from each of the City's operating funds. As of June 30, 2002, there is a fund equity deficit in the Self Insurance Fund of approximately $29.3 million. It is anticipated that individual claim settlements will be funded through participating operating fund contributions subsequent to the filing of a claim and prior to its settlement.

### Employee Group Health Insurance

Employee Group Health coverage is provided to employees and retirees by third party group health insurance carriers through an annual "cafeteria plan" selection process.

### Public Liability Insurance

The City carries public liability insurance in the amount of $54 million in excess of the City's $1 million self-insured retention. This means that the City may pay up to the first $1 million in any one insured public liability loss and that insured losses above $1 million and up to $54 million are paid by

the City's public liability insurance. The City's public liability insurance is purchased in layers, jointly with a number of counties in the California State Association of Counties – Excess Insurance Authority ("CSAC-EIA"), however, there is no sharing of policy limits with other members of CSAC-EIA for public liability claims. The City budgets for public liability claims on an annual basis. The City has incurred total annual liability claims and liability insurance premium payments as shown below in Table 18.

**Table 18**
**CITY OF SAN DIEGO**
**LIABILITY CLAIMS[1] AND PREMIUMS**
*Fiscal Years ended June 30, 1998 through 2002*

| Fiscal Year | Liability Claims Expenses And Settlement Costs | Liability Premium Payments |
|---|---|---|
| 1998 | $ 9,970,097 | $ 1,209,474 |
| 1999 | $ 7,202,644 | $ 1,103,009 |
| 2000 | $ 9,639,750 | $ 1,105,678 |
| 2001 | $ 13,394,697 | $ 1,071,330 |
| 2002 | $ 8,479,308 | $ 1,520,560 |

[1] The City's portion of settlement and investigation expenses for third party public liability claims, and other litigation expenses.

Source: City of San Diego, Risk Management

**Property Insurance**

The City participates in the joint purchase of property insurance including rental interruption and flood insurance through the CSAC-EIA pool; this does not include Earthquake insurance. This joint purchase of the City's "all risk" property insurance, insuring approximately $2 billion of City property, provides coverage for loss to City property up to approximately $400 million per occurrence, with a $25,000 deductible. This limit of insurance includes coverage for rental interruption for lease financed locations. The City also carries boiler and machinery coverage. There is no sharing of limits among the City and member counties of the CSAC-EIA pool, unless the City and member counties are mutually subject to the same loss. Limits and coverages may be adjusted periodically in response to requirements of bond financed projects and in response to changes in the insurance marketplace.

The City's "all risk" property insurance policy effective March 31, 2003, through March 31, 2004, will cost approximately $6 million. This represents an increase of 30% from the prior year, due to several factors including the events of September 11, 2001, a hardening insurance market and a loss of reinsurance capacity.

**Earthquake Insurance**

Earthquake coverage is provided for designated buildings/structures and certain designated City lease financed locations in the amount of $75 million, including coverage for rental interruption caused by Earthquake at certain designated locations. Earthquake coverage is subject to the greater of a 5% or $50,000 per unit deductible, effective through March 31, 2004. The City's earthquake coverage is purchased jointly and shared with the member counties in the CSAC-EIA pool. Due to the potential for geographically concentrated earthquake losses, the CSAC-EIA pool is geographically diverse to minimize any potential sharing of coverage in the case of an earthquake. Depending upon the availability and affordability of such earthquake insurance, the City may elect not to purchase such coverage in the future,

or the City may elect to increase the deductible or reduce the coverage from present levels.

**Employee Dishonesty and Faithful Performance Insurance**

       The City is a public agency subject to liability for the dishonest acts, and negligent acts or omissions of its officers and employees acting within the scope of their duty ("employee dishonesty" and "faithful performance"). The City participates in the joint purchase of insurance covering employee dishonesty and faithful performance through the CSAC-EIA pool. Coverage is provided in the amount of $10 million per occurrence subject to a $25,000 deductible.

<div align="center">

**LITIGATION POTENTIALLY ADVERSELY AFFECTING
THE GENERAL FUNDS OF THE CITY**

</div>

**No Pending Litigation**

       There is no litigation against the City pending or, to the knowledge of the officers of the City, threatened, in any court or other tribunal of competent jurisdiction, state or federal, in any way (i) restraining or enjoining the issuance, sale or delivery of any of the securities; (ii) questioning or affecting the validity of the securities; or (iii) questioning or affecting the validity of any of the proceedings for the authorization, sale, execution or delivery of the securities. To the knowledge of the City and the City Attorney, there are pending against the City lawsuits and claims arising in the ordinary course of the City's activities which, taken individually or in the aggregate, could materially affect the City's finances. However, taking into account insurance and self-insurance reserves expected to be available to pay liabilities arising from such actions, the City does not expect any or all of such claims to have a material adverse effect on its ability to repay the securities when due.

*De La Fuente Border Business Park v. City of San Diego*

       On January 2, 2001, a San Diego County Superior Court jury returned a special verdict in the amount of $94.5 million against the City. The jury award consisted of three parts: $29.2 million for breach of a development agreement; $25.5 million for inverse condemnation relating to planning of a regional airport; and, $39.8 million for inverse condemnation relating to excessive traffic. Claims for interest, costs, and attorneys' fees could bring the total judgment to more than $200.0 million.

       The lawsuit arises out of a 1986 development agreement (the "Development Agreement") between the City and Border Business Park, Inc., relating to the development of a 312-acre industrial park in Otay Mesa, a community within the boundaries of the City and just north of the United States-Mexican border. Plaintiff alleges the City engaged in a pattern of conduct aimed at thwarting the developer's rights under the Development Agreement, which resulted in breaches of the Development Agreement and unconstitutional "takings" of private property for public use. Specifically, plaintiff claimed the City "took" plaintiff's property by: (i) publicly discussing a proposal to build an international airport in the Otay Mesa region; and (ii) diverting commercial truck traffic onto public streets adjacent to plaintiff's property.

       The specific breaches of the Development Agreement alleged in the lawsuit include: changes in city-wide construction standards; denials of conditional use permits; delays in permit processing; imposition of Housing Trust Fund Fees; diversion of Development Impact Fees; and the mismanagement of adjacent City-owned property. The disclosure of plans for a new regional airport, and the diversion of border-bound traffic, which were the bases for the inverse condemnation awards, were also alleged as contract breaches.

Following the special verdict but before entry of the judgment, the trial judge disqualified himself from further proceedings in the case for allegedly failing to disclose personal relationships with one of the plaintiff's attorneys. The case was transferred to another judge outside of San Diego County who will sit for all purposes, including a new trial.

The City has retained two law firms to represent it in post trial motions and any appeals. Such motions and potential appeals pertain to the validity of the disqualified trial judge's pre-trial and trial rulings, and the validity of the underlying verdict.

As the result of a recent hearing on the City's post-trial motions before the newly assigned judge, the judge reduced the plaintiff's pre-judgment interest claim from $144.0 million to about $26.0 million. The court subsequently entered judgment on the verdict amount ($94.5 million), plus the pre-judgment interest for a total of $119.0 million.

In addition, the court has denied the City's motion for judgment notwithstanding the verdict and motion to set aside the verdict on the grounds of fraud. It did, however, grant the City a complete new trial on one legal theory, a contract claim, and set aside award of the damages on that theory (in the amount of $29.2 million of the $94.5 million). The court also found the contract claim largely barred by the time limits in the Government Claims Act.

The court denied the City a new trial on the remaining claims in the case for inverse condemnation, relating to the airport study and truck routing, finding that the Court needed to defer to the original judge on these matters. This has the effect of leaving in place $65.3 million in inverse condemnation damages, plus approximately $26.0 million in pre-judgment interest. The total judgment, including pre-judgment interest, is currently approximately $91.3 million. Appellate counsel for the City has advised that the City should have no obligation to pay these amounts until the appeal is concluded, which will take at least eighteen months to two years. The City will also be responsible for any post-trial interest, which will accrue at the rate of approximately 5.7% per annum, until any judgment is paid.

The City believes that a significant portion of its defense costs — both retroactive to the exhaustion of the self-insured retention of $1.0 million and prospectively through appeal— will be paid in large part by one or more of the City's insurers. The City may have some coverage for damages under its policies of insurance but the amount and scope of the coverage is not presently known. A number of insurers whose policies may cover defense costs and any judgment have challenged the applicability of their policies (see "**Insurance Coverage Issues**" below).

Despite the denial of certain of the post-trial motions, the City believes it has sound legal theories for its appeal; however, no assurance can be given that the City's pursuit of this challenge will be successful. In the event that the City is not successful on appeal, and on retrial, if any, the judgment, including any interest, will have to be paid from the City's treasury, most likely over a period of ten years with additional interest during that period, to the extent that there is not insurance coverage or a shortfall in coverage.

Because there is no final judgment at this time, given the court's partial grant of the City's new trial motion, the City had not included any moneys for the payment of any judgment in this case in its budget for the 2002-2003 Fiscal Year and does not propose to include any moneys in its budget for the 2003-2004 Fiscal Year.

On November 7, 2001, the plaintiff filed a motion with the trial court asking that the City deposit in trust into the court, the full judgment amount of $92.4 million which includes some post-judgment interest, pending the City's appeal. The court denied the plaintiff's motion. Litigation counsel has advised that if plaintiff seeks discretionary review of the denial of the motion for deposit, the plaintiff must have done so within approximately sixty days after entry of the order on November 19, 2001. As of the date hereof, no such discretionary review has been sought.

**Insurance Coverage Issues**

On April 9, 2002, three of the City's general liability insurers filed a federal court lawsuit against the City in the Southern District of California, *Insurance Company of the State of Pennsylvania, et al. v. City of San Diego*, Case No. 02 CV 0693 JM (RBB). These insurers provide coverage to the City for the years 1991 to 2001, and they collectively insure the City for policy limits of $25 million per occurrence per year (less the City's self-insured retention, which ranges from $1 million to $3 million). The insurers' lawsuit seeks a declaration that the insurers are not obligated to defend or indemnify the City for any liability it may suffer in the *De La Fuente* matter.

The City's other two liability insurers did not join in this lawsuit, although they are not precluded from joining in this lawsuit or filing a separate lawsuit. The non-suing liability insurers issued coverage to the City for the 1990-91 policy year, with collective limits of $17 million per occurrence. One of them (with policy limits of $2 million per occurrence) has indicated by letter to outside counsel that it will accept coverage for one occurrence, while reserving its rights to dispute that there is more than one occurrence.

The suing insurers are disputing coverage on the ground that the City allegedly provided late notice of the claims against it, and based upon alleged policy exclusions for breach of contract and inverse condemnation claims. Although one suing insurer has been paying a significant portion of the City's defense costs in the *De La Fuente* matter to date (about 60%), and has orally agreed to continue defending despite filing the coverage lawsuit, that insurer seeks to be relieved of the defense obligation by court order. If the insurers were to prevail on this complaint, the City would lose insurance coverage for its future attorneys' fees and costs incurred in defending the *De La Fuente* matter, and for any damages ultimately awarded in those cases, from these insurers. In the opinion of outside counsel, the City would not owe any damages to the insurance companies, even if it lost coverage, except in the unlikely event that the Court ordered the City to reimburse suing insurer(s) for past defense costs it has paid to the City.

On May 7, 2002, the City filed an answer and counterclaim in the lawsuit. The City seeks a determination that all three suing insurers are obligated to defend the City in the *De La Fuente* matter. In addition, the City seeks to recover damages for breach of contract and bad faith. However, no prediction can be made as to the outcome of this litigation.

**City Voter Initiatives**

An initiative proposing an amendment to the San Diego City Charter was submitted to the City voters at the election on the March 5, 2002. This initiative appeared on the ballot as Proposition E. The initiative asked the voters whether the City Charter should be amended to require that any increase in an existing general tax or imposition of any new general tax be levied by the City Council only if the proposed levy has been approved by a two-thirds vote of the qualified electors voting on the proposed tax measure.

At that same election, another proposition was submitted to the voters for consideration. This proposition, Proposition F, asked the voters whether the City Charter should be amended to require that, in order to be adopted or effective, any City Charter amendment, ballot proposal, initiative, statute, law, or regulation requiring a greater than simple majority vote of the electorate, and which is proposed to be adopted on or after the date of this election, must be adopted by the same proportionate vote of the electorate. In effect, the City has argued in the litigation described below that, the adoption of this proposition would require that Proposition E would have to be approved by a two-thirds vote of the qualified electors voting in the March 5, 2002 election.

Proposition E was approved by 54.4% and Proposition F was approved by 50.3% of the voters in the March 5, 2002 election. Having received a majority vote, Proposition F was adopted. The City has taken a position that Proposition E, however, by the terms of Proposition F, was not adopted.

There have been two cases filed challenging the results of the March 5, 2002 election pertaining to Propositions E and F; *Teyssier v. City of San Diego, et al. and Howard Jarvis Taxpayers Association v. City of San Diego et al.* Both actions seek declaratory relief contending that Proposition F is unconstitutional. In addition, *Teyssier* seeks a writ of mandate directing the City to certify and record the adoption of Proposition E. Both matters allege (i) that Proposition F is preempted by the California Constitution; (ii) that it cannot affect an election held prior to its effective date; and (iii) that Proposition F, having received fewer votes than Proposition E, an alleged conflicting measure on the same ballot, should have been defeated. The trial court consolidated the two cases.

On April 22, 2003, the City received a minute order of the trial court for the consolidated cases. The Court's ruling declines to invalidate Proposition E. The Court leaves open the question whether Proposition E could require a supermajority for an amendment to the City Charter, which would impose or raise a general tax. The Court's minute order has not been reduced to a judgment. The City has not yet decided to appeal or other wise contest the ruling. Regardless of the outcome of the litigation, these lawsuits are unlikely to have any impact to the City's budget or revenue for Fiscal Year 2003, because they relate only to new or increased taxes. It is currently anticipated that the City's proposed budget for Fiscal Year 2004 would not include projected revenues from any such tax enhancing measures.

**Other Litigation and Claims**

In February 2002, the Public Facilities Financing Authority of the City of San Diego issued lease revenue bonds in the aggregate principal amount of $169,685,000 (the "Ballpark Bonds") for the construction of a state of the art baseball park. The ballpark project has been the subject of a variety of litigations, however, there has not been any new litigation filed regarding the project since the approval of the original Offering Document in 2002. The case *Skane v. City of San Diego*, Court of Appeal case no. D038879 has been finally resolved, the California Supreme Court denying a petition for review on October 2, 2002. On January 30, 2003, the Fourth District Court of Appeal filed an opinion affirming a trial court judgment in favor of the City in the case *Simmons v. City of San Diego*, Court of Appeal case no. D039838. The plaintiffs failed to file a petition for review to the California Supreme Court by the filing deadline of March 11, 2003. The City and Bond Counsel are considering the import of the appellate court's decision on the City's ability to refund the 2002 Bonds (see **"BONDED AND OTHER INDEBTEDNESS- Proposed Additional General Fund Lease Commitments**). The case *City v. All Persons Interested*, Superior Court case no. GIC763487 was the subject of appeals that were consolidated under Court of Appeal case no D038587 and were further consolidated with Skane. The Court of Appeal affirmed the judgment in favor of the City and the Redevelopment Agency. The California Supreme Court

denied the petitions for review on October 2, 2002.

On March 29, 2002, Brown Field Aviation Park LLC (BFAP) filed a claim seeking damages in excess of $120 million, asserting that the City breached a Memorandum of Understanding that provided BFAP with the exclusive right to negotiate a proposed Development Agreement and Master Lease that would transform Brown Field into a cargo airport with ancillary commercial and industrial uses. BFAP contended that the City breached the MOU by requiring review by the Federal Aviation Administration prior to a City Council hearing. In addition, BFAP claimed the city breached the MOU by failing to present the project for City Council consideration in September 2000, and by failing to continue negotiations after the FAA released a preliminary airspace analysis on September 29, 2000.

On March 4, 2003 the City Council approved a settlement of this case by agreeing to pay BFAP $1.25 million. This sum represents a refund of the money BFAP paid to the City for the right to negotiate the project and for the labor costs incurred by the City staff in reviewing the proposed project. The City's excess liability carrier also agreed to pay $249,000 in settlement of the claim.

On January 16, 2003, a class action complaint (*Gleason v. City of San Diego, et al.*) for declaratory relief was filed in the Superior Court against the City, the City's Employees' Retirement System (SDCERS), and certain named members of the SDCERS board of administration. The plaintiffs, former City employees who receive City retirement benefits, allege that as a result of recent actions taken by the defendants, the SDCERS trust fund has an unfunded accrued liability of $720 million, and that by 2009, the City will owe approximately $2.8 billion to SDCERS, with an annual City budget expense of more than $250 million. In addition to the declaration of their rights, plaintiffs ask for restitution to the SDCERS trust fund, an injunction prohibiting the City from unlawfully underfunding the trust fund in the future, money damages, attorneys' fees, and other relief.

As noted under the heading **"PENSION PLAN"** above, the City's unfunded accrued actuarial liability as of June 30, 2002 is approximately $720 million. The City is defending the case and believes it has complied with applicable law in the funding of the SDCERS trust fund. The case is still in the early stages, and the City has not completed an assessment of the claim. The City cannot predict the outcome of the litigation at this time, but if the plaintiffs are successful, there potentially may be additional expense to the General Fund in the funding of the SDCERS trust fund and otherwise, over and above the City's expected expense in the funding of its pension obligations.

### INVESTMENT OF FUNDS

The Treasurer of the City of San Diego, in accordance with the Charter of the City of San Diego and authority granted by the City Council, is responsible for investing the unexpended cash in the Treasurer's pooled operating investment fund (the "City Pool"). Responsibility for the daily investment of funds in the City Pool is delegated to the City's Chief Investment Officer. The City is the only participant in the City Pool; there are no other City Pool participants either voluntary or involuntary. The investment objectives of the City Pool are preservation of capital, liquidity and return.

### Oversight and Reporting Requirements

The City Treasurer provides an investment report on a monthly basis to the City Manager, the City Auditor and Comptroller and the City Council and annually presents a statement of investment policy (the "Investment Guidelines") to the City Manager, the City Council and the City Manager's

Investment Advisory Committee. The Investment Advisory Committee was established in 1990 and is comprised of the City Auditor and Comptroller, a Deputy City Manager and three investment professionals from the private sector. The Committee is charged with oversight responsibility to review on an ongoing basis the Investment Guidelines and practices of the City Treasurer and recommend changes. Investments in the City Pool are audited by an independent firm of certified public accountants as part of the overall audit of the City's financial statements.

The City's investment section uses outside services to provide investment portfolio valuations and accounting and reporting services. The service provides monthly portfolio valuation, investment performance statistics and other statistical security reports, which are distributed to the City Treasurer accounting section and the City Auditor and Comptroller's office for review and reconciliation. The City Treasury accounting section prepares a series of monthly reports, which includes portfolio market valuation, and distributes these to the Mayor, City Council, City Manager and other officials.

## Authorized Investments

Investments in the City Pool are governed by State law and further restricted by the City's Investment Guidelines. The Guidelines have been written with safety of principal being the foremost objective. Permitted investments include U.S. Treasury securities, U.S. Agency securities, corporate medium term notes, money market instruments and the Local Agency Investment Fund (California State Pool). Reverse repurchase agreements ("reverse repos") are restricted to 20% of the base value of the portfolio and are governed by various maturity restrictions as well. The main operating funds of the City are being managed in two separate portfolios. In its management of the "Liquidity" portfolio, comprising about 35% of total funds, the City invests in a variety of debt securities with maturities ranging from one day to one year. The remaining 65% of funds are managed in a separate "Core" portfolio that consists of a variety of debt securities ranging from one day to five years; performance is measured against the Merrill Lynch 1 to 3 year U.S. Treasury Index. Safety of principal and liquidity are the paramount considerations in the management of both portfolios.

## Pool Liquidity and Other Characteristics

The City Pool (including both the "Liquidity" and the "Core" portfolios) is highly liquid. As of January 31, 2003, approximately 10% of the pool investments mature within 60 days, 21% within 90 days and 35% within 181 days (on a cumulative basis). As of January 31, 2003, the Pool had a weighted average maturity of 1.59 years (580 days) and its weighted yield was 2.90%. For purposes of calculating weighted average maturity, the City Treasurer treats investments in the State-wide Local Agency Investment Fund (California State Pool) as maturing within one day. The Liquidity portfolio had a duration of 0.35 years and the Core portfolio had a duration of 1.42 years as of January 31, 2003. Duration is a measure of the price volatility of the portfolio and reflects an estimate of the projected increase or decrease in the value of the portfolio based upon a decrease or increase in interest rates. Accordingly, the Liquidity portfolio should decrease in market value by 0.35% for every 1% increase in market interest rates while the Core portfolio should decrease in market value by 1.42% for every 1% increase in market interest rates. The City Pool's composition is designed with a goal of having sufficient liquid funds available to meet disbursement requirements. The composition and value of investments under management in the City Pool will vary from time to time depending on cash flow needs of the City, maturity or sale of investments, purchase of new securities, and fluctuations in interest rates.

### Table 19
## CITY OF SAN DIEGO POOLED OPERATING INVESTMENT FUND [1]
### *at January 31, 2003*
(Unaudited)

| Investment Instrument | Book Value | Market Value | Percent of Total [1] |
|---|---|---|---|
| U.S. Treasury Bills and Notes | $491,710,525 | $495,537,305 | 38.88% |
| Federal Agency Securities | 569,354,218 | 575,278,317 | 45.01% |
| Medium Term Notes (Corporate) [2] | 140,059,070 | 139,036,161 | 11.07% |
| Money Market Instruments [3] | 43,397,533 | 43,443,305 | 3.43% |
| Local Agency Investment Fund | 20,334,871 | 20,334,871 | 1.61% |
| NET ASSETS | $1,264,856,217 | $1,273,629,959 | 100.00% |

(1)  Based on Book Value.
(2)  These notes consist of both fixed & floating interest rate securities. The notes with floating interest rates are reset at intervals ranging from one day to three months.
(3)  These securities consist of commercial paper, negotiable certificates of deposit, term and overnight repurchase agreements, banker's acceptances, bank notes and/or thrift notes.

Source: City of San Diego, Office of the City Treasurer

## Derivatives

As of January 31, 2003, and at least since October 14, 1997, the City Pool has had no assets invested in structured notes or derivatives prohibited in California Government Code 53601. The City Treasurer defines a derivative as a financial instrument whose value is derived from an underlying asset, price, index or rate, e.g., options, futures or interest rate swaps. A structured note is an investment instrument that can contain within its structure various combinations of derivatives such as imbedded calls and interest rate swaps that will offer returns to an investor within a defined set of parameters and interest rate scenarios, e.g., step-ups, multiple-indexed notes, inverse floaters or leveraged constant maturity notes. The City Treasurer does not define fixed rate notes, debentures with call features or single index non-leveraged floating rate notes, e.g. monthly LIBOR plus or minus a spread, as structured notes. The City Treasurer limits structured notes eligible for purchase to those investments which, at the time of purchase, have no risk of principal loss if held to maturity and offer an estimated return at purchase that exceeds the return on a comparable fixed term investment in the judgment of the City's Investment Officer. The City Treasurer does not allow the purchase of securities that have a negative amortization of principal. In addition, California law prohibits the purchase by local governments of inverse floaters, range notes or interest only strips derived from pools of mortgages.

## Reverse Repurchase Agreements

A reverse repo is a transaction in which the City Pool sells a security and concurrently agrees to buy it back from the same party at a later date for a price that includes an interest component for the City Pool's use of the money. Although the City from time to time uses reverse repos, as of January 31, 2003, and since September 18, 1996, the City has had no reverse repos in the City Pool. The Investment Guidelines require that all proceeds of a reverse repo be reinvested in securities whose maturity date or coupon reset date match the maturity of the reverse repo. The Investment Guidelines limit the use of reverse repurchase agreements to 20% of the base value of the City Pool. The City's reverse repo program is monitored daily and reported monthly, as described above under "**Oversight and**

Reporting Requirements".

## BONDED AND OTHER INDEBTEDNESS

**General**

     The City has never failed to pay principal of or interest on any of its debts or lease obligations when due. The City has issued bonds or entered into installment purchase contracts secured by and payable out of loans and installment sale contracts, in order to provide conduit financing for single and multi-family housing, industrial development, and 501 (c) (3) non-profit corporations. These bonds and certificates of participation are not secured by City general funds or revenues.

**Long-Term Obligations**

     As of June 30, 2002, the City had $58,095,000 aggregate principal amount of long-term general obligation bonded indebtedness outstanding and $566,505,000 aggregate principal amount of long-term general fund lease obligations outstanding. The City's general obligation bond ratings are AAA (Fitch Ratings), Aa1 (Moody's Investors Services) and AA (Standard & Poor's).

     The following table is a schedule, by years, of principal and interest payments required to be made by the City or its oversight entities with respect to future obligations, as of June 30, 2002.

**Table 20**
**CITY OF SAN DIEGO**
**GENERAL OBLIGATION AND GENERAL FUND LEASE OBLIGATIONS**
*As of June 30, 2002*
*(in thousands)*

| Fiscal Year Ending June 30 | General Obligation Bonds | General Fund Lease Obligations | Total Principal and Interest Payable |
|---|---|---|---|
| 2003 | $ 9,395 | $ 49,146 | $ 58,541 |
| 2004 | 9,525 | 49,854 | 59,379 |
| 2005 | 9,645 | 49,921 | 59,566 |
| 2006 | 9,777 | 49,497 | 59,274 |
| 2007 | 9,923 | 46,993 | 56,916 |
| Thereafter | 26,337 | 894,774 | 921,111 |
| Subtotal | $ 74,602 | $ 1,140,185 | $ 1,214,787 |
| Less Interest Portion | $ (16,507) | $ (573,680) | $ (590,187) |
| Total Principal Portion | $ 58,095 | $ 566,505 | $ 624,600 |

The following provides a summary list of outstanding general obligation bonds and General Fund lease commitments as of June 30, 2002.

|  | Principal Outstanding (000's) |
|---|---|
| General Obligation Bonds | |
| 1994 – Open Space Park Facility District Refunding | $41,175 |
| 1991 – Public Safety Communications | 16,920 |
| Total Principal of General Obligation Bonds | $58,095 |
| | |
| General Fund Lease Commitments | |
| | |
| *Certificates of Participation* | |
| 1993 – Balboa Park/Mission Bay Park Capital Improvements [1] | $19,800 |
| 1996A – Balboa Park/Mission Bay Park Capital Improvements | 25,010 |
| 1996B – Balboa Park/Mission Bay Park Capital Improvements Refunding | 10,440 |
| *Lease Revenue Bonds* | |
| 1993 – City/MTDB Authority for Old Town Trolley Extension [2] | 16,005 |
| 1994 – City/MTDB Authority Refunding - Police CIP and Bayside Extension | 34,560 |
| 1996 – Stadium Improvements | 64,955 |
| 1998 – Convention Center Expansion Authority | 200,980 |
| 2002 – Ballpark and Redevelopment Project | 169,685 |
| 2002 – Fire and Life Safety Improvements | 25,070 |
| Total Principal of General Fund Lease Commitments | $566,505 |

(1)  To be refunded by the 2003 Refunding Certificates of Participation (Balboa Park/Mission Bay Park Capital Improvements).
(2)  To be refunded by the 2003 Refunding Lease Revenue Bonds (San Diego Old Town Trolley Extension).

Source:  City of San Diego, Auditor and Comptroller

**Recent Financings**

In June 2002, the Public Facilities Financing Authority of the City of San Diego issued $25.2 million in Lease Revenue Bonds to fund the rehabilitation and construction of fire stations and life safety facilities throughout the City.  The total project cost is estimated at approximately $45.1 million, including $10.9 million for life safety improvements and $34.2 for fire improvements.  Additional funding is expected to come from bond proceeds in future Fiscal Years.  Additionally, in April 2003, the City refunded the 1993 City/MTDB Authority Lease Revenue Bonds (Old Town Trolley Extension).

**Proposed Additional General Fund Lease Commitments**

From time to time the City issues debt to fund various capital improvements and projects. The City will be refunding the 1993 Certificates of Participation (Balboa Park/Mission Bay Park Capital Improvements) in May 2003.

In 2004, the City intends to issue approximately $87 million in General Fund obligations to implement the Library System Improvements Program adopted by the City Council in November 2002. The overall program consists of renovation, expansion and addition of new library facilities Citywide at an estimated total project cost of $312 million between Fiscal Years 2003 and 2011.  The funding sources include grants and private funds, Development Impact Fees and Facilities Benefit Assessment Fees, Other City Funds and bond proceeds.  Upon the initial bond issuance projected to occur in 2004, the remainder of the bond funds is expected to come from phased bond issuances in later Fiscal Years.

In February 2002, the Public Facilities Financing Authority of the City of San Diego issued $169.7 million in Lease Revenue Bonds to fund a portion of the City's contribution to the Ballpark and Redevelopment Project (the "Ballpark Project"). Due to litigation matters concerning the Ballpark Project that were pending at the time of issuance, the bonds, although issued on a tax-exempt basis, were sold at a premium above tax-exempt rates. When the bonds were issued, it was contemplated that if litigation is decided favorably to the City, and depending on market conditions, the City would refund the bonds with bonds bearing lower interest rates. It is currently expected that remaining litigation matters will be resolved as early as Fiscal Year 2003 but no later than Fiscal Year 2004. See "**LITIGATION POTENTIALLY AFFECTING THE GENERAL FUNDS OF THE CITY- Other Litigations and Claims**" for the status of such litigation. If such matters are resolved favorably to the City, and depending on market conditions, the City would issue refunding bonds shortly thereafter.

**Short-Term Borrowings**

The City has issued tax anticipation notes since the mid-1960's (except for Fiscal Year 1979) in anticipation of receipt of taxes and other General Fund revenues. The following table presents a 10-year history of the City's short-term borrowings:

**Table 21**
**CITY OF SAN DIEGO**
**SHORT-TERM BORROWINGS**
*Fiscal Years Ended June 30, 1994 through May 1, 2003*

| Fiscal Year Ended June 30 | Principal Amount |
|---|---|
| 1994 | $ 100,500,000 |
| 1995 | $ 68,000,000 |
| 1996 | $ 53,000,000 |
| 1997 | $ 73,500,000 |
| 1998 | $ 82,000,000 |
| 1999 | $ 88,500,000 |
| 2000 | $ 99,500,000 |
| 2001 | $ 77,000,000 |
| 2002 | $ 73,000,000 |
| 2003 | $ 93,200,000 |

Source: City of San Diego, Auditor and Comptroller

**Prior Years' Defeasance of Debt**

In prior years, the City, the San Diego Stadium Authority, the Redevelopment Agency, the San Diego Facilities and Equipment Leasing Corporation, San Diego Open Space Park Facilities District No. 1, City of San Diego/MTDB Authority, and the Public Facilities Financing Authority defeased certain debt obligations by placing the proceeds of refunding bonds in an irrevocable trust to provide for all future debt service payments on the old bonds, through certain applicable redemption dates or maturity. Accordingly, the trust account assets and the liability for the defeased bonds are not included in the City's financial statements. As of June 30, 2002, $27,910,000 of defeased bonds are still held by investors.

**Operating Lease Commitments**

The City has entered into various General Fund lease arrangements under which the City

must make annual payments to occupy facilities necessary for City operations. The table below is a schedule by years of future minimum rental payments required under such leases entered into by the City that have initial or remaining noncancellable lease terms in excess of one year, as of June 30, 2002.

### Table 22
### CITY OF SAN DIEGO
### FUTURE MINIMUM RENTAL PAYMENTS
### GENERAL FUND OPERATING LEASE COMMITMENTS

| Fiscal Year Ending June 30 | Rent Payable |
|---|---|
| 2003 | $5,132,756 |
| 2004 | 2,481,868 |
| 2005 | 2,274,252 |
| 2006 | 2,259,671 |
| 2007 | 2,249,256 |
| Thereafter | 14,704,794 |
| Total Minimum Payments | $29,102,597 |

Source: City of San Diego, Auditor and Comptroller and Real Estate Assets Department

## Overlapping Debt and Debt Ratios

Table 23 presents a statement of direct and overlapping bonded debt of the City as of February 1, 2003. Revenue bonds, tax allocation bonds and special assessment bonds are not included in the tabulation; lease revenue obligations payable from the City's General Fund or equivalent sources are included.

The City contains numerous school districts and special purpose districts, such as for water and sanitation, many of which have issued general obligation bonds. Some of the issues may be payable from self-supporting enterprises or revenue sources other than property taxation.

The City periodically issues special assessment or Community Facilities District Mello-Roos bonds on behalf of petitioning developers or citizens when the City determines that the public facilities to be financed are of a defined extraordinary benefit to the City. These bonds are secured by property owner assessments or special taxes. As of June 30, 2002, there were four 1915 Act Assessment District and one Reassessment District bond issues with aggregate outstanding principal of $43,692,999 and three Community Facilities District (Mello-Roos) bond issues with outstanding principal of $115,010,000.

The reserve funds for each of the City's outstanding Assessment District and Community Facilities District bond issues were fully funded as of June 30, 2002. Although the City is not in any way obligated to make debt service payments for either Assessment or Community Facilities District bond issues, the City has in the past taken proactive measures to protect bondholders.

**Table 23**
**CITY OF SAN DIEGO**
**STATEMENT OF DIRECT AND OVERLAPPING BONDED DEBT**
*as of February 1, 2003*

2002-03 Assessed Valuation: $104,940,180,862
Redevelopment Incremental Valuation: 4,629,088,709
Adjusted Assessed Valuation: $100,311,092,153

| | % Applicable | Debt 2/1/03 |
|---|---|---|
| **DIRECT AND OVERLAPPING TAX AND ASSESSMENT DEBT:** | | |
| San Diego County Water Authority | 49.271% | $ 810,508 |
| Metropolitan Water District | 8.872 | 44,587,123 |
| Southwestern Community College District | 17.482 | 6,912,383 |
| San Diego Unified School District | 99.911 | 764,304,390 |
| San Diego Unified School District Lease Tax Obligations | 99.911 | 67,784,618 |
| Sweetwater Union High School District | 21.100 | 7,620,265 |
| San Ysidro School District | 92.096 | 17,636,384 |
| Other High School and School Districts | Various | 9,468,043 |
| **City of San Diego** | 100. | 15,690,000 |
| **San Diego Open Space Park Facilities District No. 1** | 100. | 36,475,000 |
| City of San Diego Community Facilities District No. 1 | 100. | 52,745,000 |
| City of San Diego Community Facilities District No. 2, Improvement Area Nos. 1 and 3 | 100. | 60,250,000 |
| City of San Diego 1915 Act Bonds | 100. | 40,854,284 |
| North City West School District Community Facilities District | 100. | 92,327,921 |
| Poway Unified School District Community Facilities District No. 1 and 10 | 99.609-100. | 95,361,344 |
| San Dieguito Union High School District Community Facilities District No. 95-1 | 81.063 | 15,048,785 |
| Sweetwater Union High School District Community Facilities Districts | 5.014-100. | 2,861,346 |
| Other Special District 1915 Act Bonds | Various | 1,080,974 |
| TOTAL GROSS DIRECT AND OVERLAPPING TAX AND ASSESSMENT DEBT | | $1,331,818,368 |
| Less: **San Diego Open Space Park Facilities District No. 1 (100% self-supporting)** | | 36,475,000 |
| TOTAL NET DIRECT AND OVERLAPPING TAX AND ASSESSMENT DEBT | | $1,295,343,368 |
| | | |
| **DIRECT AND OVERLAPPING GENERAL FUND OBLIGATION DEBT:** | | |
| San Diego County General Fund Obligations | 47.537% | $ 233,049,556 |
| San Diego County Pension Obligations | 47.537 | 391,892,651 |
| San Diego Superintendent of Schools Certificates of Participation | 47.537 | 982,827 |
| San Diego Community College District General Fund Obligations | 99.907 | 41,935,963 |
| San Diego Unified School District Certificates of Participation | 99.911 | 30,253,051 |
| Sweetwater Union High School District Certificates of Participation | 21.100 | 5,112,530 |
| Del Mar Union School District Certificates of Participation | 80.659 | 10,029,947 |
| San Ysidro School District Certificates of Participation | 92.096 | 8,993,174 |
| Chula Vista School District General Fund Obligations | 5.663 | 4,492,741 |
| Other School, High School and Community College District Certificates of Participation | Various | 8,185,454 |
| **City of San Diego General Fund Obligations and MTDB Authority** | 100. | 555,535,000 |
| Otay Municipal Water District Certificates of Participation | 7.800 | 2,030,340 |
| TOTAL GROSS OVERLAPPING GENERAL FUND OBLIGATION DEBT | | $1,292,493,234 |
| Less: Otay Municipal Water District Certificates of Participation | | 2,030,340 |
| Grossmont Union High School District Certificates of Participation | | |
| (100% self-supporting from tax increment revenues) | | 65,836 |
| TOTAL NET OVERLAPPING GENERAL FUND OBLIGATION DEBT | | $1,290,397,058 |
| | | |
| GROSS COMBINED TOTAL DEBT | | $2,624,311,602 [1] |
| NET COMBINED TOTAL DEBT | | $2,585,740,426 |

(1) Excludes tax and revenue anticipation notes, enterprise revenue, mortgage revenue and tax allocation bonds and non-bonded capital lease obligations.

A - 45

~ 205 ~

Page 2.  City of San Diego

Ratios to 2002-03 Assessed Valuation:
**Direct Debt ($15,690,000)** ................................................................................**0.01%**
Total Gross Direct and Overlapping Tax and Assessment Debt ............................... 1.27%
Total Net Direct and Overlapping Tax and Assessment Debt ................................... 1.23%

Ratios to Adjusted Assessed Valuation:
**Gross Combined Direct Debt ($607,700,000) [1]** .........................................**0.61%**
**Net Combined Direct Debt  ($571,225,000)** ...............................................**0.57%**
Gross Combined Total Debt........................................................................... 2.62%
Net Combined Total Debt ............................................................................. 2.58%

| (1) | City | $ 15,690,000 |
| | City Authorities and Certificates of Participation | 555,535,000 |
| | San Diego Open Space Park Facilities District No. 1 | 36,475,000 |
| | | $607,700,000 |

STATE SCHOOL BUILDING AID REPAYABLE AS OF 6/30/02:  $2,515,864

Source:  California Municipal Statistics, Inc.

A - 46

~ 206 ~

# EXHIBIT 13

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES ACT OF 1933
Release No. 8751 / November 14, 2006

SECURITIES EXCHANGE ACT OF 1934
Release No.  54745 / November 14, 2006

ADMINISTRATIVE PROCEEDING
File No. 3-12478

| | |
|---|---|
| In the Matter of<br><br>City of San Diego, California,<br><br>Respondent. | ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934 |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 21C of the Securities Exchange Act of 1934 ("Exchange Act"), against the City of San Diego, California (the "City" or "Respondent").

II.

In anticipation of the institution of these proceedings, the City has submitted an Offer of Settlement ("Offer"), which the Commission has determined to accept.  Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, the City consents to the entry of this Order Instituting Cease-and-Desist Proceedings, Making Findings, and Imposing a Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934 ("Order"), as set forth below.

### III.

On the basis of this Order and the City's Offer, the Commission finds that:[1]

### A.    SUMMARY

This matter involves the City of San Diego's violations of the antifraud provisions of the federal securities laws in connection with the offer and sale of over $260 million in municipal bonds in 2002 and 2003. At the time of these offerings, City officials knew that the City faced severe difficulty funding its future pension and health care obligations unless new revenues were obtained, pension and health care benefits were reduced, or City services were cut.  The City's looming financial crisis resulted from (1) the City's intentional under-funding of its pension plan since fiscal year 1997; (2) the City's granting of additional retroactive pension benefits since fiscal year 1980; (3) the City's use of the pension fund's assets to pay for the additional pension and retiree health care benefits since fiscal year 1980; and (4) the pension plan's less than anticipated earnings on its investments in fiscal years 2001 through 2003.

Despite the magnitude of the problems the City faced in funding its future pension and retiree health care obligations, the City conducted five separate municipal bond offerings, raising more than $260 million, without disclosing these problems to the investing public.  In each of these offerings, the City prepared disclosure documents that are used with municipal securities offerings—that is, preliminary official statements and official statements—and made presentations to rating agencies.[2]  In addition, in 2003 it prepared and filed information pursuant to continuing disclosure agreements under Exchange Act Rule 15c2-12 with respect to $2.29 billion in outstanding City bonds and notes.[3]  Although the City provided some disclosure about its pension and retiree health care obligations, it did not reveal the gravity of the City's financial problems, including that:

- The City's unfunded liability to its pension plan was expected to dramatically increase, growing from $284 million at the beginning of fiscal year 2002 and $720

---

[1] The findings herein are made pursuant to the City's offer of settlement and are not binding on any other person or entity in this or any other proceeding.

[2] An official statement is a document prepared by an issuer of municipal bonds that discloses material information regarding the issuer and the particular offering.  A preliminary official statement is a preliminary version of the official statement that is used to describe the proposed new issue of municipal securities prior to the determination of the interest rate(s) and offering price(s).  The preliminary official statement may be used to gauge interest in an issue and is often relied upon by potential purchasers in making their investment decisions.

[3] Continuing disclosures are disclosures of material information relating to prior years' municipal bond offerings that are periodically provided to the marketplace by the bonds' issuer pursuant to contractual agreements and Exchange Act Rule 15c2-12.

~ 208 ~

million at the beginning of fiscal year 2003 to an estimated $2 billion at the
beginning of fiscal year 2009;

- The City's total under-funding of the pension plan was also expected to increase
  dramatically, growing tenfold from $39.2 million in fiscal year 2002 to an
  estimated $320 to $446 million in fiscal year 2009;

- The City's projected annual pension contribution would continue to grow, from $51
  million in 2002 to $248 million in 2009; and

- The estimated present value of the City's liability for retiree health benefits was
  $1.1 billion.

The City's enormous pension and retiree health liabilities and failure to disclose those
liabilities placed the City in serious financial straits. When the City eventually disclosed its
pension and retiree health care issues in fiscal year 2004, the credit rating agencies lowered the
City's credit rating. The City also has not obtained audited financial statements for fiscal years
2003, 2004, and 2005.

Consequently, the City violated Section 17(a) of the Securities Act, Section 10(b) of the
Exchange Act and Rule 10b-5 thereunder, which prohibit the making of any untrue statement of
material fact or omitting to state a material fact in the offer or sale of securities.[4]

**B.      THE RESPONDENT**

**City of San Diego, California** is a California municipal corporation with all municipal
powers, functions, rights, privileges, and immunities authorized by the California Constitution and
laws, including the power to issue debt. The City is the seventh most populous city in the country,
with approximately 1.3 million residents.

**C.      RELATED PARTY**

**San Diego City Employees' Retirement System ("CERS")** is a defined benefit plan[5]
established by the City to provide retirement, disability, death, and retiree benefits to its members,

---

[4] The Commission acknowledges that in the City's offering documents for sewer revenue bonds
issued in 1995, 1997, and 1999 and sewer revenue bonds that were offered but not issued in 2003,
in its continuing disclosures, and in its communications with rating agencies, the City failed to
disclose that the City's wastewater fee rate structure did not comply with certain federal and state
clean water laws, that the City was not in compliance with the terms of certain government grants
and loans, and that the City could have been required to repay those grants and loans due to such
non-compliance. The offerings in the 1990s, however, predate the offerings that are the subject of
this Order, and the City did not consummate the 2003 offering because issues arose regarding the
adequacy of its pension disclosure. In addition, in 2004, the City came into compliance with the
federal and state clean water laws and the grant and loan covenants by adopting a new fee rate
structure. The City thereby avoided having immediately to repay the government grants and loans.

[5] A defined benefit plan is a traditional pension plan under which pre-determined retirement
benefits are based on a formula established by factors such as age, years of service, and

~ 209 ~

3

i.e., City employees and their beneficiaries. CERS is administered by the CERS Board, which during the relevant period included eight City employees, including the City Treasurer and the Assistant City Auditor and Comptroller, one retiree, and three non-employee City citizens appointed by the City Council as CERS Board members.

### D.    FACTS

#### 1.    Background

##### a.    Structure of the City's Government

Until January 2006, the City's form of government was a city manager system.[6] Legislative powers of the City were vested in the City Council ("Council"), which made policies and appointed a professional city manager to carry out those policies. The Council was composed of nine full-time Council members who served for staggered four-year terms. Eight of the Council members represented the City's eight districts. The Mayor, who was elected at large, presided at the meetings of the Council and served as the official head of the City for ceremonial purposes. The Mayor and each Council member had one vote; the Mayor had no veto power.

Prior to 2006, the City Manager ("Manager") was the City's chief administrative officer and had substantial control over local government decisions. The Manager, appointed by the Mayor and Council, advised the Council of the City's present and projected financial condition, appointed and removed all city department heads (except the City Auditor and Comptroller ("City Auditor"), City Attorney, and City Clerk), prepared the City's budget, and carried out the Council's budget plan. During the relevant time period, the City's general fund budget was less than $900 million. The City Manager had several Deputy City Managers, one of whom was in charge of the Financing Services Department, which had responsibility for overseeing the City's issuance of municipal securities.

Prior to 2006, the City Auditor was also appointed by the Council, and was required to file at least monthly with the City Manager and Council a summary statement of revenues and expenses for the preceding accounting period.[7] The Auditor was the City's chief financial officer and was responsible for the preparation and issuance of the City's Comprehensive Annual Financial Reports, also referred to as CAFRs. The City's Comprehensive Annual Financial Reports included audited financial statements prepared pursuant to standards established by the

---

compensation, and in which the employer bears risk if the employer and employee contributions and the investment return on those contributions are not sufficient to fund the pension benefits.

[6] In January 2006, the City transitioned from a City Manager / Council form of government to a strong Mayor form of government. Under the new system, the Mayor became the City's chief executive officer and the City Manager's position was eliminated. The Council continues to act as the legislative body. City of San Diego City Charter, Article XV.

[7] City of San Diego City Charter, Article V, Section 39.

**~ 210 ~**

4

Government Accounting Standards Board ("GASB")[8] and various statistical, financial, and other information about the City. Portions of the Comprehensive Annual Financial Reports for the years ended June 30, 2001, and June 30, 2002 were attached as appendix B to the preliminary official statements and the official statements. The Comprehensive Annual Financial Reports for 2001 and 2002 were also filed as continuing disclosures.

The elected City Attorney served as the chief legal officer for the City. The City Attorney's office advised the Council, City Manager, and all City departments on legal matters, including disclosure in the City's securities offerings. The City Attorney was responsible for preparing all ordinances, resolutions, contracts, and other legal documents.

### b.    The City's Pension Plan

The City provided a defined benefit pension plan and retiree health care benefits to its employees through CERS. CERS functioned as a trust for the benefit of its members (i.e., approximately 18,500 current and former City employees and officials). The City was the creator of the trust and determined its terms, including the members' required contributions and the levels of benefits. CERS was administered by a Board of Administration, which controlled the investment of CERS's funds and which owed fiduciary duties to CERS members. CERS's assets consisted of past contributions by the City and CERS members and investment earnings on those funds. CERS's liabilities consisted of operating expenses and the future pension benefits that were owed to members.

Each year, CERS hired an actuary to determine the value of the plan's assets and liabilities based on certain actuarial assumptions and the amount that needed to be contributed to the plan so that the plan accumulated sufficient assets to pay pension (but not health care) benefits when due.[9] Pursuant to the City Charter, the City was to contribute half of that amount, which was expressed in terms of a percentage of payroll expenses, with the other half to be contributed by the employees, which amount was determined as a percentage of compensation based on the employee's age upon entry into CERS.

At least three concepts were particularly important in the disclosure to the public of the City's pension obligations and funding of those obligations: (1) CERS's funded ratio; (2) the

---

[8] GASB is the organization that establishes standards of state and local governmental accounting and financial reporting.

[9] An actuarial valuation is a determination by an actuary, as of a specified date, of the normal cost, actuarial accrued liability, actuarial value of the assets, and other relevant values for a pension plan based on certain actuarial assumptions. The actuarial value of assets refers to the value of cash, investments, and other property belonging to a pension plan as used by the actuary for the purpose of preparing the actuarial valuation for the pension plan. The actuarial accrued liabilities are what is owed in connection with past services, as determined by one of the actuarial cost methods. Actuarial assumptions are estimates of future events with respect to certain factors affecting pension costs, including rates of mortality, disability, employee turnover, retirement, rates of investment income, and salary increases. Actuarial assumptions are generally based on past experience, often modified for projected changes in conditions.

~ 211 ~

City's unfunded liability to CERS; and (3) the City's net pension obligation, also called the NPO. CERS's funded ratio was the ratio of its assets to liabilities. The City's unfunded liability to CERS was the dollar shortfall between CERS's assets and liabilities. The City's net pension obligation was the cumulative difference between what the City actually contributed to CERS and the amount that the City would have contributed had it conformed to a funding method recognized by GASB.

### 2.    The City's Pension and Retiree Health Care Benefits and Funding of CERS

The City failed to disclose material information regarding substantial and growing liabilities for its pension plan and retiree health care and its ability to pay those obligations in the future in the disclosure documents for its 2002 and 2003 offerings, in its continuing disclosures filed in 2003, and in its presentations to the rating agencies. As more fully described below, the City's substantial and growing pension and retiree health care liabilities resulted from several factors, including: (1) the City's intentional under-funding of its annual pension contribution; (2) the City's granting of new retroactive pension benefits; (3) the City's use of certain CERS earnings to pay for various additional pension and retiree health care benefits and to pay a portion of employees' pension contributions; and (4) CERS's earning less than anticipated returns on its investments.

### a.    The City's Historical Practice of Using "Surplus Earnings" to Fund Pension and Retiree Health Care Benefits

In fiscal year 1980, the City began instructing CERS to use "surplus earnings"—i.e., earnings above the actuarially projected 8% return rate[10]—to fund an ever-increasing amount of additional benefits for CERS members. Pension plans typically retain surplus earnings to support the plan's financial soundness and to make up for years in which earnings fall short of the assumed return rate. Rather than retaining its surplus earnings, the City began using surplus earnings in fiscal year 1980 to fund an annual extra or "13th check" to retirees. The City continued using surplus earnings to pay for retiree health care benefits in fiscal year 1982 and to pay an ever-increasing amount of the employees' CERS contributions in fiscal year 1998.[11]

In total, the City used surplus earnings to pay pension benefits and employees' contributions totaling $150 million as of the end of fiscal year 2001 and an additional $25 million as of the end of fiscal year 2002. According to a 2005 CERS audit, the City's use of surplus

---

[10] Without regard to its actual historical rate of return on investments, the CERS Board assumed an annual rate of investment return of 8%, which the actuary incorporated into his calculations. CERS defined surplus earnings as the amount of realized investment earnings in excess of the actuarially projected 8% return rate.

[11] In fiscal years 2003 and 2004, the City used CERS's surplus earnings from prior years to pay up to 27% of the employees' contributions.

~ 212 ~

earnings accounted for 17% of the increase in the City's unfunded liability to CERS from fiscal year 1997 through fiscal year 2003.

   **b.**  **Manager's Proposal 1: The City Proposes Additional Benefits in Exchange for Contribution Relief**

   In fiscal year 1996, the City agreed to increase significantly and retroactively all employees' pension benefits. The City, however, could not afford to fund the cost of the benefit increases. The City therefore made the pension benefit increases contingent on CERS's agreement to the City's under-funding of its annual contribution to CERS.

   In fiscal year 1997, the City and CERS entered into an agreement, which was referred to as Manager's Proposal 1, that set the City's annual contribution at gradually increasing rates through fiscal year 2008. This funding method, which the City termed "Corridor" funding, was not recognized by GASB and set annual funding rates that were not actuarially determined and were projected to be below GASB-recognized funding rates through fiscal year 2006. In other words, under Corridor funding, the City would be intentionally under-funding its annual liability to CERS in fiscal years 1997 through 2006.[12] After fiscal year 2006, it was estimated that the funding rate of Manager's Proposal 1 would equal a GASB-accepted rate. Manager's Proposal 1 also contained a provision intended to protect CERS's financial soundness. Specifically, if CERS's funded ratio fell below 82.3%, the City would have to increase its CERS contribution rate.

   In fiscal years 1996 and 1997, the City estimated that under Manager's Proposal 1, by the end of fiscal year 2008, the City's net pension obligation would be $110.35 million. Because the City's Corridor funding method was not GASB-recognized, GASB required that the City disclose its net pension obligation in its annual financial statements.

   **c.**  **The *Corbett* Litigation Requires the City to Fund Additional Retroactive Benefits**

   In March 2000, the City again retroactively increased pension benefits. Specifically, the City and CERS settled a class action lawsuit brought by CERS members, with *Corbett* as the named class plaintiff.[13] Under the *Corbett* settlement, the City retroactively gave increased pension benefits to both current and retired City employees, increasing CERS's liabilities. Under

---

[12] Manager's Proposal 1 was viewed skeptically by some members of the CERS Board who were not City employees. The majority of the CERS Board, however, consisted of City officials who received benefit increases that were contingent on the Board's approval of Manager's Proposal 1. Moreover, CERS's actuary informed the CERS Board that Manager's Proposal 1 was a sound proposal and CERS's fiduciary counsel opined that the Board would be acting within the ambit of its fiduciary discretion in approving Manager's Proposal 1.

[13] The *Corbett* plaintiffs raised various claims based on a 1997 California Supreme Court decision which held that an employee's salary for purposes of calculating basic pension benefits included the value of overtime and accrued leave.

Manager's Proposal 1, however, the City's contributions to CERS did not increase. As a result, the City's unfunded liability to CERS increased by $185 million.

In negotiating the *Corbett* settlement, however, the City purposefully structured certain of the increased *Corbett* benefits to avoid having those benefits adversely affect CERS's reported funded ratio and the City's reported unfunded liability to CERS. Specifically, the City structured the *Corbett* settlement so that the increased benefits for retired CERS members were to be paid in a given year only if there were sufficient surplus earnings from that year to pay the benefit. If there were insufficient surplus earnings in a given year to pay the increased benefit, then the cost of the increased benefit would become CERS's liability and would eventually be paid from future years' surplus earnings. The City and CERS treated the increased benefits to retired CERS members as contingent liabilities that were not taken into account in determining CERS's funded ratio or the City's unfunded liability to CERS. As of June 30, 2001, according to CERS's actuary, if the contingent portion of the *Corbett* settlement had been included in CERS's valuation, the City's unfunded liability to CERS would have increased by $70 to $76 million and CERS's funded ratio would have decreased by 2% to 2 ½ % from what was actually reported by the City. Thus, the City's pension situation was even more dire than the numbers, as they were reported by the City, indicated.

### d.    CERS's Actuary Report for Fiscal Year 2001 Shows a Dramatic Increase in the City's Pension Liabilities

In fiscal year 2001, CERS's investment return began to fall short of its anticipated 8% annual return. The City was informed of CERS's declining performance in February 2002, when it received CERS's annual actuarial valuation for fiscal year 2001. This report stated that as of the end of fiscal year 2001, CERS's funded ratio was 89.9% and the City's unfunded liability to CERS was $284 million, as compared to a funded ratio of 97.3% and an unfunded liability of $69 million only one year earlier. Moreover, the report noted that if the *Corbett* contingent benefit to CERS retired members were included, the City's unfunded liability to CERS would have increased to at least $354 million and CERS's funded ratio would have fallen to at least 87.9%.

CERS's actuary attributed these changes to a number of factors, including CERS's actuarial investment losses[14] of $95.6 million (and warned that there would be further actuarial investment losses in fiscal year 2002 unless the markets improved during the remaining five months of the fiscal year). In his report, CERS's actuary also warned that "all parties" should be "acutely aware that the current practice of paying less than the [actuarial] computed rate of contribution … will help foster an environment of additional declines in the funded ratio in absence of healthy investment returns."

In May 2002, the City learned that CERS would likely not have any surplus earnings from fiscal year 2002 to pay for the contingent benefits—specifically, retiree health care benefits, the 13th check, and the *Corbett* increase to retirees.

---

[14] Actuarial investment losses are the difference between the assumed investment rate, which in the City's case was 8% annually, and the actual investment results.

e.    **The Blue Ribbon Committee Report Puts the City on Notice about its Growing Pension and Retiree Health Care Liabilities**

In April 2002, the City received a warning that the City's pension and retiree health care liabilities would continue to grow and that the City was not adequately planning to meet those liabilities. This came in the form of a report from the City's Blue Ribbon Committee to the City Council.[15] The report stated that the Blue Ribbon Committee had three principal concerns regarding CERS. First, the City was granting retroactive retirement benefit increases but pushing the cost of those benefit increases into the future, long after the individuals involved in the decisions were gone. Second, the City's budgetary process did not adequately comprehend the steadily growing annual expense of the pension contribution, "particularly given the uncontrollable and non-discretionary nature of this liability." The Committee stated that the City's pension contribution would substantially increase and warned that any future benefit increases, particularly retroactive increases, would "significantly exacerbate this problem." Third, the City's budgetary process did not recognize that retiree health care costs were a non-discretionary expense that would grow at an increasing rate and that the City was not paying out of its current year's budget the full cost for their future retiree health benefits. This report thus squarely put the City on notice that it had substantial future pension and healthcare liabilities it would probably be unable to pay under the current system.

f.    **Manager's Proposal 2: The City Again Proposes Additional Pension Benefits in Exchange for Relief from an Impending Lump Sum Payment**

In fiscal year 2003, the City again increased its pension liability by granting additional retroactive benefits, used additional CERS assets to pay for additional pension and retiree health care benefits and an increased portion of the employees' contribution, and obtained additional time to under-fund its annual CERS contribution.

In the second half of fiscal year 2002, the City agreed to increase pension benefits for fiscal year 2003. From as early as October 2001, however, the City was concerned that CERS's funded ratio would fall below the 82.3% floor established by Manager's Proposal 1, which would require the City, at the very least, to increase its contributions to CERS by at least $25 million to be at a higher GASB-accepted rate.

Concerned about having to pay the additional $25 million, the City sought to condition the pension benefit increases on the City's obtaining from CERS relief from the floor of Manager's Proposal 1. In November 2002, the City and CERS agreed to Manager's Proposal 2 and the City

---

[15] In April 2001, the Mayor had appointed a nine-member committee of San Diego citizens, known as the Mayor's Blue Ribbon Committee on City Finances, to independently evaluate the City's fiscal health and make any appropriate recommendations. In February 2002, the Blue Ribbon Committee presented its report to the Council's Rules Committee, identifying nine areas of concern, two of which related to the City's pension fund. The same report was made to the full Council in April 2002.

~ 215 ~

adopted the increased pension benefits as of July 2002. Under Manager's Proposal 2, once CERS's funded ratio fell below 82.3%, the City would have five years to increase its contributions to CERS to reach a GASB-recognized funding rate.

As a result of CERS's actuarial losses in fiscal year 2002, CERS did not have surplus earnings to pay the 13th check, the cost of retiree health care, and the *Corbett* benefit increase to retired CERS members. In conjunction with Manager's Proposal 2, however, the City directed CERS to use certain of its reserve accounts to pay the 13th check and the retiree health care benefits, and to pay an increased portion of certain City employees' CERS contributions. The reserve funds could have been used to increase CERS's funded ratio and decrease the City's unfunded liability to CERS; instead, the City directed that CERS use the reserve funds to pay additional benefits.

g.    **CERS's Actuary Report for Fiscal Year 2002 and Projections for the Future Show that the City Faces Substantial Problems Funding its Pension and Retiree Health Care Liabilities**

In early 2003, the City received two reports from CERS's actuary. These reports provided the City with negative information regarding the present and projected status of CERS's funded ratio and the City's unfunded liability to CERS. First, in January 2003, the City received CERS's actuary report for fiscal year 2002. This report stated that during fiscal year 2002, CERS suffered an actuarial loss of $364.8 million and that as of the end of fiscal year 2002, CERS's funded ratio was 77.3% and the City's unfunded liability to CERS was $720 million, as compared to a funded ratio of 89.9% and unfunded liability of $284 million only one year earlier. The actuary's report further stated that if the *Corbett* contingent benefit to CERS retired members had been included, the City's unfunded liability to CERS would have been at least $790 million, and CERS's funded ratio would have been approximately 75.3%. In the concluding comment, the actuary stated that CERS was "in adequate condition," which was the first time that the actuary had not described CERS as "actuarially sound."

Second, in February 2003, CERS's actuary provided to the City projections of the City's contributions under Manager's Proposal 2, the City's net pension obligation, the City's unfunded liability to CERS, and CERS's unfunded ratio. Specifically, the City's contribution rate was projected to more than quadruple—from 9.83% of payroll in fiscal year 2002 ($51 million) to 35.27% of payroll in fiscal year 2009 ($248 million). The following chart illustrates the growth in the City's projected annual contribution to CERS:



The City's net pension obligation was projected to grow by tenfold—from $39.23 million in fiscal year 2002 to as much as $446 million in fiscal year 2009. The following chart illustrates the growth in the City's projected net pension obligation:



The City's unfunded liability was projected to increase more than seven fold—from $284 million at the beginning of fiscal year 2002 to $2 billion at the beginning of fiscal year 2009. CERS's funded ratio was projected to continue to fall—from 77.3% at the beginning of fiscal year 2003 to 65.6% at the beginning of fiscal year 2009. The following chart illustrates this dramatic increase in the City's projected unfunded liability to CERS:

11



The City had knowledge of these projections prior to all of its 2003 municipal securities offerings.

        h.      **The *Gleason* Litigation: CERS
                     Members Challenge Manager's Proposal 1 and
                     Manager's Proposal 2**

       Further evidence that the City's under-funding of CERS was potentially threatening the City's future fiscal health came in January 2003, when CERS members filed a class action, with *Gleason* as the named class plaintiff, against the City and CERS alleging breaches in connection with the City's under-funding of CERS under Manager's Proposal 1 and Manager's Proposal 2. Among other things, the *Gleason* complaint alleged that by 2009, the City would owe approximately $2.8 billion to CERS, with an annual City budget expense of more than $250 million. In March 2003, the CERS attorney in the *Gleason* litigation advised CERS that (1) certain CERS Board members had breached their fiduciary duty by adopting Manager's Proposal 2; and (2) CERS should exercise its right to nullify Manager's Proposal 2. The CERS Board, which included the City Treasurer and the Assistant City Auditor and Comptroller, rejected this advice. If Manager's Proposal 2 had been nullified, the City would have been required to make an immediate potential payment to CERS of up to $159 million.

~ 218 ~

i.    **CERS's Response to the Blue Ribbon Committee Report**
**Advises the City's Officials of the Growing Pension**
**and Retiree Health Care Crisis.**

In February 2003, additional detailed information about the City's pension funding crisis was presented to City officials when CERS responded to the Blue Ribbon Committee's report.[16]  In its response, CERS advised the City that as of June 30, 2002, CERS's funded ratio had fallen to 77.3% and the City's unfunded liability to CERS had increased to $720 million.  The response also stated that the falling funded ratio and the increasing unfunded liability resulted from three factors: a dramatic decline in CERS's investment performance in fiscal years 2001 and 2002; the City's granting of increased benefits; and the City's contributions to CERS at less than a GASB-recognized rate.

With respect to the City's under-funding, the response stated that the annual amount of the City's under-funding of CERS continued to increase in fiscal years 2002 and 2003, which was contrary to the initial projections from Manager's Proposal 1 that the annual amount of under-funding would decline beginning in fiscal year 2001.  The response further stated that the City's net pension obligation would reach $102 million by the end of fiscal year 2003 and $423 million by the end of fiscal year 2009.

The response also discussed the City's future liability for retiree health care.  CERS's actuary had estimated that the present value of the City's liability for future retiree health care was in excess of $1.1 billion.  The response further stated that the City was not making any contributions to CERS to pay for this liability, that CERS had been paying for this liability with money in a reserve funded with CERS's surplus earnings from prior years, that the reserve would be depleted in fiscal year 2006, and that in fiscal year 2006, the City would have to pay an estimated $15 million for retiree health care.  The response warned that absent a change in the benefit and a dramatic decrease in future health care costs, the City could be facing significant future funding obligations.  The response recommended that the City consider funding this future health care liability as part of its annual contribution to CERS.

j.    **The City's Study of Its Pension Obligations Concludes**
**that the City's Pension Liabilities Could Negatively**
**Impact the City's Credit Rating**

In April 2003, the City received additional information regarding the projected growth of its future pension liabilities and the possible negative effect those liabilities would have on the City's credit rating and ability to issue municipal securities.  In February 2003, the City hired a financial adviser to analyze CERS's funding and to develop potential solutions.  On April 16,

---

[16] From February 9 through 13, 2003, the local newspaper wrote three front page, above-the-fold articles about the City's under-funded pension system and the CERS response.  The newspaper articles explained that (1) by the end of FY 2009 the City's unfunded liability to CERS was projected to increase to almost $2 billion; and (2) the City's unfunded liability for retiree health care was estimated to be $1.1 billion.

~ 219 ~

2003, the financial adviser provided to the City a preliminary pension analysis. In its analysis, the financial adviser stated that because of the City's under-funding, the City's unfunded liability would continue to grow and CERS's funded ratio would continue to fall through fiscal year 2021 regardless of actuarial gains or losses. The financial adviser estimated that under Manager's Proposal 2, the City's unfunded liability to CERS would grow to $1.9 billion at the end of fiscal year 2009 and to $2.9 billion at the end of fiscal year 2021, and CERS's funded ratio would fall to 66.5% at the end of fiscal year 2009 and would be 67% at the end of fiscal year 2021.

The preliminary pension analysis also stated that the City's large unfunded liability to CERS would cause the City's contribution to CERS to increase dramatically. The analysis estimated that the City's contribution rate to CERS would more than double—from 18.87% of payroll (or $107.5 million) in fiscal year 2004 to 40.9% of payroll ($286.9 million) in fiscal year 2009.

The preliminary pension analysis also discussed the effect that the City's unfunded liability would have on the City's credit rating. The financial adviser stated that the City's current unfunded liability would not only trigger an adverse credit event but that the rating agencies would expect the City to develop a plan to reduce its unfunded liability by increasing its annual contributions and/or funding the unfunded liability by issuing bonds. The financial adviser further stated that if the City did not develop and implement such a plan, the City's unfunded liability could cause the City "significant credit and legal challenges." The City's disclosures in 2003 failed to inform investors of the financial adviser's analysis.

   3. **The Offerings, Continuing Disclosures, and Rating Agency Presentations**

    a. **The Bond Offerings and the City's Preparation of the Offerings' Disclosure Documents**

During 2002 and 2003, the City conducted the following five municipal securities offerings totaling $261,850,000 in par value:

- $25,070,000 Public Facilities Financing Authority of the City of San Diego Lease Revenue Bonds, Series 2002B (Fire and Safety Project ) (June 2002)
- $93,200,000 City of San Diego, 2002-03 Tax Anticipation Notes Series A (July 2002)
- $15,255,000 City of San Diego/Metropolitan Transit Development Board Authority 2003 Lease Revenue Refunding Bonds (San Diego Old Town Light Rail Transit Extension Refunding (April 2003)
- $17,425,000 City of San Diego 2003 Certificates of Participation (1993 Balboa Park/Mission Bay Park Refunding) (May 2003)
- $110,900,000 City of San Diego 2003-04 Tax Anticipation Notes Series A (July 2003)

A transactional financing team prepared the offering documents, that is, the preliminary official statement and the official statement, for each of the five municipal bond offerings. The

~ 220 ~

financing team consisted of outside consultants and officials from the City Manager's office (financing services division), Auditor and Comptroller's office, and the City Attorney's office. The outside consultants included, among others, bond counsel, disclosure counsel, and underwriters. The preliminary official statement and the official statement for each of the five offerings consisted of a description of the offering, a general description of the City, including financial, economic, statistical, and other information in appendix A, and audited annual financial statements from the City's Comprehensive Annual Financial Reports in appendix B. Information regarding its pension and retiree health care obligations was provided in both appendices A and B.

The outside consultants took the lead in drafting the description of the bond offerings. City officials in the financing services division were responsible for drafting appendix A. The financing services division updated Appendix A on an ongoing basis and at the time of a bond offering, forwarded the latest version of Appendix A to the entire financing team. The team met several times to review, comment on, and ultimately finalize the preliminary official statements and official statements at "page-turner meetings." Appendix B was prepared by the Auditor's office and the City's outside auditor. The Council approved all of the 2002 and 2003 offerings at open session meetings.

### b.    The Continuing Disclosures

During the relevant period, the City also filed annual continuing disclosures relating to its $2.29 billion in outstanding bonds for the purpose of updating investors on the state of the City's finances.[17] City officials in the financing services division coordinated, reviewed, and filed the 2002 and 2003 continuing disclosures. Almost all of these continuing disclosures included appendix A and portions of the City's Comprehensive Annual Financial Reports. The financing services division was responsible for ensuring that the most updated and accurate version of appendix A was attached to the continuing disclosures before they were filed.

### c.    The 2003 Rating Agency Presentations

The City made presentations to the rating agencies on a yearly basis, both in connection with specific bond offerings and to update the rating agencies on the City's general credit. The presentations were made orally with PowerPoints in meetings with representatives from Fitch Ratings, Moody's Investors Service, and Standard and Poor's. In 2003, the rating agencies specifically asked the City to address the pension plan as part of its annual presentations. These presentations were important because they directly affected the City's bond ratings. The 2003

---

[17] An underwriter of municipal securities covered by Exchange Act Rule 15c2-12 may not purchase or sell municipal securities in connection with an offering unless the issuer has undertaken in a written agreement or contract for the benefit of the bondholders to provide its audited annual financial statements and certain other annual financial and operating information, to nationally recognized municipal securities information repositories and state information depositories designated by the Commission and to provide notices of certain material events and notices of any failures to file on the nationally recognized municipal securities information repositories or the Municipal Securities Rulemaking Board and state information depositories.

~ 221 ~

PowerPoint presentations were prepared and presented by officials from the City Manager's office, including the financing services division, and the City Auditor and Comptroller's office. The financing services division drafted the pension portion of the 2003 PowerPoint presentation. Officials from the City Auditor's office made the oral presentation on the pension plan and fielded numerous questions on that topic from the rating agencies.

### 4.    The False and Misleading Disclosures

In the preliminary official statement and the official statements for the 2002 and 2003 offerings, the 2003 presentations to the rating agencies, and the 2003 continuing disclosures, the City made substantial disclosures regarding (1) the City's policies for funding CERS; and (2) the status of CERS's funding and the City's liability to CERS. Additionally, in the preliminary official statements, the official statements, and continuing disclosures, the City made certain representations regarding its retiree health care obligations. The disclosures (collectively "Disclosures"), however, were misleading because the City failed to include material information regarding the City's current funding of its pension and retiree health care obligations, the City's future pension and retiree health care obligations, and the City's ability to pay those future obligations.

First, with respect to the pension issues, the City failed in the Disclosures to reveal several material facts, including that (1) the City was intentionally under-funding its pension obligations so that it could increase pension benefits but push off the costs associated with those increases into the future; (2) because of the City's under-funding of its pension plan, its net pension obligation was expected to continue to grow at an increasing rate, reaching from $320 million to $446 million by the end of fiscal year 2009; (3) the City's unfunded liability was expected to continue to grow at a substantial rate, reaching approximately $2 billion by fiscal year 2009; (4) this growth in the City's unfunded liability resulted from the City's intentional under-funding of its pension plan, the City's granting of new retroactive pension benefits, the City's use of pension plan earnings to pay additional benefits, and the pension plan's less than anticipated investment return; (5) the City's annual pension contribution was expected to more than quadruple by fiscal year 2009; and (6) the City would have difficulty funding its future annual pension contributions unless it obtained new revenues, reduced pension benefits, or reduced City services. Moreover, the City falsely disclosed in Appendix B to its preliminary official statements and its official statements that its net pension obligation was funded in a reserve.

Additionally, with respect to retiree health care benefits, the City failed to disclose in its preliminary official statements, official statements, and continuing disclosures that[18] (1) the estimated present value of its liability for retiree health care was $1.1 billion; (2) the City had been covering the annual cost for retiree health care with pension plan earnings from prior years that were expected to be depleted in fiscal year 2006; (3) after fiscal year 2006, the City would have to pay for the retiree health care benefits from its own budget at an estimated annual cost of $15 million; and (4) the City had not planned for paying such additional costs.

---

[18] The issue of retiree health care was not addressed in the rating agency presentations.

~ 222 ~

###### 5.    The City's Knowledge of the Misleading Disclosures

The City, through certain of its officials, knew that its Disclosures were misleading. The Mayor and Council were responsible for approving the issuance of the bonds and notes, including issuance of the preliminary official statements and official statements. The Mayor and Council delegated final approval of the official statements to the City Manager. The City Manager's office was responsible for the preparation of the preliminary official statements and the official statements, including appendix A. The City Auditor's office was responsible for the preparation of appendix B to the preliminary official statements and official statements. Through their designees on the CERS Board, among other things, both the City Manager's and the City Auditor's offices had knowledge about the City's use of CERS's surplus earnings, Manager's Proposals 1 and 2, CERS's actuary reports for fiscal years 2001 and 2002, and CERS's response to the Blue Ribbon Committee Report. Also, several representatives of the City Manager's office, City Attorney's office, and Auditor and Comptroller's office attended relevant closed session meetings of the Council where Manager's Proposals 1 and 2 and the *Corbett* and *Gleason* litigations were discussed. Moreover, the Blue Ribbon Committee Report and CERS's response to the Blue Ribbon Committee Report were both presented to a committee of the Council at which officials from the City Manager's and Auditor and Comptroller's office were present. Finally, the offices of the City Manager and the City Auditor were responsible for the City's study of its pension obligations that occurred in early 2003. Through their participation and involvement in the above-referenced matters, certain city officials knew or were reckless in not knowing that the Disclosures were false and misleading.

Specifically, by early 2002, the City, through its officials, knew, among other things, that (1) CERS's funded ratio would likely fall below the 82.3% floor set by Manager's Proposal 1; (2) the City was proposing Manager's Proposal 2 to avoid the effects of CERS's falling below the floor; (3) Manager's Proposal 2 allowed the City more time to under-fund CERS; and (4) the Blue Ribbon Committee had raised concerns about the City's under-funding of CERS and the future retiree health care liability. By early 2003, the City, through its officials, knew, among other things, that (1) the City's projected total contributions to CERS would grow from $77 million in fiscal year 2004 to $248 million in fiscal year 2009; (2) CERS had fallen below the 82.3% floor of Manager's Proposal 1; (3) the City and CERS had adopted Manager's Proposal 2 to allow the City more time to under-fund CERS; and (4) CERS was using reserved surplus earnings to pay certain benefits and to pay an increased portion of the employees' CERS contribution.

###### 6.    Materiality and the City's Voluntary Disclosure

The misleading Disclosures were material in view of the City's overall financial health. The Disclosures were also material given the magnitude of the City's projected annual CERS payments in the future and the potential consequences of those liabilities to the City, including inability to make the payments without reduction in other services.

The nature and level of under-funding brought into question the City's ability to fund the pension and health care benefits in the future as well as its ability to repay the bonds and notes. Under such a scenario, the City could be forced to choose between paying pension contributions, paying what the City owes on its bonds and notes, reducing services, and/or raising fees and taxes.

~ 223 ~

The materiality of the misleading Disclosures was demonstrated by the impact on the City's bond ratings when it finally disclosed key facts about the pension plan on January 27, 2004 in a voluntary report of information, after a non-employee CERS Board member raised concerns about the City's disclosure. The voluntary report provided information regarding (1) CERS's current and estimated future funded status; (2) the City's current and estimated future liabilities to CERS; (3) the reasons for the substantial decrease in CERS's funded ratio and increase in the City's liability to CERS; (4) the City's previous use of CERS funds to pay for retiree health care and the City's estimated future liabilities for retiree health care; and (5) the City's anticipated difficulty funding its increasing CERS contribution without new City revenues, a reduction in pension benefits, a reduction in City services, or other actions. Shortly after the disclosures in the voluntary report, the rating agencies lowered their ratings on the City's bonds and notes.

### E.     Legal Discussion

#### 1.     The Securities Act and Exchange Act Antifraud Provisions

State and local governments are exempt from the registration and reporting provisions of the Securities Act and the Exchange Act. Similarly, the Commission's authority to establish rules for accounting and financial reporting under Section 19 of the Securities Act and Section 13(b) of the Exchange Act does not extend to municipal securities issuers. The City and other municipal securities issuers, however, are subject to the antifraud provisions of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. In addition, the Commission has promulgated a broker-dealer rule, Exchange Act Rule 15c2-12, which in general limits market access for certain municipal securities issues to those offerings in which the issuer agrees to file annual financial disclosures of specified financial and operating information as well as notices of certain events, if material, and notices of any failures to file with repositories designated by the Commission. The antifraud rules apply to such disclosure and to any other statements made to the market.

Section 17(a) of the Securities Act prohibits misrepresentations or omissions of material facts in the offer or sale of securities. Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit misrepresentations or omissions of material fact in connection with the purchase or sale of any security. These provisions prohibit the making of any untrue statement of material fact or omitting to state a material fact in the offer, purchase, or sale of securities. A fact is material if there is a substantial likelihood that its disclosure would be considered significant by a reasonable investor. Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1987); TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976).

Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 require a showing that defendants acted with scienter. Aaron v. SEC, 446 U.S. 680, 701-02 (1980). Scienter is "a mental state embracing intent to deceive, manipulate or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976). In the Ninth Circuit, recklessness satisfies the scienter requirement. Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc). Recklessness is "an extreme departure from the standards of ordinary care, and which presents a danger of misleading [investors] that is either known to the defendant or is so obvious

~ 224 ~

that the actor must have been aware of it." Id., 914 F.2d at 1569. Scienter, however, need not be shown to establish a violation of Section 17(a)(2) or (3). Aaron v. SEC, 446 U.S. 680, 697 (1980). Violations of these sections may be established by showing negligence. SEC v. Hughes Capital Corp., 124 F.3d 449, 453-54 (3d Cir. 1997); SEC v. Steadman, 967 F.2d 636, 643 n. 5 (D.C. Cir. 1992).

> **2.    The City's Violations of the Antifraud Provisions of the Securities Act and the Exchange Act**

The City's public disclosures in the preliminary official statements and official statements for its 2002 and 2003 offerings, its 2003 continuing disclosures, and presentations to the rating agencies failed to disclose material information regarding the City's current funding of its pension and retiree health care obligations, the City's future pension and retiree health care obligations, and the City's ability to pay those future obligations. The omission of this information caused the information that was disclosed to be misleading.

This information was material to investors. The magnitude of the City's unfunded liabilities was enormous. For example, the City knew that by 2009 the unfunded liability would reach $1.9 billion and its actuarially required contribution would be approximately $240 million compared to $51 million in FY 2002. The City's under-funding of CERS and unfunded liabilities to CERS and for retiree health care were projected to continue to grow at an increasing rate. The increase in the City's under-funding and unfunded liabilities resulted, in part, from the City's decisions to increase pension and retiree health care benefits but push the costs of those increases into the future, to use CERS's prior earnings to cover additional benefits, and to pay a portion of the employees' contribution to CERS. All of this information raised a question whether the City could pay for these pension and retiree health care obligations and repay the bonds and notes issued by and on behalf of the City.

The City, through its officials, acted with scienter.[19] City officials who participated in drafting the misleading disclosure were well aware of the City's pension and retiree health care issues and the magnitude of the City's future liabilities. Moreover, even though the City officials knew that the City's pension issues were of concern to the rating agencies, they failed to disclose material information regarding the City's pension and retiree health care issues. In light of the City's officials' detailed knowledge of the magnitude of the City's pension and retiree health care liabilities and of the rating agencies' interest in those liabilities, the City officials acted recklessly in failing to disclose material information regarding those liabilities.

## F.    REMEDIAL EFFORTS AND UNDERTAKINGS

1.    Since 2005, Respondent has implemented several remedial measures with a view to detect and prevent securities violations. Specifically, the City has terminated certain officials in the City Manager's and Auditor and Comptroller's offices or has allowed them to resign. The City has filled these positions with new employees generally having significant relevant experience with

---

[19] The City's scienter is based on the mental state of its officials. SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1089 n.3 (2d Cir. 1972).

~ 225 ~

other municipal governments or the private sector. The City has hired a full time municipal securities attorney who is responsible for coordinating the City's public disclosure and who has conducted continuing education for the City's deputy attorneys on the City's disclosure requirements.

2.    The Mayor resigned and has been replaced by a former City police chief. In January 2006, pursuant to a public referendum, the City changed from a strong city manager form of government to a strong mayor form of government.

3.    The City has hired new outside professionals including new auditors for its fiscal year audits. The City also hired individuals not affiliated with the City to act as the City's Audit Committee and charged the Committee with investigating the City's prior disclosure deficiencies and making recommendations to prevent future disclosure failures. The City has also hired new disclosure counsel for all of its future offerings, who will have better and more continuous knowledge on the City's financial affairs. This disclosure counsel has conducted seminars for City employees on their responsibilities under the federal securities laws.

4.    The City has also enacted ordinances designed to change the City's disclosure environment. First, the City created a Disclosure Practices Working Group, comprised of senior City officials from across city government. The Working Group is charged with reviewing the form and content of all the City's documents and materials prepared, issued, or distributed in connection with the City's disclosure obligations relating to securities issued by the City or its related entities; and conducting a full review of the City's disclosure practices and to recommend future controls and procedures. Second, the Mayor and City Attorney must now personally certify to the City Council the accuracy of the City's official statements. Third, the City Auditor must annually evaluate the City's internal financial controls and report the results to the City Council.

5.    Respondent shall comply with the following undertakings to:

    a.    Retain, not later than 60 days after the date of this Order, at its expense, an independent consultant not unacceptable to the Commission's staff (the "Independent Consultant"). The City shall require the Independent Consultant to (a) conduct annual reviews for a three-year period of the City's policies, procedures, and internal controls regarding its disclosures for offerings, including disclosures made in its financial statements, pursuant to continuing disclosure agreements, and to rating agencies, the hiring of internal personnel and external experts for disclosure functions, and the implementation of active and ongoing training programs to educate appropriate City employees, including officials from the City Auditor and Comptroller's office, the City Attorney's office, the Mayor, and the City Council members regarding compliance with disclosure obligations; (b) make recommendations concerning these policies, procedures, and internal controls with a view to assuring compliance with the City's disclosure obligations under the federal securities laws; and (c) assess, in years two and three, whether the City is complying with its policies, procedures, and internal controls, whether the City has adopted any of the Independent Consultant's recommendations from prior year(s) concerning such policies, procedures, and internal controls for disclosures

~ 226 ~

for offerings, and whether the new policies, procedures, and internal controls were effective in achieving their stated purposes;

b.  No later than 10 days following the date of the Independent Consultant's engagement, provide to the Commission staff a copy of an engagement letter detailing the Independent Consultant's responsibilities pursuant to paragraph 5(a) above;

c.  Arrange for the Independent Consultant to issue its first report within 120 days after the date of the engagement and the following two reports within 60 days following each subsequent one-year period from the date of engagement. Within 10 days after the issuance of the reports, the City shall require the Independent Consultant to submit to Kelly Bowers of the Commission's Pacific Regional Office a copy of the Independent Consultant's reports. The Independent Consultant's reports shall describe the review performed and the conclusions reached and shall include any recommendations deemed necessary to make the policies, procedures, and internal controls adequate and address the deficiencies set forth in Section III.D of the Order. The City may suggest an alternative method designed to achieve the same objective or purpose as that of the recommendation of the Independent Consultant provided that the City's Mayor and City Attorney certify in writing to the Commission staff that they have a reasonable belief that the alternative method is expected to have the same objective or purpose as that of the Independent Consultant's recommendation;

d.  Take all necessary and appropriate steps to adopt, implement, and employ the Independent Consultant's recommendations or the City's alternative method designed to achieve the same objective or purpose as that of the Independent Consultant's recommendation; and

e.  Require the Independent Consultant to enter into an agreement that provides that for the period of engagement and for a period of two years from completion of the engagement, the Independent Consultant shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with the City, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity; provided however, that the Independent Consultant may enter into an agreement with the City to serve as an independent monitor to oversee the City's remedial efforts with respect to enhanced accountability, greater transparency, increased fiscal responsibility, and independent oversight. Except as permitted above, the agreement will also provide that the Independent Consultant will require that any firm with which he/she is affiliated or of which he/she is a member, and any person engaged to assist the Independent Consultant in performance of his/her duties under this Order shall not, without prior written consent of the Pacific Regional Office, enter into any employment, consultant, attorney-client, auditing or other professional relationship with the City, or any of its present or former affiliates, directors, officers, employees, or agents acting in

~ 227 ~

their capacity as such for the period of the engagement and for a period of two years after the engagement.

6.      In determining whether to accept the City's Offer, the Commission considered these undertakings and remediation measures.

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in the City's Offer.

Accordingly, it is hereby ORDERED that:

A.      The City cease and desist from committing or causing any violations and any future violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; and

B.      The City comply with the undertakings enumerated in paragraph 5 of Section III.F. above.

By the Commission.

Nancy M. Morris
Secretary

~ 228 ~

# EXHIBIT 14



THE CITY OF SAN DIEGO

# MANAGER'S REPORT

DATE ISSUED:    March 27, 2002                REPORT NO.  02-063

ATTENTION:     Honorable Mayor and City Council
               Docket of April 2, 2002

SUBJECT:       Lifeguard and Fire Facility Improvements

REFERENCE:     Lifeguard Facilities
               Manager's Report No. 01-171, dated July 27, 2001
               Manager's Report No. 01-088, dated May 10, 2001
               Manager's Report No. 01-031, dated February 21, 2001

               Fire Facilities
               Manager's Report No. 01-031, dated February 21, 2001
               Manager's Report No. 00-166, dated August 7, 2000
               Manager's Report No. 00-122, dated June 1, 2000
               Manager's Report No. 00-20, dated January 28, 2000

## SUMMARY

Issues:

1)    Should the City Council approve the conceptual financing plan as outlined
      in this report for the remodeling and/or construction of Lifeguard facilities
      and approve the addition of these facilities to the Fire Facility financing
      plan, to allow for a joint financing plan?

2)    Should the City Council approve an ordinance authorizing (a.) the first
      issuance of Lease Revenue Bonds ("Bonds") by the Public Facilities
      Financing Authority of the City of San Diego ("Authority") to finance real
      property acquisition and improvements to certain Fire and Life Safety
      facilities in an amount not to exceed $30 million; (b.) a Site Lease between
      the City and the Authority; (c.) a Lease between the City and the
      Authority; (d.) an Assignment Agreement between the Authority and a
      Trustee; (e.) an Indenture between the Authority and a Trustee; (f.) a

Continuing Disclosure Agreement between the City and a Trustee; (g.) a Preliminary Official Statement; (h.) the Notice Inviting Bids; (i.) the City Manager or his designee, to take such actions, and to execute such documents as may be necessary to complete the sale of the Bonds; and (j.) the investment of a portion of the proceeds of the Bonds in instruments with a term of maturity in excess of five years?

3) Should the City Council approve the following specific actions regarding CIP 33-101.0, Fire Station 2 - Central Mission Valley?

A) Designate Site 19, Area A, commonly known as the stadium overflow parking lot, for Fire Station 2 - Central Mission Valley.

B) Authorize the transfer of $89,400 from CIP 33-098.0, Fire Station Major Components Replacement and Rehabilitation, to CIP 33-101.0, Fire Station 2 - Central Mission Valley, for Phase I of the consultant agreement with WLC Architects, Inc.

C) Approve the phase-funded consultant agreement with WLC Architects, Inc. from CIP 33-101.0 Fire Station 2 - Central Mission Valley and authorize an expenditure not to exceed $89,400 for Phase I of the agreement, and an amount not to exceed $282,140 for Phase II, provided that the City Auditor and Comptroller first furnish a certificate demonstrating that funds are available.

D) Authorize the appropriation of $45,000 from Fund 14000, Building Permit Fee District C, to CIP 33-101.0, Fire Station 2-Central Mission Valley for the construction of a mini-park adjacent to the Fire facility.

4) Should the City Council approve the following specific actions regarding CIP 33-104.0, Fire Station 5 - Uptown?

A) Authorize the transfer of $68,400 from CIP 33-098.0, Fire Station Major Components Replacement and Rehabilitation, to CIP 33-104.0, Fire Station 5 - Uptown, for Phase I of the consultant agreement with Jeff Katz Architecture.

B) Approve the phase-funded consultant agreement with Jeff Katz Architecture from CIP 33-104.0, Fire Station 5 - Uptown. Authorize the expenditure of $68,400 from CIP 33-104.0, Fire Station 5 - Uptown for Phase I of the agreement and an amount not to exceed $152,100 for Phase II of the contract, provided that the

City Auditor and Comptroller first furnish a certificate demonstrating that funds are available.

5) Should the City Council approve the following specific actions regarding lease revenues from City property for the construction of CIP 33-103.0, Fire Station 29 - San Ysidro?

A) Authorize the City Auditor and Comptroller to establish a special interest-bearing fund 30247, Capital Outlay-Fire Stations, to receive lease revenues from the tenant currently using the property on the west side of San Ysidro Boulevard that was recently acquired for Fire Station 29. These revenues and any interest earnings will be used for CIP 33-103.0 Fire Station 29 - San Ysidro.

B) Authorize the City Auditor and Comptroller to appropriate any monies that were deposited into Fund 30247, Capital Outlay - Fire Stations, including any interest earned, to CIP 33-103.0, Fire Station 29 - San Ysidro, and to expend those monies, including interest from CIP 33-103.0 for the purpose of constructing Fire Station 29.

Manager's Recommendations:

1) Approve the conceptual financing plan as outlined in this report for the remodeling and/or construction of Lifeguard facilities and approve the addition of these facilities to the Fire Facility financing plan, to allow for a joint financing plan.

2) Approve an ordinance authorizing (a.) the first issuance of Lease Revenue Bonds by the Public Facilities Financing Authority of the City of San Diego to finance real property acquisition and improvements to certain Fire and Life Safety facilities in an amount not to exceed $30 million; (b.) a Site Lease between the City and the Authority; (c.) a Lease between the City and the Authority; (d.) an Assignment Agreement between the Authority and a Trustee; (e.) an Indenture between the Authority and a Trustee; (f.) a Continuing Disclosure Agreement between the City and a Trustee; (g.) a Preliminary Official Statement; (h.) the Notice Inviting Bids; (i.) the City Manager or his designee, to take such actions, and to execute such documents as may be necessary to complete the sale of the Bonds; and (j.) the investment of a portion of the proceeds of the Bonds in instruments with a term of maturity in excess of five years.

3) Approve the following specific actions regarding CIP 33-101.0, Fire Station 2 - Central Mission Valley:

3

A)   Designate Site 19, Area A, commonly known as the stadium overflow parking lot, for Fire Station 2 - Central Mission Valley.

B)   Authorize the transfer of $89,400 from CIP 33-098.0, Fire Station Major Components Replacement and Rehabilitation, to CIP 33-101.0, Fire Station 2 - Central Mission Valley, for Phase I of the consultant agreement with WLC Architects, Inc.

C)   Approve the phase-funded consultant agreement with WLC Architects, Inc. from CIP 33-101.0 Fire Station 2 - Central Mission Valley and authorize an expenditure not to exceed $89,400 for Phase I of the agreement, and an amount not to exceed $282,140 for Phase II, provided that the City Auditor and Comptroller first furnish a certificate demonstrating that funds are available.

D)   Authorize the appropriation of $45,000 from Fund 14000, Building Permit Fee District C, to CIP 33-101.0, Fire Station 2-Central Mission Valley for the construction of a mini-park adjacent to the Fire facility.

4)   Approve the following specific actions regarding CIP 33-104.0, Fire Station 5 - Uptown:

A)   Authorize the transfer of $68,400 from CIP 33-098.0, Fire Station Major Components Replacement and Rehabilitation, to CIP 33-104.0, Fire Station 5 - Uptown, for Phase I of the consultant agreement with Jeff Katz Architecture.

B)   Approve the phase-funded consultant agreement with Jeff Katz Architecture from CIP 33-104.0, Fire Station 5 - Uptown. Authorize the expenditure of $68,400 from CIP 33-104.0, Fire Station 5 - Uptown for Phase I of the agreement and an amount not to exceed $152,100 for Phase II of the contract, provided that the City Auditor and Comptroller first furnish a certificate demonstrating that funds are available.

5)   Approve the following specific actions regarding lease revenues from City property for the construction of CIP 33-103.0, Fire Station 29 - San Ysidro:
A)   Authorize the City Auditor and Comptroller to establish a special interest-bearing fund 30247, Capital Outlay-Fire Stations, to receive lease revenues from the tenant currently using the property on the west side of San Ysidro Boulevard that was recently acquired for Fire Station 29. These revenues and any interest earnings will be

4

used for CIP 33-103.0 Fire Station 29 - San Ysidro.

B)    Authorize the City Auditor and Comptroller to appropriate any
monies that were deposited into Fund 30247, Capital Outlay - Fire
Stations, including any interest earned, to CIP 33-103.0, Fire Station
29 - San Ysidro, and to expend those monies, including interest
from CIP 33-103.0 for the purpose of constructing Fire Station 29.

Other Recommendations:  None.

Fiscal Impact:

**Lifeguard Facilities**

The total project cost for the Lifeguard facilities scheduled for construction is estimated to
be approximately $10.9 million. Recommended funding sources include:

| | |
|---|---|
| Bond Proceeds | $8,142,000 |
| Interest Earnings on Bond proceeds | $ 319,000 |
| Previously authorized funds | $2,376,000 |
| TOT Funding | $ 100,000 |
| Total Project Requirements | $10,937,000 |

Consistent with the proposed financing plan for Fire facilities which follows, General
Fund revenues in the form of Special Safety Sales Tax revenue ($750,000) will be made
available as the annual source of payment for the portion of these bonds issued to fund the
Lifeguard facilities described in this report. This will be accomplished through a transfer
of Coastal Infrastructure monies in a like amount. The City Auditor and City Treasurer
recommend this financing approach be used to assist in the marketing and rating of this
bond issuance due to past (and likely future), heavy reliance upon Transient Occupancy
Tax (TOT) revenues for funding other projects. Performing this transfer of funds will
ensure that there is no impact to Fire and Life Safety Services General Fund services. If
approved by Council, this proposed Lifeguard Facility financing plan will be combined
with the Fire Facility financing plan.

(As noted in Attachment A, additional funds will be required to complete improvements
for the Lifeguard Headquarters, CIP 33-508.0, and construction of Old Mission Beach
Station, CIP 33-509.0.)

**Fire Facilities**

5

The total project cost for the Fire facilities is estimated to be approximately $33.1 million. Funding sources include:

| | |
|---|---|
| Bond Proceeds | $30,653,000 |
| Interest Earnings on Bond proceeds | $ 1,259,000 |
| Development Impact Fees | $   600,000 |
| State Funds | $   400,000 |
| Cash | $   150,000 |
| Total Project Requirements | $33,062,000 |

Based upon the previously approved financing plan, Proposition 172 (Safety Sales Tax) revenues will be used as the source of payment on the issuance of bonds to fund the rehabilitation of the Fire stations and the replacement of major Fire station components described in this report.

**Combined Financing Package**

The total to fund the combined Lifeguard and Fire facilities project requirements is $44 million. Although the first bond issuance will not exceed $30 million for both the Fire and Lifeguard facilities, the actual issuance is currently projected to be $25.1 million, based on current market conditions. This issuance is expected to provide approximately $21.3 million in construction proceeds, and an amount sufficient to fund the debt service reserve and all related costs of issuance, including but not limited to underwriters, bond counsel, trustee, and preparation of the Official Statement. Annual bond payments on a $25.1 bond issuance are estimated to be $1.7 million at current interest rates.

The actions recommended for Fire Stations 2 (Mission Valley), 5 (Hillcrest), and 29 (San Ysidro) will have no net fiscal impact. All funds recommended to be expended are being borrowed from existing CIP projects with no negative impact to these projects schedules. Once the financing is obtained for the Fire facilities, anticipated in June 2002, these funds will be returned to the original projects.

Environmental Impact

These actions are exempt from the California Environmental Quality Act (CEQA) pursuant to the State CEQA Guidelines, Section 15061 (b) (3). This determination is predicated on Section 15004 of the Guidelines which provides direction to lead agencies on the appropriate timing for environmental review. These actions will require further review under the provisions of CEQA.

BACKGROUND

**Lifeguard Facilities**

During 2001, several actions were taken by the City Council in regard to new and remodeled Lifeguard facilities. Specifically:

- On February 27, 2001, the City Council directed the City Manager to provide a proposed financing plan to fund improvements related to Lifeguard facilities.

- On June 29, 2001, the City Manager presented a prioritized list of Lifeguard facility improvements and two possible funding options to the City Council. While the City Council approved adding the list of projects to the Capital Improvements Program at this meeting, the overall program and financing options were referred to the Natural Resources and Culture Committee for further discussion.

- On August 1, 2001, the Natural Resources and Culture Committee (a.) approved an overall program for Lifeguard facilities (b.) authorized the expenditure of $750,000 in Fiscal Year 2002 Coastal Infrastructure monies as interim funding to allow for continued progress on these projects, and (c.) directed staff to return to the City Council in the spring with a proposed financing plan.

**Fire Facilities**

- On February 27, 2001, the City Council approved an overall program for Fire facilities, approved a conceptual financing plan, and authorized interim funding to ensure that progress could continue on the project. Since then, staff has been working diligently on moving these projects forward by obtaining land and hiring consultants to begin design.

- Given the approved financing plan, the following independent consultants were, or are in the process of being, retained to assist with the proposed financing:

  | | |
  |---|---|
  | Bond Counsel: | Hawkins, Delafield & Wood |
  | Disclosure Counsel: | Quateman & Zidell |
  | Financial Advisors: | Kelling, Northcross & Nobriga |

  In order to complete this financing, a Trustee and Title Insurer are also being retained.

<u>DISCUSSION</u>

**Status Update - Lifeguard Facilities**

As indicated above, a prioritized list of Lifeguard Facilities improvements has been identified and added to the CIP. This list of improvements was developed by Fire and Life Safety Services and Lifeguard Division staff, along with the Municipal Employees Association (MEA). Included within this list are ten facilities that need to be replaced or remodeled. They include one new station at North Pacific Beach; four stations to be removed and replaced at South Mission Beach,

7

La Jolla Cove, Children's Pool and South Pacific Beach; one to be remodeled and enlarged at La Jolla Shores; two to be remodeled at Ocean Beach and Mission Beach; a property acquisition for a future new tower at Old Mission Beach; and seed money for the planning, design and infrastructure work for the Mission Bay Headquarters.

The overall program has been reviewed and refined by staff from both the Lifeguard Division and Engineering and Capital Projects, Fire and Life Safety Services management, and the MEA. Cost estimates, schedules and cash flow projections have been developed for each of the projects. These projects are summarized in **Attachment A**. Construction and design milestones are shown in **Attachment B**.

**Proposed Financing Plan - Lifeguard Facilities**

An engineering assessment of cost, schedule and cash flow has been completed to enable the financing team to determine the cash flow requirements and establish a financing schedule to meet the needs of the program, including appropriate bond issuance dates. Project requirements totaling approximately $10.9 million would be funded as follows:

| | |
|---|---|
| Bond Proceeds | $8,142,000 |
| Interest Earnings on Bond proceeds | $ 319,000 |
| Previously authorized funds | $2,376,000 |
| TOT Funding | $ 100,000 |
| Total Project Requirements | $10,937,000 |

The Bond Counsel for this financing will require that the City be reasonably certain that most of the bond proceeds will be spent within three years of the bond issuance date in order to comply with the applicable laws related to tax-exempt financings. Thus, it is anticipated that the project will require the issuance of two series of bonds, with the first occurring in June 2002.

The portion of the first issuance that will fund the Lifeguard facilities is estimated to total approximately $6.4 million, and will provide for a debt service reserve fund, costs of issuance, and a construction fund. The net proceeds from the first issuance are estimated to total approximately $5.4 million. The second issuance is anticipated to occur in Fiscal Year 2004 in the estimated amount of $3.2 million, and will provide for a debt service reserve fund, costs of issuance, and a construction fund. The net proceeds from the second issuance are estimated to total approximately $2.7 million (See **Attachment F**).

It is recommended that the financing plan described above for Lifeguard facilities be approved and integrated in a combined Fire and Life Safety financing package. The first and second bond issuances for Fire facilities are anticipated to be $18.6 million and $17.6 million, respectively (See **Attachment G**). When combined with the financing for Lifeguard facilities, the total first issuance will be approximately $25.1 million; the total second issuance will be approximately $20.8 million. The total bonded amount for the first issuance would not exceed $30 million. It is anticipated to be $25.1 million, resulting in $21.3 million in net proceeds. (See **Attachment H**).
**Proposed Financing Structure**

8

As indicated above, the maximum size of the first issuance of Bonds would not exceed $30 million, and is currently projected to be $25.1 million based on current market conditions. The term of Bonds will be 30 years, structured with serial and term maturities, as dictated by market conditions at the time of pricing. It is expected that the bonds will be priced in May, 2002, with a closing tentatively scheduled for June, 2002.

The recommended financing vehicle for the Fire and Life Safety facilities is Lease Revenue Bonds under an "asset transfer" structure. Lease Revenue Bonds are based on a lease arrangement between two entities: a governmental entity and, typically, a non-profit agency, financing authority, or joint powers authority which issues the bonds. In the case of the Fire and Life Safety Facilities Project ("Project"), it is intended that the Public Facilities Financing Authority of the City of San Diego ("Authority") be utilized for the purpose of issuing the bonds to finance the Project.

The Authority was established through a Joint Exercise of Powers Agreement by and between the City and the Redevelopment Agency of the City. The Authority is administered by a Commission which is comprised of three members of the public, the City Manager, and the City Auditor and Comptroller.

An "asset transfer" structure is a widely used financing tool whereby municipal entities "refinance" existing public facilities and borrow against the accumulated equity in the facilities in order to finance capital improvement projects. Under this structure, the City would lease an existing asset in lieu of the asset or improvement being financed. Unless an asset-transfer structure is utilized, capitalized interest is required for this type of financing during the period in which the financed project can not be occupied (e.g., during construction). By eliminating the need to fund capitalized interest from the bond issue, an asset-transfer structure results in a reduced bond issuance size and, consequently, a reduced annual lease payment amount.

Although an asset-transfer structure is being utilized for the financing, it is desirable to fund up to 12 months of capitalized interest in order to meet the cash flow requirements of the "Project" (since interest payments would be funded from the bond issue during the capitalized interest period, the City would not have to budget and make lease payments). A 12-month capitalized interest period is shorter than the estimated 24-month construction period for the project. As such, the asset-transfer structure would still result in some reduction to the bond issuance size and annual debt service payment amount.

The City's ability to use this approach is dependent upon the availability of suitable assets for transfer. To be eligible, the asset(s) for transfer must have a market value equal to or greater than the dollar amount of the lease obligations being issued and a useful depreciable life equal or greater than the term of the obligations. The asset(s) must also be unencumbered from leases or other obligations. Existing Fire stations have been identified to meet this criteria.

Section 6586.5 of the California Government Code requires that Joint Powers Authorities ("JPA"), such as the Authority, may only issue bonds to finance a public capital improvement if a member of the JPA has made a finding of significant public benefits. The City will benefit from demonstrable savings in the costs of financing the Project and will able to more efficiently deliver

9

fire and life safety services to residential and commercial development. This is based on the following:

1.) The Authority is authorized to issue bonds to finance the Project. The City of San Diego would have to undertake a certificates of participation financing to finance the Project. The financial market is broader for bonds than it is for certificates of participation. Therefore, the City will be able to take advantage of financing the Project at a lower interest rate with bonds than it would achieve with certificates of participation.

2.) The Project will improve the level of public safety by allowing for quicker response times and better overall service to communities throughout the City.

The Bonds will be sold by competitive bid, with the bid opening currently scheduled for May 2002. The best bidder will be determined based on the lowest true interest cost to the City.

**Financing Documents**

The documents that the City Council will approve through the actions requested today include the following documents as described below.

1)  The Site Lease is the agreement between the City and the Authority under which the City leases certain existing Fire stations to the Authority.

2)  The Lease is an agreement between the City and the Authority under which the City leases, from the Authority, the existing Fire stations. The City agrees to finance its contribution to the Project through the delivery of this lease, and the issuance and delivery of Lease Revenue Bonds of the Authority secured by Base Rental Payments.

3)  The Assignment Agreement is an agreement between the Authority and a Trustee. Under the Agreement, the Authority assigns without recourse all of its rights to receive Base Rental Payments, as defined in the Lease, to the Trustee.

4)  The Indenture is the contract between the Authority and a Trustee, which outlines the parties' rights, responsibilities, and obligations with respect to the issuance of the Lease Revenue Bonds.

5)  The Continuing Disclosure Agreement defines what information related to the issue and issuer will be submitted to a national information repository annually, pursuant to SEC regulation 15c2-12 effective July 3, 1995 requiring continuing disclosure of financial information, material information and certain material events, as defined in the regulation.

6)  The Preliminary Official Statement is the document furnished to potential purchasers of the bonds and by which there is disclosed to such potential purchasers the information which is material to the decision to actually buy the bonds.

**~ 238 ~**

7)      The Notice Inviting Bids is the document provided to potential purchasers of the bonds that define the terms of sale for the bonds.

**Impact on Lifeguard Operating Budget**

The proposed Lifeguard construction/remodeling of towers will not result in a staffing or operating budget impact, as all of the identified facilities are already staffed.

<div align="center">*        *        *</div>

**Status Update - Fire Facilities**

At the City Council meeting of February 27, 2001, the City Council authorized the addition of 12 specific capital improvement projects related to the construction and/or reconstruction of Fire Station facilities throughout San Diego. Approval of these 12 projects will significantly upgrade key public safety facilities, enabling Fire and Life Safety Services to better meet the public safety needs of our community. These projects are identified in detail in **Attachment C** of this report.

Work on the Fire facility projects began earlier this year and will continue through Fiscal Year 2006. Construction and design milestones for each facility are presented in **Attachment D**. The schedule for the Major Components effort, which addresses specific facility needs of existing Fire facilities, is shown in **Attachment E**.

**Actions Needed for Fire Facilities**

At this point, several actions specific to individual Fire stations are needed in order for them to move forward and be completed on schedule as part of the Fire Facilities Project:

1A.    The site identified for Fire Station 2 - Central Mission Valley, is located on the north side of Friars Road, west of Mission Village Drive. The site is currently a paved lot, utilized for stadium overflow parking. The parcel is identified as Site 19, Area A. As this site was designated for use as a Stadium adjunct per Resolution 252539 on August 25, 1980, action needs to be taken now to allow for its use as the site of a Fire station and mini-park. Following completion of this project, some remaining space will continue to be available as additional stadium parking. It is recommended that Site 19, Area A be designated for Fire Station 2 - Central Mission Valley.

1B.    Fire Station 2, Central Mission Valley - WLC Architects, Inc. has been selected to provide design services for this project. An agreement in the amount of $371,540 has been negotiated, and due to funding constraints at this time, the services will be provided in two phases. Funding for the first phase is required in advance of the bond funding to allow the consultant to begin work. Funding for the first phase in the amount of $89,400 has been identified to be borrowed from the Fire Station Major Component Replacement and Rehabilitation, CIP 33-098.0. The funding will be returned to CIP 33-098.0 upon receipt of bond proceeds. It is recommended

~ 239 ~

that the consultant agreement with WLC Architects, Inc. and the transfer of $89,400 from CIP 33-098.0 be approved.

1C.    Mission Valley Mini-Park - A mini-park will be constructed adjacent to the Central Mission Valley Fire Station 2, as a part of CIP 33-101.0, Central Mission Valley. The mini-park will be funded separately from the Fire Facility Financing, via Fund 14000, Building Permit Fee District C. Fund 14000 is funded by Park Service District Fees and as such is an appropriate source of funding for the mini-park. The mini-park is estimated to cost $250,000, of which an initial $45,000 to begin design is required at this time. It is recommended that transfer of $45,000 from Fund 14000 be approved.

2.    Fire Station 5, Hillcrest Area - Jeff Katz Architecture, has been selected to provide design services for this project. An agreement in the amount of $220,500 has been negotiated, and due to funding constraints at this time, the services will be provided in two phases. Funding for the first phase is required in advance of the bond funding to allow the consultant to begin work. Funding for the first phase in the amount of $68,400 has been identified to be borrowed from the Fire Station Major Component Replacement and Rehabilitation, CIP 33-098.0. The funding will be returned to CIP 33-098.0 upon receipt of bond proceeds. It is recommended that the consultant agreement with Jeff Katz Architecture and the transfer of $68,400 from CIP 33-098.0 be approved.

3.    On January 18, 2002 the City purchased a 1.45 acre site, at 179 West San Ysidro Boulevard, on which the future SanYsidro Fire Station 29 will be constructed. Since construction will not begin until summer 2003, the current tenant on the property has been granted a permit to lease the property from the City and use it as a used car sales lot until the City gives 90-day notice to cancel the permit. In the interim, the tenant will pay the City $2,000 per month for use of the site. As the cost of purchasing the site was funded from the Fire Station 29 CIP, it is recommended that the revenue from the lease be returned to this CIP. Upon approval, the lease payments and interest earned will be utilized for Fire Station 29 project costs.

**Schedule**

Based on prior City Council direction, the schedules for three Fire Stations, 2, (Mission Valley), 32 (Skyline/Paradise Hills) and 54 (Paradise Hills), have been accelerated from the schedules included in the previously approved priority list dated February 21, 2001, Manager's Report 01-031. Each of these projects have been moved ahead by one year from of the previous financing plan.

**Impact on Fire Operating Budget**

~ 240 ~

With two exceptions, the proposed construction/remodeling of Fire facilities will not result in any staffing or operating budget impact, as all of the identified facilities are already staffed. The two exceptions are Fire Stations 2 (Mission Valley) and 54 (Paradise Hills) which will be new, additional facilities.

Fire Station 2 (Mission Valley), is scheduled to open in June, 2005 and Fire Station 54 (Paradise Hills) in September 2005. Accordingly, funding required to staff these two facilities will be requested in the proposed City budget for Fiscal Years 2004 and 2005.

Fire Station 2 (Mission Valley), is being designed to house two engines and one truck. At this level and based on Fiscal Year 2003 salary levels, staffing would consist of 9.90 Captains, 9.81 Engineers, and 19.20 Fire Fighters. The total annual operating cost impact would be $3,969,121 (projected) including salaries, fringe benefits, overtime, and non-personnel support costs. It is possible that initially only one engine will be staffed there but that will be dependent on conditions existing at the time of completion, including additional development in the service area and budgetary considerations. Fire Station 2 (Mission Valley) will also house an ambulance but it will be funded by the Emergency Medical Service (EMS) program rather than the General Fund. The cost for ambulance staffing (1.00 Paramedic and 1.00 Emergency Medical Technician [EMT] per shift) will be $334,000.

Fire Station 54 (Paradise Hills) will house one engine and one ambulance. Staffing for the engine would include 3.30 Captains, 3.27 Engineers and 6.40 Fire Fighters. The Fiscal Year 2003 annual operating cost impact would be $1,545,328 (projected). The staffing cost for the EMS-funded ambulance is again $334,000.

**LEED Certification (Green Building Policy)**

The City is now in the process of reviewing adoption of the Leadership in Energy Environmental Design (LEED) "Silver" standard for all new and renovated City facilities. The LEED Green Building Rating System is a program of the US Green Building Council. This program was initiated by the US Green Council, which characterizes this effort as evaluating "environmental performance from a 'whole building' perspective over a building's life cycle," and "is based on accepted energy and environmental principals." Different levels of certification are based on a points system, ranging from "certified," "silver," "gold" and "platinum."

The Environmental Services Department's Energy Conservation and Management Division is planning on revising the City's current green building policy to include the US Green Building Council's LEED certification program. Initial responses from the Energy Division indicate that facilities under 5,000 square feet will most likely be exempt from LEED requirements. With the exception of the Lifeguard Headquarters project (CIP 33-508.0), all of the proposed Lifeguard Facilities will be less than 5,000 square feet, and will therefore, not incorporate LEED standards.

It should be emphasized however, this will not exempt these facilities from meeting or exceeding California Title 24 energy standards. The State of California Title 24 energy standards govern energy efficiency requirements within the State of California and set the minimum standards for energy conservation measures for the City of San Diego. In June 2001, the City of San Diego adopted the latest Title 24 requirements which will increase building energy efficiency an additional 15 to 17 percent.

~ 241 ~

With respect to implementing the LEED Silver Standard for Fire Facilities, an increase in funding of 5% and 10% respectively for design and construction, has been included in the financing plan. However, it is estimated that these increased costs will be off-set through energy efficiency and water conservation measures. The adoption of the LEED Silver rating for these type of facilities is projected to achieve payback within 10 years, thereafter resulting in a projected average utility cost saving of an *additional* 15% to 17% over the life cycle (40 years or more) of the facility.

While there are several Fire facility projects too far along to embrace the Silver LEED standard [1 (Downtown); 12 (Lincoln Park); 22 (Point Loma); 31 (Del Cerro); and the Kearny Villa Maintenance Facility], there are six facilities that can still adopt the Silver standard at an increased cost of $1,020,477, reflected in the proposed financing plan. These facilities are Fire Stations 2 (Mission Valley), 5 (Hillcrest), 17 (Mid-City), 29 (San Ysidro), 32 (Skyline/Paradise Hills), and 54 (Paradise Hills).

NEXT STEPS

**Lifeguard Facilities**

With the City Council's approval of the proposed bond financing package, and once the initial bond proceeds are received in June 2002, Engineering will continue efforts to complete construction documents for the first four lifeguard projects which have design activities scheduled this fiscal year: South Pacific Beach, North Pacific Beach, La Jolla Shores, and Children's Pool Lifeguard Stations.

**Fire Facilities**

With the City Council's approval of the proposed bond financing package, and once the initial bond proceeds are received in June 2002. Engineering will proceed with purchasing land for Fire Stations 32 (Skyline/Paradise Hills) and 54 (Paradise Hills), and continue with design and construction of the Major Components, and Fire Stations 12 (Lincoln Park), 31 (Del Cerro), 29 (San Ysidro), 5 (Hillcrest) and 2 (Mission Valley).

CONCLUSION

On February 27, 2001, the City Council authorized the addition of 12 specific capital improvement projects related to the construction and/or reconstruction of Fire Station facilities throughout San Diego. On August 1, 2001 the Natural Resources and Culture Committee approved an overall program for Lifeguard facilities and directed staff to return to the City Council with a proposed financing plan. Approval of the financing plan presented in this report for the remodeling and/or construction of Lifeguard facilities, and the authorization to issue Bonds in an amount not to exceed $30 million, are the next steps to financing the Fire and Lifeguard facilities.

ALTERNATIVE

Do not approve the requested actions necessary to issue Bonds for the funding of various Fire and Life Safety facilities.

~ 242 ~

Respectfully submitted,

_____               _____
Bruce Herring                                                    Approved: Patricia T. Frazier
Deputy City Manager                                                       Deputy City Manager

HERRING/JD

Note: Attachments B, D, E, F, G and H are not available in electronic format. Copies of these attachments are available for review in the office of the City Clerk.

Attachments:   A.  Lifeguard Facilities - Project Summaries
               B.  Lifeguard Stations - Design and Construction Milestones

               C.  Fire Facilities - Project Summaries
               D.  Fire Stations - Design and Construction Milestones
               E.  Fire Station Major Components Replacement - Phase II Design and
                   Construction Milestones

               F.  Cashflow - Lifeguard Facilities
               G.  Cashflow - Fire Facilities
               H.  Combined Cashflow - Fire and Lifeguard Facilities

# EXHIBIT 15



THE CITY OF SAN DIEGO

# MANAGER'S REPORT

| | | |
|---|---|---|
| **DATE ISSUED:** | February 27, 2003 | **REPORT NO.** 03-029 (Changes noted in strike-out/underline) |

**ATTENTION:** Honorable Mayor and City Council
Docket of March 3, 2003

**SUBJECT:** Refunding of 1993 Lease Revenue Bonds (Old Town Trolley Extension) and 1993 Certificates of Participation (Balboa Park and Mission Bay Park Improvements).

**REFERENCE:** None

## SUMMARY

### Issues

1) Should the City Council authorize the issuance of Refunding Lease Revenue Bonds in an amount not to exceed $18.5 million and approve related financing documents for the purpose of refunding the 1993 Lease Revenue Bonds (Old Town Trolley Extension, (the "1993 Lease Revenue Bonds"), including a Property Lease, Lease Agreement, Sublease Agreement, Trust Indenture, Preliminary Official Statement, Continuing Disclosure Agreement, Escrow Agreement, and related documents?

2) Should the City Council authorize the issuance of Refunding Certificates of Participation in an amount not to exceed $22.0 million and approve related financing documents for the purpose of refunding the 1993 Certificates of Participation (Mission Bay and Balboa Park Capital Improvements Program, (the "1993 Certificates of Participation"), including a Site Lease, Facilities Lease, Assignment Agreement, Trust Agreement, Preliminary Official Statement, Continuing Disclosure Agreement, Escrow Agreement, and related documents?

3)    Should the City Council authorize the substitution of cash in the Debt Service Reserve Funds of the Refunding Lease Revenue Bonds and Refunding Certificates of Participation with surety policies?

**Manager's Recommendations** – Adopt the Resolutions and Ordinances

**Other Recommendations** - None.

**Fiscal Impact** – Based on current market conditions, the refunding of the 1993 Lease Revenue Bonds is expected to generate total savings of approximately $1.0 million over a 21 year period through 2023, or 4.0% in Net Present Value Savings over the remaining term of the bonds ending in Fiscal Year 2023. The refunding of the 1993 Certificates of Participation is expected to generate a total savings of approximately $1.6 million over the next 22 years, or 5.5% in Net Present Value Savings over the remaining term of the bonds ending in Fiscal Year 2024.

As discussed above, the proposed refundings will result in future savings, in terms of lower annual lease payments. The average annual lease payments for the Refunding Lease Revenue Bonds are estimated to be $1.23 million, approximately $49,000 lower than the original annual payments for the refunded 1993 Lease Revenue Bonds.   The annual lease payments for the 1993 Refunding Certificates of Participation are estimated to average $1.24 million, approximately $74,000 lower than the original annual payments for the refunded 1993 Certificates of Participation.

It is estimated that replacement of the cash in the Debt Service Reserve Funds for the Refunding Lease Revenue Bonds and the Refunding Certificates of Participation, net of the required surety premiums, will result in the release of approximately $3.6 million. The cash funds released must be used on capital improvements which are determined to be eligible for funding with bond proceeds. These surety The funds will be used for miscellaneous capital projects, including, but not limited to, library facility improvements. to meet a portion of the annual lease payments on the Refunding Lease Revenue Bonds and the Certificates of Participation in Fiscal Years 2003 and 2004.

## BACKGROUND

In September 1993, the City of San Diego/MTDB Authority (the "Authority") issued $19,515,000 in Lease Revenue Bonds for the purpose of financing the City's portion of the acquisition, installation, equipping and construction of an extension of the San Diego Light Rail Transit System from Downtown San Diego to Old Town. Annual payments on the bonds are paid from and secured by the assignment of lease payments made by the City, utilizing an asset-transfer lease structure. An "asset transfer" structure involves a lease-back arrangement, whereby the City uses an existing asset as the basis for the lease, as opposed to the asset being constructed with the bond proceeds. The City leases the existing asset to a joint powers authority or a non-profit entity, which then leases it back to the City, with the City's lease payments used to pay off the bonds. The City has routinely used this structure for lease financings, including the Convention Center Expansion Project and, more recently, the Fire and the Life Safety

2

Facilities Project. For the 1993 Lease Revenue Bonds proposed for refunding, the joint powers authority is the City of San Diego/MTDB Authority and the facilities used as assets are: (1) the right-of-way necessary to operate the project (the Old Town Trolley Extension); and (2) a portion of a light rail maintenance yard. Both assets are owned by the Metropolitan Transit Development Board (MTDB) and leased to the Authority under the terms of a Property Lease, then leased by the Authority to the City utilizing a Facilities Lease, with the City making the annual lease payments to a Trustee, who in turn pays the bondholders. The proposed Refunding Lease Revenue Bonds will use the same facilities, with the related leases (Property Lease and Facilities Lease) amended and restated to reflect the requirements of the refunding.

In November 1993, $27,985,000 in Certificates of Participation (Balboa Park and Mission Bay Park Improvements) were issued to finance various improvement projects in Balboa Park and Mission Bay Park. For the purpose of this financing, similar to the 1993 Lease Revenue Bonds, an "asset-transfer" structure was used. The City utilized two existing facilities (the North Course of the Torrey Pines Golf Course and the House of Charm facility in Balboa Park) as assets to be leased to the San Diego Facilities and Equipment Leasing Corporation, a non-profit corporation, which then leased the facilities back to the City. Under the proposed refunding, the same facilities will be retained as assets, with the existing leases amended and restated to reflect the requirements of the refunding.

In accordance with legal requirements, the existing 1993 Lease Revenue Bonds and 1993 Certificates of Participation both maintain Debt Service Reserve Funds fully funded with Bond/Certificate proceeds. The amounts maintained in these Funds are approximately $1.3 million for the Lease Revenue Bonds and $2.3 million for the Certificates of Participation. Concurrent with the proposed Refundings, it is proposed that surety policies be substituted for the cash amounts maintained in these Debt Service Reserve Funds. With a surety substitution, the Surety Provider guarantees to make any necessary payments previously provided for by the cash funded Debt Service Reserve Funds. The use of the cash amounts released from the Debt Service Reserve Funds for the 1993 Lease Revenue Bonds and 1993 Certificates of Participation would be used to meet a portion of the annual lease payments in Fiscal Years 2003 and 2004 on these Bonds/Certificates. ~~limited to expenditures on capital projects determined to be eligible for bond financing.~~

## DISCUSSION

The documents being submitted for City Council action provide authorization to the City Manager to proceed with Refundings of the 1993 Lease Revenue Bonds and the 1993 Certificates of Participation. Under the proposed refunding plan for the 1993 Lease Revenue Bonds, the proceeds of the Refunding Bonds will be placed in an Escrow Fund with the proceeds, including any interest earned, to be used to redeem the outstanding 1993 Lease Revenue Bonds at a redemption price of 101%, plus accrued interest, on, or after June 1, 2003. Monies in the Escrow Fund will also be used to pay any payments due on any outstanding bonds prior to redemption.

For the 1993 Certificates of Participation, proceeds will also be deposited in an Escrow Fund, with the proceeds, including any interest earned, to be used to redeem the outstanding 1993 Certificates of Participation in full on November 1, 2003, at a redemption price of 101% of the principal amount, plus any accrued interest due. It is proposed that both refunding issuances

**~ 246 ~**

be offered to underwriters on a competitive basis, with the sale to occur in late April 2003.

Documents are also being submitted for City Council action to implement surety substitutions for each refunding issuance. Net of the premium amounts paid to the surety providers, a total of $3.6 million will be released for use on ~~annual lease payments in Fiscal Years 2003 and 2004. miscellaneous capital projects, including, but not limited to, library facility improvements.~~

The basic documents being submitted for City Council action include:

**Trust Indenture (Lease Revenue Bonds) and Trust Agreement (Certificates of Participation)** - Outline the parties' rights, responsibilities, and obligations with respect to the issuance.

**Lease Agreements** – Various lease agreements required to implement the lease back structure used under both types of lease obligations (Lease Revenue Bonds and Certificates of Participation)

**Escrow Agreements** – Agreement governing use and investment of funds deposited in the Escrow Account.

**Preliminary Official Statements** - Bond offering document providing certain information pertaining to the bond Refunding.

**Disclosure Agreements** - Agreement between the City and the Trustee regarding continuing disclosure requirements.

**Assignment Agreements** – Agreement assigning City's lease payments to the Trustee for the purpose of making required payments to the Bond/Certificate owners.

**Surety Agreements** – Surety Agreement providing for payment of the necessary premium amounts to the Insurer as consideration for the Insurer's guarantee to make any required payments as required under the terms of the Surety Bond.

## CONCLUSION

It is recommended that City Council authorize the issuance of Refunding Lease Revenue Bonds in an amount not to exceed $18.5 million, Refunding Certificates of Participation in an amount not to exceed $22.0 million, and the replacement of the cash amounts maintained in the Debt Service Reserve Funds of the two Refunding issuances with surety policies. It is recommended that the City Council approve all of the related financing documents, and Ordinances and Resolutions required to implement the authorized actions.

**ALTERNATIVE**

Do not approve the requested actions necessary to refund Bonds and Certificates.


Respectfully submitted,


_____              _____
Mary Vattimo                            Approved: Patricia T. Frazier
City Treasurer                                    Deputy City Manager

KOMMI/MCC