**FRANK T. VECCHIONE**
Attorney at Law
105 West "F" Street, Suite 215
San Diego, California 92101
Telephone: (619) 231-3653
Facsimile: (619) 239-0056
Email: ftvlaw@aol.com
CA State Bar: 054730

Appearing specially for Defendant,
**TERESA A. WEBSTER**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA
(Honorable Dana M. Sabraw)

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL T. UBERUAGA, EDWARD P. RYAN, PATRICIA FRAZIER, TERESA A. WEBSTER, and MARY E. VATTIMO,<br><br>Defendants. | CASE NO. 08-CV-0625-DMS (LSP)<br><br>**DEFENDANT TERESA A. WEBSTER'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF THE MOTION TO DISMISS THE COMPLAINT**<br><br>Date: November 7, 2008<br>Time: 1:30 p.m. |

Pursuant to Federal Rules of Evidence 201(b) and (d), defendant TERESA A. WEBSTER hereby requests that the Court take judicial notice of the following documents, and the facts contained therein, submitted in support of her Motion to Dismiss:

1. Attached hereto as **Exhibit 1** is a true and correct copy of the San Diego Office of the Independent Budget Analyst, IBA Report No.: 07-12 (January 22, 2007).

2. Attached hereto as **Exhibit 2** is a true and correct copy of the Memorandum of Points and Authorities in Support of Motion for Partial Summary Judgment Regarding Underfunding Claims in *San Diego Police Officers' Ass'n. v. Aguirre*, Case No. 05CV1581-H(POR).

The Court may take judicial notice of matters of public record, defined as a fact "not subject to reasonable dispute in that it is capable of accurate and ready determination by

1  resort to sources whose accuracy cannot reasonable be questioned."[1] **Exhibits 1-2** constitute matters of public record not subject to reasonable dispute, and judicial notice of these exhibits is proper.

Further, **Exhibit 1**, constitutes records of the City, and as government data and/or publications, they are not subject to reasonable dispute and are judicially noticeable.

Accordingly, defendant TERESA A. WEBSTER respectfully requests that the Court grant her Request for Judicial Notice and consider the foregoing documents, and facts contained therein, in ruling on her Motion to Dismiss Complaint.

Respectfully submitted,

Dated: September 8, 2008       s/Frank T. Vecchione
                               FRANK T. VECCHIONE
                               Appearing specially for Defendant
                               TERESA A. WEBSTER
                               Email: ftvlaw@aol.com

---

[1] *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1025 n.2 (9th Cir. 2006)

- 2 -                                                                08CV0625

OFFICE OF THE INDEPENDENT BUDGET ANALYST REPORT

# REVIEW OF MAYOR'S FIVE-YEAR FINANCIAL OUTLOOK FISCAL YEARS 2008 – 2012

*Part II. Mayor's Eight Significant Areas*

Date Issued:  January 22, 2007                                                    IBA Report Number:  07-12

## Report Overview

The Mayor's Five-Year Financial Outlook for Fiscal Years 2008-2012 was presented at the November 29, 2006 Budget and Finance Committee meeting. This Financial Outlook represents a view of the City's long range fiscal condition and fiscal challenges for the next five years. The Financial Outlook identifies the Mayor's priorities that he hopes or plans to address during Fiscal Years 2008-2012. These priorities are identified in the Financial Outlook as the eight significant areas.

This IBA report provides a review of the Mayor's eight significant areas. As stated in IBA Report 07-6, the IBA will examine all areas of the Mayor's Financial Outlook which will include: General Fund revenues and expenditures; the eight significant areas; and possible solutions to balance the budget. The IBA will also be examining possible new and increased fees, which are not contemplated in the Financial Outlook.

# Discussion of the Eight Significant Areas

## *I. Pension System – Annual Required Contribution (ARC) Plus*

The Financial Outlook identifies the Retirement System as one of the eight significant areas, reflecting the substantial role the System has played in the City of San Diego's recent financial history. As presented in the Financial Outlook and reinforced in IBA Report 07-6, the base expenditure projections already include the payment of the full ARC, including previously unfunded contingent liabilities. This is consistent with applicable law as well as industry best practices.

However, the Financial Outlook also suggests addressing this liability in a much more aggressive fashion, beyond payment of the ARC. Labeled "ARC Plus," the Financial Outlook proposes to pay additional funds into the system beginning in Fiscal Year 2008 such that there is no negative amortization of the UAAL principal. Thus, the UAAL is fully paid down in 20 years, rather than the 27 years anticipated under the current amortization schedule. This goal requires the infusion of an additional $27 million each year ($20.8 million additional General Fund contribution). According to Attachment I of the Financial Outlook, this infusion of $540 million over 20 years will save the City over $1.1 billion in interest costs. Based on the same proportionate share as above, this represents interest savings of over $847 million in the General Fund over the amortization period.

This plan has clear financial advantages: it saves the City a significant amount of money over 20 years. However, seeking solely to save money through the acceleration of the amortization period is not necessarily a prudent approach. Amortization serves a valuable function in that it enables persons or entities to pay down a debt over an extended, but sensible period of time. Amortizing a debt typically involves additional costs in the form of interest, and a debtor will save money over the long-term by reducing the amortization period. Yet it is neither prudent nor practical to reduce financing costs to zero, which would essentially mean paying for all commodities in cash, and forgoing the benefit of amortization. In the City's case, every step taken to reduce the financing costs will require expenditure reductions in other areas, and may equate to a reduction in other City services. In the proposal presented in the Financial Outlook, the City will have to reduce $20.8 million in the General Fund each year to avoid some of these financing costs. As a point of comparison, $20.8 million is nearly two-thirds of the Library Department or about one-quarter of the Park and Recreation Department. A decision to implement this plan and save on financing costs could come at the expense of reduced services to citizens.

While simply allocating additional funds to the Retirement System in order to reduce financing costs over the long-term may be somewhat arbitrary, the Financial Outlook proposes to achieve a specific policy goal through this plan: the avoidance of negative amortization of the UAAL. The phenomenon of negative amortization in the early years of the schedule is acceptable in pension system practices and by the Governmental Accounting Standards Board (GASB). This is

2

reinforced in SDCERS' June 30, 2005 valuation in which the actuary states, "This expected increase in the UAL in the early years is an acceptable and common method used by many public sector retirement systems, and specifically accepted by GASB in Statement No. 25" (p. 4). Additionally, during the presentation on January 19, 2007 regarding the valuation, the SDCERS' actuary presented projections of the future system liabilities and assets. Based on the adopted assumptions, the UAAL does continue to grow, as anticipated in the Financial Outlook. However, the projection shows that the funded ratio of the trust, the measure of assets as a percentage of liabilities, continues to improve. In fact, the projection shows an improvement of 1-2% each year, if actuarial assumptions are met. The funded ratio is a valuable measure of the trust's ability to meet its obligations, and despite negative amortization, this is expected to improve continuously as shown. Given this, and the statements regarding negative amortization by the actuary, the IBA does not recommend undue focus on this funding phenomenon. Nevertheless, the presence of negative amortization has caused consternation among some members of the public. Thus, while there are no legal requirements or practices that would induce the City to implement this plan, we recognize that it may be desirable to some to "go above and beyond" with regard to paying down the Retirement System UAAL.

In selecting an accelerated payment plan, the IBA finds the 20 year amortization a reasonable goal for consideration, in that it is a prudent amortization period and it achieves a policy goal that may be desirable to the public and elected officials. However, the true value of the ARC Plus plan cannot ultimately be judged until it is apparent what services to the citizens or opportunities to address some of the City's many other pressing needs will be foregone by diverting funds to an optional accelerated UAAL payment plan. Additionally, based on the actuarial valuation for June 30, 2006, the City's ARC will be much lower in FY 2008 than anticipated in the Financial Outlook. Thus, ARC Plus would also be lower, and the remaining deficit projected in the Financial Outlook for FY08 would be essentially eliminated if all of the proposed "solutions" remained intact.

The IBA would not support the restoration of service levels through elimination of the ARC Plus plan and creation of a surplus in FY 2008. However, given the information above, we believe the City Council should consider competing needs, such as taking an even more aggressive funding approach to Storm Water compliance, ADA compliance, and other deferred maintenance above this discretionary plan for the pension liability. Based on the above, as well as the following sections regarding the other seven areas of importance, the IBA believes that the ARC Plus plan is the most discretionary of the funding proposals outlined in the Eight Significant Areas.

## *II. Reserves*

Establishing and maintaining a General Fund Reserve level that is sufficient to address unforeseen contingencies such as natural disasters, catastrophic occurrences, or excess liabilities or judgments against the City has proven challenging given recent fiscal constraints.

Rating agencies view formalized, well-defined operating reserve policies, and the ability to historically adhere to them, as an integral factor in the credit rating process of a governmental entity. Specifically, Standard & Poor's includes "Reserves and Liquidity Policies" as one of its seven financial practices likely to affect credit quality (Financial Management Assessment, August

improvements over the next five years. The Financial Outlook does not specify the projects that will receive the proposed funding for Fiscal Years 2008-2012.

As previously noted, the Mayor's Office is in the process of completing an inventory of all deferred maintenance/capital improvement needs. The City Council needs the inventory and prioritization list as soon as possible for effective budget decision making. It is important to identify and prioritize all needs to ensure they receive full consideration during the budget process. On January 17, 2007, the City Council adopted a Council Policy for Prioritizing Transportation CIP Projects. It is imperative that the Mayor's Office continue to work towards a prioritization process that addresses City-wide CIP projects.

In addition to establishing a plan that addresses the backlog of deferred maintenance in the City, it is important to address current maintenance needs to avoid "growing" the backlog. Funding for ongoing, systematic preventative maintenance should be seriously considered. The longer maintenance is deferred, the more costly the repairs will be. While the Mayor has begun to address the deferred maintenance backlog in the Financial Outlook by making this a funding priority for the City, there is no strategy to address the ongoing systematic maintenance requirements.

The Financial Outlook also states that there are practical limits on how much work can be handled in any given fiscal year. The City should carefully evaluate and determine how many projects can be logistically accomplished each year. Furthermore, staffing requirements of carrying out projects need to be determined.

As stated in IBA Report 06-36, due to the complexity of the CIP and the difficult decisions that will be necessary during the CIP assessment, prioritization and budget processes, it is suggested that the Mayor's Office consider assigning executive level management oversight of the City's CIP to serve a critical function in overall citywide CIP coordination and management.

Finally, citizen involvement is also an integral part of both the operating and capital budgeting processes. A CIP Budget Hearing will be held as part of this year's budget process to allow for public input. New opportunities for citizen involvement in future CIP processes should also be explored.

### *IV. Other Post-Employment Benefits (OPEB)*

As discussed in IBA Report 07-6, the Financial Outlook includes the minimum required payment of Retiree Health obligations on a pay-as-you-go basis as a baseline assumption. The Financial Outlook also identifies the retiree health liability as one of the eight significant areas for aggressive action. The Fiscal Year 2007 budget established a Trust Fund of $5 million for this purpose. The proposal suggests contributing an additional $25 million and $50 million in Fiscal Year 2008 and 2009, respectively, into a Trust to actuarially pre-fund the expected liability. The Financial Outlook further assumes that the ARC, expected to be $75 million, will be paid in-full beginning in Fiscal Year 2010.

6

The IBA concurs with a plan to begin pre-funding the retiree health liability. As we emphasized in IBA Report 06-18, it is expected that municipalities will begin to address these liabilities in some manner, not just report them as required by GASB. Since the GASB requirement is just taking effect, and most municipalities have not yet valued their liability, or begun pre-funding it, there is little in the way of best practices, industry standards or advisory recommendations to guide the City of San Diego in implementing a prudent plan to pre-fund this liability. Truly, the City will be a leader in this area.

The plan in the Financial Outlook assumes ramping up the retiree health payment over three years, until the full ARC is paid in 2010 and beyond. This is a very aggressive schedule that is admirable and will reduce interest costs over the long term, as discussed in the section on retirement. Yet there are areas of exposure with the plan as described in the Financial Outlook. First, while the schedule to ramp-up pre-funding of the liability is aggressive, based on the data available to us, we do not agree that the City will be paying the full ARC by 2010. If the City uses a 30 year amortization, the ARC would have been $160 million in Fiscal Year 2006 at an assumed investment rate of return of four percent (the current assumption), or over $128 million in Fiscal Year 2008 at six percent return. While the infusion of $75 million into the Trust in Fiscal Years 2008 and 2009 will enable new investment returns, we question the rate of investment return that must be assumed in the Financial Outlook to reduce the ARC to just $75 million in 2010. The IBA suggests that more actuarial data is necessary to substantiate the assumptions in the Financial Outlook for the Retiree Health ARC.

Secondly, each year the full ARC is not paid, the UAAL for retiree healthcare grows, depending on the actuarial assumptions used. If it is true that this plan does not actually pay the full ARC, the City will have to report this on its financial statements and incur additional interest on the principal that is unpaid. We emphasize again that the City is not required to pay the retiree healthcare ARC, as it is required to do for the retirement system. Yet the IBA suggests that the City place a priority on achieving the retiree healthcare ARC, in order to implement a plan to fully write-down the retiree healthcare UAAL over time, above a plan to reduce the time horizon for paying down the pension UAAL. In other words, we believe it is more valuable to have a plan in place for both liabilities, before pursuing a more aggressive plan for one.

Notwithstanding the actual amount of the ARC in a given year, the aggressive ramp-up in retiree health pre-funding is a critical financial goal and is strongly supported by this office. The IBA suggests that, as the Financial Outlook is updated over time, staff report on practices by municipalities and recommendations by advisory organizations that may be developed in the future to ensure that the City's practices are sensible and prudent.

### *V. Storm Water Compliance*

The Financial Outlook identifies Storm Water Compliance as one of the eight significant areas that are addressed. The City of San Diego, along with other governmental agencies within San Diego County, discharges storm water under the Municipal Storm Water Permit for the San Diego Region. The Storm Water Permit, issued by the San Diego Regional Water Quality Control Board (Regional Control Board), requires that the City comply with certain requirements and adopt best management practices in order to reduce pollution in storm water runoff.

1  Peter H. Benzian (Bar No. 47456)
   Laura A. Godfrey (Bar No. 233059)
2  Colleen C. Smith (Bar No. 231216)
   Joseph Lake (Bar No. 246649)
3  LATHAM & WATKINS LLP
   600 West Broadway, Suite 1800
4  San Diego, California 92101-3375
   Telephone: (619) 236-1234
5  Facsimile: (619) 696-7419

6  Attorneys for Defendants City Of San
   Diego, Toni Atkins, P. Lamont Ewell,
7  Donna Frye, Bruce Herring, Ralph Inzunza,
   Cathy Lexin, Jim Madaffer, Brian
8  Maienschien, Scott Peters, Ed Ryan,
   Michael Uberuaga, Mary Vattimo, Terri
9  Webster, Tony Young, and Michael
   Zucchet

10                    UNITED STATES DISTRICT COURT

11                   SOUTHERN DISTRICT OF CALIFORNIA

12

13 | SAN DIEGO POLICE OFFICERS' ASSOCIATION, | CASE NO. 05 CV 1581 H (POR)
14 |   Plaintiff, |
15 |   v. | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION BY DEFENDANTS CITY OF SAN DIEGO, RALPH INZUNZA, MARY VATTIMO, MICHAEL UBERUAGA, ED RYAN, TERRI WEBSTER, MICHAEL ZUCCHET, BRUCE HERRING, P. LAMONT EWELL, SCOTT PETERS, JIM MADAFFER, TONI ATKINS, TONY YOUNG, BRIAN MAIENSCHEIN, DONNA FRYE, AND CATHY LEXIN FOR PARTIAL SUMMARY JUDGMENT REGARDING PENSION UNDERFUNDING CLAIMS
16 | MICHAEL AGUIRRE; CITY OF SAN DIEGO; SAN DIEGO CITY EMPLOYEES' RETIREMENT SYSTEM; SCOTT PETERS; JIM MADAFFER; RALPH INZUNZA; TONI ATKINS; TONY YOUNG; BRIAN MAIENSCHEIN; DONNA FRYE; MICHAEL ZUCCHET; CATHY LEXIN; MARY VATTIMO; TERRI WEBSTER; ED RYAN; P. LAMONT EWELL; MICHAEL UBERUAGA; BRUCE HERRING; AND DOES 1 THROUGH 100, INCLUSIVE, |
22 |   Defendants. | Date: March 12, 2007
   |   | Time: 10:30 a.m.
   |   | Judge: Judge Marilyn L. Huff
   |   | Courtroom: 13

1  *Spannus*, 438 U.S. 234, 245 (1978). "The more severe the impairment, the more searching the
2  [court's] examination of the legislation must be." *Campanelli v. Allstate Life Ins. Co.*, 322 F.3d
3  1086, 1098 (9th Cir. 2003).

4  Applying these principles, federal courts occasionally have recognized that public
5  employees may, under certain circumstances, possess a constitutionally-protected contractual
6  right to payment of pension benefits earned or to refund of employee contributions made.
7  Critically, however, **no published federal case holds that public employees have a**
8  **constitutional right to an actuarially-sound pension system**. In the absence of *any* published
9  authority concerning this issue, no clearly established constitutional right to an actuarially-sound
10 pension system exists as a matter of law. *See, e.g.*, *Blueford v. Prunty*, 108 F.3d 251, 255 (9th
11 Cir. 1997).

### b. Nor Did the Individual Defendants' Enactment of MP2 Violate Clearly-Established California Law

14 Even if this Court were to look (improperly) to California law to discern the contours of
15 the SDPOA members' asserted contract rights, the Individual Defendants' actions did not violate
16 the SDPOA members' constitutional rights. Rather, the nature of the constitutional right in
17 question is relatively narrow in scope.

18 California law recognizes public employees' right to an actuarially-sound pension
19 system. *Bd. of Admin. v. Wilson*, 52 Cal. App. 4th 1109, 1136 (1997). This right is derived from
20 and implicit in public employees' state constitutional right to substantial or reasonable pension
21 benefits. *See id.* at 1132. Such benefits may be modified "for the purpose of keeping a pension
22 system flexible to permit adjustments in accord with changing conditions and at the same time
23 maintain the integrity of the system." *See id.* (citing *Valdes v. Cory*, 139 Cal. App. 3d 773, 783-
24 84 (1983)). As the *Wilson* court explained, however, when a government entity establishes by
25 statute a retirement system to pay pension rights of state employees, "[a]ctuarial soundness of the

LATHAM&WATKINS   SD\571462.6
ATTORNEYS AT LAW
SAN DIEGO
18
CASE NO. 05 CV 1581 H (POR)
MOTION FOR PARTIAL SUMMARY
JUDGMENT RE UNDERFUNDING CLAIMS

1   system is necessarily implied in the total contractual commitment, because a contrary conclusion
2   would lead to express impairment of employees' pension rights." *Id.*[9]
3   Thus, this corollary aspect of the City's contractual obligation to its employees is merely
4   an implied contractual right that is intended to protect pension beneficiaries' interest in the
5   integrity of the source of funding for the payment of benefits. *See Valdes v. Cory*, 139 Cal. App.
6   3d at 785 (basing the implied contractual right to an actuarially-sound pension system in
7   authority "for the proposition that employee pension beneficiaries have a vested interest in the
8   integrity and security of the source of funding for the payment of benefits"). Stated differently,
9   the constitutionally-protected contractual right to an actuarially-sound pension system extends
10  only insofar as it protects pension beneficiaries' right to payment of benefits earned—it is not an
11  abstract guarantee divorced from the qualified right to receive benefits.
12  A pension system thus is actuarially sound for constitutional purposes if it is reasonably
13  capable of paying all benefits presently owed, even if through express mitigating measures.
14  *Wilson*, 52 Cal. App. 4th at 1136 (suggesting that temporary mitigation of employer
15  contributions would not violate the state contract clause when accompanied by "express
16  provision for [subsequent] mitigation through increased employer contributions"); *see also* Op.
17  Cal. Atty. Gen. 06-808, 2006 WL 3694844 (Dec. 1, 2006) (pension system is not rendered
18  actuarially unsound by retirement board decision to extend the amortization period for payment
19  of benefits beyond the average remaining work period of the members eligible to receive the
20  benefits).
21  Further, a pension system does not impair constitutional contract rights when changes in
22  the level of pension funding are accompanied by comparable new advantages, *i.e.*, new
23  benefits.[10] The California Court of Appeal recently explained this principle, noting (albeit not in

---

[9]  This right has not as yet been extended to retiree health care benefits. That retiree health care benefits would be treated differently makes sense as such benefits are not pension benefits and must be separately administered under federal law. *See* City's Motion for Partial Summary Judgment Regarding 2005 Negotiations at 17-18.

[10]  While the sensibility of this doctrine -- which permits a simultaneous decrease in funding and increase in benefits -- is perhaps questionable, it remains an accurate statement of California law. *See Wilson*, 52 Cal. App. 4th at 1145 (holding that any modifications to a pension

LATHAM&WATKINS  SD\571462.6
ATTORNEYS AT LAW
SAN DIEGO

19

CASE NO. 05 CV 1581 H (POR)
MOTION FOR PARTIAL SUMMARY
JUDGMENT RE UNDERFUNDING CLAIMS

1  the context of an alleged contract clause violation), that the mere existence of an unfunded
2  liability ("unfunded actuarial accrued liability" or "UAAL") does not render a pension system
3  actuarially unsound:

> *A decision that increases UAAL is not necessarily bad for members.* As the actuary's June 30, 2002 valuation makes clear, the primary cause of the increase in UAAL in the Association's pension fund in 2002 was an increase in pension benefits valued at approximately $1.1 billion. Obviously, such benefit increases do not harm members. *If the Board were prohibited from increasing UAAL, such benefit increases may not have been granted, since the County might have determined that such increases were unaffordable.* As the Association's actuary noted in his June 30, 2002 actuarial valuation in defining UAAL: "Most retirement systems have UAAL. They arise each time new benefits are added and each time an actuarial loss is realized. *The existence of UAAL is not in itself bad*, any more than a mortgage on a house is bad. UAAL does not represent a debt that is payable today."

12  *Bandt v. Bd. of Retirement, San Diego County Employees' Retirement Sys.*, 136 Cal. App. 4th
13  140, 157 (2006) (emphasis added).
14       Similarly, here, there can be little doubt that the Individual Defendants' enactment of
15  MP2 did not violate the SDCERS beneficiaries' constitutional rights. Because MP1 is no longer
16  in issue, the sole question before the Court is whether MP2 alone rendered the system actuarially
17  unsound such that payment of the SDPOA's members' pension benefits is in jeopardy, thereby
18  violating their qualified constitutional rights to receive benefits. Stated differently, the members
19  have no constitutional claim predicated upon a speculative fear that valid benefits may not be
20  paid.
21       The undisputed evidence shows that the SDPOA has no claim: The funding component
22  of MP2 did not render the pension system actuarially unsound to such a degree that any benefits
23  to which SDCERS beneficiaries lawfully are entitled are in danger of going unpaid. UMF 40
24  (Testimony of J. Esuchanko) (stating that in the absence of significant adverse effects, so long as

---

system are valid if accompanied by an offsetting comparable new advantage to employees, including changes to the payment of employer contributions); *see also Claypool v. Wilson*, 4 Cal. App. 4th 646, 665-66 (1992) ("The saving of public employer money is not an illicit purpose if changes in the pension program are accompanied by comparable new advantages to the employee.").

LATHAM&WATKINS  SD\571462.6
ATTORNEYS AT LAW
SAN DIEGO
20
CASE NO. 05 CV 1581 H (POR)
MOTION FOR PARTIAL SUMMARY
JUDGMENT RE UNDERFUNDING CLAIMS

1  the unfunded liability is properly amortized and paid, SDCERS will be able to continue paying
2  City employees' retirement benefits into the future). The undisputed evidence further establishes
3  that the *total* amount of underfunding attributable to the City contribution rate stabilization plan
4  contained in *both* MP1 and MP2 is less than $ 150 million. UMF 41. Such a relatively small
5  amount could not in and of itself render SDCERS actuarially unsound—and, indeed, it already
6  has been rectified in the *McGuigan* settlement.[11]

7  Moreover, the SDCERS actuary recently has concluded that SDCERS is able to pay all
8  current beneficiaries, and is capable of servicing planned pension obligation debt to cover any
9  presently accrued liabilities. UMF 42. Remarkably, as of June 30, 2006, the SDCERS funding
10 ratio reportedly is 79.9%, UMF 43, a funding level which is *well-above* the "at-risk" funding
11 ratio guidelines contained in the recently enacted Pension Protection Act of 2005. *See* 26 U.S.C.
12 § 430(i). Thus, as a matter of federal law, by its own accounting, SDCERS presumptively is not
13 actuarially-unsound, and most importantly for constitutional purposes, fully capable of paying
14 benefits when due. Indeed, ***Plaintiffs have not alleged and cannot show a single instance in***
15 ***which they failed to receive a benefit payment when due.***

16 In addition, although MP2 modified the City's required annual contribution to SDCERS,
17 it was accompanied by both comparable new advantages, and contained express mitigating
18 provisions. MP2 modified the City's contribution requirements while at the same time granting
19 City employees substantial new benefits.[12] As explained in a July 3, 2002 Memorandum written

---

[11] Thus, to the extent that the MP2 employer contribution rate stabilization plan caused some component of the pension system underfunding, it has already been remedied. *See* UMF 20.

[12] The City elsewhere has argued that these retirement benefits were unlawfully created and are therefore void. *See SDCERS v. City of San Diego*, San Diego Superior Court No. GIC 841845, Court of Appeal No. D050181 (petition for writ of mandate filed Jan. 25, 2007). Should the City prevail in this contention, because the benefits created under MP1 and MP2 represent the most significant portion of the SDCERS unfunded liability, *see* UMF 44 (total amount of unfunded liability due to increased benefits is $899.3 million), SDCERS funded ratio will increase dramatically, and the soundness of the pension system will increase accordingly. If, however, the increased benefits created by MP1 and MP2 ultimately are adjudicated to be lawful, these benefits would constitute comparable new advantages sufficient to validate any contractual impairment caused by MP2. *See* UMF 45 (Testimony of J. Esuchanko) (stating that the total value of the benefit increases provided under MP2 is $272 million). Thus, either way, the SDPOA's constitutional claim fails.

LATHAM&WATKINS  SD\571462.6
ATTORNEYS AT LAW
SAN DIEGO
21
CASE NO. 05 CV 1581 H (POR)
MOTION FOR PARTIAL SUMMARY
JUDGMENT RE UNDERFUNDING CLAIMS

by Defendant Herring to Lawrence Grissom, the then-SDCERS Retirement Administrator, these benefits could not have been extended to the City's employees absent a modification in the City's contribution rates:

> The City, through labor negotiations, agreed that the 2.50% at age 55 [retirement factor] is an appropriate benefit to bestow. The City, however, was not willing to grant this benefit, given the cost, if at the same time, it might be facing a jump in retirement contribution rates . . . . Consequently, the City agreed *contingent* upon the resolution in this proposal.

UMF 46. The relevant City Ordinances further bear out that the City's employees and retirees were attaining substantial new benefits. UMF 47.

MP2 additionally included mitigating provisions responsive to any potential impairment of the actuarial soundness of the system. MP2 required the City to increase its contributions if, as of June 20 in any fiscal year between 2002 and 2009, the funding ratio fell below 82.3%, pursuant to a legally-defined formula. UMF 48. Thus, even if the SDPOA could establish a violation of California law, either of these factors -- the existence of mitigating provisions and the concurrent creation of new benefits -- necessarily defeats the SDPOA's claim as a matter of law.

In the absence of disputed material facts, supported by competent evidence, that the City's pension system is actuarially unsound such that it is unable to pay all valid pension benefits owed as due, the Contract Clause has not been violated as a matter of law. This Court therefore should grant summary judgment in favor of the City and Individual Defendants on the underfunding portion of the SDPOA's Contract Clause claim.

### 2. Even If a Constitutional Violation Occurred, Under the Circumstances, A Reasonable Official Could Reasonably Have Believed His or Her Conduct Was Lawful

In the absence of clearly established federal (and California) law, the Individual Defendants could not reasonably have known their conduct would violate any of the SDPOA's *federal* constitutional rights. *Davis v. Scherer*, 468 U.S. 183, 197 (1984) (official is entitled to qualified immunity when his conduct does not violate clearly established federal law; whether his conduct violates clearly established state law is irrelevant). In the absence of any federal

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN DIEGO

SD\571462.6

22

CASE NO. 05 CV 1581 H (POR)
MOTION FOR PARTIAL SUMMARY
JUDGMENT RE UNDERFUNDING CLAIMS

1  Individual Defendants have not violated the SDPOA's constitutional rights. In the absence of a
2  constitutional violation, a conspiracy to violate constitutional rights cannot exist as a matter of
3  law. *E.g.*, *Woodrum v. Woodward County*, 866 F.2d 1121, 1126 (9th Cir. 1989); *see also*
4  *Landrigan v. Warwick*, 628 F.2d 736, 742 (1st Cir. 1980) ("While conspiracies may be
5  actionable under section 1983, it is necessary that there have been . . . an *actual deprivation of a*
6  *right secured by the Constitution* and laws.") (emphasis added). Accordingly, this Court should
7  grant summary judgment in favor of the City and Individual Defendants on the SDPOA's Fourth
8  Claim.[15]

## V. CONCLUSION

Based on the foregoing, the City and Individual Defendants respectfully request this Court enter partial summary judgment in their favor with regard to the SDPOA's Second, Third, and Fourth Claims for Relief.

Dated: February 12, 2007

LATHAM & WATKINS LLP

By /s Colleen C. Smith
Colleen C. Smith
colleen.smith@lw.com
Attorneys for Defendants City Of San Diego, Toni Atkins, P. Lamont Ewell, Donna Frye, Bruce Herring, Ralph Inzunza, Cathy Lexin, Jim Madaffer, Brian Maienschien, Scott Peters, Ed Ryan, Michael Uberuaga, Mary Vattimo, Terri Webster, Tony Young, and Michael Zucchet

---

[15] Should the Court grant the City's and Individual Defendants' motions for summary judgment with regard to the SDPOA's § 1983 claims, the SDPOA's supplemental state law claims should be dismissed without prejudice. 28 U.S.C. § 1367(c)(3); *Gini v. Las Vegas Metro. Police Dep't*, 40 F.3d 1041, 1046 (9th Cir. 1994).

LATHAM&WATKINS SD\571462.6
ATTORNEYS AT LAW
SAN DIEGO
25
CASE NO. 05 CV 1581 H (POR)
MOTION FOR PARTIAL SUMMARY
JUDGMENT RE UNDERFUNDING CLAIMS